**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAIRN ENERGY PLC and<br>CAIRN UK HOLDINGS LIMITED,<br><br>          Plaintiffs,<br><br>    v.<br><br>AIR INDIA, LTD,<br><br>          Defendant. | Civil Action No. |

## COMPLAINT

Cairn Energy PLC ("**Cairn Energy**") and Cairn UK Holdings Limited ("**CUHL**," and together with Cairn Energy "**Plaintiffs**"), by and through their undersigned attorneys, bring this action for declaratory judgment against defendant Air India, Ltd. ("**Air India**"), and for a money judgment against Air India, as the alter ego of the Republic of India ("**India**") and therefore jointly and severally liable for the debts and obligations of India itself, and allege as follows:

## NATURE OF THE ACTION

1.    This is an action for declaratory relief against Air India pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to determine and resolve questions of actual controversy involving the relationship between India's wholly-owned national airline, Air India, and India, and in particular, whether Air India is the alter ego of India.  In addition, Plaintiffs seek a money judgment adjudging that Air India is jointly and severally liable to satisfy the judgment Plaintiffs expect to be awarded against India based on a pending petition to confirm an arbitration award issued on December 21, 2020 (the "**Petition to Confirm**" and the "**Award**").

2.    India's control over Air India is wide-ranging, extending throughout Air India's legal existence to its day-to-day operations and its financial affairs.  India displays a dominating hand over Air India in governance matters large and small by, among other things, controlling,

appointing, and having the power to remove Air India's officers and directors; determining whether, when, and from whom Air India acquires fleet equipment; dictating the airline's operational policies, from wages for its employees, to fares charged, and routes to offer; and making regular intrusive demands for information regarding operations.  India entrenches these powers by making Air India dependent on grants, loans, and guarantees from India for its financial survival.

3.        Under federal common law first recognized by the Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("**Bancec**"), a judgment creditor of a foreign sovereign may look to an instrumentality of the sovereign debtor for satisfaction of a judgment either when the instrumentality is "so extensively controlled by its owner that a relationship of principal and agent is created," or when giving effect to the ostensible separate legal status of the state and its instrumentality would work a "fraud or injustice."  *Id.* at 629 (internal citations omitted).

4.        Five so-called "*Bancec* factors" have been developed to aid courts in their analysis: (1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018).  These factors are applied on a case-by-case basis rather than a "mechanical formula" for determining extensive control.  *Bancec*, 462 U.S. at 633.

5.      Here, the extensive control of Air India by India establishes that an alter ego relationship exists between them.  In addition, it would give rise to fraud and result in injustice to give effect to the legal fiction that Air India and India are technically separate.

## THE PARTIES

6.      Cairn Energy is a company organized under the laws of the United Kingdom and located at 50 Lothian Road, Edinburgh, EH3 9BY, Scotland, United Kingdom.

7.      CUHL is a company organized under the laws of the United Kingdom and located at 50 Lothian Road, Edinburgh, EH3 9BY, Scotland, United Kingdom.

8.      Air India is the national airline of India and is a foreign corporation incorporated under the laws of India and wholly owned and controlled by India.  Air India operates in the United States and does substantial business in this judicial district, where its United States operations are headquartered.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1330(a), 1367, 1605(a)(1), and 1605(a)(6).   Air India is a "foreign state" as defined in 28 U.S.C. § 1603. Plaintiffs' claims are based upon the enforcement of an arbitration award issued against India, as well as commercial activities that Air India undertakes in the United States as the alter ego of India.

10.     This Court has personal jurisdiction over Air India pursuant to 28 U.S.C. § 1330(b), which extends personal jurisdiction over a foreign state that is not immune from suit and that has been properly served with process pursuant to 28 U.S.C. § 1608.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(l) because Air India resides and conducts business in this District.  Specifically, Air India's United States operations are headquartered in this District at 570 Lexington Avenue, New York, New York, 10022.  In

addition, Air India holds property in this District against which Plaintiffs expect to enforce their anticipated judgment.

## FACTUAL ALLEGATIONS

12.     The facts of the dispute that gave rise to the Award relate to India's improper retroactive assessment of a capital gains tax on a restructuring transaction undertaken by Cairn Energy, a foreign corporation which conducted business for years in India.

## I.     The Underlying Dispute

13.     On March 14, 1994, the United Kingdom and India entered into the Agreement between the United Kingdom of Great Britain and Northern Ireland and India for the promotion and Protection of Investment (the "**UK-India BIT**").[1]   The UK-India BIT is applicable to "all investments made by investors of either Contracting Party in the territory of the other Contracting Party."[2]

14.     The UK-India BIT also provides a mechanism for settling disputes between an investor and the state where the investor made its investment.[3]   The UK-India BIT provides that a disagreement not settled through amicable negotiations or international conciliation may be referred to arbitration, and further lays out the procedure and requirements of such arbitration.[4] Under the treaty, "[t]he decision of the arbitral tribunal shall be final and binding and the parties shall abide by and comply with the terms of its award."[5]

---

[1]   Ex. 1 (UK-India BIT).

[2]   *Id.*, Art. 2.

[3]   *See id*., Art. 9.

[4]   *Id.*, Art. 9(3).

[5]   *Id.*, Art. 9(3)(c)(v).

15.     The Cairn Energy Group began its oil and gas exploration and development activities in India 25 years ago.  Cairn Energy made significant investments in the Indian states of Andhra Pradesh, Gujarat, and Rajasthan, creating thousands of jobs and contributing more than US $3 billion to the Indian economy before it sold the majority of its interests in 2011.  In Rajasthan alone, Cairn's oil and gas discoveries have generated revenues of approximately US $20 billion for India since production started in 2009, and, during the development of the infrastructure in Rajasthan, 16,000 people were employed.

16.     In 2006, Cairn Energy—which held its worldwide assets outside of India—decided to consolidate its Indian assets under an Indian holding company, Cairn India Limited ("**CIL**"), and offer the shares of that company for public sale through an initial public offering on the Bombay Stock Exchange.

17.     To effect this consolidation, Cairn Energy engaged in a series of corporate transitions to separate its non-Indian assets, which were consolidated in a separate holding company, from the Indian assets to be held by CIL (the "**2006 Transactions**").

18.     The 2006 Transactions involved the transfer of shares in non-Indian companies and were not taxable under then-existing Indian tax law—which applied capital gains tax only to the transfer of assets situated in India, including shares in Indian-incorporated companies.   In structuring the 2006 Transactions, Cairn Energy complied with all applicable laws and regulations in India and fully disclosed the details of the Transactions to all relevant Indian agencies.  The 2006 Transactions were approved by India in 2006, and at no point during that process did India ever suggest that any capital gains tax was due as a result of the 2006 Transactions.

19.     Between 2009 and 2011, CUHL sold a substantial portion of its shareholding in CIL to Petronas International Corporation Limited and Vedanta Resources Plc.  At the time of

these transactions, India never suggested that CUHL was required to pay capital gains tax as a result of the 2006 Transactions.

20.     Years later, in November 2013, Cairn Energy publicly announced that it was contemplating participating in CIL's share buy-back program.  Cairn Energy's announcement that it may exit from the Indian market by selling its last remaining Indian asset at the time (its shares in CIL) immediately triggered a series of sham audits by the Indian income tax authorities, and the supposed "discovery" by those authorities of the very share transfers that had been fully disclosed to India in 2006.

21.     Ultimately, India retroactively applied an amendment to the Indian taxation laws expanding the scope of India's tax jurisdiction (the "**2012 Amendment**") to revive tax reviews and initiate sham investigations into the 2006 Transactions.  India's purported investigations into the years-old and previously fully disclosed transactions led to India's assessment of taxes, penalties, and interest on Plaintiffs amounting to over US $4 billion on account of the 2006 Transactions.

22.     To satisfy the tax assessment, India unilaterally seized Plaintiffs' shares in CIL days before Cairn Energy was to sell the shares into the buy-back program, and withheld hundreds of millions of dollars in tax refunds to meet the tax capital gains tax assessed.

## II.    Plaintiffs' Initiation of the Arbitration and the Tribunal's Award Against India

23.     Plaintiffs initiated an Arbitration against India on September 22, 2015, challenging these measures.  A three-member tribunal (the "**Tribunal**") was appointed as provided under Article 9 of the UK-India BIT, with Mr. Laurent Lévy serving as the Presiding Arbitrator. Plaintiffs' position in the Arbitration was that India breached its obligations under the UK-India BIT to treat Plaintiffs' investment fairly and equitably through its retroactive application of the

2012 Amendment as a basis for retroactively taxing the 2006 Transactions and by attaching and enforcing against CUHL's assets to satisfy the tax obligations alleged to arise out of the tax demand.

24.     India was present at and represented by counsel throughout the Arbitration.  The Tribunal held an evidentiary hearing from August 20 to 31, 2018, in The Hague, Netherlands.

25.     On December 21, 2020, the Tribunal issued its 568-page unanimous Award in Plaintiffs' favor.  The Tribunal held that India breached its obligations under the UK-India BIT's fair and equitable treatment provision by applying the 2012 Amendment to India's tax law retroactively and undertaking enforcement actions against Plaintiffs' assets.  The Tribunal found that India failed adequately to balance Plaintiffs' protected interest with India's power to regulate, as such application lacked any specific justification and thus deprived Plaintiffs of their ability to plan their activities in consideration of the legal consequences of their conduct.  On this basis, the Tribunal ordered India to withdraw its unlawful tax demand.

26.     The Tribunal also calculated Plaintiffs' monetary losses suffered as a result of India's treaty breaches as totaling approximately US $1.2 billion and issued a monetary award for that amount, plus interest.

27.     Plaintiffs have been unable to collect on the Award from India.  Despite Plaintiffs' multiple requests for payment and the fact that India was obligated to satisfy the Award immediately, having agreed in the UK-India BIT that it will "abide by and comply with the terms of [the arbitral tribunal's] award,"[6] India has failed to pay anything or to comply with the Tribunal's order to withdraw the tax demand.[7]

---

[6]  Ex. 1, Art. 9(c)(v) (UK-India BIT).

[7]  India has filed a writ in the Netherlands seeking the annulment of the Award.  This proceeding remains pending.

**III.**   **Pending Petition to Confirm the Award and Anticipated Judgment Against India**

28.     On February 12, 2020, Plaintiffs brought the Petition to Confirm the Award in the proceeding captioned *Cairn Energy PLC and Cairn UK Holdings Limited v. Republic of India*, 1:21-cv-00396-RJL (D.D.C. Feb. 12, 2020).  In the Petition to Confirm, Plaintiffs seek entry of (i) an order recognizing and confirming the Award; and (ii) a money judgment against India in an amount equal to the full amount of damages and interest under the Award, as well as post-judgment interest, attorney's fees, and costs.

29.     The Petition remains pending.  Currently, Plaintiffs are taking steps to effect service of process on India under The Hague Service Convention, which is expected to take several months.  Once service is complete, it is anticipated that the Petition to Confirm will result in a money judgment against India in favor of Plaintiffs.  As soon as a judgment against India is issued in the District of Columbia, Plaintiffs expect to register the judgment in this District and pursue enforcement efforts against India's property located in New York.

30.     Plaintiffs have also initiated proceedings in numerous other locations around the world seeking recognition and enforcement of the Award.  India continues to refuse to pay the amounts due.

**IV.**   **Air India Is India's Alter Ego.**

31.     In this action, Plaintiffs seek a ruling that Air India is the alter ego of India and that it should be held jointly and severally responsible for India's debts, including from any judgment resulting from recognition of the Award.

32.     Where a state-owned entity like Air India is so extensively controlled by its sovereign parent that a principal-agent relationship exists between them, or when giving effect to the nominal separateness of the state-owned entity would work fraud or injustice, courts have held

that the state-owned entity may be held liable for the debts of the state, and *vice versa*.  *See Bancec*, 462 U.S. at 629.  As described below, India dominates Air India's activities to such an extent that its relationship with Air India is clearly one of principal-agent.

33.     India's extensive control over Air India is undeniable and the facts presented below more than satisfy the *Bancec* standard, which considers: (1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018).

34.     *First*, India exerts a high level of economic control over Air India.  Not only does India support Air India financially through grants, capital contribution, guarantees, loans, and special tax treatments, but India essentially controls Air India's access to other sources of funding, including private bank loans; Air India's earnings from air service operations, including by regulating fares and routes; as well as Air India's spending.  Therefore, India enjoys control over all aspects of Air India's financial affairs.

35.     *Second*, Indian government officials manage the airline and control its day-to-day operations.  As detailed below, India appoints Air India's leadership, sets their pay, and has the power to remove them from their position.  Unsurprisingly, this has led to an Air India Board of Directors dominated by government officials, and to the prompt removal of Directors or managers who criticize India's micromanagement of the airline.  India's control over Air India's daily operations extends to the most mundane matters—such as pest control—and includes employee grievances, passengers' complaints or suggestions, setting of routes, and determination of fares

and schedules.  The government holds performance reviews and intrusive audits of Air India, closely monitoring the airline and giving directives into myriad aspects of Air India's functioning at these proceedings, such as aircraft acquisition; lease of aircraft; route planning; flight operations; flights incidents/delays; customer service complaints; recruitment; labor and wages, to name a few.

36.     *Third*, all of Air India's profits and losses are borne by India.  Air India has run continuous losses since it was merged with Indian Airways, and the government has covered all of those losses.  India also guarantees Air India's loans.  In return, Air India provides India with valuable services by upgrading government employees' tickets for free, delaying collection of outstanding payments, and purchasing specially made aircraft exclusively for government VIP service.

37.     *Fourth*, India is the real beneficiary of Air India's conduct.  India forces Air India to undertake uneconomic transactions to accomplish foreign policy goals, to fly routes that generate more losses than revenues for its own political and diplomatic purposes, and to give government officials perks on its airlines.  India also freely transfers Air India's debts and assets to itself or to companies wholly-owned by it.  If Air India were run as a truly independent juridical entity, it would have gone out of business well over a decade ago.  It is kept in existence only to further India's interests.

38.     *Fifth*, the distinction between Air India and India is illusory, and respecting those differences would inequitably allow India to shield its assets from creditors.  India does not observe corporate formalities but rather stacks the Board of Air India with politicians and civil servants, all the while India dictates the airline's every-day policy decisions at every level.  Government revenue—including the revenue taken from Plaintiffs—is funneled into Air India to keep this

unprofitable enterprise running.  And India would inevitably offset any judgment entered against Air India by contributing cash to the company.  It would, as a result, be inequitable to treat Air India as a separate corporate entity when India does not treat it the same way.

**A.**     **India Air Was Established as, and Has Always Been, an Alter Ego of India.**

39.     Air India is not a typical state-owned airline.  By operation of its internal law and the Articles of Association under which Air India was created, India has full functional, administrative, and economic control over Air India and controls its operations through its Ministry of Civil Aviation (the "**MoCA**").  From the time of its nationalization to the present day, India has always treated Air India as an integral part of the state itself, not a separate company with independent personality.

40.     India's involvement in Air India dates back to 1948 when it acquired 49% of Air India's shares from the Tata Group, which had established Air India in the 1930s.  The government took full control of Air India in 1953 through the Air Corporations Act of 1953 (the "**1953 Act**"), which nationalized the private airlines then in existence in India and established two statutory corporations in their place: Air India International (which flew to international destinations from India) and Indian Airlines (for domestic travel).[8]  The 1953 Act made Air India the sole Indian carrier permitted to operate on virtually all international routes, and gave Indian Airlines a monopoly over all domestic flights.  It transferred all existing airline routes in India to these corporations, made employees of preexisting airlines employees of Air India International and Indian Airlines, and made it illegal for any other airline company incorporated in India to operate in India without the permission of India.[9]

---

[8]   *See* Ex. 2 § 3(1) (excerpts of The Air Corporations Act of 1953).

[9]   *See id.* §§ 16–19.

41.     The 1953 Act made Air India and Indian Airlines mere appendages of the Indian government.  Under the 1953 Act, India had authority to appoint not only the Chairman of the Board, but every single Director serving on it, as well as the power to direct the hiring of certain employees for both companies.[10]  Section 34 gave the government the power to give any binding directions to the corporation, including but not limited to directing the corporation to implement airline routes and discontinue others, and to exercise veto power over any corporate action.[11]  Government approval was required to appoint the Managing Director, determine and levy fares and freight rates, borrow money, make capital expenditures, dispose of property, or enter into a lease exceeding 10 years.[12]  India could also transfer airline routes and property between Air India and Indian Airlines.[13]

42.     The Air Corporations (Transfer of Undertakings and Repeal) Act of 1994 (the "**1994 Act**") repealed the 1953 Act and eliminated the airlines' parallel monopolies—allowing private airlines to compete against both Air India and Indian Airlines.[14]  The 1994 Act also reconstituted the airlines as joint-stock Government Companies under the Companies Act of

---

[10]   *See id.* § 4(1)(A), 20(2).

[11]   *See id.* § 34.

[12]   *See id.* §§ 8, 10, 35.

[13]   *See id.* § 39.

[14]   *See* Ex. 3 § 11 (The Air Corporations Act of 1994).

1956,[15] which were still fully owned by India.[16]  But the 1994 Act did not take away India's power over the day-to-day operations of Air India and Indian Airlines.  Section 9 of the Act specifically preserved India's power to give both companies binding directions.[17]

43.    India propped up Air India against its domestic competitors throughout the 1990s. As detailed further below, India provided repeated capital contributions to help minimize Air India's debt and routinely guaranteed Air India's loans, while failing to collect the guarantee fees that it would charge other companies for this service.[18]

44.    Despite these subsidies, Air India and Indian Airlines still could not compete against their domestic rivals, and operated at net losses throughout the 1990s and 2000s.[19]

45.    India ultimately attempted to bail out both companies by merging them in April 2007 to form the National Aviation Company of India Ltd.[20]—which was renamed to "Air India Limited" in 2010.  It is still colloquially known as "Air India."

---

[15]  The Companies Act of 1956, contained a special category of "Government Companies"— defined as "any company in which not less than fifty-own per cent of the paid-up share capital is held by the Central Government" or other Indian governmental entity—to which special provisions applied.  *See* Ex. 4 § 617 (excerpts of The Companies Act of 1956).  Similar provisions exist under the current The Companies Act of 2013.  Ex. 5 §§ 394–95 (excerpts of The Companies Act of 2013).

[16]  *See* Ex. 3 § 3 (The Air Corporations Act of 1994).

[17]  *See id.* § 9.

[18]  *See infra* Section IV(D)(2).  A 2006 Parliamentary Commission revealed that the government had not collected guarantee fees from Air India from 1989 to March 2004, Ex. 6 ¶ 6 (MoCA, Public Accounts Committee, 2006–2007, 14–30: "Non-Recovery of Guarantee Fee from Air India and Indian Airlines" (Aug. 7, 2006)), and the company's recent most recent financial statements confirm that this practice has persisted.

[19]  *See* Ex. 7 ¶ 3.4 (MoCA, Public Undertakings Committee, 2009–2010, 15–4: "National Aviation Co of India Ltd.—Merged Entity of Erstwhile Air India and Indian Airlines" (Jan. 20, 2010)).

[20]  *Id.* ¶ 1.1.

46.     The merger of Air India and Indian Airlines illustrates the extent of India's control over every aspect of Air India's business.  As a 2010 Parliamentary panel explained, the merger was "flawed," "ill-conceived," and "[not] arrived at by the two Airlines on their own accord."[21] The planned merger originated as a concept paper prepared at the behest of the MoCA and was ultimately approved by the Indian Prime Minister and the Cabinet.[22]  A government committee chaired by the Defense Minister determined the roadmap for the merger.[23]  The MoCA took responsibility for communicating with the rank and file of the merged companies, and met repeatedly with the employees' union representatives.[24]  India also harmonized compensation and other benefits for employees, and to supervise the process, appointed a commission made up of a retired Indian Supreme Court justice, two civil servants, and an academic.[25]  In short, the merger was a consequence of and further solidified India's day-to-day control over all aspects of Air India's business.

**B.     India Maintains Control through Its Economic Ownership and Air India's Corporate Charter.**

47.     Even after the 1994 deregulation and the 2007 merger, India continued to describe Air India as "a symbol of the State."[26]  To this day, India owns 100% of Air India, and can (and does) control essentially everything it does.

---

[21]   *Id.* at 110.

[22]   *See* Ex. 8, at 55 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)); Ex. 9, at 39 (Comptroller and Auditor General, Performance Audit Report (2011)).

[23]   Ex. 9, at 38 (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)).

[24]   *See* Ex. 8, at 68–69 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

[25]   *Id.* at 64.

[26]   Ex. 9, at 121 (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)).

48.     India maintains the power to appoint all members of the Board of Directors, including the Chairman of the Board, to dictate the length of their terms, to set the their remuneration,[27] and to remove them for any reason.[28] India is also permitted to appoint Air India's Managing Director and determine the Managing Director's remuneration.[29]

49.     The current regime also preserves India's power to regulate Air India's affairs, including the authority to issue any directives to the company.[30]

50.     As explained in more detail below, the MoCA continues to oversee and monitor day-to-day operations, including those most central to Air India's operation.  For example, India requires government approval of all international routes.  The MoCA makes "suggestions" for all domestic routes which, on information and belief, Air India interprets as directives.[31]  Most of Air India's routes (domestic and international) operate at a loss.[32]  Additionally, the Directorate General for Civil Aviation (India's aviation sector regulator) is required to take into consideration Air India's operational plans before allocating routes to other airlines.[33]  As of 2009, only thirteen of its routes (5% of its total routes) were profitable.[34]  By November 2014, only nine of its routes

---

[27]  *See* Ex. 10 § 106 (Articles of Association of Air India Ltd. (Nov. 8, 2019)).

[28]  *Id.* §§ 97, 115.

[29]  *Id.* §§ 130–31.

[30]  *Id.* § 161.

[31]  Ex. 7 ¶¶ 5.1, 5.17 (MoCA, Public Undertakings Committee, 2009–2010, 15–4: "National Aviation Co. of India Ltd. – Merged Entity of Erstwhile Air India and Indian Airlines" (Jan. 20, 2010)).

[32]  Ex. 9, at xv (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)).

[33]  Ex. 11 ¶ 3.6 (Director General of Civil Aviation, Guidelines for Grant of permission to Indian Air Transport Undertakings for Operation of Scheduled International Air Transport Services (March 15, 2017)).

[34]  Ex. 12 (*The Time For Talking Is Over*, BUSINESSWORLD (Aug. 16, 2009)).

made a profit.[35]  Sunil Arora, former Managing Director of Indian Airlines and a board member of Air India, complained that the MoCA barred Indian Airlines from flying on financially viable routes, and that those routes were instead snapped up by their competitors.[36]

51.     The private sector recognizes that India continues to dominate Air India to its detriment.  In 2018, India sought to partially divest Air India, offering 76% of its shares for sale, but received no bids.[37]  As *The Economist* explains, investors stayed away from the bidding process because they suspected that India would use its anticipated remaining 24% ownership interest to "keep meddling after the sale to stop job losses ahead of next spring's general election."[38]

### B. Air India's Leadership Is Comprised of Government Officials and Persons Who Have Strong Links with the Government.

52.     As mentioned above, India is bestowed with the power to appoint and replace Directors, determine their remuneration, appoint the Chairman of the Board and appoint Managing Director.

53.     Sunil Arora, former Air India Board member and Indian Airlines Managing Director, explains:

> ***Board meetings of Air India … [are] a farce.***  Instructions on key
> agenda items are communicated beforehand on telephone or

---

[35]   Ex. 13, at 4 (Lok Sabha Question 81 (Nov. 25, 2014)).

[36]   *See* Ex. 14 (*Praful Patel, Aide Sunk Air India, Former Indian Airlines Chief Says*, TIMES OF INDIA (Aug. 17, 2002)); Ex. 15 (*The Praful Patel Guide to Destroying AI*, FIRSTPOST (July 1, 2011)); *see also* Ex. 16 ¶¶ 117–20 (Department-Related Parliamentary Standing Committee on Transport, Tourism and Culture, Merger of Public Accounts Committee, "One Hundred Fifty First Report On Merger of Indian Airlines and Air India: Its Impact on the Civil Aviation Sector" (Jan. 21, 2010)) (listing international and domestic routes from which Air India withdrew service that were taken up by private sector competitors).

[37]   *See* Ex. 17 (*Air India Sale Gets No Bid, Exposes Hurdles For Modi's Divestment Drive*, REUTERS (May 31, 2018)).

[38]   Ex. 18 (*Plans To Privatise India's Flag-Carrier Have Run Into Turbulence*, THE ECONOMIST (June 9, 2018)).

personally by [the] Minister [of] Civil Aviation or by his [Officer on Special Duty].   No suggestions to the effect, that the issue in question requires a more detailed examination or that there are some implications, are countenanced.   ***The key word is 'immediate and unquestioned compliance*.'[39]**

54.     Before one Board meeting at which plans to lease property were discussed, for example, the Minister of Civil Aviation informed Mr. Arora "that since he and Secretary, Civil Aviation were satisfied about the correctness of the plans, it is expected that we should immediately endorse it during the Board Meeting."[40]  When Mr. Arora stated that the proposed lease "raise[d] some issues, [he] was curtly asked to endorse the proposal," and was asked by the Minister "when the Minister and the Secretary himself are satisfied, what more is there for [the Directors] to see?"[41]

55.     In another Board meeting, the Board was asked to approve a Rs 4 billion expenditure (the current equivalent to US $54 million)[42] to refurbish airplanes without any cost-benefit analysis done on the proposal, based solely on the say-so of the Minister of Civil Aviation. The Minister even called Board members in advance of the meeting and told them "that the item in question ha[d] to be approved immediately."[43]

---

[39]  Ex. 14 (*Praful Patel, Aide Sunk Air India, Former Indian Airlines Chief Says*, TIMES OF INDIA (Aug. 17, 2012)) (emphases added).

[40]  *Id.* (capitalization altered).

[41]  *Id.*

[42]  All Rs-USD calculations use the present exchange rate, unless otherwise noted.

[43]  VINOD RAI, NOT JUST AN ACCOUNTANT: THE DIARY OF THE NATION'S CONSCIENCE KEEPER (Kindle Locations 3277–82) (2014).

56.     Vinod Rai, the former Comptroller and Auditor General of India, has observed that it was commonplace for Air India Board members to receive "telephonic instructions from the minister or his representative on what decision to take" at Board meetings.[44]

57.     As a consequence of India's extensive interference in day-to-day operations, Air India has been unable to attract and retain talented officers.  In 2011, for example, Air India's Chief Operating Officer Gustav Baldauf, an outsider with significant experience in the global airline industry, complained that "the government plays [] too prominent a role in operations."[45] He made this statement after India prohibited him from international travel in the course of his duties.[46]  India ultimately forced him to resign.[47]

58.     India also uses its power of appointment to stack the board with civil servants and politicians with no experience in the airline industry, rather than businessmen and women with relevant industry knowledge.  As *The Economist* explains, India's inexperienced yet connected Board appointments ensure that Air India's leadership will not act independently to benefit the company, but rather remains "pliant" to political interference to benefit politicians.[48]

59.     A 2010 report by the Parliamentary Committee on Transport, Tourism, and Culture found that India has consistently appointed "generalist" civil servants as Air India's Managing

---

[44]  *Id.* (Kindle Locations 3240–42).

[45]  Ex. 19 (*Show Cause Notice To AI's COO Baldauf For His Reported Remarks*, ECONOMIC TIMES (Feb. 24, 2011)).

[46]  *See* Ex. 20 (*Air India Clips COO, CTO's Wings*, ECONOMIC TIMES (Feb. 15, 2011)).

[47]  Ex. 19 (*Show Cause Notice To AI's COO Baldauf For His Reported Remarks*, ECONOMIC TIMES (Feb. 24, 2011)).

[48]  *See* Ex. 21 (*Most of India's State-Owned Firms Are Ripe For Sale Or Closure*, THE ECONOMIST (June 3, 2017)).

Director, rather than "technocrats and knowledge experts."[49]  That same report found that Air India's Directors were often appointed for short periods of time ("some even for a few days") and lacked any "substantive expertise," and that at the time of the report, there were no "professionals [or] independent Directors on the Board."[50]

60.     Four of the nine present day Directors are current or former politicians and civil servants, four are current Air India officers, and every one of the nine has substantial government ties.[51]

61.     The Chairman of the Board and Managing Director of Air India, Rajiv Bansal, is a senior civil servant and an officer belonging to the Indian Administrative Service, India's principal civil service comprised of career bureaucrats who administer central government ministries, departments, agencies, and corporations.[52]  Two other Directors, Vimalendra Patwardhan and Satyendra Kumar Mishra, are also senior civil servants nominated by the MoCA—the Indian department responsible for supervising and regulating the airline industry, including Air India.[53]

---

[49]  Ex. 16 ¶ 162 (Department-Related Parliamentary Standing Committee on Transport, Tourism and Culture, Merger of Public Accounts Committee, "One Hundred Fifty First Report On Merger of Indian Airlines and Air India: Its Impact on the Civil Aviation Sector" (Mar. 3, 2010)).

[50]  *Id.* ¶ 157.  This is a longstanding problem: a 2003 parliamentary committee report criticized Air India for failing to "professionalize[]" (*i.e.*, appoint "professional managers in industry and trade with a high degree of proven ability") the "Board of Directors for Air India" in accordance with guidelines applicable to public sector enterprises.  Ex. 22, at 20–21 (Eleventh Report: Committee on Public Undertakings (2003–2004) (Dec. 17, 2003)).

[51]  *See* Ex. 23 (Board of Directors, AIR INDIA).

[52]  *See* Ex. 24 (*Rajiv Bansal is Air India's next chairman and managing director*, HINDUSTAN TIMES (Sept. 15, 2020)).  In April 2020, India's cabinet of ministers upgraded Mr. Bansal to a rank equivalent to a secretary to the government (the senior-most position available to officers working for the government).  Ex. 25 (*Government Promotes Air India Chief Rajiv Bansal To Secretary-Level Rank*, FINANCIAL EXPRESS (Apr. 26, 2020)).

[53]  *See* Ex. 26 (*Air India may send 5000 employees on compulsory leave*, INDJOURNALS (July 16, 2020)).

Daggubati Purandeswari, an "independent Director," is a former member of Parliament.[54]  Vinod Hejmadi is Air India's present Chief Financial Officer, Amrita Sharan is Air India's Director of Personnel, Meenakshi Mallik is Director of Commercial, and R.S. Sandhu is Director of Operations.[55]

62.    The other ostensibly "independent Director" is Kumar Mangalam Birla, the chairman of the Aditya Birla Group, who has been nominated by India to the Board of Directors of other government-managed or -controlled institutions and has led several government task forces in the past.[56]

63.    India also preserves its control with high turnover among its officers.  As of January 2010, for example, a parliamentary committee found that in the two-and-a-half years since the 2007 forced merger, there had been "four changes in Chairman and Managing Director, five changes to head of Commercial Department, three changes to head of Cargo Handling and multiple changes in IT, industrial relations, planning, procurement, Engineering and most other functional areas.…  This has resulted in the impairment of the entire decision making process."[57]

---

[54]  *See id.*

[55]  *See* Ex. 23 (Board of Directors, AIR INDIA).

[56]  *See* Ex. 27 (Mr. Kumar Mangalam Birla, ADITYA BIRLA GROUP).

[57]  Ex. 16 ¶ 163 (Department-Related Parliamentary Standing Committee on Transport, Tourism and Culture, Merger of Public Accounts Committee, "One Hundred Fifty First Report On Merger of Indian Airlines and Air India: Its Impact on the Civil Aviation Sector" (Mar. 3, 2010)).  These are longstanding problems.  *See, e.g.*, Ex. 28 ¶ 8.1 (Fourth Report: Committee on Public Undertakings, 2000–2001, 13–4: "Air India Limited: Ministry of Civil Aviation" (Feb. 7, 2001)) (observing that Air India's "Managing Director is the only person… professionally conversant with the airlines business in the current Board of Directors which consists of four Government Directors and one professional manager").

64.    Even government officials have recognized that, in reality, Air India is not yet a "board managed company."[58]

**C.    India Dictates Air India Policy and Manages It on a Day-to-Day Basis.**

**1.    Indian Law Grants India Broad Control over Air India's Operations.**

65.    Under Article 77(3) of the Constitution of India, India formulated the Business Allocation Rules to identify and allocate administrative duties amongst the ministries and departments of the government.[59]  Pursuant to the Business Allocation Rules, Air India and other similar corporations have been allocated to the administrative control of the MoCA.  Matters relating to Air India and its subsidiaries subject to the administrative control of the MoCA include:

(i)     General policy and allied matters;

(ii)    Constitution of [the] Board of Directors;

(iii)   Administrative matters including deputations/delegations/ training; request for posting/transfers/promotion/housing; SC/ST matters etc; verification of characters & antecedents of employees;

(iv)    Air India employees service regulations/rules, and amendments /interpretations thereof;

(v)     Financial matters including five years/annual plans, annual reports and [a]ccounts, budgetary support/[f]inancing arrangements for capital expenditure/[g]ovt. [g]uarantees;

(vi)    Investments proposals including purchase/ lease purchase/lease of aircraft and equipment; investment of funds abroad; duty exemptions;

(vii)   Performance review/monitoring of targets;

(viii)  Labour welfare; wage revision; strikes/[i]ndustrial disputes; [g]rievances of employees;

---

[58]  Ex. 29 (*Government Working On New Turnaround Plan For Air India*, INDIAN EXPRESS (Sept. 7, 2018)).

[59]  Article 77(3) of the Constitution of India states, "The President shall make rules for the more convenient transaction of the business of the Government of India, and for the allocation among Ministers of the said business."  Ex. 30, Art. 77(3) (excerpts of INDIA CONST.).

(ix)    Matters relating to fares and freight rates/concessional fares;

(x)     Grant of free/concessional passages and transportation of cargo;

(xi)    Matters relating to air services/carriage of cargo; priority quota of [s]eats;

(xii)   CSA/passenger/cargo [s]ervices agents and related matters;

(xiii)  Advisory [c]ommittees, passenger facilitation;

(xiv)   Passengers' complaints/suggestions;

(xv)    Board meetings;

(xvi)   VIP references on matters handled in the Section;

(xvii)  International operations of Air India except the "designation" and utilization of entitlements/traffic rights' available for Indian carriers;

(xviii) Deputation/delegation of Air India and its subsidiaries officials for participation in conferences/meetings on matters with ICAO and Bilateral air agreements;

(xix)   Directions to Air India (on [i]nternational [s]ervices) for grant of free/concessional air passage/air transportation;

(xx)    Annual Reports and laying of accounts before Parliament.[60]

66.   The MoCA is also in charge of "[l]egal matters and court cases, audit reports/observations," "Parliament [q]uestions, reports of Parliamentary [c]ommittees and other related matters," "[m]eetings of [c]ommittee constituted" and "[d]rafting of legislation" in relation to the subjects listed above in paragraph 65, "[d]ivestment, allocation of shares, issues of bonds etc of Air India," and "[p]ermission to travel by [p]rivate [a]irline by [g]overnment [s]ervants/[o]fficers."[61]

---

[60]  Ex. 31, at 6 (MoCA, Functions Allocated to the Ministry and Their Distribution among Sections (June 23, 2014)).

[61]  *Id.* at 7.

67.     India's sweeping control over Air India as contemplated in the Business Allocation Rules is realized all along the MoCA's bureaucratic ladder.  As noted in paragraph 61, two of Air India's Directors are senior Indian civil servants.  The Government of India (Transaction of Business) Rules, 1961, require that the appointment of the Chairman and the Boards of "State-owned public corporation[s]" like Air India be approved by India's Cabinet of Ministers.[62] Subjects ranging from appointment and delegation of Air India's officials to disposal of aircraft, labor and wages agreements, industry disputes, and legal matters are allocated to different administrative channels at the MoCA and overseen respectively by the Minister, the Secretary, the Joint Secretary, the Under Secretary, or the Central Public Information Officer.[63]  The MoCA also holds regular performance review meetings and issues Annual Plans, and Monthly/Quarterly Performance Reports to closely monitor and navigate the operation of Air India.[64]

68.     For its part, the Indian Parliament intimately scrutinizes the MoCA's management of Air India, and regularly examines and discusses Air India's performance and operations in parliamentary sessions.  Much of this examination takes place during the "Question Hour," the first hour of the Parliament's sitting session, which is customarily devoted to questions that Members of Parliament raise about any aspect of administrative activity to specific Ministers. Members of the Indian Parliament frequently seek information on myriad aspects of Air India's functioning, such as aircraft acquisition; lease of aircraft; route planning; flight operations; flights incidents and delays; customer service complaints; recruitment; labor and wage, to name a few.[65]

---

[62]  Ex. 32, at 14 (Government of India (Transaction of Business) Rules, 1961).

[63]  Ex. 33, at 4 (MoCA, Consolidated Departmental Instructions on the Channel of Submission and Level of Final Disposal of Various Cases (June 1, 2014)).

[64]  *Id.*

[65]  *See generally* Ex  13 (Lok Sabha Questions Compilation).

In addition, parliamentary committees "examine [Air India] and hold discussions on its functioning and performance from time to time apart from giving suggestions and recommendations relating to the activities of Air India" in order to ensure that "policies and activities of [Air India] are … under constant scrutiny of the public through [this process]."[66]

69.     India also exercises control over Air India's business operations by conducting regular audits of Air India's accounts and performance.  Sections 139(5) and 143(5) of the Companies Act of 2013 empower the Comptroller and Auditor General of India to (i) appoint the auditor of a Government Company (such as Air India) and (ii) to direct such auditor as to the manner in which Air India's accounts are to be audited.[67]  Under Section 394 of the same Act, the Comptroller and Auditor General of India performs comprehensive reviews of Air India's accounts and operations and issues reports to the President of India and each House of the Parliament.[68] The Comptroller and Auditor General of India audits the accounts of (i) the union government, (ii) state governments,[69] and (iii) government-owned companies.  The Comptroller and Auditor General submits its audit reports to the government, which in turn submits these reports to Parliament for its review.

70.     For example, in the 2011 Performance Audit Report,[70] India examined and commented on, among other things, aircraft acquisition (pp. 5–35), revenue parameters (pp. 87–88), aircraft leases (p. 91), cargo operations (pp. 92–93), route strategy (pp. 93–98), customer

---

[66]   Ex. 34 (excerpts of Air India's Right to Information Manual).

[67]   *See* Ex. 5 §§ 143(5)-(6) (excerpts of Companies Act of 2013); *see also* Ex. 35 § 57 (Comptroller and Auditor General Regulations on Audit and Accounts (Amendments) 2020).

[68]   *See* Ex. 5 § 394 (excerpts of Companies Act of 2013).

[69]   India has a quasi-federal form of government, with power divided between the government at the national level (the so called the "union" or "central" government) and state governments.

[70]   Ex. 9 (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)).

service (pp. 98–99), publicity and sales promotion (pp. 99–101), financial performance (pp. 104–109), and Air India's revenue management system (p. 110).

71.    The 2017 Performance Audit Report examined and gave recommendations on aircraft availability, deployment and utilization of aircraft, management of bilateral agreement with foreign airlines and slot management, network and route strategy, human resources management, hiving off certain business to subsidiaries, IT systems, passenger service, and operational performance.[71]  These periodic performance audits supplement the Comptroller and Auditor General's responsibility for appointing Air India's statutory auditors for its annual accounts, "direct[ing] … the manner in which the accounts … are required to be audited," and providing any comments or follow-up.[72]

### 2.    India Subordinates Air India's Operations to Its Political Interests.

72.    India often subordinates Air India's business interests towards its foreign policy objectives, government officials' corrupt personal interests, and bizarre pet projects.

73.    In 2002, for example, India transferred three Air India planes to Afghanistan's national airline as part of the government's initiative to rebuild Afghanistan.[73]  India's foreign minister presented this gift during an official trip to Kabul, in which he announced that India would donate the airplane he arrived in.[74]

74.    In 2013, a Canadian court convicted a Canadian-Indian individual for conspiring to bribe the Indian Minister of Civil Aviation to use his official position to force Air India to award

---

[71]  Ex. 36 (Comptroller and Auditor General, Performance Audit Report (Mar. 10, 2017)).

[72]  *See* Ex. 5 §§ 143(5)-(6) (excerpts of Companies Act of 2013).

[73]  *See* Ex. 37 (*India Gifts 3 Airbus Aircraft To Afghanistan*, REDIFF.COM (May 7, 2002)).

[74]  *See* Ex. 38 (*Indian Official Comes Bearing Gift For Afghan Airline*, L.A. TIMES (Aug. 11, 2002)).

a US $100 million contract to a biometric security company.[75]  Although the bribery scheme fell

apart after an initial payment to the Minister was made, the conspiracy illustrates the extent of the

MoCA's real and perceived control over Air India's business decisions.

75.     And in June 2002, the Minister of Civil Aviation dictated that Air India offer

executive class passengers ayurvedic massages during flights.[76]  It took four months for Air India

to scrap this plan, only after the masseurs, state tourism officials, and aviation experts inundated

the Minister with obvious technical flaws in the plan, including that the massage oils were pungent

and would disturb other passengers, it is impossible to receive massages in seated positions,

passengers would require showers mid-flight to wash the massage oil off, and the massage oil was

combustible and not suitable for aircraft use.[77]

76.     A particularly egregious example of governmental intrusion into Air India's day-

to-day operations is the MoCA's involvement in the negotiation of Air India's purchase of 68

aircraft from US-based Boeing Corporation ("**Boeing**") during 2004–2006—the largest aircraft

purchase in India's civil aviation history.[78]  That incident illustrates how political and diplomatic

considerations, rather than necessity or economic benefits for the company, drive Air India's

aircraft acquisitions and route planning.

77.     When India and the United States started discussing nuclear cooperation between

the two countries in the early 2000s, forty-three members of the US Congressional Caucus on India

---

[75]   *See* Ex. 39 (*R. v. Karigar*, 2013 ONSC 5199 (Ontario Sup. Ct.)); Ex. 40 (*Canadian accused of bribing cabinet minister in India*, GLOBE AND MAIL (Feb. 1, 2012)).

[76]   Ex. 41 (*Ayurvedic Massages on Board A-I*, ECONOMIC TIMES (June 15, 2002)).

[77]   Ex. 42 (*No Massages For Air-India Passengers*, FINANCIAL EXPRESS (Oct. 21, 2002)).

[78]   Ex. 9, at 5–14 (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)); Ex. 43 (*Air India Buys 68 Planes From McNerney's Boeing*, FORBES (Jan. 11, 2006)).

and Indian Americans who had an "abiding interest in U.S.-India relations" wrote to India's Prime Minister, pressing for Air India to purchase aircraft from Boeing.[79]  The letter was immediately forwarded to the MoCA.  The MoCA then decided to purchase more planes from Boeing to please the United States.[80]

78.    In August 2004, the MoCA decided at a meeting led by then Minister of Civil Aviation Shri Praful Patel that "Air India should revisit [an earlier, more limited] proposal for purchase of aircraft and submit a fresh project to the Government."[81]  Shortly after the meeting with the MoCA, Air India revised the plan it had previously approved, grossly inflating the aircraft requirement for Air India and its subsidiary from 10 medium capacity long-range aircraft (to be purchased from Airbus) and 18 small capacity short-range aircraft (to be purchased from Boeing) to a total of 68 aircraft (including 50 long-range aircraft to be purchased from Boeing).[82]

79.    Compared to other bidders, Boeing offered less favorable terms on percentage discount and made aggressive demands on the minimum number of aircraft to be purchased and

---

[79]  Ex. 8, at 147 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)); *see also* Ex. 44 (*US Seeks Indian Nod for Boeing Deal*, HINDUSTAN TIMES (Oct. 27, 2003)) (Congressman Joseph Crowley "urg[ed] Prime Minister Vajpayee to authorise the sale as soon as possible."); Ex. 45 (*US Congressmen Urge Indian Premier to Authorize Aircraft Sale*, BBC INTERNATIONAL REPORTS SOUTH ASIA (Oct. 25, 2003)) (Congressman Joseph Crowley urged the sale as "it will serve as a 'great demonstration' of 'strengthened' Indo-US commercial ties"); Ex. 46, at 45 (India Nuclear Chronology, James Martin Center for Nonproliferation Studies at the Monterey Institute of International Studies (Dec. 1, 2010)) (India confirmed on July 31, 2003 that it "[was] involved in a dialogue with the United States to develop and expand nuclear and space cooperation").

[80]  Ex. 8, at 120 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

[81]  *Id.* at 141–43 (brief chronology of Air India's aircraft acquisition from Boeing).

[82]  Ex. 9, at 9–12 (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)).

revenue benefit.[83]  The Board of Air India at this time indicated to the MoCA that it had rejected Boeing's previous, far less expensive offer because even "acquisition of 17 long-range aircraft" as contemplated by the offer "would not be economically viable" for the airline.[84]  Purchasing 50 long-range aircraft, in contrast, would (and did) cripple Air India.  The acquisition made even less sense, the Indian Parliament's Public Accounts Committee found, because India was planning on merging Air India and Indian Airlines at the time, and Indian Airlines' captains and first officers were licensed to operate only Airbus aircraft, and could not operate Boeing aircraft.[85]

80.     Despite these reservations and concerns raised by the Board about acquiring excess aircraft, India firmly insisted on the acquisition in the interest of facilitating ongoing negotiations with the United States to lift a ban on selling nuclear technology to India.[86]

81.     Mr. Arora, a Board member at the time, explains that India compelled the Board to approve this purchase.  Before the April 2005 Board meeting in which Air India approved the purchase, the Secretary of Civil Aviation called him "advising [him] to attend the Board meeting and support the fleet plan proposal."[87]  The Board was not given a Financial Evaluation Report regarding the proposal until "three days after the Board meeting" approving the purchase.[88]

82.     India continued to dominate negotiations with Boeing even after Board approval. After Boeing was announced to have won the bid, the MoCA constituted an "Overseeing

---

[83]   Ex. 8, at 120 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

[84]   *Id.* at 120–21.

[85]   *Id.* at 69–70.

[86]   *See* Ex. 47 (*How to Ruin a Public Sector Institution*, ECONOMIC & POLITICAL WEEKLY (Sept. 17, 2011)).

[87]   RAI, *supra* note 43, (Kindle Locations 3246–52).

[88]   *Id.*

Committee" to "oversee the process of price negotiations with Boeing for acquisition of aircraft" and negotiate on behalf of Air India throughout August 2005 and November 2005.[89]  The plan was revised again during the course of India's negotiations with Boeing from an acquisition of 35 aircraft with an option to purchase an additional 15 to the purchase of 50 aircraft all on firm basis. In exchange for this commitment by India on Air India's behalf, Boeing promised to make other investments in India that were not specific to Air India.[90]

83.     India's extensive involvement throughout the negotiation process is best illustrated in the Secretary of the MoCA's own words:

> When Air India came back to us with the proposal of their aircraft acquisition, it went through all the established procedures of the Government.  It went through techno-economic feasibility study stage.  It went through [the pre-Public Investment Board ("PIB")]. It went through Price Negotiation Committee.  On top of it, there was one oversight committee.  It went to the Cabinet.  It went to the Empowered Group of Ministers.  So, all established procedures of the Government were followed in acquisition of aircraft.[91]

---

[89]  Ex. 8, at 141 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

[90]  *Id.* at 30 ("In view of cumulative factors mentioned above the [Empowered Group of Ministers ('EGoM')] chose to place firm orders of 50 aircraft on account of discounts made available by Boeing Company as also the other investments to be made by the Boeing Company in India."); Ex. 9, at 33 (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)) ("The commitments obtained from Boeing in respect of the AIL aircraft acquisition, as reflected in Chairman, EGoM's note to the PM, were … : [i] Boeing would provide training simulators costing up to US \$75 million.  [ii] Boeing would invest up to US\$ 100 million for creation of MRO [Maintenance, Repair and Overhaul] facilities for Boeing aircraft in India.  [iii] Boeing would invest US\$ 10 million in training and other civil aviation requirements.").

[91]  Ex. 8, at 54 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

84.    The acquisition of 68 aircraft (50 aircraft by Air India and 18 aircraft by Air India's subsidiary) was finalized upon direct approval from India's Prime Minister's Office on December 30, 2005.[92]

85.    Contemporaneously with these aircraft acquisition discussions, the MoCA started "impress[ing] upon the need for Air India to examine the possibility of non-stop India-US operations" on multiple occasions.[93]   In line with India's directive to purchase additional long-range aircraft, the MoCA "communicated" to Air India that it ought to consider acquiring more ultra-long-range aircraft in view of the "[n]ew dimension in the competition on the India/USA route with the introduction of non-stop flights."[94]  Air India later opened a non-stop India-US route but has consistently lost money on operating these flights.  In fact, an audit from 2014 revealed that Air India's single largest loss-making route was the India-US route.[95]

86.    The United States rewarded Air India's unnecessary purchase of the Boeing planes by lifting India's status as a nuclear outlaw.  Soon after finalizing the deal with Boeing, on March 2, 2006, India signed the Civil Nuclear Cooperation Agreement with the United States. This Agreement was the first step in lifting a ban on selling nuclear technology to India—a ban the United States imposed on India because of its testing of nuclear weapons in 1998 and its repeated refusal to ratify the Nuclear Nonproliferation Treaty.[96]  President Bush commented when

---

[92]    *Id.* at 142 (brief chronology of Air India's aircraft acquisition from Boeing).

[93]    *See, e.g.*, Ex. 9, at 10 (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)) ("Minister (CA) in a meeting at Mumbai impressed upon the need for Air India to examine the possibility of non-stop India-US operations.").

[94]    *Id.* at 11.

[95]    Ex. 8, at 93, 135 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

[96]    *See, e.g.*, Ex. 48 (*U.S. Announces Nuclear Exception for India*, N.Y. TIMES (July 27, 2007)).

signing the Agreement that "[m]iddle class Indians are buying home appliances from American companies like Whirlpool.  Younger Indians are enjoying McCurry meals from McDonald's.  ***And Air India has recently ordered 68 planes from Boeing***."[97]

87.     It is clear that Air India's aircraft acquisition from Boeing was a bargaining chip India used in its negotiation with the United States to advance India's political and diplomatic agenda.

88.     These arbitrary, politically driven decisions decimated Air India's finances.  Air India has been overburdened by the debt incurred purchasing the excess aircraft from Boeing and establishing and maintaining the loss-making India-US routes.  Air India was ultimately forced to sell many of these unnecessary Boeing planes to a competitor at a steep loss for just a third of their listing price.[98]

89.     India has itself recognized the disastrous results this political interference has brought Air India.

90.     In 2012, an Indian court, in an action challenging Air India's purchase of aircraft, also questioned Air India's "giving away … profitable air routes to the private airlines and retaining only loss making routes and even the unprofessional decision of merger of Indian Airlines and Air India."[99]

91.     Reviewing these events retrospectively, a 2014 Parliamentary committee report faulted the government for "impinging on the autonomy of [Air India] leading to loss of traffic to

[97]   Ex. 49 (*Bush to Nation: India-US N-deal Good*, INDO-ASIAN NEWS SERVICE (Mar. 6, 2006)) (emphasis added).

[98]   *See* Ex. 50 (*Gajapathi Slams UPA for Air India Losses*, INDIA TODAY (Oct. 2, 2014)).

[99]   *See* Ex. 51, at 23–24 (*Ctr. for Pub. Interest Litigation v. Union of India* (2012) 3 SCC).

[Air India],” noting that the government pressured Air India into offering the India-US routes “in[] spite of the fact that historically, India-USA sector was a loss-making sector and a commercially unviable route.”[100]

92.     In 2017, India’s investigating agency, the Central Bureau of Investigation, launched a probe into, among other things, Air India’s irregular purchase of a large number of aircraft and route planning strategy under the MoCA’s directive.[101]

### 3.     India Runs Air India’s Business on a Day-to-Day Basis.

93.     There is no doubt that India’s extensive control encroaches into even the most trivial aspects of Air India’s day-to-day operations.  The MoCA evaluates and negotiates terms for transactions involving aircraft acquisition,[102] aircraft insurance,[103] lease of aircraft,[104] and aircraft grounding.[105]  When Air India sought admission to the Star Alliance, a global airline alliance, the Star Alliance demanded concessions from India.[106]  Further, as explained above at paragraphs 50,

---

[100]   Ex. 8, at 136 (MoCA, Public Accounts Committee, 2013–2014, 15–93: “Performance of Civil Aviation in India” (Feb. 6, 2014)).

[101]   *See* Ex. 52 (*CBI Files Three FIRs on UPA Aircraft Buy, Air India decisions*, TIMES OF INDIA (May 30, 2017)); Ex. 53 (*Air India Investigation: A Reckoning Six Years in the Making*, THE WIRE (June 7, 2017)); *see also* Ex. 13, at 35–36 (Lok Sabha Question 3004 (Aug. 3, 2017)) (FIRs registered by CBI relating to abuse of official position in the purchase of the 68 Boeing aircraft and other conducts).

[102]   *See, e.g.*, Ex. 9, at 5–35 (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)).

[103]   *See, e.g.*, Ex. 13, at 33–34 (Lok Sabha Question 886 (July 20, 2017)) (the MoCA reporting to the Parliament insurance premium paid by Air India for grounded aircraft).

[104]   *See, e.g.*, *id.* at 31–32 (Lok Sabha Question 3584 (Mar. 23, 2017)) (the MoCA reporting to the Parliament aircraft lease terms); *id.* at 28 (Lok Sabha Question 4692 (Dec. 15, 2016)) (the MoCA reporting to the Parliament lease of aircraft for regional operations).

[105]   *See, e.g.*, *id.* at 7 (Lok Sabha Question 1103 (Mar. 2, 2015)) (the MoCA reporting to the Parliament the number of grounded aircraft and reasons for grounding).

[106]   *See* Ex. 8, at 71 (MoCA, Public Accounts Committee, 2013–2014, 15–93: “Performance of Civil Aviation in India” (Feb. 6, 2014)).

68–71, and 85–92, India interferes with Air India's route planning strategy as a matter of course with little concern for Air India's profits or financial health.

94.     The MoCA also routinely submits reports on issues such as operational delays and emergency landings to the Members of Parliament upon request.[107]  Supervision of Air India's daily operation extensively reaches matters such as tackling technical issues of aircraft,[108] Air India's business dealings with vendors and travel agencies,[109] and even taking steps to "keep rats away from flights and its surrounding places."[110]

95.     India is also intimately involved in personnel and labor matters for Air India.  The MoCA negotiates with representatives of pilots and directly regulates pays, employee benefits, and their working schedule.[111]  As a follow-up to the 2007 merger of Air India and Indian Airlines, the MoCA appointed a Committee headed by a former Indian Supreme Court justice to review various issues related to pay and wage rationalization between employees of the two airlines.[112]

---

[107]  *See, e.g.*, Ex. 13, at 27 (Lok Sabha Question 707 (July 21, 2016)) (flight delay due to fight between flight attendants); *id.* at 12 (Lok Sabha Question 1864 (Mar. 9, 2015)) (a tail strike and hard landing incident); *id.* at 9 (Lok Sabha Question 1106 (Mar. 2, 2015)) (emergency landing due to engine problems with the Boeing 787 Dreamliners).

[108]  *See, e.g.*, *id.* at 24 (Lok Sabha Question 838 (Apr, 28, 2016)) (technical glitches with the Boeing 787 Dreamliners and maintenance process); *id.* at 44 (Lok Sabha Question 2751 (Aug. 20, 2018)) (investigating into software glitch in the airline's check-in system).

[109]  *See, e.g.*, *id.* at 45 (Lok Sabha Question 1778 (Dec. 20, 2018)) (potential conflict of interest arising from the distribution deal with Air India's ticket agency); *id.* at 29 (Lok Sabha Question 43 (Feb. 2, 2017)) (alliance with Indian Railway Catering and Tourism Corporation Limited).

[110]  *Id.* at 34 (Lok Sabha Question 817 (Apr. 28, 2016)).

[111]  *See, e.g.*, *id.* at 39 (Lok Sabha Question 935 (Feb. 8, 2018)) (government meeting with pilot representatives to negotiate pays and allowances); *id.* at 10 (Lok Sabha Question 1136 (Mar. 2, 2015)) (pilot recruitment and pilot working hour rules); *id.* at 16 (Lok Sabha 472 (Apr. 27, 2015)) (stressed pilots); *id.* at 6 (Lok Sabha Question 1362 (Dec. 1, 2014)) (payment of house rent allowance to Air India employees); *id.* at 14 (Lok Sabha Question 3077 (Mar. 16, 2015)) (working schedule for technical staff of the merged entity of Air India and Indian Airlines Limited).

[112]  Ex. 36, at 93 (Comptroller and Auditor General, Performance Audit Report (Mar. 10, 2017)).

When pressed by the pilots' union for better pay and working conditions, the Minister of Civil Aviation stated that such matters were "between me and my children [*i.e.*, Air India's employees]."[113]

96.     India's continuous mismanagement of Air India's day-to-day business resulted in the airline's poor performance and consistent loss-making since the 2007 merger.  In April 2012, India approved the Turn Around Plan and the Financial Restructuring Plan ("**FRP**") to improve Air India's performance and finance.

97.     The Turn Around Plan was a comprehensive proposal created, implemented, and monitored by the government and involved measures that touched upon Air India's finances, employment practices, and business practices.  In the end, the Turn Around Plan actually made it easier for India to interfere with Air India's business operations, as it created an Oversight Committee and a Group of Ministers empowered to monitor Air India's progress in achieving the Turn Around Plan's objectives.[114]  The Oversight Committee—which is headed by the Secretary of the MoCA and consists of other governmental officials, including the Secretary of the Department of Expenditure, Additional Secretary & Financial Advisor of the MoCA, Joint Secretary of the MoCA—"rigorously" reviews Air India's performance monthly.[115]  In answering a member of the Parliament's query as to "whether the Government monitor the performance of Air India on regular basis," the MoCA confirmed that the Oversight Committee "closely

---

[113]  Ex. 54 (*The Air India Fiasco*, WALL STREET J. (Mar. 15, 2011)).

[114]  Ex. 13, at 13 (Lok Sabha Question 3051 (Mar. 16, 2015)) (the MoCA reporting to the Parliament about setting up an Oversight Committee to monitor Air India's progress under the Turn Around Plan).

[115]  Ex. 8, at 23–24 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

monitor[ed]" Air India's operations.[116]  India separately audited Air India's achievements under the Turn Around Plan and the FRP in 2016.[117]

98.     Air India has been essential instrument of India's effort to combat the pandemic. Under the Vande Bharat Mission, India designated Air India as the "nodal agency" and ordered it and its subsidiaries to operate non-scheduled flights to evacuate stranded Indian citizens throughout the world under the supervision of multiple government agencies.[118]  As of April 16, 2021, Air India has operated a total of 23,051 repatriation flights to evacuate 3,188,191 stranded passengers.[119]  According to India's Ministry of External Affairs, Air India is currently scheduled to operate at least over 1,500 repatriation flights under phase 10 of the Vande Bharat Mission.[120] In addition to the passenger flights, Air India also operated special charter flights on domestic and international routes to transport essential medical and supplies across the country and the world "on the directions of the Government."[121]

99.     On the controversial issue of furlough and pay cuts to Air India's employees during the pandemic, Air India also fully abided by the MoCA's directives.  Since July 2020, the MoCA has been meeting with Air India's officials to review staff cost and adjust pay and allowances in

---

[116]  Ex. 13, at 2–3 (Lok Sabha Question 7 (Nov. 24, 2014)).

[117]  Ex. 36, at i (Comptroller and Auditor General, Performance Audit Report (Mar. 10, 2017)).

[118]  Ex. 55 (*Vande Bharat Mission: Major Airports and Ports in India Gear Up to Receive Stranded Indians Abroad,* ECONOMIC TIMES (MAY 7, 2020)); Ex. 56, at 161 (excerpts of 2019–2020 Air India Annual Report); *see also* Ex. 57 (MoCA Departmental Order (May 6, 2020)) (designating Air India as the "nodal agency" to facilitate the government's repatriation process).

[119]  Ex. 58 (Vande Bharat Mission - Number of Flight and Passengers Flown (Apr. 16, 2021)); Ex. 56, at 161–162 (excerpts of 2019–2020 Air India Annual Report).

[120]  *See* Ex. 59 (excerpts of Ministry of External Affairs, Vande Bharat Mission—List of Flights, Phase 10).

[121]  Ex. 56, at 161–62 (excerpts of 2019–2020 Air India Annual Report).

light of the pandemic.[122]   The MoCA decided to impose a compulsory leave without pay on employees for up to five years.[123]   The Indian National Congress (the leading opposition party in the Indian Parliament) and the pilot unions have raised vehement protests against the MoCA on its treatment of Air India's employees and urged the MoCA to withdraw the leave without pay policy—illustrating that the MoCA, not the Air India Board or its officers, calls the shots.[124]

100.    Thanks to India's management-by-bureaucrats model, Air India has operated for years with little regard for customer satisfaction.   Complaints regarding customer services are collected by the Under Secretary/Director and supervised by a Joint Secretary at the MoCA, oftentimes without being satisfactorily addressed.[125] Unlike a privately owned airline, Air India has not made customer satisfaction a priority because it does not depend on customer revenues for its survival, but solely on the government.

**D.    India Exerts Economic Control Over Air India.**

101.    India enjoys control over all aspects of Air India's financial affairs.   Air India's revenues come "from its internal accruals, bank borrowing and financial support from the Government of India."[126]   As explained below, not only does India support Air India financially

---

[122]   Ex. 60 (*Pay Cut: Air India Pilots Warn of "Potentially Disastrous Psychological Impact"*, TIMES OF INDIA (July 23, 2020)) (Air India tweeted that "[r]ecent decisions … regarding rationalization of staff cost were reviewed in a meeting at @MoCA_goi").

[123]   *Id.*; *see also* Ex. 61 (*Opposition MPs Ask Puri to Withdraw AI's Leave without Pay Scheme*, INDO ASIAN NEWS SERVICE (July 16, 2020)).

[124]   *See* Ex. 61 (*Opposition MPs Ask Puri to Withdraw AI's Leave without Pay Scheme*, INDO ASIAN NEWS SERVICE (July 16, 2020)); Ex. 62 (*Pilot Unions Urge Air India, Ministry to Reverse Salary Cuts*, THE HINDU (Mar. 28, 2021)).

[125]   Ex. 33, at 4 (MoCA, Consolidated Departmental Instructions on the Channel of Submission and Level of Final Disposal of Various Cases); Ex. 13, at 21 (Lok Sabha Question 3179 (Dec. 17, 2015)) (the MoCA reporting to the Parliament Air India's complaint handling procedure).

[126]   *Id.* at 53 (Lok Sabha Question AU772 (Feb. 6, 2020)).

through grants, capital contribution, budget allocation, and loans, it also essentially controls Air India's access to other sources of funding, including private bank loans; Air India's internal accruals, including by regulating fares and routes; as well as Air India's spending.  As Air India's Managing Director put it in 2009, "[i]f Air India had been private, it would have closed down long ago."[127]   Air India has lost money every year since.   Air India's management has candidly acknowledged in its most recent annual report that it can sustain its business only with "continued support of the Government."[128]

### 1.    India Provides Significant Financial Support to Air India.

102.   India provides significant and regular financial support to Air India through a combination of capital contributions, grants, and loans.  Riddled with debt due to its irresponsible aircraft purchases, Air India is so dependent on India's financial support that, without such support, Air India's management says it would be "extremely difficult to maintain … current operations,"[129] and its independent auditor has questioned Air India's ability "to continue as a going concern," given the "complete erosion of [its] net worth."[130]

103.   *First*, financial support is regularly made available to Air India by India through direct capital contribution.[131]   Some of these funds were invested pursuant to India's 2012 Turn

---

[127]   Ex. 12 (*The Time For Talking Is Over*, BUSINESSWORLD (Aug. 16, 2009)).

[128]   *See* Ex. 56, at 82 (excerpts of 2019–2020 Air India Annual Report).

[129]   *See id.* at 10.

[130]   *Id*. at 81–82.

[131]   *Id.* at 188 ("The Company has regularly received Equity Infusion from the [government of India]….  All these steps are aimed at creating a positive environment. In view of the above and the financial support from the Govt of India and various measures taken by the Company to improve its operational efficiencies, various revenue enhancing measures, cost control measures undertaken etc. the Company expects improvement in its Operational and Financial Performance,

Around Plan for Air India, which at the time had accumulated a significant amount of debt.[132] Although the Turn Around Plan contemplates "both operational and financial turnaround of [Air India],"[133] even to this day, Air India "relies on Government support to conserve its liquidity position."[134]   As detailed in annual reports issued by Air India, the cumulative total of the government's capital contribution to date has risen from Rs 1.45 billion (US $36.03 million)[135] since 2007–2008 to Rs 326.65 billion (US $4.41 billion)[136] in 2019–2020.[137]  From 2007–2008 to 2019–2020, India's average annual capital contribution was Rs 25.13 billion (US $342.70 million).  These funds are appropriated in the national budget approved by the Parliament each year.

---

in the near future and hence, the Financial Statements of the Company have been prepared on the 'Going Concern' basis.").

[132]   *See* Ex. 63 (*Air India Has Received Rs 30,520-cr Equity Infusion Since FY12, Says Govt*, BUSINESS STANDARD (Dec. 5, 2019)); *see also* Ex. 13, at 51–52 (Lok Sabha Question AU2882 (Dec. 5, 2019)); Ex. 56, at 81 (excerpts of 2019–2020 Air India Annual Report) ("The Company has received continuous support from the Government of India (GoI) initially through the introduction of the Turnaround Plan (TAP)/Financial Restructuring Plan (FRP) approved in 2012 and then under the Strategic Revival Plan in FY 2018- 19 which has helped the Company to improve its operating and financial parameters.").

[133]   Ex. 64, at 17–18 (excerpts of 2014–2015 Air India Annual Report).

[134]   Ex. 56, at 193 (excerpts of 2019–20 Air India Annual Report).

[135]   The USD figure is calculated based on the average exchange rate for Rs-USD in 2007–2008.

[136]   The USD figure is calculated based on the average exchange rate for Rs-USD in 2019–2020.

[137]   *See* Ex. 65, at 101 (excerpts of 2007–2008 Air India Annual Report); Ex. 66, at 89 (excerpts of 2009–2010 Air India Annual Report); Ex. 67, at 63 (excerpts of 2010–2011 Air India Annual Report); Ex. 68, at 76 (excerpts of 2011–2012 Air India Annual Report); Ex. 69, at 95 (excerpts of 2012–2013 Air India Annual Report); Ex. 70, at 93 (excerpts of 2013–2014 Air India Annual Report); Ex. 64, at 117 (excerpts of 2014–2015 Air India Annual Report); Ex. 71, at 124 (excerpts of 2016–2017 Air India Annual Report); Ex. 72, at 142 (excerpts of 2017–2018 Air India Annual Report); Ex. 73, at 157 (excerpts of 2018–2019 Air India Annual Report); Ex. 56, at 141 (excerpts of 2019–2020 Air India Annual Report).

104.     These staggering capital contributions are increasingly controversial in India.  After the 2012 financial restructuring plan failed, India considered a new Turn Around Plan in 2018, known as the Strategic Revival Plan, to allow Air India to "stand on its own feet" to prepare the airline for an eventual sale to the private sector, recognizing the significant support India provides Air India.[138]  Competing airlines regularly question India's financial support to Air India, accusing the government of granting Air India "special privileges" and "funding their losses."[139]  Even the Comptroller and Auditor General of India has criticized India for not adjusting its capital contributions in Air India.[140]

105.     *Second*, Air India receives aid in the form of grants from the MoCA for, among other things, the purchase of aircraft.  For example, during financial year 2020–2021, the MoCA issued approximately Rs 8.1 billion (US $110.2 million) as grants to Air India for the purchase of two new aircraft "for special operations."[141]  These aircraft were to be used to fly the country's top leadership on important government missions and have since been transferred to the Indian Air Force.[142]

106.     *Third*, India also allocates substantial sums on a regular, annual basis to Air India Asset Holding Ltd ("**AIAH**"), a special purpose vehicle ("**SPV**") incorporated by India in 2018 to

---

[138]   Ex. 29 (*Government Working on New Turnaround Plan for Air India*, THE INDIAN EXPRESS (Sept. 7, 2018)).

[139]   Ex. 74 (*Air India Privatization Will Level the Playing Field in India: IATA Chief*, ECONOMIC TIMES (Mar. 21, 2021)).

[140]   *See* Ex. 36, 9–10 (Comptroller and Auditor General, Performance Audit Report (Mar. 10, 2017)).

[141]   Ex. 75 (Table Showing Grants-in-Aid by Ministry of Civil Aviation—Grantee Organisation for Financial Year 2020–21, MINISTRY OF CIV. AVIATION).

[142]   Ex. 76 (*First VVIP Aircraft "Air India One" for President, PM to Arrive Today*, THE TIMES OF INDIA (Oct. 1, 2020)).

offload Air India's debt in order to make Air India a more attractive acquisition target.  For the 2021–2022 fiscal year alone, India through the MoCA budgeted Rs 22.69 billion (US $308.79 million) for AIAH.[143]  India has allocated a total of approximately Rs 83.84 billion (US $1.14 billion) to AIAH to finance the debts transferred from Air India.[144]

107.    **Fourth**, India has also provided loans to Air India on non-commercial and highly favorable terms.  For example, a loan of Rs 45 billion (US $612 million) was also provided to Air India in the 2020–2021 fiscal year from the National Small Saving Fund (the "**NSSF**").[145]  According to a news report, an Air India official was quoted having stated that "[t]he NSSF loan is like borrowing from the Government and are 0.5% cheaper compared to commercial banks."[146]

108.    **Fifth**, unlike private airlines, Air India enjoys special treatment under Indian tax law, which allows it to carry forward indefinitely unabsorbed depreciation into future years.[147]  Because Air India has been unfailingly operating at loss under India's mismanagement since its 2007 merger with Indian Airlines, it has not made any taxable income and therefore has not paid any income tax to the government.  As of March 31, 2020, the company had a total deferred tax asset of Rs 200.74 billion (US $2.73 billion), consisting of Rs 89.83 billion (US $1.22 billion) of

---

[143]    *See* Ex. 77, at 18 (excerpts of Notes on Demands for Grants 2013–2014, 2014–2015, 2016–2017, 2017–2018, 2018–2019, 2019–2020, 2021–2022).

[144]    *See id*. at 15, 18.

[145]    Ex. 13, at 58 (Lok Sabha Question AU662 (Feb. 4, 2021)).  The NSSF is a fund administered by the Department of Economic Affairs of the MoF pursuant to the National Small Savings Fund (Custody and Investment) Rules, 2001 (the "NSSF Rules"), and was established in 1999 to consolidate collections from the public under various "small saving schemes" floated by India.

[146]    Ex. 78 (*Air India Seeks Govt Nod for Rs 2,400 Crore Loan from NSSF*, LIVEMINT (May 29, 2019)).

[147]    Ex. 79 (*Tax Act Amended for Air India, Indian Merger*, AVIATION INDIA (Feb. 17, 2017)).

brought forward losses, as well as unabsorbed depreciation and other temporary differences, all of which will be offset against future tax liabilities as contemplated in its 2019–2020 annual report.[148]

### 2. India Controls Air India's Access to Other Sources of Funding.

109.    Even where Air India obtains income from outside of India, India controls those revenue streams in two respects.  First, Air India obtains more favorable commercial loans thanks to Indian government guarantees.  Second, India dictates Air India's fares.

110.    ***India routinely guarantees loans and other payment obligations for Air India.*** India has acted as a guarantor for loans and other payment obligations taken by Air India on numerous occasions.  The government's financial rules allow it to act as guarantor to enable Air India to raise financing at lower interest rates or on "more favourable terms."[149]  As of March 2020, India had agreed to guarantee amounts up to Rs 783.60 billion (US $10.66 billion).[150]

111.    Between March 2008 and March 2020, Air India's total outstanding government guarantees ranged in value between Rs 45.82 billion (US $1.14 billion[151]) in 2008 to Rs 428.97 billion (US $5.79 billion[152]) in 2020.[153]  During the fiscal year 2020–2021, India guaranteed additional loans Air India received—totaling Rs 9 billion (US $122.73 million).[154]

---

[148]   Ex. 56, at 186 (excerpts of 2019–2020 Air India Annual Report) ("Further, the Deferred Tax Assets have been created against carry forward Depreciation *only which are available to the Company indefinitely* as per the provisions of the Income Tax Act.") (emphasis added).

[149]   *See* Ex. 80 (Rule 276 of the Ministry of Finance's General Financial Rules (2017)).

[150]   Ex. 81, at 5–8 (excerpts of Detailed Demand for Grants of Ministry for Civil Aviation for 2009–2010, 2021–2022).

[151]   The USD figure is based on average exchange rate for Rs-USD in 2007–2008.

[152]   The USD figure is based on average exchange rate for Rs-USD in 2019–2020.

[153]   *See* Ex. 81, at 2, 3, 5–8 (excerpts of Detailed Demand for Grants of Ministry for Civil Aviation for 2009–2010, 2021–2022).

[154]   Ex. 13, at 60–61 (Lok Sabha Question 4894 (Mar. 25, 2021)).

112.    Although under India's financial rules, the government must be paid a guarantee fee in exchange for its guaranteeing loans, Air India does not pay those fees.[155]  By March 2020, Air India's outstanding guarantee fees of Rs 18,275.0 million (US $248.7 million) had been eclipsed by the "penal charges on the delayed payments of Guarantee Fee"—late fees—which by that point had reached Rs 20,769.9 million (US $282.7 million).[156]  More recently, Air India has begun classifying the fees as contingent liabilities "not acknowledged as debts."[157]  It does so with good reason: in 2020, as part of India's efforts to make Air India an attractive asset to potential buyers, it decided to forgive any outstanding guarantee fees owed by the airline.[158]

113.    Support via guarantee of private loans continued even after India halted capital contributions and began discussing divestment from Air India.[159]  Although India did not contribute additional capital in the 2020–2021 fiscal year, it extended "a guarantee support of Rs 9.6 billion[, or around US $127 million,] to [Air India] which was used to raise new working

---

[155]   Ex 6, at 2 (MoCA, Public Accounts Committee, 2006–2007, 14–30: "Non-Recovery of Guarantee Fee from Air India and Indian Airlines" (Aug. 7, 2006)).

[156]   Ex. 56, at 155 (excerpts of 2019–2020 Air India Annual Report).

[157]   *Id.* at 58, 155; *see also* Ex. 72, at 144–45 (excerpts of 2017–2018 Air India Annual Report) (classifying a portion of the guarantee fees as contingent liabilities).

[158]   Ex. 82 (*Govt offers Air India with Loan against Aircraft of Rs 23,286 Crore*, ECONOMIC TIMES (Jan. 27, 2020)); *see also* Ex. 83 (MoCA's Preliminary Information Memorandum for Inviting Expression of Interest for Strategic Disinvestment of Air India (Jan. 27, 2020)) (all contingent liability confirmed against Air India for "Guarantee Fee/Penal charges due to [the Government of India]" will be indemnified by the Government).

[159]   Ex. 84 (*Alfred Chua*, *Civil aviation Minister Forecasts Bleak 2020 Results for Air India*, FLIGHT GLOBAL (Mar. 28, 2021)).

capital loans"[160] and to refinance, rolled-over bridge loans where the lenders were "not in agreement to further extend these … facilities."[161]

114.  ***India controls other sources of Air India's income.***  India has the right, under Section 129 of Air India's Article of Association and the Instrument of Delegation of Financial Powers to set Air India's fares.[162]  In fact, Air India has been operating flights connecting smaller Indian towns at a $35 price cap as "insisted" by the Indian Prime Minister—a politically popular yet economically unviable model for operating these short-haul flights.[163]  And as explained above, India has used Air India to advance its political and diplomatic agenda, even at the cost of the airline's financial health, locking it in unprofitable routes when requested by diplomatic allies.[164]

### 3.  India Controls Air India's Spending and Oversees Its Financial Situation.

115.  India also exerts control over Air India's spending and closely monitors its financial state and accounts.

116.  India's ability to control Air India's capital expenditures is set out in Clause 3.3 of Instrument of Delegation of Financial Powers of Air India, which provides:

> All project [sic] for acquisition of aircraft / engines / simulators / APUs, which require capital expenditure, are required to be approved by the MoCA, and governmental bodies such as the Public Investment Board (headed by the Secretary (Expenditure) of the Ministry of Finance) and the Cabinet Committee on Economic Affairs, wherever necessary.[165]

---

[160]  *Id.*

[161]  Ex. 56, at 27 (excerpts of 2019–2020 Air India Annual Report).

[162]  Ex. 10 § 129 (Air India Articles of Association); Ex. 85, at 21 (Instrument of Delegation of Financial Powers of Air India Ltd.).

[163]  Ex. 86 (*Why India's Airlines Fail to Take Off*, BANGKOK POST (Dec. 3, 2018)).

[164]  *See supra* Section IV(c)(2).

[165]  Ex. 85, § 3.3 (Instrument of Delegation of Financial Powers of Air India Ltd.).

117.    Further, any investments made by Air India must be in compliance with guidelines issued by the "Department of Public Enterprises, Ministry of Heavy Industries & Public Enterprises or any other authority of Government of India with regard to investment to be made by the Public Sector Undertakings."[166]   As discussed above in Sections IV(C)(1) and IV(C)(3), wages paid to Air India's employees must be "in accordance" with guidelines issued by the Department of Public Enterprises, and while Air India has notional autonomy in employee matters, India routinely interferes in such matters.[167]   Constitutional limitations against discrimination also apply to Air India's employment decisions.[168]

118.    The 2012 Turn Around Plan, executed over the past decade, involved not only capital contribution, but also a plan, devised by the government, for Air India to "i) Rationaliz[e] staff costs; …  iii) Optimiz[e] Fuel and Oil Consumption; iv) [Develop] [r]oute rationalization; [and] v) Control[ ] Aircraft Maintenance expenses."[169]

119.    To inform this line-item budget management, India closely monitors Air India's economic situation.  Because Air India is a Government Company, the Comptroller and Auditor-General of India (on behalf of India) appoints auditors to examine and report on Air India accounts under the Companies Act of 2013.[170]   That Act also requires Air India to submit an annual report

---

[166]   *Id.* § 22.

[167]   *See also* Ex. 56, at 180 (excerpts of 2019–2020 Air India Annual Report) ("In view of Department of Public Enterprises (DPE) guidelines applicable to PSUs no wage revision can be granted to the employees of loss-making PSUs.  The Company has been making losses since 1st January 2007 hence no provision has been made towards wage revision/settlement.").

[168]   *See infra* Section V.

[169]   Ex. 13, at 54 (Lok Sabha Question AU1861 (Sept. 22, 2020)).

[170]   Ex. 5 § 139(5) (excerpts of Companies Act of 2013).

to India's Parliament, together with audit reports and comments made by the Comptroller and Auditor-General of India.[171]  And as explained above at paragraph 69, the Companies Act of 2013 itself requires the Comptroller and Auditor General of India to perform comprehensive reviews of Air India's accounts and operations and produce reports to India and each House of the Parliament.[172]  These reports go into significant detail, including financial performance and revenue reporting.

E.    **India Treats the Property of Air India and Its Own Interchangeably.**

120.    To this day, India treats Air India as its personal fief, rather than an independent company subject to corporate formalities.

121.    India routinely receives air transportation from Air India for which it does not pay. Even though Air India has operated at a loss every year since the 2007 merger, the MoCA (in 2020) required Air India to upgrade tickets for all former Secretaries of the MoCA and their families.[173]  No doubt for this reason, all official travel by government officials is done through Air India, absent written authorization of a senior government officer.[174]  The government rarely makes on-time payments due to Air India in spite of the airline's financial difficulties,[175] and does not pay interest to Air India on delayed payments.[176]  As of December 2019, for example, India owed Rs 4.58 billion (US $62.33 million) to Air India solely for the cost of the Prime Minister's

---

[171]  *Id.* § 394.

[172]  *See* Ex. 5 §§ 143(5)-(6), 394 (excerpts of Companies Act of 2013).

[173]  Ex. 9, at xiv (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)).

[174]  Ex. 7 § 2.15 (MoCA, Public Undertakings Committee, 2009–2010, 15–4: "National Aviation Co of India Ltd.—Merged Entity of Erstwhile Air India and Indian Airlines" (Jan. 20, 2010)).

[175]  Ex. 9, at xxi (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)).

[176]  Ex. 13, at 58 (Lok Sabha Question 649 (Feb. 4, 2021)).

travel and Rs 2.43 billion (US $33.07 million) for the cost of travel by the President of India.[177] As of February 2021, India owed Air India nearly Rs 5 billion (US $68.05 million) in airfare for flights of government "VVIPs" ("very, very important persons"), at a time when Air India was forced to borrow Rs 2.25 billion through a short-term loan facility to refinance an earlier loan.[178]

122.    As a result of the state's interference and cavalier attitude towards Air India's finances, Air India has operated at a loss every year since its 2007 merger.[179]  Its losses for this past year are estimated to be between Rs 9.5–10 billion (US $129.3–136.1 million), up from Rs 8 billion (US $108.87 million) the previous year.[180]  As explained in Section IV(D), Air India is able to stay in business only because India subsidizes its losses,[181] and routinely guarantees its debts.[182]  The situation is now sufficiently dire that India's present Minister of Civil Aviation has publicly claimed: "Air India is a first-rate asset but has an accumulated debt of Rs 60,000

---

[177]    *See* Ex. 87 (*Govt Owes Air India Rs 798 Crore; More Than Half of It for PM's Travel*, THE WEEK, (Dec. 2, 2019)).

[178]    *See* Ex. 88 (*Centre Owes Air India Nearly Rs.r500 Crore for VVIP Flights*, HINDUSTAN TIMES (Feb. 5, 2021)); *see also* Ex. 36, at 19 (Comptroller and Auditor General, Performance Audit Report (Mar. 10, 2017)).

[179]    *See* Ex. 89 (*Air India Set to Post Record Loss in FY21 on Pandemic Woes*, MINT (Feb. 8, 2021)).

[180]    *See id.*

[181]    *See* Ex. 90 (*Air India's Hidden Subsidy Shows That the Govt Uses the Company Merely as a Political Tool*, FIRSTPOST (July 31, 2016)).

[182]    *See* Ex. 89 (*Air India Set to Post Record Loss in FY21 on Pandemic Woes*, MINT (Feb. 8, 2021)).

Crore…."[183]   In a response to a recent question in Parliament, the MoCA estimated Air India's losses during 2020–2021 to be in excess of Rs 90 billion (US $ 1.22 billion).[184]

123.   Air India's independent auditors have likewise questioned "the ability of the Company to continue as a going concern" in light of the "complete erosion of the net worth of the Company."[185]

124.   India also assumes Air India's debts directly.  In 2019, the government transferred half of Air India's debt (Rs 29.464 billion of Rs 58.255 billion total, or US $400.98 million to $792.80 million) to AIAH, the SPV established by India to offload Air India's debt.[186]  India has also transferred debts of some of Air India's subsidiaries to this SPV.[187]  The government will ultimately absorb these debts.[188]  Air India's most recent Annual Report states that India may assume even more debt.[189]

125.   Moreover, India declines to respect corporate formalities with regards to Air India's assets.  India transferred most of Air India's real estate assets to AIAH,[190] and is in the process of selling Air India's many valuable real estate assets all over the country.[191]  The Ministry of Housing and Urban Affairs is responsible for selling some of these properties, and the proceeds

---

[183]   *See* Ex. 91 (*"Choice Between Disinvestment or Closing Down": Hardeep Purl Announces 100% Privatisation of Air India*, NEW INDIA (Mar. 27, 2021)); Ex. 92 (*Financial Bids Will Be Invited in Coming Days for Air India Sale: Puri*, THE HINDU (MAR. 26, 2021)).

[184]   *See* Ex  13, at 62–63 (Lok Sabha Question 5018).

[185]   *See* Ex. 56, at 58 (excerpts of 2019–2020 Air India Annual Report).

[186]   *See* Ex. 93 (*Tata, Govt Iron Out Differences over Air India*, AVIATION PROS (Apr. 5, 2021)).

[187]   *See* Ex. 13, at 46–47 (Lok Sabha Question AS264 (July 11, 2019)).

[188]   *See* Ex. 94 (ICRA, Air India Assets Holding Limited: Rating affirmed (Feb. 2, 2021)).

[189]   *See* Ex. 56, at 188 (excerpts of 2019–2020 Air India Annual Report).

[190]   *See* Ex. 93 (*Tata, Govt Iron Out Differences over Air India*, AVIATION PROS (Apr. 5, 2021)).

[191]   *See* Ex. 13, at 37 (Lok Sabha Question 1139 (Dec. 21, 2017)).

will be transferred to AIAH.[192]  This process was initially overseen by a committee made up of a Supreme Court justice, a retired Auditor General, and a retired civil servant, and all sales are approved by the Cabinet.[193]  The government, rather than the company, appointed consultants to ascertain the value of these properties to determine which properties should be sold.[194]  This whole process is subject to intense parliamentary scrutiny as well.[195]

## V.    India's Own Courts Have Held that Air India Is One and the Same with the State.[196]

126.    Air India is considered to be the "State" under Indian law.

127.    Articles 12 through 35 of the Indian Constitution require the "State" to respect various fundamental rights.  Article 12 defines the "State" to include (a) the central government of India and the local state governments; (b) Parliament and the state legislatures; (c) all local authorities; and (d) "*other authorities* within the territory of India, *or under the control of the Government of India*."[197]  Under Indian law, corporations can be considered the "State" of India when they are "financially, functionally and administratively dominated by, or under the control of, the government."[198]

---

[192]   *See* Ex. 56, at 100 (excerpts of 2019–2020 Air India Annual Report).

[193]   *See* Ex. 13, at 37 (Lok Sabha Question 1139 (Dec. 21, 2017)); *id.* at 19 (Lok Sabha Question 3365 (Aug. 10, 2015)).

[194]   *Id.* at 42 (Lok Sabha Question 2722 (Aug. 2, 2018)).

[195]   *See id.*; *id.* at 41 (Lok Sabha Question 325 (July 19, 2018)) (questions concerning sale of iconic buildings in Mumbai).

[196]   Plaintiffs intend to raise an issue of Indian law as set forth in this section and hereby provide notice of same pursuant to Fed. R. Civ. P. 44.1.

[197]   Ex. 30 (excerpts of INDIA CONST., Art. 12) (emphasis added).

[198]   Ex. 95, at 111 ¶ c (excerpts of *Pradeep Kumar Biswas v. Indian Inst. of Chemical Biology*, (2002) 5 SCC 111).

128.    Air India has routinely been considered to be the "State"—given its extensive financial, functional, and administrative domination by the government—under Indian law.  In *Lena Khan v. Union of India*, the Indian Supreme Court held that Air India was "a corporation which is for all purposes State within the meaning of the term as provided in Article 12 of Constitution of India," and thus required to respect constitutional rights.[199]  Other Indian courts have come to the same conclusion.[200]

129.    There is thus no reason to treat Air India as a separate juridical entity under US law when, under Indian law, it has the status of the "State."

## COUNT I
### (For Declaratory Judgment)

130.    Plaintiffs repeat and re-allege each and every allegation of Paragraphs 1 through 129 of this Complaint as set forth herein.

131.    A justiciable and actual controversy exists before this Court with respect to Air India's relationship with India.  A declaratory judgment resolving this question is likely to clarify or settle the legal rights of the parties to this action, and/or terminate a principal source of the insecurity and/or controversy that brought about this action.

132.    As a matter of Indian constitutional law, Air India is considered to be the "State" under Indian law.

133.    An instrumentality like Air India is the alter ego of its parent state when the parent state controls the instrumentality so extensively that a principal-agent relationship exists between

---

[199]   Ex. 96 ¶ 10 (*Lena Khan v. Union of India*, (1987) 2 SCC 402).

[200]   *See* Ex. 97 ¶ 49 (*Jeetendra Krishna Verma v. Air India Limited*, (2019) LLR (SN 49) 777); Ex. 98 ¶ 3 (*Rakesh Rai v. National Aviation Company of India*, (2013) W.P No. 287).

them, or where giving effect to the nominal separateness of the instrumentality would work fraud or injustice.

134.     In this case, India undoubtedly controls the Air India, as demonstrated by the facts set forth above.  Moreover, the nominal distinction between India and Air India is illusory and serves only to aid India in improperly shielding its assets from creditors like Plaintiffs. Specifically, giving effect to Air India's nominal separateness from India would unjustly deprive Plaintiffs of the ability to recover the assets located in this District that, although nominally held by Air India, are actually controlled by India.

135.     Plaintiffs' arbitral claims against India are thus enforceable against Air India.

## COUNT II
### (For Money Judgment Against Air India in Favor of Plaintiffs)

136.     Plaintiffs repeat and re-allege each and every allegation of Paragraphs 1 through 135 of this Complaint as set forth herein.

137.     On February 12, 2021, Plaintiffs brought the Petition to Confirm the Award against India in the proceeding captioned *Cairn Energy PLC and Cairn UK Holdings Limited v. Republic of India*, 21-cv-00396-RJL (D.D.C. Feb. 12, 2020).  Plaintiffs expect to be awarded judgment against India in that proceeding.

138.     Accordingly, Plaintiffs will be entitled to judgment expressly adjudging Air India, as the alter ego of India and legally indistinct from the state itself, to be jointly and severally liable for any judgment entered against India pursuant to the Petition to Confirm in the District Court for the District of Columbia.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants be entered as follows:

    a. Declaring pursuant to 28 U.S.C. 2201 that Air India is the alter ego of India and legally indistinct from the state itself;

    b. Adjudging that Air India shall be jointly and severally liable for the judgment that will be awarded, to Plaintiffs against India based on the Award;

    c. Awarding money damages against Air India in the amount judgments entered against India;

    d. Awarding interest, costs, fees and other expenses associated with this action, including reasonable attorney fees, and

    e. Awarding such other legal or equitable relief as this Court deems just and proper.

Dated: May 14, 2021

                          Respectfully submitted,

                          QUINN EMANUEL URQUHART & SULLIVAN, LLP

                          _____
                          Dennis H. Hranitzky
                          Mark McNeill
                          Debra O'Gorman
                          dennishranitzky@quinnemanuel.com
                          markmcneill@quinnemanuel.com
                          debraogorman@quinnemanuel.com
                          51 Madison Avenue, 22nd Floor
                          New York, NY 10010
                          (212) 849–7000 Main Office Number

                          Florentina Dragulescu Field (*pro hac vice forthcoming*)
                          florentinafield@quinnemanuel.com
                          1300 I Street NW, Suite 900
                          Washington, District of Columbia 20005
                          (202) 538-8000 Main Office Number

                          Alex H. Loomis (*pro hac vice forthcoming*)
                          alexloomis@quinnemanuel.com
                          111 Huntington Ave, Suite 520
                          Boston, MA 02199
                          (617) 712–7100 Main Office Number

                          *Attorneys for Plaintiffs Cairn Energy PLC and Cairn UK Holdings Limited*