# EXHIBIT 7

**C.P.U. No. 937**

**4**

### FOURTH REPORT

### COMMITTEE ON PUBLIC UNDERTAKINGS

### (2009-2010)

### (FIFTEENTH LOK SABHA)

### NATIONAL AVIATION COMPANY OF INDIA LIMITED- *MERGED ENTITY OF ERSTWHILE AIR INDIA AND INDIAN AIRLINES*

### MINISTRY OF CIVIL AVIATION



**Presented to Lok Sabha on _____**

**Laid in Rajya Sabha on_____**

### *LOK SABHA SECRETARIAT*

### *NEW DELHI*

**March, 2010 / Phalguna 1931(S)**

# CONTENTS

| | | | Page No. |
|---|---|---|---|
| Composition of the Committee (2009-2010) | | | (iii) |
| Introduction | | | (v) |

**Part- A**

**Report**

| 1. | Introduction | | 1 |
|---|---|---|---|
| | A. | Historical Background | 1 |
| | B. | Board of Directors | 4 |
| 2. | Merger | | 7 |
| | A. | Implementation of Common Code | 26 |
| | B. | Change of Brand Name of Indian | 27 |
| 3. | Financial Performance | | 28 |
| | A. | Reasons for losses | 31 |
| | B. | Turn-around Plan | 35 |
| 4. | Fleet Management | | 47 |
| | A. | Fleet Acquisition | 48 |
| | B. | Maintenance of Aircraft | 61 |
| | C. | Phasing out of old Aircraft | 63 |
| | D. | Leasing of Aircraft | 64 |
| 5. | Routes | | 67 |
| | A. | Flying on Routes as a Social Obligation | 82 |
| 6. | Ground Handling & MRO Services | | 85 |
| | A. | Ground Handling Services-Joint Venture | 86 |
| 7. | Human Resource | | 91 |
| | A. | Manpower | 91 |
| | B. | Salary and Wages | 93 |
| | C. | Protection of Interest of the Employees of NACIL | 100 |
| | D. | Training of Employees | 102 |

**Part – B**
**Observations / Recommendations of the Committee** — 103

**ANNEXURES**
Minutes of the sittings of the Committee — 117

(i)

# COMPOSITION OF THE
## COMMITTEE ON PUBLIC UNDERTAKINGS (2009 - 2010)

**SHRI V. KISHORE CHANDRA S. DEO - CHAIRMAN**

| Sl. No. | MEMBERS,  LOK SABHA |
|---------|---------------------|
| 2. | Shri K.C. Singh „Baba" |
| 3. | Shri Ramesh Bais |
| 4. | Shri Hemanand Biswal |
| 5. | Shri Anant Kumar Hegde |
| 6. | Shri Sukhdev Singh Libra |
| 7. | Dr. Charan Das Mahant |
| 8. | Shri Baijayant Panda |
| 9. | Shri L. Rajagopal |
| 10. | Shri Nama Nageswara Rao |
| 11. | Chaudhary Lal Singh |
| 12. | Shri Ganesh Singh |
| 13. | Shri N. Dharam Singh |
| 14. | Shri Rajiv Ranjan Singh alias Lalan Singh |
| 15. | Shri Bhisma Shankar alias Kushal Tiwari |

**MEMBERS,  RAJYA SABHA**

| | |
|---------|---------------------|
| 16. | Shri Birendra Prasad Baishya |
| 17. | Shri Bharatkumar Raut |
| 18. | Ms. Mabel Rebello |
| 19. | Dr. T. Subbarami Reddy |
| 20. | Shri Vijay Kumar Rupani |
| 21. | Shri Tapan Kumar Sen |
| 22. | Shri Amar Singh |

**SECRETARIAT**

| | | | |
|---|---|---|---|
| 1 | Shri J.P. Sharma | - | Joint Secretary |
| 2 | Shri Ajay Kumar Garg | - | Additional Director |
| 3 | Shri Paolienlal Haokip | - | Under Secretary |
| 4 | Smt. Malvika Mehta | - | Senior Executive  Assistant |

(iii)

## INTRODUCTION

I, the Chairman, Committee on Public Undertakings (2009-10)  having been authorized by the Committee to submit the Report on their behalf, present this 4th  Report on the National Aviation Company of India Limited- Merged Entity of Erstwhile Air India and Indian Airlines.

2.      The Committee took oral evidence of the representatives of NACIL on 8th October, 2009 and 12th November, 2009 and further, took oral evidence of the representatives of Ministry of Civil Aviation on 17th December, 2009.                          .

3.      The Committee considered and adopted this Report at their sitting held on 20th January, 2010.

4.      The Committee wish to express their thanks to the representatives of the National Aviation Company of India Limited and Ministry of Civil Aviation for placing before them the desired material and information in connection with the examination of the subject.  The Committee would also like to place on record their appreciation for the invaluable assistance rendered to them by the officials of the Lok Sabha Secretariat attached to the Committee.

5.      For facility of reference and convenience, the observations and recommendations of the Committee have been printed in **bold letters** in **Part-B** of the Report.

**New Delhi:**                                             **V. KISHORE CHANDRA S. DEO**
**20th January, 2010**                                          **Chairman,**
**30 Pausa, 1931 (Saka)**                      **Committee on Public Undertakings**

(v)

**PART –A**

**CHAPTER 1**

**INTRODUCTION**

1.1     The National Aviation Company of India Ltd. (NACIL) was incorporated under the Companies Act, 1956 on 30th March, 2007, by merging Air India Ltd. and Indian Airlines Ltd.  The *erstwhile* Air India Ltd. and Indian Airlines Ltd. were the flag carriers of the nation plying on international and domestic routes respectively.

1.2     With increased liberalization by the Government in the aviation sector, the two erstwhile entities were faced with serious competition both internationally and in the domestic market.  To ensure their survival in such a fiercely competitive industry, the Government merged the carriers with a view that the merged entity would get an opportunity to combine infrastructure and would be able to build a stronger and sustainable business.

1.3     However, almost two years after the merger, the company is plagued by serious survival issues including a huge financial loss, no real integration taking place, a disenchanted workforce, gross mismanagement regarding operations under different codes and a massive debt following an ambitious fleet acquisition plan.   The Committee, by opting to examine NACIL, seek to extend support to NACIL in restoring the past glory of the national carrier and to enable it to turn the corner.

A.    <u>Historical Background</u>

1.4     The Company was asked to furnish a background note on its formation and the changes undergone since its formation.  The same is given as under:-

"The need for amalgamation of Air India Limited (AI) and Indian Airlines Limited (IA) was necessitated due to the fact that both AI and IA, which were operating in a largely protected environment, were faced with fierce competition from domestic private and global airline companies.  Market share had declined substantially for both airlines. Significant increase in competitive activity had eroded historical advantage of both carriers as leading international carriers had increased coverage and frequency to major cities in India and domestic carriers also significantly ramped up operations.

The declining market, operating and financial performance posed a serious threat to future survival of the two airlines on a stand-alone basis.  It was felt that in an increasingly consolidating global aviation environment, where ‚critical mass/size" is a key success factor, combining the two state owned airlines into a single merged entity would better equip them to survive and prosper amidst fierce global and domestic competition as it would provide an opportunity to leverage

combined assets and capital better and build a stronger sustainable business.  It was also felt that the amalgamation would:

- o  Enable optimal utilization of existing resources through improvement in load factors and yields on commonly serviced route as well as deploy „freed up" aircraft capacity on alternate routes.
- o  Provide an opportunity to leverage skilled and experienced manpower available with both the companies to the optimal potential.
- o  Provide an integrated international/domestic footprint which would significantly enhance customer proposition and allow easy entry into one of the three global airline alliances.
- o  Provide an opportunity to fully leverage strong assets, capabilities and infrastructure.
- o  Potential to launch high growth and profitability businesses (Ground Handling Services, Maintenance Repair and Overhaul etc.)

Keeping in view the above, the merger of Air India and Indian Airlines was cleared by the Empowered Group of Ministers (EGoM) on 21st February, 2007 and thereafter by the Cabinet on 1 March, 2007.

Incorporation

Consequent to the Cabinet clearance National Aviation Company of India Ltd. (NACIL) was incorporated under the Companies Act, 1956 on 30 March, 2007.

Commencement of Business

The Certificate for Commencement of Business was issued by the Registrar of Companies, National Aviation Company of India Ltd. Capital Territory of Delhi & Haryana on 14 Mar, 2007.

Registered Office & Corporate Office

The Registered Office of the Company is at Airlines House, 113 Gurudwara Rakabganj Road, New Delhi and Corporate Office at the Air India Building, Nariman Point, Mumbai.

Effective date of merger

The Ministry of Corporate Affairs, Government of India, vide Order dated 22 August, 2007 approved the Scheme of Amalgamation of Air India Limited and Indian Airlines Limited with the National Aviation Company of India Ltd.  under Sections 391-394 of the Companies Act and on filing the Order with the Registrar of Companies, New Delhi the merger became effective from 27 August 2007, with an appointed date of 1 April 2007 and both the erstwhile entities viz. Air India Limited and Indian Airlines Limited stood dissolved without being wound up.

<u>Authorized Share Capital & Paid-up Share Capital</u>

Consequent to the amalgamation of the erstwhile Air India Ltd. and erstwhile Indian Airlines Ltd. into National Aviation Company of India Ltd., the authorized share capital of the Company was increased from Rs. 5 lakhs to Rs. 1500.05 crores.  The paid-up Share Capital was increased from Rs. 5 lakhs to Rs. 145 crores.  The entire Paid-up Capital is held by the Government of India.

<u>Brand Name</u>

Post merger, the brand name "Air India" has been retained with "Maharaja" as its mascot………

<u>Increase in the Authorised Share Capital</u>

The total aircraft acquisition programme of NACIL is of approx. Rs. 44,000 crores.  In addition, several other projects including inter alia setting up of MRO facilities for Boeing and Airbus fleet, joining star alliance, joint venture for Ground handling , introduction of hub & spoke at Mumbai and Delhi, setting up of international hub at Frankfurt and acquisition of new Passenger Reservation System have been undertaken by the Company.  These projects involve huge investments and are being funded from internal accruals as well as through borrowings.

As against the above, the paid up capital of the Company is only Rs. 145 crores.  It is necessary that the equity base of the company should be substantial enough to support the capital requirements as well as the long term working capital requirements.  Strengthening the equity base is also essential as leveraging of the debt has to be done in a manner to keep right balance between debt and equity since a favourable debt-equity ration is essential for the company to get a competitive rate of interest in the international markets.

In view of the above and the fact that the Company cannot raise capital from the market, a request has been made to the Government of India for infusion of at least Rs. 5000 crores towards the equity capital of the Company.  This will help the company to have a favourable debt-equity ratio.  For this purpose it is necessary to increase the Authorised Capital of the Company.

The NACIL Board has approved increasing the Authorised Share Capital from the present Rs. 50,00,05,00,000 and the approval of the shareholders of the Company is being sought."

**B.**   **Board of Directors**

1.5   On being asked about the details of the present composition of the Board of Directors, Air India in their written replies stated as under:-

"The appointment of Directors on the Board of Directors of the Company is made by the Government of India in terms of Articles 98, 117 & 133 of the Articles of Association of the Company.

The present composition of the Board of Directors is as under:

| | | |
|---|---|---|
| (1) Shri Arvind Jadhav | Chairman & MD | |
| (2) Shri Amod Sharma | SBU Head-Related Business | - Functional Director |
| (3) Shri Anup K.Srivastava | Director (Personnel) | - Functional Director |
| (4) Smt. Anita Khurana | SBU Head-Cargo | - Functional Director |
| (5) Shri Vipin K.Sharma | SBU Head-MRO (E&C) | - Functional Director |
| (6) Shri K.M.Unni | SBU Head-MRO (AF) | - Functional Director |
| (7) Shri S.Chandrasekhar | Director (Finance) | - Functional Director |
| (8) Shri N.Vaghul | | -Non-official Director |
| (9) Shri E.K.Bharat Bhushan | Jt. Secretary & F.A. | -Govt. Director |
| (10) Shri Prashant Sukul | Jt. Secretary | -Govt. Director |

1.6   When queried as to whether the composition of the present Board is in accordance with the proportion prescribed by DPE regarding the strength of functional and non-functional Directors, the Company submitted in their written replies the following:-

"The total approved strength of the Board of NACIL is 15.

The DPE O.M.No. 18 (6)/91-GM dated 16 March 1992, inter alia, lays down as under:

(A)   Functional Directors:

The number of such Directors on a Board should not exceed 50% of the actual strength of the Board

(B)   Government Directors:

The number of Government Directors on a Board should in no case exceed two

(C)   Non-official Directors:

The number of Non-Official Part-time Directors on a Board should be at least one-third of its actual strength.

Hence, the composition of the present Board is in compliance of DPE guidelines."

1.7    When the Ministry were asked the same question, they stated in their written replies as follows:-

"The DPE O. M. No. 18 (6)/91-GM dated 16 March 1992, inter- alia, lays down as under:

(A)          Functional Directors:

The number of such Directors on a Board should not exceed 50% of the actual strength of the Board.

Presently, one Functional Director on the Board of NACIL is in excess.  However, with the appointment of two more non-official Directors, the strength of Functional Directors would be in line with DPE guidelines.

(B)          Government Directors:

The number of Government Directors on a Board should in no case exceed two.

The number of Government Directors on the Board is two, which is in line with DPE guidelines.

(c)          Non-official Directors

The number of Non-Official Part-time Directors on a Board should be at least one-third of its actual strength.

Keeping in view the DPE guidelines, two more Non-official Directors are required to be appointed, for which the proposal is under process."

1.8    The Ministry of Civil Aviation were asked whether any vacancies exist in the present Board of Directors of NACIL and what steps have been taken by the Ministry of Civil Aviation to fill the same.  In their written replies, they submitted the following:-

"As per Memorandum & Articles of Association of NACIL, the maximum number of Directors on the Board should not be less than 3 and not more than 15, all of whom shall be appointed by the President of India.  The present strength of the Board of Directors of NACIL is 10.


Keeping in view the DPE guidelines, two more Non-official Directors are required to be appointed, for which the proposal is under process."

1.9    NACIL was asked what steps have been taken to professionalize the Board of Company.  In reply, they submitted the following:-

"The constitution of the Board is decided by the Government.

As regards professionalisation of the Board, as a beginning, the Ministry has already appointed Shri N.Vaghul, then Chairman of ICICI Bank Ltd.

Mr. Vaghul is on the Board of Directors of NACIL since 18 September 2007. He retired from ICICI Bank Ltd. as its Chairman with effective 1 May 2009.

Mr. Vaghul has a vast experience of finance and banking.  He was responsible for transforming ICICI from a small size long term credit bank to a large diversified financial conglomerate.   He was instrumental in starting an investment bank, a commercial bank, a venture capital company and an asset management company as part of the ICICI group.  He was also responsible for the promotion of India"s first credit rating company CRISIL.

He has served as the Chairman of several Committees and Task Forces constituted by the Government and the Reserve Bank of India.  He has handled several assignments for Asian Development Bank, IFC and the World Bank."

1.10   In this regard, during oral evidence of the Ministry of Civil Aviation, the Secretary further stated the following:-

"….. In fact, the hon. Member had also asked me specifically on what would be the Government"s support for NACIL.  I am sorry if we were not clear enough in our report.   I would like to mention some of the issues that we plan to take on priority.   One is NACIL Board is going to be strengthened with eminent persons.  In fact, we expect orders very shortly because that itself will give an image which is not just a few Government officers but people with respect and dignity who would really bring a value added to the national board. …."

**CHAPTER 2.**

**MERGER**

2.1     With regard to merger of Indian Airlines with Air India, NACIL was asked as to what level of flexibility had been provided to achieve financial and capital restructuring through revaluation of assets.  In reply, they submitted the following:-

> "Under the Scheme of Amalgamation which has been approved by the Ministry of Corporate Affairs, the assets of the erstwhile entities viz. AI and Indian have been valued by the valuers and the revised valuation would be incorporated in the books of the Company from the appointed date of the merger ie.1[st] April 2007.  This would considerably improve the networth of the Company which we would be able to leverage for the purpose of raising long terms loans from Banks/Financial Institutions.  The paid up capital of the Company was already restructured at the time of amalgamation since the carry forward losses and the reserves were adjusted against the paid up capital of both the entities and the capital of the merged entity was determined at Rs.145 crores."

2.2     NACIL was asked to give details about the monitoring mechanism that had been put in place to oversee the ongoing merger/amalgamation of Indian Airlines with Air India. In their written replies, they submitted the following:-

> "With effect from 27th August 2007, Air India Limited and Indian Airlines Limited stood dissolved without being wound up in accordance with thee Scheme of Amalgamation and merged into National Aviation Company of India Ltd. (NACIL).
>
> A cross-functional Integration Cell has been formed under C.M.D. to monitor integration activities.   In order to deal with the merger-related grievance of various employees, a Three-Tiered Grievance Redressal machinery has been put in place."

2.3     The Company was asked to give details of the timeframe within which the integration of Air India and Indian Airlines at all levels was supposed to be completed. Details were asked for in table form of all the steps involved as part of the roadmap of the merger, along with the timeline for each stage and the status as of now, reasons for delay, if any and revised timeline therefor.  NACIL submitted the following in their written replies:-

> "Time-frame of manpower integration :

| Category of employees | Time frame |
| --- | --- |
| Non-Technical | 06 months |
| Technical | 12 months |
| Flying Crew (Pilots & Cabin Crew) | 18 months" |

2.4    The reasons for the merger of the erstwhile Air India and Indian Airlines were queried from NACIL, to which they replied as under:-

"The need for amalgamation of Air India Limited (AI) and Indian Airlines Limited (IA) was necessitated due to the fact that both AI and IA, which were operating in a largely protected environment, were faced with fierce competition from domestic private and global airline companies.  Market share had declined substantially for both airlines.  Significant increase in competitive activity had eroded historical advantage of both carriers as leading international carriers had increased coverage and frequency to major cities in India and domestic carriers also significantly ramped up operations.

The declining market, operating and financial performance posed a serious threat to future survival of the two airlines on a stand-alone basis.  It was felt that in an increasingly consolidating global aviation environment, where „critical mass/size" is a key success factor, combining the two state owned airlines into a single merged entity would better equip them to survive and prosper amidst fierce global and domestic competition as it would provide an opportunity to leverage combined assets and capital better and build a stronger sustainable business.  It was also felt that the amalgamation would:

-Enable optimal utilization of existing resources through improvement in load factors and yields on commonly serviced routes as well as deploy „freed up" aircraft capacity on alternate routes.

-Provide an opportunity to leverage skilled and experienced manpower available with both the companies to the optimal potential.

-Provide an integrated international/domestic footprint which would significantly enhance customer proposition and allow easy entry into one of the three global airline alliances.

-Provide an opportunity to fully leverage strong assets, capabilities and infrastructure.

-Potential to launch high growth and profitability businesses (Ground Handling Services, Maintenance Repair and Overhaul etc).

Keeping in view the above, the merger of Air India and Indian Airlines was cleared by the Empowered Group of Ministers (EGoM) on 21 February 2007 and thereafter by the Cabinet on 1 March 2007. Consequent to the Cabinet clearance, National Aviation Company of India Limited (NACIL) was incorporated under the Companies Act, 1956 on 30 March 2007. The Ministry of Corporate Affairs, Government of India, vide Order dated 22 August 2007 approved the Scheme of Amalgamation of Air India Limited and Indian Airlines Limited with the National Aviation Company of India Limited under Sections 391-394 of the Companies Act and on filing the Order with the Registrar of Companies, New Delhi the merger became effective from  27 August 2007,

with an appointed date of 1 April 2007 and both the erstwhile entities viz. Air India Limited and Indian Airlines Limited stood dissolved without being wound up. ……..In addition, M/s. Accenture had also highlighted that the merger also provides an opportunity to undertake a comprehensive transformation programme to improve the overall competitive and profit position. The transformation programme should encompass –

- Clarity on operating model for airlines business
- Integration and restructuring of network
- Strategic cost reduction and productivity enhancements
- Fleet renewal and products revamp
- Significantly enhanced focus on service levels
- Cash injection / liquidation of non-core assets
- Review options of outsourcing non-core areas
- Targetted injection of best-in-class management skills
- Strong branding and communication campaign (at the right stage)
- Continued Government support
- Regulatory support to prevent over capacity and crowding
- Infrastructure to support growth
- Favourable negotiations on bilateral rights."

2.5   In this regard, during oral evidence, the CMD, NACIL stated before the Committee the following:-

"The problem which is being faced in the company is this. In the last one year, the fuel prices had gone up to 145 dollar per barrel. That was a major killing factor, not only for the Indian Airlines, but for all the legacy carriers, what we call as full service carriers. A week back, for the first half, the British Airways had declared a loss. Singapore Airlines, just about two days back, declared, for the last quarter, 114 million dollar loss. Losses are being incurred by Lufthansa or by Air Canada or by Japan Airlines or by Thai Airways, all over the world, most of the airlines are now showing losses on hand.

Two industry-specific issues have come up – one is high fuel prices and the second is loss of yields. That is passenger fares have dropped; capacities are in excess and in most of the places where the capacity has been in excess, prices have fallen down.

The third aspect which has come in the last two years is that low cost carriers have come; they have bought new aircrafts; they are still on the verge of getting their act together; they are all in shortfall; they do not operate for more than six hours; they operate within their own region initially; they strengthen themselves there and then, they expand into the neighbouring regions. They do not over-arch on 2-3 regions and go into other areas.

If you look at Silk Air, it started its low cost carriers only in South East Asia, between Singapore, Jakarta and other areas. They killed the long carriers first;

when they become strong, they are now entering into India. Malaysia started Air Asia, as a low cost carrier; they had introduced into entire South East Asia; now, they want 18 destinations in India. Tiger is a small low cost carrier of Cathay Pacific; they dominated Hong Kong; they came and dominated Bangkok; now they want entry into India. On the West side, we got Emirates, etc. They are introducing Fly Dubai, Air Arabia and a host of other small carriers; they are going to focus on India. They are looking at 18-20 destination points in India. Why I am telling you all is that I felt that it is my bounden duty to tell what I understand from the situation so that probably I will get a better advice from you on this issue.

Madam had raised an issue on hand. It is a clear fact that Indian market and the Chinese market are the two key drivers for the future growth of civil aviation in the world. Everybody wants to have a share in these two markets – China and India. While saying so, the people who want to enter into India, are looking at airlines within India, which are domestically strong, with whom they are going to share or invest or partner.

Singapore Airlines, Air India and Emirates – I would like to compare for your consideration. Singapore Airlines does not have any domestic market. They have only one airport, one country; they just cannot survive only on their domestic market. The only way they can survive is on the domestic market of some other countries, that is South East Asia and Malaysia, Indonesia and others or India. Emirates is one city and one country; there is only one city; they also cannot survive without actually tapping Indian market. Air India also, in its old avatar, did not have a domestic network; it was also similarly placed like the Singapore Airlines and the Emirates; there was no difference between the two. The ability of Singapore Airlines and Emirates to enter into as many destinations domestically helped them to survive. Air India either had to enter into domestically completely in order to get all the feeder market into itself or find some other airlines with whom it is going to jointly handle. This is one perspective which I want to keep on line.

That is why, when the question came up, if Air India and Indian Airlines had not merged, Air India would have died, in the sense that there is a strong domestic public sector undertaking which is already dominant in the Indian market. If Air India wants to compete with the Indian Airlines, and try to develop another 20 destinations, Air India would not have been in a position to do so. It has only wide bodies; it does not have any narrow bodies to operate in the Indian market, whereas Indian Airlines had only narrow bodies to operate in the Indian market and does not have wide bodies to operate in the international market. Now today if you are going to look at the Jet and Kingfisher which want to do international market, first they consolidated it on the domestic side and then they started asking for international routes. When they concentrated on the domestic side, all of them had narrow bodies. They do not have wide bodied aircrafts in the domestic market and wide bodies are required for international routes. So, when Jet and Kingfisher both had entered the market and wanted international routes,

they started procuring wide bodied aircrafts. The same thing, Indian Airlines also did. Indian Airlines also was a predominantly narrow bodied aircrafts – Airbus and the earlier, 737-200. With this narrow body, they can operate in the neighbouring areas, and in the domestic market. They cannot go to Paris or they cannot go to London; they cannot go to Japan or Shanghai or any other place. They had to buy a wide bodied aircrafts. So, Indian Airlines tried to grow from domestic market into a larger market.

Actually speaking, it should have been like this – either you should have allowed the Indian Airlines to grow from a strong domestic base to an international base or you should have allowed Air India from a strong international base to come into domestic base. These were the two questions which have come up. As a person who is coming at a time when I was not a party to the decision of merger at all, I still have a little bit of what you call, looking at from outside, the way you have asked the question, I had to ask myself – whether this merger was really right; conceptually the merger makes sense; practically it is a different issue. Practical issues, I would like to point out, on hand. If you ask my personal opinion on the question of whether the merger conceptually or financially – if you look at it financially – the merger makes sense because either Indian Airlines had to buy wide bodied aircrafts or the Air India would have to buy narrow bodied aircrafts. Now, here are two questions – in India, under a public sector undertaking concept, would you have allowed Air India to buy narrow bodied aircrafts to operate in Indian conditions and would you have allowed Indian Airlines to buy wide bodied aircrafts, In the national interest, somebody would have said that already these people have got these two aircraft types, why do you not merge them together. This was the question. So, it makes sense that any airline in the world will have a set of narrow bodies and a set of wide bodies. The question which comes up here is why this entire problem is being faced right now – the problem of merger itself is a big issue.

Nowhere in the world any merger has really been successfully completed. If you take the Delta-Northwest airlines, today if you go to the United States and ask the pilot or a cabin crew he will say, "I am a Deltan.  I am a North-western". There is the North-western merger happened with the regional airline known as Redmond Airlines.  There also they continued to have Redmond salary structure, Redmond career progression which is part of the Northwest and Northwest is part of Delta.  How these synergies have to be done?  What has happened is though these two are public sector undertakings in Civil Aviation industry their internal procedures, processes, human relations, working conditions, timings and methods of dealing are totally different."

2.6    The Committee asked NACIL to give an account of the situation prevalent in the merged company after the merger and questioned whether the actual integration of every aspect of both the companies had not yet been completed.  In reply, NACIL submitted the following:-

"Over the last two years, routes have been rationalized and several overlapping international routes in the Middle East and East Asia have been eliminated. Areas have also been identified where the airline would be able to realize economies of scale in the procurement of goods and services. A combined insurance policy was taken for covering aircraft and Non - aviation insurance to cover all equipments and buildings and other facilities. Similarly, annual saving of nearly Rs.200 crores is envisaged by procuring bulk fuel for the entire fleet operations including that of subsidiary companies due to "Volume Discount on Fuel".  Tenders of certain In-flight service items were released on a consolidated requirement basis to achieve "Volume Discount".

Engineering facilities available at various locations have been used to leverage the shortfall in capacity in Mumbai resulting in saving   on transportation costs.

Apart from this, management of working capital is also done optimally by taking the resources position on a combined basis.

As per the estimates worked out by internal working groups/department at the time of initiating the merger an amount of Rs.996 crores have been projected as the synergy benefit spread over for a period of two years against which an amount of Rs.503 crores have been realized as synergy benefit in the first one year of the integration. The details of the estimated and actual figures of the synergy benefit are as follows :

| Area | Estimates-Annualised (Rs.in Crores) | Actual Accrual - (Year 1) (Rs.in Crores) | Annual accrual -(Year 2) (Rs.in Crores) |
|---|---|---|---|
| | | | |
| Network | 299 | 127 | |
| Sales & Marketing | 160 | 69 | |
| Finance | 224 | 223 | |
| Material Management | 91 | 38 | |
| Cargo | 99 | 17 | |
| Ground Handling | 69 | 11 | |
| Engineering / MRO | 10 | 10 | |
| Security | 26 | 4 | |
| Administration | 1 | 0.2 | |
| Regions | 17 | 3.7 | |
| TOTAL | 996 | 503 | |

It is true that the actual integration of every aspect of both the companies is yet to be completed.

**However, integration of both the companies have been completed in the following areas;**

- Overall (Corporate level)

- o   Finalization of CMD
- o   Finalization of Board of Directors
- o   Finalization of organization structure for NACIL
- o   Selection of leadership team - Functional Directors, Executive Directors and some General Managers (holding independent charges)
- o   Setup of Integration Cell
- o   Setup of Grievance Redressal Mechanism
- o   Setup of Communication Plan
- o   Monitoring & tracking of overall synergy benefits

- Sales & Marketing
  - o   Preferential SPA"s & sale by GSA"s – pax only
  - o   Common pricing on overlap markets - AI and IC
  - o   Implement all network  integration „quick wins"
  - o   File Summer-2008 slots at coordinated airports
  - o   Integrated & Standardized MIS
  - o   Common sales / distribution policies
  - o   Finalization of Integrated sales force structure
  - o   Common marketing, promotions advertising
  - o   Design commercial training procedures
  - o   Integrated Schedule for Summer 2008
  - o   Consolidated Travel Agents network & common commission / incentives structure
  - o   Filing of fares from more O&Ds – IA domestic network to / from AI international destinations
  - o   E-ticketing between AI and IA
  - o   1-way Free sale:  IA  flights by AI
  - o   Common front-end interface for website

- Customer Service
  - o   Unified face to customer (UFC) at all touch points - signages
  - o   Unified face to customer (UFC) at all touch points - equipment
  - o   Unified face to customer (UFC) at all touch points - stationary (boarding passes, baggage tags, etc)
  - o   Unified face to customer (UFC) at all touch points - in flight items
  - o   Through check-in & seamless transfers
  - o   Common / integrated  call center
  - o   Standardize services provided by the company to cabin crew (transportation, hotel, etc - excludes allowances)

- Network
  - o   Decision to join Star Alliance
  - o   Rationalization of key overlap markets - AI and IC
  - o   Standardized feeder flights to / from BOM for AI"s international flights
  - o   File W-2007 slots at coordinated airports

- Finance
  - o   Design of Transfer Pricing principles between SBUs
  - o   Synergies/ quick wins in Insurance
  - o   Synergies/ quick wins in Fuel procurement- ATF

- o Synergies/ quick wins in number of banks & fund management
- o All aspects towards standardization of  revenue & expenditure accounting & processing
- o Integration of Accounting policies, legal & tax issues.
- o Integrated Financial Statements (P&L / Balance Sheet, etc)
- IT
  - o Revenue Accounting
  - o Hardware upgrade (servers)
  - o Network upgrade (MPLS IP VPN, Bandwidth, etc)
  - o Through check-in & seamless transfers
  - o E-ticketing between AI and IA
  - o Common front-end interface for website
- Ground Handling
  - o AI"s Contracts Section to deal with the new customer airlines at BOM, MAA,COK, TRV IA to deal with the new airlines at all other stations like DEL, CCU, AMD, CCJ etc
  - o Common procedure for procurement of GH equipment, spare inventory control
  - o Ramp-side activities to be taken over by GSD at select stations
- Material Management
  - o Integrated Policy
  - o Synergies in Aircraft Spares Procurement and Initial provisioning
  - o Synergies in Office Equipment & Hardware
  - o Synergies in Catering & Up-liftment
  - o Synergies in Cabin Consumables
  - o Synergies in Ground catering
  - o Synergies in Passenger hotel
  - o Synergies in Crew & Cabin Hotels
  - o Synergies in Traveling/ Transportation
- MRO
  - o Subgroups of Engine and APU will visit bases to assess the facilities and future growth capabilities
  - o Feasibility study of existing component capability list
  - o Exchange of information on Quality Procedures, MEL/CDL, etc
  - o Exchange of information on inventory management procedures, facilities, IT systems and manpower
  - o Evaluation of accessories and avionics component list and study test facilities of the new fleet
  - o Uniform Quality Control policy for MEL Preamble
  - o Common MOE manual as per CAR 145
  - o Aircraft performance and Component Reliability Reporting System Procedure Harmonization
  - o Common utilization of Fabrication Facilities, Non Destructive Testing, Composite Repair Shop, Machine shop, Structural shop, etc.
- Cargo
  - o Implementation of common pricing and SPA"s in the common markets

- o   Operation of first freighter with common AI Cargo branding
- o   Common mail and courier operations
- o   Interline message exchange to be functional between current AI and IA systems
- Operations and Flight Safety
  - o   Common safety policy along with a joint flight safety manual (with two co-existing parts) for the purposes of AOP (subject to in-principle approval by DGCA and other authorities)
  - o   Formulation of a joint emergency response plan and a preparatory drill for the same.
  - o   Extension of support of flight safety sections to all stations where there is presence of any airline
  - o   Common use of VHF company frequency
  - o   FMC database (Central Training Establishment) – Obtain value discounts from Honeywell
  - o   Operations manual integration including Training, Flight Dispatch & Operations
  - o   IOSA certification for AI and IC
  - o   Requirements identification for crew scheduling & rostering software
- Training (Operations)
  - o   Common e-mail id for sharing of information
  - o   Integration of training manual for AOP
  - o   Integration of other associated manuals (SOP, Emergency response manual etc.)
  - o   Integration of training manual for IOSA
- HR – General Cadre
  - o   Organization Structure till DGM level
  - o   Seniority integration principles for general cadre - ED to DGM level
- HR – Policies
  - o   Delegation of Administrative and Financial Powers
- Public Relations
  - o   Initiation of brand building exercise for the merged entity
  - o   Initiate joint handling of media relations
  - o   Finalize common PR agency
- Security
  - o   Prepare note on organization structure for unified security departments in the merged entity
  - o   Present draft note to the ministry on extensions of single agency concept to all international airports in India
  - o   Visit to airports to study processes and implementation of aviation security processes
  - o   Initiate common use of X-BIS and BRS systems at major international airports
  - o   Rationalization of in-flight and in-house magazines
  - o   Exchange data on manpower and other available resources in both security departments

- o  Initiate use of common aviation training facilities
- o  Initiate use of common manpower available
- o  Initiate manpower assessment to cater to security requirements as per R P Singh committee
- Admin (Corporate Affairs)
  - o  Appointment of RTI appellate authority
  - o  Finalization of legal structure & legal practices for NACIL
  - o  Initiate exchange of Minutes of Board / General meetings (on CD)
  - o  Compilation of all reports and procedures with consultation of directors Official Language Civil Aviation to finalize way forward
  - o  Preparation of RTI material on company website

**However, integration of both the companies are in progress in the following areas :**

- Sales and Marketing
  - o  Common agreements and rate structure with all CRS/GDS
  - o  Single point accountability for sales force
  - o  Consolidated GSA network & common commission / incentives structure
  - o  Integrated airport facilities & City Ticketing Offices
  - o  Implement common commercial training procedures
  - o  Common / integrated  internet booking engine
  - o  Single Revenue Management System
  - o  Integrated PSS / Single Code
- Customer Services
  - o  Unified face to customer (UFC) at all touch points – uniforms
  - o  Rationalization of cabin crew deployment at BOM and DEL
  - o  Integrated training plan for cabin crew
  - o  Integrated scheduling plan for cabin crew
  - o  Integration of Alliance Air cabin crew into full service carrier
- Network
  - o  Rationalization of key overlap markets - Full Service and Low Cost carriers
  - o  Complete "clean sheet" network planning exercise
- Finance
  - o  Integrated ERP
  - o  Implementation of Transfer Pricing between SBUs
  - o  Synergies/ quick wins in finance expenses in common foreign & domestic stations
- IT
  - o  PSS
  - o  Common cargo automation / IT system
  - o  Integrated Operations Control Center (IOCC) - hub control, flight dispatch, crew scheduling, etc
  - o  MRO solution

- o ERP - Finance / Material Management / HR
- o Email system
- Ground Handling
  - o Decision on method of handling (erstwhile AI / erstwhile IC / combined / outsourced) of flights at following overlap stations- AMD,CCJ,IXE, ATQ, PNQ and TRZ
  - o Finalize plan for outsourced activities at common stations
  - o Rationalization of handling contracts at common stations for getting a better deal
  - o Centralized control for Ground Handling at both domestic and international handling at MAA, CCU, TRV  Equipment to be pooled and operated as a single unit
  - o GS workshop facility and training centers at all stations to be pooled
  - o Common procedure for handling contract agreements including SLAs compliance & monitoring
- Materials Management
  - o Aircraft Spares Procurement - Synergies in common parts
  - o Aircraft Spares - Synergies in Repairs & Logistics
  - o Synergies in Outsourced Services
  - o Synergies in canteen supplies
  - o Synergies in Medical Items
  - o Synergies in Uniforms purchase
  - o Synergies in Storage Facilities
- MRO
  - o Policy decision on outsourcing Aircraft handling at Line Maintenance level in foreign stations, except for certification.
  - o Common contract for cabin cleaning
  - o Common engineering office in all Line Stations with all equipments and facilities
  - o Feasibility study of avionics and accessories space, manpower and equipment at various locations
- Cargo
  - o Infrastructural synergies at some airports
  - o Common cargo automation / IT system
- Operations and Flight Safety
  - o Conducting of joint Safety audits
  - o FOQA harmonization
  - o Implementation of Fuel Efficiency Gap Analysis (FEGA) recommendations
  - o Technical feasibility study for sharing of DFDR Frequency data and Flight Scape software systems
- Training (Operations)
  - o Explore potential for an independent training profit center
- HR – General Cadre
  - o Seniority integration principles for general cadre - remaining office levels

- o Level mapping principles
- o Compensation harmonization principles
- o PLI harmonization
- o Organization structure harmonization below DGM level
- HR – Other Cadres
  - o Union (Staff integration)
  - o Engineering integration
  - o Operations integration
  - o Cabin crew integration
  - o Other technical cadres integration
- HR – Policies
  - o Service Regulations, Standing Orders, Passage Regulations
  - o Recruitment and Promotions policy
  - o Annual Performance Appraisal policy
  - o Foreign posting policy
  - o Training & Development policies
  - o Harmonized rules for new recruits
- Properties and Facilities
  - o Rationalization of booking offices
  - o Rationalization of city offices
  - o Rationalization of airport facilities
- Medical
  - o Common medical policies
  - o Common medical panels
  - o Medical facilities harmonisation
- Admin (Corporate Affairs)
  - o Preparation of RTI material on company website

**However, integration of both the companies will have to be initiated in the following areas:**

- Sales and Marketing
  - o Codeshare & 2-way Freesale
- IT
  - o Data warehouse and MIS
- Ground Handling
  - o Common training procedures
  - o Common optimized procedure to be adopted for Ramp services and On-ramp aircraft servicing
  - o Centralized control for both domestic / international handling at DEL and BOM
  - o Finalize costing and cost-tracking methodology
  - o Common optimized procedure to be adopted for Terminal side services
  - o Automation of procedures particularly computerized system to be implemented

- Materials Management
  - Integrated Process
- MRO
  - Integration of IA Mumbai Engineering Training School with AI facilities . Faculty of non aircraft specific courses can be utilized
  - Combined Overhaul shop load planning
  - Acquisition of common aircraft scheduling tool
  - Combined Hangar planning
  - Common training for better utilization of A &C engineers license privileges at Line Maintenance level
  - Existing AI and IA technicians having A& C and EIR ( avionics)  to be trained on 737/800 and inducted in NACL and deputed as per requirement
  - Integration of aircraft training courses
- Cargo
  - Common policies and procedures
  - Common training
  - Integrated training facilities
- Operations and Flight Safety
  - Sharing of Jepson manuals to aircrafts instead of pilots
  - EDS" computerized flight planning software
  - Single Air Operators Permit (AOP)
  - Cross deployment of crew
- Training (Operations)
  - Initiate sharing of ground instructor resources in common areas (specific aircraft type trainings will continue as separate)
  - Integrate common courses for trainee pilots
  - "Initiate common training  - Flight dispatchers at CTE- Security (BCAS training) - First aid training for cabin crew - Aviation medical training"
  - Sharing of printing press facilities / resources
  - Harmonization of issuance of circulars / manuals
  - Maintenance of common training records
  - Formulation of new training policy for merged entity
  - Finalization of training captains strength and ratio per fleet for merged entity
  - Common ground instructors ratio / placement
  - Finalize effect on pilots, cabin crew, flight dispatchers & engineer"s training
- HR – General Cadre
  - Transition to SBU model
- HR – Other Cadres
  - Transition to SBU model
- Properties and Facilities
  - Prepare of a common set of procedure / departmental manuals
  - Finalization of the technical and financial powers for the properties & facilities department

> > o Standardization of tendering procedure
> > o Raise cross-functional Query to HR – incorporating E&M (Electrical & Mechanical) engineering activities for creation of infrastructure in scope of civil works
> > o Initiate centralized control for projects (project cost >10 lakhs)
> > o Initiate deployment of projects team on visiting basis"

2.7    NACIL were asked if any sensitivity analysis was made before going in for the merger.  The following statement was furnished by the Company:-

"The business case for the merger was finalized after reviewing the following aspects:

1. Overall Aviation scenario globally and in India – increased competition from private and foreign carriers
2. Increasingly overlapping roles of erstwhile Air India and Indian Airlines cannibalizing on each other"s business
3. Deteriorating operating and financial performance vis-à-vis competition
4. Need for a flag carrier with an integrated domestic and international footprint
5. Expected synergies from merger and costs of merger…….

Both erstwhile Air India and Indian Airlines made losses in 2006-07 and since then losses have worsened significantly because of external factors such as deteriorating market conditions (falling yields, rising fuel costs). Impact of market conditions was so severe, that even airlines like Jet Airways which were making good profits at the time of AI-IA merger have made significant losses since then.

At the time of the merger, the analysis was focused on estimating synergies through merger. The overall synergy estimate was broken down into year wise synergy accrual targets. After the second year of the merger, NACIL"s losses have increased due to above external factors such as deteriorating market conditions. These losses in turn have masked the benefits that had accrued from the merger.

Sensitivity analysis/Impact of any external factor (such as ATF prices, load factors, yields) which have affected the financial performance of the combined entity, would have had an equal, if not greater effect on the standalone companies (had the merger not taken place)."

2.8    The Committee asked NACIL to clarify who could be held accountable for ineffective implementation of the merger.  The written replies submitted by NACIL are as under:-

"Overall status on integration areas is as follows:-

|  | Completed | In Progress | Not initiated |
|---|---|---|---|
| Operational Integration | 61 | 28 | 26 |
| Contingent on management decisions | 20 | 11 | 1 |
| Contingent on IT readiness/ augmentation | 15 | 26 | 10 |
| Contingent on HR Integration decisions | 8 | 17 | 6 |

Key Areas where integration has progressed well

- Progressive integration of network/ schedules
- Progressive cross-utilisation of aircraft fleet
- Leveraging scale for joint procurement (fuel, insurance etc)
- Opportunity to join Star Alliance
- Merger Synergies at the end of Year 1 reported by Working Groups/ departments ahead of projections

Key Areas where integration has not progressed well

- Manpower Integration
- Cross utilisation of resources (especially in Airport areas)
- IT augmentation
- Properties and Facilities integration
- Opportunity to launch new SBUs/ subsidiaries (MRO, GHS, Cargo)

2.9    In this regard, during oral evidence of the representatives of NACIL, Chairman, COPU observed:-

"…. there is still one big question which remains un-answered, that is the intention of the merger that took place between the Indian Airlines and Air India. As I had mentioned last time, both the airlines were running at a loss at that time, both were in the red - and I do not think anywhere in the world two companies which were both going at a loss have been merged."

2.10   The Chairman, COPU further stated the following:-

"We have also noticed that your integration of Indian Airlines and Air India has not been user-friendly.  It has been on paper but in practical terms there is no real integration.  If you go to any of the Air India counter which was Indian Airlines earlier on, the board says „Air India" but are they in a position to issue you ticket on the international route?  They say that they are not authorised to issue tickets.  As far as employees and pilots are concerned, I do not know whether the terms are the same or not.  This has done more damage to both the airlines rather than having benefited anybody in any of the area."

2.11   The Ministry of Civil Aviation were asked what assistance and support, the Ministry had provided/was providing to NACIL for completing the merger process. In their written replies, the Ministry submitted as under:-

"A new company under the name of NACIL was incorporated under the Companies Act, 1956 by the Government on 30.3.2007.   The scheme of amalgamation was approved by the Ministry of Corporate Affairs on 22.8.2007. The approval of Registrar of Companies was granted on 27.8.2007 completing the legal formalities of merging Air India and Indian Airlines with NACIL. Thereafter, NACIL Board was required to execute the merger.

The merger is to be completed by NACIL and Government has been assisting its management in all matters wherever Government approvals are required."

2.12   During oral evidence of the representatives of Ministry of Civil Aviation, the Committee commented on the above-mentioned reply by the Ministry of Civil Aviation, as under:-

"….I went through the answers which you have given.  Let me refer to question No. 6 on page 15 in which it was asked categorically to state the assistance and support which the Ministry of Civil Aviation has provided or providing to NACIL for completing the merger process.  There is a two paragraph reply to that. Nowhere does it reflect the assistance you have provided.  You will see the reply is totally beating around the bush.  You are not talking about what exactly you are doing about it. ….."

2.13   When asked what steps were taken by the Government to strengthen the NACIL while mandating it to implement the merger in view of the exponential expansion of its functions, the Ministry of Civil Aviation in their written replies, stated as under:-

"The NACIL"s Board was reconstituted with Chairman & Managing Director, Joint Chairman & Managing Director, 8 Functional Directors, 1 Non-official Director and 2 Government Directors with a view to provide professional guidance in the merger process.

States were requested to exempt the properties of NACIL from Stamp Duty. Some of the states have responded positively.

Ministry of Finance was requested to amend Section 72A of the Income Tax Act in a manner so as to extend the benefit of carry forward of the unabsorbed depreciation of Air India and Indian Airlines to the new merged entity to be set off against its taxable profits in future.

Government of India Guarantee was provided for acquisition of new aircraft.

Government has approved setting up of a Joint Venture Company by NACIL with SATS for Ground/Cargo Handling activities at various airports."

2.14   The Committee commented the following on the above given answer:-

"Coming to question No. 7, it was asked about the steps which have been taken by the Government to strengthen NACIL and the answer is as though you are a catalyst, you are not concerned with the fate of NACIL. …."

2.15   On the same issue, the Secretary in his oral statement before the Committee submitted as given below:-

"In fact, the hon. Member had also asked me specifically on what would be the Government"s support for NACIL.  I am sorry if we were not clear enough in our report.  I would like to mention some of the issues that we plan to take on priority. One is NACIL Board is going to be strengthened with eminent persons.  In fact, we expect orders very shortly because that itself will give an image which is not just a few Government officers but people with respect and dignity who would really bring a value added to the national board.

We are also very grateful to the Government that they have issued orders that all official travels will have to be by Air India.  They should get us about Rs.1500 crore of revenue every year.

We will ensure that the service is also better.  We are looking at the Oil Ministry to have the sales tax on ATF come down to 4 per cent.  It is because 29 to 31 per cent of ATF sales tax is really harming not only Air India but almost all the airlines.  Oil Companies have also given an additional six months credit to Air India.  This is also happening.  Then the Government guarantees for some of our loans will bring it down.

We are also working at looking at the entire aircraft purchase programme. Our fleets are about 20 years old.  Unless we go in for new aircrafts, it would be very difficult. But given the financials, we are looking at, may be, some cancellations and some deferments.  We are talking to the Exim Bank on restructuring and re-delivery of this.  We are talking to Boeing because fortunately the 787s which they were supposed to give us is delayed.  So, using that, we are trying to defer some of the purchase of the aircrafts which will give us the much-needed financial help.  We are also looking at some leaseback arrangements of some of the aircrafts.  We are talking to other airlines to take it.  All this, we feel, will bear

fruit in the next six months to one year.  Even when we talk about the merger, we feel it is a little too early to say whether it is a success or a failure. I think, normally, any merger has taken three to four years; we are at about two years. Now with the kind of course corrections that we are looking at within the Board and within the Government for Air India, and with the present 20 per cent increase in passengers, with the loads and the yields increasing with the raising fares, I think our revenue stream also should improve.  This would also help us to tide over this with some help from the Government.  In fact the Government help is also not      Rs. 8000 crore as has been mentioned; they are giving us, to begin with, just Rs. 800 crore.  This will be closely monitored by the Group of Ministers. It has been made very clear to Air India that there is no free money coming; you will get Rs. 800 crore; you will have to show as to how much of cost cutting and revenue enhancement you will make. In fact the commitment given by the CMD and his officers to the GoM is about Rs. 1900 crore of cost reduction and revenue enhancement by April.  On the basis of that, that this Rs. 800 crore have been given. So, there is a tight monitoring by the Government at the GoM, and by the Ministry.  I think with these kinds of close monitoring that the Ministry would do, we hope to tide over some of these crisis. ….”

2.16   On being asked whether there was any monitoring mechanism which has been developed and implemented by the Ministry of Civil Aviation (MoCA) for monitoring the process of integration between Air India and Indian Airlines and details (in table form) of all the steps involved as part of the roadmap of the merger, along with the timeline for each stage, current status, reasons for delay, if any and revised timeline therefor, the Ministry replied as under:-

> “A cross-functional Integration cell has been formed under CMD to monitor integration activities. In order to deal with the merger related grievances of various employees, a Three Tiered Grievance Redressal machinery has been put in place.
>
> In this connection please refer to the merger integration project update of October 2009 already submitted to COPU.”

2.17   The Ministry were asked what instructions/guidelines were issued to NACIL by the Government while mandating it to implement the merger inter-alia including the following -(i) Route dispersal, (ii) Route dispersal in non non-profitable areas, (iii) Fleet Management and Acquisition, (iv) Leasing of Aircraft, (v) Capacity utilisation, (vi) Passenger Load Factor, (vii) Wage disparities, (viii) Controlling of costs, (ix) Code sharing, (x) Ground Handling Services, (xi) Maintenance & Repair Overhaul Services, (xii) Joint Ventures, (xiii) Performance of subsidiary companies, and (xiv) Various other issues relevant according to the Ministry related to the merger of Air India and Indian Airlines. In reply, they submitted the following:-

"No specific instructions were issued.  However, as per time-frame provided in the consultant"s report, NACIL was required to complete the process by 18/24 months."

2.18   The Committee asked what in the opinion of the Ministry had been the impediments in the way of the merger not taking place as per plan.  In reply, the Ministry submitted as under:-

"There were a number of issues involved in the merger of the two erstwhile airlines in the areas of IT, Manpower, Sales & Marketing, Network integration, Finance, Materials Management etc.

Merger of Air India and Indian Airlines coincided with the global recession and increasing fuel prices which has further complicated the matter and affected the pace of integration negatively.

While there has been progress in the areas of route rationalization, combined insurance policy, sourcing of fuel, sharing of engineering facilities, management of working capital etc., the progress in certain areas like IT, manpower integration has been slow."

2.19   When asked to give details of the meetings held at the Governmental level for reviewing implementation of the merger since the year 2007 and the impact of such meetings in expediting the completion of the process, the Ministry of Civil Aviation stated in their written replies, the following:-

"Apart from keeping a tab through Government Directors on the Board of NACIL, implementation of merger process was reviewed from time to time at Secretary/Minister level."

2.20   On being asked who the Ministry think is responsible for the mess in which the merged entity finds itself, the Ministry replied as under:-

"At the time the merger was contemplated, it was anticipated that there would be optimal utilization of all the resources and a growth in market conditions and global commitment for travel. Subsequently, due to the recessionary conditions affecting the market conditions in India & abroad, there has been a continuous pressure on yields, passenger load factors, etc. The loss of NACIL is mainly attributable to these factors including the expansion of fleet, which has resulted in additional interest and depreciation charges. Added to this the implementation of the wage agreements & the spiraling ATF prices has also impacted the bottom-line."

2.21   In this regard, the CMD, NACIL during oral evidence before the Committee submitted as under:-

"….The question comes up, maybe even if you want to de-merge the two today, in the de-merged condition also both will not survive.  In de-merged condition Air India will have to behave like a domestic carrier competing with Indigo and Spice Jet and has to become a low cost carrier. …."

## A.   Implementation of Common Code

2.22   The Company were asked to define Passenger Service System. They were further asked to give details of the status of implementation of this system for operating all domestic and internal flights under a common code and when it was likely to be implemented and made fully operational, the Company replied the following:-

"Passenger Service System is a set of applications and services that is provided in an automated environment for handling of passengers by an airline. This broadly includes airline Reservations, Fares, Inventory Management, Ticketing including e-Ticketing, Departure Control System/Check-in, Boarding Pass and Baggage Tag Printing, Baggage Reconciliation System, Automated Boarding Control, Weight & Balance, Flight Tracking, Credit Card authorization, Mis-handled Baggage Tracking etc.

NACIL is currently in the process of selecting a service provider for hosted PSS solution.

 The cut over date will be ascertained based on the selected service provider's tender response with respect to the implementation plan."

2.23   Regarding operations by both erstwhile airlines under a common code, CMD, NACIL stated the following before the Committee:-

"The first issue is, merger is okay.  Yes, merger is okay.  Is implementation proper?  Implementation is not proper.  You have asked one question that you cannot buy a ticket on the Indian Airlines counter.  Sir, we asked this question to the Indian Airlines; can you take the entire load of Air India on your computer system.  No, Sir.  For 16 years it has been an old computer system and they need to revive it.  They have floated a tender for revival.  We asked Air India computer system whether they will take the entire Indian Airlines support on this. They also could not.  Today, we have called for a tender.  We are going in for a demonstration of the IT system so that we have single passenger system.  It will take us at least six months to get the entire single-passenger system to come up. Unless that single-passenger system comes up it is difficult for us to do anything on the order.  Outside work we can do much better but internal work we cannot do.  If this company has to really survive in the long term basis it has to have a single IT system and if it does not have that there is no reason for it to continue."

**B.**   **Change of Brand Name of Indian**

2.24   With regard to the change of brand name of the erstwhile Indian Airlines, the Chairman, COPU during oral evidence of the representatives of NACIL stated the following:-

> "…..Indian Airlines and Air India were two established names, well marketed, well established for five decades.  When you had already thought of this scheme of merger for whatever reason, right or wrong it may have been, where was the need to introduce this business of „Indian" in the middle?  When you were thinking of merging Indian Airlines and Air India, in the interim period why did you have this business of „Indian" which meant changing your logos, making new letter heads and so on.  I do not know how much expenditure had gone into that. Apart from the expenditure it also caused a lot of confusion.  The well established trait name which had been marketed all along was totally disrupted during that period of time."

2.25   NACIL were asked to explain why the brand name of Indian Airlines was changed to „Indian" when the merger had already been thought of and how much expenditure was involved in changing the logos and all the other related activities for changing the brand name. NACIL replied the following:-

> "Indian Airlines had launched its new identity, viz. Indian, a new logo, viz. wheel of Konark and the livery to coincide with the induction of new A319 aircraft in their fleet effective 7th December 2005 (the first new type of aircraft to join the Indian Airlines fleet after a long gap of 11 years).
>
> The new look of the airline was meant to communicate a bold striking progressive and distinctive image for the airline. The wheel of the sun temple at the konark which is the logo of the new brand symbolizes timeless motion, convergence and divergence. It also embodies the solidity and the trust that has stood the test of time. It was decided by the board of erstwhile Indian Airlines, that this new livery and new logo consisting of graphic inspired by the konark wheel, will appear on all the 43 new aircraft to be inducted by Indian Airlines, as approved by the Government.
>
> The approximate expenditure on rebranding of Indian Airlines to Indian was Rs.3.25 crores which was spent as a part of budgeted advertising/ promotion/publicity expenditure.
>
> While the above change in the brand of Indian Airlines was effected during December 2005, amalgamation of Indian Airlines with NACIL was approved by the Board of Directors of Indian Airlines on 9th May 2007. The Ministry of Corporate Affairs vide its order dated 22nd August 2007, had approved the scheme of amalgamation of Indian Airlines and Air India into NACIL."

## CHAPTER 3.

## FINANCIAL PERFORMANCE

3.1   NACIL was asked to give details of profit made during the financial years 2007-08 and 2008-09 and to state what percentage out of the total turnover was the profit during those years.  In their written replies, NACIL submitted the following:-

"The details of the profits made by NACIL during the financial year 2007-2008 are given below:

|  | (Rs. crs) |
|---|---|
| Total Revenue | 15257.47 |
| Total Expenses | 18555.56 |
| Net Profit/(Loss) before tax | (3298.09) |
| Provision for tax | (1071.93) |
| Net Profit/(Loss) after tax | (2226.16) |

As seen from above the company has made a loss of Rs. 2226.16  crores as against a revenue of Rs. 15257 crores.

The accounts for the year 2008-09 are yet to be finalized."

3.2   On being asked what targets had been fixed in respect of turnover; and profit of the Company during the year 2009-10, NACIL in their written submission stated the following:-

"The Revenue Budget Estimates for 2009-2010 have targeted a turnover of Rs 12618.50 crores.

As per the Revised budget estimates the estimated loss will be Rs. 5439.73 crores for the year 2009-2010 where expenditure on fuel is based on crude prices at USD 85 per barrel."

3.3   On what action had been taken to attain the targets fixed for the year 2009-10, NACIL stated:-

"In order to attain the targets fixed for 2009-10, the need to increase our high yield traffic and gain the loyalty of our agents was critical.  With this in mind, Air India has taken the following initiatives in the recent past:

**Fares and Schemes:**

✓ Attractive cut and pay incentives offered to Travel agents on F/J fares – both IATA and market fares – e.g. ex India to USA/Canada/UK/ Europe, a 25% incentive is offered on IATA F/J fares and 10% on F/J market fares.

✓ Companion Free Scheme offered on IATA full fares between India and USA/Canada/UK/Europe – valid for outbound travel till 31st March 2010.

✓ Companion Free Scheme in F/J ex India to all international routes - valid till till 31st March 2010.

✓ Spouse Free Scheme available ex India to USA/ Canada/UK/Europe on the highest market fares (F22/J22 which are approx. 50-60% lower than the IATA fares) – valid till 30th Sept. 2009.

✓ Spouse Free Scheme available in J class on domestic sectors extended to include family – valid till 31st March 2010.

✓ Special Companion Scheme implemented whereby passengers travelling on international routes ex India on the highest market fares in F/J will be entitled to a companion ticket at 50% of the same fare.

✓ In view of poor carriage in J class ex stations like DXB, NBO and HKG, and as proposed by the field, we have approved a Companion Free Scheme on market fares for a limited sale period.

✓ Competitors" fares are monitored on a daily basis and steps are taken to maximize our loads and revenues."

3.4     The net profit/loss of Air India and Indian Airlines after tax, for last ten years before the merger and after the merger for NACIL for the year (2007-08) is given below:-

Pre merger figures are:-

**(Rs in crore), figures in brackets signify loss.**

| Year | Air India | Indian Airlines |
|------|-----------|-----------------|
| 1997-98 | (181.01) | 47.27 |
| 1998-99 | (174.48) | 13.12 |
| 1999-2000 | (37.63) | 45.27 |
| 2000-01 | (44.40) | (159.17) |
| 2001-02 | 15.44 | (246.75) |
| 2002-03 | 133.86 | (196.56) |
| 2003-04 | 92.33 | 44.17 |
| 2004-05 | 96.36 | 65.61 |
| 2005-06 | 14.94 | 49.50 |
| 2006-07 | (447.93) | (240.29) |

Post merger figure for NACIL is:-

Year 2007-08        -        (Rs. 2226 crore)-loss

3.5    The Company submitted the following for 2008-09:-

"As regards 2008-09 the accounts of the Company are still under audit and would be submitted as soon as they are approved by the Board."

3.6    On being asked whether there was any delay in finalizing auditing financial results/accounts for 2008-09 like in 2007-08, and if so, the reasons therefor, NACIL replied the following:-

"We have already developed a Uniform Accounting Policy for the merged entity in the year 2006-07 to present the accounts. Similarly a uniform chart of accounts was also developed during the year 06-07 for bringing about uniformity in accounting for the transactions. ERP was introduced in NACIL (A) in all the stations, domestic as well as international, during the last year which required some time to settle due to the extensive training involved and the challenges posed by the system.   A Process Consultant is being appointed to extend the scope of ERP to NACIL (I) also. The entire ERP implementation is planned to be completed by March 2011. Since presently NACIL (A) and NACIL (I) accounts are being separate they have to be consolidated and audited by three different firms of Auditors.

We are trying to present the accounts of 08-09 before end October 09, which is an improvement from the position last year when we presented the accounts of 07-08 in mid December 08.  Further the accounts of all the subsidiary companies have also to be audited and presented to their respective Boards before the accounts of NACIL is finalized as the impact of the subsidiary company accounts on NACIL has to be taken into account."

3.7    NACIL was asked the percentage of their total expenditure spent on fuel, passenger amenities, salaries and interest, whether for principal repayment or for the aircraft.  In reply, NACIL submitted the following:-

"The break up of the expenditure incurred in 2007-08 as per the audited report and the break up of the provisional results for 2008-09 which is under audit is given below:

| Particulars | Audited | Provisional |
| --- | --- | --- |
| | 2007-08 | 2008-09 |
| | % | % |
| Fuel & Oil | 33.7% | 34.2% |
| Staff Costs | 17.4% | 16.2% |
| Material & Outside | 9.0% | 5.4% |

| Repairs | | |
|---|---|---|
| Hire of Aircraft | 7.4% | 7.4% |
| Landing & Navigation | 5.2% | 4.5% |
| Pax Amenities | 3.2% | 2.4% |
| Commission | 3.3% | 2.1% |
| Depreciation | 4.1% | 5.9% |
| Handling | 2.9% | 2.6% |
| Interest | 3.8% | 8.6% |
| Other Expenses | 9.9% | 10.9% |
| **Total Expenditure** | **100.0%** | **100.0%** |

The Interest costs include only the interest element and do not include the principal element.  The Interest costs are for both the working capital and aircraft borrowings."

**A.     Reasons for Losses**

3.8     When asked to give in detail the reasons for losses by NACIL, the Company replied the following:-

"The losses in NACIL were mainly due to the following factors:

1)      Decline in passenger load factor due to competition both on domestic and international term.
2)      Decline in projected yield due to the large scale expansion of capacity by low cost carriers.
3)      Increase in financing cost due to aircraft acquisition and increasing working capital.
4)      Increase in depreciation expenditure and aircraft maintenance cost.
5)      Increase in wage bill and other staff cost due to implementation of various agreements.
6)      Increase in aviation turbine fuel cost.

The merged entity NACIL suffered a loss of Rs 2,226.16 crores in 2007-08 an increase of Rs 1537.94 crores (which is around 3.23 times the combined losses of the erstwhile entities)

The losses of the combined entity in 2007-08 were analysed in detail by the Board and the reasons attributable for the losses were discussed and approved by the Board.

The main reasons for the losses are -

- Decline in passenger load factor due increased competition *(from 65.6% to 63.8%)*
- Decline in yields  *(from Rs 3.38/Pkm to Rs 3.22/Pkm)*
- (*Combined effect of the above two resulted in a decline in Passenger revenue by Rs 288 crores from Rs 10242 crores in 2006-07 to Rs 9954 crores in 2007-08)*
- Decline in Freight revenue *(by Rs 74.98 crores from Rs. 747.63 crores to Rs 672.65 crores)*
- Increase in staff costs *( Rs 495 crores from Rs 2729.91 crs to Rs 3224.50 crores)*
- Increase in financing costs both for working capital and aircraft borrowings *( Rs 425 crores from 276.12 crores to Rs 701.30 crores )*
- Increase in Aviation Turbine Fuel (ATF ) cost ( Rs 305 crs from Rs 5947.35 crs to Rs 6252.51 crs)
- Increase in depreciation expenditure *(Rs 31.74 crs from Rs 729.92 crs to Rs 761.6 crs)*

It may be pertinent to note that the entire Aviation industry has been affected globally due to the recessionary trends and the International Air Transport Association (IATA) have been forecasting huge losses for the entire industry and in September 2009 announced a revised global financial forecast predicting airline losses totaling US$11 billion in 2009 as against the previous prediction of US$ 9 billion. The same is primarily due to rising fuel prices and exceptionally weak yields. IATA also revised its loss estimates for 2008 from a loss of US$10.4 billion to a loss of US$16.8 billion.

As per IATA, three main factors are driving the expected losses:

**Demand:** Passenger traffic is expected to decline by 4.0% and cargo by 14% for 2009.

**Yield**: Yields are expected to fall 12% for passenger and 15% for cargo. The fall in passenger yield is led by the 20% drop in demand for premium travel. There is little hope for an early recovery in yields in either the passenger or cargo markets.

**Fuel**: Spot oil prices have been driven up sharply in anticipation of improved economic conditions.

IATA expects losses to continue into 2010 with the industry expected to report a US$3.8 billion net loss. This is based on a limited revival of growth in traffic

volumes of 3.2% for passenger and 5% for cargo; very little increase in yields of 1.1% for passenger and 0.9% for cargo and oil at US$72 per barrel.

The position of airlines in India is also similar and there is pressure both on yields as well as load factors as there is excess capacity in the market and demand has shrunk.

Moreover all the synergy benefits expected out of the merger have not materialise in full as subsequent to the merger, the entire aviation landscape has changed significantly due to Global Recession, increase in fuel prices and the collapse of major financial institutions in USA. Any merger process is a time consuming exercise and quite a number of issues/components/policies need to be sorted out. Strategies of the erstwhile entities have to be co-related and discussions with Unions are one of these major exercises. A common IT system is required to fully realize the merger benefits and is one of the conditions for joining Star Alliance. The common PSS system is not yet in place."

3.9     NACIL was asked to explain why they were suffering losses even when during 2008 and 2009, their fleet size and load factor had increased.   NACIL replied the following:-

"The combined fleet strength of the two erstwhile entities as on 31St March, 2007 was 106 aircraft and the fleet size increased to 122 on 31st March, 2008 and reduced to 119 aircraft as on 31st March, 2009.

There is a mismatch in the age of the aircraft, The aircraft are either below 5 years or are over 15 years. The breakup of the aircraft as on 31.3.09 is given below:

| Aircraft type | Below 5 Years | 5-15 years | over 15 years |
|---|---|---|---|
| B777-200LR | 5 | | |
| B777-300ER | 5 | | |
| B777-200ER/A | | 4 | |
| B747-400 | | 2 | 4 |
| A310 | | | 6 |
| A310 Frtr | | | 4 |
| A319 | 15 | | |
| A320 | | | 47 |
| A321 | 12 | | |
| A330 | | 2 | |
| B737-200 | | | 11 |
| 747-300 | | | 1 |
| Beechcraft | | 1 | |
| Total | 37 | 9 | 73 |

As can be seen from above the new fleet has helped reduce the average age but a large number of aircraft are over 15 years.

As the new aircraft are joining the fleet NACIL is returning all the leased aircraft and no new leases are being finalized. The total number of leased aircraft returned during 08-09 was 11 and 8 more are to be returned in 09-10. The new fleet are being deployed on all the major trunk routes.

The delivery of the new aircraft did result in improved performance of NACIL on account of schedule integrity. However, primarily due to the fact that the new deliveries coincided with the global recessionary trends and huge rise in fuel prices, losses were suffered not only by NACIL but by the entire Aviation industry in India and globally.

Most of the routes made cash losses due to fall in revenues, due low load factors and drop in yields, while the costs increased due to rapid increase in fuel costs and due to spiraling infrastructure expenditure. Financing costs also began to increase as interest rates began to rise and the new fleet resulted in increased depreciation charge.

In 2009, although the load factors have shown a small increase, the yields have dropped significantly due to increased competition especially from low cost carriers and excess capacity in the market.

The details of the load factors for the last two years compared to the combined load factor of the erstwhile entities is given below:

| Year | | Pax Load factor % | Yield per PKM   *(Rs)* |
|------|------|------|------|
| **2006-07** | AI | 63.8 | 2.72 |
| | IC | 68.8 | 4.10 |
| | Combined | 65.6 | 3.25 |
| **2007-08** | NACIL | 63.8 | 3.22 |
| **2008-09(prov.)** | NACIL | 59.6 | 3.50 |
| **2009-10 (April- Sep)** | NACIL | 62.7 | 2.97 |

3.10   On being asked how much the procurement of the new fleet was responsible for the present loss, NACIL replied thus:-

"The following are the interest and depreciation charges on account of the new fleet acquisition:

(Rs. in Million)

| Year | Interest | Depreciation |
|------|----------|--------------|
| 2006-07 | 2761.2 | 7093.1 |
| 2007-08 | 7013.0 | 7616.6 |
| 2008-09 | 16658.8 | 12258.9 |
| 2009-10 | 25660.0 | 13800.0 |

**B.    Turn-around plan**

3.11   On being asked to give salient features of any turnaround plan made by NACIL, including details of reliefs and concessions sought from the Government and the present status of the turnaround plan, NACIL replied the following:-

"The following initiatives have been taken by the Management in bringing a turnaround in the performance of the company:

**(A) Cost Reduction: (Target Rs.1500 crs)**

01     Rationalization of loss making routes both on the domestic and international sector
02     Rationalization of meal uplifts at domestic and foreign stations.
03     Reduction of contractual employment and outsourcing of work
04     Rationalization of man power at Indian and Foreign Stations by closure of certain offline offices.
05     Return of aircraft on lease.
06     Study on Fuel Efficiency Gap Analysis under which IATA has been appointed to make an in depth study of the Fuel Efficiencies at various levels. The recommendations made by IATA are being considered at the highest level by a Strategic Group and are at various stages of implementation. These measures include reduction of the weight of the aircraft, following a cost index prescribed by IATA both on domestic and international routes, implementation of a computerized Flight Planning & Monitoring System, use of Ground Power Units instead of Auxilliary Power Units, optimization of reserve fuel carried on board, etc.
07     Rationalization of wage agreements including PLI Scheme.

**(B)  Revenue Enhancement – (Target Rs.1200  crs.)**

1. Increase in Passenger Revenue through improved marketing initiatives.
2. Increase in Cargo Revenue through better utilization belly space on line flights and cargo freighters.
3. Initiative for on board revenue
4. Increase in excess baggage revenue.
5. Farming out engine MRO / Line Maintenance to a separate Strategic Business Unit resulting in better utilization of capacity and optimum utilization of manpower resources.
6. Alternate use of properties
7. Aviation Training Services.

**(C)     Relief / Concession sought from the Government.**

1. One time Equity support of  Rs.10,000 crs for repayment of aircraft principal.
2. Rs.10,000 crs interest-free, 10 year loan with 5 year moratorium to support working capital reduction
   a.     From current 15000 to 5000 crs.
   b.     Balance 5000 to be securitized and converted into a long-term debt.
3. Setting up of Group of Ministers to supervise turnaround of Air India
4. Support of Bilaterals.
   a.     Freezing / roll-back, 6th freedom to be checked
   b.     Review access (points/frequency) arrangements in Bilateral Agreements.
5. Support for preferred slot negotiation at key international airports (timing, quantum) especially at Frankfurt hub.
6. Permission to defer/cancel part of new aircraft order as well as pre-mature return of old leased aircraft.
7. Ensure government support travel only Air India and are allowed to avail of commercial concessions / promotion offers (especially Frequent Flyer miles)
8. Aviation Turbine Fuel as „declared goods". Pricing in line with international „basket" price.
9. Amend definition of workman under IDA 1947 to exclude Pilots, Flight Engineers and Aircraft Maintenance Engineers from purview of the said Act.
   a.     Exemption from Contract Labour (Aboiltion and Regulation) Action 1970 to enable competitive outsourcing.
10. Prudential norms to be applied by banking industry on loans to Civil Aviation Sector.
11. Restructuring of top management team and appointment of Independent Directors (Finance, IT, Hospitality, Legal and Economic disciplines)………..

The turnaround plan has been presented to the Committee of Secretaries on 29th August, 2009 wherein the action plan has been broadly divided into 0-9 months,

9-18 months & 18-36 months. These are broadly segregated under Operational efficiency, Product Improvement, Organization Building & Financial Restructuring.

The ownership for implementing the targets under each of this plan has been given to the various Functional Directors / Executive Directors / General Managers.

|  | 0-9 months | 9-18 months | 18-36 months |
|---|---|---|---|
| Goal | *Survival (Cash Conservation)* | *Loss Reduction* | *Profit focus* |
| Operational Efficiency | • Improved aircraft utilization<br>• Route profitability enhancement<br>• Fast-tracking FEGA / Fuel Council<br>• Material / Maintenance spend control<br>• Rationalise Manpower costs<br>    − Redeployment of operational manpower<br>    − Rationalisation of offline stations<br>    − Reduced outsourced / casual / IBOs<br>• Other fixed / variable overheads reduction<br>• Non-traffic revenue enhancement<br>• Quick Win IT Initiatives (ARMS, Website, Fare tracking, Flight Planning) | • BPR and IT enablement in<br>    -Commercial<br>    -Finance/<br>    MMD<br>    MRO/<br>    Engineering<br>• Initiate review of In-sourcing and outsourcing opportunities | • BPR and IT enablement<br>- Other areas<br>• Implementation of In-sourcing and outsourcing opportunities |
| Product improvement | • On-time performance<br>• Customer surveys<br>• Product consistency | • PSS<br>• Star Alliance entry | • Brand-building & makeover<br>• New markets/ fleet plans |
| Organisation | • Operational & Business integration<br>• Sales & Distribution | • Manpower integration<br>• HR Transformation | • HR Transformation (cont) |

| Building | • restructuring<br>• Revamp union agreement / incentives<br>• New Governance structure (Board etc) | • Subsidiary Operationalisation | • Spin – off non core businesses (JV /Alliance) |
|---|---|---|---|
| Financial Restructuring | • Aircraft lease / purchase review<br>• Capitalisation & debt restructure<br>• Credit rating | • Enterprise Risk Management<br>• Preparation for IPO | • IPO |

3.12   The Committee asked NACIL how they could prepare their turn around plan without finalizing the Annual report for the year 2008-09:-

"As the provisional un-audited figures for 2008-09 were available, the turn around plan was based on the estimated figures available.

3.13   NACIL were further asked to state what the provisional projections were for the same. In reply they submitted the following:-

"The provisional figures for 2008-09 which are under audit for NACIL are given hereunder:

| Details | Rs Crs |
|---|---|
| Operating Revenue | 13225 |
| Operating Expenses | 18896 |
| Operating Loss | (5671) |
| | |
| Total Revenue | 13479 |
| Total Expenses | 19179 |
| Net Loss after tax | (5700) |

The audit process is on and the final figures should be available by the first fortnight of November 2009."

3.14   For measures already started for revival of the company, NACIL was asked to give an account of progress made till the present.  The details furnished by NACIL are given below:-

"Some of the measures that have already commenced and made progress are enumerated below:

1) **Manpower Cost Rationalisation** –

<u>Cost</u>

- Introduction of Leave without Pay scheme – Completed, 277 applications received
- 50% PLI cut – Board approval obtained, Alternate PLI scheme to be finalized by Dec 31, 09
- Elimination of overtime  - Orders issued, operational from July 09
- Rationalisation of contract & casual employees – Group constituted, to submit report by Oct 31, 09
- Rationalisation of manpower outsourcing – Dec 31, 2009

<u>Productivity</u>

- Repositioning of Operating Personnel – Nov 09
- Redeployment of surplus staff – staff identification 15 Sep 09, initiate redeployment Oct 09
- Standard staffing policy & work practices – Policy to be formulated by Oct 09
- Increased pilot utilization - 70 hours / month  - Oct 09

2) **Fuel Management**

- Appointment of Fuel Council – Completed
- Fuel consumption tracking
- Flight-wise & pilot-wise– Initiated in Aug 09
- Fuel Management Information System – Jan 10
- Tracking of fuel burn guarantees – In progress
- Implementation of flight planning system – Mar 10
- Plan for fuel consumption audit through Quarterly audits through IATA
- Fuel hedging (setting up of a unit) – Oct-Dec 09

3) **Route Profitability Enhancement**

- Focus on top 20 loss making routes - *Completed*
- Categorize target routes for Yield improvement focus – *Completed*
- Load factor (LF) improvement focus – *Completed*
- Cancellation/ restructuring– *Completed*
- Yield improvement routes - Pricing strategy & responsibilities –*30-Sept*
- LF improvement routes – Sales targets –*30-Sept*
- Cancellation/ Restructuring routes – *Completed for Winter Schedule*

**4) Non-traffic Revenue Enhancement**

<u>On-Board Revenue</u>

- Assessment of Buy On Board scheme.  - *In progress*
- Business plan for increasing ancillary revenue from onboard products such as third party advertisement, in-flight advertising, co-branding of products, on board sale of items, packaged products like insurance, etc. – *In progress*

<u>Revenue from Properties</u>

- Inventory of real-estate - Sep 09
- Appointment of real-estate advisor - Oct 09
- Finalized plan - Mar 10

Further the cost control measures initiated by NACIL in August 2008 and December 2008 have resulted in the reduced cost as detailed below :

| Sr. No. | Cost Reduction Heads | Impact |
|---|---|---|
| 1 | Contractual / Casual employment outsourcing | Anticipated savings of Rs.18 crores p.a. |
| 2 | Material consumption and outside repairs and services | Anticipated savings of Rs.580 crores during last one year |
| 3 | Return of leased aircraft | 11 aircraft returned during 2008-09 and 8 aircraft being returned |
| 4 | Fuel conservation / efficiency | Savings of Rs.131.23 crores up to September 2009 |
| 5 | Pool Vehicle / fuel etc. | Expected savings of Rs.5 crores p.a. |
| 6 | Reimbursement of Tax on perks / mobile reimbursement | Expected savings of Rs.2 crores p.a. |
| 7 | Hotel accommodation / temporary postings / foreign | Expected savings of Rs.10 crores p.a. |
| 8 | Abolition of PSF and charging of fee in SOL tickets | Expected savings of Rs.10 crores p.a. |
| 9 | Inflight catering (rationalisation of meal uplifts) | Expected savings of Rs.103 crores p.a. |

| 10 | Other measures (reduction in overtime, relocation of EDs to India from abroad, curtailment of foreign posts, curtailment of late sitting allowances and restriction of leave encashment)" | Expected savings of Rs.85 crores p.a. |
|---|---|---|

3.15   The Committee asked the Company to state the basis of assumption of the price of crude oil as $85 per barrel while preparing the turn-around plan for seeking governmental support as it formed about 38% of the total cost. The reply by NACIL is furnished below:-

"The Revised Estimates for 2009-10 were finalized around 10th September, 2009 and the crude price prevalent around that time was USD 71-73 per barrel. Crude had slowly began to rise from its lows of USD 48-50 per barrel in April 09 to USD 70 per barrel and the outlook was that crude would be range bound in the coming months around USD 80-100 per barrel.

Since crude prices are very volatile, reaching a peak of USD 147 in July 08 by rapidly rising from its lows of USD 60"s and since the upward movement in crude had begun in August-September 2009, fuel costs were calculated at USD 85 per barrel. Crude is currently trading at USD 80 per barrel."

3.16   NACIL was asked to state what efforts were being made to restructure their financial system. In their written submission, they stated as under:-

"A number of steps have been taken in order to cut cost and increase revenue. These include:

a)      Rationalization of certain routes which were incurring cash losses.
b)      Return of leased aircraft.
c)      Reduction in contractual employment.
d)      Rationalization of wage structure.
e)      Induction of new fleet to reduce maintenance cost.
f)      Fuel efficiency to be improved through implementation of various measures suggested by IATA.
g)      Increase in revenue through aggressive marketing strategies.
h)      Leveraging the company"s MRO facilities and properties for earning additional revenue.
i)      Focus on increasing cargo revenue.

The Government has also been approached to induct equity in order to improve the debt/equity ratio, strengthen the net worth and balance sheet of the company."

3.17    On being asked whether the Company was asking the Government to give them subsidy, NACIL replied thus:-

> "The Government has been approached to induct equity into the company to support the acquisition plan. The Government has also been approached for providing a GOI guarantee for Working Capital Loans which would reduce the interest cost."

3.18    The Committee stated that it was apparent that even after taking all the measures, the Company would not be in a sound financial situation and asked what they intended to do about the same.  In their written replies NACIL stated the following:-

> "Even after taking the measures for reduction of cost and increase in revenue, the company would not be able to reach a breakeven situation since the approximate revenue-expenditure gap is of the order of Rs.400 crores per month. In order, therefore, to achieve this, we have identified further areas of revenue enhancement and cost reduction.  Fuel will play a critical role in achieving the targeted savings and reduction in fuel cost would assist the company in achieving the targets planned.  The company is also examining the possibility of leasing out certain aircraft which are surplus to its requirement and reducing the size of its fleet to the most optimal size as well as increasing the utilization of the Airbus and Boeing fleet."

3.19    On being asked why, when the market was expanding and Air India and Indian Airlines are merged, the airline was reducing its targets from Rs.15,000 in 2008-09 to an expected business of Rs.12,680 crores in 2009-10, NACIL replied the following:-

> "The reduction of the target from Rs.15,000 crore in  2008-09 to Rs. 12,680 crore in 2009-10 is mainly because of  reduction in yields.  It may be  mentioned that due to global recession, IATA has forecasted a loss of US\$ 16.8 billion in 2008 and US\$ 11 billion  in 2009.  Due to a weak economic and revenue environment, several carriers across the globe have reported huge losses on account of pressure on yields and reduction in revenue/increase in cost.
>
> In the light of this, the company had reduced the target from what was contemplated earlier."

3.20    NACIL was asked to state the reasons that have been identified for not getting better business even though a consultant said that NACIL"s fares are cheaper by \$150-\$160 compared to any international player. Given below is their reply:-

> "Air India"s fares are put into the market after analysing the perception of our product in the mind of a customer. Our field stations and Headquarters units are in regular contact with the travel trade, corporate houses and various associations. It is a continuous process of feedback and our fares are determined accordingly. We have in the past had a poor track record in terms of on-time performance, old aircraft being operated on some routes etc. which has had an

adverse impact on the consumer choosing Air India as a preferred airline. With the new aircraft in our fleet and on-time performance improving, we have progressively improved our image in the market."

3.21   With regard to the financials of Air India, CMD, NACIL submitted the following to the Committee in his oral statement:-

"Now, we have submitted to the Government of India very clearly that even if I am able to do my operating expenses equal to operating revenue I still cannot pay for my interest on Rs. 16,000 crore which I have taken out. I cannot pay the repayment of my instalments for the aircrafts. In these two areas I cannot do and if something is not given to us then the only option is that if somebody else is able to take over the company and pay for this particular thing. What we have submitted to the Government is that we will be able to do what we can do best, that is current operations. We will try to reduce our current operations. We will try to make our expenses less and we will try to increase our revenue based upon this one. In the winter schedule this year, from October 26[th] onwards we have started, we have done a re-jigging of the entire system. Please bear with me on this issue, the number of aircrafts that I have got on hand and with the number of hours that we have to run, last year we were using 9 hours per aircraft. Now, in this winter season we have increased it to 13 hours per aircraft and in the next year summer we are going to increase it to 16 hours. For doing that one I have to keep my engineering staff in some other airports also. I have to do transfers and get them trained to do that job. We are going to save 523 crore on the new network which we have done. Hon. Members are present here, there was a hue and cry about our flights from Kerala. People said that why certain flights were removed and some flights were given to Jet and all that, actually what we have done is that the total number of kilometres offered on that sector is higher than what we have given earlier. I am saving Rs. 113 crore. Somewhere you have to allow me to get the balance right where when I rationalise a route and save the money without cutting down some other costs and all that, allow me that. If you do not allow me that then I am not able to do this and then at the end of the day I am going to have Rs. 400 to Rs. 500 crore cash deficit every month. Every last 10 days of the month of mine are spent trying to ring up banks trying to get additional money. No bank is going to give and in fact this hon. Committee has seen 100s of public sector companies and 100 other companies, no where the working capital is more than 25 per cent of the total revenue. My revenue is going to be Rs. 12,000 crore and then my working capital should be just Rs. 4,000 crore. Today my working capital has shot to Rs. 16,000 crore and nobody is going to pay me any money. So, I have been stuck in this issue. So, first issue is the civil aviation losses and the second issue is the merger issue and the third issue is the public sector undertaking issue. We ourselves have a legacy issue. We have opened up offices in every city. We have got two offices, we have got an Air India office and an Indian Airlines office and both rent we are paying and we trying to integrate that. Everywhere there is a duplication of services. So, I have to find out a solution for the duplication of services. Then comes the public sector inefficiency per se. When I say public sector inefficiency, I am not

mentioning public sector per se and all that but hon. Members have raised an issue that you are still behaving like a Government employee and not behaving like a corporate employee like that. We have to bring in a corporate culture change in the company itself if we really want to survive. Now, what has happened in that case is the marketing effort in the domestic sector is not very strong. So, we have to find a very strong marketing sector to do this job. Our marketing sector thinks that sitting in the office, giving four calls is sufficient. But it is not like that. Our marketing people will have to go out in the field. If they have to go the field and all that then I have to change the conditions and push them around to go ahead.

So, what we have decided is that we will be removing outsourced and contract employees in the airport.  We will train our own employees, who are sitting in the offices, and push them into airports.  So, I can cut my contract cost and outsourcing cost.  But I cannot terminate the outsource contract overnight.  I have to wait for them to finish.  Apart from that I will have to train my employees. So, there is a very serious resistance in the company even to shift from the city office to the airport.  I would request the Committee to kindly delve on this issue. Business is changing.  If you want to do good service, we need to be at the airport. Sitting in Connaught Place, I cannot service the customers in the airport. 45 to 50 per cent of my staff is not in airport.  They are sitting outside.  If there is a problem in the airport and if you make a call, the call goes to somewhere outside in the city and some Manager will have to pick it up and he will have to give the solution.  Now, the solution is not made available locally there.  So, I need to appoint a General Manager in the airport itself to get all the issues settled.  When I tried to shift them, they are refusing to go. Business is changing and redeployment is a must.  Redeployment has to be done.  This is an indulgence I want from the Committee.  So, I tried to just briefly tell about the issues which are coming.  At present the depreciation cost is Rs. 1,000 crore and the interest is Rs. 1,600 crore.  If we remove that, the operational losses will be lesser.  The balance is on fuel price increase and loss of revenue.  Earlier I was getting Rs. 3.57 per km. Now, I am getting only Rs. 2.92 per km.  Now, there is no way I can increase the price.  I cannot increase the price because as the hon. Members know passengers have got choices today.  But if I reduce my price, my yield will further go down.  So, the issue is, as the Manager, can I have my cost less than what I am getting from the market?  Then only will I be able to survive. This is what Dr. Raut was mentioning.  In my book you cannot see anything which can give the confidence that the company will ever make a profit in the next two or three years.  One may think as to what is the use of giving these Rs. 5,000 crore to Rs. 6,000 crore to a company like NACIL.  So, what we have asked the Government of India is that for the next six months I have a cash problem because I have to pay salaries, etc.  Most of the payment will go towards the fuel.  If I do not make the payment, my aircraft will not run.  Now, the position has become so tight that if I do not have money to pay for engine spares. In January and December, if you have another meeting on NACIL, I will have to submit to you shamefully saying that now the aircraft are on the ground because the engine spares are not available. Engine spares are not manufactures in

India.  They are all manufactured abroad.  They are all international companies.
They will simply write one letter and they will stop it.  They are refusing to
despatch current engine spares to us unless I make payment in advance.  Then,
there is a question about lease rentals.  Why my lease has gone very high?  We,
in the next three years, are going to make the lease rental cost zero. We want to
remove all the rentals because we do not want to pay."

3.22    The Committee asked the Ministry of Civil Aviation to explain what steps along
with the timeframe the Ministry had undertaken/proposing to undertake for pulling Air
India (NACIL) out of its financial mess.  NACIL stated the following in their written
replies:-

"NACIL has already made presentations to the Committee of Secretaries on 25[th]
July, 2009 & 29[th] August, 2009 in respect of its turnaround plan towards cost
reduction & revenue enhancement (copies of these presentations were already
submitted to COPU).

The time frame has broadly been classified under 6 / 12 / 18 months to achieve
certain specific targets.

The Group of Ministers (GOM) considered the turnaround plan of NACIL in its
meetings held on 21st October, 2009 and 12th November, 2009 and decided upon
the financial package for the airline.   The recommendations of the GOM are
being placed before the Cabinet Committee on Economic Affairs (CCEA)."

3.23    In this regard, during the oral evidence of representatives of Ministry of Civil
Aviation, the Committee stated the following:-

"About the turnaround plan, NACIL is in the red with a deficit of Rs. 8000 crore
and this figure is increasing day by day. To the best of my knowledge and belief
means, if the turnaround plan is for say five years and if it is implemented, at the
end of the fifth year, you should be able to say confidently that you are out of
debt and danger and now you are making profit. Nowhere does the turnaround
plan explains or spells out the programme so that at the end of the third year, you
are out of debt and red.

So, then, what is your turnaround plan? As my colleague has said, if you are
eating up the Government"s money or the peoples" money and still not been able
to make profit, then why should the Government come forward and give its kitty
to you?  After all, this is public money and you need to look at it.  Every time, it
has been said, per aircraft employee ratio is worst in India. It is not so and if it is
so, then there are reasons behind it.  I am associated with some of the unions
and associations of the Air India employees and, therefore, I will tell you that we
should not compare ourselves with other nations as far as per aircraft manpower

is concerned because the services that we render and the services that the other aircraft render are different. Our eating habits are different and, our dining arrangements are different.  Therefore, it is bound to happen that this ratio will be more."

**CHAPTER 4.**

**FLEET MANAGEMENT**

4.1    Regarding the fleet management practices of the Company, the details as provided by NACIL are given below:-

"As far as Engineering Department of NACIL(A) is concerned, the aircraft are scheduled for operation as per the route plan and time-table decided by the Commercial Department.  To meet the above schedule, maintenance checks are carried out as per the maintenance check schedules recommended by the manufacturers of aircraft and approved by DGCA, India.  In addition to the above routine maintenance, we also rectify the snags as and when occurred on the aircraft.

There are two aspects of fleet management:

a)    Planning for type and number of aircraft to buy;
b)    Purchase of the aircraft, its delivery, checking, maintenance and operation.

The part a) is usually handled by a Committee of Executive Directors of Planning, Commercial, Finance, Engineering and Operations Departments of NACIL.  Most of the studies are co-ordinated by the Fleet Planning Department.

NACIL takes a long term view of fleet and network by looking at the company"s strategy, development of network, characteristics of aircraft available, performance of aircraft in use and their phase out plans.  NACIL develops a long term plan for aircraft induction and deployment.

The part b) is mainly done by the Engineering Department of NACIL with assistance from Finance Department during purchase and Operations Department for delivery and operation.

The fleet management practices of NACIL(I) are to ensure availability of required number of aircraft for schedule operations and to keep the remaining number of aircraft under scheduled maintenance activity at any given time.

NACIL(I) follows a preventive maintenance programme formulated in consultation with the aircraft manufacturers and approved by the DGCA.  This programme aims at ensuring the airworthiness of aircraft at par with worldwide standards.

To maintain our aircraft as per the required Quality Standards, an assessment is done for the available Engineering infrastructure in house or whether to send aircraft, engines and components abroad for repairs.  This assessment forms the basis of number of aircraft in our fleet to be under maintenance and number of aircraft which can be made available for scheduled operations. This is a continuous process, which ensures optimum utilization of the aircraft fleet."

4.2    Details regarding „grounding of aircraft" for want of engines/schedule maintenance and loss suffered by the Company on this account are given below:-

"In last two years there has been no grounding of aircraft in NACIL (A) fleet due want of engines/ schedule maintenance and therefore there is no loss to the Company on this account.    In order to ensure safety of the aircraft and passengers, all aircraft in NACIL(A) fleet including engines, APUs, components & accessories fitted on these aircraft are maintained to the highest airworthiness standards.  The aircraft are considered airworthy provided the maintenance is as per approved schedule/ programme and all mandatory modifications stipulated by the DGCA as well the regulatory authorities of aircraft manufacturing countries are incorporated.   All the aircraft in NACIL (A)'s fleet are maintained to the highest airworthiness condition and meet all the requirements of the regulatory authorities.

"In NACIL (I), as on date i.e. 24th September 2009, 4 A320 family aircraft  (3 A320 plus 1 A319)  are undergoing major maintenance i.e. „C" Checks(1 at Hyderabad,1 at Kolkata and 2 at Delhi) and 5 A320 family aircraft(4 A320 plus 1 A321) are undergoing „A" Check (1 at Mumbai and 4 at Delhi).All the A320 aircraft  under checks require serviceable engines for completion of the checks. In addition, two(2) A320 aircraft are on ground specifically due non-availability of serviceable engines."

**A.    Fleet Acquisition**

4.3    The Committee asked for the details of the plans of acquisition of aircraft for NACIL"s fleet and details regarding the number of aircraft ordered, how many have been inducted and details of review, if any, of acquisition . NACIL submitted the following:-

"Erstwhile Air India had placed an order for acquisition of 50 Long Range Aircraft in three different categories (viz. 8 nos. of B777-200LR, 15 nos. of B777-300ER and 27 nos. of B787"s.

Erstwhile Indian Airlines had placed an order for 43, A320 family aircraft viz. 19 nos. of  A319, 20 nos. of A321 and 4 nos. of A320s.

Air India Charters Limited had placed an order for 18 nos. of B737-800 aircraft.

The deliveries of these aircraft commenced from October 2006 and are being progressively inducted in a phased manner.  The details of the aircraft type wise inductions till date, and the balance deliveries of aircraft for NACIL are provided type-wise below:-

| | Acft ordered | Inducted till date | Future Induction Pattern | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Aircraft Induction pattern for NACIL*A), NACIL(I) & AIE-2009 till 2014 (Updated based on Revised Assumptions/Actual Deliveries-As on 16 Sep 2009) | | | | | | | | | |
| | | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | |
| B777-200LR | 8 | 8 | | | | | | | 0 |
| B777-300ER | 15 | 8 | Sep | Apr, May, Jul,Nov | May,Aug | | | | 7 |
| B787-8 | 27 | 0 | | | Apr(4), May, Jun(3),Jul(3), Aug,Sep,Oct, Nov | Sep,Oct | 2nd Qtr(2),3rd Qtr | 1st Qtr,2nd Qtr(6) | 27 |
| A319 | 19 | 14 | Sep,Oct, Nov,Dec | Jan | | | | | 5 |
| A320 | 4 | 0 | | Feb(2), Mar(2) | | | | | 4 |
| A321 | 20 | 15 | Oct,Nov, Dec | Jan,Apr | | | | | 5 |
| B737-800(AIE) | 18 | 16 | Sep,Dec | | | | | | 2 |
| Total | 111 | 61 | 10 | 11 | 17 | 2 | 3 | 7 | 50 |

Note:    Number in brackets indicate more than one aircraft being delivered in that month.

NACIL Board at its 21st Meeting held on 20th August, 2009 directed the Management to actively pursue the cancellation of the orders for the six nos. of B777-300ER aircraft which were scheduled for delivery in 2010/11 with M/s. Boeing.  While a proposal addressing the issue from M/s. Boeing. "

4.4    The strength of the fleet of both Air India and Indian Airlines separately before the merger is given below:-

"The details of the fleet (owned and leased) for erstwhile Air India and erstwhile Indian Airlines – as on August 2007 is given below:

<u>Air India</u>

| Aircraft Type | Number |
|---|---|
| B747-400 | 7 |
| B747-400 Combi | 1 |
| B747-300 Combi | 2 |
| B777-200ER | 4 |
| B777-200LR | 3 |
| A310 | 14 |

| A310 Freighter | 2 |
|---|---|
| B767-300 | 2 |
| B757-200 | 1 |
| B737-800 | 17 |
| Total | 53 |

Indian Airlines

| Aircraft Type | Number |
|---|---|
| A300 | 3 |
| A321 | 3 |
| A320 | 48 |
| B737 | 11 |
| DO228 | 2 |
| A319 | 6 |
| ATR42 | 4 |
| Total | 77 |

4.5    NACIL was asked whether a comparative safety and fuel economy audit was carried out for the Airbus and the Boeing aircraft before placing the order for acquiring more fleet. If the same was carried out, details of the audit and results thereof were also asked for.  The replies by NACIL are given below:-

"Aircraft selection process involved a detailed technical study of the of the bids received from the aircraft manufacturers i.e. M/s. Airbus and M/s. Boeing. The technical analysis includes the sectorwise fuel consumption comparison and payload capability between the aircraft types which are under study. The fuel consumption comparison are made for those routes that have been included in the Request For Proposal (RFP) issued by erstwhile Air India and Indian Airlines."

4.6    NACIL further stated in their written replies:-

"The comparisons are made between the aircraft type i.e. between Airbus and Boeing which were the candidate aircraft for selection. With regard to the safety, the airplanes which have been manufactured by the Boeing and Airbus are being operated by the various airlines in the world and there is no adverse report or experience by any of the operator.  If any such reports are made, the same will be available in the public media.

During selection, a comparison is made with regard to the fuel consumption, pay load capability between the candidate aircraft Airbus and Boeing keeping in view their proposed route for the type of aircraft. Such type of analysis will provide a comparison which will help in making the final selection which of course will also be dependent on the pricing and the discounts that are being offered by the manufacturers.

<u>Safety Audit</u>

Both Boeing and Airbus aircraft are type certified by their respective regulatory authorities viz. FAA and EASA.  These certificates are accepted by DGCA.  The type certification involves detailed study of the aircraft systems design and testing including flight testing under defined conditions.  DGCA and consequently Air India  accept the Type Certificate issued by the manufacturers regulatory agencies.  Hence, no separate safety audit is conducted by Air India.  However, Air India ensures that additional requirement, if any, specified by DGCA are incorporated in the aircraft fuel audit. Air India also has the choice to select additional optional features which could enhance the safety and comfort features.

<u>Fuel Audit</u>

Detailed ground rules including fuel policy and route data are sent to the manufacturers for obtaining fuel burn and other data on the proposed routes.  Similarly, fuel burn and other aircraft performance related guarantees are obtained under defined conditions.

These two sets of data are co-related to verify the estimates provided by the manufacturers.  The performance guarantees are incorporated in the purchase agreement and their compliance is verified at the time of aircraft delivery. The fuel burn data provided by the manufacturers form a part of comparative economic evaluation of the aircraft on the proposed route structure."

4.7    In this connection, Chairman, COPU during oral evidence observed the following:-

"….apparently….you are projecting the Boeing 787 for its fuel efficiency and economy but I do not whether you have purchased that at all till today.  By projecting 787 you are using 777 and other aircraft.  A comparative study was made - I do not know whether it is right or wrong, you should enlighten us - which says that the Airbus 340 was more efficient, fuel economy was better.  It is for you to choose whichever aircraft you want.  It is not my business whether you should buy this or that but projecting one thing, buying one thing and then ultimately the entire loss has to be lumped by these airlines but these are the things which have been added to the misery of these two airlines."

4.8    The CMD, NACIL further elaborated in his oral evidence to the Committee:-

"…..So, this question has been rightly asked that when there was a fuel efficient aircrafts, did we buy the fuel efficient aircrafts or not. There are two issues on hand. Firstly, the procurement of Air India wide body was done under Air India Board and the narrow body was done by Indian Airlines Board. There are two Boards on hand. This question did come up. It went to the Cabinet and the Government did approve it for procurement of both these sets of aircrafts, both different companies. The Boeing 777 and 787 was supposed to be the future fuel efficient aircraft. I will submit the details. Hon. Member Shri Raut had asked as to

who took the decision, where the decision was taken and whether demonstration was made and all that. The internal rate of return for a 787 is around 12.6 per cent. The internal rate of return for 777 which we have got now is 2.6 per cent. The entire project is profitable only when there is one 787 to be run along with a 777. The aircraft 787, if you ask me today, do you want 787? I have to say that I want 787. My entire losses are because I am not operating Delhi – Kualalampur in the manner I want to run. I am not able to run profitably now on Gulf areas because I am using some smaller aircrafts where I can use a larger aircraft. I am not able to run between Bangkok-Shanghai, Bangkok-Tokyo and other places where 787 can work beautifully or equivalent. I have no problem of 787 but give me an aircraft which is a medium haul aircraft which I can dominate. Now I have short haul aircraft which are running inside the domestic market and I have got long aircraft running on that side. But in between the profitable area where I need to operate is known as the medium haul aircrafts which are not available to me. The deliveries of 787 should have been complete by now. But it got delayed completely and we have slapped a compensation claim of 710 million dollars. Obviously, they have confirmed 145 million dollars they will pay as compensation for the delay and so we have tried to push the entire delivery. ….."

4.9    In this regard, the Chairman, COPU stated the following during oral evidence of the representatives of Ministry of Civil Aviation:-

"….you had mentioned that about 34 per cent of the money is spent on fuel.  You see, the 777 aircraft is a fuel guzzler, as we read from the reports.  I think you are getting the 787 aircraft because of its fuel economy.

You also mentioned that there were losses in the Delhi-London and Delhi-New York sectors, which are long sectors, where you need aircrafts or carriers which are economic as far as the fuel consumption is concerned.  So, how long are the 787s going to take?  Does it mean that till then we will suffer these losses as far as the fuel consumption is concerned?"

4.10    In reply Secretary, Civil Aviation submitted the following:-

"One 787 is now coming in the middle of next year but we would really have to look at the old things because the exercise of looking between this and looking at the Airbus also which are much more fuel consumption is going on both in the Ministry and in Air India.   I must also tell you that the Ministry has two representatives on the Air India Board.   They are part of most of these restructuring committees and the manpower committees.  So, we are very much hands on in trying to see that this national carrier is brought back into rail."

4.11    NACIL were asked whether the Airbus A340 is more fuel efficient than the Boeing 787.  In reply, they submitted the following:-

"In the techno-economic evaluation of the aircraft carried out, the Airbus A340 aircraft was evaluated under the category of Ultra Long Range (ULR) and Medium Capacity Long Range (MCLR-A) aircraft and the corresponding models

considered were A340-500 and A340-600 respectively. The corresponding Boeing aircraft models that were studied for the comparative evaluation were B777-200LR in the ULR category and B777-300ER in the MCLR-A category respectively.  As far as the B787 aircraft is concerned, this was a candidate aircraft in the MCLR-B category and the corresponding Airbus candidate in this category was A330-200.  The fuel efficiency of the B787 aircraft was found to be better than its competitor aircraft A330-200 by 17%."

4.12   It was asked if the orders were placed for Boeing 787 even before the prototype of the craft was there.  It was further asked as to who gave the demonstration and who gave the expert opinion; why was there a hurry to place the orders.  In reply, NACIL submitted the following:-

"In response to the RFP issued to the aircraft / engine manufacturers in December 2004, Boeing had offered the B787 (earlier named 7E7) aircraft and the aircraft program schedule was advised as under :

- B787 Launch date : April 2004
- Entry into service :  May 2008

The aircraft selection process was in line with the normal aviation industry practices followed wherein many of the airline customers enter into purchase agreements with Aircraft manufacturers like Boeing and Airbus while the aircraft offered are in the development stage."

4.13   NACIL were asked by the Committee to state which aircraft NACIL had placed the order for what was the original time frame and schedule for induction of the new fleet, how far were they lagging behind and what were the reasons for the same.  In reply, NACIL submitted as under:-

"The aircraft-wise details of the Contractual and Actual delivery dates are as under:

| TYPE OF AIRCRAFT | ORDERED | RECEIVED | CONTRACT-UAL DATE | AIRCRAFT REG. NO. | DELIVERY DATES |
|---|---|---|---|---|---|
| B777-200LR | 8 | 8 | Feb-07 | VT-ALA | 26-Jul-07 |
| | | | Mar-07 | VT-ALB | 24-Aug-07 |
| | | | Apr-07 | VT-ALC | 27-Jul-07 |
| | | | Dec-07 | VT-ALD | 31-Dec-07 |
| | | | Feb-08 | VT-ALE | 03-Mar-08 |
| | | | Apr-09 | VT_ALF | 23-Jun-09 |

| | | | May-09 | VT-ALG | 28-Jul-09 |
|---|---|---|---|---|---|
| | | | Jun-09 | VT-ALH | 28-Aug-09 |
| **B777-300ER** | 15 | 9 | Jun-07 | VT-ALJ | 10-Oct-07 |
| | | | Jul-07 | VT-ALK | 31-Oct-07 |
| | | | Aug-07 | VT-ALL | 18-Dec-07 |
| | | | Apr-08 | VT-ALM | 04-Jun-08 |
| | | | May-08 | VT-ALN | 11-Jul-08 |
| | | | Apr-09 | VT-ALO | 13-Jul-09 |
| | | | May-09 | VT-ALP | 25-Aug-09 |
| | | | Jun-09 | VT-ALQ | 31-Aug-09 |
| | | | Jul-09 | VT-ALR | 29-Sep-09 |
| | | | .Apr10 | VT-ALS | .Apr10 |
| | | | .May10 | VT-ALT | .May10 |
| | | | .Jul10 | VT-ALU | .Jul10 |
| | | | .Nov10 | VT-ALV | .Nov10 |
| | | | .May11 | VT-ALW | .May11 |
| | | | .Aug11 | VT-ALX | .Aug11 |
| **B787-800** | 27 | Nil | Sep-08 | VT-ANA | .Apr11 |
| | | | Mar-09 | VT-ANB | .Apr11 |
| | | | Oct-08 | VT-ANC | .Apr11 |
| | | | Mar-09 | VT-AND | .Apr11 |
| | | | May-09 | VT-ANE | .May11 |
| | | | Nov-08 | VT-ANG | .Jun11 |
| | | | Dec-08 | VT-ANH | .Jun11 |
| | | | Jan-09 | VT-ANI | .Jun11 |
| | | | Aug-09 | VT-ANJ | .Jul11 |
| | | | Oct-09 | VT-ANK | .Jul11 |
| | | | Oct-09 | VT-ANL | .Jul11 |

| | | | Dec-09 | VT-ANM | .Aug11 |
|---|---|---|---|---|---|
| | | | Dec-09 | VT-ANN | .Sep11 |
| | | | Dec-09 | VT-ANO | .Oct11 |
| | | | Jan-10 | VT-ANP | .Nov11 |
| | | | Feb-10 | VT-ANQ | .Sep12 |
| | | | Mar-10 | VT-ANR | .Oct12 |
| | | | Oct-10 | VT-ANS | .2ndQtr13 |
| | | | Nov-10 | VT-ANT | .2ndQtr13 |
| | | | Dec-10 | VT-ANU | .3rd13Qtr |
| | | | Jul-11 | VT-ANV | .1stQtr14 |
| | | | Aug-11 | VT-ANW | .2ndQtr14 |
| | | | Aug-11 | VT-ANX | .2ndQtr14 |
| | | | Sep-11 | VT-ANY | .2ndQtr14 |
| | | | Sep-11 | VT-ANZ | .2ndQtr14 |
| | | | Sep-11 | VT-NAA | .2ndQtr14 |
| | | | Oct-11 | VT-NAC | .2ndQtr14 |
| **B737-800** | 18 | 17 | Nov-06 | VT-AXH | 30-Nov-06 |
| | | | Dec-06 | VT-AXI | 19-Dec-06 |
| | | | Jan-07 | VT-AXJ | 09-Jan-07 |
| | | | Jan-07 | VT-AXM | 16-Jan-07 |
| | | | Jan-07 | VT-AXN | 27-Jan-07 |
| | | | Feb-07 | VT-AXP | 14-Feb-07 |
| | | | May-07 | VT-AXQ | 14-May-07 |
| | | | Jul-07 | VT-AXR | 13-Jul-07 |
| | | | Jul-07 | VT-AXT | 26-Jul-07 |
| | | | Sep-07 | VT-AXU | 09-Oct-07 |
| | | | Jan-08 | VT-AXV | 15-Jan-08 |
| | | | May-08 | VT-AXW | 20-Jun-08 |

| | | | Jul-08 | VT-AXX | 30-Jul-08 |
|---|---|---|---|---|---|
| | | | Oct-08 | VT-AXZ | 02-Feb-09 |
| | | | Jan-09 | VT-AYA | 23-Apr-09 |
| | | | May-09 | VT-AYB | 28-Jul-09 |
| | | | Jul-09 | VT-AYC | 29-Sep-09 |
| | | | Oct-09 | VT-AYD | .Dec09 |
| **A-321** | 20 | 17 | Apr-08 | VT-PPA | 03-Jul-07 |
| | | | May-08 | VT-PPB | 05-Aug-07 |
| | | | Jun-08 | VT-PPD | 19-Aug-07 |
| | | | Jul-08 | VT-PPE | 05-Dec-07 |
| | | | Aug-08 | VT-PPF | 15-Dec-07 |
| | | | Sep-08 | VT-PPG | 17-Jan-08 |
| | | | Oct-08 | VT-PPH | 26-Apr-08 |
| | | | Nov-08 | VT-PPI | 19-Jun-08 |
| | | | Dec-08 | VT-PPJ | 03-Jul-08 |
| | | | Jan-09 | VT-PPK | 24-Aug-08 |
| | | | Feb-09 | VT-PPL | 15-Jan-09 |
| | | | Mar-09 | VT-PPM | 13-Feb-09 |
| | | | Apr-09 | VT-PPN | 02-Jul-09 |
| | | | May-09 | VT-PPO | 07-Aug-09 |
| | | | Jun-09 | VT-PPQ | 29-Aug-09 |
| | | | Jul-09 | VT-PPT | 01-Nov-09 |
| | | | Aug-09 | VT-PPU | 29-Nov-09 |
| | | | Sep-09 | | .Dec09 |
| | | | Oct-09 | | .Jan10 |
| | | | Nov-09 | | .Apr10 |
| **A-319** | 19 | 17 | Sep-06 | VT-SCF | 19-Oct-06 |
| | | | Oct-06 | VT-SCG | 20-Oct-07 |

| | | | Nov-06 | VT-SCH | 31-Oct-07 |
|---|---|---|---|---|---|
| | | | Dec-06 | VT-SCJ | 17-Nov-07 |
| | | | Jan-07 | VT-SCI | 02-Dec-07 |
| | | | Feb-07 | VT-SCK | 20-Dec-07 |
| | | | Mar-07 | VT-SCL | 15-Oct-08 |
| | | | Apr-07 | VT-SCM | 09-Nov-08 |
| | | | May-07 | VT-SCN | 09-Nov-08 |
| | | | Jun-07 | VT-SCO | 06-Mar-08 |
| | | | Jul-07 | VT-SCP | 01-May-09 |
| | | | Aug-07 | VT-SCQ | 30-.May09 |
| | | | Sep-07 | VT-SCR | 01-Aug-09 |
| | | | Oct-07 | VT-SCS | 02-Sep-09 |
| | | | Nov-07 | VT-SCT | 01-Oct-09 |
| | | | Dec-07 | VT-SCU | 29-Oct-09 |
| | | | Jan-08 | VT-SCV | 29-Nov-09 |
| | | | Feb-08 | | .Dec09 |
| | | | Mar-08 | | .Jan10 |
| | | | Apr-08 | | |
| **A-320** | 4 | 0 | Dec-09 | | .Feb10 |
| | | | Jan-10 | | .Feb10 |
| | | | Feb-10 | | .Mar10 |
| | | | Mar-10 | | .Mar10 |

The reasons for the delays are as under:

<u>B737/B777</u>

Initial eight B777 aircraft were delayed due to late delivery of the seats to Boeing. Besides, seven B777 and five B737 aircraft were delayed due to a strike in Boeing.

B787

As shown in the attached table, the originally scheduled deliveries of the B787 aircraft per Purchase agreement were to commence effective September 2008. Boeing delayed the deliveries due various technical reasons. Now, Boeing have advised that the deliveries to NACIL will commence in April 2011."

4.14   It was queried as to whether NACIL"s maintenance capability was in tune with their current acquisition of fleet. If not, what steps had been taken to retain / reskill the maintenance personnel.  In their written submission, NACIL stated as under:-

"NACIL"s maintenance capability is in tune with the current acquisition of fleet. It has got proper infrastructure as well as trained manpower to carry out maintenance of aircraft .Some new facilities for in-house maintenance/overhaul of new engines and APU types as well as for some components are in the process of setting up based on economic study."

4.15   The Committee asked NACIL that at a time when their revenues were barely Rs.7,000 crores and when they had to pay an interest of nearly Rs.6,500 crores per annum, what prompted NACIL to go in for a new fleet costing thousands of crores of rupees (approximately Rs.44,000 crores). In reply, NACIL stated as under:-

"Both the erstwhile Air India and Indian Airlines had ageing fleet and were unable to induct new fleet during the past several years, whereas the competitors had brand new fleet and offered a superior product. Project reports for the acquisition of 68 aircraft (8 B777-200LR, 15 B777-300ER, 27 B787-8 and 18 B737-800 for its LCC Air India Express) by the erstwhile Air India were submitted in May, 2005 and the acquisition of 43 aircraft (19 A319, 4 A320 and 20 A321) by erstwhile Indian Airlines were submitted in April, 2002.

Fleet acquisition plan by erstwhile Air India and Indian Airlines were made in the backdrop of aviation market scenarios prevailing at that time and the prognosis of future market developments based on economic and industry indicators then. A brief description of the assumptions which formed the basis for acquisition of aircraft were:

i)   The Indian Air Market and specially outbound travel – both for business and for leisure – has also been growing much faster than inbound travel.  These trends are likely to continue.

ii) The declaration of several airports in India as international airports and increased operations by competitor airlines to/from interior points in India has resulted in the increased fragmentation of the Indian Air Market – particularly to/from short-haul destinations in the Gulf and South East Asia.  A fewer number of passengers are, therefore, willing to travel over AI"s hubs at Mumbai and Delhi, necessitating   Air India to look at point-to-point operations from the interiors to various destinations.

iii) Many foreign airlines have obtained huge increases in 3rd/4th freedom markets between India and their home countries.  Moreover, they have also been able to gain access to interior points in India.   These airlines are using their excess capacity to funnel traffic between India and USA/UK/Europe through their respective hubs.  As a result of increased capacity deployment by competitor airlines, the international air market to/from India has become fiercely competitive.

iv) The regulatory regime for international air transport in India had also witnessed a significantly increased pace of liberalization. Airlines from the SAARC/ASEAN countries and the UK had been granted virtually unlimited access to the Indian air market, an Open Skies Agreement has been concluded with the US, permission was granted to private domestic airlines in India to operate to international destinations in all countries As a result of these developments, a further quantum increase in the scale of competition in the international air transport market can be expected in the near future.

v)  The Passenger Air Market to/from India grew at an average annual growth rate of around 6% during the period from 1990 to 2000 and further improvements were expected in the global economy and the continued buoyancy, liberalization and globalization of the Indian economy was also visualized at that time. Based on this a long-term traffic growth rate of at least 7 to 8 % per annum was expected.

An airline"s capacity share is, inter alia, one of the primary determinants of its market share. It was then envisaged that erstwhile Air India will, therefore, have to increase its capacity deployment at a rate that is faster than the forecast traffic growth rate, in order to increase its capacity share and, therefore, its market share and thus a fleet acquisition plan of 50 new wide bodied and 18 new aircraft for Air India Express was made and ordered accordingly.

Erstwhile Indian Airlines" plan to acquire 43 new Airbus A320 family aircraft was based on the backdrop of following assumptions and facts:

i)      Domestic air traffic grew at a compounded growth rate of 4.8% from 1993-94 to 2000-01. As a result, working group on Civil Aviation has recommended annual traffic growth rate of 5% during 10th Plan Period (2002-2007).

ii)     Working group on Civil Aviation after examining historical traffic growth rates and logistics of domestic operations had also recommended annual domestic cargo growth rate of 5% during 10th Plan Period.

iii)    Working group on Civil Aviation after taking into account the forecast prepared by ICAO, IATA and aircraft manufactures had recommended an annual growth rate of 6% for international passenger carriage and 7.5% for international cargo carriage.

iv)     Complete phase out of A300 and B737 fleet in a phased manner was also planned while planning the acquisition of new fleet by the erstwhile Indian Airlines.

**Supplementary:**

The revenues of the two erstwhile entities were in the region of Rs 13,000 crore in 2004-05 when the project reports were finalized.

The Total Revenue breakup was as under:

|                  | 2004-05   |
|------------------|-----------|
|                  | Rs crs    |
| Air India        | 7676.39   |
| Indian Airlines  | 5362.57   |
| Total            | 13038.96  |

The average annual interest burden works out to approximately Rs 900 crores (Rs 650 for AI and Rs 250 for IC) and not Rs 6500 crores per annum

In the case of Boeing Project for erstwhile Air India about 54.4% of the capacity was for replacement and the balance 45.6% was for growth.

About 70% of the Airbus capacity was for replacement of the then existing fleet of A300 and B737 aircraft and for return of the leased aircraft and only about 30% the additional capacity was to cater to traffic growth.

The fleet acquisition program was primarily an expansion cum replacement program."

4.16   During the course of oral evidence, the CMD, NACIL stated in this regard, as under:-

"…..You had raised the issue of how can two loss making companies be merged together and what is the necessity for looking at the acquisition of aircraft and all that. The last acquisition that was done in Indian Airlines and Air India both was a long time back. Till the new aircrafts came, Air India more or less, 60 to 70 per cent of its entire routes were being run by leased aircrafts. There was no option for Indian Airlines and Air India at that time to either to say that we do not have any more aircrafts and I will run with only 20 aircrafts or lease it out. So, they leased out. So, what we are trying to do is that our aircrafts are old. All the aircrafts that are 20 years old or 29 years old we are trying to dispose them off and we also are returning all the leased aircrafts. One hon. Member mentioned as to why we are not returning all the leased aircraft at one shot. There are contracts in hand and when we ask them to return on one shot that means I will be taking out 46 aircrafts in one day or in one year. That means I will have to remove that many routes. We are not during that. What we are doing is if six aircrafts are coming in the next six months then we would like to release six aircrafts from this side. We would like to maintain something like 100 odd aircrafts in a two machine configuration. One in the Boeing side we have

developed such a large infrastructure of Boeing engineering and on the other side we have developed a large Airbus engineering and these two are hot today in the market. If I segregate this and ask for an IPO also, as an hon. Member had asked as to why we are not going in for bonds, nobody is going to invest money in Air India but everybody would like to invest money in the MRO activities. So, what we have decided is that we will concentrate on two machine configurations only and remove all the other machines, so that we have some synergies done on that hand and run that show on that basis. ……."

## B.    Maintenance of Aircraft

4.17    Details regarding the average operative life of an aircraft are given below:-

"There are no norms stipulated for operative life of an aircraft beyond which aircraft are not considered as airworthy.

Aircraft are considered airworthy as long as aircraft are maintained as per approved maintenance programme of DGCA and complying with all mandatory requirement stipulated by the DGCA as well as the regulatory authorities of the aircraft manufacturing countries.  All the aircraft in Air India"s fleet are maintained in airworthy condition and meet all the requirements of the regulatory authorities.

To maintain the aircraft in airworthiness condition, there is an elaborate system to check the airworthiness of aircraft. Manufacturers" recommendations as contained in Maintenance Planning Document (MPD) and approved by DGCA is scrupulously followed by Air India.  Every time an aircraft lands after operating a flight, it is required to undergo certain checks besides rectification of flight snags. Additionally, aircraft undergoes various checks at specified intervals in terms of flying hours/ flying cycles/ number of days. These inspections are carried out by qualified Aircraft Maintenance Engineers and the aircraft is certified as airworthy when it meets all the requirements laid-down."

4.18    Given below is a comparative statement of how long the aircraft are used in India versus international usage.

"We had phased out our old aircraft when they were between the age of 20 to 25 years. The reasons for phasing out the older aircraft from NACIL (A)"s fleet were due to high maintenance & operating costs.  Recently, we had phased out two Boeing 747-300 aircraft which were approximately 20 years of age.

The phasing out the aircraft from the fleet depends upon the company policy of each operator. We understand that some of airlines like Singapore Airlines maintain their aircraft average age as 5 to 6 years, to keep the fleet younger.

4.19   The details of the average cost of maintenance of aircraft, old and new are as under.

"There is no age limit of flight hour or flight cycle or calendar year   limit after which the aircraft in the NACIL(I) fleet should be grounded. However, it has been acknowledged that the maintenance of aircraft becomes more expensive with age.  This is because special inspections and modifications  for aging aircraft are undertaken and these may result in repair / replacement of structural components to ensure that the aircraft continue to be airworthy.  As a result, the operation of very old aircraft is more expensive.

The maintenance cost of old aircraft is more than that of the new aircraft. As the aircraft are getting old, the inspection and the maintenance task to be performed on the aircraft, as stipulated by DGCA, manufacturers and other regulatory authorities, increases. This includes Corrosion Prevention & Control Programme (CPCP), Structural Sampling Inspection Programme (SSIP), Mandatory Modifications, Service Bulletins etc. The material consumption of the old aircraft are also higher than that of new aircraft.

It is seen that the maintenance material consumption of a new aircraft is low. As the aircraft ages, the cost of maintenance increases to a maturity level at around 7th or 8th year of service. Thereafter, by about 12th year, the ageing affect sets in. As far as the Airframe is concerned, the cost of materials in the first year is about 40% of the mature level (8th year cost). After about 12/13th year in service, this cost increases at a rate of 1% per 1000 flight hours. By about 20th year the Airframe cost is about 25% more than the mature level.

In case of Engine, the cost of materials is as low as 10% in the first year of operation. It quickly rises to about 70% in the 5th year and 100% by 8th year of operation. Thereafter, the ageing effect sets in and the cost increases to about 22% over the maturity level in 20th year.

In addition to the increase in cost of maintaining the aircraft, the ground time required for carrying out the maintenance increases dramatically in the later years. This is due to the corrosion, fatigue and scarcity of spares. As aircraft would go out of production, it becomes difficult to procure materials required for maintenance of the old aircraft. This increases the ground time, affecting the revenue earning potential of the aircraft and thereby the economics of the aircraft operations. Besides the operational reliability of the aircraft suffers from snags and defects which are more frequent in the older aircraft.

Hence most of the airlines phase out their aircraft by 15-20 years. Some airlines like Singapore Airlines, have chosen to phase out their aircraft at the age of about 7 years to maintain an image of young fleet. Besides, they have the advantage of high utilization with these aircraft on which the maintenance requirements are rather low in the initial years."

**C.**   **Phasing out of old Aircraft**

4.20   Details about phasing out of old aircraft are given below:-

"The Strategic direction of NACIL is to progressively phase out older aircraft and induct new aircraft to replace their capacity.  New Aircraft will entail higher capital costs, but will have better passenger appeal, higher operating reliability and we will be able to achieve higher aircraft utilization levels**.**

The NACIL Board has taken a decision to phase out 11 nos. of A320 inducted in 1989 and 1990, which are not under sale and lease back.  It is our intention to phase out the initial 30 nos. of A320 aircraft, inducted by erstwhile Indian Airlines with V2500 – A1 engines and bogey type landing gears, at the earliest, with the availability of replacement aircraft.  Most of the A320 family regional operations, will be replaced with the B787, when it is received.

Out of the eight owned A310s, four have been converted to freighters.  The balance four, under sale and lease back upto 2012, also need to be phased out.  However, these aircraft are to be replaced by the B787, whose delivery has been delayed by Boeing.

All the wet leased aircraft are also being progressively phased out.

With the availability of 777-300ERs, the B747-400s are being phased out of commercial operations.  Since these aircraft are being used for VVIP operations, their eventual phase out is depended on the transfers of 2 / 3 aircraft to the Government.

Although phase out of older aircraft is dictated by commercial / strategic constraints, phasing out of aircraft which are presently under sale and lease back would entail payment of penalty for premature termination of the leases.  Therefore the final phase out decisions will be taken on a case by case basis."

4.21   NACIL was questioned whether instead of phasing out the old fleet over a span of years, is it not better to finish the process in one go.  In reply, NACIL stated the following:-

"The phasing out of old fleet is done over a span of years and normally coincides with the induction of new fleet. The induction of new aircraft is also over a span of few years to ensure that no disruption to our route network is there due to non-availability of aircraft.

The aircraft were inducted in a phased manner over a period of time. Also, the replacement aircraft are also inducted in a phased manner. Therefore the older aircraft are phased in such a manner that sufficient aircraft are available to maintain the commercial schedule."

## D.   Leasing of Aircraft

4.22   NACIL was asked to state whether the process of „leasing" of aircraft is economically feasible or viable or whether this process has led to losses for the company.  NACIL submitted in their written replies the following:-

> "NACIL has been dry leasing aircraft from various lessors in the market, for lease periods of 3 to 7 years, as an interim measure, pending the purchase of aircraft, so that it can expand it"s capacity and network at the earliest. However, it was always recognized that "leasing" was a stop-gap arrangement, and in due course the objective was to replace the dry leased aircraft with owned aircraft.
>
> It was seen that acquiring new aircraft will have a lead time of at least 3 years due selection, approvals and manufacturing time. Such lead time in adding capacity would have a very adverse impact on the airlines profitability and competitiveness. The one way out of this situation was to lease aircraft on dry lease basis.
>
> The last acquisition of owned aircraft in erstwhile AI was in 1996 (2 x B747-400s). Proposals for acquisition of aircraft viz. 3 x A310-300 in 1993 - meant for replacement of the old 3 x A300-B4 aircraft, 1 x B747-400 in 1998 - meant for replacement of the old B747-200 aircraft, were not approved.  There was an urgent need to phase-out the old A300-B4 and B747-200 aircraft. Pending aircraft acquisition, AI inducted the A310-300 and B747-400 from 2000 onwards - on dry lease in view of all facilities and infrastructure available for these aircraft.
>
> The last fleet acquisition exercise in the erstwhile Indian Airlines was in 1989-90 (induction 31 x A320s). Likewise, in view of the phase out of 11 x B737s and 4 x A300-B4 in 2007 and 2008 respectively, by the erstwhile Indian Airlines, there was a need to induct capacity in the short term, pending approval for fleet acquisition, to regain lost market share. Similarly, in order to operate the mandatory North East routes, erstwhile Indian Airlines had to lease the ATRs, as it did not have a suitable aircraft in its fleet then to operate to the North East.
>
> Subsequently, the liberalization of the Indian economy, the enhanced entitlements given to foreign carriers and the interior points of call in India being declared as international airports - all led to an enhanced growth in the international air market.  In its effort to increase its capacity share of the Indian Air Market, Air India had submitted a Project Report for 28 aircraft (10 x A340s + 18 B737s) in 2004.  Pending this acquisition, as an interim arrangement Air India was required to lease more capacity and thereby inducted the 4 x B777-200ER aircraft in 2005-06, since suitable A310-300 and B747-400 aircraft were not available for lease
>
> In erstwhile Air India, in all 16 A310s, 8 B747-400s and 4 B777-200ERs were taken on dry lease during the period December 2000 to December 2005. One 747 was taken on a short term lease (1 year) in September 2007 to overcome urgent requirement. The rest of A310 and 747 fleets were taken on 3-year lease

term. The 777s were inducted on 5-year term. Similarly, 3 x 767-300ERs, 1 x 757-200ER and 1 x A310 were inducted during the period November 2006 to May 2007 for a lease period varying between 6 months and 1 year.

The B777-200ER aircraft were inducted for a five year lease term to provide bridge capacity while the new fleet is being inducted and the 747 lease fleet is being phased out.

In erstwhile Indian Airlines, 33 aircraft consisting of 26 A-320, 5 A-319 and 2 A-330s were also taken on initial lease period of 3 to 5 years. Since A-320 and A-300 aircraft were being operated under IC coded flights, it was easier to induct and operate A-320 family type of aircraft.

As can be seen from the Table here below while growth in pax carriage was 17.6% AAG for domestic and 11% AAG for international, the capacity share of NACIL on the domestic sectors declined from 51.7% in 2000/01 to 17.2% in 2008/09. Similarly, considering the demand for capacity and the delay in delivery of B787s, the lease term of six A310s was extended by another term on newly negotiated terms and conditions.

Had it not been for induction of capacity on lease, both the erstwhile Indian Airlines and Air India would have been completely marginalized."

4.23   NACIL has been leasing different aircraft of different make before and after the merger.  Spare parts of all the different makes of aircraft are also required which are sometimes lent to other companies often incurring losses.  There are huge losses and these aircrafts are always sent abroad for maintenance.  Therefore, NACIL were asked to state why they wanted this lease at all.  In reply, NACIL submitted as under:-

"Leasing of aircraft is typically short term solution and is intended for following reasons:

1.     to take care of expanding market when the owned fleet capacity is inadequate.
2.     to establish new routes or consolidate the existing markets when the existing fleet is not enough to meet the market requirements.
3.     to bridge the capacity gap between the present capacity and new fleet acquisition.
Due to the all above, leased aircraft were inducted in the past.

It takes six months to more than a year for a leasing company to place an aircraft with a lessee.  Therefore, none of the lessors were willing to accept an exit clause.

In view of the global recession and its impact on NACIL, efforts were made in this year to terminate the existing leases prematurely.  This did not materialize due to the current market conditions and low demand for lease aircraft.

Normally NACIL takes up Haj operations using additional lease capacity equivalent of four 747s and two A310s.  However, this year NACIL was able to avoid this extra expenditure by deploying its own fleet for Haj operations without disrupting the other revenue services.   This is made possible due to the availability of dry lease fleet with NACIL."

**CHAPTER 5.**

**ROUTES**

5.1    NACIL was asked to explain what was the basis of route allocation for domestic and international flights and who allocated the routes to the private and government carriers.  NACIL submitted written replies as under:-

"There are no restrictions placed on the airlines with regard to introduction of flights on purely domestic routes. However, airport / airfield /slot constraints act as impediments to the introduction of services on some routes.

As regards international routes, the airlines are required to submit proposal for operations on new routes to the Ministry / DGCA for designation of the carrier to undertake scheduled operations on the concerned routes and for the allocation of necessary bilateral entitlements. The details of the processes involved in obtaining permission / entitlements are given below:-

**Guidelines for operation of Indian scheduled carriers on international routes**

1.    Eligibility Criteria:

1.1    Scheduled Carriers having continuous operations of at least 5 years in the domestic sector on the date of application and having a minimum fleet size of 20 aircraft are permitted to operate on international routes.

1.2    Scheduled Carriers should have valid Air Operators Permit (AOP), should be security cleared by Ministry of Civil Aviation of Home Affairs and have the approval of Aircraft Acquisition Committee.

2.    Routes Available:

2.1    Except Air India and Indian Airlines, other Scheduled Carriers are not allowed to operate to UAE, Qatar, Bahrain, Oman, Kuwait and Saudi Arabia for a period of three years.

3.    Methodology of Route Allocation:

3.1    Due considerations would be given to the operational plans of Air India and Indian Airlines before allocating routes to other eligible Scheduled Carriers.

3.2    All eligible Scheduled Carriers would be asked to submit their operational plan in the first and the third quarter of each year in the application form provided in Annexure "A". Applications are to be filed in duplicate to DGCA (Attn: Director Regulation & Information) with a copy to Ministry of Civil Aviation.

3.3    At any given point of time operational plan of up to one year would be considered for route/traffic right allocation.

3.4   Allocation of traffic rights to Scheduled Carriers would depend on the availability of traffic rights to particular countries/routes.  If the total entitlements fall short of the requirements projected by the eligible airlines. Inter-se allocation of entitlements will be in the ratio of ASKMs deployed by the Scheduled Carriers on domestic routes over last five years.  For this purpose ASKMs deployment of Scheduled Carriers in domestic sector would be determined twice in a year on 1st January and on 1st July of each year.  Traffic entitlements decided on the basis of ASKMs deployment will be rounded off to the nearest whole number.

3.5   Traffic rights allocated for a particular schedule, i.e. Summer or Winter schedule of a particular year will have to be utilized by the Scheduled Carrier within the same schedule period.  Failure to utilize traffic rights once granted would lead to a ban of two years on that route.

3.6   Scheduled Carriers are not permitted to reduce ASKMs deployment in domestic sector once rights are allocated on international routes. Entitlements given to Scheduled Carriers may be reviewed in the event any of them reduces domestic operations after obtaining traffic rights on international routes.

3.7   Notwithstanding the above guidelines, Government may at its discretion permit or deny allocation of rights keeping in view the preparedness of the airlines, viability of operations and the overall interests of the civil aviation sector."

5.2   When asked to furnish a chronology of events leading to the cession / ceding of routes to private operators, NACIL replied thus:-

"The principal reasons for AI"s withdrawal from routes are

1. Acute capacity constraints faced by the airline for an extended period up to 2007-08 due to delay to the airlines" fleet renewal plans
2. Loss making nature of operations on certain routes
3. Phasing out of aircraft which were appropriate for deployment on certain routes
4. Strategic decision to expand operations on certain routes in preference over certain others

The chronology of routes withdrawn is given below:

International

| Sectors dropped from AI network since 2002-03 | |
|---|---|
| Sector | Reason |
| Bangalore-Bangkok | Withdrawn from Jun 06 due to cash losses |
| Jaipur-Bangkok | Withdrawn from Jul 06 due to poor carriage and additional cost of positioning aircraft in Jaipur adding to |

|  | the cash losses |
|---|---|
| London - New York (JFK) | Sector dropped as a result of Route Rationalisation in Sep 08. Proposed to serve this route via Codeshare with KU |
| Paris - Newark | EWR flights rerouted via Frankfurt scissors Hub in Apr 09 in line with the European Hub strategy |
| London - Chicago | Chicago flights rerouted via Frankfurt scissors Hub in Apr 09 in line with the European Hub strategy |
| Guwahati – Bangkok | Route withdrawn in Jun 08 due to poor route economics |
| Kolkata – Bangkok | Flights now operated by Air India express |
| Chennai / Trichy / Calicut – Fujairah / Ras Al Khaimah | Fujairah / Ras Al Khaimah were technical halts. These halts were removed along with Trichy from Nov 07 due to very poor carriage to / from these stations |
| Bangkok – Tokyo | Bangkok transit on Tokyo flight dropped in Nov 07 to achieve synergy between AI and IC networks |
| Singapore – Jakarta | Sector dropped in Dec 07 to save costs and improve route profitability |
| Pune-Hyderabad - Singapore | Sector dropped in Dec 07 due to deficit on the route |
| Goa-Sharjah | Withdrawn from Apr 08 and replaced with Goa-Dubai which is currently served daily |
| Coimbatore-Sharjah | Sector dropped in Apr 08 due to very poor carriage on the route |
| Hyderabad-Nagpur-Bangkok | These services that were introduced in 2005-06 were withdrawn in Jul 08 due to continuous cash losses |
| Bangalore-Sharjah | 4/wk services replaced with daily Bangalore-Dubai from Aug 08 |
| Nairobi - Dar-e-Salaam | Sector dropped as a result of Route Rationalisation in Sep 08 |
| Delhi-Kuala-Lumpur & Bangkok-Kuala Lumpur | These links were withdrawn due to poor carriage and part of restructuring exercise on the Delhi-Bangkok-Kuala Lumpur services |
| Hyderabad – Riyadh | Route now served over Mumbai with Hub and Spoke |

| | connections from Hyderabad |
|---|---|
| Ahmedabad-Sharjah | Replaced with Ahmedabad-Dubai services by Air India Express from Oct 08 |
| Chennai-Bangkok | Sector dropped in Jan 09 due to deficit on the route |
| Bangkok-Singapore | This link was a positioning leg on the Delhi-Bangkok-Singapore route to provide Delhi-Singapore link. Withdrawn from Feb 09 as AI introduced stand alone services on Delhi-Singapore route |
| Pune-Dubai | Route now served by Air India Express |
| Cochin - Al Ain | Route now served by Air India Express |
| Calicut - Al Ain | Route now served by Air India Express |
| Cochin - Abu Dhabi | Route now served by Air India Express |
| Calicut - Abu Dhabi | Route now served by Air India Express |
| Trivandrum - Abu Dhabi | Route now served by Air India Express |
| Trivandrum - Muscat | Route now served by Air India Express |
| Cochin - Doha - Bahrain | Route now served by Air India Express |
| Mumbai - Doha - Bahrain | Route now served by Air India Express |
| Cochin - Dubai | Route now served by Air India Express |
| Trivandrum - Kuwait | Route now served by Air India Express |
| Trivandrum - Dubai | Route now served by Air India Express |
| Cochin - Kuwait | Route now served by Air India Express |

Domestic

1. Mumbai-Puttaparthy
This link was operated by erstwhile Indian Airlines during Jul to Mar every year. However, due to very poor carriage on these services, these services were not operated since Feb 2004.

2. Mumbai-Pune
This link was discontinued from Dec 05 due to very poor carriage on the route.

3. Ranchi-Patna
This link was a positioning leg on the Mumbai-Delhi-Ranchi-Patna services to operate the link between Delhi-Patna route. Since the carriage between Patna

and Ranchi / Mumbai was very poor and since AI increased in the number of services on Delhi-Patna route, AI withdrew the extension Ranchi-Patna in order to save costs effective Jun 08.

4. Bangalore-Bhubaneshwar
This link was withdrawn effective Apr-08 due to poor carriage and resultant cash losses.

5. Bangalore-Pune & Pune-Goa
These links were withdrawn effective Jun 08 due to poor carriage and resultant cash losses.

6. Bangalore-Cochin
This link was withdrawn effective Jun 08 due to poor carriage and resultant cash losses.

7. Calicut-Cochin, Chennai-Coimbatore, Cochin-Coimbatore, Goa-Calicut, cochin-Goa, Calicut-Trichy
These links have been the positioning legs on AI"s international services on Chennai-Coimbatore-Cochin-Sharjah, Bahrain-Doha-Calicut-Cochin, Mumbai-Calicut-Cochin-Sharjah and Mumbai-Goa-Calicut-Sharjah services. With introduction of standalone services by AI on the international city pairs and also part of route rationalisation exercise, the Cochin-Goa & Calicut-Trichy links were withdrawn from Nov 07, the links Chennai-Coimbatore, Cochin-Coimbatore, Goa-Calicut were withdrawn from Apr 08 and Calicut-Cochin from Apr 09. However the Calicut-Cochin link is served by AI Express."

5.3   The Committee asked NACIL to explain on the issue of how, without a plan to expand their area of operation, did they want to make a turn around plan by cutting down and closing down operations in different areas.  In reply, NACIL submitted the following:-

"During the past one and half years beginning from about Jun 08 the airline industry has been hit hard by abnormal increase in ATF costs which was then followed by global economic slowdown that has impacted the carriage & revenues of the industry world over. As per IATA, the airline industry"s yields world over have been eroded by about 20% even while the ATF prices rose by about 30% in 2007-08 and a further 80% during the period Jun-Aug 08. By the time, the ATF prices started softening in the 3rd quarter of 2008-09, the economic slowdown had set in firmly. The traffic to / from / within India suffered a further blow on account of the 26/11 incident at Mumbai which saw a steep decline in tourist arrivals into India to the extent of 20 to 25% in the peak months.

In this context, expanding areas of operation was not considered as a viable strategy for turnaround in the short term. As a result of the economic slowdown, demand continues to be weak even while average fares are about 25% lower than the previous year. The domestic market has seen some growth but this has

come at fares that do not give rise to commensurate benefits by way of revenues.

In order to tide over the situation, the airlines the world over inclusive of Indian carriers have resorted to capacity cuts to contain the losses incurred. As per IATA, the industry capacity during Jan-Sep 09 has been lower by about 3.4 % and the passengers carriage measured in terms of RPK has been lower by 5.3% compared to the same period a year ago. The aviation industry environment has been further vitiated by high ATF prices on the supply side. As against the above, AI has reduced its capacity on international and domestic routes by only about 1% during the period Apr-Sep09. The strategy adopted by AI is not only supported by the global trends but also by the actions taken by some of the foreign / Indian carriers on their operations on routes to / from India.

| Airline | Route withdrawn During past 1 to 2 years |
|---------|------------------------------------------|
| Jet Airways | Mumbai - Shanghai - San Francisco |
| Jet Airways | Amritsar - London |
| Kingfisher | Bangalore – London |
| British Airways | Kolkata - London |
| Virgin Atlantic | Mumbai - London |
| Air France | Chennai - Paris |
| Royal Dutch KLM | Hyderabad - Amsterdam |
| Austrian | Mumbai - Vienna |
| Aeroflot | Mumbai - Moscow |
| Singapore Airlines | Amritsar - Singapore |
| Delta | Mumbai - Atlanta |

5.4    Regarding reduction of routes being operated upon by NACIL, the Chairman, COPU stated as under:-

"…you are reducing both domestic and international routes.  On the one hand you get new fleet of aircraft and on the other hand you keep surrendering routes. Many of these routes were considered commercially very-very viable and lucrative.  For example the Mumbai-Dubai route.  How many flights did the Air India four or five years ago have and how many do you have now?  Same is the case with the commercially viable routes within the country also.  Purchasing

aircraft on the one hand and then surrendering or bartering away routes which have been doing well do not correlate or collaborate to each other."

5.5   NACIL was asked to clarify their position in the matter of complaints that in the domestic segment the remunerative routes are being surrendered by NACIL to the private airlines. In their written replies, they stated the following:-

"The withdrawal of services by erstwhile IA / AI in the domestic market has been on account of non-availability of suitable / sufficient aircraft to sustain certain operations and the loss making nature of these operations on certain routes.

The Government of India pursued open sky policy for the domestic air services from about the year 2003-04. During the period starting from 2003-04, while the new and the existing private airlines continuously added capacity, erstwhile Indian Airlines was faced with acute capacity constraints arising from the following.

1.  Inordinate delay to the airline"s fleet renewal plan
2.  Reduction in the operating fleet of A320 from about the second half of 2005-06 due to maintenance / engine constraints
3.  Operating crew shortage for B737 fleet which had by then been transferred to Alliance Air (its subsidiary) starting from about Jan 2005
4.  Eventual  phase out of B737 aircraft in 2007 and A300 aircraft by March 08
5.  The strategic need to replace the feeder wide body services with narrow body aircraft in order to reduce cost of operations and to replace some of the international wide body routes with narrow body aircraft due to reduction in wide body capacity on account of phase out and lease return.

As such, while erstwhile Indian Airlines was in no position to increase its domestic capacities, the private airlines increased their capacities in successive years by between 12 and 44% during the 4 year period commencing from Apr 04. Consequently, erstwhile Indian Airlines" operations on some of the domestic routes got marginalized by increased frequencies / capacities offered by the competitors on these routes. As a result, losses began to be accumulated on some of the domestic routes which the airline was compelled to withdraw in its short term interests.

It is also pertinent to observe that with the entry of low cost carriers, there has been a distinct shift in demand from full service carriers to those of the low cost (low fare) carriers. In a bid to hold on to its market share, AI was also compelled to drop its fares on the domestic routes. The reduction in fares has also been partially responsible for increasing the losses suffered by erstwhile IA / AI leading to the discontinuance of operations on some of the routes.  In a market where there are several players, withdrawal of services by one player inevitably strengthens the field for its competitors.

The details of domestic city pair links from which erstwhile IA / AI have withdrawn operations post liberalization of the aviation sector and not restored thereafter are as under.

City pairs discontinued by erstwhile Indian Airlines

1. Agatti-Goa (due to poor loads – about 5 passengers on an average per flight)
2. Bangalore-Bhubaneswar (now served with convenient connections in both directions over Chennai)
3. Coimbatore-Cochin (domestic leg of international flight operating on the Chennai-Coimbatore-Cochin-Sharjah route thrice weekly – restructured as Cochin-Sharjah to cut costs to the extent of Rs. 12 Cr per annum)
4. Chennai-Coimbatore (domestic leg of international flight operating on the Chennai-Coimbatore-Cochin-Sharjah route thrice weekly – restructured as Cochin-Sharjah to cut costs to the extent of Rs. 12 Cr per annum)
5. Chennai-Trichy (domestic leg of international flight operating on the Chennai-Trichy-Trivandrum-Sharjah route daily – restructured as Trivandrum-Sharjah to cut costs to the tune of about Rs. 33 Cr per annum resulting in estimated net benefit of Rs. 10 Cr per annum. The Chennai-Trichy city pair is being served by IX)
6. Hyderabad-Nagpur (domestic leg of international flight operating on the Hyderabad-Nagpur-Bangkok. Flight was dropped due to poor loads and losses – Rs. 2 Cr during the three month period Apr-Jun 08)
7. Mumbai-Khajuraho (de-linked due to poor carriage – average of less than 5 passengers per flight)
8. Mumbai-Patna (de-linked due to poor carriage – average of about 12 passengers per flight. Convenient onward connections in both directions have been made available over Delhi  )
9. Mumbai-Pune (dropped due to poor loads – about 30 passengers per flight)
10. Pune-Goa (a unidirectional link on the triangular flight on the Bangalore-Pune-Goa-Bangalore route which was discontinued due to losses – Rs. 4 Cr during three month period Apr-Jun 08. The Bangalore-Pune v.v. & Bangalore-Goa links have been restored)
11. Trichy-Trivandrum (domestic leg of international flight operating on the Chennai-Trichy-Trivandrum-Sharjah route – restructured as Trivandrum-Sharjah)
12. Bhubaneswar-Kolkata (Was part of the daily service on the Chennai-Bhubaneswar-Kolkata route. The service was withdrawn due to capacity constraints / poor loads – 40 passengers per flight on the CCU-BBI sector & losses – Rs. 4 Cr during 2 month period Apr-May 08. The link between Chennai and Bhubaneswar has since been restored)

13. Mumbai-Vadodara (due to poor loads of about 30/flight and losses-Rs. 2.5 Cr during 6 month period Apr-Sep09)

Details of city pairs which were served by B737 aircraft that have been taken over by erstwhile IA/ AI on A320 family aircraft are as under:

1.  Agartala-Kolkata
2.  Aizawl-Imphal
3.  Aizawl-Kolkata
4.  Bagdogra-Guwahati
5.  Bagdogra-Kolkata
6.  Bangalore-Chennai
7.  Khajuraho-Varanasi
8.  Bhopal-Delhi
9.  Bhopal-Indore
10. Bhopal-Mumbai
11. Bhubaneswar-Chennai
12. Chennai-Port Blair
13. Delhi-Bagdogra
14. Delhi-Guwahati
15. Delhi-Indore
16. Delhi-Jodhpur
17. Delhi-Khajuraho
18. Delhi-Leh
19. Delhi-Patna
20. Delhi-Udaipur
21. Delhi-Varanasi
22. Hyderabad-Vizag
23. Imphal-Kolkata
24. Jodhpur-Udaipur
25. Kolkata-Dibrugarh
26. Kolkata-Port Blair
27. Leh-Jammu
28. Leh-Srinagar
29. Mumbai-Indore
30. Mumbai-Jamnagar
31. Mumbai-Jodhpur
32. Mumbai-Mangalore
33. Mumbai-Nagpur
34. Mumbai-Rajkot
35. Mumbai-Udaipur

36. Mumbai-Vizag

Details of city pairs that were discontinued by Alliance Air due to withdrawal of B737s which could not be taken over by erstwhile IA / AI due to capacity constraints on A320 family fleet are as follows:

1. Agra-Varanasi
2. Agra-Khajuraho
3. Agra-Delhi
4. Ranchi-Bhubaneswar (directional)
5. Bhavnagar-Mumbai
6. Bhubaneshwar-Hyderabad
7. Bhubaneshwar-Vizag
8. Chandigarh-Leh
9. Chennai-Nagpur
10. Kolkata-Nagpur
11. Kolkata-Vizag
12. Raipur-Vizag"

5.6     The Ministry of Civil Aviation was asked whether they had issued orders on the basis of which the profitable routes had been / were being surrendered to the private airlines.  The Ministry of Civil Aviation submitted in their written replies:-

"The guidelines for operation on international routes by the Indian private carriers are provided in the Aeronautical Information Circular no. 2/2005 dated 21 January 2005, modified vide File No.5/251/2008-IR dated 17 July 2009, under which it is clearly specified that due consideration shall be given to the operational plans submitted by National Aviation Company of India (NACIL) before allocation of the traffic rights to other eligible applicants."

5.7     In this regard, the Committee during oral evidence of representatives of NACIL stated the following:-

"…..what we are seeing in the papers is that the NACIL is conceptualising its turn-around by cutting its area of operation.  Will it not decimate your entire operation?  As a operational company, how can you conceive of doing that by cutting down your area of operation?  Can you even dream of making a revival in a competitive scenario? I do not understand its logic at all.  The details which you have given, do not give any clear picture.  From Kolkata to Mumbai, Jet is operating seven flights, King Fisher is operating four flights and Indian operates two. You know that Kolkata-Mumbai route is always full.  Similarly, in Kolkata-Hyderabad route, Jet operates eleven flights; King Fisher operates one and Indian none.  I think very recently they have started operating one.  There are many other examples.  If you see the routes between the metropolis and major

cities and if you make a comparative study between Jet, King Fisher and Indian, it will clearly show that you have given all these to them on a platter."

5.8   NACIL was asked if they felt that the entire social responsibility to operate in non-remunerative routes had been thrust on NACIL as a result of which they had not been able to make profits.  They submitted in their written replies as under:-

"Currently, AI & its subsidiaries operate to 62 Indian destinations including 11 destinations in 6 North-East States besides 33 international destinations outside India.

Besides the Route Dispersal Guidelines (RDG) of the DGCA, the Government policy does not thrust any express obligations on NACIL in the development of its network. However, being a Government owned airline, NACIL does receive many suggestions / references from the various agencies such as Government, Hon"ble MPs, Trade & Industry, Social, Cultural associations, etc which go to influence NACIL"s route network perhaps to a greater extent than that of its competitors. For instance, NACIL"s operations in the North-East are determined in consultation with the North-East Council (NEC) not only for the ATR operations in that Region (which is covered by a Commercial Agreement with the NEC) but also operations with other aircraft types on the NACIL fleet. Similarly, NACIL restored the link between Cochin and Agatti on the directive of the Ministry despite these operations being loss making. NACIL is also required to respond to National requirements such as operation of charter flights, relief flights, Haj charters, etc which compel the airline to divert capacity from scheduled services thereby disrupting these schedules. In a broader light, maintaining connectivity to remote and underserved markets is woven into NACIL"s network planning systems whereas private airlines develop their network based solely on profitability / network synergies.  For instance, AI deploys almost double the capacity on the Category II & IIA routes to / from North-East, J & K, Port Blair & Lakshadweep Islands than the minimum stipulated by the DGCA under the RDG.

5.9   It was queried as to who decides the routes to be operated upon by airlines – the Ministry or whether NACIL is surrendering routes and taking up new ones. Further, it was asked what are the considerations while allocating routes and Whether viability and profitability of routes is taken into consideration prior to allocation of routes. In reply, NACIL stated as under:-

"NACIL decides the routes that it will operate. NACIL has not withdrawn services from any of the routes that have been profitable to the airline.

The routes operated by NACIL are broadly determined by the following factors.

1.     Market requirement as reflected in the market size as gathered from sources available to the airline including feedback from NACIL"s own officials in the field
2.     Medium / long term strategic considerations of the route

3.      The propensity of the route to generate feeder traffic / revenues on the other routes in the NACIL network & to support the airline"s alliance plans

4.      Estimated passenger carriage / revenue based on market dynamics

5.      The estimated profitability from the identified route weighed against available alternatives

6.      Feasibility of operations based on availability of necessary resources in terms of suitable aircraft, crew and Engineering support for the operations

The concerned airline normally carries out independent economic evaluation of the profitability of the routes while taking a decision in this regard.

Subsequent to this decision, the concerned airline requests the Ministry of Civil Aviation for allocation of traffic rights to operationalize its plans.  The details of the procedures to be followed are given in AIC dated 17 July 2009 and are summarized below:

i)      All eligible airlines (airlines with a minimum of 5 years continuous operation in domestic sector and a fleet of 20 aircraft) are required to request for allocation of traffic rights in a defined format which also gives details regarding fleet, availability of slots at the airport to which traffic rights are sought, pilots/engineers, etc.

ii)     Traffic rights are initially allocated for a period of one year only to be reviewed later.

iii)    Allocation of traffic rights depend upon the availability of such rights under respective bilateral Air Services Agreement.  In case traffic rights are not sufficient to cover the requirements of all the eligible Indian carriers, the allocation to various eligible carriers shall be made in the ratio of available seat kilometers (ASKMs) deployed by the various carriers on domestic scheduled services during the last 5 years.

iv)     Due consideration shall be given to operation plans submitted by NACIL before allocation of traffic rights to other eligible carriers.

v)      The Ministry of Civil Aviation may at its discretion grant or deny allocation of traffic rights to any carrier if it is not satisfied with the preparedness of the carrier to undertake such operations and also about the viability of operations on a particular route."

5.10   The CMD, NACIL during oral evidence before the Committee further elaborated on the issue of route dispersal, the following:-

„…The issue of route dispersal guidelines which you had mentioned, we were monopoly people.  We have got open sky and competition has come.  It is extremely difficult for us to withdraw a route which was established earlier.  Now if I have to withdraw a route from let us say Kolkata-Imphal or Kolkata-Aizawl,

there may be no pressure on me and the Ministry may not say anything.  But I cannot withdraw that.  That was introduced long time back.  It is very difficult for me to get away from the non-metro cities.  I have got limited aircraft on my hand. I have to decide how much of those have to be operated on the metro and how much I have to still retain in the non-metro cities.  Therefore, what has happened is that when you look at NACIL"s network in the category II and IIA, we are more or less double the capacity required by the route dispersal guideline.  Now I would like to withdraw that.  But whether I should really withdraw it or not is an issue.  Sir, I will be submitting a detailed note to you about telling you exactly that in which areas why I am not withdrawing and what are my losses.  Normally we do not look at the fixed overhead costs.  We only look at cash loss – how much petrol, how much variable cost and how many allowances, etc.  Based on that if we are able to recover that, then we work it out.  That is the economics which is worked out in that area.  I will be submitting a detailed note on this issue.  In fact, all these issues which you have raised, I will be submitting a detailed report to you but I am just explaining certain issues.  Delhi-Agatti link which was the directive of the Ministry, I have myself personally written a letter on that saying that we would like to discontinue it because we are losing money on that.  We would not be able to run that particular route unless the Government of India is going to give us an annual subsidy there.  Now the demand from North-East Council and eight States is that the aircraft which we are plying is 40 seater and they say that they want a 20 seater.  So, there is a gap on that issue.  We are struggling with that whether we can run the 40 seater or a 20 seater there.  Now these are demands which are coming.  Sir, you will agree with me that if NACIL play a role as a national carrier, it will be extremely difficult for a national public sector undertaking under the Government of India control and under the august body of Parliament here just to deny a State somewhere that we will not run a route to you just because if we do not run somebody else would also not run because they want to it only in a profitable situation.

What the private airlines will do is that they will try to find out when Imphal Calcutta becomes profitable. The day Imphal Calcutta route becomes profitable they will run a flight on that route and till that time they have to depend on somebody else. …..."

5.11   The Secretary, Ministry of Civil Aviation with regard to route rationalization stated the following:-

"…..This is also being considered by the CMD to ensure that we look at the revenue enhancement, the route enhancement things and here also the Members had pointed about the route rationalisation as to why there are so many difficulties.

Here we entirely agree that there has been a fair amount of adhocism.  So, what has been done in the last two-three months is that we have appointed an independent international consultant on these route issues.  They have actually come up with a lot of suggestions and we have really gone into this winter

schedule.  We have just issued a winter schedule where we have the kind of loss making routes.  In fact, there are 29 international routes which give us a loss of about Rs.2,000 crore and we are re-examining some of these things.  For your information, I would like to submit that the Mumbai-New York and the Delhi-New York flights, which are our prestigious and premium flights, last year made a loss of Rs.750 crore.  So, this is a matter of great concern and it should not happen. We are finding out what are the marketing issues, what are the branding issues so that these flights do start earning revenues.

On route rationalisation, we have come up with a plan and as the hon. Member has said, we will give a comparative statement on this winter schedule so that the entire thing is openly available and we do not stop routes which are making good money.  So, this is something that is very much top of our priority and we will ensure that this is done. ...."

5.12    He further added the following:-

**"**Coming back to the routes thing, now that  we have  an independent Consultant and a complete report, I assure you that we will give you the entire thing because from this winter schedule we have a very transparent kind of thing  on the routes, which we do not want to keep changing because one of the banes of the Air India has been that we have been keeping on changing routes when we have got a good market.  So, this time we have got an independent Consultant and evaluation, and that I will submit as early as possible."

5.13    NACIL was asked to explain the basis on which the timings of various flights is decided upon.  The reply is given below:-

"The timings of various flights are planned based mainly on the timings that are preferred by the target passengers, the airline"s goal to provide convenient connections to / from other major destinations on AI"s and its partner airlines" networks and the timings adopted by the major competitors on the route. The actual timings are however, determined as per the availability of internal resources and slots at the concerned airports."

5.14    In the new aviation open sky policy, there has been an emphasis on bilateral routes between various countries and permission to give Indian carriers to operate on more international routes including Gulf. In this regard, NACIL was asked to state whether more profitable routes have been given to private airlines as compared to Air India and in this bilateral exchange, which routes has Air India got.  The reply furnished by NACIL is produced below:-

"It is incorrect to say that more profitable routes have been given to private airlines as compared to Air India.  As a policy, due consideration is given to the operational plans submitted by National Aviation Company of India Limited (NACIL) before allocation of the traffic rights to the other eligible applicants.  Only on exercise of the first right of refusal by Air India for operations on particular

International routes, such rights are considered for giving to other Indian private scheduled operators.

Currently, Air India and its subsidiary, Air India Express together operate international services to 33 foreign destinations (34 from 01 December 2009) in 24 counties."

5.15   On how many destinations were not served by NACIL, prior to opening up of the international market, NACIL replied thus:-

"Erstwhile AI / IA were serving these stations even prior to the introduction of the liberalized Civil Aviation policy of the Government of India in Jan 05 with the sole exception of Washington, to which destination the airline plans to commence operations effective from 1st Dec 09."

5.16   NACIL was asked to explain how they would be able to improve their commercial viability if they reduced their routes.   NACIL in their written replies explained the following:-

"The current international long haul operations of NACIL are giving rise to cash deficits. In other words, if additional capacity were to be deployed by NACIL at this stage such additional capacity would only give rise to greater cash losses in the short term than any improvement in the profitability of the airline. This situation has come about in the wake of intense competition and adverse developments in the airline"s operating environment. NACIL"s competitors on the international routes including Jet Airways with the notable exception of Gulf carriers have all deferred plans to increase operations and in some cases even reduced operations on routes to / from India.

The details of withdrawal of operations by other carriers on routes to / from India in the recent past are given in the table below:

| Airline | Route withdrawn During past 1 to 2 years |
|---|---|
| Jet Airways | Mumbai - Shanghai - San Francisco |
| Jet Airways | Amritsar - London |
| Kingfisher | Bangalore – London |
| British Airways | Kolkata - London |
| Virgin Atlantic | Mumbai - London |
| Air France | Chennai - Paris |

| Royal Dutch KLM | Hyderabad - Amsterdam |
| --- | --- |
| Austrian | Mumbai - Vienna |
| Aeroflot | Mumbai - Moscow |
| Singapore Airlines | Amritsar - Singapore |
| Delta | Mumbai - Atlanta |

In the economic front, during the past one and half years beginning from about Jun 08 the airline industry has been hit hard by abnormal increase in ATF costs which was then followed by global economic slowdown that has impacted the carriage & revenues of the industry world over. As per IATA, the airline industry"s yields world over have been eroded by about 20% even while the ATF prices rose by about 30% in 2007-08 and a further 80% during the period Jun-Aug 08. By the time, the ATF prices started softening in the 3rd quarter of 2008-09, the economic slowdown had set in firmly. The traffic to / from / within India suffered a further blow on account of the 26/11 incident at Mumbai which saw a steep decline in tourist arrivals into India to the extent of 20 to 25% in the peak months.

In this context, expanding areas of operation is not considered as a viable strategy for turnaround in the short term. As a result of the economic slowdown, demand continues to be weak even while average fares are about 25% lower than the previous year. The domestic market has seen growth but this has come at fares that do not give rise to commensurate benefits by way of revenues.

In order to tide over the situation, the airlines the world over inclusive of Indian carriers have resorted to capacity cuts to contain the losses incurred. As per IATA, the industry capacity during Jan-Sep 09 has been lower by about 3.4 % and the passengers carriage measured in terms of RPK has been lower by 5.3% compared to the same period a year ago. The aviation industry environment has been further vitiated by high ATF prices on the supply side. As against the above, AI has reduced its capacity on international and domestic routes by only about 1% during the period Apr-Sep09."

## A.   Flying on Routes as a Social Obligation

5.17   It was asked if the entire burden of social responsibility had been thrust on NACIL by the Ministry of Civil Aviation.  NACIL replied as under:-

"Apart from the mandatory requirement as stipulated by the DGCA as detailed in answer to Question 10 above, NACIL has in the past undertaken special operations as a social obligation to evacuate Indians in crisis situations for e.g. special flights were operated to evacuate Indians during the Gulf war etc.

Currently, NACIL & its subsidiaries operate to 62 Indian destinations including 11 destinations in 6 North-East States besides 33 international foreign destinations outside India (34 from 1st Dec 09).

Besides the Route Dispersal Guidelines (RDG) of the DGCA, the Government policy does not place any obligations on NACIL in the development of its network. However, being a Government owned airline, NACIL does receive many suggestions / references from the various agencies such as Government, Hon"ble MPs, Trade & Industry, Social, Cultural associations, etc which go to influence NACIL"s route network perhaps to a greater extent than that of its competitors. For instance, NACIL"s operations in the North-East are determined in consultation with the North-East Council (NEC) not only for the ATR operations in that Region (which is covered by a Commercial Agreement with the NEC) but also operations with other aircraft types on the NACIL fleet.

NACIL is also required to respond to National emergencies / requirements such as operation of charter flights, relief flights, Haj charters, etc which require the airline to divert capacity from scheduled services thereby impacting  schedules.

As NACIL(I) (erstwhile Indian Airlines) was the sole domestic operator for many decades, the airline"s domestic network has evolved over time and the network continues to provide connectivity to remote and underserved markets. For instance, AI deploys almost double the capacity on the Category 2 & 2A routes to / from North-East, J & K, Port Blair & Lakshadweep Islands than the minimum stipulated by the DGCA under the RDG."

5.18    The Committee asked if certain decisions had been thrust on NACIL by the Ministry of Civil Aviation and if so, whether NACIL or the erstwhile Indian Airlines or Air India ever made any representation to the Ministry asking them to compensate for these losses.  In reply, NACIL stated the following:-

"The NACIL had written to the Ministry of Civil Aviation that its operations on the Cochin-Agatti sector would need to be subsidised by the Government to the extent of the anticipated cash losses. The matter was examined in the Ministry of Civil Aviation and NACIL has been advised to make out a comprehensive proposal for seeking subsidy from Government for operating on Cochin-Agatti route and other such routes, which are not being operated on commercial considerations.  NACIL"s ATR operations on the North-East routes are supported by a grant of Rs. 38.50 crores annually from the NE Council."

5.19    In this regard, the Chairman, COPU stated the following:-

".....You also refer to what you had mentioned on broader light that private airlines develop the network based solely on profitability/networking, which means, the entire burden of social responsibility has been thrust on you by the Ministry as I see it whereas the private airlines have been allowed to function only on certain criteria such as profitability and networking.  It is not your fault. If it is being done by the Ministry, we should be aware of it, we should know that in

specific terms. If this is the practical position which has taken place, in my opinion, it is totally wrong and I think, the Ministry will have to answer these questions and pay for it because after all, all of us have been very proud of our national carriers, both Air India and Indian Airlines. We are here to assist you make the turn around as quickly as possible, to make a profit; we are not here to help you to assist in switching on the red right and shutting this entire thing. ….”

5.20   The Committed asked NACIL, if in their opinion, the private airlines need to shoulder this social responsibility.  In reply, NACIL submitted as under:-

“As per the RDG, the private airlines are required to deploy certain portion of their capacities on the Category 2, 2A and 3 routes.”

5.21   NACIL was asked to give details of routes they were not withdrawing their aircraft from, the reasons for the same and the losses being incurred. In their written replies, NACIL stated the following:-

“Due to the high cost of inputs for the past one and half years beginning from about Jun 08 on account of abnormal increase in ATF costs, followed by global economic slowdown coupled with the excess capacity situation in the industry resulting in poor load factors & yields, NACIL”s services on most of the routes have been incurring cash losses. Many of these routes are of strategic nature with long term potential and as such, NACIL is not in favour of withdrawing these operations. Notwithstanding the above, NACIL has taken efforts at restructuring & re-fleeting in order to improve the operating economics through cost reductions and revenue enhancement resulting from deployment of newer and more fuel efficient aircraft and greater network synergies.”

## CHAPTER 6.

## GROUND HANDLING & MRO SERVICES

6.1   When asked what steps have been taken by the Company to tap the potential of high growth and profitable businesses such as Maintenance, Repair and Overhaul (MRO) facilities, ground handling services, etc., NACIL replied as under:-

"NACIL (A) is providing Technical Assistance to various Foreign and Domestic operators at various airports in India where our manpower is positioned.  We are also providing certification to some of these operators.  Our Engineering and Engine Overhaul facilities are providing Engineering services to various Foreign & Indian parties including foreign/ domestic airlines. This includes providing Hangar facilities, undertaking maintenance checks on aircraft, Repair /overhaul /testing of Engines, APU(Auxiliary Power Units), Components & Accessories fitted on the aircraft.

In addition, following steps are being taken by NACIL(A) to tap market potential for Engineering / Engine Overhaul facilities.

1.  Attempts have been made to contact various operators in India to send their components and engines to our MRO facility.

2.  We have participated in the tenders/ bids published by private airlines in India like Spice jet for performing "C" check and engine overhaul.

3.  Attempts have been made to contact various well known aviation experts for marketing engine overhaul facility in the world.

4.  Attempts have been made to appoint Messrs. Star Aviation as exclusive representative to market engine overhaul facility in the Middle East Region

NACIL I and European Aeronautic Defence and Space Company (EADS), signed a Joint Venture Agreement on 16 October 2008, for creation of an Aircraft Maintenance, Repair and Overhaul (MRO) Centre. This new MRO centre after it receives the approval of the Government will start its operations at the earliest at Indira Gandhi International Airport, Delhi.  It would become a Member of the Airbus MRO Network.

As per the Agreement, the Joint Venture will undertake airframe maintenance and repair of Airbus aircraft of NACIL to begin with.  Later, it will extend the facility to other types of aircraft (e.g. ATR) and aircraft of other airlines as also to aircraft other than the Airbus family.  NACIL is a major operator of Airbus aircraft and is currently inducting 43 new A320 Family aircraft into its fleet.  The induction programme started with effect from mid 2007 and would continue till early 2010. Currently, it operates 35 A320s, 18 A319s, 13 A321s and two A330s of Airbus family aircraft.

The facility would also cater to the markets in South Asia Region and neighbouring countries.  By 2013, over one hundred single aisle aircraft and around ten wide body aircraft per year would be maintained and the centre would employ 250 to 300 Indian technical personnel.  Other Indian as well as foreign operators / airlines would also benefit from its services soon.

Both NACIL and EADS are initially 50-50 equity partners in the Joint Venture. A third Airbus network partner and local affiliate EADS company would be inducted soon.  The total project cost has been estimated at US $ 40 million spread over 5 years which includes new wide body aircraft hangars, equipment etc.

After the induction of Airbus Network Partner is inducted into the JVC, NACIL and (EADS and IAV) would divest equal proportions of their shareholding in JVC

Lock-in period of EADS France shareholding in the JVC would  be minimum of four (4) years from the closing date."

## A.   <u>Ground Handling Services-Joint Venture</u>

6.2    On being asked whether the Company has entered into or proposed to enter into any Joint Venture Agreement with any other Government Company or private agency or international organization, NACIL stated as under:-

"Yes, NACIL has entered into Joint Venture with Singapore Air Terminal Services (SATS) at BLR & HYD for providing Ground Handling Services.  Besides NACIL is in the process of discussion with SATS to undertake ground handling services at other Metro Airports other than BLR & HYD."

6.3    NACIL was asked to state the reasons for entering into a Joint Venture with Singapore Air Terminal Services for provision of ground handling services.  The replies furnished are as under:-

"NACIL has entered into a Joint Venture Agreement with Singapore Airport Terminal Services for Ground Handling at Bangalore International Airport and Rajiv Gandhi International Airport at Hyderabad.

One of the various selection criteria stipulated by BIAL for awarding Ground Handling at the new Bangalore International Airport, was "International experience and network of Ground Handling Services at best international standards and competitive prices at airports similar to the size and set up of the new Bangalore International Airport (25%)".

With regard to the above selection criteria, NACIL decided to enter into a JV with an international experienced Ground Handling Agent.  Out of the Foreign Handling Agents shortlisted by BIAL, only Swiss port and SATS had submitted the tender as independent unit, whereas other global players had joined hands with Indian partners.  M/s Swiss port had declined the offer for a Joint Venture

partnership with NACIL for Cargo and hence there was no other independent international operator other than SATS shortlisted by BIAL.  As such it was felt appropriate to join hands with SATS for submission of tender for Ground Handling at BIAL.  This was particularly in view of the fact that Air India had agreed to go jointly with SATS for submission of tender for Cargo.

At Hyderabad, a pre-condition to qualify in the tender procedure was to form a consortium with third party ground handling service provider or the ground handling subsidiary of a foreign airline or parent company of an airline offering ground handling service.

GHIAL had shortlisted 10 International Ground Handling Agencies apart from Air India and Indian Airlines operating through Hyderabad Airport, to whom the tender was sent.  Out of these 10 parties, only M/s SATS from Singapore and M/s DNATA from Dubai had shown interest to join NACIL as JV partner. Therefore, Security Clearance for SATS and DNATA was asked for, from the Ministry of Civil Aviation, Government of India, on the direction of AI Board. Ministry of Civil Aviation informed Air India that Security Clearance has been accorded by Government for AI/IC to have M/s SATS as the JV Partner.

Further, the Civil Aviation Policy vide Sl.No. 7/2007 dated 28th September 2007 para 2 (A) (i) confirms that Subsidiary Company of NACIL or its Joint Venture is eligible to undertake Ground Handling Services at all Metro Airports in addition to the Handling Agencies appointed by Airport Operator.

In view of the above, NACIL after getting concurrence from MOCA, entered into a Joint Venture with SATS, at BLR and HYD."

6.4   The projected financial implications of the joint-venture as provided by NACIL are given below:-

"The JV with SATS has been approved for implementation at all metro airports. As a result of the Joint Venture the revenues from the Ground Handling business would accrue to the Joint Venture Company and NACIL and SATS would have an equity participation of 50:50 in the Joint Venture Company. The Business Plan for the metro airports (other than BLR & HYD) is still in the process of being finalized."

6.5   On being asked to state whether there are plans to review or extend the Joint Venture, NACIL replied as under:-

"Yes.  There are plans to review the Joint Venture."

6.6   The Committee asked NACIL to explain why on one hand NACIL opted for a Joint Venture for ground handling services when on the other hand they say that they have a large number of staff who can provide ground handling services to all the carriers in the country. NACIL replied thus:-

"NACIL has entered into a consortium at Bangalore and Hyderabad airports with SATS. This consortium was necessitated due to precondition of Tender requirements of BLR and HYD airports in which to qualify international experience was one of its major pre-requirements to bid.

For other airports, NACIL is in the process of discussions with SATS. While the government has accorded approval to NACIL to enter into a joint venture, SATS has proposed that this joint venture be formed with its subsidiary, SATS Investment Private Limited. The due diligence process is under progress and NACIL has sought details of ownership which are yet to be sorted out.

As per Ground handling policy, NACIL can undertake providing Ground Handling services either through joint venture or through its own subsidiary. To take advantage of this government policy NACIL is considering to carry out the ground handling through its subsidiary, Air India Air Transport Services Limited to enable provide ground handling to all carriers in the Country."

6.7    The Secretary, Civil Aviation stated the following in the above matter:-

"The SATS is a joint venture for ground handling not for the MRO. For the ground handling, actually, this has not been yet formed; it is under discussion. It is because, as you have rightly pointed out, Air India has got grandfather rights in all these airports. We are very clear that we do not want to surrender or negate any of this. In fact, even this morning, I had a discussion with the CMD. So, discussions are going on. I can assure you that we will not do anything where these rights are compromised in any way."

6.8    In this connection, the Committee during oral evidence of the representatives of NACIL made the following observations:-

"…..The entire engineering contingent you are having can serve all the airlines operating in our country. Similarly, in the matter of ground handling also. Why are you allowing ground handling? You are not allowing but somebody else is allowing. Why a position should not be taken to the effect that ground handling of the entire country should remain with you completely? The Committee may take a view that the engineering services which is related to the safety should also be centralised and the service has to be taken by all concerned. That way, it would give a much better avenue in making better use of the skilled manpower."

6.9    In this regard, the CMD, NACIL further elaborated as under:-

"….When nobody was doing ground handling, it was Air India and NACIL staff which was doing ground handling on behalf of the airport operators. Today, with open sky policy which is a new policy, they have allowed the airport operators to identify and appoint their own ground handling agent. Therefore, what is happening is that in Bangalore, Hyderabad, Cochin and now followed by Delhi and Mumbai, the airport operator being a private operator, he is being given the authority under the concession to appoint their own ground handling agents to do

this work.  In Bangalore and Hyderabad where when they called for tenders, Air India or Indian Airlines were not eligible to participate in the ground handling.  We had to join one more international ground handling agency to just qualify.  It is a joint venture in the sense that it is a consortium.  We both agreed to spend our own money.  We handle our own work and the operator handles this one.  So, if you go to Bangalore and Hyderabad, if you fly a private airline or you fly any international airline, the ground handling will be under an organisation know as Air India SAT but actually only when you fly on Indian Airlines and Air India, you will find Indian Airlines staff doing the job.  Internally it is segregated.   Now under these circumstances, at NACIL in the management we have taken a stand that the ground handling which is doing business for 19 airlines all over the country, this should be floated into a separate subsidiary. For the entire 8000 employees there, give them the full freedom; let them service not only Indian Airlines and Air India but also everybody else on the same pricing.   This is what we had submitted to the Standing Committee also.  The hon. Committee had agreed to our suggestion saying that yes, NACIL will have to go in for a subsidiary, segregate the engineering completely, allow them to have a Rs.3000 crore business, segregate the ground handling and allow to have something like Rs.1000 to Rs.2000 crore business, segregate your cargo and segregate your training. ….”

6.10    On whether NACIL have made any proposal to the Government requesting for vesting of the whole ground handling services for all airlines with them, NACIL submitted in their written replies as under:-

“Ground Handling Services at the airports are governed by the Government's Ground Handling Policy issued from time to time .

In order to improve the Ground Handling Services, Government of India has come out with the policy to increase competition and allow other Ground Handling Service Providers to provide Ground Handling Services at Metro Airports.

NACIL has been permitted by the Government of India to provide Ground Handling either through its subsidiary or by a joint venture partner.  However obtaining business will depend upon the market conditions/ competition prevailing.

NACIL has not projected any proposal to Government of India for vesting of whole Ground Handling

Services for all airlines with NACIL.”

6.11    The Secretary, during oral evidence stated the following regarding creation of strategic Business Units (SBUs) for ground handling and MRO services:-

"One point that the hon. Member had made was about using the kind of talent and the schemes that are available in Air India. I would be very happy to inform you that we are now in the process of setting up the SBUs, the Special Business Units for ground handling and for MRO. This will be spun off as a separate unit for everything so that the additional employees can be absorbed into this because from about 30,000, we can come down to about 20,000. This is very much in consideration and we hope to operationalise this soon. Absolutely, it will be completely a company of NACIL. There is no joint venture or anything. This is called SBU. In fact, this was also one of the recommendations of the Consultant. Actually, in my view, this should have been done first so that the employee kind of problem would not have come. If we had got into SBU, this would have been hived off. They would have been happy and they would have played a role. So, this is also being done."

**CHAPTER 7.**

**HUMAN RESOURCE**

## A.   Manpower

7.1    Details regarding the total staff strength in NACIL (both sanctioned and in position) at present, any surplus manpower in the Company and the breakup of staff strength as on 31.08.2009 in NACIL are as follows:-

"NACIL (A)    -       13739
NACIL (I)      -       16778
TOTAL FOR NACIL- 30517

As for the sanctioned strength, the Company has done away with the concept of sanctioned strength and the existing strength is taken as operating strength."

7.2    On the issue of poaching of NACIL"s skilled manpower by private operators and steps taken to prevent these activities, NACIL replied as under:-

"NACIL-I has just sufficient pilots to meet the schedule requirement of Operations.  After the advent of open sky policy of the Government of India in the early 90s, there was mushrooming growth of private airlines and air taxi operators and erstwhile Indian Airlines experienced exodus of pilots.

With the passage of time, keeping in view the development of aviation in the Indian scenario, necessary amendments  have been  made by NACIL-I through the service regulations that stipulate six months notice period for tendering resignation from the services of NACIL-I.  Similarly, the DGCA through issuance of a CAR made it mandatory on part of a pilot to serve a notice of six months before joining any other operator from the serving employer.

In addition, it is the endeavor of NACIL-I to select, train and release pilots on routes as per the schedule requirements of the airline.  As per the industry practice and as per the industrial dispute act the company encourages collective bargaining and recognized line pilots association negotiate with the management of NACIL-I  on all matters concerning the service regulations, working conditions and conditions of labor which is a successful democratic practice adopted by all companies.  The pilots are offered reasonable career progression opportunities for professional development as well as to administratively / hierarchically develop   in the company.   The pilots are offered early command training, reasonable pay package and other associated security packages making the working conditions impressive.

The above factors act as a restraint against poaching of pilots of NACIL-I.  Only 13 resignations of Pilots and 02 resignations of Engineers have been accepted since the year 2002 in NACIL-I and there are negligible number of resignations in

NACIL-A. (Pilot 1, Engineer-5). Further, 12 Flight Despatchers have submitted resignations in 2008. The same have, however, not been accepted.

NACIL is, however, resorting to recruitment of technical manpower like Pilots, Engineers, Technicians/Cabin Crew on a regular basis.  During the last five years, 752 Pilots (473 in NACIL-I and 279 in NACIL-A), 299 Engineers (243 in NACIL-I and 56 in NACIL-A), 633 Technicians (201 in NACIL-I and 432 in NACIL-A) and 1748 Cabin Crew (763 in NACIL-I and 985 in NACIL-A) have been inducted."

7.3    Details about manpower per aircraft and comparison with private airlines and international standards as furnished by NACIL are given below:-

"The employees per Aircraft Ratio as on 31.05.2009 for the airline is as under :-

NACIL (A)    :       1 : 286
NACIL (I)     :       1 : 177
NACIL         :       1 : 214

There is no international benchmarking for an ideal aircraft to employee ratio. Aircraft to employee ratio varies from airline to airline depending upon the nature and extent of functions performed in house as most of the airlines have outsourced majority of its functions which are still being performed in-house by the Company. Concluding therefore,  that aircraft/employee ratio of NACIL  is extremely  high or misleading, may not be correct as foreign airlines invariably do not perform the functions such as Aircraft Major Maintenance Activities, Ground Handling activities, Vigilance, Transport, Medical, Civil Engineering, Ministry references/Parliament questions etc. nor do they have to maintain departments such as Rajbhasha, Internal Audit etc. Comparison, therefore, cannot be drawn.

This compares with any other world-class airline as illustrated below:

Aircraft Employee Ratio of other Airlines

| Name of the Airlines | Aircraft/Employee ratio |
|---|---|
| British Airways | 178 |
| Air Lanka | 434 |
| Air France | 245 |
| Egypt Air | 568 |
| PIA | 380 |
| KLM | 220 |
| Thai Airways | 321 |
| Singapore Airlines | 161 |
| Malaysian Airlines | 230 |
| Virgin Atlantic | 282 |

(Source: IATA WORLD TRANSPORT STATISTICS 45th Edition published in 2001)"

**B.**   **Salary and Wages**

7.4   NACIL was asked to state whether there is any parity between the terms and conditions and the salary and wages that are paid to pilots who were with Air India or Indian Airlines earlier and who have now been amalgamated as Air India Pilots. It was also asked if after the merger, whether the terms and conditions are same for all. NACIL replied the following:-

> "There is no parity between the terms and conditions of Salary, PLI and Flying Related Allowances since the employees of NACIL, including Pilots are paid salary, PLI and Flying Related Allowances in terms of the Settlement/Agreements/Understandings signed with the respective Union/Associations/Guild of erstwhile Indian Airlines and Air India.
>
> Subsequent to merger the integration and harmonization of Salary, PLI and Flying Related Allowances have not yet been completed in respect of all employees including Pilots of the erstwhile Airlines and they continue to be paid as per the existing Settlements signed with their respective Union/Associations/Guild."

7.5   Regarding disparity between the two erstwhile airlines, the CMD, NACIL, during oral evidence, stated the following before the Committee:-

> "….What has happened is though these two are public sector undertakings in Civil Aviation industry their internal procedures, processes, human relations, working conditions, timings and methods of dealing are totally different. For example, I readily agree with you when you asked why there is disparity between the two companies. I will just present it to you, Sir.
>
> In Air India when a pilot is taken on we give him an advance in dollars in the beginning of the month. He takes six months to reconcile the account and give it back. In Indian Airlines we do not give. We ask him to spend and then he is reimbursed the amount. These two are two conditions which are there. Pilots are asking parity with Air India. The point, Sir, is the pilots in Indian Airlines who are flying wide body can ask for parity with Air India but pilots who are flying only narrow body cannot ask for parity with wide body. In best of the best airlines wide body are different. Secondly, Indian Airlines pilots operate on single time zone or the maximum two time zones. Air India pilots and cabin crew have to operate on three or four time zones. If they leave their destinations they are away for 15 to 20 days. If Indian Airlines pilots have to leave their destination at the maximum within 48 hours they are back home. So, the conditions are totally different in terms of operation. This is more complicated by the fact that the DGCA has very clearly laid down the safety rules saying under what conditions you are going to use the pilots and how are they going to be used. Therefore,

what has happened is that Indian Airlines has bases in Chennai, Kolkata, Delhi, Mumbai and also some bases in Kerala.   Indian Airlines people move their resources to wherever the operations are.   Within Air India they do not do that. All the resources of Air India are based predominantly in Mumbai itself.   To shift them to Delhi also becomes a little difficult task.   What happens is, we take the resources out of Mumbai, bring them to Amritsar and Delhi and then make them fly the international flight and come back.   They come back to Mumbai.   So, we have to pay for the positioning flight whereas we do not have to pay for the positioning flights in the Indian Airlines concept.   There are some discrepancies in that, there are problems on that but we need to sort them out.

Now, with regard to the working conditions, Air India employee have five days a week.   He sits next to an Indian Airlines employee who has six days week.   Air India"s employee lunch hour is specific.   He goes out for his lunch and comes back.   Indian Airlines the lunch hour is specific but it is rotated.   So, even in lunch hour if you go to the Indian Airlines counter you may get the ticket but if you go to the Air India they will say it is lunch hour you may come back after the lunch hour.   Both are sitting in the same room.   Problem came up in Kolkata when a customer asked could he come to their office to buy a ticket.   They did not answer the question properly and asked him to come.   When he came, he wanted to buy an international ticket, he was told to come at 3.00 o" clock because lunch hours were there.   We have got 38 hours, 44 hours and 48 hours week.   To rationalise this means I have to sit down with all the employees and change the conditions.   No two employees are willing to change the condition. They are asking should they work on a 48 hours or 38 hours week.   Everybody agrees to a 38 hours week.   Today, conditions have changed.   Everybody is moving to more or less 45 to 48 hours per week.   These are issues which are coming in.

There is also an issue about the caps given to Indian Airlines pilots are different from the Air India pilots.   Discrepancies are such that quite a number of these issues are embedded in the agreement with the Union itself.   I have 14 Unions representing.   Some of them are recognised and some are not.   Each one has an issue on hand and each one has got the capacity to incapacitate the company. Each one has its own issue. …."

7.6   The Secretary, Ministry of Civil Aviation further added while deposing before the Committee on this issue:-

"The manpower integration, I am sorry to say, has not happened.   There are, as hon. Members have correctly pointed out, a lot of anomalies between the Indian Airlines and the Air India workers at different levels.   This is causing tremendous heartburn and I feel that we really have to address this.   Though there were grievance redressal committees, they have not really been very functional.   This is a top priority because unless there is a merger in the hearts of the employees, this will not happen.   This is something that is of great concern to us.

What we have now done is that we have set up a Cross-functional Integration Cell headed by the CMD and a three-tier grievance redressal mechanism where we are looking at the entire wage pattern and the anomalies.  I am quite sure that this will result in a wage agreement because this is giving a lot of motivational problems for an organisation which is already ventilating. This point of the Members on the manpower anomalies is also being taken and this is a cause for a lot of integration problems, along with the IT integration, as you have said, ticket booking and all that.   That has now reached the final stage and very shortly, I think, the IT integrator will be in place so that both IC and Air India thing could be taken up.  So, these two-three issues have been really causing a lot of problems.

Though it may not be possible to de-merge things, what we are now looking at is that let us have a kind of pause mode to see that we get out of this financial crisis by having the Air India and Indian Airlines run as separate streams within the merger and not cause too much of difficulties because of all this. ….”

7.7    The Committee further asked Secretary, Civil Aviation, the following:-

“As you have said, the merger took a very long process. You have appointed consultant and then screening was done.  It was screened at the level of the Cabinet Secretary.  I would like to know whether your consultant has suggested to you about the problems of anomalies, the problems of the employees in respect of the merger.   I would like to know whether the consultant has suggested these to you; and if he has suggested these, then whether you considered them or not.

Secondly, you have accepted that many anomalies are still persisting.  Do you think that full preparation was not done before taking a decision on the merger?  I would also like to know as to what steps were taken at the level of the Ministry about the anomalies which are still persisting.  Do you think that full preparation was not done before the merger decision was taken?

7.8    To the query put forth, the Secretary replied:-

“Sir, regarding the anomalies, it was mentioned in the Report of the consultant also that this would be one issue and pain point that we really have to consider.  It was suggested at that time itself that there would be grievance redressal machinery in the Ministry to look into this with the Additional Secretary and FA but in operationalizing, the problem was much larger than was really thought of.  So, that is why we have now set up this very important coordination cell with the CMD and a three-tier machinery.  This has happened two or three months back …..Before the merger, actually the only step was that there was grievance redressal machinery set up in the Ministry under the FA to look into all these things. It was set up.  There were some meetings but that was, very frankly to admit, not enough definitely.”

7.9     The Committee further stated the following:-

"There is a difference between grievance redressal committee and the anomalies committee.  Redressal means if something is left out, then the employees would come for its redressal..  But not taking any decision about the employees is not redressal.  You should have taken a decision as to what will happen to the Air India staff, to the Airlines staff.  There are several categories of employees such as crew members, ground staff and pilots.  Anomaly redressal and grievance redressal are two different things.  If somebody is getting Rs. 10,000, then he can say that he wants Rs. 500 more.  That should come under grievance.  But it is a total anarchy.  No decision about the employees was taken before the merger. Do you agree with it?"

7.10    The Secretary, Civil Aviation admitted that much more had to be done and that there were anomalies. He stated as under:-

"Yes.  Definitely much more had to be done in terms of this.  It was a grievance as well as an anomaly which was causing the grievance.  So, this was something that was really not taken care of.  I do admit that there was an anomaly."

7.11    On the issue of how much money being saved in percentage and in quantum, by reduction in salaries, NACIL replied the following:-

"The company has not effected any reduction in the salaries of the employees of NACIL.  As such, the question of saving does not arise."

7.12    NACIL was asked to elucidate how any reduction in salary would bridge the gap in the deficit faced by the airline.  NACIL replied as under:-

"Considering the mounting financial losses of the Company and the requirements of the Government in order to consider support to the Company, the Board of Directors of NACIL directed the Management to work out an alternate scheme to the Performance Linked incentive which should be related to the actual revenue performance, profitability, on time performance of the Company in terms of bench mark fixed and in respect of flying crew also the flying hours flown.

The Board directed the Management to effect a 50% reduction in the PLI payments (including flying related allowances paid to crew) to all categories of employees including flying crew.

The recommendations of the 5 Member Committee was discussed in the 22nd Meeting of the Board of Directors held on 10th September 2009 followed by detailed discussions in the 23rd Meeting of the Board held on 23 September 2009. It was decided that the reduction in PLI and flying related allowances would be immediately given effect in respect of Executives of all streams and officers of NACIL. i.e. From the level of Officers in erstwhile Indian Airlines in the pay scale of Rs.9000-14300 and above and Assistant Manager (Grade 25) in erstwhile Air India in the pay scale of Rs.8550 – 13600 and above.

Accordingly an Office Order was issued on 24th September 2009 by the Management.

| Slabs (Rs.) | Percentage | Amount at the top of the Grades |
|---|---|---|
| Upto 10000 | 25% | Rs.2500 |
| 10001-25000 | 35% | Rs.2500+35% of 15000 |
| 25001-50000 | 40% | Rs.7750+40% of 25000 |
| 50001-200000 | 45% | Rs.17750+45% of 150000 |
| Above 200000 | 50% | Rs.85250+50% excess over 200000 |

In addition to the above, the following allowances will stand abolished /modified as under:

1.  Executive Pilots of erstwhile Air India/India Airlines:
Entertainment Allowance while on flying duty at outstation away from base.
2. Executive Pilots of erstwhile Indian Airlines:
a.  Executive flying allowance.
b.  25% above the applicable flying allowance for undertaking training on simulator.
c.  50% additional over the applicable flying allowance for undertaking hub and spoke flights.
d.  Payment for carrying out observation flights.
However, the said Order was kept in abeyance and a Board Sub Committee was constituted to examine all related issues and submit its recommendations to the Board. Further, a separate Order has also been issued by the Operations Department whereby it was decided that as far as issues concerning Executive Pilots, a Committee would be constituted of Executive Pilots to discuss the issue. The recommendations of the Board sub-Committee are awaited."

7.13   With regard to rationalizing the manpower cost, the Committee observed the following:-

"….firstly you have given an elaborate structure of the cost in the whole programme.  I think, more than extra emphasis has been given in rationalising the manpower cost.  Your cost structure shows that around 34 per cent of your cost is from fuel and the manpower cost, in fact, gone down over the previous year to around 16.2 per cent.  So, by rationalising on manpower cost just having 16.2 per cent share in your total cost structure, how much you can maximum optimise when in an operational company like NACIL where manpower is a crucial element in keep your flights, flying.  So, I think this needs to be given a serious look because whatever statement we see in the newspapers even in the last couple of weeks everywhere it is hinging on manpower cost.  I think that is creating a kind of situation which is also demoralising your work force banking on whom you have to make turn around or you have to revive.  I think on this

whether there is any scope of drawing a balance in your public statements and if you can kindly inspire your Minister also to become rational in public statements because everywhere manpower is being made the villain.  It is being told that you have a basic pay of Rs.70,000 and APL payment of Rs.6 lakh.  After all they have not given it to themselves.  It is a system which has given it to them.  So, instead of putting a blame at the right point, if you go on just doing it, that will have a demoralising affect.  So, on that issue a serious rethink is required."

7.14   Details regarding number of foreign pilots and Indian pilots are given below:-

"The total strength of Indian / foreign Pilots in NACIL as on 12.11.2009 is as under:

| Sl No. | Details | NACIL (A) | NACIL (I) | TOTAL |
|--------|---------|-----------|-----------|-------|
| 1. | Indian Pilots | 633 | 834 | 1467 |
| 2 | Foreign Pilots | 151 | - | 151 |

In NACIL (I) no foreign pilots are recruited as a matter of policy."

7.15   The details of respective flying hours, the respective package and the share of foreign pilots" remuneration in the total pilots remuneration package are given below by NACIL:-

"In NACIL (I) no foreign pilots are recruited as a matter of policy.

Average Flying Hours of Pilots as per Oct 2009

|     | CMDR | FO |
|-----|------|-----|
| 777 | 66.58 | 63.34 |
| 744 | 39.84 | 35.44 |
| 310 | 24.75 | 20.51 |
| 737 | 68.10 | 59.62 |

Note: There is no difference in average flying hours of Indian pilots versus foreign pilots.

Pay package comparison of Pilots of NACIL (A)

**Indian Pilots:**

**First officers:** Regular salary as per their grade and scale plus flying allowance varies between

$ 1005 to 6117 from 0 - 10 years

**Commanders:** Regular Salary as per their grade and scale plus flying allowance varies between

$ 8121 to 13783 from 0 - 10 years and beyond

Overtime allowance as applicable if their utilization goes beyond 80 Hrs per month or 480 hours in 6 months.

**Foreign pilots:**

B777  Commander - $ 12,700 per month
B737  Commander - $ 10,000      "
A310  Commander - $  8,750      "
B747  Commander - $  8,750      "
B777  First Officer - $  6,700      "

In addition to the above following bonus is also paid:

First year        - $ 12,000
Second year  - $ 12,000
Third Year      - $ 15,000
Forth Year      - $ 15,000

Time off: 7 days off each calendar month or 14 days in each 2 calendar month period.

Travel to Home: 1 round ticket from their place of residence to base of operation once in a month.

Overtime allowance as applicable if their utilization goes beyond 80 Hrs per month."

7.16    On this issue, the CMD, NACIL clarified the following-

".....There was a question about expat pilots.  I want to tell you that all the expat pilots who are there, they are not in Indian Airlines.  All of them are in 777 and 737-800.  777 and 737-800 have come into India in the last two years.  The simulators were not in India.  The simulators are from outside.  The commanders require minimum training. The DGCA says that if you want to be a commander on 777, you should have a minimum of 500 hours of flying experience.  Whereas it is not necessary in the USA.  In USA if you are doing lesser number of hours, you will get a certificate.  Now, I have to run the flight.  Expat pilots are commanders. We have not taken any expat pilots for copilots. All the copilots are Indians. With our 777 simulators coming to India, our chances of getting commanders in India will be higher because the simulation will be done in India and they will continue to do a lot of simulation training in Mumbai itself.  Once that happens, we do not require the expat pilots.  Expat pilots are all

commanders. The impression given is that as if the copilots are also expats. That is not so. We have got about 170 expat pilots. Half of them are employed in Air India Express on 737-800 and half of them are in the 777, which is under Air India. I have no problem. I will remove them. The moment I remove them I do not have commanders. If I do not have commanders I will not be able to run the airlines. I am put in this situation. The media and the employees who are trying to tell us about this one is that basically why do you not touch the commanders on hand. I would like to touch the commanders and replace them with the Indian commanders. But I require time to replace them. The DGCA has asked us to give a time frame under which we want to do it. Because of the 777 simulator available with us, we should be able to do it. Another grouse is this. The commanders in 777 are being converted from pilots of 777 Air India. Indian Airlines pilots are not getting chance to become commander on the 777 because Indian Airlines pilots are all getting trained and becoming commanders on Airbus. Now, the DGCA will not allow me to shift the pilots overnight who are trained in airbus to 777. It has a wide body. The conditions are different and the demands are different. The DGCA conditions are different. So, even if I merge and bring one pilot cadre, still I will have what is known as Airbus cadre and 777 cadre."

7.17   The Committee stated that NACIL"s cost structure shows that around 34% of their cost is from fuel and the manpower cost has gone down over the previous year to around 16.2%. As manpower is a crucial element in NACIL"s operations, whether a serious rethink is required on the issue of reduction of manpower. Their reply is as under:-

"With the merger of two airlines, certain activities which were hitherto being performed separately in the two organizations have been clubbed and thus manpower shortages are being overcome to some extent.

There is no freeze in recruitment on operational manpower like Pilots, Engineers, Service Engineers and Cabin Crew and proposals put up by the user department are examined and based on the requirements of the Company, the manpower is augmented through external recruitment and internal redeployment.

However, in order to tide over the present financial crisis being faced by the Company, all recruitment actions have been kept in abeyance for the present."

## C.   Protection of Interest of the Employees of NACIL

7.18   Ministry of Civil Aviation were asked to state what steps were taken to protect the interests of the employees of the Indian Airlines and Air India during the merger process in respect of fixing of common seniority, fixation of pay scales, pay protection and no adverse effect on various incentives being drawn by them. The Ministry of Civil Aviation furnished their written replies as under:-

"The Scheme of Amalgamation inter alia provides that with effect from appointed date and upon the scheme becoming effective, any and all employees employ in connection with a working of the transferor companies as on the effective date shall become the employees of the transferee company employed without any breach or any interruption of service and subject to the provisions of the scheme, on terms and conditions not less favourable than those applicable to them as on effective date.

The Scheme of Amalgamation inter alia further provides that the transferee company undertakes to continue to abide by any agreements/settlements enter into with any recognized labour unions/employees and also applicable Awards of Tribunal/Arbitrator by the transferor companies.

Further also, the Scheme of Amalgamation provides that the Officers or other employees who have retired before the appointed date from the services of the transferor companies and are entitled to any benefits, rights or privileges, shall be entitled to receive the similar benefits, rights or privileges from the transferee company.

The merger is proposed to be achieved in a phased manner. The issues regarding determination of inter-se seniority, compensation, etc. would be addressed by taking due consideration of the legitimate employee interests. A well structured grievance redressal machinery has also be put in place to address the employee grievances, be they of individual nature or of a nature relating to a group/class of employees."

7.19    With regard to HR integration, CMD, NACIL stated the following:-

"….The issue about the integration not user-friendly in practical terms and no integration has been done, I agree with you on that. There are a lot of issues. HR issue is a big issue which is going to come up. But let me submit that Air India and Indian Airlines scales and designations also do not match; even if the designations match, the working conditions do not match; if the working conditions match, non-wage related allowances do not match; even if the non-wage related allowances match, the attitude of the two people do not match; and even if the attitude matches, in a same pay scale, everything matches etc., the age difference is there. There are officers in either organisations who say that I recruited him, I was in the interview to recruit him and he and I am also on the same scale, same work etc. So, the list is endless. I am just submitting to you that we are trying to make sure that similarly placed employees in that particular category will work in a similar work environment. That means, if the Trivandrum Airport is to be run by the Indian Airlines staff, it would be fully Indian Airlines staff. The Cochin Airport is going to be fully run by Air India staff so that there is no disharmony between the two sorts of things. At least they will run on their own till we are able to get harmonization done……"

7.20   The Ministry of Civil Aviation were asked whether promotions of officials which were due on 1.4.2007 in Air India and Indian Airlines were given before fixation of their common seniority and details thereof.   The Ministry of Civil Aviation stated the following:-

> "Promotions of officials of both erstwhile Air India and Indian Airlines were carried out as per the erstwhile promotion policy and guidelines after 01.04.2007.  However, in terms of the instructions from the Ministry regarding interim governance in view of the merger of Air India Ltd. and Indian Airlines to form National Aviation Co. of India Ltd., promotions to the grade of General Manager and Executive Directors were not carried out until a merged seniority was worked out.  Accordingly promotions to the grade of Executive Director were carried out in August 2008 on merged seniority.  Similarly, promotions to the grade of General Managers were carried out in March 2009 on merged seniority for all departments except cadres of Engineering, Operations and Ground Support.

> Promotions to the post of Dy. General Manager, a Notification No. 03 of 2009 dated 25.03.09 was issued to carry out promotions in the merged entity.  However, the promotion process is yet to be completed.

> Further, promotions in different grades below the grade of Dy. General Manager in both erstwhile Air India Ltd and Indian Airlines have been carried out before the fixation of their common seniority till July 2009."

## D.   Training of Employees

7.21   With regard to training of the employees of NACIL, CMD, NACIL during oral evidence before the committee, made the following observations:-

> "…. I would like to submit to the hon. Committee that we have simulators for Boeing 777 and we have simulators in Hyderabad also.  These simulators are capable of not only training Indian Airline pilots in NACIL but also capable of training others.  Therefore, if it is a part of Indian Airlines when we try to do business under the departmental situation, it does not happen.   So, what we are saying is that just like the National Thermal Power Corporation (NTPC) which has set up its own training institute like PMI, - they would have submitted all those papers – we are trying to follow that model where a totally full-fledged independent training system is there.  To inform you about the attitude of the employees and all that, for the last two-three years no employee has undergone any training.  This is a hospitality sector where every employee will have to go for more than one training in six months.  Unless this training is done, it will not be possible.  So, we have tried to join hand with hospitality sector like Tata Group of companies who are willing to offer a free training facility in Aurangabad for our crew and others.  It is a regular process.  You would ask a question why was it

not done earlier.  I will not be able to answer that question why it was not done earlier but I would like to say that we are sensitive to this. …."

**PART-B**

**Observations / Recommendations of the Committee**

At the very outset, the Committee would like to emphasise that the primary endeavour of the Committee is to address the root causes of malaises afflicting the Public Sector Undertaking(s) being examined and to propose ways and means for revival and effective functioning of such PSU(s).  It is with this approach that the Committee have proceeded with the comprehensive examination of NACIL.

The Committee would now like to dwell upon the issues in the order of their emergence.  The root cause of the malaises afflicting NACIL is the very „merger‟ which brought this entity into being.  Hence, the issues relating to merger of erstwhile Indian airlines and Air India form the fulcrum of the Committee‟s deliberations.

I.      **Merger of erstwhile Air India and Indian Airlines**

The Committee note that National Aviation Company of India (NACIL), the merged entity of the erstwhile Air India and Indian Airlines, formed ostensibly to bring the two individual carriers out of their losses by drawing synergies out of the merger, is today fast slipping further into an abyss.  A consequential fallout, therefore, is emergence of a volley of questions and a crying need for their answers. The COPU, whose primary concern is to see that each of the Central Public Enterprises flourishes, feel that there is an urgent need to discern the problems being faced by the Public airline company and facilitate its revival into a financially viable and profitable enterprise.

The Committee find it pertinent to note that in the pre-merged scenario, Indian Airlines had registered profits between 2003 and 2006 and so had Air India between 2001 and 2006. In 2006-07, the losses incurred by both companies totalled Rs. 688.22 Crore (Rs. 447.93 crore-AI + Rs. 240.29 crore-IA). In 2007-08, the merged airline suffered losses totaling Rs. 2226 Crore, Rs. 5488 Crore in 2008-09, while the projections for the losses in 2009-10 are even higher. The

multiplication of losses suggested that something is radically wrong either with the projections of the benefits of the merger or with the implementation of the merger.

The Committee are of the considered opinion that the merger was flawed at its very inception and it never really took off, as is well evident from various documents on record.

A critical fact to be noted is that prior to the merger, Air India and Indian Airlines were distinct entities having wide variances in critical areas such as operations, fleet requirement, requisite expertise, service conditions to a good measure, conditions of recruitment, pay structures, IT requirements and functioning. The post-merger scenario clearly vindicates lack of proper examination/scrutiny of these critical issues and an undue haste by the Government and the NACIL. The so-called merger is nothing but a kind of marriage between two incompatible individuals with hardly any meeting ground.

The Committee note with concern that the merger of the erstwhile Indian Airlines and Air India was an ill-conceived and erroneous decision neither arrived at by the two Airlines on their own accord nor mutually considered by them to be in their best interests.  On the contrary, in the years preceding the merger, the two Airlines had finalized grandiloquent plans for acquisition of new fleet and had even placed orders in their efforts to revive their respective businesses which were at that point of time grappling with the changed market scenario brought about by the increasing private competition ushered in by the Open Sky Policy. At this juncture, Indian Airlines, which had established unparalleled Brand recall value across the country, was rebranded and „Indian‟ suddenly appeared in the skies without any convincing rationale drawing humongous costs from the public exchequer. As all would well appreciate, the importance of brand equity which is phenomenal both in terms of goodwill and performance was frittered away with this whimsical decision. The Committee also observe with bafflement that while the merger of these two airlines had extensively been deliberated upon since the early 1970s, and the refrain all through had been to tread cautiously, it was

abruptly done in 2006-07, throwing all caution to the wind. The Committee could find no justifiable explanation for this abrupt haste. The Committee are distraught to note that millions have been spent to appoint consultants to advise on various matters starting with the revival roadmaps, followed by merger and turn around plans, which have gone in vain due to non-implementation of the expert inputs in their entirety.  Besides, the Committee feel that the two Airlines, despite being in the public sector, apparently did not receive the required support of the Government in the decades preceding and immediately following the introduction of the Open Sky Policy.  The Committee would like to be apprised of the agencies/individuals responsible for taking such a whimsical decision and urge suitable action so that such decision leading to intangible loss to a PSU does not recur in future.

The Committee are disconcerted to note that having imposed the merger of the two carriers, the Ministry has shown little initiative in monitoring the progress of the charted merger plan.  Taking note of the fact that the CMDs of NACIL were frequently changed during the crucial two years period from the date of approval of merger by the Cabinet in March 2007, the Committee strongly deprecate the failure of the government for not ensuring the continuity of leadership in the nascent stages of the merger. The utter lack of sincerity on the part of the Ministry of Civil Aviation, the Committee feel, is manifest in their failure to ensure some continuity of leadership to the Company during its nascent stages of merger.

The Committee also note with great dissatisfaction that whereas the initial projections for the merger schedule showed June 2009 as the time by which synergies of the merger would be realized in all areas, the Company is still struggling with the bulk of the integration processes as on date.  Most importantly, the failure to resolve issues pertaining to the integration of human resources, the Committee feel, not only reflects poorly on the performance of the managers of the merger process, but also adversely affects the morale of the work force, which in turn affects the Company"sperformance on all fronts.

The Committee take strong objection to the Ministry and NACIL camouflaging all their failures on the pretext of the rising fuel prices and the world recession.  The Committee, therefore, reject any attempts to - shield the failure for executing the merger plan by the Company"s management as initially scheduled, and the Ministry"s attitude of shying away from responsibility in effectively monitoring the same and ensuring its timely execution by rendering timely support.

Considering the fact that the merger cannot be undone now, and in view of the huge stakes to the public exchequer in the event of the Company sliding into deeper financial mess, the Committee feel that certain urgent and firm steps need to be taken to redeem the remnants of the public carriers of lore.

## Recommendation No. 1

The Committee feel that there is a need for consistency in plans and policies of the company for the merger to consolidate and for this purpose there is a need for some credible leadership at the top. The Committee, therefore, recommend that the leadership of NACIL should be put on a mission mode with a mandate spelt out in unequivocal terms to turn around the Company within a specified period.  The postings in the top slot of the Company should invariably be governed on the basis of performance and accountability.

## Recommendation No. 2

Closely linked with the aspect of leadership is its structure.  The Committee note that prior to the merger, both Air India and Indian Airlines had in place a fairly well placed infrastructural base.  The Committee, therefore, feel that it is quite logical to take benefits from the respective positive aspects of the subsidiaries (viz. Air India and Indian Airlines) of the merged entity.   The Committee, therefore, recommend that the making of NACIL into a holding company under which two separate wings, NACIL-Indian Airlines with its Headquarters at Delhi and NACIL-Air India with its Headquarters at Mumbai, each headed by a Managing Director who shall report to Chairman, NACIL, needs to be

seriously considered.  In the opinion of the Committee, this arrangement alone would substantially redress the problems faced by the Company in the various integration processes, especially of manpower which is presently debilitated by differences in working conditions and work culture between employees of the two erstwhile separate companies.

## Recommendation No. 3

The Committee note that irrespective of the merits of the merger plan, the present gravity of spiraling losses could have been averted had the implementation of the merger plan been strictly adhered to within the stipulated timeframe. The Committee, therefore, recommend that a fresh, realistic and definite timeline for completion of pending processes of merger, such as establishing a uniform code – a pre-condition for joining the Star Alliance, setting up Strategic Business Units (SBUs), cross utilization of resources, IT augmentation, customer services, sales and marketing, finance, ground handling, MRO, operations and flight safety, training, cargo, etc., may be worked out and put in place immediately.  The Committee further recommend that reasons behind the undue haste in merger and lack of monitoring after the merger should be probed to fix the responsibility for the same and that the government must set up an effective monitoring mechanism to review the progress made on the revised merger schedule every quarter.  The Committee also recommend that all the loss attributable to merger of IA and AI should be recouped by the Government as the decision of merger was a policy decision spearheaded by the Ministry-in-charge.

## Recommendation No. 4

The Committee note that a mechanism for ensuring accountability in the implementation of the entire merger process is conspicuous by its absence. The position of CMD, designated as the Merger Champion, was turned into a musical chair of sorts during such a crucial phase in the consolidation of the merged entity, absolving the occupants of any liability to face the accountability.  This in turn gave scope for literally „passing the buck".   The Committee recommend that

responsibilities for managers put in charge of these pending matters should be properly defined and stringent accountability procedures put in place to ensure timely execution of defined tasks.

## Recommendation 5

The Committee note that as per various newspaper reports, huge amounts of money were made available through financial institutions for facilitating the merger.  The documents on record, however, do not reveal as whether these funds had been expended / disbursed judiciously or not. The Committee desire that this matter might be looked into by the appropriate authority.

## II.    Route Rationalization and Route Allocation

The Committee note that route rationalization implies deploying maximum number of aircraft on maximum possible flights on commercially profitable routes.  The Committee further note that under the guidelines, routes are allocated by the Ministry on the petition of airlines. The Committee also note that a national carrier has a social obligation to ply certain air routes.  However, the Committee cannot ignore reports appearing in National Newspapers about the public carriers being disadvantaged by the allocation of prime commercial routes to private airlines such as Jet Airways, Kingfisher Airlines and the Emirates and also the allocation of time-slots on common routes in such a way that the private carriers would get the bulk of passengers on such routes.  The Committee are of the firm view that it is imperative that NACIL should have lucrative air routes as these are required for its profitability and, in a way, for its very sustenance.

## Recommendation No. 6

The Committee feel that it is in the public interest for the Ministry of Civil Aviation to dispel any misgivings over transparency of route and time-slot allocations raised by allegations of favors being shown to private operators for some consideration or the other. The Committee, therefore, recommend that the

Ministry of Civil Aviation should conduct a transparent review of the entire route and slot allocations, both in the domestic and international sectors, and effect necessary changes to ensure that NACIL is neither put at any disadvantage nor appear to be placed in any disadvantageous position.

### Recommendation No. 7

The Committee note that NACIL is operating 18.4% of its flights on social sector routes like Category II, IIA and III routes whereas the DGCA"s Route Dispersal Guidelines prescribe only 10% as mandatory requirement for such sectors. Thus, there is an 8.4% excess deployment by NACIL on social sector routes. At a time when the entire airline industry is struggling with their financial margins, the Committee are perturbed by the lack of transparency in the enforcement of Route Dispersal Guidelines under which all Scheduled operators are required to operate a fixed percentage of their flights in the so-called social sectors. The Committee particularly desire that no additional burden is forced upon NACIL by virtue of it being a public carrier. The Committee, therefore, recommend that necessary amendments should be carried out in the Route Dispersal Guidelines of the DGCA, alternatively ensuring, (a) strict compliance by all scheduled airlines to operate the mandatory 10% of their scheduled flights in Cat II/IIA/III routes, i.e. social or non-commercial sectors, or, (b) compensation to airlines operating such flights in excess of the mandatory percentage by those airlines that are either willfully not complying, or are, for some reason, unable to fulfill the required percentage of social sector flights out of their total scheduled flights, the full extent of losses plus a certain margin which shall be punitive in nature.

The Committee also recommend that a mechanism may be evolved to make the said guidelines mandatory for all private airlines and for punitive action against the violators.

## Recommendation No. 8

The Committee regret to note that though fuel price is a major component of loss, as claimed by the management of NACIL, there is no serious effort to improve the fuel consumption norm for aircraft in use.  This becomes clear as the NACIL or the Ministry did not even possibly refer to the huge fuel loss incurred on account of idle flying hours before landing and on account of long stretch of taxying after landing- all due to air-traffic congestion in airports.  The Committee recommend a mandatory energy audit by an external energy auditor to assess the avoidable fuel-losses and fix fuel consumption norm for aircraft in use.

### III.    Fleet Acquisition and Management

The Committee are skeptical of NACIL‟s request for Rs. 10,000 Crore capital in- fusion from the government towards fleet acquisition.  The Company, as well as the Government, have not presented any details of project financial closure for the acquisition projects of the erstwhile Indian and Air India, which were finalized before merger of the two airlines was even mooted.   The Committee feel that the lack of continuity of policies as is manifest in the failure of concerned entities to adhere to plans (made by predecessors in positions of authority) regarding the revenue sources for financing the acquisition projects reveal an underlying lack of sense of ownership and public responsibility. The Committee are also concerned about the delay in the delivery of the more fuel efficient Boeing 787 and Airbus A-320/321/319 aircraft.

The Committee note that in one of the aspects of fleet management relating to the maintenance of airworthiness of aircrafts, the Company is having unutilized manpower capacity. The Committee note that the engineering force in the company is capable of effectively running maintenance operations for 300 aircraft, while the company itself has only some 100 aircraft. However, on the other aspect, there are disparaging reports in the media about a lot of aircraft capacity lying idle due to the grounding of certain types of aircraft for one reason

or the other.  The Committee note that utilization of aircraft in the company is at a low of 9 hours per day while the benchmark is at 16 hours per day.  The Committee recommend optimal utilization of the available manpower who otherwise have necessary skill and experience to maintain airworthiness of aircraft.

### Recommendation No. 9

The Committee have taken note of the prolonged neglect of aircraft acquisition in the pre-merged Air India and Indian Airlines and the need to enhance the fleet strength of the NACIL to have a critical mass of capacity to give it a shot at regaining its lost market share. The Committee are concerned to note that the project financial closure of the pre-merged entities have been allowed to be swept away by the confusion reigning in the much eulogized merger. Considering the irreversibility of the mess that has been created by the sloppy handling of the merger process and the need to look to the future, the Committee feel that capital infusion into the ailing public airline to make the company credit worthy for its operational credit requirements has become imperative to salvage the remnants of the legendary airlines.  However, the Committee desire that strict compliance to defined performance benchmarks should be made a precondition to a phased capital infusion.

### Recommendation No. 10

The Committee see hope in the new line of planning whereby the Engineering strength of the company is proposed to be channelized into forming a separate business unit of Maintenance, Repair and Overhaul (MRO) as a subsidiary. The Committee strongly recommend that NACIL should be encouraged to develop MRO as a separate and professional business unit catering to the aviation industry as a whole.  The Committee also recommend that the processes involved towards this enterprise be expedited in consultation with the employees and that the Government extend all necessary support to the Company in this regard.

**Recommendation No. 11**

The Committee note that a lot of idle capacity is being allowed to exist in the Company despite ambitious acquisition orders. The Committee hope that the initiatives taken to cut down such idle capacity taken by the present management would realize tangible benefits. The Committee, therefore, recommend that the steps necessary to increase the utilization of aircrafts should be expedited without delay to bring up the average utilization to 16 hours per day per aircraft. The Committee enjoin the Ministry of Civil Aviation that the company be fully protected from any kind of extraneous pressure to retain commercially unviable routes or to operate unprofitable new routes.

IV.   <u>Ground Handling</u>

**Recommendation No. 12**

The Committee note that the pre-merged entities, IA & AI had a monopoly of ground handling activities within India prior to the Open Sky Policy of 1994, and that the private airport operators, who also came into the scene in the wake of this policy had been given the authority, under the new policy, to assign ground handling activity to entities of their choice in the airports operated by them.   However, when these operators, notably at Bangalore and Hyderabad, notified their invitations for expressions of interest, the national carriers were disqualified by a requirement to have international experience.   The Committee further note that this has resulted in idle manpower capacity to the National Carrier, cutting into its operational margins. The Committee, therefore, recommend that NACIL whose two subsidiaries have decades of expertise and experienced workforce with respect to international operations should be assigned the ground handling activity exclusively and other avenues may be sought only when NACIL is not in a position to carry out the job.

### V.     Corporate Work Culture

#### Recommendation No. 13

**The Committee note that during the evidence, the CMD had admitted the lack of Corporate Work Culture in the Company.  In this regard, the Committee have taken note of the plans now made to redress the same by a proposed introduction of a new staff training plan requiring the staff to undergo training in hospitality and other areas of work every six months.  The Committee recommend that the management of NACIL should effectively carry out their training plan so as to cultivate attitudinal changes amongst the employees to enable them to compete with the corporate competitors.**

### VI.    Training

#### Recommendation No.14

**The Committee note that both pre-merged companies, IA & AI, have adequate training facilities devoted to the training of their own personnel which have now been inherited by NACIL.  The Committee also note that in the emerging market reality of stiff competition and falling margins, especially in the airline industry, it is no longer financially sustainable to have devoted training facilities.**

**The Committee, therefore, recommend that the training infrastructure and manpower inherited by NACIL from its pre-merged entities be galvanized into an independent subsidiary of NACIL with improved capacities to cater to such of the professional trainings as required by the airline industry in general, and to be operated as a separate unit of business capable of competing internationally.**

### VII.    Protection of Interests of Employees
#### Recommendation No. 15

The Committee note that there had been a large number of reports and representations from the employees and the staff of both the companies.  As is evident, there is a high level of disenchantment and discontentment with the process of merger.  Employees of any organization and their welfare are the key to the success of any organization.   Customers can be served well if the employees are well trained and motivated. Lamentably, employees of the merged entity are unduly discriminated.  The Committee are concerned to note that this manner of riding roughshod over its employees has become a general perception rather than the general regret of the Company.

The Committee also observe that with a view to check attrition, PLI (Productivity Linked Incentive Scheme) was introduced with the advent of Open Sky Policy.  At that point of time, employees of Indian Airlines and Air India were not allowed to go to private airlines on higher pay scales.  While appreciating the perhaps „laudable objective" to safeguard interests of the now merged entities, the question/issue that arises is the fairness of treatment for employees who had been loyal and stayed on and are now being forced to accept cuts.

The Committee feel that basic incentives for employees need to be reviewed. A maxim to be borne in mind is that governance, both of countries and of organizations, is an art and one that respects the human factor. The Committee, therefore, recommend that steps should be taken to protect the interests of the employees who have then been held back from getting better packages in the private sector on the one hand, while on the other, they  should be required to perform to their optimum potential that justifies such incentives by giving them advance training in their respective area of work and introducing a corporate regimen.  The Committee further recommend that on issues relating to service matters, no unilateral decision should be forced upon and a consensual approach should prevail when discussion with employees" representatives becomes a part of corporate culture.

### Recommendation No. 16

In this connection, the Committee also note that promotions in the officers cadres of both NACIL (Air India) and NACIL (Indian Airlines) are vacancy based and are carried out through a process of selection.

The Committee, however, understand that promotions in officers grade both in NACIL (Air India) and NACIL (Indian Airlines) have been made in a subjective manner prior to the date of commencement of merger as well as after the merger exercise.  This, the Committee understands, has been the case in respect of vacancies in higher grades as also in cases of resultant vacancies in some cadres.  Thus, a situation has arisen where officers in some cadres have had smooth advancement in their careers whereas officers in other cadres, though eligible for promotions against the vacancies available in their cadres, have been denied their due advancement in career.  The Committee, therefore, recommend that NACIL should have a relook into all such cases and ensure that the genuine aspirations of the officers in each cadre are judiciously addressed and promotion exercises which have already become due should be first completed before merging the cadres on the basis of seniority.

### Recommendation No. 17

The Committee further observe that the designation and the pay scales/emoluments drawn in the two organizations are not at par as the persons holding the same designation in NACIL (Air India) and NACIL (Indian Airlines) are getting different emoluments/scales of pay.

The Committee note the difficulties in addressing the concerns of the employees enjoying the same designations and having different pay scales in the two organizations.  This obvious difficulty which should have been foreseen at the outset did not seem to have even occurred to those who worked out the merger process. The Committee, however, feel that as far as possible, it may be ensured that there is no loss of emoluments and a feeling of alienation amongst the employees of the two organizations.  The advisable course of action would,

therefore, appear to be to merge the two sets of employees with reference to the scales of pay and not based on their designations. The final action taken in this regard may be communicated to the Committee.

### Recommendation No. 18

The Committee have been apprised that there has been a shifting of allowances of NACIL (Air India) employees from salary (wage) slip to PLI slip issued to them. The Committee feel that at this juncture such kind of action on the part of management does not seem to be proper as the merger of two sets of employees has not been fully effected so far.

The Committee, therefore, recommend that any cut or advancement should be proportionate to the scale of pay as it otherwise will be against the assurance "No employee would be placed at a disadvantage at any stage" which was communicated to the employees before merger of the two organizations.

New Delhi:                                                      V. KISHORE CHANDRA S. DEO
20th January, 2010                                          Chairman,
30 Pausa, 1931 (Saka)                           Committee on Public Undertakings

**ANNEXURE**

**MINUTES OF THE 5th SITTING OF THE COMMITTEE ON PUBLIC UNDERTAKINGS (2009-10) HELD ON 8TH OCTOBER 2009**

The Committee sat from 1230 hrs to 1345 hrs.

**PRESENT**

**Chairman**

    **Shri V. Kishore Chandra S. Deo**

**Members, Lok Sabha**

| | |
|---|---|
| 2 | Shri K.C. Singh „Baba" |
| 3 | Shri Ramesh Bais |
| 4 | Shri Hemanand Biswal |
| 5 | Shri Anant Kumar Hedge |
| 6 | Shri Sukhdev Singh Libra |
| 7 | Dr. Charan Das Mahant |
| 8 | Shri Baijayant Panda |
| 9 | Shri N. Dharam Singh |
| 10 | Shr Rajiv Ranjan Singh alias Lalan Singh |
| 11 | Shri Bhisma Shankar alias Kushal Tiwari |

**Members, Rajya Sabha**

| | |
|---|---|
| 12 | Shri Bharatkumar Raut |
| 13 | Ms. Mabel Rebello |
| 14 | Dr. T. Subbarami Reddy |
| 15 | Shri Vijay Kumar Rupani |
| 16 | Shri Tapan Kumar Sen |

**Secretariat**

| | | |
|---|---|---|
| 1. | Shri J.P. Sharma | Joint Secretary |
| 2. | Shri Rajeev Sharma | Director |
| 3. | Shri Ravindra Garimella | Additional Director |
| 4. | Shri Ajay Kumar | Additional Director |
| 5. | Shri Paolienlal Haokip | Under Secretary |

**Representatives of NACIL**

| | | |
|---|---|---|
| 1. | Shri Arvind Jadhav | CMD |
| 2. | Shri S. Venkat | Company Secretary & ED (Finance) |
| 3. | Shri V. Srikrishnan | ED (Hqrs.) |
| 4. | Shri Prashant Sukul | JS (MCA) |

2.      The Committee took oral evidence of the representatives of National Aviation Company of India Limited (NACIL)-the merged entity of Air-India and Indian Airlines- for the purpose of its comprehensive examination. At the outset, the Chairman welcomed the representatives of National Aviation Company of India Limited (NACIL) and also drew their attention to direction 58 of the Directions by the Speaker relating to evidence before Parliamentary Committees.  The Chairman then informed the members that the CMD, NACIL, had requested him earlier for deferment of the extant hearing because of the ongoing crisis in Air India due to pilots" strike and obtained their concurrence to take another detailed evidence.   Thereafter, the representatives of NACIL made a brief power point presentation on the subject following which, the Members raised queries on various aspects pertaining to the Company.  The Chairman asked the CMD, NACIL to note down the points raised by the members and to furnish detailed written notes on the same to the Committee Secretariat at the earliest. The Committee also desired that the next meeting to take oral evidence of the representatives of NACIL be held to see how well NACIL keeps up to their commitments as submitted in their presentation earlier.

3.      The Chairman then thanked the representatives of NACIL for appearing before the Committee and presenting their views on the subject.

4.      *A verbatim record of proceedings has been kept on record separately.*

5.      *The witnesses then withdrew.*

6.      *The Committee then adjourned.*

*******

## <u>MINUTES OF THE 8th SITTING OF THE COMMITTEE ON<br>PUBLIC UNDERTAKINGS (2009-10) HELD ON 12TH NOVEMBER 2009</u>

The Committee sat from 1230 hrs to 1450 hrs.

### <u>PRESENT</u>

<u>Chairman</u>

**Shri V. Kishore Chandra S. Deo**

<u>**Members, Lok Sabha**</u>

| | |
|---|---|
| 2 | Shri K.C. Singh „Baba" |
| 3 | Shri Ramesh Bais |
| 4 | Shri Sukhdev Singh Libra |
| 5 | Dr. Charan Das Mahant |
| 6 | Shri Nama Nageswara Rao |
| 7 | Shri N. Dharam Singh |
| 8 | Shri Rajiv Ranjan Singh alias Lalan Singh |

<u>**Members, Rajya Sabha**</u>

| | |
|---|---|
| 9 | Shri Birendra Prasad Baishya |
| 10 | Shri Bharatkumar Raut |
| 11 | Ms. Mabel Rebello |
| 12 | Dr. T. Subbarami Reddy |
| 13 | Shri Tapan Kumar Sen |

<u>**Secretariat**</u>

| | | |
|---|---|---|
| 1. | Shri J.P. Sharma | Joint Secretary |
| 2. | Shri Rajeev Sharma | Director |
| 3. | Shri Ravindra Garimella | Additional Director |
| 4. | Shri Ajay Kumar | Additional Director |
| 5. | Shri Paolienlal Haokip | Under Secretary |

<u>**Officials of National Aviation Company of India Limited**</u>

| | | |
|---|---|---|
| 1 | Shri Arvind Jadhav | CMD |
| 2 | Shri K.M. Unni | SBU Head MRO (Fir Frame) |
| 3 | Shri Vipin K. Sharma | SBU Head MRO (E&C) |
| 4 | Shri S. Chandrasekhar | Director (Finance) |
| 5 | Shri S. Venkat | CS & ED (Finance) |

2.      At the outset, the Chairman welcomed the representatives National Aviation Company of India Limited (NACIL) and drew their attention to direction 58 of the Directions by the Speaker relating to evidence before the Parliamentary Committees. Thereafter, the Members raised queries on various aspects pertaining to the subject and the explanations/clarifications on the same were given by the representatives of NACIL.  Information on some of the points raised by the Committee was not readily available with the representatives of NACIL.  They were therefore asked to furnish the same to the Committee Secretariat at the earliest possible.

3.      At the end, the Chairman thanked the representatives of NACIL for providing all the information on the subject matter as desired by the Committee.

4.      *A verbatim record of proceedings has been kept on record separately.*

5.      *The witnesses then withdrew.*

6.      *The Committee then adjourned.*

## MINUTES OF THE 10th SITTING OF THE COMMITTEE ON PUBLIC UNDERTAKINGS (2009-10) HELD ON 17TH DECEMBER 2009

The Committee sat from 1500 hrs to 1645 hrs.

### PRESENT

**Chairman**

    **Shri V. Kishore Chandra S. Deo**

**Members, Lok Sabha**

| | |
|---|---|
| 2 | Shri Ramesh Bais |
| 3 | Shri Sukhdev Singh Libra |
| 4 | Shri Nama Nageswara Rao |
| 5 | Shri Ganesh Singh |
| 6 | Shri Rajiv Ranjan Singh alias Lalan Singh |

**Members, Rajya Sabha**

| | |
|---|---|
| 7 | Shri Birendra Prasad Baishya |
| 8 | Shri Bharatkumar Raut |
| 9 | Ms. Mabel Rebello |
| 10 | Shri Tapan Kumar Sen |
| 11 | Shri Amar Singh |

**Secretariat**

| | | |
|---|---|---|
| 1. | Shri J.P. Sharma | Joint Secretary |
| 2. | Shri Rajeev Sharma | Director |
| 3. | Shri Ajay Kumar | Additional Director |

**Officials of Ministry of Civil Aviation**

| | | |
|---|---|---|
| 1 | Shri M. Madhavan Nambiar | Secretary |
| 2 | Shri Prashant Sukul | Joint Secretary |
| 3 | Smt. Abha Shukla | Director |

2.      At the outset, the Chairman welcomed the representatives of Ministry of Civil Aviation and drew their attention to direction 58 of the Directions by the Speaker relating to evidence before the Parliamentary Committees.  Then, the Members raised queries on various aspects pertaining to the subject and the explanations/clarifications on the same were given by the representatives of Ministry.  Information on some of the points raised by the Committee was not readily available with the representatives of Ministry. They were therefore asked to furnish the same to the Committee Secretariat at the earliest possible.

3.      At the end, the Chairman thanked the representatives of Ministry for providing all the information on the subject matter as desired by the Committee.

4.      *A verbatim record of proceedings has been kept on record separately.*

5.      *The witnesses then withdrew.*

6.      *The Committee then adjourned.*

## <u>MINUTES OF THE 13th SITTING OF THE COMMITTEE ON PUBLIC UNDERTAKINGS (2009-10) HELD ON 20th JANUARY, 2010.</u>

The Committee sat from 1615 hrs to 1650 hrs.

## <u>PRESENT</u>

**<u>Chairman</u>**
      **Shri V. Kishore Chandra S. Deo**

**<u>Members, Lok Sabha</u>**

      2      Shri K.C. Singh „Baba"
      3      Shri Anant Kumar Hegde
      4      Shri Sukhdev Singh Libra
      5      Shri N. Dharam Singh

**<u>Members, Rajya Sabha</u>**

      6.      Shri Bharatkumar Raut
      7.      Ms. Mabel Rebello
      8.      Shri Tapan Kumar Sen

**<u>Secretariat</u>**
      1.  Shri J.P. Sharma              -        Joint Secretary
      2.  Shri Rajeev Sharma            -        Director
      3.  Shri Ravindra Garimella       -        Additional Director
      4.  Shri Ajay Kumar              -        Additional Director

2.      The Committee considered and adopted the Draft Report on National Aviation Company of India Ltd-Merged Entity of *Erstwhile* Air India and Indian Airlines with minor changes/ suggested additions and authorized the Chairman to finalize the Report for presentation.

*3.      The Committee then adjourned.*