# EXHIBIT 8

# 93

## PERFORMANCE OF CIVIL AVIATION IN INDIA

### MINISTRY OF CIVIL AVIATION

# PUBLIC ACCOUNTS COMMITTEE
# 2013-2014

## NINETY-THIRD REPORT

FIFTEENTH LOK SABHA



**LOK SABHA SECRETARIAT**
**NEW DELHI**

# NINETY-THIRD REPORT

# PUBLIC ACCOUNTS COMMITTEE
# (2013-14)

### (FIFTEENTH LOK SABHA)

# PERFORMANCE OF CIVIL AVIATION IN INDIA

## MINISTRY OF CIVIL AVIATION

*Presented to Lok Sabha on* 6.2.2014
*Laid in Rajya Sabha on* 6.2.2014



LOK SABHA SECRETARIAT
NEW DELHI
*February*, 2014/ *Magha,* 1935 (*Saka*)

**PAC No. 2020**

*Price*: ₹ 200.00

© 2014 By Lok Sabha Secretariat

Published under Rule 382 of the Rules of Procedure and Conduct of Business in Lok Sabha (Fourteenth Edition) and Printed by the General Manager, Government of India Press, Minto Road, New Delhi-110 002.

# CONTENTS

PAGE

COMPOSITION OF THE PUBLIC ACCOUNTS COMMITTEE (2013-14) ........................... (iii)

COMPOSITION OF THE PUBLIC ACCOUNTS COMMITTEE (2012-13) ........................... (v)

COMPOSITION OF THE PUBLIC ACCOUNTS COMMITTEE (2011-12) ........................... (vii)

INTRODUCTION ...................................................................................... (ix)

## REPORT

### PART I

CHAPTER  I      Introductory ........................................................... 1

CHAPTER  II     Acquisition of Aircraft by Erstwhile Air India Limited (AIL) .... 3

CHAPTER  III    Acquisition of Aircraft by erstwhile Indian Airlines
                Limited (IAL) ........................................................ 38

CHAPTER  IV     Merger of AIL and IAL into NACIL ..................................... 55

CHAPTER  V      Liberalised policy towards Bilateral Agreements on
                International Entitlements ........................................... 75

CHAPTER  VI     Operational performance .............................................. 89

CHAPTER  VII    Financial performance ................................................ 104

CHAPTER  VIII   Miscellaneous ........................................................ 114

### PART II

                Observations and Recommendations .................................... 119

                ANNEXURES

I.      Brief chronology of events related to the acquisition of aircraft
        by the erstwhile AIL ............................................................ 141

II.     Minutes of the meeting held on 2nd August, 2004, chaired by
        the then Minister, Civil Aviation ............................................. 143

III.    Letter from 43 member delegation of US Congress regarding
        AIL's proposed aircraft acquisition forwarded by PMO to
        MoCA ........................................................................... 145

IV.     Clarifications regarding its traffic and market share assumptions
        provided by Air India ......................................................... 151

V.      A copy of the Restricted Letter Agreement 6-1166-DJG-776 on
        the subject 'Liquidated Damages-Non-Excusable Delay' in the
        Purchase Agreement Number 2998 between the Boeing
        company and erstwhile Air India Limited relating to Boeing
        Model 787-837 Aircraft ......................................................... 152

(ii)

PAGE

VI.   Brief chronology of events related to the acquisition of aircraft by the erstwhile IAL .................................................................. 154

VII.   Expenditure incurred by Air India on maintenance/repair/ servicing of aircraft in foreign countries during last five years .......................................................................................... 156

VIII.   A copy of the presentation made by the Ministry of Civil Aviation before the Prime Minister in March, 2006 on the issue of the proposed merger of AIL and IAL ................................. 159

IX.   The overall synergies realised as on 31 Dec., 2011 for Air India to the tune of approximately ₹ 1535 crore .............................. 165

X.   List of all completed, in progress and not initiated items department-wise of Air India .................................................... 166

XI.   Details regarding industry standards for aircraft utilization .... 174

XII.   Details of the reasons for increase in loss of Air India from 2007-08 onwards ..................................................................... 176

APPENDICES

I.   Minutes of the Thirteenth Sitting of the Public Accounts Committee (2011-12) held on 11th January, 2012 ................... 179

II.   Minutes of the Fifteenth Sitting of the Public Accounts Committee (2011-12) held on 19th January, 2012 ................... 181

III.   Minutes of the Seventeenth Sitting of the Public Accounts Committee (2011-12) held on 22nd February, 2012 ................. 184

IV.   Minutes of the Sixteenth Sitting of the Public Accounts Committee (2013-14) held on 30th January, 2014 ................... 187

COMPOSITION OF THE PUBLIC ACCOUNTS COMMITTEE
(2013-14)

Dr. Murli Manohar Joshi — *Chairman*

MEMBERS

*Lok Sabha*

2. Shri Anandrao Vithoba Adsul
3. Dr. Baliram
4. Shri Ramen Deka
5. Shri Sandeep Dikshit
6. Dr. M. Thambidurai
7. Shri T.K.S. Elangovan
8. Shri Jayaprakash Hegde
9. Dr. Sanjay Jaiswal
10. Shri Bhartruhari Mahtab
11. Shri Abhijit Mukherjee
12. Shri Sanjay Brijkishorla1Nirupam
13. Shri Ashok Tanwar
$14. Shri Ajay Maken
15. Shri Dharmendra Yadav

*Rajya Sabha*

16. Shri Prasanta Chatterjee
17. Shri Prakash Javadekar
**18. Shri Ashwani Kumar
19. Shri Satish Chandra Misra
††20. Dr. V. Maitreyan
21. Shri N.K. Singh
22. Smt. Ambika Soni

SECRETARIAT

1. Shri Devender Singh   —   *Joint Secretary*
2. Smt. A. Jyothirmayi   —   *Deputy Secretary*

---

$ Elected *w.e.f.* 14th August, 2013 *vice* Dr. Girija Vyas appointed as Minister of Housing, Urban Development and Poverty Alleviation *w.e.f.* 17th June, 2013.

** Elected *w.e.f.* 3rd September, 2013 *vice* Dr. V. Maitreyan ceased to be a Member upon his retirement as a Member of Rajya Sabha *w.e.f.* 24th July, 2013.

†† Elected *w.e.f.* 3rd September, 2013 *vice* Dr. E.M. Sudarsana Natchiappan appointed as Minister of State for Commerce and Industry *w.e.f.* 17th June, 2013.

COMPOSITION OF THE PUBLIC ACCOUNTS COMMITTEE
(2012-13)

Dr. Murli Manohar Joshi— *Chairman*

MEMBERS

*Lok Sabha*

2.   Shri  Anandrao Vithoba Adsul

3.   Dr. Baliram

4.   Shri Sandeep Dikshit

5.   Dr. M. Thambidurai

6.   Shri T.K.S. Elangovan

7.   Shri Anant Kumar Hegde

8.   Shri Bhartruhari Mahtab

9.   Shri Sanjay Brij Kishor Lal Nirupam

10.   Shri Shripad Yesso Naik

†11.   Shri Abhijit Mukherjee

12.   Shri Ashok Tanwar

†13.   Shri Takam Sanjoy

14.   Dr. Girija Vyas

15.   Shri Dharmendra Yadav

*Rajya Sabha*

16.   Shri Prasanta Chatterjee

17.   Shri Prakash Javadekar

18.   Shri Satish Chandra Misra

19.   Shri Sukhendu Sekhar Roy

20.   Shri J.D. Seelam

21.   Shri N.K. Singh

22.   Prof. Saif-ud-Din Soz

---

† Elected *w.e.f.* 6th December, 2012 *vice* Shri Sarvey Sathyanarayana appointed as Minister on 28th October, 2012.

†† Elected *w.e.f.* 6th December, 2012 *vice* Dr. Shashi Tharoor appointed as Minister on 28th October, 2012.

(v)

COMPOSITION OF THE PUBLIC ACCOUNTS COMMITTE
(2011-12)

Dr. Murli Manohar Joshi — *Chairman*

MEMBERS

*Lok Sabha*

2.  Shri Anandrao Vithoba Adsul

3.  Dr. Baliram

4.  Shri Sandeep Dikshit

5.  Shri Anant Kumar Hegde

6.  Dr. Bhartruhari Mahtab

7.  Shri Shripad Yesso Naik

8.  Shri Snajy Brij Kishorlal Nirupam

9.  Shri Jagdambika Pal

10. Dr. Kavuru Sambasiva Rao

11. Shri Adhi Sankar

12. Kunwar Rewati Raman Singh

13. Shri K. Sudhakaran

14. Dr. M. Thambidurai

15. Dr. Girija Vyas

*Rajya Sabha*

16. Shri Tariq Anwar

17. Shri Prasanta Chatterjee

18. Shri Naresh Gujral

19. Shri Prakash Javedekar

20. Shri Satish Chandra Misra

*21. Shri. J.D. Seelam

22. Prof. Saif-ud-Din Soz

---

* Elected *w.e.f.* 29th August 2011 *vide* the vacancy occurred *vice* Smt. Jayanti Natarajan appointed Minister *w.e.f.* 12th July. 2011.

(vii)

# INTRODUCTION

I, the Chairman, Public Accounts Committee (2013-14), having been authorised by the Committee, do present this Ninety-third Report (Fifteenth Lok Sabha) on 'Performance of Civil Aviation in India ' based on C&AG Report No. 18 of 2011-12, Union Government (Civil) relating to the Ministry of Civil Aviation.

2. The Report of the Comptroller and Auditor General of India was laid on the Table of the House on 8th September, 2011.

3. The Public Accounts Committee (2011-12) selected the subject for detailed examination and report. The Committee took evidence of the representatives of the Ministry of Civil Aviation, Air India (AI) and some Associations/Unions of Air India on the subject at their sittings held on 11th January, 2012, 19th January, 2012 and 22nd February, 2012, respectively. As the examination of the subject could not be completed, the Public Accounts Committee (2012-13) and the Public Accounts Committee (2013-14) re-selected the subject for examination. The Committee considered and adopted this Report at their sitting held on 30th January, 2014. Minutes of the Sittings form Appendices to the Report.

4. For facility of reference and convenience, the Observations and Recommendations of the Committee have been printed in thick type in the body of the Report.

5. The Committee thank their predecessor Committees for the valuable work done by them.

6. The Committee would like to express their thanks to the representatives of the Ministry of Civil Aviation, Air India and Indian Airlines Officers Association, Indian Aircraft Technicians Association, Air India Aircraft Engineers Association and Airlines Ground Instructors Association for tendering evidence before them and furnishing the requisite information to the Committee in connection with the examination of the subject.

7. The Committee place on record their appreciation of the assistance rendered to them in the matter by the office of the Comptroller and Auditor General of India.

NEW DELHI;
31 *January*, 2014
11 *Magha,* 1935 *(Saka)*

DR. MURLI MANOHAR JOSHI
*Chairman,*
*Public Accounts Committee.*

**REPORT**

PART I

**CHAPTER I**

INTRODUCTORY

The scheduled air services in India began in October, 1932 under the Aviation Department of Tata Sons Ltd., which was succeeded by Tata Airlines. This was subsequently renamed in July, 1946 as Air India Ltd., and incorporated as Air India International Ltd. in March, 1948. The nationalisation of Air India International Ltd. took place with the passing of Air Corporations Act in 1953. As a result, two corporations came into existence, namely Indian Airlines Corporation (as the national domestic carrier) and Air India (as the international carrier). However, in 1994, the Air Corporations Act was repealed, and Air India Ltd. (AIL) and Indian Airlines Ltd. (IAL) were incorporated under the Companies Act, 1956. The Government-owned airlines dominated the Indian aviation industry till the mid- 1990's, when, as part of the Open Sky Policy, the Government of India (GoI) ended the monopoly of AIL and IAL in air transport services and allowed private operators to provide air transport services. The scheme of amalgamation of Air India Ltd. and Indian Airlines Ltd. into National Aviation Company of India Limited (NACIL) which was approved in August, 2007, was effective from 1st April, 2007. Subsequently, in November, 2010, NACIL was renamed as Air India Ltd. (AI). The administrative Ministry for the Government airline is the Ministry of Civil Aviation (MoCA).

II.  AUDIT REVIEW

1.2 This report is based on the C&AG Report No. 18 of  2011-12, Union Government (Civil) on 'Performance of Civil Aviation in India' relating to the Ministry of Civil Aviation. The Audit Report dealt with the Performance of Civil Aviation in India which included NACIL (Air India Limited as known today), the Ministry of Civil Aviation and the Bilateral Agreements concluded by Government of India with other Governments on entitlements for international operations between India and other countries, as well as permissions given to private Indian carriers to operate on international routes.

1.3 The main objectives of the Performance Audit were to ascertain:—

- whether the acquisition of aircraft by the erstwhile Air India Ltd. (AIL) and Indian Airlines Ltd. (IAL) was appropriately planned and effectively implemented, with due regard to economy, efficiency and accepted norms of financial propriety;

- whether the merger of AIL and IAL into NACIL was properly planned and the effectiveness of merged operations of the two entities;

- the impact of the liberalised policy of the Government of India (GOI) from 2004-05 onwards on grant of air traffic rights to other countries through Air

2

Services Agreements (ASAs)/ "bilateral" agreements, and permitting Indian private carriers to fly on international routes;

- the main reasons for the financial and operational performance of the pre-merger airlines and the merged entity; and

- whether the Ministry of Civil Aviation (MoCA) exercised its oversight role adequately and effectively.

1.4 The Public Accounts Committee (2011-12) selected the subject for detailed examination and report. During the course of examination, the Committee obtained necessary information from the Ministry of Civil Aviation (MoCA). The representatives of the MoCA, Air India (AI) and some Associations/Unions of Air India were called before the Committee for deposition on the various issues that had arisen. The Committee took the oral evidence of the following:—

(i)  Representatives of the Ministry of Civil Aviation (Minutes of the Sitting form Appendix-I) on 11.1.2012;

(ii)  Representatives of NACIL (now renamed as Air India) (Minutes of the Sitting form Appendix-II) on 19.1.2012; and

(iii)  Representatives of Indian Airlines Officers Association, Indian Aircraft Technicians Association, Air India Aircraft Engineers Association and Airlines Ground Instructors Association (Minutes of the Sitting form Appendix-Ill) on 22.2.2012.

Based on the written and oral information obtained from the MoCA, the Committee proceed with the examination of the subject in the succeeding paragraphs.

1.5 Meanwhile, the Hon'ble Delhi High Court, on 1st June, 2012, passed an order on the petition of Centre for Public Interest Litigation (CPIL), filed by Shri Prashant Bhushan and Shri Pranav Sachdeva, Advocates. The petitioner alleged deliberate and misdirected decision of the Ministry of Civil Aviation driving Air India and Indian Airlines into heavy losses to the tune of thousand of crores. The Hon'ble Delhi High Court, while observing that it was the function of PAC to look into the financial irregularities, ruled that since a responsible Committee like PAC was looking into the matter, they were desisting from giving any directions but expected PAC to look into the matter from all angles.

## CHAPTER II

ACQUISITION OF AIRCRAFT BY ERSTWHILE AIR INDIA LIMITED (AIL)

**A.  Overview**

On 30 December, 2005, the erstwhile Air India Ltd. (AIL) signed purchase agreements with Boeing and General Electric (GE) for supply of 50 Boeing aircrafts (with GE engines) at an estimated project cost of ₹ 33,197 crore:

- 8 B777-200LR ultra long range aircraft (ULR) with a seating capacity of 266;

- 15 B777-300 ER medium capacity long range aircraft (MCLR-A) with a seating capacity of 380; and

- 27 B787-8 (popularly known as 'dreamliner') medium capacity long range (MCLR-B) aircraft with seating capacity of 258.

In addition, Air India Charters Ltd. (AICL), a subsidiary of Air India which operated low cost carriers under the 'Air India Express' brand, also signed purchase agreements with Boeing and CFM for supply of 18 short range B737 aircraft with CFM engines at an estimated project cost of ₹ 4,952 crore.

**B. Chronology of Events**

2.2.  In 1996, the erstwhile AIL had its last fleet acquisition which involved induction of two B747-400 aircraft. The table in (**Annexure - I**) gives a brief chronology of events related to the current acquisition of aircraft by the erstwhile AIL.

2.3.  According to the Ministry of Civil Aviation, it had undertaken the following measures for evaluation of aircraft for new acquisition from 1993 onwards:

i.  The evaluation of Medium Capacity Long Range (MCLR) aircraft started in 1993, when Ministry constituted an in-house Committee of Experts to identify aircraft requirements for both Air India and Indian Airlines.

ii.  Subsequently in the same year another in-house Committee was constituted to evaluate the MCLR aircraft, which formed part of the fleet requirement for AI's long range operations.

iii.  In 1994, the evaluation of A340-300/B777-200/MD11 was recommended as these aircrafts were available as the latest technology aircraft from the 3 different manufacturers *viz.* Airbus, Boeing and Mac Donnel Douglas.

iv.  In 1995 AI invited bids for 23 MCLR aircrafts *viz.* 10 firm+13 option.

v.  Bids evaluated and Committee report was submitted in 1996. However, decision was deferred in view of elections.

3

4

vi. Thereafter, this project did not progress in view of Government's plan on AI's disinvestment.

vii. In 2002, the MCLR study recommenced after AI was taken off the disinvestment list.

viii. A new Request for Proposal (RFP) floated for 17 MCLR aircraft *viz.* 10 firm + 7 option, in Dec. 2002.

ix. In 2003, the evaluations were undertaken and report was presented to the Board. On 8 November, 2003, based on the various alternative scenarios evaluated in the report of the TENC dated 7.11.2003 and the rankings accorded by Committee based on Net Present Values (NPVs), the Board decided to recommend 10 long range A340-300 aircraft on firm basis and 18 short range B737-800 aircraft.

x. Accordingly, the Board authorized Management to prepare and submit a Project Report for acquisition of (10) A340-300 aircraft plus (18) B737-800 aircraft to Ministry of Civil Aviation.

xi. In January, 2004, the Project Report for acquisition of (10) A340-300 and (18) B737-800 aircraft was submitted.

xii. While a decision was yet to be taken in the matter, on 30th March, 2004, a presentation was made to the Board on AI's medium term business strategy and growth plan. This plan envisaged:

- Aggressive expansion of AI capacity and network in next 2-3 years through induction of aircraft on dry lease.

- Establishment of separate new airline under AICL for low fare low cost operations.

- Fleet rationalization (including phase out of older, uneconomic B747-200s and B747-300 combis).

- Production upgradation and strategic cost management (through outsourcing of non-core activities).

xiii. During March-August 2004, AI's medium term business strategy and growth plan up to winter 2006-07 were developed further. Over the next few months, through discussions within AI and in consultation with the Ministry of Civil Aviation lead to approval of the following proposals by AI Board:

- Establishment of low fare low cost airline — AI Express (at the meeting of AI Board of 29 May, 2004).

- Dry lease of (20) aircraft, (3) medium capacity ultra long range plus (17) medium capacity long range aircraft during period from winter 2004-05 and winter 2006-07 (Board meeting 17 July, 2004).

xiv. During this period, AI's long term vision, mission and business strategy document was also prepared. This document, *inter alia*, emphasized the need for AI to

5

focus on customer needs and satisfaction and to adopt a three pronged strategy based on—

- capacity and network expansion,

- product improvement,

- operations improvement, and

- to progress further, its strategic relationship with Lufthansa and commercial operation arrangement with other airlines.

xv.  The proposal for acquisition of 28 aircraft submitted in January, 2004 represented only the first phase of acquisition of aircraft by AI and the supplemental proposals for the acquisition of additional aircraft were to be submitted in due course.

xvi.  On 26th May, 2004, *vide* Office Order No. HQ/9-52/1156, the TENC Committee had been directed to develop AI's fleet plan up to 2014. The candidate aircraft types to be considered by AI were also identified.

xvii.  On 2nd August, 2004, AI's proposal for acquisition of 10 A340- 300 plus 18 B737-800W aircraft was discussed at the meeting of Ministry of Civil Aviation (Minutes of the meeting placed as **Annexure - II**) in the context of above developments and it was decided that AI should take a comprehensive view of its fleet requirement for the next 15 years also keeping in mind:

- The non stop services to USA with ULR aircraft by competitor airlines in the Gulf / South-East Asia and consequent need for a competitive product offering with suitable aircraft by AI.

- The low cost low fare operations envisaged under AI Express with B737-800 aircraft.

- Induction of aircraft on dry lease to meet the interim capacity requirements of AI and AI Express.

xviii.  Accordingly, AI was asked to revisit its proposal for purchase of aircraft (including additional new aircraft to be considered and submit a fresh proposal).

xix.  On 13th September, 2004, the Board was advised that AI's TENC had been directed to commence work on AI's long term fleet plan and following course of action was being adopted:

- Revised fleet plan reflecting proposed pattern of operations and fleet composition is being developed for the year 2012- 13 to cover operations on existing routes under both AI and AI Express.

- After Board approves the proposed revised plan, the proposal for 18 B737-800 would be reviewed to examine the work viability of the acquisition of these aircraft for AI Express on a standalone basis.

- Offers would be invited for acquisition of aircraft by AI.

6

xx.   In December, 2004, RFPs were issued inviting offers for —

- 8 Ultra Long Range (ULR) aircraft (5 Firm + 3 Option)

- 15 Medium Capacity Long Range-A (MCLR-A) aircraft (10 Firm + 5 Option)

- 27 Medium Capacity Long Range-B (MCLR-B) aircraft (20 Firm + 7 Option)

xxi.   On 18th February, 2005, the report of the TENC based on gross price of aircraft was submitted.

xxii.   Subsequently, the report of the TENC was presented to the Board in its 106th meeting held on 26th April, 2005.

xxiii.   In this meeting, the Board approved the acquisition of 50 aircraft—

- 8 B777-200LRs with GE90-110 engines

- 15 B777-300ERs with GE90-115 engines

- 27 B787-8s with GEnx-64 engines from Boeing by AI at an approximate net project cost of ₹ 30,700.62 crore, subject to Government approval.

xxiv.   However, it was recognized that the actual project cost may vary based on actual aircraft deliveries finalized which will in turn depend on the date on which the project is approved by the Government and orders are placed as also the actual economic invoices applicable at the time of aircraft delivery.

- Decided to recommend to the Ministry of Civil Aviation that copies of the TENC report dated 18th February, 2005, the addendum dated 26th April, 2005 and the presentation made to the Board be sent to the Comptroller and Auditor General India (CAG) and to the CVC.

- Authorized the Management to prepare and submit a project report for the acquisition of the above 50 aircrafts to Government for approval.

xxv.   In May 2005, the Project Report for acquisition of the 50 aircrafts was submitted.

xxvi.   In November 2005, Report of the Price Negotiating Committee was submitted.

xxvii.   On 30th December, 2005, Government approval was received and Purchase agreement was signed.

**C. Undue time taken for acquisition**

2.4. According to Audit, the AI's aircraft acquisition process took an unduly long time. Due to lack of timely acquisition, AIL had to induct 13 additional aircraft on dry lease by January, 2004. AIL's proposal of December, 1996 for aircraft acquisition was not cleared, and a fresh process for acquisition was initiated only in January, 2002. The initial proposal was made in December, 1996 and examination continued till January, 2004. AIL's project report of January, 2004 proposed acquisition of 18 small capacity short range aircraft (B737-800) and 10 medium capacity long range aircraft (A340-300) with a positive Net Present Value (NPV) on stand-alone basis. However, by November, 2004, the AIL Board changed their fleet acquisition plan and submitted a revised proposal for acquisition of 50 medium capacity long range ultra long range aircrafts (in addition to 18 small capacity short range aircraft for AICL).

7

2.5. The sequence of events from January, 2004 to November, 2004 shows that the erstwhile AIL reworked its earlier acquisition plan and expanded its requirement. From the approval for the constitution of Empowered Group of Ministers (EGoM) by the Cabinet Committee on Economic Affairs (CCEA), for final round of negotiation with lowest bidder, to the, signing of purchase agreement, it took just 16 days. Furthermore, the revised plan saw a dramatic increase in the number of aircraft to be purchased in the period between January, 2004 and November, 2004.

2.6. When the Committee sought to know the reasons for the undue time that was taken for acquisition, the Secretary, MoCA deposing before the Committee stated:—

> "Again recounting from 1996 till 2004, the company went through different stages of phenomena. For example, the company was put on disinvestment mode in 1999. There was also a process for bid, etc. From 1996 to 2001, it remained in disinvestment mode. So, nothing could be done. That was one impact. In 2001, the Cabinet decided that there would be no disinvestment. Therefore, the Government immediately started the fleet acquisition plan which was pending for the past 12 years. Thereafter, we have moved as fast as we could have to provide the latest fleet to Air India because provisioning of fleet is one of the most important tools to enable an airline to deploy capacity, to capture market, to provide best services, to compete, etc.

> When the Cabinet decided in 2004 to go ahead with the acquisition of fleet, we completed the process within 18 months. Of course, there are questions why we moved fast. Here, we are in a contradictory mode. On the one hand I am saying that the whole aircraft acquisition . was delayed for 12 to 13 years on account of variety of reasons that I mentioned, on the other hand the Ministry has been commented upon why we hastened the process.

> We are not aware of the optimum time in which the acquisition of aircraft should take place. We are not aware of that."

2.7. Explaining the undue time taken for acquisition, the MoCA *vide* its written note submitted as under:—

> "The comment of CAG with regard to an unduly delayed process of acquisition is indeed true. We would also like to add that if the process of acquisition had been gradual in both airlines Air India and Indian Airlines Corporation (IAC) over the past years, the aged structure of the fleet would not have deteriorated to the levels it had by 2003-04. Also, the financial requirements of a phased induction would have been gradual over the years and not precipitated into an operating crisis in 2004-05. However, instead revenues that could have been channelized into a phased induction programme were utilized for enhancing the emoluments structure within the airlines particularly that of the Performance Linked Incentive (PLI).

> The situation was thus at a passe/in both airlines and it was imperative of the new Government to arrest further decline of the airlines. Also because a recession hit the international market prior to 2004 caused by the 9/11 in US

8

> and Severe Acute Respiratory Syndrome (SARS) epidemic, the revenue levels of the airlines worldwide were at their nadir and most airlines at this point sought bail-outs from their respective Governments. This did not happen in India, but did put the airline in a position that caused the previous Government to put them on the disinvestment block. That process would not occur because the parties interested in buying the airlines withdrew their offers."

Reflecting on the choices before the Government, the representative further deposed:

> The incoming Government then, thus had only two choices — either to close the airlines or to prop them with a slew of measures that needed to be implemented. Alongwith the sorry state of the airlines there was on the other hand, an increase in demand for liberalization of the sector aided by the inability of the airlines to expand their fleet to meet market requirements. There was thus little choice but to invest in new equipment for both the airlines if they were to run and address the medium and long term market scenario. Therefore contradictory comments that the CAG Reports have made over the inability of the airlines to serve the market as also those that suggest hastening this acquisition process needs re-examination and broader understanding, which we propose to do. In the report it must also be borne in mind that the aviation sector is a completely market driven & dynamic institution with the need for rapid decision making to address the ever changing scenario. As a result it cannot be taken as a static set of circumstances and within a limited perspective of some of the observations made in the report.

> It must also be kept in mind that there are long gestation periods in acquisition proposals fructifying and unforeseen delays as we are now experiencing in the Boeing 787 dreamliner. It might also be argued that the acquisition process is avoidable and that enhancement of capacity can be achieved by leasing. This also creates a new dependence on another set-up of market dynamics that for leasing of aircraft."

2.8. Further, the MoCA, while furnishing the reasons for the revised proposal for acquisition of 18+50 aircraft being processed with alarming haste as against the earlier decision for acquisitiOn of 18+10 aircraft, has submitted as under:—

"i.  In November 2001, the Board had approved Air India's proposal that pending directions from the Government with regard to the disinvestment and infusion of funds for aircraft acquisition, Air India should identify its requirement for additional aircraft including the number of suitable generic aircraft types to be acquired during the next 5 years. In the same proposal, Air India sought approval to rationalize aircraft types in its fleet.

ii. The Board constituted an inter-departmental Committee of directors and mandated them to identify the additional aircraft requirement for fleet rationalization, modernization and expansion.

9

iii.  As envisaged in the proposal, the need for adding capacity was mainly because Air India's fleet was ageing and this resulted in low schedule reliability, inferior passenger appeal and poor image. Air India's B747s were too large and Air India was forced to offer low frequency services with circuitous routings as against the competitor services which offered high frequency, direct point to point services — which were preferred by high yield passengers. Additionally the comfort and service levels in Air India's First and Executive Class were too inferior as compared to the competition. Smaller and shrinking network required immediate attention to avoid Air India getting marginalized with the onset of stiff competition. Based on this, the internal Committee had recommended a strategy which envisaged an aggressive capacity and fleet expansion at a rate higher than the market growth, with modern and new technology aircraft. The Committee further recommended rationalization of the fleet by reducing the number of types in the aircraft fleet, induct smaller new aircraft types — one Long Range type for long thin routes and one Short Range type for short haul routes.

iv.  The market changes in the late 1990s and early 2000 demanded aircraft with longer range and smaller capacity to cater to the fragmented markets which were originating from interior parts of India. Interior airports had been opened up for competition and competitor airlines were offering direct connectivity from, interior airports to the long haul markets through their own hubs. Historically, Air India was serving the interior Indian points by connecting them to one of the primary hubs *viz.* BOM/DEL, with the high density B747 aircraft. However, with competition growing in the interior points, the passenger choice began shifting away from Air India, which was seen in lowering of market share.

v.  Just after 2000 when Air India was taken off the disinvestment list, the Management took stock of the market changes in the preceding years and a strategy for growth was presented to the Board. Since aircraft induction exercise has a long gestation period, Air India Board approved the leasing option for Air India to induct capacity immediately till such time it is able to acquire its own aircraft.

vi.  Initially, Air India limited the leasing to the B747 and A310 type of aircraft in view of its in-house facilities and expertise available for this aircraft. Subsequently, in view of Air India's aircraft evaluation exercise in which Air India had commenced evaluation of new technology aircraft types, the A330/B777s aircraft were also considered for leasing. In all, Air India has leased a total of 33 aircraft during the period Dec .2000 to 2005/06. With this capacity, Air India was able to increase its presence in its core markets *viz.* USA — (new routes to New York and increase in capacity to Chicago), mount additional operations to the Gulf and S.E. Asia.

vii.  Despite this capacity induction through the leasing method, Air India's capacity and market share was steadily declining from almost 30% in 2004 to 21% in 2010. It may be noted that the Indian air market size was 16 million in 2004 and grew at a Compound Annual Growth Rate (CAGR) of 14% to 32.8 million in 2010. While the leasing of aircraft helped Air India maintain its capacity share despite the market growing in double digit figures, stiff competition on most of its core routes had diluted yields because of excess capacity in these markets. This was

10

combined with unforeseen incidents like, the SARS in 2003, fall in S.E. Asian economies in 2007, global recession in 2008 and the ongoing fuel price escalation. All of these events, apart from the continuous impact of liberalisation had their impact on the airline. For Air India since a part of its capacity in these years was on lease, it was difficult to maintain profitability in view of lower revenue earnings.

viii. In view of the procedures that Air India is required to follow, the flexibility of taking quicker decisions to respond to market changes reduces. However, with induction of new aircraft, Air India has been able to return all the aircraft taken on lease and also phase out some of its old/ageing fleet — and replace this capacity with new aircraft. New aircraft induction has helped Air India to standardize its product and also improve its product appeal. This is reflected in the results of the recent few years, where, despite having a stagnant capacity share Air India has been able to maintain a market share at a level slightly higher than its capacity share. Air India's market share from the year 2005 onwards has always been consistently higher than its capacity share, which has resulted in a positive Market Performance Index (MPI). Between the years 2004 and 2010, the capacity in the Indian Air Market grew at a CAGR of 14.3%, whereas Air India could grow its capacity by only 7.6% CAGR *viz.* at half the rate of the industry growth, this reflected a proportionately lower growth in the passenger carriage where the index grew by 12% in terms of its passenger carriage to/from India. Air India could grow its passenger carriage by only 5.7%.

ix. The 50 Aircraft Project Report had envisaged that the initial deliveries of the new aircraft would be towards replacing some of the old aircraft and lease returns. In fact out of 50 aircraft, 27 units were meant for replacement of old/leased aircraft and the balance 23 units were to provide for growth. Air India till date has inducted 20 of the 50 new aircraft and has been able to phase out its old A310 aircraft and all of its leased capacity. As such, with this fleet, Air India has just been able to maintain its capacity level on core routes. Some of the routes which Air India had discontinued in 2008/09 during the period of global recession have not been reinstated in view of the capacity shortage.

x. Additionally, Air India has not been able to correct its route/aircraft mismatch on some of its important markets like, Singapore, Bangkok and Dubai, where narrow body aircraft are being operated. This has affected Air India's product offering as competitors are offering wide body aircraft on these routes and offering seamless connectivity on their onward long haul markets through their hubs. Wide body aircraft facilitates efficiency in baggage connections for transit flights.

xi. As of 2011, all the leased aircraft have been returned, except for the 2 A330s, which will be returned next year. The aircraft on sale and lease back (SLB) still continue to be in the fleet. New capacity induction of the balance 30 owned aircraft has not taken place in view of the delay of the B787 aircraft. In effect, only 40% of the new aircraft acquisition *viz.,* 20 of 50 Long Range units has been inducted.

11

xii. Despite this, Air India has since winter 2010, after DEL was offered as an integrated terminal, has built its hub at Delhi and started hub operations through a network of bank structure of domestic/international arrivals and departures, thereby enabling connectivity to/from Delhi on most of Air India's international operations. It will be noted that such a hub structure of operations requires the airline to provide timely connections to connect the domestic airlines to the domestic departure and *vice versa*. This structure tends to lower the aircraft utilisation levels for the network carrier. However, Air India's experience of its operation's from Delhi hub has been beneficial, Air India has been able to increase its transfer connection to/from Delhi significantly *viz*, from nearly 300 passengers/day in 2008/09 to more than 2000 passengers /day in 2010/11."

2.9. The Ministry also asserted that the change in the proposed aircraft acquisition plan from 10 wide body to a fleet of 50 wide body aircraft has been a considered decision within the Airlines based on the consultation and advice from the Ministry.

**D. Increase in requirement from 10 + 18 aircraft to 50 + 18 aircraft in 2004**

2.10. The erstwhile AIL's project report of January, 2004 proposed for acquisition of 10 medium capacity long range aircraft (A340-300) and 18 small capacity short range aircraft (B737- 800). However, by November, 2004, the AIL Board changed their fleet acquisition plan and submitted a revised proposal for acquisition of 50 medium capacity long range/ ultra long range aircraft, in addition to 18 small capacity short range aircraft for AICL. This decision to enhance AIL's requirements after detailed analysis took just four months (from August to November, 2004), after MoCA had advised AI on 2nd August, 2004 to "revisit" their proposal.

**E.  Chronology of events leading to change in aircraft requirements of AIL**

| Date | Brief  Details of Event |
|---|---|
| 1 | 2 |
| 30 October/ 3 November, 2003 | Letter from 43 member delegation of US Congress regarding AIL's proposed aircraft acquisition forwarded by PMO to MoCA. **(Annexure- III)** |
| 27 January, 2004 | PMO forwarded two letters from Boeing (a letter of 17 November, 2003 to Secretary, MoCA and a letter of 2 January, 2004 to PMO to MoCA, wherein Boeing indicated that the economics of the acquisition project were strongly dependent on the number of aircraft chosen, and that the technical evaluation could be easily influenced with the change in assumptions on number of aircraft. |
| 19 February, 2004 | In response to contentions made by Boeing in these letters, AIL intimated MoCA that: |
|  | • Equal opportunity had been given to both suppliers, and the number of long range aircraft had been reduced from 17 to 10 as it was not economically viable; |
|  | • The evaluation was undertaken in conformity with AIL's requirements. The question of giving Boeing a revenue benefit of 7 additional seats |

12

| 1 | 2 |
|---|---|
| | (reduced by them to provide the mid cabingalley) did not arise; also, estimation of residual value after 17 years life of aircraft was fraught with risk and the percentage discount offered by Boeing for 10 aircraft was lower than that offered by Airbus;       . |
| 3 March, 2004 | Director (S), MoCA intimated PMO that the in-house TENC had evaluated different aircraft types on the basis of identical ground rules, providing fair opportunity to all bidders.<br><br>In addition to highlighting the issues raised by AIL to MoCA, he also stated that AIL had invited offers for 10 firm and 7 optional long range aircraft. Boeing  had the opportunity of bringing in scale economics into their offer. After due consideration of economics, the AIL Board had recommended acquisition of only 10 A340-300 aircraft as it felt that acquisition of 17 long range aircraft  would not be economically viable. |
| 29 June, 2004 | Director (S), MoCA recorded on file that there had been some "important developments" as submitted by Secretary, MoCA to the Principal Secretary to   PMO that many international carriers were planning direct operations to   USA/Canada and the A340-300 aircraft was going out of production in near future. Therefore, AIL needed to review its proposal and consider suitable long range   aircraft    for its fleet. Further, it was understood that *"Minister, Civil Aviation (CA) also impressed upon AIL in a meeting at Mumbai to examine the  feasibility of direct India-US/ Canada flights".* |
| 5 July, 2004 | AS&FA (Additional Secretary and Financial Advisor), MoCA expressed ignorance about the purported note of Secretary, MoCA and stated that:<br><br>• "I am not aware of the A-340-300 going out of production in the near future, thus calling for a re-look at the choice. The fact that Air India chose to invite offers for this type of aircraft and the Company decided to quote for the same less than a year ago, leads one to think whether Air India chose the right type of aircraft while inviting offers. If the assumption that the aircraft is going out of production is true, Air India is guilty of not having done their homework and the Airbus Company is  guilty of unethical business practice in offering an aircraft that is being  phased out. ...But it would be worthwhile to get clarifications on these aspects from both Air India and Airbus Company".<br><br>• "Minister (CA) in a meeting at Mumbai impressed upon the need for Air India to examine the possibility of non-stop India-US operations. But he never suggested that the present fleet acquisition plan should be dropped and only that option should be examined. Hence, it would not be correct to presume that the new option that would be examined would be 'in lieu of' the existing plan. It could be 'in addition' as well. Of course, if Air India decides to go in for the option of non-stop India America operations, this would call for a re-look at the present fleet acquisition  proposal".<br><br>Consequently, AS&FA suggested that a meeting (like the one Minister, CA took in respect of IAL) would be in order, wherein the points of view of both AIL. and MoCA could be considered, and a consensus arrived at on the future course of action.            . |

13

| 1 | 2 |
|---|---|
| August, 2004 | In a meeting on 2 August, 2004 taken by the then Minister, Civil Aviation with Secretary, MoCA and CMD, AIL, it was decided that: |

<div style="margin-left:2em">

- Air India should revisit the proposal for purchase of aircraft and submit a fresh, project proposal to the Government at the earliest, which could include the revised requirements.

- Al could examine whether the proposal for purchase of short range aircraft for the low cost airline is justified on a stand-alone basis and could be de-linked from the purchase of other types of medium range and long range aircraft for, Al. While doing so, AI should examine whether economics of the proposal for acquisition would be favourable, keeping in view the low-cost and low fare operations envisaged through a separate company. If the proposal is found to be justified and viable, Air India should revert to the Government at the earliest.

- At this meeting of 2 August, 2004, the Chairman and Managing Director (CMD), AILwas of the view that although the present proposal did not fully cater to the requirement of AIL's fleet, the additional requirement of aircraft could be projected separately through a supplementary proposal after due evaluation. However, it was felt that it may not be advisable or prudent to go through the pre-Public Investment Board (PIB) and PIB exercise in two separate stages with two different sets of proposals for such capital intensive projects. It would be desirable to take a total and comprehensive view on the fleet of AIL, keeping in mind its plan and growth for the next fifteen years or so.

</div>

MoCA communicated the above mentioned decisions on 5 August, 2004 to AIL and directed them to revisit the acquisition proposal and submit a fresh proposal, which would include revised requirements in view of:

<div style="margin-left:2em">

- New dimension in the competition on the India/USA route with the introduction of non-stop flights through ultra long range aircraft by competing airlines in South East Asia and the Gulf Region. Unless AIL was able to match this product and connectivity by adding suitable aircraft to its fleet (which was not a part of the present proposal), AIL's competitiveness, load factors and revenues were likely to be severely affected.

- AIL had decided (May, 2004) to launch a 'no frill' airline called 'Air India Express' through a separate company (Air India Charters Limited) to destinations in South East Asia and the Gulf, which would offer lower fare to passengers.. Therefore, the current project proposal may not have taken into account the economics of these types- of aircraft if operated on low cost basis and with fares that would be 25 per cent lower than existing fares.

</div>

| October, 2004 | CMD, AIL indicated to MoCA that during the AIL Board meeting of 13 September, 2004, some Board members indicated that in .view of MoCA's advice, the fleet acquisition programme needed to be revisited in its entirety (including examination of other aircraft types, apart from B737-800, for small capacity short range aircraft). CMD, however, felt that the B737-800 project should be delinked and studied separately and was to be submitted under the banner of AICL.CMD sought MoCA's clarification in this regard. |

14

| 1 | 2 |
| --- | --- |
| | MoCA sought clarification from CMD, AIL as to whether the B737-800 aircraft was selected after carrying out the required comparative evaluation 'on stand alone basis. AIL confirmed the selection of B737- 800 aircraft after comparative evaluation on stand-alone basis. |
| 18 November, 2004 | Director (S) noted that "strictly speaking, it is for the AI Board to take view in the matter. As far as Ministry's advice is concerned, there is a suggestion... that AI needs to take a total comprehensive view on its fleet, keeping in mind its plans and growth for the next 15 years or so". |
| | Consequently, a clarification was issued along these lines, with the approval of Minister, Civil Aviation, to AIL. |
| 24 November, 2004 | AIL Board considered and approved a revised long term fleet plan for 50 aircraft. (two thirds on firm basis and one-third on option basis), apart from 18 aircraft for its subsidiary, AICL. Paras 13 and14 of the Extract from the Minutes of this 103rd meeting of the Air India Board reads: |
| | "13. Shri Vaghul suggested that the changes that have taken place in the aviation industry environment since the submission of the earlier Project Report in January, 2004 which have necessitated the proposed change in Air India's fleet requirements should be elaborated in the Project Reports to be submitted to the Government. |
| | 14. The Board was of the view that the deliverirschedules for the new aircraft should be dovetailed with the aircraft lease plan. At this stage, the CMD mentioned that since the Ministry had assured Air India that its aircraft acquisition proposals would be cleared expeditiously i.e. by March, 2005, Air India should now dry lease only the aircraft required by it during the period upto Summer 2006 and plan for new aircraft deliveries for its requirements from winter 2006/07 onwards. The Board then expressed the views that the aircraft acquisition could also co-exist with the aircraft lease plan and that further expansion of the capacity, fleet and network-over and above the expansion envisaged in the revised fleet plan- could, in fact, be considered". |
| | This process of revision took only four months. |

2.11. On being asked to furnish reasons for such sharp revision in the number of aircraft, the MoCA submitted that Air India had not acquired/inducted new aircraft in its fleet during 1996-2004. During this period, Air India had submitted Project Reports for Acquisition of 2xB747-400s (in 1997-98) and 3xA310-300s (in 1996). Both these projects were not approved. Air India had aircraft which were more than 20 years old and it had a fleet of 33 aircraft with four different generic types. There was a need for Air India to rationalize and standardize its aircraft types alongside phasing out the old and aged fleet which was the cause for low passenger appeal and low dispatch reliability. An internal committee of Air India had started the evaluation of a new aircraft type *viz.*

15

the MCLR aircraft way back in 1993. The committee had at that time, invited bids in January1995 for 23 MCLR aircraft (10 firm + 13 on option). Subsequently, evaluations were made for 17 aircraft (A340/B777) end finally a proposal for 10 A340 aircraft was submitted to the Government based on its financial results. Pending acquisition of new aircraft, after Air India was taken off the Government's disinvestment list in 2000, the Air India Board approved an interim strategy of inducting aircraft on lease — for expanding capacity and for beginning the process of rationalizing Air India's fleet. Air India had inducted 13 aircraft on lease upto 2004. This enabled Air India to phase out its old A300-B4 and some of B747-200 aircraft, which in turn helped in partial fleet rationalization.

2.12. The Ministry further submitted that in 2004, when Air India submitted its Project Report for 28 aircraft *viz.* 10xA340 + 18x8737, its total fleet size was 33 units of which 20 were owned and 13 were on dry lease. This proposal had envisaged that 68% of the new wide body induction would be towards replacement and the balance would be towards growth. This induction as stated in the Project Report was to form the first phase of acquisition of new aircraft by Air India, which would cover Air India's requirement during the 10th Plan peripd *viz.* 2002-03 to 2006-07. 7 of the 10 A340 deliveries were scheduled in 2005-06 and 2006-07. The balance 3 units were scheduled to be delivered in 2007-08.

The reasons that were submitted for revision of aircraft requirement were that:

(a) A 15 year comprehensive view of its fleet requirement rather than only 5/6 years. A longer time-frame increased the growth requirements.

(b) Incorporate Air India's growth plans as reflected in the medium term business strategy that was prepared in March, 2004, which entailed an expansion of Air India's capacity through leasing of aircraft, establishment of a low fare-low cost airline and fleet rationalization.

(c) All the leased aircraft and most of the owned aircraft were to be replaced. This capacity replacement was included in the revised fleet requirements.

(d) The requirement for Ultra Long Range aircraft for India-USA operations was included in the revised fleet requirements.

2.13. Further, on being asked to specify in no uncertain terms the authority which initiated this revision of fleet acquisition plan, the MoCA responded:—

"The aircraft acquisition proposal of erstwhile Air India was discussed in the Ministry of Civil Aviation on 2nd August, 2004 and in that meeting various developments which had taken place were discussed. AI also informed that its present proposal did not fully cater to the requirement of its fleet and the additional requirements of aircraft could be projected separately through a supplementary proposal after due evaluation. After due deliberations, it was felt that it may not be advisable or prudent to go through the pre-PIB and PIB exercise in two separate stages with two different sets of proposal for such capital intensive projects and it would be desirable to take a total and comprehensive view on the fleet of AI keeping in mind its plans and growth

16

for the next 15 years or so. Accordingly, it was decided that AI should revisit the proposal for purchase of aircraft and submit a fresh project proposal to the Government at the earliest, which could include the revised requirements. Ministry of Civil Aviation, as such, did not direct AI to revise the requirement of aircraft to any particular number. The requirement was revised after evaluation of changed Civil Aviation scenario and the long term growth plans of AI by the Techno Economic and Negotiating Committee (TENC) — an internal committee of senior directors."

2.14. The Ministry while furnishing its response to the observations made in the Audit Report had stated:—

"....the pressing debt structure that the airline finds itself is the cost of the manner in which the investments needed to be made in the past, but did not, and the observations regarding acquisition of 50 aircraft itself, when 30 of them are not yet part of the fleet and have not even been paid for, is premature."

2.15. The Committee desired to know if AI had requested the Ministry to strengthen its financial position due to increase in number of aircraft and to this the Ministry replied as under:—

"In both its aircraft acquisition proposals submitted in January, 2004 for 28 aircraft and in May, .2005 for 50 aircraft, Air India had expressed the need for infusion of additional funds into Air India for financing aircraft acquisition. In the 2004 Project, Air India had referred to the 8th Report of the Disinvestment Commission of August, 1998, which had recommended injection of ₹1000 crore as equity in Air India for financial restructuring — a need that was highlighted even before Air India was put on the disinvestment list. It was stated that such an infusion would strengthen Air India's balance sheet and enable Air India to obtain aircraft financing on favourable terms.

In May 2005 Project Report, Air India had again referred to the need for this equity infusion to support the aircraft acquisition. The Project Report had a further reference to an earlier request made by Air India for infusion of -2500 crore as additional equity capital.

Though Air India had requested the Ministry towards infusion of 2500 crore as equity to support the large number of aircraft acquisition, the same was, however, never assumed in the financial evaluation due to uncertainty on the issue of Initial Public Offering (IPO).

The Project Report proposed the acquisition to be financed using External Commercial Borrowings (ECB) and internal resources and based on the fixed interest rate of 5.5% which is based at then London Interbank Offered Rate (LIBOR) of 3% p.a. and margin of 2.5%. The decision to fund it through debt and internal resources was taken in view of the economics involved as AI were able to secure US Exim financings for all its earlier aircraft at very competitive rate of interest. Hence, AI requested the GoI to provide a sovereign guarantee for arranging Exim financing for its acquisition of Boeing aircraft."

17

**F. Flawed Assumptions underlying revised project report (50 long range aircraft)**

2.16. According to Audit, many of the key assumptions such as increase in capacity share, yield increases (at constant cost) underlying the revised project report for acquisition of 50 long range aircraft (as against 10 long range aircraft envisaged earlier) were flawed or unduly optimistic.

2.17. To the specific query of the Committee regarding the basis for making assumptions such as increase in capacity share, yield increases at constant cost underlying the revised project report for 50 long range aircraft, the MoCA replied as under:—

> "In the project report for acquisition of 50 Long Range aircraft, dated 14 May, 2005 details of market development and prospects were provided by AI. The gist of these details is given below:
>
> — Due to increased liberalization and globalization of Indian economy and success of Indian IT industry, the outbound travel was growing faster.
>
> — Declaration of several Indian airports as international and• increased operations by foreign airlines from interior points in India had fragmented the market resulting in unwillingness of passengers from interior points to travel over AI's Mumbai and Delhi-hubs.
>
> — Many foreign airlines had started seeking and were being given huge increases in capacity entitlements — far in excess of the genuine 3rd/4th freedom markets resulting in their use of this excess capacity to funnel traffic between India and USA/UK/Europe through their respective hubs.
>
> — Virtual open skies between UK, South Asian Association for Regional Cooperation (SAARC) / Association of Southeast Nations (ASEAN) countries, US had increased the scale of competition and made the Indian air market fiercely competitive.
>
> — The Indian air market grew at an Average Annual Growth (AAG) rate of 6% during 1990-2000. In 2003, the market recovered from the September, 11, 2001 terror attacks and showed strong signs of recovery. The long term traffic growth rate was assumed to be 7-8% which was not very high as compared to the AAG achieved in the previous decade (6%).
>
> — Capacity share of an airline is a primary determinant of its market share. AI therefore had to increase its capacity deployment at a rate faster than the traffic growth rate, in order to increase its capacity share and therefore its market share.
>
> — Private domestic carriers were aiming to fly overseas and had a brand new fleet.

18

Induction of 50 aircraft would enable AI to expand capacity on international routes at an AAG of 10.8%. This growth rate had factored the reduction in capacity as an outcome of transfer of some of its Gulf and SE Asia routes to AICL. Further the induction of aircraft was to take place over a period of time *i.e.* from 2007 uptil beginning of 2012. The last induction had taken place in 1992-93 and the aircraft were nearly 14-15 years old. The new generation fleet was mainly to replace the 747s and the A 310s which were not considered fuel efficient.

In terms of Available Seat Kilometres (ASKMs), the capacity was expected to grow at an AAG of 14.5% - because of increased proportion of operations on long haul routes."

2.18. On the issue of assumptions for yield increase, the Ministry made the following submission:—

"AI's route strategy was to focus on its core markets of USA, UK and Gulf, including non-stop services between India and USA with ultra long range aircraft. As far as possible, operate high frequency, direct, point-to-point services with standardized - arrivals/departures, increased network connectivity through scissor operations over London, Frankfurt, Paris, Hong Kong and Singapore.

It was envisaged that the above route strategy would enable an increase in yields. The increase in the outbound market and increase in volumes in different market segments like Visiting Friends and Relatives (VFR) tourist, leisure and business traffic segments additionally encouraged AI's assumptions of increasing yields. Foreign airlines operating to India with brand new aircraft and offering seamless transfers and connectivity were demanding higher yields. This further encouraged AI to make an assumption of higher yields in its evaluation.

As per the TENC Note, a one-time yield increase of 5 per cent in all classes was assumed to take into account the effect of product improvement resulting from the deployment of new generation aircraft. A further one-time yield increase of 10 per cent in all classes was assumed for non-stop services to USA with B777-200LR aircraft to take into account the benefit of reduced elapsed travel time due to non-stop service.

The TENC Report incorporated assumptions developed by the Committee consisting of the heads of Commercial, Materials Management, Finance, Engineering, Engine Overhaul, Operations and Planning Departments at that stage. The Committee was aware that international airlines were generating higher revenues."

2.19. When asked whether these assumptions were flawed or unduly optimistic, the MoCA submitted:—

"......... the assumptions made appeared feasible, based on market information on revenues of international carriers.

19

> In retrospect, it may be seen that some of these assumptions are adversely impacted by the global recession and steep hike in fuel prices which had an impact on the profitability of the project IATA airlines reported huge losses in 2008 and 2009 due to the global economic slowdown and recession in the aviation industry."

2.20. The Committee were also apprised that in the revised fleet plan of AI there were projections that increase in capacity share would automatically lead to an increase in AIL's market share and one-time yield increase, at constant costs of 5% on all classes.

2.21. With regard to the above context, the Committee desired to know the basis for such projections. The Ministry, in its written note, submitted as under:—

> "An increase in capacity share does lead to an increase in the market share for an airline. However, Air India's market share had been gradually declining due to factors such as old aircraft, increase of capacity by competing airlines, worldwide recession, etc.

> Air India's revenues and yields were lower than the industry level in view of its product offering which involved a small and an ageing fleet and a mismatch of its route and aircraft mix. It was therefore assumed that with new and modern aircraft, Air India's yields would come close to the industry levels. The TENC committee felt that 5% increase was a reasonable estimate and could be achievable by Air India."

2.22. When the Committee sought details about year-wise actual performance of AIL in terms of market share, yield and costs *vis-a-vis* the assumptions, the Ministry furnished the actual yield for the wide body aircraft and the market share from 2005-06 onwards which is given in the table below:—

| Year | Yield for Wide body (₹/Passenger Kilometre) | Air India's Market Share(AI /IA) |
|---|---|---|
| 2005-06 | 2.79 | 26.5 |
| 2006-07 | 2.75 | 24.7 |
| 2007-08 | 2.85 | 21.9 |
| 2008-09 | 2.99 | 16.3 |
| 2009-10 | 2.57 | 16.1 |
| 2010-11 | 3.06 | 14.5 |

**G. Concerns of other stakeholders**

2.23. Audit Report had highlighted that at the pre-Public Investment Board (PIB) stage, various concerns regarding the assumptions made for enhancement of capacity were expressed by the representatives of the Planning Commission and Department of Expenditure (DoE).

20

At the pre-PIB Meeting (August 2005), the representatives of the Planning Commission and Department of Expenditure (DoE) had expressed several concerns:

| Concerns of Planning Commission | Considering the past trends, the assumptions made by AIL regarding traffic projections were risky and the upgradation appeared to be very ambitious, as statistics of the Directorate General of Civil Aviation (DGCA) did not suggest the kind of growth assumed in the Project Report. The Project Report assumed substantial increase in long haul traffic and the proposed increase in market share from 19 per cent to 30 per cent would only be possible, if 10 to 12 per cent rate of growth was achieved. It was not clear how the policies of the Government relating to this sector would fuel such growth. |
|---|---|
| | Internal rate of return with fuel cost at current prices was only 6.2 *per cent.* This was tantamount to skating on thin ice, especially when traffic growth was not guaranteed. |
| Concerns of Department of Expenditure | The assumption that enhancement of capacity would necessarily lead to higher market share may not be tenable beyond a point. **Consequently, a purely supply side response would run into huge demand side risks.** The high traffic growth projections, therefore, needed careful consideration since project viability was highly sensitive to reduction in traffic yield. |

Audit pointed out that citing shortage of time, the pre-PIB meeting (August 2005) could not discuss the response of AIL on the above concerns. MoCA decided to directly include the response of AIL on these observations in the draft note for the PIB meeting (October 2005). AIL had responded to the concerns of DoE by stating that market share could be increased by increasing capacity.

Audit further pointed out that despite the concerns expressed by the Planning Commission and the DoE at the pre-PIB stage (August 2005), the PIB finally approved the purchase of 50 aircraft (35 on firm basis and 15 on option basis) for AIL at a price•not exceeding 33,197 crore (besides 18 aircraft for AICL at ₹ 4,952 crore). The decision for exercising the option for 15 aircraft was to be taken by the board of AIL depending on market situation. Further, MoCA was directed by PIB to evaluate AI's cost structure and productivity and fix benchmarks for achieving reduction in cost and enhancing productivity. DoE also observed, in December, 2005, that the steps proposed to be taken for cost reduction and enhancing productivity in AIL may be clearly indicated by MoCA in the final CCEA note. However, MoCA simply indicated in the CCEA note that a Committee would be set up by the Ministry to evaluate the cost structure and productivity.

21

2.24. The observations of Planning Commission, DoE and the Department of Economic Affairs, as expressed in the meeting of PIB held on 13.10.2005, read as follows:—

"Planning Commission          .

The following observations, were made by Principal Adviser, Project Appraisal and Management Division (PAMD), Planning Commission:—

(i)   Since Air-India is a commercial undertaking, it is best to leave major commercial decisions to them while the balance sheet of AI shows that there had been marginal profits for the last three years, for large investments over a long period, the balance sheet should be stronger, especially since AI is seeking Govt. guarantee for the loan.

(ii)   Since Debt Service Coverage Ratio is below one, it should be explained how air India will service the debt.

(iii)   Looking at past trends, the assumptions regarding traffic projections are risky and the upgradation appears to be very ambitious. Directorate General of Civil Aviation (DGCA) statistics do not suggest the kind of growth that is being assumed in the project. The project assumes substantial increase in tong haul traffic and the proposed increase in market share from 19% to 30% will only be possible if 10 to 12% rate of growth is achieved. It is not clear how the policies of Government relating to this sector would fuel such growth.

(iv)   Air India's target of increasing its market share to 30.8% by 2012-13 may be its corporate priority. However, from Government investment point of view, this is not a Plan priority. Planning Commission would be keener to see growth of public-private investment in the civil aviation sector as a whole.

(v)   Internal Rate of Return with fuel cost at current prices is only 6.2%. This is tantamount to skating on very thin ice, especially when traffic growth is not guaranteed.

(vi)   In order to mitigate the traffic risk, it would be useful to consider acquisition of 35 aircraft on firm basis and 15 aircraft on optional basis, and also consider a mix of lease and outright purchase.

Department of Economic Affairs

The following observations were made by Jt. Director, DEA:—

(i)   As far as acquisition of aircraft is concerned, DEA supports the proposal 'in principle', keeping in view the evolving civil aviation scenario, and the need to plan for some over capacity in infrastructure sectors.

(ii)   There is need for a clear road map for development of the air transportation sector as a priority infrastructure sector with a level playing field for both public and private operators.

(iii)   With respect to financing with GoI guarantee, a preferred option may be to encourage financing arrangements not involving government guarantee.

22

(iv)  With an investment plan of such high order, it would be imperative for the Government to lay down productivity norms and benchmarks based on global best practices.

Department of Expenditure (Plan Finance Division)

The following observations were made by Joint Secretary, PF.II:—

(i)  The assumption that enhancement of capacity would necessarily lead to higher market share may not be tenable beyond a point. Consequently, a purely supply side response will run into huge demand side risks. The high traffic growth projection therefore need careful consideration since project viability is highly sensitive to reduction in traffic yield.

(ii)  With Air India's plan for an IPO, the weighted average cost of capital would be higher and the project would become riskier.

(iii)  Debt service coverage ratio of the project for 50 aircraft is below one on a stand alone basis. The capacity of Air India to service the debt is a crucial issue, especially since Govt. guarantee is being sought.

(iv)  On balance, Plan Finance division would support purchase of 35 aircraft with an option for 15 aircraft. It also needs to be decided as to when and how the option, would be exercised.

(v)  With respect to Air India Charters, data for the last five years indicates that AI has been losing money on the Gulf & S.E. Asia routes even though capacity has gone up. In this backdrop, there appears to be little cause for comfort about the performance of AICL in this segment.

(vi)  Low cost operations are crucial for the success of AICL. However, the assumption that the salaries of the pilots and cabin crew would be one tenth of the corresponding staff in AI does not seem to be reasonable.

(vii)  Operating Cost per available ton KM is ₹ 11.58 for AI and ₹ 17.30 for AICL. This requires explanation.

(viii)  The debt service coverage ratio for AICL needs to be determined on a stand alone basis.''

2.25 To the query of the Committee whether these concerns of Planning Commission and Department of Expenditure were suitably addressed by AIL, the MoCA in its reply stated as under:—

"The Memorandum for Public Investment Board pertaining to the acquisition of aircraft was submitted in August, 2005. This memorandum included comments/clarifications raised by Ministry of Civil Aviation, Deptt. of Expenditure, Planning Commission and the Integrated Finance Division of the Ministry of Civil Aviation.

The pre-PIB meeting was held on 31st August, 2005 and the PIB approval was received in October, 2005.

23

With respect to the queries pertaining to traffic projections and enhancement of capacity leading to a higher market share, Air India had provided detailed clarifications regarding its traffic and market share assumptions **(Annexure - IV)."**

### H. Negotiation Process

2.26 A multiplicity of negotiating procedures was adopted with regard to the acquisition process:

- With the 'in-principle' approval of MoCA, CMD, AIL constituted a Price Negotiation Committee (PNC) in June, 2005 to hold price negotiations with the concerned airframe/engine manufacturer to negotiate the terms and conditions to be incorporated in the purchase agreement, without any commitment to the manufacturer fill the receipt of GoI approval for the acquisition project.

- According to Audit, the appointment of a price negotiating committee even before the pre-PIB meeting (let alone PIB approval) was surprising. The only possible explanation could be "expediting" the acquisition process. However, no such haste was shown till the aircraft requirements were revised upwards from 10 long range aircraft to 50 long range aircraft.

- In August, 2005, MoCA constituted an Overseeing Committee to oversee the process of price negotiations. The negotiations held between August, 2005 and November, 2005 resulted in reduction of ₹ 539 crore in the net project cost of 50 aircraft.

- After consideration of the proposal, CCEA approved constitution of an Empowered Group of Ministers (EGoM) for "one final round of negotiations" with the manufacturers to finalise the transaction; this was based on a letter by the Minister, Civil Aviation to the Prime Minister on the lines of the EGoM set up earlier in respect of the IAL acquisition. These negotiations were held on 24 December, 2005.

2.27 The composition of the various significant Committees/Agencies formed during the process of aircraft acquisition by erstwhile Air India is tabled below:—

| Committee/Agency | Date of Constitution | Composition |
|---|---|---|
| 1 | 2 | 3 |
| Techno Economic and Negotiation Committee (TENC) | November, 2002 | Shri V.K. Mehra, Director-Engineering (Engine Overhaul)<br>Shri S.V. Punhani, Director-Finance<br>Shri Babu Peter, Director-Engineering<br>Capt. M.K. Hathi, Director-Operations<br>Shri V. Srikrishnan, Director-Materials Management<br>Shri S. Lalwani, Director-Planning & International Relations |

24

| 1 | 2 | 3 |
|---|---|---|
| Price Negotiation Committee (PNC) | 16 June, 2005 | Shri V.K. Mehra, Director-Engineering (Engine Overhaul) Shri S.V. Punhani, Director-Finance Shri Babu Peter, Director-Engineering Capt. M.K. Hathi, Director-Operations Shri V. Srikrishnan, Director-Materials Management Shri S. Lalwani, Director-Planning & International Relations |
| Overseeing Committee | 18 August, 2005 | Shri C.G. Somiah, Former C&AG — one man Committee |
| Empowered Group of Ministers (EGOM) | 15 December, 2005 | Shri P. Chidambaram — Minister of Finance, Shri H.R. Bhardwaj — Minister of Law & Justice, Shri Oscar Fernandes — Minister of State (Independent Charge) of the Ministry of Statistics & Programme Implementation, Minister of State (Independent Charge) of the Ministry of Youth Affairs & Sports and Minister of State (Independent Charge) of the Ministry of Overseas Indian Affairs, Shri Praful Patel — Minister of State (Independent Charge) of the Ministry of Civil Aviation. |

2.28 Audit was of the view that it was normal and necessary to make an assessment through commercial intelligence gathered globally, to assess a reasonable or threshold price based on comparable prices paid by other buyers and other factors. However, no benchmarks for the cost of the aircraft were set (either for the AIL acquisition or for the IAL acquisition) before negotiations were initiated with the manufacturers at various levels.

2.29 While furnishing the Ministry's response to Audit observations on the issue of gathering commercial inteligence in order to arrive at the threshold price it was stated:—

> "Every attempt is made by any buyer to collect commercial intelligence globally to determine the threshold price. Benchmarks are always established in a negotiation and therefore this conclusion that there were not any, is not correct. As we will see later every attempt was made. However, to obviate and to make the process completely transparent and accountable, the Ministry requested the PMO to constitute an Oversight Committee to further negotiate and oversee the details of the procurement process. This is also rare phenomenon in the Government".

25

2.30 To the query of the Committee regarding the steps taken by the Ministry to arrive at a benchmark price, the reply submitted was:—

"No separate benchmark price was set up for the negotiation process as no industry standards are available for benchmarking the price of civil aircraft. However, the negotiations were conducted by a Committee comprising senior members of Air India under the guidance of an Oversight Committee formed by the Ministry of Civil Aviation under the Chairmanship of Sh. C.G. Somaiah. The final round of negotiations was conducted by an Empowered Group of Ministers to obtain the best possible terms from the manufacturers."

2.31 When the Committee desired to know the reasons for MoCA being unable to ascertain a reasonable or threshold price based on comparable prices paid by other buyers and other factors especially for an acquisition of this nature, it was submitted as under:—

"The reasons, for not being able to ascertain the comparable purchase price by other airlines are given below.

*Confidentiality*

The commercial terms of the sale/purchase of aircraft is always covered with confidentiality clauses just as the confidentiality clauses in Air India's purchase agreements with Boeing and other manufacturers. This makes such data of other customers inaccessible to us by any legal means.

Air India had evaluated the aircraft as per the directions laid down by the Ministry of Civil Aviation and Central Vigilance Commission.

In line with the above directives, sealed bids were invited from the competing parties by a Request For Proposal and it was stated therein that:

'You are requested to submit your best terms at this stage itself since the company's policy does not permit evaluation of offers submitted after the date of bid submission specified herein.'

Thus all the competing manufacturers were asked to submit their best terms at the beginning itself in the financial bid. After the financial evaluation was completed, the negotiations were held only with the L1 bidder - in line with the CVC's directions.

In view of the foregoing, it was not possible for Air India to obtain the commercial terms of sale to other buyers.

*Benchmarking*

It was not possible to benchmark against any previous acquisition since the type of the aircraft and volume was different. No industry standards are available for benchmarking the price of civil aircraft. Therefore no separate benchmark price was set up for the negotiation process. However, the negotiations were conducted by a Committee comprising senior members of Air India under the guidance of an Oversight Committee formed by the Ministry

26

of Civil Aviation led by none other than the former CAG Mr. C. G. Somaiah. The final round of negotiation was conducted by an Empowered Group of Ministers to obtain the best possible terms from the manufacturers.

After securing the approval of the Board for the acquisition, the Project Report along with the Board's decision was sent to CAG as well as CVC for their comments through the Ministry of Civil Aviation so as to ensure transparency before placing the order on Boeing. However, Ministry/AI was not benefited by the advice of GAG and CVC in this regard.

However, a letter.agreement was signed with Boeing which stated that the Boeing confirms that the general terms and conditions ( including but not limited to prices, financing conditions, guarantees and warrantees) granted to the AI are not less favourable when compared in its entirety and not individually than those contracted with any purchaser airline having its main base in the region, being a competitor to AI at the time of signing the purchase agreement."

2.32 Audit scrutiny revealed that AIL and AICL signed the purchase agreement with Boeing and GE/CFM on the same day *i.e.* 30th December, 2005 when MoCA conveyed approval of GoI to AIL for acquisition of 68 aircraft on firm basis (50 aircraft for AIL with GE engines and 18 aircraft with CFM engines for its subsidiary, AICL, on the basis of the terms and conditions negotiated by the EGoM), involving cash concessions and special financing concessions estimated at ₹ 1848.07 crore. To this Audit observation, the Ministry had responded that since the price offers were valid only upto 31st December, 2005, the purchase Agreements were signed on 30th December, 2005.

2.33 The Committee asked whether AIL had considered to seek an extension of time from the manufacturers as no approval was received from the Government even upto last week of December, 2005 and the Boeing offer was to expire on 31st December, 2005. To this, the Ministry informed the Committee that as the Government approval was received on 30th December, 2005, the question of seeking extension of time did not arise. It was further informed that the concerned departmental representatives from Finance, Engineering and Planning including legal advisors had held protracted discussions with Boeing to finalize the terms of the purchase agreement and the same were kept ready to be signed once the Government approval was received. Further it was added that the purchase agreement was signed on 30th December, 2005 only after the receipt of the Government's approval.

**I. Reconfiguration of Seats in November, 2005**

2.34 Audit scrutiny also revealed that during the negotiation process, the configuration of seats was revised in November, 2005 (a post-bid change):—

- The proposed configuration of seats on the B777-200LR and B777-300ER was discussed at a meeting with the then Minister, Civil Aviation on 12 November, 2005. It was decided that "in the context of the fiercely competitive aviation scenario, AIL should provide the best possible product in terms of seat comfort,

27

in-flight entertainment systems and other passenger amenities on the new aircraft". Accordingly, the seating capacities of the B777-200LR and B777-300ER aircraft were reduced by 28 seats and 38 seats respectively.

- It was also noted that the then Commercial Director, AIL had confirmed that in the Executive Class, AIL should be able to achieve a further yield increase of 5 per cent on both aircraft, provided that "there is no substantial increase in competitive pressures and all other aspects of the AI product offering meet prevailing global standards."

- The revised seat configurations were finalised and intimated by AIL to Boeing, and were only subsequently submitted for the AIL Board's information (not approval). Even the GoI EGoM was not informed (as per documents made available to Audit) of this change in seat configuration.

As regards projected increase in revenue, the preliminary analysis for the seat changes based on the methodology adopted in the Project Report indicated significant reduction in estimated passenger revenue and overall revenues, and the higher revenues were projected only by assuming additional 5 per cent yield increase in the Executive class.

2.35 On being asked to furnish the details of this reconfiguration *i.e.*, the post-bid changes in the seat configuration that was revised in November, 2005, the MoCA submitted:—

"The seat reconfiguration was decided only after the tender process got over and the L-1 was selected based on report submitted by techno-economic committee comprising of heads of Departments of the concerned departments of Air India and approved by AI Board. The revised seat-configuration did not adversely impact the profitability estimated in the project report. As a matter of fact, the profitability showed marginal improvement as a result of the reconfiguration. To clarify further, the selection process involved pre-defined like-with-like comparison of competing aircraft. Hence, further improvements were only made with respect to the already selected product *i.e.*, Boeing aircraft in this case. Comparing all the aircraft under the new seat standards would not have changed the selection as the difference in the operating economics between the competing aircraft would continue to be maintained...........

As desired, the seat configuration of the competitor Airbus fleet was estimated using the actual seating standards that were chosen for the Boeing fleet. The comparative data is briefly discussed hereunder.

*ULR* — The total seat count of 777-200LR reduced by 28 — with 4 less in F/C, 7 more in B/C and 31 less in E/Y classes respectively.

The total seat count of A340-500 reduced by 28 — with no change in F/C, 4 more in B/C and 32 less in E/Y classes respectively.

28

> *MCLR-A* — The total seat count of 777-300ER reduced by 38 — with 2 less in F/C, 12 more in B/C and 48 less in E/Y classes respectively.
>
> The total seat count of A340-600 reduced by 45 — with no change in F/C, 12 more in B/C and 57 less in E/Y classes respectively.
>
> *MCLR-B*—The total seat count of 787-8 reduced by 2 — with 6 less in B/C and 4 more in E/Y classes respectively.
>
> The total seat count of A330-200 reduced by 6 — with 6 less in B/C and no change in E/Y classes respectively.
>
> As can be seen, the reduction in seat count is similar or relatively worse in case of Airbus fleet when the changes made in the Boeing fleet are applied to the Airbus aircraft. This would have no change or adverse change in the relative profitability of Airbus aircraft."

2.36 The Ministry failed to furnish to the Committee, reasons for the erstwhile AIL not seeking approval of Government for seat reconfiguration. However, in response to an Audit enquiry regarding the same, AI had stated (August 2010) that two Joint Secretaries of MoCA were on the AIL Board and, therefore, only issues requiring approval of GoI were referred to the latter.

2.37 On being enquired whether the seat reconfiguration had an impact on the transparency of the negotiation process and the terms and conditions of the contracts with the supplier, the MoCA replied:—

> "It may kindly be noted that Boeing does not manufacture aircraft seats and the airlines are given a choice to select its seat vendor from among the approved panel of Boeing. Hence, the seat reconfiguration could not have been factored into the negotiation process or that would have an impact on the negotiations. The negotiation process focused on lowering the cost of acquisition of the aircraft and obtaining other terms of the sale. The seat reconfiguration was taken up to offer improved passenger amenities in the premium classes, such as horizontal flat beds in the Executive Class as compared to the inclined flat beds that were originally planned. At that time, it was seen that most of the premium airlines were offering horizontal flat beds and Air India had to offer a similar product to compete with such premium airlines."

2.38 While deposing before the Committee, the Strategic Business Unit (SBU) Head (MRO-Airframe), AI claimed:—

> "Basically, the reduction in seat count is very similar or relatively worse in the case of the competitor. So, we have seen all that. Basically, the seats came down because of the flat seat requirement in the business class. Looking back, we feel it is a right decision which we have taken because in business class, everybody is having flat seat. Our occupancy in business class is quite good, especially on the US route. For a 16-hour-flight, there is a need for having a flat seat."

2.39 When the Committee desired to know the assumption for further yield increase during the negotiation process, the MoCA replied that assumption of yield had no connection with the negotiation process.

29

2.40 To a specific query as to whether the changes in seat configuration were suggested by the concerned airline or the Ministry, the MoCA replied:—

".... the decision to change the interior configuration of the aircraft was taken at the airline level. In this regard, it may be noted that the seating configuration in the Business class of the aircraft were based on the seat pitch of 60 inches at the time of evaluation as well as submission of the project report in May, 2005. However, as the delivery of the aircraft were to begin in mid 2007 and beyond, it was felt that, in the context of emerging fiercely competitive aviation scenario the configuration of the new aircraft should be reviewed in order to ensure that Air India offers the best possible product in terms of seat comfort, in-flight entertainment system and other passenger amenities on the aircraft. In this direction, a decision was taken to configure the aircraft with fully horizontal lie-flat seats at 74-76 inches pitch in the executive class."

**J. Option for 15 Aircraft Dispensed with**

2.41 Audit has highlighted that till EGoM's recommendation, the fleet acquisition for AIL was premised on only 35 aircraft on firm basis, with 15 aircraft on option basis. The PIB specifically recommended acquisition of 35 aircraft on firm basis, and 15 aircraft on optional basis, with the decision for exercising the option for 15 aircraft to be taken by the AIL Board depending on the market situation. This approach was also specifically recommended by both the Planning Commission and the Department of Expenditure at the pre-PIB stage. Furthermore, it was also highlighted specifically by the AS&FA, MoCA during the PIB meeting.

2.42 Responding to the Audit observations regarding the requirement of number of aircraft the Ministry had replied:—

"...proposal of AIL and Ministry was only for 35 aircraft as against the then existing 42 obsolescent fleet 15 aircraft were to be considered as an option if required in the future. However, the EGoM opted for the full number because of the concession it would be attracting from the supplier as has been quantified by Audit itself in its report besides the 30% offsets for Boeing and 40% from Airbus which is not quantified by Audit in this report. The expansion plan also needed to figure the dynamic environment. It occurred at a time when there were non-stop services beginning to the US continent. Also it was in the background of the proposal to start a low cost airline to cater to routes in the Gulf and South-East Asia for a different clientele of the country. The LCC concept itself was a recent phenomenon worldwide and can be validated by the success of such carriers in our country. This would not have found many takers in 2004. In both proposals the airlines chose to propose its numbers. Ministry of Civil Aviation has no role in the choice of numbers and types of aircraft. It relied entirely on the assessment of the Airline."

30

2.43 On being asked to furnish the reasons for placing a firm order for all 50 aircraft, thus defying the recommendations of the PIB, Planning Commission and Department of Expenditure (DoE), the Ministry submitted as under:—

"As explained in reply to the CAG, this was evaluated in the Project Report and only then did DoE officials recommend the proposal for acquisition of 35 aircraft on firm basis and 15 on option basis to the PIB. We would like to reiterate that this assessment of growth were made by the airline and as mentioned in the Project Report, 27 of the 50 proposed aircraft were to only maintain the existing capacity and 8 were intended to cater to the growth factor with 15 kept as an option for future growth. The point still remains that it was not possible for the airline to even retain the market share without acquisition of new aircraft. It must be borne in mind that AI had 42 aircraft even in 2002- 03. Even today, in the context of the Turnaround Plan, the airline has projected a near doubling of its size — an addition of 135 aircraft to the existing complement to cater to its required share of the market.

In view of cumulative factors mentioned above the EGoM chose to place firm orders of 50 aircraft on account of discounts made available by Boeing Company as also the other investments to be made by the Boeing Company in India. Audit itself has valued these at ₹ 1800 crore approx. It does not include the value derived from the 30% of the said investment in offsets as also the $175 million investment by Boeing in MRO plus that invested in other training facilities. The EGoM successfully obtained 30% offsets in their negotiations. All of these form part of the assets invested as a result of this project. These also need to be evaluated and form part of the calculation. It must also not be overlooked that the project evaluations were scrutinized by the Planning Commission and PIB and also the monetary value of the benefit derived out of capping of escalation by the EGoM."

**K. Financing of Acquisition**

2.44 The Committee were informed that due to delays of 117 to 331 days in providing GoI guarantee, AIL and AICL had to avail bridge loans as a stop-gap arrangement to make necessary pre-delivery payments. Since these bridge loans carried a higher rate of interest than that envisaged, AIL and AICL paid additional interest of ₹ 199.37 crore and ₹ 21.34 crore respectively.

2.45 Clarifying that there was no direct role of GoI in financing this acquisition, the Secretary, MoCA deposing,before the Committee stated that :—

"The second point that I wanted to clarify was that directly there was no financing from the Government. The company came to us only for Government guarantee because Government guarantee provides, certain level of comforts to the bankers. So, the Government did not have any direct financing role in this. They only came to us for Government guarantee and we provided it."

2.46 On the aspect of financing of acquisition of new fleet, Director (Finance), Air India in his deposition before the Committee added as under:—

"Traditionally, Air India has not received much equity at all in the past. Air India's equity prior to the merger was hardly ₹ 153 crore, though we have

31

been expanding from our own resources. We have not received any support from the Government in equity form at all. In this case, it was a massive expansion spreading over nearly ten years. Before the merger, we had nearly 34 or 35 aircraft fleet. We today have only 20. We still have not been able to replace it from aircraft to aircraft. The Government said that the equity was not possible. A Kelkar Committee was also set up at that time in order to look at both the organization so as to infuse equity in the company because we have never asked for equity and the Government also, because of so many priorities, could not bring in equity into the company. So, all financing in the past up to 2005 were mainly done due to internal resources. Whatever we used to generate we used to repay the aircraft loans and there was no budgetary support to Air India. Only after that when we acquired this particular aircraft, the Government agreed to give a Government of India Guarantee. In fact, we had asked for some equity in our project of about ₹ 2000 crore. But the Government said that since we are giving you a guarantee, you should raise it at a very reasonable cost. That is the reason why and fortunately for us, the US Export-Import Bank (Exim) Bank agreed to give a guarantee and the Government of India gave a counter guarantee and we were able to raise it at a very low cost. The interest cost was very low. Why we have got into this debt trap is mainly because of this fact."

2.47 When specifically asked about this aspect of delay in providing GoI guarantee which cost the company ₹ 220 crore, the Director (Finance), AI, further deposed as:—

"As far as your question on the delay in the Government of India guarantee is concerned, what happens is when the aircraft are ready, we have to acquire the aircraft. We have to raise a bridge loan. So, this bridge loan comes to us at a higher cost - LIBOR plus 400 basis points or something whereas the US Ex-IM loan comes at a very low cost - LIBOR plus 24 or 40 or 50 basis points. So, there is a huge differential cost. It is below 100 basis points. So, we follow up with the Government frequently in saying that it has to give the guarantee on time. If the guarantee is available with the delivery of the aircraft, then, the guarantee can be substituted and Ex-IM financing can be taken. We can avail of this facility at a very cheap cost. But, during the first phase of acquisition, there was a delay in the giving of the Government of India guarantee. It may be due to the fact that the headroom was not available to the Budget. The Government of India has also the Fiscal Responsibility and Budget Management (FRBM) Budget which is equal to 0.5 per cent of the GDP. More than that, they cannot give the guarantee. Though we had told the Government that these aircraft would be coming during that particular period of time, yet the Government did not have the Budget to give. There was a delay. Because of the delay, we had to pay a higher interest to these institutions. As and when the guarantee was available, we substituted and refinanced the entire loan at a lower cost. That is the reason why we had to pay ₹ 199 crore additionally."

32

2.48  Asked to state categorically if any analysis was carried out by AI management regarding the delay in providing GoI guarantee and Al's lack of foresight in this regard, the MoCA in its written note submitted as under:—

"In December, 2005, Air India (AI) signed a Purchase Agreement with Boeing for purchase of 50 aircraft. The GoI had committed to provide guarantee for acquisition of 50 aircraft. AI received Exim Bank's Final Commitment to finance the first 7 aircraft and 2 spare engines in September, 2006 and Preliminary Commitment to finance the balance aircraft.

As per terms at which Exim agreed to support the financing, GoI guarantee in favour of Exim Bank was one of the conditions. AI wrote to Ministry of Civil Aviation in September, 2006 requesting MCA to approach Ministry of Finance for the GoI guarantee. Various meetings were held between officials of MoCA/ MoF/AI explaining the Exim guarantee lease structure. After approval of the MoF, documents (running into more than 100 pages) were submitted to MoCA which in turn forwarded the same to Ministry of Law and Justice for vetting. On receipt of clearance from Ministry of Law and Justice, the guarantee was issued by MoCA October, 2007.

In the meantime, delivery of the aircraft as per scheduled delivery dates started from July, 2007 and AI had no option but to take delivery of the aircraft as per the contracted delivery dates using interim financing arranged through various Banks. Exim financing counter guaranteed by GoI is the cheapest source of funds available since the guarantee of Exim Bank is equivalent to US Government which is rated as "AAA" in the financial markets.

As Exim financing could not be concluded by the time of delivery of these aircraft, AI took delivery of these aircrafts using Bridge financing. After receipt of GoI guarantee in October, 2007, AI expeditiously concluded the "Exim financing and drew down from the Exim facility and repaid the Bridge facility."

**L. Delayed delivery of aircraft**

2.49 As per the information furnished by the Ministry (dated 3.9.2013), against the 50 aircraft to be delivered, only 28 aircraft (8 B777-200LR, 12 3777-300ER and 8 B787-8 aircraft) have been delivered so far; delivery of the remaining 3 B777- 300ER aircraft was deferred at the instance of AI in 2009. The Committee have now been informed that the remaining 22 aircraft (3 B777-300ER and 19 B787-8) have been scheduled to be delivered by December, 2016. As regards compensation for delayed deliveries, MoCA stated (February 2011) that after negotiations, Boeing had agreed for compensation, which worked out to nearly $ 500 million and that the matter was further being discussed with Boeing.

2.50 On the issue of current fleet strength of AI, the Director (Finance ), AI deposed before the Committee as under:—

"This 18 aircraft is for the 737 for the low cost. As far as the wide body aircraft is concerned, we ordered 50 aircraft at that particular point of time. Till now only 20 aircraft have come because there is a delay. Three aircraft of 737 have

33

been deferred at the instance of the Air India to 2014 because we thought that let us first utilise this fleet to the maximum extent. So, we have told the Boeing to defer their aircraft.

Now, the 787 aircraft has not yet come in. So, the 787 aircraft will start coming sometime in March of this year (2012). It is proposed that when the 787 aircraft comes in, we would have a re-look. It is a fuel- efficient aircraft. Airport operators like ANA are already using it. They say it is 20 per cent more fuel efficient than its competitors. When this aircraft comes, then, we will have a re-look at all the routes in which the aircraft have to operate because these are some of the routes which are making losses which can be substituted with the 787 aircraft. About those aircraft which are rendered surplus as a result of it, we may think of leasing them out or giving back so that we will trim the fleet size according to these things. So, the idea is that the ,787 aircraft induction will be implemented. Whichever aircraft we feel is going to be rendered surplus on the routes in which we are losing, we can give back those aircraft."

2.51 As per the information furnished by the Ministry, AI, as of September, 2013, acquired 8x B777-200 LR and 12 x B777-300 ER aircraft. Explaining the reasons for deferring the delivery of 3 B777-300 ER aircraft the MoCA stated that:—

"Air India has deferred the last 3xB777-300ER aircraft. These aircraft were to have been delivered in 2010-11 and 2011-12. After the onset of the economic recession in late 2008, traffic was on the decline and many airlines were adopting the strategy of reducing capacity and operations to reduce the impact of recession. Air India had undertaken restructuring of its existing operations including reduction of operations in an attempt to curtail losses. Additionally, the Board directed Air India Management to explore the possibility of deferment/cancellation, of new aircraft induction to reduce the burden of loan repayments. The proposal for deferment of the B777s was made at Air India's Board meeting held in June, 2009, based on a Board's directive to evaluate the cost of deferment, *vis-a-vis* the cost of taking delivery of the aircraft. While the Board directed that Air India should cancel or defer the deliveries of the last 6xB777-300ER aircraft, Air India was in a position to defer the delivery of the last 3 aircraft since the other 3 aircrafts were already in production and deferment of the same was not possible. The revised delivery dates for the last 3 aircraft proposed by Boeing are now scheduled for 2014-15."

2.52 Deposing before the Committee on the issue of deferring the delivery of 3 B777-300 ER aircraft, SBU Head MRO (Airframe) submitted that:—

"The market did change. We started feeling the burden of interest and all that. We thought that it is the right time not to have more debt on us; let us postpone getting those three aircraft; let us get more 787 aircraft before we can take these three aircraft."

The witness further added:

"Because of the delay in the 787 delivery, we thought that let us get the right aircraft for the medium-haul routes; let us not have the three aircraft coming

34

in and adding to our burden. We have considered this that let us not have it at that point of time."

2.53 To a specific query of the Committee regarding compensation for delayed delivery of the aircraft, the MoCA stated as under:—

"As per the purchase agreement, the B787 were to be delivered from September, 2008. There has been a delay in delivery of these aircraft by more than three years.

As far as the subject of B787 delay compensation is concerned, the purchase agreement includes terms for compensation up to a maximum of 180 days: However, due to the considerably longer delay, discussions with Boeing have been in progress to enhance the level of compensation beyond that is provided for in the Purchase Agreement. In March, 2011, Boeing has submitted a proposal for settlement of B787 delay compensation. The same was put up to the Board for their consideration and the Board has constituted an Overseeing Committee to look into the matter. The compensation package from Boeing is in advanced stage of negotiation.

As such, the delay does not amount to a breach of contract as the terms for delay compensation including an option for termination of the  contract, on account of delay beyond 180 days, are included in the Purchase Agreement."

2.54 A copy of the Restricted Letter Agreement 6-1166-DJG-776 on the subject 'Liquidated Damages-Non-Excusable Delay' in the Purchase Agreement Number 2998 between the Boeing company and erstwhile Air India Limited relating to Boeing Model 787-837 Aircraft is attached as **(Annexure -V)**. As per Clause 1 of this Restricted Letter Agreement, the amount of liquidated damages to be paid by Boeing for each day of Non-Excusable Delay in delivery of aircraft was to be calculated according to an approved formula on the basis of the data in the most recent AVMARK publication at the time customer received notice of a non- excusable delay from Boeing. The formula that was to be applied was:

$$\frac{\text{AVMARK average for the newest and oldest lease rates (for the model aircraft)}}{30 \text{days}}$$

and this was rate per day.

2.55 With reference to this clause of the Purchase Agreement the Committee sought details of the formula chalked out for calculating liquidated damages to be paid by Boeing for each day of Non-Excusable Delay in delivery of aircraft. According to the Ministry AVMARK is a monthly international Aviation publication that provides details about the prevalent lease rates for old and new models of different aircraft types operating in the global aviation market. The lease rates were based on reported transactions and on AVMARK's experience in consulting, appraisal and fleet evaluation. As per the agreement, Boeing was liable to pay Customer liquidated damages for each day of Non-Excusable Delay (collectively the Non-Excusable Delay Payment period) at a rate to be determined as per the liquidated damages formula. The AVMARK average for the newest and oldest lease rates for the model of aircraft being delayed

35

would be divided by 30 days to determine the rate per day. In no, event the amount paid would exceed an aggregate sum of 180 days of the rate per day. The AVMARK publication was subject to subscription. Hence, during the beginning of the delay compensation estimation in late 2008, Air India had used date from a similar publication 'Aircraft Fleet & Network Management' which also tabulated the lease rates of various types of aircraft. As B787 lease rates were not available at that time, the lease rates of a comparable aircraft *viz* A330-200 was used.

Dry Lease rate of oldest aircraft = USD 0.590 million per month.

Dry Lease rate of newest aircraft = USD 0.880 million per month.

The Average lease rate was USD 0.735 Million per month or approximately USD 25,000 per day. As the B787 was a more modern aircraft than the A330-200 it was envisaged that a higher lease rate to the tune of USD 30,000 per day would be realized for the B787 aircraft. Thus for an average daily lease rate of USD 30,000 per day, the compensation payable was USD 30,000 multiplied by 180 days and would work out to USD 145.8 million (*i.e*. 27 multiplied by 5.4).

The definition of the term Excusable Delay, as submitted by the Ministry, was any delay in scheduled delivery month of aircraft caused by the term (i) Acts of God; (ii) War or armed hostilities; (iii) Government acts or priorities; (iv) Fire floods or earthquakes; (v) Strikes or labour trouble causing cessation, slowdown or interruption of work; (vi) Inability, after due diligence, to produce materials, systems, accessories, equipments or parts: (vii) Inability, after due diligence, to obtain type certification; and (viii) any other cause beyond Boeing's control and not occurred by Boeing's fault or negligence. Whereas, delay in delivery of any aircraft beyond the last day of the delivery month (Scheduled delivery) as per the purchase agreement by any cause that is not covered under the definition of Excusable Delay  was termed as Non-Excusable delay.

2.56 The Ministry further clarified that based on the definition of Non-excusable delay, the delay in the delivery of dreamliner aircraft by Boeing was in the category of Non-excusable Delay'. When asked to intimate the number of dreamliner aircraft that were delivered by Boeing to Air India, the Ministry failed to furnish the said information.

2.57 Furthermore, when the Committee called for the latest factual position regarding dreamliners being grounded since January 2013, on the directions of US Aviation regulator following ,battery-file problems, as highlighted in various media reports, the Ministry submitted its response to the Committee as:—

"Air India had grounded all of its 6 B787 aircraft since 17.01.2013 following a directive of DGCA that was based on Federal Aviation Administration (FAA), USA, Emergency Airworthiness Directive (EAD) dated 16.01.2013 which required all B787 operators to temporarily ground the aircraft, subsequent to fire incident reported on aircraft operated by JAL (Japan Airlines Ltd.) and ANA (AI Nippon Airways) caused by malfunctioning of Lithium-ion battery.

Investigations by US NTSB (National Transportation Safety Board) in coordination with Boeing and concerned regulatory authorities were initiated to establish the root cause of problems and to develop a mitigation plan.

36

A modification plan was submitted to FAA for approval which included modifications to the affected components of the aircraft such as battery, battery charger, etc. FAA approval to the modification plan (Service Bulletin) was received on 26 April, 2013.

In order to restore B787 aircraft back to service, Boeing AOG team had arrived in Mumbai-Engineering facility and commenced work on the first aircraft on 30th April, 2013, to accomplish the Boeing Alert SB. The task has been accomplished and all six aircraft were positioned at Delhi."

2.58 On being asked if there were any in-built clauses to safeguard the interests of the Airlines in the event of technical problems arising after the delivery of aircraft, as was seen in the instant case, the Ministry replied:—

"In the contractual agreement, Boeing warrants that, at the time of delivery all Boeing products will be free from defects in materials, process of manufacture and workmanship, including the workmanship utilized to install suppliers products, engines, etc. The agreement also warrants that all Boeing products will be free from defects in design, including selection of materials and process of manufacture in view of the state of the art at the time of design. In case of B787 aircraft such warranty is applicable for a period of 48 months after delivery.

As per Clause 7.3 of the Warranty, Boeing will reimburse Customer's reasonable costs of Direct Materials and Direct Labour by credit memorandum (excluding labour hours expended for overhaul) at Customer's Warranty Labour Rate to correct defective Boeing products.

As per clause 7.3.5, Boeing will reimburse Customer's freight charges associated with a Correction of a defect on a Boeing product performed by its Authorized Agent or a third party contractor."

2.59 When queried if the Ministry sought any compensation from Boeing for losses incurred by Air India due to grounding of dreamliner aircraft, the Ministry stated as under:—

"In line with standard warranty terms offered by all the manufacturers, there is a clause in the Warranty which specifics that Boeing will not be liable for any consequential or other damages due loss of use, revenue or profit due any fault in the aircraft.

However, it may be pertinent to mention that at the time of agreement, the situation of grounding of the entire fleet of newly inducted dreamliners and that too for a prolonged period was not foreseen or taken into account. This matter, therefore, needs to be dealt with separately outside the purview of the Purchase Agreement/Warranty. Accordingly, the matter of compensation for losses suffered by Air India on account of the grounding has been taken up with Boeing.

37

A three member Committee comprising heads of Engineering, Finance and Commercial has also been constituted by the Board. during its 52nd Board meeting held on 7th May, 2013, to negotiate on the matter of compensation to be provided by Boeing on account of the prolonged grounding of these aircraft and consequent damages suffered by Air India."

# CHAPTER III

## ACQUISITION OF AIRCRAFT BY ERSTWHILE INDIAN AIRLINES LIMITED (IAL)

### A. Overview

In February, 2006, the erstwhile Indian Airlines Limited (IAL) signed purchase agreements with Airbus/CFM for supply of 43 Airbus aircraft (with CFM engines) at an estimated cost of ₹ 8399.60 crore:—

- 19 A319 air craft (seating capacity of 122);

- 4 A320 aircraft (seating capacity of 140); and

- 20 A321 aircraft (seating capacity of 172).

### B. Chronology of events

3.2 The last fleet expansion of IAL was completed in 1994, with the induction of 30 A320 aircraft over the period 1989-94. A chronology of events related to the acquisition of aircraft by the erstwhile IAL is given in **(Annexure-VI).**

3.3 Deposing before the Committee, SBU Head — MRO (Engine & Components) gave a brief background on IAL's acquisition process as:—

"The last acquisition made by us, prior to merger, was in 1989-90 for 31 aircraft A320 type. 19 of them were taken in 1989-90 period and the remaining 12 are taken in 1993-94 period. By the turn of the century, these aircraft were becoming older. The earlier ones were already about 12 years old. New technology was coming into the picture. It was more passenger friendly with better cabin ambiences and in flight entertainment system. Also, from the point of view of avionics development which had taken place, aircraft are also becoming more and more fuel efficient. It was time to acquire the newer fleet, because of the growth that was occurring on the commercial 'side. So, it was time to acquire more number of fleet.

... the Government had set up Dr. Vijay Kelkar Committee which had mentioned that in case we do not induct aircraft, then our market share will reduce from almost 100 per cent to 11 per cent. This report was considered by the Government in 1995 and in May, 1999, with the plan of giving equity of about 325 crore to the erstwhile Indian Airlines, it was decided that acquisition of aircraft should be carried out to capture and retain its market share. So, the Indian Airlines carried out the necessary studies. In February, 2000, the Board approved the methodology and parameters. The offers were invited from the manufacturers. But at that point of time, the disinvestment issue started with the Indian Airlines.

38

39

Later on, after the study we were given a go ahead that at least we can call for the Request For Proposal (RFP) that may request for proposals from the manufacturers in December, 2001 for the acquisition of the aircraft as a study. In March, 2002, our in-house Committee analysed the offers and submitted its recommendation of 43 aircraft A320 type to the Board."

**C. Undue time taken for acquisition**

3.4 The IAL's aircraft acquisition process took almost ten years from October, 1996 (when an inhouse aircraft evaluation Committee was constituted) to February, 2006 (when the purchase agreements were finally signed with Airbus and CFM).

3.5 Asked to comment on the unduly long time taken for the IAL's aircraft acquisition process, the MoCA submitted as under:—

"The 43 aircraft project was first submitted to the Ministry on 19th April, 2002. It was considered in two meetings of pre-PIB on 25th April, 2003 and 12th June, 2003. Thereafter, in discussions with the MoCA on 12th July, 2004, in connection with widebody aircraft requirements of IA, the Ministry advised that IA should consider its impact on the 43 aircraft acquisition before it is processed further. IAL considered all such aspects and re-submitted the proposal which was duly considered by the Ministry on merits and processed it further."

**D. Flawed underlying assumptions**

3.6 Audit pointed out that the Net Present Values (NPVs) of fund flows of all the considered sets of aircraft (including the L-1combination of Airbus aircraft) were all negative, even assuming constant cost and revenue yield at 2001-02 levels. In March, 2002, IAL had projected an increase of 6 per cent in domestic fares in the first year (2003-04), with further annual increases of 2 per cent for four years (2004-05 to 2007-08) evidently to make the negative NPV Positive.

3.7 When qurried by the Committee, the Ministry failed to provide details of actual increase in domestic fares worked out to be for the period 2003 to 2008 and its difference from the increase projected by IAL. 05 to 2007-08), levidently to make the negative NPV positive.

3.8 According to Audit, in practice, IAL was obviously unable to achieve such dramatic increases in yield at constant costs:—

• Besides dramatic increases in fuel and staff costs, the actual increase during 2007-08  on 10 domestic routes test checked by Audit was only due to fuel surcharge and not due to any increase in the basic fare.

• The percentage of cost to revenue increased from 99 per cent in 2004-05 to 152 per cent in 2009-10.

• During the period from 2006-07 (when aircraft delivery commenced) to 2009-10, the total revenue declined by 25 per cent from ₹ 7,196 crore to ₹ 5,372 crore. In fact, when IAL increased the basic fare in 2008-09 by 21 per cent, Passenger Load Factor (PLF) dropped by 8.65 per cent and revenue declined from ₹ 7,196 crore to ₹ 5,564 crore.

40

3.9 On being asked whether the NPV of all sets of aircraft were accurately projected, the MoCA submitted as under:—

"The Airbus acquisition project study initially was based on the then prevailing yields in September, 2001 on IC network i.e. ₹ 4.23/Revenue Passenger. Kilometers (RPK) for Domestic sectors and ₹ 4.10/RPK for International Sectors. At the said yields NPV at 8% discount factor p.a. was coming negative for all the sets (different combinations of aircraft under consideration). Therefore a fare increase on domestic sectors at 6% effective 2003-04 and thereafter 2% every year till 2007-08 *i.e.* year of final induction was assumed as the same was considered reasonable. After factoring in the fare increase, the IRR of the project was worked out to be 9% on a stand-alone basis. The first aircraft-(A319) was inducted in October, 2006. The second and subsequent aircraft inducted from June, 2007 and onwards till April, 2010."

- The actual yields on IC network were as given below:

| Financial Year | per RPK |
|----------------|---------|
| 2006-07 | 4.10 |
| 2007-08 | 3.75 |
| 2008-09 | 4.41 |
| 2009-10 | 4.41 |
| 2010-11 (Prov.) | 4.42 |
| 2011-12 (April-September, 2011) | 5.02" |

3.10 As regards the actual increase in revenue yield since the acquisition of the aircraft, the MoCA submitted as under:—

In the Project Report for 43xA,320 family aircraft prepared in April, 2002, the passenger revenue yield was based on September 2001 actual achieved yield *viz*. ₹ 4.23 per RPK for domestic operations and ₹ 4.10 for international operations.

The actual achieved yield year wise from 2005-06 is given below and it will be noted that except for the year 2007-08, the yield has been close to the Project Report assumption.

| Year | Yield ₹/Revenue Passenger Kilometers for Narrow body aircraft |
|------|---------------------------------------------------------------|
| 2005-08 | 4.36 |
| 2006-07 | 4.13 |
| 2007-08 | 3.75 |
| 2008-09 | 4.41 |
| 2009-10 | 4.14 |
| 2010-11 | 4.18 |

41

3.11 Further asked to state whether the achievements supported the projected cash flows, the MoCA responded:—

"It may be stated that the assumptions in the project report were based on the competition, market conditions, past and expected traffic growth, expected induction of capacity by competitors, etc. The actual achievements may therefore vary from the assumptions in the project study. It may also be indicated that when the aircraft were evaluated the share of the Low Cost Carrier (LCC) market in India was below 10%. This has now grown to nearly 70% as of date resulting in dilution of yields of the full service carriers like AI."

3.12 In a subsequent written submission, MoCA elaborated on the emergence of Low Cost Carriers (LCC) and their position *vis-a-vis* Full Service Carriers (FSC):—

"Low Cost Carriers (LCC) and Full service carriers have been in existence over the past few decades in USA and Europe / UK. Low cost carriers came into existence in Asia/India during the last decade. With the advent of low cost carriers in different markets across the globe, Full Service carriers (FSC) and LCC have been co-existing: each serving the distinct needs of different segments of air travellers.

While LCC have focused on offering no frill services at low fares for point to point travel on all economy aircraft with dense seating from/to secondary airports, FSC have relied on attracting traffic through wider connectivity through busy hub airports, offering dual class on more comfortably configured aircraft even in the economy class, with additional product features such as frequent flier programmes, through check-in, code shares, airport lounges, in-flight entertainment, etc. LCC have generally built their competitive strategy around the following typical practices, which yielded significant reduction in operating costs over FSC:

- Higher aircraft utilisation through shorter turnaround times, enabled by unique cabin services culture & limited on board services and extended window of operations.
- Denser seating in a single class configuration, the typical seat pitch is in the range of 29 inches against 30-32 inches adopted by FSC in the economy class.
- Operations from secondary airports with lower user charges & holding times.
- Distribution strategies aimed at cutting sales agency commissions & GDS costs.
- No frill services.
- Earning ancillary revenues as well as charging for services that are offered complimentary as part of the full service product."

3.13 The Ministry further stated that the Indian LCCs had not been in a position to adopt all the competitive strategies mentioned above because there were no secondary airports in the vicinity of major hub airports in India, relatively limited

42

Internet penetration, pre-dominant share of corporate traffic and concomitant expectations regarding service levels, congestion at metro airports leading to long holding times and slot restrictions which directly impact aircraft utilization. Hence, admittedly, the competition between LCC and FSC in India has been perhaps more intense than elsewhere.

3.14 Apprising the Committee of the measures taken to improve the co-existence of LCC and FSC in the country, the Ministry stated that:—

> "In order to address this situation, the FSC competitors of AI in India have launched their own LCC either as a distinct brand — example Jet Airways / JetLite inventory holding out inventory as 9W and S2 respectively; or carved out some of the capacity within the same brand to operate on the LCC model— example Jet Airways (Jet Konnect inventory commonly held out as 9W & King Fisher/King Fisher Red inventory commonly held out as IT.

> AI too has planned to convert 14 of its old A 320 aircraft currently in two class configuration having 20 business and 125 economy class seats into all economy planes having 168 economy class seats in all which would help in reducing the cost per seat by about 15% so that AI would be better equipped to match the low fares offered by the LCC and thereby capture a larger share of this segment.

> With regard to the strategies adopted by AI and other Indian FSC to counter the competition from LCC it may be stated that all these airlines have strategized to increase aircraft utilisation through extended window of operations and reduced ground times through more efficient airport systems, strong hub operations, expanded Frequent Flyer Programme (FFP), greater focus on web sales and rationalisation of In flight meals."

**E. Concerns within MoCA and other appraising agencies**

3.15 Audit examination highlighted that concerns regarding potential difficulties of IAL in successfully funding the acquisition process with a positive NPV had been raised within MoCA, but were ignored. The then AS&FA, MoCA, clearly noted his serious reservations at the PIB Meeting (November 2004) on the acquisition proposal:—

- The basic study for induction of aircraft was done in the late 1990's, and subsequent increase in the capacity by the private operators had increased the competition significantly, thereby undermining the basis of the study.

- In the airline industry, it was a standard practice to keep a few options, which may or may not be exercised.

- While there could be an increase in the international and domestic traffic, the share of IAL in such traffic may not be of the same order, leaving the aircraft sub optimally utilised.

- Both direct and indirect operating costs of IAL were phenomenally high. Unless efforts were taken to reduce cost, all revenue and cost calculations would go awry, thus, undermining the entire exercise of acquisition.

43

Subsequently, in March, 2005, he reiterated that "As regards the financial viability of the acquisition, it appears... that in all probability, this project is not going to be financially viable. The project has assumed Aviation Turbine Fuel (ATF) rate of 2001, whereas the present rate is much higher, if we take into account the present ATF rate, there will be much less returns as compared to those reflected in the Cabinet Note."

AS&FA's note also made two other important points:—

- There were only two major players — Airbus and Boeing, but negotiations with only L-1 were permissible— under CVC guidelines (hence not much concession could be obtained from Airbus); hence, there was a need to evolve new procedures with limited players in the field, so that maximum benefit could be obtained for Government;

- It was difficult to obtain information regarding sale of aircraft to other airlines in India due to confidential contractual arrangements, and hence, it was desirable to strengthen economic intelligence by GoI.

3.16 In this context, the Committee wanted to know the specific attempts made by MoCA/IAL to address the concerns of the appraising agencies. MoCA in its reply stated:—

> "As per records available, for the 43 Aircraft Project Report, 2 pre-PIB meetings were held in April, and June, 2003 respectively. The final PIE meeting was scheduled for Jan. 2004 but was subsequently held in Nov., 2004. All the queries raised by the agencies mentioned in the questions *viz*. AS&FA, MoCA, Planning Commission and DoE were addressed in the document submitted for the final PIB meeting".

3.17 The Committee further sought reasons for not reconsidering the acquisition proposal given the fact that there were concerns raised from many quarters *i.e.* the Planning Commission, the Department of Expenditure and within the Ministry itself. In reply, the MoCA stated as under:—

> "The 43 aircraft project was first submitted to the Ministry on 19th April, 2002. It was considered in two meetings of pre-FIB on 25th April, 2003 and 12th June, 2003. Thereafter, in discussions with the MoCA on 12th July, 2004, in connection with widebody aircraft requirements of IA, the Ministry advised that IA should consider its impact on the 43 aircraft acquisition before it is processed further. The impact of widebody aircraft was considered in the following view points:—

> (a) Need to consider induction of A-321 — which had 172 seats, comparable to widebody medium/long range aircraft—and review the consequential requirements of revised nos. of A319 and A320, if a widebody aircraft is leased-in by IC.

> (b) The analysis of alternate fleet solutions for existing bids in the light of above course of action, if adopted.

44

> The in-house evaluation committee examined in detail and concluded that no useful purpose will be served to de nova examine the fleet replacement project, as widebody aircraft induction plan is for medium to long range international operations and does not in any way obviate the requirement of 43 aircraft out of which 70% is for replacement capacity. The requirement of widebody aircraft as proposed to be met by induction of leased capacity only on a standalone basis. Thus, Ministry did send the proposal back to IAL with the advise to analyse and consider the impact of the acquisition of 43 aircraft. IAL considered all such aspects and re-submitted the proposal which was duly considered by the Ministry on merits and processed it further."

3.18 The Planning Commission and the DoE raised concerns on several key and critical issues at different stages (initial stage, pre-PIB meetings, and PIB meetings) but finally concurred with the acquisition proposal at the time of the submission of the CCEA note. The main concerns of the Planning Commission at different points of time are summarized below:—

- In the pre-PIB meetings, IAL clarified that the increase in capacity would be around 30 per cent, and 70 per cent of the capacity was towards replacement. The Planning Commission's representative indicated that new accretion to capacity had to be viewed with great circumspection, and suggested that IAL should consider purchasing only 28 aircraft at this stage, and the rest in Phase-II, after reviewing the situation, depending on the growth of traffic.

- The aircraft requirement, at least for international routes, could be reduced, as it would be appropriate for IAL and AIL to chalk out a common strategy for their international operations, as they were competing with each other along with other international airlines on some international routes. Further, although IAL was envisaging expansion of international operations to increase its market share, private airlines were also being permitted to operate to neighbouring countries.

- The company was incurring losses in the last three years, and it was necessary to evolve a suitable strategy for funding the proposal to avoid time and cost overrun. Further, operating more aircraft to compete with the private sector might lead to further deterioration of IAL's financial position.

The main concerns of the Department of Expenditure (DoE) at different stages are summarised below:

- It would be prudent to go in for some options, rather than placing orders for all 43 aircraft on a firm basis, as the projected fare hikes and load factors on international sectors might not materialize in the competitive market scenario.

- The acquisition project had negative NPV at constant price for all combinations. Further, the project envisaged 6 per cent increase in fares during the first year of induction, and 2 per cent p.a. thereafter for four years. Since these projections were made in March, 2002 and fares upwardly revised since then, further hikes might not be possible in the present market scenario. The financial bids were

45

around 3 years old and it was likely that during that period the prices may have softened. Therefore, a question might arise why fresh bids should not be invited.

- The pressure of competition was much more intense on international sectors than in the domestic sector, with more bilateral rights being granted in these sectors and the possibility of other domestic scheduled operators being granted international rights. Consequently, the projections of load factors on international sectors may not materialize in the long run.

- The financing pattern *i.e.* the mix of rupee and foreign exchange debt, need for Government guarantee, etc. would also have to be considered.

3.19 In the PIB meeting of November 2004, MoCA and IAL justified the projections in the Project Report on the following grounds:—

- Adoption of 8 per cent Internal Rate of Return (IRR) was appropriate, as the earlier rate of 12 per cent was a very old historical figure when the interest rates were very high.

- Fare increase may not be really difficult in the present scenario.

- The capacity addition was justifiable, as the market was growing at a rate of 7.8 per cent p.a. over the 2000-01 level, and the annual growth projection of 5 per cent in the 10th Plan was on a conservative side.

- Market share of IAL would be directly related to its capacity share.

- The proposal to permit domestic carriers to fly on domestic and international routes had been duly considered.

3.20 As per Audit, despite an increase in fleet strength from 67 aircraft (March, 2005) to 97 aircraft (March, 2009), IAL's market share declined precipitously from 37 per cent in 2004-05 to 16.9 per cent in 2008-09, and only increased marginally to 17.7 per cent in 2009-10.

3.21 In the light of the above and the fact that the increase in fleet had not resulted in any dramatic improvement in commercial performance of IAL, the Committee asked the Ministry to furnish the reasons for making flawed assumptions in the project for aircraft acquisition. The Ministry in its reply submitted as:—

"Erstwhile Indian Airlines had a fleet size of 68 aircrafts in FY 2005, from which 11 old B737-200s were being operated under the Alliance Air code for regional operations. Indian Airlines was also operating international services to the Gulf, S.E Asia and SAARC countries and more than $\frac{1}{3}$ rd of the capacity was deployed on these international services. Erstwhile IC's market share was 37.1% in the year 2004-05, with competition from three other domestic airlines. Over the next 5 years period up to 2010-11, three more domestic airlines commenced operations, thereby increasing the capacity and competition in the domestic market. The other airlines steadily increased their capacity share at the expense of IC, since IC was not able to match equivalent

46

capacity induction, to retain its capacity share at the level of 2005-06 which was 32%. In airline industry, the thumb rule of higher capacity share leading to higher market share reflected in IC's decline in the market share, in view of its inability to retain its share of capacity — with seven other airlines competing on mostly the same routes. The new airlines also operated Airbus aircraft which resulted in poaching of licensed employees like pilots and engineers. Combined with this problem, erstwhile Indian Airlines had also started the process of return of the leased aircraft, consequent to new aircraft induction.

The table below gives year-wise capacity and market share of erstwhile IC and the present Air India's domestic operations:——

| Year | Air India's Capacity Share (%) | Air India's Market Share (%) |
|---|---|---|
| 2004-05 (erstwhile IC) | 41.8 | 37.1 |
| 2005-06 (erstwhile IC) | 32.1 | 28.2 |
| 2006-07 | 22.8 | 20.3 |
| 2007-08 | 18.7 | 17.9 |
| 2008-09 | 17.2 | 16.9 |
| 2009-10 | 17.2 | 17.9 |
| 2010-11 | 16.8 | 17.1 |

From the Project Report submitted by erstwhile Indian Airlines, it is seen that traffic trends for the period 1993-94 up to 2000-01 were examined and future projections for growth were based on the recommendations of the Government's Working Group on the Civil Aviation for the 10th Plan period. From the Project Report, it is seen that projections and market growth estimates, up to the year 2007-08 were considered. The average annual growth rate assumed in the Project Report for the domestic market was 5% and for the international market was 6%. The actual growth experienced was in the range of 12% to 44% during the period 2005-06 to 2010-11, except in the year 2008-09, which experienced a decline in the market due to recession.

The assumption for seat factors in the Project Report for the various set codes were in the range of a minimum of 60% and a maximum of 67%. The actual seat factors experienced in the domestic operations from the year 2005-06 are also above 60%, except for 2008-09 which was the year of recession. It can be concluded from the data above that the assumptions of yield and load factors were not flawed since the actuals are close to/or higher than the assumptions. However, a quantum increase in the competition led to dilution of traffic for Air India and an increase in the input costs contributed to the decline in profitabilities.

47

As detailed in the Project Report, the year-wise fleet size envisaged from 2003-04 to 2007-08 was 62 increasing to 73 in 2007-08. With new aircraft induction, erstwhile IC had phased out its old aircraft. 18 leased A320 aircraft have already been returned to the respective lessors. Five A319 and two A330 aircraft on lease are in operation and due for return in the year 2014.''

3.22 To a pointed query of the Committee with regard to the erstwhile IAL management not revisiting the aircraft acquisition proposal, the MoCA replied that the 43 aircrafts proposal submitted by erstwhile Indian Airlines (IC) was discussed in the Ministry. Further, from the Minutes of the Meeting held on 12th July, 2004 it was evident that the Project Report for 43 aircrafts was already submitted to the PIB for consideration and Indian Airlines was asked to review its fleet plan in the context of its present operations and future plans. While Indian Airlines kept its 43 aircrafts requirement unchanged, the file records had a reference to a sensitivity analysis undertaken by the in-house evaluation committee to evaluate options for removing A321 which had a seating comparable to a widebody seating and replacing it with either A319 or A320. This evaluation was undertaken in view of IC's future plans of increasing its international operations which would requrre widebody aircraft which would have a seating of close to 200 seats. However, the final recommendations of the airline were to keep the 43 aircraft proposal unchanged and evaluate the option of inducting widebody aircraft on lease.

**F. Negotiation Process**

3.23 Audit scrutiny revealed that despite the PIB's decision that MoCA decide the benchmark for further negotiations with the L-1 bidders, no such benchmarks were set by MoCA before negotiations.

3.24 When the Committee sought to know the reasons for not setting up a benchmark for further negotiations with the L-1 bidders, it was submitted by the MoCA that no separate benchmark price was set up for the negotiation process as no industry standards were available for benchmarking the price of civil aircraft. However, the negotiation's were conducted by a committee comprising senior members of Air India under the guidance of an Oversight Committee formed by the Ministry of Civil Aviation under the Chairmanship of Sh. C.G. Somaiah and the final round of negotiations was conducted by an Empowered Group of Ministers to obtain the best possible terms from the manufacturers.

**G. Manufacturer commitments for MRO/ Training Centre not fulfilled**

3.25 The EGoM minutes for the IAL aircraft acquisition from Airbus reflected the following commitments:—

- A training centre would be established by Airbus in India at an approximate investment of US$ 75 million.

- A warehouse for spares would be established in India (cost not quantified in monetary terms as it depended on the types of spares stock-out).

48

- Even though Airbus was not the leading company, it would assist the creation of MRO facilities in India in association with promoters. The estimated investment was of the order of US$ 100 million.

3.26 In Audit's view, the commitments made by Airbus regarding creation of MRO and training facilities were quite open-ended:—

- Unlike the other clauses, there was no mention of a timeframe by which such facilities will be created.

- The wording committed by Airbus Industries was "... agreed to make or facilitate the following investments". It was not clear who or what combination of promoters (Airbus and/ or other entities) would together make up the required investment.

- In respect of the MRO, the wording "facilitate creation of MRO facilities in India in association with the promoters" did not give any indication of a binding commitment.

- There was no mention anywhere that the training and MRO facilities would be exclusive for IAL's use or would be meant for all users of Airbus aircraft (public and private) in India and nearby.

3.27 Audit further brought out that the commitments obtained from Boeing in respect of the AIL aircraft acquisition, as reflected in Chairman, EGoM's note to the PM, were similar (without exact costs, timeframes etc.):—

- Boeing would provide training simulators costing upto US$ 75 million.

- Boeing would invest upto US$ 100 million for creation of MRO facilities for Boeing aircraft in India.

- Boeing would invest US$ 10 million in training and other civil aviation requirements.

The directions of the EGoMs were communicated to both IAL and AIL. While these commitments were included in AIL's purchase agreements, these commitments were, however, not included in IAL's purchase agreements.

3.28 On being asked to state the reasons for the commitments like creation of MRO, training facilities, warehouse facilities for aircraft spares, etc. not being included in the purchase agreements in respect of the IAL fleet acquisition, the MoCA has replied as:—

> The Letter Agreement no. 4 to the Purchase Agreement dated 20th February, 2006 describes various Cooperation Projects to be established in India by / with the assistance of Airbus such as Maintenance, Repairs and Overhaul (MRO), Pilots training facilities and a dedicated Spares Centre for Airbus aircraft. As per Letter Agreement No. 4,

> The Airbus recognizes the importance of the civil aviation market in India and to facilitate the growth of this market, will together with its partners, will establish Pilot training facilities in India. Airbus would work in cooperation with the Ministry of Civil Aviation to study and select the location for such facilities.

49

Airbus will also establish a dedicated spares centre for India. The locations for such facilities will be decided, based on the needs of All Airbus customers in India.

Airbus confirms that it is already engaged in serious discussions in relation to the above cooperation projects including with various MRO providers and that it will continue to provide its full support and cooperate in good faith for timely introduction of such facilities.

As such, no firm commitment was made by Airbus for direct investment in above cooperation projects. Therefore, factually Airbus commitments are by way of 'Cooperation Projects' as per Letter Agreement No. 4 to the Purchase Agreement.

It is understood that Airbus either on its own or along with its partner(s)/ affiliate(s) have already established a dedicpted Spares centres for Airbus aircraft in Navi Mumbai and Pilots training facilities for Airbus aircraft in Bengaluru.

It may also be stated that Letter Agreements to the Purchase Agreement constitute, an integral part of the Purchase Agreement and governed by all the provisions of the Purchase Agreement."

3.29 When asked to elaborate on the progress made towards setting up of the MRO and warehouse facilities, the MoCA submitted as under:—

"As per the letter agreement No.4 to the Aircraft Purchase Agreement dated 20th February, 2006 , Airbus conveyed that they, along with their partners / affiliates would assist in creation of MRO facilities in India, but as such, they made no firm commitment for direct investment in MRO facilities in India.

Therefore, factually Airbus commitments are by way of "Cooperation Projects" as per Letter Agreement No. 4 to the Purchase Agreement.

The matter was taken up by AI with the Airbus and EADS (European Aeronautic Defence and Space Company, the parent Company of Airbus) during the meeting held in January, 2008 Airbus in their letters dated 22nd January, 2008 sent to AI, had mentioned their obligation and endeavours to support the establishment of an MRO venture between Air India and EADS and its Indian affiliates. There was no mention of any financial commitment in the letter.

A Business Plan on MRO Venture was jointly prepared by Air India and EADS. The Business Plan was broadly acceptable to EADS but the valuations proposed by AI were not acceptable to them. EADS appointed PWC (Price Waterhouse Coopers) as the independent valuer in consultation with Air India.

PWC report was not acceptable to Air India due to the undervaluation of AI's contributions, to the MRO compared to what is as indicated in the business plan.

50

EADS advised that asset valuation report prepared by PWC should not be revisited in view of the high cost and time consuming process. EADS requested Air India to suggest some alternate ways.

AI conveyed that it is working on hiving off its MRO activity as a separate Company (AIESL), a wholly owned subsidiary of Air India. Air India suggested that Airbus could contribute in the development and expansion of AIESL MRO facilities for Airbus including ATR aircraft as Support / Investment Project. Air India has not yet received response from EADS/Airbus in this regard."

3.30 When the Committee sought factual position with regard to an article published in the daily 'Hindustan Times' dated 16.3.2013 wherein it had been reported that 'CBI registered an FIR, against Airbus Industries of France and seven former and serving officials of Indian Airlines— now merged with Air India—for failing to properly implement a concession clause built into a ₹ 9000 crore agreement for acquiring 43 aircrafts in 2006', the Ministry submitted that the Mininistry had received PE-DAI-A-0001 dated 14.1.2010 registered by CBI against 'unknown officials of Ministry of Civil Aviation and others' on 15.1.2010. But this Ministry has not received copy of any FIR, registered by CBI against Airbus Industries of France and seven former and serving officials of Indian Airlines, as published in the daily Hindustan Times dated 16th March, 2013.

3.31 In response to another query of the Committee regarding meeting the costs for these facilities, the MoCA stated that Air India had developed and was running its MRO facilities, which were fully equipped and active facilities covering all aspects of an Airline MRO *viz.* Airframe, Engines and Components for the last several decades for maintenance of its aircraft. However, statedly, there was no direct Airbus participation in its MRO currently.

3.32 The Committee were also apprised that M/s Boeing was committed to set up an MRO facility in India in Joint Venture as a part of the agreement for purchasing 68 aircrafts from M/s Boeing for Air India and Air India Express. As per the understanding with Boeing and Air India, Boeing would construct the Hangar facility and hand over the same to Air India. Boeing had short listed Nagpur for setting up the MRO and L&T was approved as Design & Build contractor. 45% of civil construction was completed and target date for completion of the MRO facility was July, 2013. However to a specific query of the Committee whether any study was conducted for establishing MRO at Nagpur by Air India, the reply of the Ministry has been negative.

3.33 On being asked whether Nagpur had any aviation infrastructure for setting up the MRO there or AI would have to start from scratch to build this MRO, the Ministry responded as under:—

"*MIHAN*—Multi-modal International Cargo Hub and Airport at Nagpur  is one of the biggest economical development projects currently  underway in India. Maharashtra Government formed a special purpose entity in the name of Maharashtra Airport Development Company (MADC) for development of MIHAN. Singapore Changi Airport has been selected as the consultants for

51

the project. Indian Air Force (IAF) is also going to come up with its own Gajraj project along side MIHAN. Boeing proposed to set up the MRO at SEZ area near Nagpur Airport".

3.34 When the Committee sought details regarding MRO facilities set up till date in the country and the ones which required upgradation, the Ministry submitted as under:—

"As far as Air India is concerned, Air India (narrow body) has four major bases for MRO activity for its captive workload at Delhi; Mumbai; Hyderabad and Kolkata. Air India also has JEOC (Jet Engine Overhaul Complex) at Delhi and Mumbai. Third party workload is also undertaken at these MRO facilities.

Air India (wide body) has a MRO facility at Old Airport, Mumbai. This MRO facility presently has the capability to carry out all the maintenance checks of B777, B747-400 and A310 aircraft and engines 7 APUs fitted on these aircraft. This also has the capability to carry out the maintenance, overhaul & repair of the components and accessories fitted on B747-400 and A310 aircraft. In addition, this facility is being •upgraded in a phased manner to carry out maintenance, overhaul and repair of components and accessories fitted on B777 & B737 aircraft and at present, has the capability to carry out maintenance, overhaul & repair of some of B777 & B737 components & accessories.

Besides above, 14 other MRO have been set up in the country. Upgradation of these MROs is taken up/driven by the commercial considerations and the customer need."

3.35 When queried if the Air India MRO Infrastructure and facilities were being utilized fully, the Ministry submitted:—

"Delhi is designated as the main base for all A320 type aircraft, Mumbai for A321 and Kolkata for A319 aircraft. Hyderabad base is handling the spillover work of A320 aircraft.

Air India has developed and is running its MRO facilities for the last several decades for maintenance of its aircraft. These are fully equipped with active facilities covering all aspects of an Airline MRO, *viz*., Airframe Engines and Components.

Services of these MROs over a period have been utilized to the extent required by Private airlines like, Jet Airways, Indigo, Spice Jet, Go Air, Kingfisher and erstwhile Deccan Airways besides other Government organizations like IAF, etc.

The MRO facility of Air India wide body group is fully utilized by undertaking the maintenance, overhaul and repair jobs of Air India and Air India Express aircraft. In addition to the above, jobs from outside parties are also undertaken whenever slots are available, so as to avoid any hindrance to own aircraft jobs."

52

3.36 Submitting data regarding the number and type of aircraft of Air India and Air India Express which utilized the hangar facility for last five years, it was stated as under:—

| Year | Type of aircraft | | | | |
|---|---|---|---|---|---|
| | B747-300 | B747-400 | A310 | B777 | B737-800 (AI Express) |
| 2007 | 2 | 9 | 18 | 10 | 17 |
| 2008 | 2 | 8 | 15 | 14 | 20 |
| 2009 | - | 6 | 12 | 21 | 25 |
| 2010 | - | 6 | 10 | 21 | 25 |
| 2011 | - | 5 | 4 | 20 | 21 |
| 2012 till date | - | 5 | - | 20 | 21 |

The Ministry also stated that all the MRO except MAS GMR Aero Technic Ltd. (MGMT), Hyderabad and M/s Cochin International Aviation Services Limited, Cochin (CIASL) are being utilized fully.

3.37 On being asked to furnish data regarding expenditure incurred by Air India/ erstwhile Air India and Indian Airlines on maintenance/repair/servicing of their aircraft in foreign countries during the last 5 years and the reasons therefor when MROs were available within the country, the Ministry submitted as under:—

> "The MRO facilities of Air India are equipped with infrastructure and manpower for carrying out maintenance checks of the aircraft in Air India's fleet in-house.
>
> However, Air India has been leasing aircraft for its operations which are sent abroad for redelivery/major maintenance checks since the lease agreements stipulate that these checks can be accomplished only at a Federal Aviation Administration (FAA)/ European Aviation Safety Agency (EASA) approved MRO facilities and Air India MRO facilities are not FAA/EASA approved.
>
> The expenditure incurred by Air India on maintenance/repair/servicing of aircraft in foreign countries during last five years is attached at **(Annexure-VII)".**

**H. Synergy between AIL and IAL network not considered during acquisition process**

3.38 MoCA had commissioned in 2004, a study by AT Kearney to suggest measures for achieving better operational integration between AIL and IAL. The study had recommended freeing up of capacity by leveraging the AIL and IAL networks for international short haul markets and consolidation of frequencies on overlap routes and redeployment of freed up capacity on under serviced routes. The acquisition process for Air India was taking place from December, 1996 till 2005. Around the same time, Indian Airlines (1996 to 2006) was also going in for the acquisition process.

53

3.39 In this backdrop, the Committee sought to know the reasons for carrying out such an expensive fleet acquisition process independently by pre-merger airlines. In its submission, the Ministry stated that Air India and Indian Airlines were managed separately and were operating in two different market segments and hence the fleet acquisition process was carried out separately in each airline. Further, it was stated that AT Kearney was given the exercise to suggest measures for achieving operational integration between AIL & IAL but at that point of time the merger of the two companies was not under consideration.

**I. Risks of Debt Funded Acquisition**

3.40 Audit in its Report has brought out that even as of 2005-06 (when the decision on acquisition of 50+43 aircraft by AIL and IAL was taken), the debt-equity ratios of AIL was very high at 4.6:1 and negative in case of IAL. The fleet acquisition cost for both AIL and IAL was to be funded entirely through debt except for a marginal equity infusion of Rs. 325 crore in respect of IAL. With additional borrowings of Rs. 32,274 crore and Rs. 8,335 crore towards acquisition of aircraft by AIL and IAL, the debt equity ratio of both AIL and IAL would be further adversely affected (as against prudent project financing ratios of upto 4:1).

3.41 When the Committee sought the views of the Ministry on this issue, the Director (Finance), AI deposed:—

> "The financing is a very important point because the Air India did not have equity. It has to borrow. So, for the borrowings everybody asked for a good debt-equity ratio, which we did not have at all. So, we cannot borrow also beyond a particular limit. So, those points were kept in mind at that time when we went in for a modicum fleet. So, when we were asked to revisit, the Government assurance was there that we will give a guarantee for the loans that you acquire and all. So, that is the reason why we went in for the plan, taking into consideration the competitors."

3.42 On being queried as to whether AI management ever considered that given the poor financial health of the Airlines at the time of acquisition, such massive acquisition would further contribute to financial woes of the Airlines, the Ministry replied that the 10 MCLR (A340) acquisition proposal was submitted as its financial risk was lower than the 17 MCLR proposal. Even after the TENC developed the 50 widebody aircraft plan, the Committee agreed to de-risk the proposal by taking 15 of the 50 aircraft on options. 8 of the 23 B777s were to be on option. Orders for all 50 aircraft were placed on firm basis after approval of the Government. While the proposal had a financial risk and involved assumptions of increase in yield and load factors, the project was described as justified in terms of traffic growth and the need to increase Air India's market share.

3.43 When asked to justify the proposition of such a huge acquisition (AIL purchased 50 Boeing aircraft at a cost of Rs. 33,197 crore) financed mainly out of borrowings that led AIL to such a precarious financial position, the Ministry stated:—

> "The acquisition of aircraft was proposed to be financed using External Commercial Borrowings (ECB) and Internal Resources. The Project Report

54

had assumed that the funding of the entire acquisition would be through an ECB at a fixed interest rate of 5.5% which is based on then LIBOR of 3% p.a. and margin of 2.5%. The same was proposed as all earlier aircraft financings were funded by AI through debt supported by GoI Guarantee. 'The Government had given its in-principle approval to provide GoI guarantee for the acquisition of 50 Boeing aircraft as this would help AI to secure Exim financings at competitive rates of interest.

The Project Report had also requested the Government to consider infusing of funds as equity to support its aircraft acquisition but fleet induction financing had largely been through debt as the same is economically more viable under guarantee support issued by GoI."

3.44 In the course of oral evidence of the representatives of the MoCA, the Committee pinpointedly stated the fact that the sovereign guarantee given by Government of India for the acquisition of aircraft meant that if AI was unable to pay the debt, the Government would pay it. To this, the Secretary, MoCA responded as under:—

"When Air India came back to us with the proposal of their aircraft acquisition, it went through all the established procedures of the Government. It went through techno-economic feasibility study stage. It went through PIB. It went through Price Negotiation Committee. On top of it, there was one oversight committee. It went to the Cabinet. It went to the Empowered Group of Ministers. So, all established procedures of the Government were followed in acquisition of aircraft."

# CHAPTER IV

## MERGER OF AIL AND IAL INTO NACIL

Audit has pointed out that the initial reference to the merger of AIL and IAL in the records of MoCA is a noting of 16th March, 2006 that the Minister, Civil Aviation had desired a concept paper on the integration/merger of AIL and IAL; AIL had sent a concept paper prepared by the consultants, AT Kearney. This concept paper of 2004 (which highlighted the potential for value, creation through collaboration on fleet and network between IAL and AIL) was referred to in the December, 2004 note on liberalisation of bilateral agreements, but was re-considered only after completion of independent fleet acquisitions by both airlines.

4.2 Subsequently, a presentation was made on 22nd March, 2006 before the Prime Minister on the issue of the proposed merger of AIL and IAL. According to the file notings scrutinised by Audit:—

- In the presentation, it was highlighted that in the light of the global trend towards consolidation in the airlines industry, it had become incumbent for the two national carriers to work towards merger, as the merged entity would not only be able to compete effectively in the market but would also find greater acceptability amongst the global alliances. It was emphasised that given the overall developments in the civil aviation sector internationally as well as in the domestic sector, nothing short of merger would be an effective way to compete effectively in the market.

- During the discussions held after the presentation, apprehensions were expressed with regard to the HR problems arising due to merger. However, it was felt that it would be in the overall interest of both AIL and IAL to sort out these issues and work towards merger under the guidance of MoCA.

- During, the discussions, it was, *inter-alia*, suggested that the MoCA may examine the possibility of certain interim measures like formation of a holding company of both AIL and IAL preceding their full merger.

- After detailed deliberations, 'in principle' approval was given for working towards the merger of AIL and IAL and to bring up a Cabinet note with full details at a later date in this regard.

4.3 When the Committee sought a copy of the above presentation made by the Ministry of Civil Aviation before the Prime Minister in March, 2006 on the issue of the proposed merger of AIL and IAL, the Ministry initially had failed to provide a copy of the same stating that it was not traceable with Air India.

4.4 To the further queries of the Committee regarding (a) details about other significant files/documents that were found to be not traceable, if any, either with the

56

Ministry or Air India, and (b) details of the system put in place to ensure that such incidents do not recur, the Ministry submitted that 'all records and files in AI Section, Ministry of Civil Aviation are maintained properly and no significant file/document have been found not traceable. AI has also not informed of loss of any such file'. Alongwith this communication dated 10.4.2013, the Ministry forwarded a copy of the presentation made by the Ministry of Civil Aviation before the Prime Minister in March, 2006 on the issue of the proposed merger of AIL and IAL (Annexure VIII). It was also submitted that 'It has been informed by Air India that there are no other supporting documents to indicate that this was the presentation Made before the Hon'ble Prime Minister, except for the date *i.e.* March 22, 2006 and an initial on the first page which appears to be that of the then CMD, Shri V. Thulasidas'.

4.5 On the 'in principle' approval for working towards merger of AIL and IAL, the following course of action was approved:—

- Since AIL had taken the lead in making the presentation, they would be asked to engage a consultant, in consultation with IAL, to advise on the merger process, for which a draft Terms of Reference (ToR) was also prepared;

- Working Group's for Commercial, Finance/ Accounts, Engineering/ Operations and HR involving officials of both AIL and IAL would be constituted.

4.6. The National Aviation Company of India Limited (NACIL), now Air India, was formed with the legal merger of erstwhile AIL & IAL, with the appointed date of merger as 1st April, 2007. All assets, liabilities and obligations of both the companies were undertaken by the new, company.

**A. Initiation of Merger—Objectives and Envisaged Benefits**

4.7 In July, 2006, Joint Committee of Boards of AIL and IAL in Merger (constituted by GoI) selected Accenture India Pvt. Ltd. as a consultant to advise on the merger.

4.8  Explaining the procedure that was followed to appoint the consultant for the merger, the Director (Finance), Air India, deposing before the Committee during evidence stated as  under:—

> "Accenture was appointed as merger consultant. There was a proper bidding process wherein people had applied. Then, there was the technical qualification and financial bids were also there. So, based upon the persons who had technically qualified, their financial bids were opened. Based on that, Accenture was appointed. It was appointed in three phases. One is about preparing a business case for merger, why merger was required. The second is if merger was required and the Government was satisfied with that, then, proceed to the Cabinet for approval. The third is if the Cabinet approved it, then the third stage was post-merger. That means, they will hand-hold us for some time. So, it was divided into three phases. The fee also was divided into three phases. Supposing a business case for merger did not, impress the Government, then, there was no point in going to the second stage. So, that was done in the first stage. There was a Cabinet Paper that was prepared for the merger. That was the second stage. The Cabinet approved it on 2nd of

57

March, 2007 for the merger. Then, post-merger was the third stage. So, once the Government had approved the merger, then only post-merger activities were carried out. There were a lot of post-merger activities for integration and all that. It was done by Accenture in a hand-held thing."

4.9 While examining the issue of merger, the Committee sought to know the history and the background that had led to merger. The SBU Head (MRO—Airframe), Air India deposing before the Committee submitted as under :—

"There was a historical disadvantage. The Air India and Indian Airlines had a lot of overlapping routes. That was one thing on which we were competing with each other, whereas we were not in a position to compete with the market. That was one of the main things that we were competing with each other on many routes."

He further added:

"Basically, we were planning to have integrated international and domestic opprations. That is one of the main reasons basically to fight the competition. We will have a very strong network and our fleet will be one of the largest in this part of the globe. We thought that we should be working together rather than competing with each other and giving the advantage to our competitors outside the country. That is one of the main reasons for looking at the merger."

4.10 The SBU Head-MRO (E&C), AI, elaborating on the background of the process and reasons for merger deposed as:—

"I may give just a little bit of background as to why the merger was looked into and it was considered to be appropriate at that point of time. Primarily, there were four issues according to us. One was that the competitiveness in the aviation field was increasing both at the domestic side because a lot of private operators had come by that time and even the low cost carriers had come in. The market share of each of the entities mainly the erstwhile Indian Airlines was also reducing. On the global front, Air India, as it is, was facing a lot of competition from other international carriers because the aviation market in India was growing.

The other point was that both the airlines were operating at that point of time with older type of aircraft and they were in the expansion mode and the acquisition of aircraft was required and the processes were going on. This required integration of various requirements. Similarly, there were certain overlapping routes from the scheduling point of view which were being operated by erstwhile Indian Airlines, as well as Air India at that point of time and also the subsidiaries.

Seventy per cent of the global traffic was being routed through various alliances in the world and in order to take leadership role in aviation, it was necessary that we should also become a partner to some of the alliances and take proper market share as well as provide services to the people. With this background, the merger was to provide us the competitiveness, economy of

58

scale, the resource consolidation and the optimal use of both the aircraft equipment, ground handling side as well as the manpower. As two different entities, many of the processes were of repetitive nature like reservation system, the engineering side and the ground handling side. So, by combining them and integrating them, this would have given a much better use of the resources available within the two airlines.

With this aspect, the MRO side of the two airlines as well as the ground handling side of the two airlines, even they would be made separate entities to provide services to the main airline as an integrated entity. With the merger and the integrated company there will be seamless travel; there will be better scheduling of the aircraft; there will be better product provided to the public; there will be unified booking system; there will be common purchases on the various commodities mainly the fuel, the insurances and also on the other fronts of aircraft spares and other things."

4.11 On the issue of benefits.of merger, the witness added as under:—

"With the merger, the benefits have started accruing to the airline that we are becoming a more compact organisation. Lot of duplications have been avoided in the organisation. We, as erstwhile Indian Airlines, inducted 43 Airbus A-320 family aircraft and the erstwhile Air India had also inducted 20 aircraft of Boeing 777 type. Some of the facilities, which were to be set up on the engineering side, were common and we decided that no duplication of the facilities will be carried out and we will utilise or synchronize each other's facilities and there will be no spending of money on that.

Similarly, on the procurement of fuel and also on the insurance side, lot of money has been saved. We have carried out the fuel efficiency gap analysis and the analysis of operating practices, which have also resulted in good saving. So, overall, about Rs. 1530 crore has been saved because of the commonality and common integration with the merger.

This has also resulted, from our commercial point of view, in the seamless travel from the interior of the country to the outside world and *vice-versa*. So, these are the benefits that have come with the merger. We hope that the benefits as we progress, however, will multiply and accrue better and we will become a better organisation after resolution of certain HR issues which are with the company and for which Dharmadhikari Committee is looking into those aspects."

4.12 When asked to furnish chronology of the process of merger of Air India and Indian Airlines, the Ministry submitted as under:—

"Air India, which operates on international routes and Indian Airlines with its domestic network have a significant potential for achieving synergy. It is, therefore, felt that the integration of Air India and Indian Airlines could lead to developing seamless connectivity network of regional operations, short to medium haul trunk operations, long haul operations, which will lead to improved

59

product through increased network coverage. Their merger could also provide substantial synergy for procurement, sales and distribution besides affording an opportunity for financial restructuring/ strengthening by leaving common assets.

Accordingly, a presentation was made by the Ministry of Civil Aviation before the Prime Minister in March,2006 when an 'in-principle' view was taken that the merger of the two airlines would be in their best interest.

Air India was advised to appoint a Consultant/Advisor in consultation with Indian Airlines to advise on the merger process. Accordingly, Air India Board, at its 114th Meeting held at Mumbai on 4 May, 2006 decided to appoint a Consultant/advisor in consultation with Indian Airlines by inviting Expression of Interest (EOI) from various consultancy/accounting firms who had expertise on the subject through a tender in order to advise on the merger process. The Board also constituted a committee on Merger comprising CMDs of both AI & IC, Shri N. Vaghul, Chairman, ICICI Bank and independent Director on the Board of AI, the representatives of MoCA and Finance Directors of both AI & IC to select a suitable consultant and oversee the process of merger.

The First Meeting of the Merger Committee was held on 16 June, 2006 in Mumbai to consider the EoIs received from the consultants and thereafter they were requested to make a presentation to the Committee in the 2nd Meeting of the Committee on 26/27 June, 2006. Based on the EOI's received and the presentations made by them, three consultants were shortlisted.

The draft Terms of Reference and Evaluation Criteria for technical & Financial bids were finalized by the Committee at its 3rd Meeting held on 14 July, 2005 and forwarded to the shortlisted bidders. The three shortlisted parties submitted their Technical & Financial bids on 21 July, 2006.

At its 4th Meeting held at Delhi on 24 July, 2006, the Committee evaluated the bids submitted by the parties. After evaluation the Committee selected M/s. Accenture India Pvt. Ltd for appointment as consultant to advise on the Merger. The Air India Board in its 116th meeting held on 29 July, 2006 had approved the selection of M/s. Accenture as consultant to advise on the merger process.

MoCA *vide* its order dated 31 August, 2006 constituted a Core Group to monitor the progress and to coordinate with the consultants at the top level. Four Working groups were also constituted by the Ministry comprising of representatives of MoCA, Directors of both Air India & Indian Airlines and Nominees of the consultant to coordinate on the major issues. It was decided that the Core Groups & Working Groups should meet at least once in a month to review the progress in the merger process. In addition, the core group of Personnel appointed to assist the consultants & working group should meet on day-to-day basis in order to achieve the smooth functioning of the entire merger process.

60

The entire merger process was broadly divided into three parts:

(i) Pre-Cabinet Approval Tasks.

(ii) Post-Cabinet Approval Tasks including legal merger.

(iii) Post Merger Tasks.

The first phase of work *i.e* Pre-Cabinet Approval Tasks focused mainly on developing the high level blueprint for the proposed merger in view of the declining market share of both Air India and Indian Airlines, significant increase in competitive activity, financial/operating metrics of both the airlines, their overlapping roles and the trend globally of flag carriers having integrated international and domestic footprint.

MoCA *vide* letter dated 2 March, 2007 informed that Union Cabinet had approved the proposal to merge the two airlines after a series of presentations, by M/s. Accenture to the Government at different levels and after having presented the business case for merger, the business integration blueprint and the entity structuring option. Prior to the Cabinet approval, the proposal was approved by a Group of Ministers who had, in turn, referred it to a Committee of Secretaries to vet the various issues involved in the merger.

On 05.4.2007, the Ministry of Civil Aviation set up an Interim Governance Mechanism to ensure that the management decisions in AI & IC were taken in consultation with each other to achieve optimum synergies in all areas of airline management in the run up to the merger.

With the Cabinet approval, the Phase II commenced which comprised of integration design, selection of CMD, selection of Integration Champion, creation of common Board of Directors, selection of Functional Directors/ Executive Directors for the merged entity etc.

In the third phase, M/s. Accenture listed out the following tasks to be accomplished.

• Selection of leadership team (CMD, Heads of various functions).

• Finalisation of organization structures by CMD in consultation with heads of functions.

• Implementation of integration initiatives identified in Phase-2 led by heads of various function.

• Tracking and monitoring of implementation at various levels (CMD, Board, MoCA etc)."

4.13 Responding to the observation made by Audit that they were unable to ascertain the detailed justification for, or the background to the 'in-principle' approval

61

of GoI for 'working towards the merger' of AIL and IAL, the MoCA furnished the following detailed justifications for merger:—

(i) Fierce competition and deteriorating market performance posed serious threat to the survival of AI & IAL on a stand alone basis.

(ii) Declining market share of both AI & IA.

(iii) Significant increase in competitive activity eroded historical advantage of both carriers since international carriers increased their frequency into , India and simultaneously there was increase in the number of private domestic carriers and some of them becoming international.

(iv) Financial/Operating matrix of both entities lagged behind competition.

(v) AI & IA had increasingly overlapping role.

(vi) Globally flag carriers have integrated international and domestic footprint.

(vii) The merger of AI & IA alongwith a comprehensive transformation program was imperative to improve competitiveness in the following form:—

(viii) Combined fleet strength of AI & IA will be —

- largest in India.

- comparable to others in Asia like SQ, Malaysian & Emirates.

- improve world ranking in terms of fleet size.

(ix) Integrated domestic and international footprint will.

- enhance customer proposition.

- facilitate entry into one of the global airline alliances.

(x) Merger will also enable optimal utilization of resources by fully leveraging existing assets, capabilities & infrastructure planned fleet expansion.

(xi) Merger also provided an opportunity to significantly enhance networth by revaluing the assets.

4.14 When the Committee further asked the Ministry whether the merger was properly planned and effectively implemented, the Ministry in its written submission, explained its position as under :—

"Before the legal merger of the 2 erstwhile Airlines in August, 2007, the merger blueprint was formulated by 11 working groups (as per list below) comprising of members from both the airlines from the respective departments:—

- Commercial

- Human Resources

- Operations

- Finance

- Information Technology

- Procurement

62

- Engineering & MRO

- Low Cost Carrier

- Ground Handling

- Cargo

- Administration

Members of the above working groups detailed out the plan for integration of individual departments. In addition to the working groups, an Integration Cell was formed comprising of members of both airlines to monitor and drive the integration process.

Post the legal merger, an integrated organization structure was put in place and directors were slotted to head various departments/functions with harmonized responsibility across the operations of two erstwhile airlines. Implementation of integration plans was driven by respective departments and department heads with periodic review and monitoring by CMD and MoCA."

The Ministry further added:

We had seen good progress on the following integration initiatives:

- Progressive integration of network/ schedules;

- Progressive cross-utilisation of aircraft fleet;

- Leveraging scale for joint procurement (fuel, insurance etc.);

- Completion of PSS project (with the implementation of the system in February, 2011, there is now a single code for the airline); and

- Harmonisation of booking offices/ facilities."

4.15 When asked if the merger had increased the effectiveness of the two entities, the Ministry replied that merger resulted in cost synergies in areas such as fuel contracts, insurance, procurement etc. Merger had also resulted in revenue synergies on account of Network integration which helped in providing seamless connectivity to customers across domestic/ international locations, as well as implementation of common pricing etc. The Ministry further stated that the synergy benefits over a period of 3 years have resulted in savings of ₹1000 crore including the benefits accruing under the Fuel Efficiency Gap Analysis. Overlapping routes had been removed and a good hub and spoke system was established between different cities in India over Delhi hub.

4.16 With regard to the merger process taking place according to the Consultant's report, the Ministry submitted:—

"M/s. Accenture has pointed out that this merger process was successful in operational areas. However, there was a delay in implementing the single code reservation system due to finalization of tender and other subsequent

63

> processes. Human resources integration took a long time and the Dharmadhikari Committee, which was set up for studying the seniority and other pay structure, level mapping, etc. has submitted the report to the Government on 31.1.2012. Apart from this, there are certain rules and regulations *viz*. Service rules and regulations, Passage regulation, Medical facilities etc. which are yet to be integrated.''

### B. Lack of adequate validation of financial case for merger

4.17 According to Audit, the main focus of the process leading upto the implementation of the merger was on consideration of alternative options for merger, stamp duty and tax implications, creation of top level posts for accommodating existing incumbents etc. However, it was found that the financial case for the merger was not adequately validated, prior to the merger.

4.18 Regarding the above Audit observation, the Ministry explained that the details of the financial gains from the merger due to synergies were anticipated and formed part of the Consultant's report. That some of them had not materialized was due to several other factors that were prevalent.

4.19 To a specific query of the Committee regarding the cost incurred for actualizing the merger, the MoCA submitted that the payment made to M/s. Accenture who were appointed as Advisor for merger of Air India and Indian Airlines was ₹ 15.41 crore.

### C. Huge Delays in Actualisation of Merger/Integration

4.20 Although the merger of AIL and IAL was officially notified in 2007, there were huge delays in actualization of the merger/operational integration. On enquiring about the timeframe fixed by MoCA for completion of the merger process and the mechanism formulated regarding the same, the Ministry stated:—

> "Initially, complete merger process was supposed to be completed within 36 months from August, 2007 *i.e.* the date of merger. However, subsequent factors *i.e.* migration to a Passenger Service System (PSS), single code, IT integration, bogged down HR integration owing to legacy union agreements, integration of various cadres on Department of Public Enterprises (DPE) guidelines, acceptable level mappings etc. has delayed the merger process. However, steps to integrate the operation of the merged airline were initiated immediately following the merger in August, 2007 and good progress is achieved in integration of network schedules, cross utilization of fleet, joint procurement for fuel, joint fleet insurance, deriving benefits of the synergy completion of single code operation. Air India has set up an inter-departmental committee to monitor and facilitate the integration progress. Similarly, several working groups were set up at lower levels to implement the merger and integration. Ministry has constituted a committee of experts under the Chairmanship of Justice (Retired) D. M. Dharmadhikari to go into the HR issues including contentious issues w.r.t. PLI, level mapping and cadre re-structuring."

64

4.21 Entailing the reasons for constituting the Committee headed by Justice Dharmadhikari, the Ministry made the following submissions:—

"To resolve the disparities relating to the HR issues like level mapping, compensation, harmonization etc. for all employees including pilots, the Government of India *vide* its Notification No. AV. 18016/03/2011-AI dated 11th May, 2011 has appointed an independent committee of external experts headed by a retired Judge of the Supreme Court of India, Justice (retd.) D.M. Dharmadhikari. The other members include Prof. R. Dholakia from IIM, Ahmedabad, Shri Rajeshwar Dayal, Retired Director, Department of Public Enterprises and Shri Syed Nasir Ali, Director in the Civil Aviation Ministry.

The terms of reference of the Committee are as follows:

 (a) To examine the principles of integration across various cadres and determination of level and seniority;

 (b) To examine the principles of pay/wage rationalization and restructuring between all the employees of the erstwhile airlines;

 (c) To examine and suggest harmonized working conditions of various categories of employees of erstwhile airlines depending upon the requirements;

 (d) To examine the above (a), (b) and (c) in the light of the cost neutrality principle;

 (e) To examine the principles governing the structure of pensionary schemes, death-cum-retirement gratuities and other terminal benefits having financial implication;

 (f) To examine and make recommendations with respect to the general principle parameters of the different Productivity Linked Incentive schemes and bring them in line with airline practices; and

 (g) Any other matters that would be referred to the Committee.

The Expert Committee has met the registered Unions/Associations which have made their submissions to them irrespective of whether they fall in the category of recognized unions or not. The Committee has also met other agencies like DGCA, DPE etc. and the Management and the Government of India.

The Report of the Committee has been submitted on 31st January, 2012 to the Government."

4.22 It was further submitted by the Ministry that it has constituted a 3-member Committee consisting of officers from Department of Public Enterprises, Ministry of Civil Aviation and an independent expert to examine the recommendations of Justice Dharmadhikari Committee and formulate a time-line for its implementation.

4.23 When the Committee sought a copy of the Dharmadhikari Report, the Ministry replied (on 4.6.2012), that the same would be provided once it is approved for

65

acceptance by the Government. However, when asked to apprise the Committee of the Ministry's action on this Report (as of March, 2013), the MoCA failed to do so.

4.24 When specifically asked to elaborate the reasons for not achieving complete integration of the two entities, the Ministry submitted that:—

> "Subsequent to the merger, all efforts have been made for harmonization of the HR issues. Management and the employees and the unions have been engaged in dialogue to finalize and formulate various policies to address these issues. The HR Sub-Committee of the Board of Directors had been formed to address all merger related issues. A process of dialogue with the Unions by the Management including meetings of the Ministry of Civil Aviation with the Unions also took place. A consensus was arrived that an independent committee of experts headed by a retired Judge of the High Court/Supreme Court outside the organization could impartially examine all the issues engaging the management, employees and the unions.

> In a Company of such large dimensions there are several constraints in implementing the merger process. The area of integration of manpower and the solution to the HR issues is a major task and involves a high integration cost. The delay in harmonizing is due to the critical financial condition being faced by the company and also the high cost of integrating the manpower on issues like level mapping, compensation harmonization, etc. for all employees including pilots. In the 2009-10 CoPU disposition, Secretary, Civil Aviation had said that all HR related matters were presently put in a kind of pause mode till the company comes out of the Financial crisis. Besides that integration of manpower and harmonization of seniority may also lead to certain industrial relations issues which in the present financial status the Company is not in a position to absorb. Hence, the integration process is being taken up in steps gradually.

> Ministry of Civil Aviation is constantly monitoring process of merger and a meeting in this regard has been held by the Secy., MoCA. Regular follow up on integration issues is held with various departments on an ongoing basis."

4.25 Further, when asked if the problematic factors were taken into account while dealing with merger which could have otherwise affected adversely the timely integration of AIL and IAL, the Ministry replied:—

> "Issues likely to take time were related to HR targets for integration. These were although anticipated and planned for, yet the process was time consuming due to several HR issues in both the erstwhile airlines."

4.26 When specifically asked about the areas in which the integration has been completely actualized, the Committee have been apprised by the MoCA as under:—

> "Merger of Indian Airlines and Air India is an ongoing activity. There are areas where synergies are being availed on an ongoing basis. The actual merger of both the companies for every, aspect is yet to be completed but many areas have been completed or under process. The merger has been

66

completed in many identified areas and the major milestones are being achieved albeit slowly due to the precarious financial position of the company.

The merger benefits like economies of scale, network and savings are being achieved. The overall synergies realised as on 31st December, 2011 for the company are approximately ₹ 1535 crore **(Annexure - IX)**.

The major milestone of a Single Air Operating Permit (AOP) has been achieved and issued by DGCA. The cut over to the new Passenger Service System has also been completed and the Company has migrated to a Unicode system. Integration of both the companies have also been completed in many areas like Finalization of CMD, Board of Directors, organization structure for Air India (then NACIL), selection of leadership team — Functional Directors, Executive Directors. In regard to Functional Director and Executive Director levels, Organisational Structure have been finalized however compensation harmonization is yet to.be harmonised. Further, General Manager and Dy. General Manager level Organisational Structure have been finalized in respect of majority of the departments. Other areas completed are for Material Management—Integrated Policy, Financial Synergies/quick wins in Insurance, Fuel procurement—ATF, banks & fund Management, common Accounting policies, legal & tax issues, Passenger Service System (PSS), delegation of Administrative and Financial Powers, etc. The booking offices at the domestic stations where separate offices existed for both the erstwhile organizations have been integrated to handle both domestic and international bookings in one premises. In regard to the international stations like Singapore, Bangkok, Dubai, Dhaka and Colombo, where commonality of stations existed, the same have been integrated. Engineering facilities are also being utilized in an integrated manner.

At the time of merger 226 critical activities had been identified and targeted for completion. Out of these 161 of the identified areas have since been completed. 58 items are in progress and 7 not initiated.

| Performance dependency | Total | Completed | In-progress | Not initiated |
|---|---|---|---|---|
| Operational Integration | 123 | 97 | 21 | 5 |
| Contingent on management decisions | 38 | 30 | 6 | 2 |
| Contingent on IT readiness | 35 | 24 | 11 | 0 |
| Contingent on HR Integration decisions | 30 | 10 | 20 | 0 |
| Total | 226 | 161 | 58 | 7 |

67

The list of all completed, in progress and not initiated items department-wise is placed at **(Annexure-X)**."

**D. Delays in implementing Single Code Passenger Reservation System**

4.27 Prior to the merger, the two airlines were using separate reservation systems (UNYSIS system by AIL and IBM system by IAL) with separate airline codes (IC for Indian Airlines flights and AI for Air India flights). Hence, an important aspect in the merger was the integration of the reservation systems of the erstwhile AIL and IAL to help the merged entity to operate all its flights on a single code and provide smooth travel for passengers on all domestic and international routes.

4.28 The Committee were informed by the MoCA that although single code passenger reservation system was scheduled to be achieved by 1st April, 2008, IA & AI finally managed to migrate to single code passenger reservation system *w.e.f.* 27th February, 2011. The delay was attributed to re-tender as one of the parties who was not selected had gone to CVC and it took considerable time.

4.29 Enumerating the accrued benefits of implementation of single code passenger reservation system, the Ministry stated:—

"The travel trade has expressed their satisfaction at being able to sell one code for a through itinerary. With two separate codes — AI and IC, there was a limitation on the number of airlines IC could interline with due to system constraints. Now with one code, unlike the 35 carriers IC which could interline within the past, for the domestic network, AI can now interline with 90 interline carriers and more can be added. This means that all foreign carriers operating to India now have a choice of selling domestic sectors on AI along with the other domestic carriers.

Global Distribution System (GDS) connectivity has improved substantially and bookings are not being lost, particularly from Online Travel Agencies (portals). The System response speed has improved to match industry standards.

The single reservation system has given the customer the benefit of buying tickets through one Website unlike in the past when the customer had to click for domestic separately and international separately.

Inventory management has also become more effective with one code, especially for through journeys to interior points in India by rationalising the booking classes."

**E. Harmonization of Human Resources**

4.30 According to Audit, the HR Integration below the level of DGM, representing 98 per cent of the staff had still not taken place, The Committee sought to know the latest status on,the integration and the reasons for the delay in this vital aspect of the merger. The Ministry, in its response, reiterated its reply stating that several constraints were being faced in implementing the merger process owing to the large dimensions of AI. Integration of manpower and solving of the HR issues was delayed due to financial

68

crisis faced by AI and complicated industrial relations issues. The Ministry further stated that all efforts were being made for harmonization of the HR issues.

4.31 However, in a candid admission before the Committee on the issue of HR integration consequent to merger, one of the witnesses stated as under:—

> "At present, since five years of the merger, they have integrated the reservation system. But, as on date, even on the field, practically, the erstwhile Indian Airlines personnel are working separately; the erstwhile Air India personnel are working separately."

4.32 The witness further tendered before the Committee, that the MoCA in 2007 had held meetings with the Employee Associations/Unions of the two airlines but only to announce the decision of the merger and not to discuss the key issues.

4.33 The letter No. JAC/EGoM/01/2007 dated 8th February, 2007 of Joint Action Committee of Unions/Associations/Guilds of Air India Limited addressed to Shri Pranab Mukherjee, the then Minister of External Affairs and Convenor, EGoM, reads as follows:—

> "As you are kindly aware, the Honourable Minister of Civil Aviation met all the unions of Air India on 17th January, 2007 in Delhi on the directions of the EGoM. This was apparently to apprise the representatives of the two oldest aviation companies *viz.* Air India and Indian Airlines, on the proposed merger.
>
> The above meeting was convened at a short notice of 24 hours, which made it virtually impractical and impossible to prepare and submit our concerns in detail and in all fairness we should have been given at least 15 days time for the said meeting. The entire exercise was laced in the most cosmetic manner while summarily brushing aside the most important element, the human factor and the lives and livelihood of almost 33000 families together......"

4.34 In the light of the above, when the Committee asked the Ministry whether it had held any consultations with the Unions/Associations when the Government wanted to merge the two Airlines and whether any of the Unions/Associations had expressed any reservations or apprehensions about the merger, the Ministry in its response stated:—

> "The process of merger of Indian Airlines Ltd. and Air India Ltd. had the participation of the Unions/Associations of both the erstwhile airlines and communication was maintained with them through letters as well as meetings.
>
> Chairman and Managing Director of Indian Airlines on 27.10.2006 issued a letter to all employees of Indian Airlines on merger of Air India and Indian Airlines.
>
> Hon'ble Minister of Civil Aviation met the representatives of all the Unions/ Associations of IAL on 17.01.2007 at Rajiv Gandhi Bhawan, New Delhi.
>
> Minister of Civil Aviation met representatives of newly elected Central body of Air Corporations Employees Union (ACEU) on 7.02.2007.

69

Joint Secretary, Ministry of Civil Aviation also met the representatives of newly elected Central body of ACEU on 20.02.2007.

On 27.02.2007 a meeting was also taken by the Minister of State for Civil Aviation with the ACEU on issues related to the proposed merger.

On 02.03.2007, Joint Secretary, MoCA sent a letter to all the employees below General Managers. In the letter it was, *inter-alia*, mentioned that the merger of two airlines would be completed in phased manner over the next two years. Further to keep the merger process as smooth as possible, manpower of both airlines would be Integrated gradually in a calibrated approach.

Again, on 07.03.2007 the Hon'ble Minister of Civil Aviation held a meeting with the representatives of Unions/Associations of Indian Airlines on merger.

On 15.06.2007 CMD, Air India sent a letter to all employees of Indian Airlines on his appointment as the Chairman and Managing Director of the merged Airline and formation of the new company called National Aviation Company of India Limited. He informed *inter-alia* that a communication channel will be established to receive feedback and Inputs during the merger process and all suggestions & inputs were welcome.

CMD of Air India along with CMD Indian Airlines also met the representatives of all Unions/Associations both of IA and AI on 18.7.2007 along with the consultants to keep them abreast of the developments and to have an, interactive session with them.

It may therefore be seen that Unions/Associations were being kept adequately briefed in the merger process. Besides the Scheme of Amalgamation has addressed most of the issues raised by the Unions/Associations."

4.35 In subsequent submissions made to the Committee, the Ministry stated that a 3-tier grievance redressal machinery was formed to address the employee grievances. Communications on the progress of merger were also being issued from time to time by the CMD/MoCA. The concerns of the Unions and Associations were also heard and addressed by the Ministry of Corporate Affairs during the hearing on the petition on Merger and the same formed part of the Order on Merger issued by the Ministry.

4.36 During the course of examination the Committee was given to understand that Captains and Commanders of the pre-merger entities had different licenses *i.e* IA pilots had Airbus license and AI pilots had Boeing license. Drawing the attention of the Ministry to this fact, the Committee questioned the so called merger of the two entities. In reply, the Ministry affirming the fact pointed out by the Committee further stated that:—

"This is a regulatory requirement of DGCA and pilots are licensed in this manner internationally. Captains and First Officers are authorised to operate the type of aircraft for which they have been endorsed in the license. Incidentally, erstwhile NACIL-I fleet consisted of Airbus types of aircraft and erstwhile NACIL—A consisted of Boeing & Airbus (A310) aircraft.

70

In view of the merged entity now functioning as Air India Ltd. issues pertaining to integration, cross fleet training, etc. are under discussions. However, pilots will always remain specific to the aircraft/aircraft family."

**F. Membership of Star Alliance**

4.37 In a dynamic and growing passenger air transportation industry, the pooling of the resources of multiple carriers in the form of airline alliances is considered to be of critical importance for several reasons:—

- It helps to bring together networks, lounge access, check-inservices, ticketing, 'move under one roof ' projects and a host of other services to improve the travel experience for the customer and efficiencies for the airlines.

- It also reduces the costs of individual airlines from economies of scale.

Consequently, one of the targeted objectives of the merger included easy entry into one of the three global airline alliances.

4.38 Audit scrutiny revealed that even after four years of merger, AI was yet to join the Star Alliance network, a leading global airline alliance established to offer customers convenient worldwide reach and a smoother travel experience, After paying an entry fee advance of • 5 million in June, 2008, NACIL's entry into the Star Alliance was intended to take place in March, 2009. The balance of • 5 million was required to be paid at the time of entry into the alliance. Out of the pre-requisites for joining the alliance (Minimum Joining Requirements — MJR), the most important requirement was a passenger reservation system with a single code for both the erstwhile airlines, which did not take place until February, 2011. Since Star GmbH (*Gesellschaft mit beschrankter Hafung,* German for *'company with limited liability'*) was not ready to extend the timeline for payment of balance 50 per cent joining fees beyond 30 June, 2010, AIL paid the balance entry fee of • 5 million in 12 equal instalments from January, 2010 to December, 2010.

4.39 The Ministry replied (August, 2011) to Audit that the delay in joining Star Alliance was on account of large number of Minimum Joining Requirements and the time consuming process involved, and this was likely to be fulfilled by 31 July, 2011. The Ministry further informed that Air India had met 90 per cent of the requirements of the MJRs. Thus, as far as the Government was concerned, Air India was all set to join the Star Alliance. The Ministry also clarified that they had received no formal communication about Air India having been denied entry into the Star Alliance and had, in fact, also learnt about this from the news reports in the press. The Ministry also stated that the decision of Star Alliance to exclude AI would not have any major impact on AI's operations.

4.40 When asked about the latest position regarding the prospect of AI's membership in Star Alliance, the MoCA, submitted as under :—

"As per the extended timeline agreed between Air India and Star Alliance, AI was required to comply with all the 87 Minimum Joining Requirements (MJRs) by 31 July, 2011. AI was on track to comply with all the requirements and join Star Alliance by 31 July, 2011.

71

However, in the interim, Star had requested the Indian Government to give a prior written confirmation that it shall grant approval to Jet Airways to join Star if and when it applies. Star had also advised AI that if it does not receive such a written decision from the Government of India, AI's joining may not be approved by the Star carriers, which were required to vote unanimously in favour of AI stating that AI has complied with all the joining requirements and the obligation to support entry of a 2nd carrier as agreed under the Agreement signed with Star Alliance in December, 2007.

Meanwhile, Star had advised AI to keep the activities related to the joining date (such as application of Star Alliance logo on AI aircraft, installation of Star signages at the airports, etc.) on hold till such time a decision was taken in favour of AI and an agreement reached on the joining date.

AI had complied with all the joining requirements (other than those which required a decision on the joining date) by 29 July, 2011 and has received a written confirmation of the same from the concerned official in Star Alliance.

However, on 01 August, 2011, AI was informed by Star that AI has not met the joining conditions in full and, therefore, AI's membership has been put on hold. When details were sought about the specific requirements not being met by AI, the response received was not specific. It appears that the apparent reason for AI being put on hold to join Star may have been the perceived lack of support from AI for entry of 2nd Indian carrier into Star Alliance

The prospect of AI joining Star are currently being discussed at the highest level in AI and the Ministry of Civil Aviation."

4.41 Further, when asked to state the implication for AI on not joining Star Alliance, the MoCA stated:—

"If AI is not able to join Star Alliance even after the efforts being made at the highest level, the benefits envisaged from joining the Alliance would not accrue to AI. The main benefits envisaged from joining an Alliance were as follows:

(i)   Enhanced Frequent flyer Programme (FFP) participation

Participation in FFP co-operation is mandatory for joining Star Alliance. Joining Star would have ensured that AI has FFP agreements with 28 Star members, as against 2 airlines with whom it currently has FFP agreements.

(ii)   Enhanced code share network

While code share agreements are not mandatory for joining Star, generally, all Star carriers develop code share arrangements with a majority of other Star carriers. This would have given AI an enhanced reach through secondary network.

(iii)   Enhanced Brand image

Joining Star was expected to benefit AI due to the Brand image associated with Star Alliance."

72

4.42 Apprising the Committee regarding the alternative actions undertaken by the Ministry to achieve the benefits which were expected from joining star Alliance, the MoCA stated:—

"AI has, however, targeted conclusion of commercial co-operations (code share, FFP, enhanced Safety Performance Analysis System, etc.) with a number of foreign airlines. Since AI may still join Star, it has been decided that initially such commercial co-operations would be entered into with Star carriers and "non-aligned" carriers since members of competing alliances may be wary of entering into arrangements with AI as it is still seeking to join Star.

On the Branding front, it may be noted that in the last couple of years, AI has taken major initiatives (particularly on the IT front) to enable AI offer competitive product/service level to its passengers. In addition, it has been decided that without waiting to join Star, AI would implement the functionalities (which a Star carrier is required to offer to its/other Star carriers' premium passengers) to its own and also code share partner's premium passengers.

The above efforts should enable AI to achieve many of the benefits of joining Star."

4.43 According to the information furnished by the Ministry, Star Alliance was paid Euro 10 million as entry fee. To a specific concern of the Committee regarding refund of the money paid to Star Alliance, the MoCA replied:—

"There is no provision of refund in the agreement signed with Air India. The agreement was signed by Air India in good faith, and this situation of the Chief Executive Board refusing us was not foreseen.

However, AI had raised the issue of refund of joining fees during a meeting with Star on 18 July, 2011 and the Star CEO had orally advised that the joining fees could be returned after deducting the expenses incurred by the Star carriers.

At the same time it is to be stated that Air India's membership thus far, has been put on hold, and not refused."

The Ministry failed to apprise the Committee of the latest status (as of March 2013) regarding Air India's entry into Star Alliance Network.

**G. Accounting System**

4.44 According to Audit, even after four years of merger, the erstwhile AIL and IAL had separate accounting package. A common integrated Enterprise Resource Planning (ERP) had still not been implemented and AI kicked off the project work only in January, 2011.

73

4.45 In this context, the Committee sought to know the timeframe by which a common integrated ERP for the AI would be implemented. The Ministry replied as under:—

"The corporate SAP ERP system in Air India and subsidiary companies of AI was signed off for implementation with IBM and SAP in January, 2011 after approval of the Board. The ERP project is scheduled for phase-wise implementation over a 18-24 months time frame. It will cover the Finance, Procurement and HR processes within the department and across the organisation. It will also integrate with various other IT applications under implementation in the operating departments.

The 1st phase is implemented/completed and the 2nd phase is scheduled for 'Go-live' in June, 2012 - followed by the 3rd Phase in November, 2012."

4.46 Asked to putforth the constraints in implementation of an integrated ERP, the MoCA submitted:—

"The constraints observed are non availability of full time dedicated staff with required domain knowledge/skill set for the ERP Project from the deptts./ module owners due to need for such staff for their own core functionalities. The lack of a well augmented team on a continuous basis is adversely impacting project timelines - given that work processes design and solution configuration for the merged entity with varied process and disparate systems is taking considerable time to conclude."

4.47 When the Committee desired to know about the steps being taken/taken by the MoCA to overcome the constraints encountered in  implementing a common integrated ERP for Air India, the Ministry failed to respond.

**H. Synergy benefits not quantifiable**

4.48 Audit pointed out that the original estimates of synergy benefit (₹ 820 crore) were refined during the detailed design work by the Consultant (Accenture), and the annualised estimates of revised synergy benefits projected were ₹ 996 crore. As against this, the actual accruals were to the tune of ₹ 503 crore till December, 2008 (as claimed by Accenture in a presentation made in April, 2009) Subsequently, the  AIL Management responded to Audit by stating that the quantification of subsequent synergy benefits was practically difficult on standalone basis because the benefits of network integration were the cumulative effect of many factors.

4.49 In the light of the above, when the Committee wanted to know the reasons for the inability of the AIL Management to quantify these benefits when the consultant itself estimated it to the tune of 503 crore, the MoCA replied:—

"Merger of Indian airlines and Air India is an ongoing activity. There are areas where synergies are being availed on an ongoing basis. The actual merger of both the companies for every aspect is yet to be completed but many areas have been completed or under process. The merger has been completed in many identified areas and the major milestones are being

74

achieved albeit slowly due to the precarious financial position of the company.

The merger benefits like economies of scale, network and savings are being achieved. The overall synergies realised as on 31 Dec., 2011 for the company are approximately ₹ 1535 crore **(Annexure - IX)**."

**CHAPTER V**

LIBERALISED POLICY TOWARDS BILATERAL AGREEMENTS ON
INTERNATIONAL ENTITLEMENTS

Traffic rights for operation of international air services are specified through bilateral Air Service Agreements (ASAs, also referred to as "bilateral agreements" or simply "bilateral"). These ASAs or bilateral agreements are concluded bilaterally, usually on the basis of reciprocity and fair/equal opportunity, and provided the legal framework for scheduled air services between two countries. Under these ASAs, traffic rights and capacity entitlements are exchanged between the countries on the basis of market requirements. The ASAs clearly specify the "entitlements" of the designated airline(S) of both countries in terms of frequency of operations, number of seats, points of call etc. Concept of "open skies policy", permits unrestricted air services between countries with minimal Government intervention.

5.2 In Civil Aviation arena, the concept of 'Open Sky Policy', permitting unrestricted air services between countries with minimal Government intervention, has become prevalent in recent times. Upto 2000, bilateral entitlements to/ from India were in line with end-to-end traffic projections based on 3rd and 4th freedom traffic — *i.e.* carrying passengers from the home country to another country and *vice- versa*. Foreign carriers were restricted only to major airports in India. During 2003- 04, bilateral entitlements were liberalized and foreign airlines were permitted to operate to interior points in India *i.e.* beyond the major airports.

5.3.  In a Cabinet note moved by MoCA in December, 2004 for 'Utilisation of Traffic Rights on International Routes' it was submitted that while bilateral air traffic rights on international routes between India and other countries were decided on the basis of reciprocity, the actual utilisation of available rights on international sectors was highly imbalanced. While Indian entitlements had remained grossly underutilised, there was a problem of inadequate capacity on most international routes from India, with passengers finding it difficult to obtain seats for nearly six months of the year. The Ministries of External Affairs, Tourism and Commerce, as well as trade, industry and tourism bodies felt the need to liberalise international air services so that seats were available to/from India all through the year. Acknowledging the problem of serious capacity constraints on international routes during several months of the year, the MoCA had adopted a 'limited open sky policy' to cater to peak season requirements (which had expanded substantially from 2003-04 onwards), permitting designated airlines to operate unlimited number of services to their respective points of call for three to six months in a year.

5.4 From 2004-05 onwards, there was substantial liberalization by the Government regarding the policy on bilateral agreements on entitlements for international operations between India and other countries as well as in allowing private Indian airlines to

76

operate on international routes. The envisaged benefits of liberalized policy were that (a) passengers would have greater choice for international travel, (b) India's utilisation of traffic rights on international routes would improve, (c) Tariffs on international routes were likely to become more reasonable and affordable, and (d) AI and IA would both gain by synergising their operations, Audit opined that while the liberalized policy towards bilateral entitlements benefited the Indian traveller considerably in terms of choices and lower tariffs, the timing of the liberalization (given the timing of AIL/IAL aircraft acquisition, upgraded Indian airport with infrastructure with hub-spoke capabilities etc.) did not provide a level playing field to the country's flag carrier.

5.5 On being queried whether the liberalized policy towards bilateral entitlements provided a level playing field to AI, the MoCA submitted the following:—

"Bilateral entitlements were liberalised in 2003. In November, 2003, Cabinet had decided to consider additional traffic rights to ASEAN countries. 5th freedom rights were given to SAARC countries. Scheduled Indian private airlines allowed to operate to all SAARC countries against unutilised entitlements. In order to protect the interests of the Air India and provide a level playing field in the liberalised policy environment following measures have been taken :—

- In September, 2004, the Ministry was directed by the Cabinet to address issues relating to building up of the capacity both in the public and private sector for providing air services between India and other countries and optimum utilisation of such capacity. In December, 2004 a decision was taken to reserve traffic rights for Air India and Indian Airlines for operation to the Gulf countries of UAE, Qatar, Oman, Bahrain, Kuwait and Saudi Arabia until 31.12.2009.

- Due consideration was given to the operational plan of the national carriers before allocating routes to other eligible schedule carriers. It was ensured that Air India had a first right of refusal for allocation of traffic rights.

- Cabinet had decided in December, 2004 wherein private Indian carriers with 5 years domestic experience and minimum 20 aircraft were allowed to fly international against Indian entitlements. While doing this, the Government reserved the Gulf sector exclusively for Air India for the next 3 years *i.e.*, until December, 2007 and further had commercialised agreements (approx. ₹ 400 crore annually) which Air India had entered into with international carriers in lieu of their inability to fly to some of the countries, and for which they are being compensated for capacity mismatch which continued till December, 2009.

- The Cabinet also directed the Ministry to seek multiple designation and enhance entitlement for other private carriers who would require these for their long-term growth plan.

77

Thus, Air India exercised the first right of refusal over every other Indian carrier and this has been the general principle. Whenever any reservation has been expressed by Air India, it was taken into account particularly if they had future interest in operating in that region. However, if reservations are expressed on routes AI did not intend to utilise, it is not possible to hold back the request of other Indian carriers since that would inconvenience the travelling public and their needs.

The Government is the sole owner of the bilateral rights. Most and above all, it is the Indian public whose demand not only have to be catered for, but allowed freedom of choice. This also allows them the benefit of lower fares. Audit itself concedes this point. Since 2009, the number of bilaterals which enhanced rights have been minimal and this, well before the position paper that emanated from the Indian airlines. The only bilaterals that have been pursued since 2009 are those in which Indian airlines had perceived their interest. It must also be appreciated that while negotiating bilaterals, there are many other stake holders; who demand greater enhancement especially representatives of Trade and Commerce, Tourism and Airport operators themselves. Today all modernised airports in the country cater to traffic far less than their capacity and are in grave danger of continuing to be in debt for want of adequate clientele and thereby revenue. The Ministry of Civil Aviation has to cater to the interest of all stakeholders and not just one section. Above all is the Indian citizen.

Under the liberalised policy, the number of seats exchanged in bilateral increased as indicated in the report. However in aggregate terms, this was in line with the increases in total carriage over the period."

5.6 Audit pointed out that the 6th freedom traffic from/to India was largely captured by Emirates, Jazeera Airlines, Qatar Airways, Thai Airways, Singapore Airlines, Lufthansa, British Airways, Cathay Pacific, Continental, Northwest etc. The 6th freedom carriage by the foreign carriers to their total carriage from/ to India ranged from 40 to 79 per cent (Gulf carriers), 39 to 76 per cent (South East Asia carriers), 61 to 87 per cent (European carriers) and 2 to 34 per cent (North American carriers).

5.7 Negating the inference drawn by Audit that entitlements given to foreign carriers enabled them to carry 6th freedom traffic which otherwise would have been carried by Air India and other Indian carriers, the MoCA has further stated that:—

"If Indian carriers could have operated on these routes utilising these rights available, they definitely would have. A point that needs to be cleared once again in perspective is that there are over 190 countries in the world and (all) carriers flying from India go to only 47 countries, *i.e.* those which are connected by flights operating on an origin and destination basis from India *i.e.* using 3rd and 4th freedom traffic. The remaining countries are connected by carriers who operate to such countries and who therefore make use of 3rd and 4th freedom entitlements given by the Indian side and likewise also by the countries of ultimate destination. It is not possible for Indian carriers to

78

connect to all destinations. There is thus inevitability about usage of 6th freedom traffic, although it is an entitlement that is never conceded in a bilateral."

**A. Sixth Freedom Traffic**

5.8 International commercial aviation traffic rights are usually expressed as 'freedoms of the air', which constitute a set of commercial aviation rights granting a country's airline the privilege to enter and land in another country's airspace. The convention officially recognises five freedoms. 6th freedom, the right to fly from a foreign country to another foreign country while stopping in one's own country, has gained considerable importance in today's scenario. For example, the 6th freedom traffic of Emirates involves flying passengers from India through Dubai (its home State) to UK/ USA. Many international airlines especially those operating from city States/ small states (*e.g.* Emirates/ Dubai; Qatar Airways/ Qatar; Cathay Pacific/ Hong Kong; Singapore Airlines/ Singapore) earn a large portion of their passenger traffic revenues from 6th freedom traffic.

5.9 The massive expansion of bilateral entitlements in respect of several countries (notably in the Gulf, South East Asia and Europe) has facilitated several foreign airlines (predominantly Emirates) in tapping the vast Indian market and funneling such traffic over their hubs (*e.g.* Dubai) to various destinations in the USA, UK, Europe and elsewhere through 6th freedom traffic. As per Audit, although the bilateral agreements do not explicitly provide for exercise of 6th freedom rights, the entitlements exchanged are vastly in excess of genuine flying requirements between the two countries and implicitly allow mega-airlines with giant hubs to exploit 6th freedom traffic.

5.10 On being asked to explain in detail, the MoCA stated :—

"The process began with the opening up of domestic markets to private Indian carriers in 1993-94. Similar aspirational change as well as the need of the Indian Diaspora living overseas and further growth caused by the integration of the Indian economy with the global economy dictated a positive move in this regard. India was one of the poorest performers in this regard worldwide despite having magnificent tourist assets, that themselves spelt the need for expansion of the International aviation market. The process indeed began in 2002 with the liberalisation of the skies for SAARC and ASEAN regions besides having near unlimited open skies for 6 months of the year during the winter months. It began to be necessary to free and institutionalise the bilateral requirements with countries of economic and geopolitical importance to India. This is a process that had been bottled for decades and was in crying need for reform.

Expansion of the aviation sector, both domestic and international, increased the opportunity for trade, further employment (caused by expansion in the sector) tourism opportunities and the pressing need of the Indian Diaspora living outside India, predominantly in Gulf, South East Asia, Europe and US. This diaspora themselves contributed significantly to the Indian economy by way of huge remittances which have now touched $ 55 billion annually,

79

incidentally the highest for any country worldwide. Not providing an opportunity for travel was being unfair to fellow citizens. Moreover, it must be borne in mind that the Delhi- Mumbai-centric approach to travel in and out of the country, whether for Indian/international travellers was unfair to all other geographical regions within the country specially States like Kerala, Punjab, etc. Constant pressure has been exerted by all sections of trade, representatives of the people and the Ministry of Tourism in its several reports which compelled the Government to take a fresh holistic look at the solutions required to quench this requirement.

The Ministry of Civil Aviation submitted, in December, 2004, a note to the Cabinet outlining these objectives and reinforced by the comprehensive study of this aspect by the Naresh Chandra Committee set up by the previous Government in 2003. The Committee, among other recommendations, expressed the dire necessity to liberalise the sector in order that it no longer constitutes a hindrance to the growth and progress of the country. In the Indian geographic context, unlike other transportation sectors, it is only the aviation sector that contributes its transportation link with the rest of the globe.

CAG has also commented about the timing of this process and stated that the process should have been more gradual to allow time for Air India to have acquired the aircraft and be able to grow. In this light, we would like to emphasize, that the process only began after widespread consultations that led to the Cabinet policy decision in December, 2004 wherein private carriers with 5 years domestic experience and minimum 20 aircraft were allowed to fly internationally against Indian entitlements. While doing this, the Government reserved the Gulf sector exclusively for Air India for the next 3 years *i.e.* until December, 2007 and further had commercial agreements (approx. ₹ 400 crore annually) which Air India had entered into with international carriers *in lieu* of their inability to fly to some of the countries, and for which they were being compensated for capacity mismatch which continued till December, 2009. These two initiatives Were expressly to address the concerns of Air India moving out from a protected environment to a competitive scenario, as is predominant elsewhere. The Cabinet also directed the Ministry of Civil Aviation to seek multiple designation and enhanced entitlements for other private carriers who would require these for their long term growth plan. As facts bear out, over this period, the liberalisation process *enabled the country to enhance bilateral  rights at a similar growth trajectory as the number of Indians travelling overseas.*

In spite of all these efforts made by the Government and the carriers, direct connectivity with India could only be established with less than 50 countries of the 190 odd countries in the world. Travelling to these perforce have to be carried by carriers that connect India to these countries through principal hubs and by airlines that have the ability and capacity to operate on such routes."

80

5.11 Claiming that sixth freedom traffic is an inevitability and it is a phenomenon that is prevalent worldwide and followed the diktat of market requirement, the Ministry added:—

> "Being undefined and invisible, no country concedes sixth freedom to another in a brlateral negotiation. Sixth freedom traffic is dictated by market forces and passenger preference. For example the IT industry, South India centric, could not be integrated with their clientele in the US to Silicon Valley, etc., without sixth freedom traffic *e.g.* Bangalore being, connected to San Francisco which neither US nor Indian carriers serve end to end. Similarly, the African continent would not be connected to India without sixth freedom over the Gulf."

5.12 Enumerating the reasons for Indian carriers' inability to fully utilize the opportunities provided by sixth freedom traffic, the MoCA stated :—

> "Indian carriers are no exception to this phenomenon and have over several decades been utilising Sixth Freedom opportunities although at a relatively smaller quantity that was restricted by the size of our carriers. The country even now has with all its airlines combined, less than 50 aircraft flying overseas. This nowhere matches the demand for travel overseas to and from India. Carriers are now poised for growth of sixth freedom traffic with the commencement of several major airports which have begun to work as international gateways. The Government assists and indeed coordinates this process to assist our airlines towards this objective. At T3 hub in DIAL about 11000 daily passengers are transiting with utilisation of sixth freedom rights by Indian carriers. This number Will grow if we allow our carrier to fly to new destinations in SE Asia and Europe and 6th freedom enable east to west and *vice versa* at T3 hub in Delhi now and at Mumbai later in 2012.

> Unforeseen delays in the delivery of 27 Boeing 787 have also further delayed Air India's ability to channelize sixth freedom traffic. The downturn of the World 'Economy in 2008 coupled with massive oil price hikes reaching $ 145/- a barrel in fact further restricted all Indian Airlines in their ability to expand at planned rates."

**B. Bilateral Policy**

5.13 The Committee desired to know if the MoCA had made any assessment regarding the liberalized policy towards bilateral entitlements. In this regard, the Ministry submitted that a detailed policy was being drawn up and the same would be submitted to the Committee once it was completed.

5.14 When asked about the Civil Aviation policy that had been adopted by the Government of India, the MoCA has replied as under :—

> "The Naresh Chandra Committee made several recommendations for the aviation sectors most of which are implemented. The draft civil aviation policy drawn up at that time was not pursued. Now in 2011, Ministry of Civil Aviation has decided to formulate National Civil Aviation Policy and consultation is going on.

81

> To have a sustainable orderly growth of the aviation sector, the Ministry has felt the need to spell out a long term Civil Aviation Policy addressing various issues related to the sector. Accordingly on 22.12.2011, a Committee has been constituted under the Chairmanship of Secretary, Civil Aviation to formulate a Civil Aviation Policy to address the long term issues of the sector and provide a road map for development. First meeting of the Committee constituted to formulate the Civil Aviation Policy was held on 26.12.2011 under the Chairmanship of Secretary. A follow up meeting of the Committee was held on 27.1.2012 under the Chairmanship of Shri G. Asok Kumar, Joint Secretary.
>
> As per decision taken in these meetings, a consultation paper has been placed on the website of the Ministry inviting comments from all stakeholders by 20.2.2012."

The latest position (as of March 2013) of the Civil Aviation Policy being formulated by the Ministry was not furnished by the MoCA to the Committee.

5.15 On being asked if there .existed any possibility of rollback of excess entitlements granted beyond genuine traffic requirements, the Ministry's submission has been as under :—

> "Any roll back of excess bilaterals or freezing bilateral entitlements has to be decided mutually and cannot be a unilateral action since this principle is enshrined in the Air Services Agreements. India has never had an occasion to ral back bilateral or freeze bilateral. In fact this is, unless there is adequate reason, a diplomatic embarrassment. Earnings of Air India and the erstwhile Indian Airlines are not only dependent upon the fact that the Government concludes bilateral ASAs with countries, but several other factors.
>
> The allocation of traffic rights to an applicant airline depends on the availability of such rights under the respective bilateral air services agreement In case the available traffic rights are not sufficient to cover the requirements reflected in all the applications, the allocation of traffic rights to various eligible applicants shall be in the ratio of Available Seat Kilometres (ASKMs) deployed by the applicants on domestic scheduled air transport services during the last five years. For this purpose, the ASKM deployment of schedule carriers in domestic sector is determined twice in a year on 1st January, and on 1st July, Traffic - entitlements decided on the basis of ASKM deployment shall be rounded off to the nearest whole number and allocated to the applicant. The grant of traffic rights essentially requires the approval of the Ministry.
>
> Though demands of a sector are usually conveyed by airlines in the inter-ministerial meetings, requests for talks are sent to the Ministry through letter. Once traffic rights are granted, the airlines have to fulfil the procedures for allocation of traffic rights.
>
> The traffic rights are allocated for a schedule *i.e.* summer or winter schedule of a particular year. Generally the traffic rights that are allocated for a schedule

82

shall be utilized during the same schedule. Failure to do so shall render the applicant ineligible for allocation of these rights for the next two years.

Schedule carriers are not permitted to reduce ASKM deployment in domestic sector once rights are allocated on international routes.

Entitlements given to Scheduled carriers may be reviewed in the event any of them reduces domestic operations after obtaining traffic rights on international routes.

The Government may at its discretion permit or deny allocation of rights keeping in view the preparedness of the airlines, viability of operations and over all interests of the civil aviation sector.

Sixth Freedom of the Air—the right or privilege, in respect of scheduled international air services, of transporting, *via* the home State of the carrier, traffic moving between two other States (also known as a Sixth Freedom Right). The so-called Sixth Freedom of the Air, unlike the first five freedoms, is not incorporated- as such into any widely recognized air service agreements such as the "Five Freedoms Agreement."

5.16 On being asked to state in unambiguous terms, if AI suffered due to lack of empathy of the MoCA towards the plight of National Carriers, the Ministry replied in negative. It stated that the role of MoCA was to work towards the goal of the development of the civil aviation sector and due consideration was always given to the operational plans of Air India before allocating traffic rights to Indian carriers.

5.17 Audit had brought out that as a consequence of the liberalised bilateral rights extended by MoCA, the private Indian carriers significantly ramped up their operations, and were granted permission to operate on international routes and the share of private Indian carriers increased substantially *vis-a-vis* the National Carriers.

5.18 Asked to specify the impact of open sky policy on the revenues of official carriers, the MoCA replied:—

"While there is no methodology for exact quantification of the impact of open sky policy on Air India, the financial impact of liberalization of entitlements has been significant. However, losses would have been caused by multiple factors and liberalization has been one of them."

**C. India-Dubai Sector**

5.19 Audit Report highlighted that the utilization of enhanced capacity entitlements by the carriers of the Gulf region (especially Dubai) was almost invariably higher than that of the Indian Carriers (for example, Dubai carrier's utilization being 98.5% and Indian carriers' utilization being 45.90%). According to Audit, a significant reason for this was 6th freedom traffic from India routed through these foreign countries to other destinations and not merely point-to-point traffic.

5.20 As per Audit, as an illustrative case of the liberalization of bilateral entitlements, the sequence of events relating to the Dubai sector, covering the period from

83

May, 2007 to March, 2010, (when the seat capacity was increased from 18,400 seats/week to 54,200 seats/week and points of call in India were increased from 10 to 14), highlighted the one-sided nature of benefits to Emirates/Dubai (through enhancement of entitlements and additional points of call in India).

5.21 The MoCA further clarified as under :—

"Dubai is the largest market till 3rd and 4th freedom basis. UAE is home to more than 1.5 million Indian Nationals who work there besides another 2-3 million in other Gulf/Arab countries. Indian Carriers notably Air India fly the maximum flights from the most number of our cities to Dubai. The bilateral entitlements have gone up significantly in the last few years albeit stepped up annually due to the huge traffic potential. It is not only the working class/labour class but a large number of business travellers, both ways and also significant number of Indians who travel for tourism since it is nearer, cheaper and also fulfils the aspirational change to travel overseas on holidays. This is also true of Thailand/Malaysia and Singapore. While 6 freedom will certainly be used by their carrier it must be borne in mind that some destinations are probably only serviced by their network in terms of choice of time and the frequency they offer. The entire West Asia, African Continent and many Central and East European countries are very well connected by their carrier. This should be looked upon as an advantage for the Indian traveller as well as people within to visit India on business or for tourism.

Indian Carriers while of course presently using substantial seats (with a huge demand pending approval by Government for Indian private carriers which will be allotted of course subject to right of first refusal by air India) have the added advantage of using 5th freedom which means Air India and other carriers can carry traffic from Dubai to beyond, a right their carriers cannot enjoy flying to India and going beyond. In fact, this aspect has not been covered or appreciated by audit where Indian Carriers have got added advantage over Gulf Carriers.......

That our ability to extract unrestricted 5th freedom to any destination ex-Dubai (that is being able to carry originating traffic from Dubai or transiting from India to any part of the world and to the extent of our full 3rd and 4th freedom entitlement) is something which audit has completely ignored nor appreciated. Such 5th freedom is not available to carriers of Dubai. For example, Emirates, Etihad, Qatar, Thai, Malaysia, Singapore all airlines are operating to India in a 3 to 5 hour radius operate wide body Boeing 777 or Airbus 330 aircraft. It would be pertinent to note that Air India does use the B777 wide body aircraft on some flights to Dubai. Moreover, the Airbus 321 of Air India which it operates to Dubai is a 180 seater aircraft with a good business class & in flight entertainment also, which can fly from Dubai to many other countries like Jordan, Syria, Egypt, Libya to name just a few. By that argument why can Air India or others not operate for example Mumbai-Dubai and beyond say to Europe or USA? There is no restriction in our bilateral, whereas their carriers are restricted from doing so beyond India."

5.22 Audit further brought out that Air India repeatedly protested on the lack of reciprocity and the funnelling of 6th freedom traffic by Emirates through Dubai from interior locations in India. In September 2006, PMO had forwarded two letters to MoCA from Shri Abani Roy and Shri Ajay Chakraborty, MPs. Shri Roy's letter referred to the policy under which the Gulf region had been reserved for PSU airlines for three years, and, as per the assurance given by the Hon'ble Minister (CA), this needed to be increased to 5 years. The file notings indicated that "in the draft civil aviation policy..., on Gulf routes, reservation of all traffic rights for AIL and IAL is. proposed to be extended from 3 yrs to 5 yrs. There is no proposal to review. these provisions", and suggested informing the PMO appropriately. However, the subsequent notings indicated that "OSD to MCA has conveyed that reply to PMO need not go." In fact, the reservation for AIL/ IAL continued only for 3 years *i.e.* till December, 2007. Clearly, the Gulf sector was AIL/ IAL's most profitable international segment before the liberalised policy on bilateral entitlements. AIL repeatedly expressed strong reservations to MoCA against the proposals/requests from Gulf countries for increase in seat entitlements as well as additional points of call at interior locations in India. This was on the grounds that the existing capacity was well in excess of "genuine"/point-to-point traffic (*i.e.* 3rd/ 4th freedom traffic) and that these proposed increases largely reflected 6th freedom traffic, which would adversely affect AIL's performance not only on the Gulf sector, but also other sectors like UK/USA Europe. Despite AI's .reservations, MoCA went ahead with massive increases in entitlements from 2004-05 onwards.

5.23 On being asked to substantiate the MoCA's approval for massive increase in entitlements from 2004-05 onwards inspite of repeated reservations of AIL against the proposals/requests from Gulf Countries for increase in seat entitlements as well as additional points of call at interior locations in India, the Ministry replied as:—

"Although, Air India expressed reservations, there was a considerable increase in the demand for opening up the Gulf routes, once the 3 years moratorium and protection of the Gulf routes for Air India was over. There. were demands from other Indian Airlines also which  needed to be catered to. Accordingly, entitlements were stepped up, at the request of Indian carriers for the Gulf routes in a graded manner."

5.24 To the query of the Committee regarding reciprocity in the facilities extended by India to Dubai, the Ministry's response was as follows:—

"India has fifth freedom rights beyond Dubai while India has not conceded fifth freedom rights for Dubai, UAE. This is an advantage for our side. Unfortunately, the fifth freedom given to India is without any restriction but the Indian carriers have not been able to take this to their advantage for want of fleet. Furthermore, the Gulf sector was completely reserved for the national carrier until the 31st December, 2008 and thus Air India had the first mover advantage for this region. Further the sector was opened up gradually in the interest of enhancing operations of Air India."

5.25 According to Audit, change of gauge facility at Dubai International Airport, which would have given an opportunity for Indian carriers to funnel traffic in smaller

85

capacity aircraft from interior Indian locations and take them onward to UK/USA/ Europe and other destinations in larger capacity aircraft was not adequately pursued, nor linked to grant of additional benefit. To this, the Ministry submitted as under:—

> "..........about the issue of change of gauge in Dubai, it must be noted that the Government *suo moto* has tried to get this in the agreement without any such demand coming from any of our carriers. Change of gauge is relatively new concept in the international air services system. India is a signatory to only one ASA containing this provision — with the USA, signed in 2005. Excepting US which was an open sky agreement India has not signed any such agreement with any other country. This we have obtained specifically from Dubai. This has been asked by India keeping an eye on the future. It has no relevance presently with the operations or financial performance of the airlines the subject matter of the• present audit. Let any airline pursue this requirement and it can be certainly addressed with the Dubai Government. It is therefore surprising that this finds mention in this Audit report. It has no relevance to AIL's performance.

> The moot point is that no airline in the world will have a change of gauge in a 3 hour flying radius. This means that they have to set up a huge infrastructure like Mumbai or Delhi in Dubai, complete with Engineering hangars, base staff, base pilots, cabin crew etc. This entails enormous cost and moreover, where are the extra planes with Air India to position them there? Besides does India grant them similar reciprocal change of gauge facility? The answer is 'NO' ."

5.26 Asked to state whether grant of change of gauge facility at Dubai International Airport was still being pursued by AI, the MoCA replied:—

> "During the last talks with Dubai in 2008, India had proposed that a change of gauge article should be incorporated in the air services agreement. This would provide benefit to the Indian carriers which would allow smaller aircraft feeding into Dubai to serve beyond points with much larger aircraft at Dubai. While accepting in principle, till date Dubai has not accepted implementation of this Article. The Indian Government has reminded the UAE authorities periodically but because no Indian Carrier has shown an inclination, it has not been pressed for immediately."

**D. Joint Position Paper on Bilateral Rights**

5.27 Audit examination revealed that in February, 2011, the representatives of Jet Airways, Kingfisher Airlines and Air India had presented a joint position paper on the bilateral rights exchanged in the recent past for the Confederation of Indian Industry's National Committee on Civil Aviation. This paper highlighted that access to a large number of points in India coupled with capacity entitlements to foreign carriers proved detrimental to the condition of the Indian carriers.

5.28 When the Committee sought MoCA's response on this joint position paper,

86

the Ministry submitted that though AI was a party to this paper, this fact was not in the knowledge of the Ministry. The Ministry added:—

> "The Joint Position paper on bilateral rights was not shared with MoCA. Therefore, the data which has been provided in it cannot be verified in the Ministry. In any event, verification of data on sixth freedom traffic is not possible since such rights are barely ever granted."

### E. MoCA's Monitoring of Performance of AIL, IAL and AI through MoUs

5.29 The annual MoU between the administrative Ministry of the GoI and the management of the Central Public Sector Enterprise (CPSE) is intended to be a performance monitoring tool for evaluating the performance of the CPSE at the end of the year with reference to the targets fixed at the beginning of the year. MoU evaluation of CPSE in done only once in a year based on audited annual accounts of the concerned CPSE.

5.30 Audit review brought out that the MoUs signed between the erstwhile IAL and AIL and MoCA were flawed. The non-financial parameters included in the MoU included minor or insignificant parameters or gave undue weightage to such parameters, at the cost of critical traffic and operating parameters in the airline industry (such as those being monitored by Directorate General of Civil Aviation). This skewed the MoU ratings of IAL and AIL unduly to present a rosy picture of performance.

5.31 When the Committee sought to know the latest position on the MoU for evaluating the AI with reference to the targets set at the beginning of the year and the parameters taken into account, the MoCA submitted as under:—

> "The MoU for the year 2011-12 has been finalised by the Ministry in consultation with the AI has already been sent to the Department of Public Enterprises (DPE) on 29th September, 2011 which is based on the original Turnaround Plan prepared by SBI Caps, consultants appointed by Air India, for the preparation of Financial Restructuring Plan (FRP). The detail parameters in the MoU for 2011-12 have the standard static financial parameters prescribed by DPE and specific and dynamic parameters.

> The composite score for the MoU for 2010-11 has also been forwarded to DPE on 29th September, 2011 based on the provisional results for 2010-11. Air India has a composite score of 3.93 which is equivalent to "Fair". It may be pertinent to mention that the following factors which are beyond the control of Air India affected the financial performance in 2010-11.

> - Global recession which led to decrease in demand resulting in reduction in Passenger revenues.

> - Increase in fuel prices resulting in increased fuel cost to the extent of approximately ₹ 950 crore.

> - Increase in interest on Working Capital by around ₹ 425 crore mainly due to increase in borrowing rates and working capital limits.

87

- Increase in Provision for Gratuity by around ₹ 200 crore in view of the amendment of the Gratuity act raising the ceiling from ₹ 3.50 lakh to ₹ 10 lakh."

The Ministry further added that the scope of the financial specific and dynamic parameters has been widened by the Ministry of Civil Aviation to enable a proper review of the Undertaking.

5.32 The Composite score is an index of the performance of the CPSE which is calculated as the aggregate of all the weighted score of the actual achievements *vis-a-vis* the targets set out on a 5-point scale. The list of composite score of AI (pre/post merger) from 2005-06 to 2009-10 as furnished by the MoCA is given below:—

| Year | Remark |
| --- | --- |
| 2005-06 | Draft MoU submitted to DPE on 23rd Jan, 2006 for erstwhile Air India. Composite Score not finalized |
| 2006-07 | Revised Draft MoU submitted to DPE on 14th Dec., 2006 for erstwhile Air India |
| 2007-08 | MoU signed with DPE on 18 April, 2007. It contained only one line that merger of Air India and Indian Airlines in to the new company shall be completed in 2007-08. |
| | The merger was completed in the year and National Aviation Company of India Ltd. was formed in 2007-08. |
| 2008-09 | MoU signed and submitted to DPE on 16th April, 2009. Composite Score not finalised. |
| 2009-10 | Draft MoU submitted to MoCA in September, 2010- MoU not signed Composite Score not finalized. |
| 2010-11 | MoU not signed. |

**F. Grant of Undue Facilities**

5.33 Audit pointed out that in March, 2010, at a time when NACIL was going through a major financial crisis, MoCA issued an order, whereby the facility for upgradation of ticket for self and immediate family for travel to the highest class available by Air India/ Indian Airlines, subject to availability of seats, was extended to all former Secretaries of the Ministry of Civil Aviation.

5.34 When asked about this, the Ministry responded that it had constituted Justice Dharmadhikari Committee and one of the terms of reference of this Committee was to look into the facilities to retired employees. The committee had submitted its report on 31st January, 2012 and it was stated to be under consideration of the Ministry.

5.35 However, in a subsequent submission of the Ministry, it has been stated that since the facility of upgradation of seat was subject to availability of seats in the

88

higher class, there was no loss of revenue. It was further stated that the seats in an aircraft/flight were a perishable commodity which were wasted once the aircraft took off and no revenue was generated.

## CHAPTER VI

OPERATIONAL PERFORMANCE

### A. Key Operational/Revenue Parameters

The details of key performance indicators of AI (including erstwhile Indian Airlines) during the period 2005-06 to 2010-11, as furnished by the Ministry are given below:—

| Financial Year | Passengers (Million) | Passenger Revenue (₹ Cr) | Revenue Passenger Kilometres (Million) | Available Seat (Million) | Passenger Load Factor % | Revenue/ Revenue Passenger Kilometres (Million) | A/c Utili-zation p.a. |
|---|---|---|---|---|---|---|---|
| 2005-06 | 12.30 | 10397 | 31403 | 47274 | 66.4 | 3.31 | 3723 |
| 2006-07 | 12.96 | 10242 | 31483 | 47869 | 65.8 | 3.25 | 3732 |
| 2007-08 | 13.21 | 9954 | 30890 | 48393 | 63.8 | 3.22 | 3593 |
| 2008-09 | 10.36 | 9267 | 25950 | 43591 | 59.5 | 3.57 | 3468 |
| 2009-10 | 11.75 | 9150 | 28965 | 44723 | 64.8 | 3.16 | 3511 |
| 2010-11 | 13.11 | 10238 | 31130 | 44511 | 69.9 | 3.29 | 3726 |

6.2 Audit scrutiny revealed a significant deterioration in operational performance on most parameters such as passenger/cargo revenues, Available Seat Kilometres (ASKM), Available Tonne Kilometres (ATKM), Revenue Passenger Kilometres (RPKM), passenger revenue per RPKM and Passenger Load Factor (PLF) for the two airlines (pre/post merger) between 2005-06 and 2009-10.

6.3 On being asked to explain reasons for decline in key operational and revenue markers of the National Carrier, the MoCA responded:—

"Prior to the merger, erstwhile AI and IA had developed their route networks independent of each others' goals. Consequently, there was little synergy in the two airlines' networks. While AI lacked the right resources to develop a cost-efficient feeder network for its long-haul routes, IC suffered from insufficient sales support of its domestic flights from foreign markets where AI held sway. On the India — Gulf and India — South- East Asia markets, two airlines had operations on the same routes as the other which gave rise to unhealthy/undesirable competition between the two airlines in these markets. The competition between the two airlines resulted in lower yields, revenues & profitability to both the airlines. Further AI was serving these routes with wide body aircraft which produced inferior economics on these relatively short-haul routes.

90

During this period AI's fleet including that of erstwhile Indian Airlines has undergone several changes by way of return of leased aircraft, phase out of old aircraft and induction of new aircraft.

The number of wide body aircraft available for scheduled operations has declined from about 31 aircraft in 2005-06 to about 22 aircraft in 2010-11, This has been one of the main reasons for the decline in the Available Seat Kilometres (ASK) during the period in question.

The other principal reasons for the decline in the ASK and the revenues are as detailed below:—

- AI had consciously downsized its long haul operations to reduce losses in an environment of rising cost of fuel and challenges faced in increasing yields in an increasingly competitive market.

- The financial years 2008-09 and 2009-10 were particularly difficult ones not just for Air India but for the aviation industry globally where most airlines had to resort to capacity cutbacks and yield sacrifices. From around the middle of FY 2010-11, cabin crew constraints on the narrow body fleet also compelled AI to reduce the utilization of its A320 family fleet.

- Post merger, the operations of erstwhile Indian Airlines, Air India and Air India Express had to be rationalized to avoid wasteful competition in order to improve the bottom line of the merged entity and its subsidiary. The main actions taken in this connection are:

  - Replacement of erstwhile AI's wide body aircraft services with the narrow body aircraft from the erstwhile Indian Airlines fleet on short medium haul services within India and on the regional international to improve profitability.

  - The hiving off of considerable operations of erstwhile Air India on the India-Gulf/SE Asia routes to AI Express to improve profitability

  - Withdrawal of positioning legs on International flights where the cost of operating the positioning sector was disproportionately high as compared to the revenues earned from the sector has also contributed to reduction in ASK."

6.4 While, claiming that improvements were registered in certain key operational and revenue parameters, the Ministry submitted as under:—

"Though the ASK's have reduced by 6%, the PLF achieved by AI has been gradually increasing over the past 3 years as may be seen from the details given below:

|  |  |
|---|---|
| 2009-10 | 64.8% |
| 2010-11 | 69.1% |

91

| | |
|---|---|
| Apr.-Dec. 2010 | 66.7% |
| Apr.-Dec. 2011 | 68.3% |

It may also be mentioned that AI has achieved higher passenger revenues to the extent of ₹ 1088 cr. in 2010-11 compared to 2009-10. Even during Apr.-Dec. 2011, AI's passenger revenues and yields have been higher by ₹ 503 cr. as compared to that achieved during the same period in 2010 in spite of the adverse impact of the pilots' strike on the AI's operations/revenues. The details are given below:—

| Period | Passenger Revenue (₹ Cr.) | Change over previous year | Yield/RPK (₹) |
|---|---|---|---|
| Apr. 09-Mar. 1 0 | 9150 | | 3.10 |
| Apr .10-Mar. 11 | 10238 | 11.9% | 3.37 |
| Apr.-Dec. 10 | 7941 | | 3.41 |
| Apr.-Dec. 11 | 8444 | 6.3 % | 3.60 |

Also, the various strategic actions taken by AI in recent years such as phase out of old aircraft, implementation of the new common Passenger Service System, rationalisation of routes, establishment of operational hub at Delhi, etc. have resulted in gradual improvement in the operating results of AI's services in terms of revenue deficit over cash costs of operations:

| FY | Revenue deficit over cash costs ₹ cr. |
|---|---|
| 2007-08 | - 885 |
| 2008-09 | -2739 |
| 2009-10 | -1114 |
| 2010-11 | -864 |

**B. Unsatisfactory performance *vis-a-vis* other competitors**

6.5 Audit scrutiny has revealed that the performance of IAL *vis-a-vis* its competitors on various parameters (PLF, domestic market share, Passenger Revenue/ RPKM) was consistently poor. IAL's On-time Performance — a critical parameter of service — was dismally low, compared to both full service carriers (Kingfisher and Jet Airways) and low cost carriers (JetLite, Indigo, Go Air).

6.6 Asked to state categorically if AI was constrained in any respect to match the performance levels achieved by other airlines, the MoCA attributed AI lagging behind the private players to the following factors:—

• Poor image due to adverse publicity in various media.

92

- Disruptions to services due to Industrial Relations (IR) issues.

- Inadequate and ageing work force at customer contact points.

- Liquidity crunch and resultant shortages of essential aircraft spares and consequently relatively inferior performance against schedules.

- Delay in the induction of B 787 — as this aircraft having capacity of 256 seats is more ideally suited to demand on many international sectors on which AI is forced to deploy aircraft having much higher capacity.

- Delay in implementation of new Passenger Service System and Automated Revenue Management System across the network.

- Non-participation in Star Alliance as planned.

However, the MoCA also claimed that there had been improvement in AI's performance in terms of PLF, yields and profitability to the extent that the airline was in a position to control its costs.

6.7 Regarding standard utilization of aircraft, flying hours for a pilot and aircraft to employee ratio in civil aviation industry as well as Air India's position in comparison with these standard parameters, the Ministry submitted as under:—

"Aircraft Utilisation:

The aircraft utilization mainly depends upon the commercial schedule and the maintenance check requirements.

The aircraft utilization in block hours during the year 2011-12 for the aircraft in Air India's fleet is as under:

| Aircraft type | Daily utilization |
| --- | --- |
| B747-400 | 6.12 |
| B777-200LR | 12.31 |
| 777-300ER | 13.23 |
| A320 | 8.6 |
| A319 | 8.9 |
| A321 | 10 |
| A330 | 9.6 |

Note : The utilization of B747-400 aircraft is deliberately kept low due to high cost of operation.

The details regarding industry standards for aircraft utilization is attached at **(Annexure - XI).**

93

Flying hours for a Pilot:

The average flying hours per month for the last 12 months for a Pilot for a B747-400 aircraft is 40 hrs. and that of B777-800 is 69 hrs. As regards Airbus fleet, the average flying hrs. per month for the last 12 months for P1 (Commander) is 61 hrs. and 55 hrs. for P2 (Co-pilot). However, as per DGCA, a Pilot can fly up to 1000 hrs. per annum.

Aircraft to employee ratio:

The aircraft to employee ratio in Air India and that in some of the leading Indian and foreign airlines on 31.12.2011 were as under:

| Name of Airlines | Total No. of Aircraft | Total No. of Employees | Aircraft/ Employee Ratio |
|---|---|---|---|
| Air India | 115 | 27274 | 1:237 |
| Jet Airways | 97 | 13177 | 1:136 |
| Lufthansa | 297 | 116353 | 1:417 |
| British Airway's | 234 | 41494 | 1:177 |

The Company, is in the process to hive off its MRO and Ground handling SBU into subsidiaries and thereby bringing down the total number of employees to 11874 and the aircraft to employee ratio to 1:103 which would be comparable to other international airlines."

**C. Route Profitability Analysis**

6.8 Audit scrutiny also revealed that with regard to the erstwhile AIL, during the period between 2005-06 and 2009-10 most routes (North America, UK, SE Asia etc.) were incurring losses, and only the Gulf/ Middle East and Far East Asia routes were making profits till 2005-06. However, by 2009-10, all routes were loss-making. Of these, the single largest loss-making route was the India/ USA route.

6.9 The Committee sought to know whether the MoCA had analyzed the reasons for low route profitability. In response, the MoCA in a written submission stated:

"Low route profitability is on a variety of reasons. Apart from historical reasons such as lack of alliances, inadequate frequent flyer programme, few code shares only and connectivity, delayed deployment of PSS, the increased competition exposed Air India to greater competition despite all efforts to give the airline adequate measures of protection.

• The higher yields achieved in 2008-09 was due to higher fuel surcharges applied during that year to partially account for the unprecedented increase in ATF costs.

• The increase in yields in North America routes in 2010-11 is due to introduction of more non-stop services replacing one halt service to North America *via* Frankfurt.

94

- The continuous decline in the yields achieved on the Gulf routes coupled with decline in PLF during the period resulted in even the Gulf services turning cash negative.

- The steep decline in the yields achieved on the Europe/UK sectors in 09-10 may be attributed to additional capacity on these routes deployed by AI's competitors."

6.10 Audit examination of route economics for the period 2005-06 to 2009-10 relating to erstwhile IAL revealed that out of total 742 Services (500 Domestic and 242 International), 63% were not meeting cash costs, 25% were meeting cash costs but not total costs, and only 12% were meeting total cost of operations. In response to Audit observation, AI Management stated (February, 2011) that during the period under review, access to the Indian market for foreign carriers had increased manifold on the one hand while Indian carriers were given unrestricted rights to increase domestic capacities besides entry into the international markets. Consequently, Indian carriers commenced operations on the very same international routes which were/are served by the Company.

6.11 However, the Ministry (in August, 2011) termed the claim of AI Management that unrestricted right was being provided to Indian carriers to increase domestic capacities as incorrect. Further, the MoCA made the following submission to the Committee:—

"The domestic carriers, including AI, operate under the Route Dispersal Guidelines and airlines are free to operate on any route. Operations on a particular route are decided by airlines keeping in view the commercial viability and availability of resources."

**D. Quality of Service**

6.12. Indian Market Research Bureau survey (commissioned by Air India) of customer perception of AI and other airlines such as Kingfisher, Jet Airways, Singapore Airlines, Lufthansa and British Airways revealed that in the international arena, the fliers were demanding more than the basic facilities with overall travelling experience and comforts and that the Air India brand was no longer preferred as it was not meeting the above standards. The study further revealed that the services of 'Air India' were not oriented towards customer satisfaction, the personnel had an indifferent "sarkari" attitude and brand Air India was kept as a substitute airline to travel.

6.13 In the light of the above, the Committee enquired about the mechanism that was evolved by AI to ascertain the level of customer satisfaction with regard to various services provided by AI. The MoCA submitted as:

"The following steps have been taken/being taken for improvement in Customer Services Department—

- Inflight announcement after take-off and prior to landing has been introduced for filling in of Passenger Feedback Forms.

- Inflight announcement for Web Sale and Sky Bazaar Sale has been introduced and modality of operation of Sky Bazaar is under review to make it more passenger friendly.

95

- A separate cell has been set up for entertaining and evaluating suggestions/feedback to be obtained directly from cabin crew to bring rationalization/improvement in services.

- A project has been taken in hand to bring a change in uniform pattern and design to provide variety on board.

- Action has been initiated to procure adequate quantity of Hindi newspapers and magazines.

- Hold-over of Inflight Entertainment contents on wide body aircraft used to be NIL which has been increased to a Library of Contents available on-board offering wider choice. At present 152 movies/other programmes of different classifications are available for viewing.

- Inflight content updaticn on narrow body aircraft has been reduced from monthly to fortnightly.

- Mood lighting has been done in the wide body aircraft intended to uplift passenger experience and the feedback indicates that it elevates passenger experience and provides clean and posh look of cabins.

- Cabin boarding music has been changed to lndo-West Fusion having a rich sound to be played at boarding, taxing, landing and arrival taxing at audible level and the feedback indicates that combined with mood lighting it has a mind altering and calming effect on passengers.

- Efforts are being made to upgrade cabin management by having neat and tidy cabins, clean and hygienic toilets, controlled temperature to have positive effect on passengers.

- Call Centre Services : upgradation/under upgradation.

  - FFP Cell — Implemented with effect from 26 Feb., 2011 offering membership, redemption and related services — functional.

  - French Toll Free — Seat assignment/Excess Baggage related offers for Indian origin passenger travelling ex-France has been implemented.

  - Tele Check-in for AI International Sectors being finalized.

  - Dial-a-Ticket (DAT) for AI International Sectors with payment collection through Domestic and International credit cards — work in progress.

  - Feedback Cell — Accessible through a Toll Free No. for handling customer feedback and complaints — work in progress; committee to negotiate being constituted.

  - Web, Chat & SMS Pull — work in progress."

96

**E. Leased Aircraft could not be returned**

6.14 Audit report highlighted that although the acquisition project involved return of all leased aircraft, as of March, 2010, IAL and its subsidiary Airline Allied Services Ltd. (AASL), had 37 leased aircraft. Of these 37 aircraft, 11 aircraft were very small capacity aircraft and 8 aircraft were sold and leased back, evidently as a means of funds generation (in view of the AI's critical financial position). Of the remaining aircraft, eight A320 aircraft had been obtained on an operating lease from a lessor (M/s. AerCap) in Netherlands between March, 2003 and March, 2005. Six of these aircraft were to be returned between March, 2008 and October, 2009, after completing the extended lease period.

As per the lease agreements, the leased aircraft were to be sent to a mutually acceptable MRO facility for completion of stipulated aircraft checks before return to the lessor. Three of these aircraft were withdrawn from commercial operations by IAL and sent to a Jordan based MRO between February and July, 2008. However, the lessor refused to accept the return of the aircraft, by raising disputes on their physical condition and documentation and raised claims of huge settlement amounts.

Finally, one aircraft was returned to the lessor in May, 2009 after a 'buy-out package' (*viz*, payment of compensation to the lessor by IAL, in exchange for waiving all liabilities associated with the aircraft "redelivery conditions") of $ 2.7 million.

6.15 When asked to furnish the details of this case, the Ministry's submission was as under :—

"As per the lease agreements pertaining to three A320 aircraft belonging to Netherland/Ireland based lessor were sent with their approval to a Jordan based aircraft maintenance organisation for accomplishment of lease return major checks.

• The lessor sought huge compensation for the shortfall in the physical condition and documentation meeting the redelivery/return conditions of the first aircraft. The compensation was negotiated considerably downwards in respect of the first aircraft by a Negotiating Committee constituted by CMD as per the decision of the Board. After completion and inspection of the next two aircraft, the lessor sought even higher compensations which were disputed by IAL(AI). The excessive and highly unreasonable buy-out amounts, being extremely disproportionate to meet return conditions, clearly indicated the intention of AerCap (a leading aircraft lessor) to avoid or delay redelivery of aircraft to the extent possible. That the lessor's intention was malafide is borne by the fact that it expected the return of about 17 years old aircraft in near brand new condition by listing even minor ignorable issues thereby even questioning the capability of its own recommended MRO.

• The Board was apprised on the status of these two aircraft. The Board decided that in respect of these aircraft, for which lease had expired and

97

    were awaiting redelivery at Jordan Aircraft Maintenance Limited—JorAMCo, the company should immediately stop payments to the lessor.

- The lessor served the notices of default for the non-payments of the lease rentals of these aircraft, which were duly responded with the replies drafted by erstwhile Indian Airlines' Indian Legal Advisor. The lessor then filed a suit against Air India in the Delhi High Court for recovery of due amounts and even for winding up of the company.

- Meanwhile, protracted negotiations were being done by the Negotiating Committee with the lessor. The parties however, could not arrive at a mutually acceptable settlement. Therefore, it was decided to appoint an independent neutral Technical Expert, as per the provisions of Lease Agreement, to inspect the aircraft and documents and decided the quantum of compensation.

- While the court case in the Delhi High Court, as stated above was going on, the lessor simultaneously filed suits in the courts at Amsterdam and Paris, who passed orders for freezing Air India's accounts without even seeking Air India submission on the issue.

- This was brought to the notice of the Board, which decided that a Global Negotiation settlement for lease return of AerCap's aircraft be arrived at through our lawyers. Accordingly, a Global Settlement Agreement was executed between Negotiating Committee comprising of erstwhile Indian Airlines and AerCap with the involvement of erstwhile Indian Airlines' Indian & foreign Legal Advisers for all the aircraft belonging to this lessor. In the Global Settlement, it was agreed that the independent Technical Expert, who had already been appointed for the purpose, should determine the settlement amount in respect of these two aircraft.

- In its final report, the Technical Expert scaled down the buy-out amounts in respect of EYB & EYC.

- Aircraft EYB & EYC were returned to the lessor after inspections by the Technical Expert and carrying out the maintenance tasks, which had become due by that time.''

6.16 The Committee further sought details of expenditure incurred by the erstwhile IAL for returning these two contentious leased aircraft to the lessor including that of forming the Negotiating Committee, appointing the technical expert etc. However, MoCA failed to furnish details sought for.

6.17 On being asked to state in no uncertain terms whether this situation could have been averted, the MoCA stated as under:—

    ''The Lease Agreements were executed after proper vetting by and with the involvement of foreign legal adviser and were based on international practices. The experience has indicated that these agreements are heavily loaded in

98

favour of lessor and leave room for manipulation by them if their intentions are malafide. The experience gained in the above process shall be put to use in executing future leases by incorporating more clarity on various clauses and preparing ourselves to meet the expectations of the lessor."

**F. Passenger Load Factor (PLF) in First Class and Business Class**

6.18 Audit has pointed out that the Passenger Load Factor (PLF) of AIL on international operations declined from 73.3 per cent in 2003-04 to 61.1 per cent in 2009-10. By contrast, the PLF of Jet Airways increased from 19.4 per cent in 2003-04 to 80.4 per cent in 2009-10.

6.19 Asked to enumerate the reasons for AI's display of poor PLF, *vis-a-vis* its competitors, the MCA replied:—

''The lower PLF on the AI system may be attributed to the following factors:

- Poor image due to adverse publicity in various media.

- Disruptions to services due to IR issues.

- Lack of presence in the domestic low-cost market with suitable product variant.

- Inadequate and ageing work force at customer contact points.

- Liquidity crunch and resultant shortages of essential aircraft spares and consequently relatively inferior performance against schedules.

- Delay in the induction of B 787 — as this aircraft having capacity of 256 seats is more ideally suited to demand on many international sectors on which AI is forced to deploy aircraft having much higher capacity.

- Delay in implementation of new PSS and Automated Revenue Management System across the network.

- Non-participation in Star Alliance as planned.

  However, the PLF achieved by AI has been gradually increasing over the past 3 years."

6.20 The aircraft operated by AIL on the international routes normally had a configuration of Economy, Business/Executive and First Class, of which Business/ Executive and First Class represent high yielding business. There was a substantial decrease in the PLF of AIL flights in First class from 14.4 per cent (2004-05) to 12 per cent (2009-10) and in Business/ Executive class from 31.0 per cent (2004-05) to 27.73 per cent (2009-10).

6.21 Enumerating the special schemes to improve the PLF on First and Business/ Executive Segment, the MoCA submitted that AI offered a number of schemes for promotion of Executive Class product on the domestic network. These included Get Up Front Offer, Upgrade through Option Town, Super Saver Offers, Platinum Pass and Companion Free Scheme. Other stated measures were entering into a number of

99

Corporate Deals by offering discounts/incentives on volumes, promotional fares offered based on seasonality to augment loads, upgrading offers for passengers to sample their product at a price so that they could convert to regular First/business class passengers, incentivise agents so that Air India captured the market share of First and Business Class traffic.

**G. Publicity and Sales Promotion**

6.22 As against the industry norms of 1.5 per cent to 2 per cent, the percentage of publicity and sales promotion expenditure to the revenue earned for Air India ranged between 0.22 per cent and 0.46 per cent whereas in respect of private airlines, the percentage ranged between 0.75 per cent and 3.99 per cent. Further, expenditure on publicity and sales promotion by Air India decreased from ₹ 7 70.15 crore in 2007-08 to ₹ 29.12 crore in 2009-10.

6.23 When asked to justify this low expenditure on advertising by AI in the present context of aggressive marketing adopted by its competitors, the Ministry replied that in 2009-10 it was felt that due to the severe cash crunch being faced by the company, expenditure towards publicity and sales promotion was to be kept to the bare minimum. However, in 2011-12, the company embarked upon major advertising campaigns in the various media channels like Television, Print, Radio and Hoardings, AI's official website and online channels and tying up with major events. The Ministry added that in contrast to ₹ 460.80 lakh spent on Advertising & Sales Promotion during period April — December, 2010, a sum of ₹ 860.70 lakh was spent on Advertising & Sales Promotion, during April—December, 2011, thus showing increased expenditure of 86.7% under this head.

**H. Negligible Sales from Website**

6.24 Audit examination had brought out that during 2007-08, AI revamped and changed its website to make it user friendly, but the percentage of web sales to total sales was poor. An integrated website was achieved in February, 2010 but the web sales increased marginally to 2.63 per cent of total sales in 2009-10.

6.25 Elaborating the efforts made to improve the web sales, the MoCA submitted to the Committee:—

> "As regards comments on improved website, for enhancing customer satisfaction and for improving sales through website, effective September, 2011, new webmaster and core team was designated with the objective of making the website as customer friendly and making it as a marketing tool to enhance direct sales thereby reducing distribution costs and other costs related to bookings through other channels *i.e.* agents, portals, booking Offices etc.

> **Initiatives taken so far:**

> - The travel/ticketing rules and regulations related to customers are being updated on real time basis (which has become an ongoing process now) to enhance customer satisfaction.

100

- Constant development & modification of Website & Web page contents as per market and commercial requirement (which has become an ongoing process) which in turn enhances customer satisfaction.

- To make it comprehensive platform and single window for all e- business activities and major source of revenue for AI.

- To enhance the speed and processing time the website has been migrated to NIC platform (Government of India) effective January, 2012 which in turn enhances customer satisfaction.

- The refund processing time has been reduced to couple of days to restore customer confidence.

- The helpdesk response time (to respond to customer queries) has been reduced to 24 hours by augmenting the entire set-up to tune it to market requirement.

- A short term web based scheme has been launched effective January, 2012 to encourage customers for web based bookings/ticketing.

- Aggressively using website as e-marketing tool for advertising promotional schemes, destinations, new flights, schedule, fares etc.

These initiatives have helped Air India to restore confidence of e- customers, change the focus of website *i.e.* customer related and above all increase direct sales *i.e.* web sales.

At present the percentage of web sales is approximately 10% of the total passenger sales on network basis now.

In order to enhance the direct sales (web sales) further, some of the major initiatives under process or in the near future are:

- To make our site truly global and globally accessible site with regional foreign languages option.

- To make it interactive and user friendly.

- To make it as major channel of revenue generation, competitive and at par with other booking portals.

- Use as an effective platform to reduce unsold inventory levels in the long run to develop website as interactive tool for customers, prospective business clients, global networking, Press releases/ information tool about our products, features etc, Blog writing, linking & development, Platform to patronise and bring people closer who matter for our business on global basis, as international tool for marketing, sales, publicity and promotion etc., platform for developing business, partnerships and associations, platform for co-promotional, co-branding activities, launches etc. and Developing data base for promotional activities.

- To link website to other social media networking sites for getting increased traffic with objective of enhancing sales, constructive publicity and brand building.

- To develop website as tool for electronic media publicity for AI to reduce costs.

- To develop ancillary revenues for Air India by extending options like travel insurance, visa processing, in-bound tourism etc for its customers."

6.26 When asked if any efforts were being made by MoCA/AI to minimize the commission paid to external agencies for sale of tickets and hence reduce the loss of revenue, the Ministry submitted as under:—

"AI is in a competitive market both for domestic and international sales. Majority of the sales happens through the Travel Agents, and they get the standard normal commission on sales from all Airlines. In order to reduce the distribution cost/commission costs, Air India is promoting sales through its own website. On such sales, there is no commission cost or distribution cost. Currently, there two promotional schemes, introduced by AI, (i) Click & Save, and (ii) Get Lucky are going on to increase the sale through AI website.

When migrating to a single code in February, 2011, a detailed exercise was undertaken to rationalise the commission amounts paid to travel agencies worldwide. As a general rule, commission levels were reduced to fall in line with each country's national carrier.

In India, Air India pays commission to agents at the same level as the other two full service carriers so as to be competitive in the market."

**I. Code Share Utilisation**

6.27.  The term 'code share arrangement' means selling of the seats on a flight by a different (operating) airline by a marketing airline through a different code. Audit observed that during 2009-10 the code share seat utilisation was only 43.48 per cent. However, by increasing the code share utilisation to 70 per cent, AIL could earn an additional ₹ 60 crore per annum.

6.28.  When the Committee desired to know whether MoCA explored the avenues offered by code share utilisation in generation of revenue for AI, the Ministry responded as under:—

"Air India is working at developing code shares with premier airlines. We have developed code shares with 12 airlines. However, some of the premier airlines, notably United/Continental, Air Canada and ANA in Star, have not responded to our requests and have been postponing developing code share co-operation with us."

6.29 When the Committee sought to know the reasons for certain premier airlines not responding to requests of MoCA for developing code share co-operation, the Ministry failed to apprise the Committee.

102

**J. Hiring of Aircraft**

6.30 Audit examination revealed that during the period 2006-10, AIL returned 24 lease aircraft but entered into a fresh lease for 17 aircraft mainly to retain market share and to bridge the capacity gap. However, AIL made operational losses on the leased aircraft for the period 2006-07 to 2009-10; while the total revenue earned on leased aircraft operations was ₹ 7 9,882 crore, expenditure incurred was ₹ 14,786.26 crore, resulting in an operational loss of ₹ 4,886.13 crore. The percentage of losses on leasing operations to total operational losses of AIL during 2006-10 ranged between 24.59 per cent and 64.99 per cent.

6.31 Audit had reviewed eleven lease aircraft proposals, out of which five were executed prior to 2006-07 and six during 2006-10 and observed that in respect of seven proposals, leasing had been justified with negative returns for 'maintaining market presence' or slot utilisation at foreign airports.

6.32 Asked to enumerate the attempts being made to reduce lease capacity of AI, the MoCA submitted:—

> "As far as attempts made to reduce the lease capacity of AI is concerned, all the aircraft taken on lease by Air India Wide-body group were returned to the Lessors after the expiry of their lease term. In the erstwhile IAL, 18 leased A320 aircraft have already been returned to the respective lessors. Five A319 and two A330 aircraft on lease are in operation and due for return in the year 2014. There are eight Sale and Lease back A320 aircraft whose leases come to an end during the period 2013-15."

**K. Cargo Carriage**

6.33 Audit in its review has brought out that Cargo carriage by AIL was on a declining trend over the years *vis-a-vis* its competitors. AIL had converted four passenger aircraft (including two leased aircraft) into freighter aircraft at a cost of ₹ 168.30 crore for its own dedicated freighter operations on the Paris, Frankfurt, Far East and South Asian routes. The freighters were inducted between June, 2007 and December, 2008, but cargo freighter operations were suspended in September, 2009, since AIL incurred a loss of ₹ 270.62 crore on these operations. In fact, as of April, 2010, AIL continued to incur lease charges of approximately ₹ 2.27 crore p.m. on the leased freighter aircraft, despite no cargo operations from October, 2009 onwards.

6.34 In this context, the Committee sought explanation regarding the losses incurred by AI in cargo operations. The MoCA responded that:—

> "Two A310 aircraft were inducted for freighter operation in mid 2007. In February, 2008, the fuel prices globally started escalating and peaked in August, 2008. As fuel constitutes 53% of cash cost, this led to an increase in cost of operations thereby making the route unprofitable. This was followed by a global economic slowdown from September, 2008 severely affecting export and import trade worldwide.

103

In January, 2009, two more aircraft were inducted. It may be noted that all four aircraft were not utilized simultaneously because each one had to undergo periodic maintenance checks.

Despite the high cost of operation and the above-mentioned limitations, AI Cargo continued to strive to enhance uplifts and utilization and achieved steady load factors of 78% ex India and 72% into India. However, due to the market environment the corresponding revenues were not forthcoming.

The freighters were withdrawn in September, 2009 due to losses, and deployed effective 15 October, 2009 for DOP operations as there was a shortage of crew for the 8737 operation and AI had a contract with the DOP which continued till 31st March, 2010 when contract with DOP expired. Subsequently, Management decisions were taken to lease/sell out the aircraft, as the aircraft were very old and difficult to maintain.

The major reasons for losses suffered by AIL in line cargo operations are:

- Decline in the air cargo market due to economic downturn.

- Decrease in AI capacity share due to considerable capacity induction by competitors. Air India capacity has remained stagnant.

- Withdrawal of capacity from Los Angeles and Combi aircraft capacity from Tokyo.

- Withdrawal of capacity from Seoul/Nairobi/Birmingham and reduction of flights into/ex Hong Kong.

- Equipment replaced in the Gulf region from A310 (WB) to B737/A320 with limited belly capacity."

When asked to furnish reasons for inducting two more freighter aircraft in January, 2009 even though its cargo carriage suffered losses due to economic slowdown from September, 2008, the Ministry failed to do so.

6.35 Further, asked to specify the steps being taken by the MoCA to improve cargo profitability, the MoCA stated:—

"Air India continues to do aggressive marketing to achieve higher utilization of the cargo capacities. Action to improve yields and revenue has been taken by offering market driven rates and incentivizing the cargo agents. The strategy has resulted in increase of revenue year on year."

## CHAPTER VII

### FINANCIAL PERFORMANCE

Audit Report had pointed out that the overall financial position of IAL/ AIL and the merged entity was abysmally poor during the period from 2004-05 to 2009-10. Even in 2004-05/ 2005-06 (when the aircraft acquisition was still under way), the financial position of the airlines was not very promising. This deteriorated drastically post-merger (2007-08 onwards).

7.2 When the Committee sought details regarding the changes in profitability of the Airlines, it has been submitted as under:—

"The National Aviation Company of India Limited (NACIL), now Air India, was formed with the legal merger of erstwhile Air India Ltd. & Indian Airlines Ltd. effective 1st April, 2007. All assets, liabilities and obligations of both the companies were undertaken by the new company.

The company has been facing severe liquidity crunch due to various factors like operational losses and its financial and operating performance has been affected in the recent years due to a number of internal and external factors. The company has experienced delayed payments to the lenders, creditors and its employees. However, the company with the support from the Government is committed to the complete revival by putting in place a Turn Around Plan (TAP)/Financial Restructuring Plan (FRP). Various initiatives have been taken by the management for improving the operational performance of the company and implementing FRP which contains sufficient equity infusion from the Government as well as additional capacity building by way of acquisition of new fleet of aircraft —Boeing 787.

The global recession which started in 2007-08 led to deterioration in the aviation environment adversely impacting Air India. The global recession and slowing down of the economy led to cut throat competition whereby both the passenger carriages and the passenger revenue yields experienced steep decline. Additionlally, the prices of Aviation Turbine Fuel (ATF) also showed a consistently upward trend whereby crude oil prices peaked in July 2008. Barring 2009-10 (when the prices declined) the ATF prices adversely impacted the bottom line of the company during the period 2007 to 2011.

Apart from the above, the financials of the company were also affected due to increase in interest costs on enhanced borrowings for both aircraft acquisition as well as working capital requirements (due to the committed plans to acquire 43 Airbus and 50 Boeing aircraft, finalized prior to merger). The depreciation on new aircraft as well as increase in wages for wage agreements (committed prior to merger) and enhancement of Gratuity Limits from ₹ 3.5 lakhs to ₹ 10 lakhs also contributed to the losses of the company.

105

The above resulted in the total accumulated loss of ₹ 20,192. 03 crore during the last four years as per the details given hereunder:—

| Year | | Net Loss After Tax (₹ in crores) |
|---|---|---|
| 2007-08 | : | ₹ 2226.16 |
| 2008-09 | : | ₹ 5548.26 |
| 2009-10 | : | ₹ 5552.44 |
| 2010-11 | : | ₹ 6865.17 |
| **Total** | | **₹ 20192.03"** |

The details of the reasons for increase in loss from 2007-08 onwards are given in **Annexure - XII.**

7.3 Further, the MoCA indicated the debt-equity ratio of AI as under :—

| Year | Debt/Equity Ratio |
|---|---|
| 2007-08 | 55  : 1 |
| 2008-09 | 101 : 1 |
| 2009-10 | 21  : 1 |
| 2010-11 | 9   : 1 |

Equity is equal to the Paid up capital of the company.

7.4 To a pointed query of the Committee as to whether the merged airline was heading towards a debt trap, the Ministry replied:—

"The company is finding it difficult to meet its daily working capital requirements. Banks have stopped lending to Air India any further. Therefore, the overdue amounts are rising. The company had prepared a Turnaround Plan which included a financial restructuring plan. As per the plan the Government would be required to infuse equity to the extent of ₹ 30,231 crore in the next ten years out of which ₹ 6750 crore is in the form of upfront Equity in 2011-12. If the Financial Restructuring Plan is approved and the equity infusion takes place as envisaged then the company would be able to meet its obligations towards interest and repayment of loans."

7.5 In his deposition before the Committee, the Secretary, MoCA stated:—

".................. when the Indian Airlines and Air India made procurement of aircraft, it was another financial burden on the company and as a result of which the cost further increased and the revenues were not keeping pace with it so that the gap between the operating cost and the revenue kept on widening."

**A. Increase in Working Capital**

7.6 As of July, 2010, AI had availed an overall amount of ₹ 19,207 crore as Working

106

Capital loan, of which ₹ 18,162 crore was utilised as working capital, and ₹ 1,045 crore was utilised for aircraft acquisition payments. The main items on which the working capital loans were utilised as of June, 2010 were fuel (₹ 5,639 crore), aircraft repairs and refurbishment (₹ 4,058 crore), interest/repayment of old aircraft loans (₹ 3,732 crore), leasing (₹ 1,416 crore) and wages (₹ 1,348 crore).

7.7 As per the information furnished by the Ministry as on 31st December, 2011, total outstanding working capital loan of AI was ₹ 22,663 crore (including payment towards aircraft project loan ₹ 884 crore). Outstandings to various vendors/authorities, interest on working capital loan, salary/ PLI/allowances including payment of fuel bills to Oil marketing companies were approximately ₹ 5900 crore.

7.8 The Committee sought to know if NACIL/AIL Board had ever considered that an enormous increase in working capital loan limits without a corresponding increase in operational revenue would cause major liquidity problem. To this, the MoCA explained as under :—

> "Yes, the Board, of Air India Ltd. and NACIL did address the issues of liquidity problems and ways and means to service the huge debt. The Board increased the borrowing limits only because of the fact that Air India was experiencing severe liquidity issues and needed the funds to pay the normal Working Capital requirements. The approvals granted were always in small tranches to meet the immediate requirements.

> It may be noted that the Equity base of Air India was very small at ₹ 145 crore only. The company had therefore made an initial proposal for additional equity in October, 2008 requesting for an infusion of Equity capital of ₹ 1231 crore and a soft loan of ₹ 2750 crore.

> The above proposal was revised taking into consideration the future capital requirement, fall in yields and decline in Market Share. In consultation with Accenture and SBI Caps a revised requirement of Equity and soft loan was submitted in July, 2009 to the Committee of Secretaries requesting for Equity support of ₹ 10,000 crore and Interest free loan/deep discount bond of ₹ 10,000 crore. The above proposal was discussed in the GoM meetings. Since then the Government has infused equity of ₹ 3200 crore in the last three years.

> The Board has always been kept informed of the progress of the Turnaround Plan and the approvals granted for raising the working capital limits were primarily to help the company meet its day to day requirements."

**B. Real-time Revenue Management Systems**

7.9 According to Audit Report, the use of PROS, an Automated Revenue Management System (ARMS) was discontinued from February, 2011, after the introduction of the new single code reservation system, which required integration of PROS with the new reservation system: The use of PROS was restored for international flights only from June, 2011; for domestic flights, the use of ARMS has not yet been implemented due to lack of adequate training of the revenue management team at Delhi.

107

7.10 On being asked to furnish the details of implementation of ARMS by AI, the MoCA replied:—

> "ARMS has been fully implemented with the new SITA Reservations, Inventory and Departure Control System effective 1st Nov. 2011 on international routes. Over 95% of all International flights are on PROS system. Charter flights like Haj operations are not put on PROS solution, as well as 2 flights with overlapping sectors, and 4 six-sector flights as ARMS cannot optimise them.

> Following the training of Revenue Management personnel at Delhi, PROS was introduced in a progressive manner on domestic flights from October, 2011. As at present, PROS has been implemented on all single-sector domestic flights on metro sector, operating between Delhi, Mumbai, Kolkata, Bangalore, Hyderabad and Chennai. These flights account about half of the domestic system revenues."

**C. Productivity Linked Incentive (PLI)**

7.11 Audit's contention has been that Productivity Linked Incentive (PLI) paid to AI officials amounted to rewarding employees for less than average achievement, since the base levels for incentive payment were set lower than the average performance achieved prior to introduction of the PLI scheme. During 2004-10, huge amounts continued to be paid as PLI to different categories of staff without appropriate linkage to operational and financial performance, at a time when the airline(s) could hardly afford such payments.

7.12 In the light of the above, the Committee sought to know the steps taken by the MoCA to minimize the huge expenses in respect of PLI paid to officials. In its submission, the MoCA has replied:—

> "The employees are paid Performance Linked Incentive (PL1) only on fulfilment of the predefined operational and performance parameters. The Ministry has time and again advised the management of AI & IA to adhere to DPE guidelines while formulating their wage/incentive structure. The Ministry has included in the terms of reference for Justice Dharmadhikari Committee issues related to PLI.

Further, the MoCA has added that :

> There is disparity between the terms and conditions of salary, PLI and Flying Related Allowances since the employees of Air India Ltd., including Pilots are paid salary, PLI and Flying Related Allowances in terms of the Settlement/ Agreements/Understandings signed with the respective Union/Associations/ Guild of erstwhile Air India and Indian Airlines."

7.13 To a concern of the Committee regarding huge remuneration paid to AI Staff, the Executive Director (IR), AI deposing before the Committee stated:—

> "When the Open Sky Policy had started, we, as the national carrier, suffered a loss because a lot of our experienced manpower was poached upon and

108

taken by the other Carriers, offering very high remuneration to them. At that time, •we had approached the Government and we were given a direction that in case you have to pay anything, it has to be linked to their performance and productivity and when we entered into the settlements at that point of time, it was an effort not only to match what the market was paying at that time but also to gain, higher productivity in return, which we did. Our utilisation of aircraft had gone as low as 1100 hours per aircraft and after introducing this, we increased the utilisation which is today nearly 4,000 hours, per aircraft. We were also able to generate a lot of revenue. This money had come out of all the revenue and savings we had done. 1 can say that when we did the last revision also, we were competitive with what the market was paying for equivalent people, but the enhancements were given only in the form of PLI so that if you had increased productivity under those parameters, you were paid and if the parameters were not fulfilled, the pay-out under the parameter did not accrue to the employee. This was the basic rationale of why PLI agreements were initiated way back in 1996. The pay-out that is there today for pilots and engineers is comparable to the other carriers in domestic sector."

7.14 As regards the huge percentage of expenditure on HR, the Director (Finance), Air India, deposed as under :—

"...as far as the percentage of expenditure on human resources is concerned, it is agreed that Air India has a very high staff cost as compared to the other airlines in India. The Jet Airways is between 12 to 13 per cent and Kingfisher is less than that. Ours is 25 per cent. It is agreed because there are certain reasons for that. Mainly the reason is that a lot of activities are performed in-house which Jet Airways get it done through outside agencies, like ground handling activities. We have a huge force and we are also taking up for other airlines."

7.15 Statistics regarding aircraft to employee ratio in Air India and that in some of the leading Indian and foreign Airlines as on 31.12.2011 that was submitted to the Committee is as under:—

| Name of Airlines | Total No. of Aircraft | Total No. of Employees | Aircraft/Employee Ratio |
|---|---|---|---|
| Air India | 115 | 27274 | 1:237 |
| Jet Airways | 97 | 13177 | 1:136 |
| Lufthansa | 297 | 116365 | 1:417 |
| British Airways | 234 | 41494 | 1:177 |

It was further submitted that the Company is in the process to hive off its MRO and Ground handling SBU into subsidiaries and thereby bringing down the total number of employees to 11874 and the aircraft to employee ratio to 1:103 which would be comparable to other international airlines.

109

7.16 On the issue of high employee to aircraft ratio in Al, a witness deposing before the Committee expressed his views as:—

> "In the Press, it has been always highlighted that Air India as a whole has got a very high employee to aircraft ratio. Private airlines or foreign airlines like Singapore or British Airways have been shown in the paper that their employee to aircraft ratio is very low. But in those airlines like Singapore Air Traffic Control, ground handling is a separate company. Engineering in Singapore is a separate company and Airline is a separate company. So, when they show in the paper that employee and aircraft ratio is low, they are talking about the airline employees only.

> But here we are a total entity. So, naturally the aircraft to employee ratio will be more. So, if that is shown and projected that is the main criteria behind this loss, it is absolutely wrong because this is no where projected that this is totally an in-house service; catering is in-house service; engineering is in-house service; ground handling is in-house; and security is in-house."

**D. Turn Around Plan(s)**

7.17 From August 2009 onwards, multiple versions of a Turn Around Plan for Air India have been presented. Deloitte had furnished a report on "Review of Turn Around Plan" in February 2011, after considering four financial scenarios proposed by AI. Some of the salient projections/assumptions underlying the review report are as follows:

- Increase in Al's domestic market share from 17% to 21% (with PLF of 75% and 80% in full service and LCC operations respectively), assuming a growth in domestic market of 22% p.a. (against the overall market growth rate of 12-13%).

- Growth of AI's market share by 15% p.a. (against market growth of 8-9%), with targeted PLFs of 71 to 80%.

- Yields from wide-body aircraft growing at 5% p.a. to stabilise at ₹ 3.55/RPKM and from narrow-body aircraft at 3% p.a. to stabilise at ₹ 4-5.55/RPKM.

- Staff cost to decrease from ₹ 0.92/ASKM in 2010-11 and 0.32/ ASKM in 2014-15.

7.18 Regarding the Turn Around Plan for AI, the Committee have been apprised by the Ministry as under:

> "The Turnaround Plan (TAP) was prepared by Air India with the help of SBI Caps who were advisors on the Restructuring Plan in June, 2010. The TAP included an Operational Turnaround and a Financial Restructuring, The TAP was required to be vetted by an independent Aviation Consultant as per the requirement of the lenders before they could consider any restructuring of the working capital loans.

> As such M/s. Deloitte Touche Tohmatsu India Pvt. Ltd. (Deloitte) who are independent Aviation Consultants were appointed to review the turnaround plan of Air India.

110

Deloitte submitted their report in February, 2011 which was then discussed with the lenders in April, 2011. The lenders appointed a Steering Committee from amongst its members to study the Turnaround Plan along with the comments of Deloitte. Based on the inputs of the lenders, the Turnaround Plan was revised and Deloitte gave their report on the revised Turnaround Plan in June, 2011, The Revised TAP was presented to the Group of Ministers in June, 2011, who appointed a Group of Officers mainly from the Ministry of Finance to study the TAP.

The Group of Officers had several meetings with Air India, SBI Caps and Deloitte and reviewed various Scenarios of the TAP. The Group of Officers submitted the report to GoM in September, 2011 suggesting that the Moderated Growth Scenario VII is the most suited. The Group of Ministers accepted the above report in the meeting on October 28, 2011 and requested that regulatory forbearance of the Reserve Bank of India be obtained. Reserve Bank of India has given its approval and dispensations that were sought by the lenders and has asked the lenders to complete the Financial Restructuring by 20th March, 2012. The plan is awaiting approval by the various lenders and their respective Boards.

As per the approved plan the Government would be infusing equity of ₹ 30,231 crore in the next ten years including an upfront Equity infusion of ₹ 6750 crore in 2011-12."

However, the Ministry failed to provide details of latest position of this TAP and various lenders involved therein.

7.19  Highlighting the features of this Turn Around Plan, the Ministry submitted as under:—

"Air India has appointed SBI CAPS as its financial consultant to chalk out a recovery plan for Air India. In consultation with SBI CAPS Air India has drawn   out a Turn Around Plan/FRP, the highlights of which are as under:—

(a)   Conversion of short term working capital of ₹11000 crore into long terms loans of 11% of 15 years duration and conversion of ₹ 7500 crore into cumulative redeemable preference shares or an alternate debt instrument.

(b)   Achievement of on-time punctuality of 93% by 2015.

(c)   Increase in Passenger Load Factor going upto 73% by 2015 and 75% by 2020.

(d)   Up-front equity infusion by Government. upto ₹ 6750 crore in FY. 2012 and equity for covering cash deficit upto 2021 — ₹ 4552 crore and equity equal to guaranteed loans till FY 2021 of ₹ 18,929 crore aggregating to ₹ 302.31 crore over 10 years *i.e.* up to FY 2021.

(e)   Increase in aircraft utilization.

111

(f)  Hiving of non-core areas in  ground handling and MRO to subsidiary companies.

(g)  Monetization of assets.

(h)  Introduction of VRS scheme amongst employees.

(i)  Rationalization of routes.

(j)  Implementation of relevant IT system for ticket, network planning, crew scheduling, operation efficiency, SABRE (Integrated Operation Control Centre), etc.

(k)  Grounding of ageing fleet.

(l)  Corrective steps to bring down cash losses on day to day basis.

(m)  Improvement in customer oriented services as envisaged by TAP.

In the event the above parameters are achieved, the company is likely to turn EBITDA positive by 2013, cash positive by 2018 and Profit after Tax by 2020."

7.20 Elaborating on its plan of further fleet expansion, the Ministry stated as under:—

"The Group of Officers in their report submitted in October, 2011 to the GoM have recommended that induction of aircraft to be only based of route planning and economics and to be reviewed after 2014-15."

7.21 On some salient features of the TAP, the Director (Finance), AI during evidence deposed as:—

"What is being planned as a part of the turnaround plan and the FRP also, the entire ground handling and engineering is being hived off into two separate units, namely Ground Handling Unit and Engineering Unit. A number of staff will be transferred to these units. Now they will have new performance indicators in these units, that is, new performance indices.

Further, the witness added:—

....there will be two separate companies. One is for Maintenance Repair and Overhaul (MRO) and another is for ground handling. These will be authorized in order to undertake ground handling activities at all the Airports. Now Government's new policy of ground handling is coming whereby Air India's subsidiary company or joint venture can only handle ground handling at the airports."

7.22 In a subsequent written submission, the Ministry furnished details regarding hiving off ground handling and engineering into two separate units as part of the Turn Around Plan.

**"MRO**

MRO is not a core activity of an airline business. It is a worldwide practice to have MRO as a separate and independent company to achieve better efficiency

112

and productivity. Many airlines in the world such as Lufthansa, Singapore airlines, British Airways, Air France, Air Lanka, Malaysian Airlines have hived off their MRO activity into separate companies.

Air India Engineering Service Ltd. (AIESL) was formed as a wholly owned subsidiary company of erstwhile air India Limited on 11th March, 2004. The Cabinet has recently accorded its approval to operationalise it. It is mandated to render Maintenance, Repair and Overhaul services to aviation industry including to Air India.

Operationalisation of AIESL is also a part of the turn-around-plan (TAP).

The Air India Management met various Unions/Associations on different Occasions in this regard. Unions/Associations sought clarifications on various issues which were explained to them alongwith the advantages which will accrue to the MRO company (AIESL) once it is operationalised as an independent Company, such as increase in productivity and operational independence thereby getting third party business.

**Ground Handling**

M/s. A.T. Kearney & Co. (appointed by the Ministry of Civil Aviation) recommended in 2002 to hive off Ground Handling activities in Air India and Indian Airlines. Thus, Air India Air Transport Services Ltd. (AIATSL) was formed by Air India in July, 2003 as a wholly owned subsidiary of Air India, with ₹ 100 crore as authorized capital with an investment of ₹ 10 crore as paid up capital (current paid up capital ₹ 5 lakh).

AIATSL was formed primarily to :

    (i)    Hive off the Ground Handling Activities

    (ii)    Lower the employee wage-cost platform

    (iii)    Contract manpower for GH, Security and other functions, directly as well as through 3rd party agencies.

As per the new GH Policy issued in September, 2010, by Government of India, subsidiary company of the National Airline *i.e.* Air India Ltd. or its Joint Venture is authorized to undertake Ground Handling services to its .own flights and flights of its customer airlines. The Cabinet has recently accorded its approval to operationalise AIATSL.

In this regard, 10 years Business Plan has been developed, which is included in the TAP. It is estimated that the profit will be consistent from the 1st year itself. An investment of ₹ 972 crore is envisaged over 10 years. Estimated Profits after tax for the year 2020-21 will be ₹ 142 crore.

AIATSL will function as Ground Handling SBU with about 12,000 staff including permanent, casuals and contract employees, for handling AI and 3rd party Airlines activities at all Indian Airports excluding those airports where AISATS Joint Venture is functional *i.e.* Bangalore, Hyderabad, Delhi, Mangalore and Trivandrum.

113

Preliminary discussions were held with various Unions of erstwhile companies and they were informed that the service conditions, pay & perks of AI permanent employees will be secured.

**Manpower**

The Company proposes to transfer/depute around 15,400 employees (MRO-7400 and GH — 8000, excluding contractual and outsourced employees) to AIESL and AIATSL. This measure will rationalize its staff cost, which currently forms around 21% of the operating cost. Presently, the company is in the process of finalizing the modalities for transfer of the concerned employees to these subsidiaries".

7.23. The SBU, Head MRO (Engine & Components), AI with regard to the revival strategy of AI deposing before the Committee during evidence submitted as:—

"Regarding the revival strategy of Air India as an integrated integrity, the Company has put up a turn around plan and a financial restructuring plan to the Government after lot of deliberation and discussion. This plan looks into the matter with respect to the market growth, with respect to the seat factor, with respect to the yields that at what rate we should grow, at what rate we should acquire aircraft not only in the integrated integrity but also in the subsidiary company like Alliance Air and Air India Express. This financial restructuring plan looks into as to how to restructure the debt and also to obtain equity for acquisition of the large number of aircraft."

7.24. The Executive Director (Headquarters), AI added :—

"...we have presented a financial restructuring plan to the group of officers set up by the Government. It has gone to the Group of Ministers in December. That plan is presently under consideration. In terms of the plan we have asked for an upfront equity infusion of ₹ 6750 crore, plus we have asked for infusion of equity to fund cash deficit of ₹ 4552 crore, plus we have asked the Government to take over the burden of all principal repayments and all interest payments on account of fleet acquisition. So, the total equity support we have sought from the Government is of ₹ 30,231 crore."

# CHAPTER VIII

MISCELLANEOUS

## A. AI-SATS

During the course of the examination of the subject, the Committee were informed about the joint venture between the then NACIL (now Air India) and Singapore Airport Terminal Services (SATS) for ground handling at Bangalore, Hyderabad, Delhi and Mangalore.

8.2. When asked to furnish the details of this Joint venture of AI-SATS and the reasons for the same, the MoCA submitted the following:

> "The then National Aviation Corporation of India Ltd.  (NACIL), now Air India Ltd., had entered into a Joint Venture Agreement with Singapore Airport Terminal Services (SATS) for Ground Handling at Bangalore International Airport and Rajiv Gandhi International Airport at Hyderabad.
>
> From the various selection criteria stipulated by BIAL for awarding Ground Handling at the new Bangalore International Airport, one of the criteria was for which the weightage was 25%, 'International experience and network of Ground Handling services to best international standards and competitive prices at airports similar to the size and set up of the new Bangalbre International Airport'.
>
> With regard to the above selection criteria, the then NACIL decided to enter into a Joint Venture with an international experienced Ground Handling Agent. Out of the Foreign Handling Agents shortlisted by BIAL, only Swissport and SATS had submitted the tender as independent unit, whereas other global players had joined hands with Indian partners. M/s. Swissport had declined the offer for a Joint Venture partnership with NACIL for Cargo and hence there was no other independent international operator other than SATS shortlisted by BIAL. As such, it was felt appropriate to join hands with SATS for submission of tender for Ground Handling at BIAL.
>
> At Hyderabad, a pre-requisite to qualify in the tender procedure was to form a consortium with third party ground handling service provider or the ground handling subsidiary of a foreign airline or parent company of an airline offering ground handling service.
>
> GHIAL had shortlisted 10 International Ground Handling Agencies apart from Air India and Indian Airlines operating through Hyderabad Airport, to whom the RFP (Request for Proposal) were issued. Out of these 10 parties, only M/s. SATS from Singapore and M/s. DNATA from Dubai had shown interest to Join NACIL as JV Partner. Security Clearance for SATS and DNATA

114

115

was asked for, from the Ministry of Civil Aviation, Government of India, on the direction of AI Board. MoCA communicated to CMD, Air India that Security clearance has been accorded by Government for AI/IC to have M/s SATS as the JV Partner.

Selection process of Joint Venture Partner for Metro Airports was initiated on receipt of information from Ministry of Civil Aviation that the Cabinet Committee on Security has approved the new ground handling policy in which subsidiaries/Joint Venture of AI & IA have been permitted to undertake ground handling activities at Indian airports. The Civil Aviation Policy *vide* SI. No.3/2010 dated 2nd June, 2010 para 2 (A) (i), (ii) & (iii) stipulates that Subsidiary Company of NACIL or its Joint Venture is eligible to undertake Ground Handling Services at all Metro Airports in addition to the Handling Agencies appointed by Airport Operator through competitive bidding and by Airport Operator themselves or their Joint Venture.

In view of all the above facts, the then NACIL after getting concurrence from MoCA entered into a Joint Venture with SATS, at BLR, HYD and Delhi.

NACIL in its 16th Board Meeting held on 17th December, 2008 conveyed its approval for formation of one omnibus JV Company with SATS for carrying out Ground Handling/Cargo Handling activities at various airports. Approval for formation of Joint Venture was also conveyed by the Ministry of Civil Aviation on 16th March, 2009."

8.3. Further elaborating on the joint venture of AI-SATS, the Ministry stated as under:

"AI-SATS joint venture is 50-50 equity partnership between AI and AI-SATS which initially operated as an Association of Persons (AoP) and incorporated on 20th April, 2010 into a company by the name of Air India SATS Airport Services Private Limited. The business was transferred from AoP to the new company incorporated *w.e.f.* 1st August, 2010.

As per the tender document issued by the Bangalore International Airport Ltd. and Hyderabad International Airports Ltd. only a firm which has international experience could carry out ground handling activity at the Greenfield airport. Air India did not have any international experience and therefore had to tie up with SATS who were shortlisted after evaluation so that they could carry out the activity of Ground Handling at Bangalore and Hyderabad. Air India on its own has not qualified to handle ground handling activities at Bangalore and Hyderabad and if we had not tied up with a JV partner, we would have lost the business to other foreign competitors who were authorized to do ground handling at these airports.

AI-SATS Joint Venture commenced its operations at Bangalore eff. 23rd May, 2008 at Hyderabad eff. 23rd March. 2008 at Delhi eff. 3rd September, 2010, at Managlore eff. 1st October, 2010 and presently operationalisation at Thiruvananthapuram Airport is under process. AI -SATS is providing Ground Handling for Air India flights and its client airlines' flights at these airports."

116

8.4. Asked to specify how the profits were being shared between AI and SATS, the Ministry stated that the profits were being shared in the capital ratio of 50:50 after tax on declaration of dividends.

8.5. On being asked to furnish details for the last three years (2009-2012) regarding the profits earned by the Joint Venture and the amount AI got as its share, the MoCA replied that since AI-SATS had to invest in capital equipment and running the business, till date *i.e.* as on 08.05.2012, no profits had been distributed by way of dividends amongst both the partners,

8.6. When the Committee sought details of investment made by SATS in the form of cash investment on ground handling equipment and human resources, the MoCA submitted as under :

"The initial investment made by AI and SATS was ₹ 33.39 crore totalling ₹ 66.78 Crore in the Association of Persons (AoP) which now stands at ₹ 87.23 crore as on 31st March, 2011. The share capital of Air India SATS Airport Services Private Limited is 80839950 shares of ₹ 10 each issued at a premium of ₹ 0.79 per share totaling ₹ 872263051 owned 50:50 by Air India Ltd. and SATS Ltd.

Since AI had a ban on recruitment, no manpower could be recruited on the pay roll of Air India in non-operational areas. AI-SATS joint venture was therefore formed to carry on ground handling business at the new greenfield airports like Hyderabad and Bangalore. Otherwise this business would have been lost to competitors like Menezes and other ground handling agencies who had foreign collaborations and had set up business at all the airports. The Ground Handling equipment at Hyderabad/Bangalore/Delhi is owned by Air India and leased to AI-SATS at a rental fee. Wherever Air India provides services to AI-SATS, the same is billed to the joint venture company.

SATS brought its own manpower of six officials from Singapore to India to man the important locations.

SATS have stated that they would bring in additional share capital once Air India's equipment at Delhi is valued. The valuer is in the process of submitting, his report and after acceptance of the valuation, SATS has agreed to bring in an equivalent amount in the form of equity share capital contribution."

The Ministry failed to apprise the Committee whether evaluation of Air India's equipment at Delhi has been completed.

8.7. When queried if the MoCA/AI faced any opposition when AI entered into an agreement with SATS to set up the joint venture, the Ministry replied as under :

"The Air Corporations Employees Union (ACEU) and the Air India Employees Guild (AIEG) had formed a 'CIVIL AVIATION JOINT ACTION FRONT' (CAJAF) to fight "the retrograde Civil Aviation Policies of Government of India including the Ground Handling/MRO Policy. The front opposed-the Ground Handling policy of the Govt. of India in granting permission to foreign Ground Handling

117

companies in the guise of Joint venture and demanded that it should be immediately revoked and NACIL should be given the required priority to provide ground handling services at all Indian airports and assistance for running an economical, reliable and efficient airlines. They stated that lucrative business of Ground Handling was being handed over to the joint Venture and the Unions/ Associations saw no benefit for NACIL or the Govt. of India. On 08 12.2008, CAJAF held a National Convention at Delhi which was attended by the representatives of the Civil Aviation Joint Action Front, Central trade Unions and some other Unions/Associations of erstwhile Indian Airlines and Air India. The CAJAF withdrew its agitation programme after the decision of the Ministry of Civil Aviation to defer the new Ground Handling Policy at that time. The new Ground Handling Policy is presently *sub-judice*."

8.8. Further, the Committee sought information regarding ground handling policy in vogue in Air India and the latest position of ground handling policy as the matter was stated to be *sub-judice* the Ministry failed to respond.

8.9. When asked to state whether detailed financial implications were worked out before going in for and after the joint venture of AI-SATS, the MoCA submitted the following:

"As a result of Ground Handling policy of Government of India, Air India had to go in for a joint venture at airports since, as per the ground handling policy, a subsidiary of Air India or its joint venture partner, the airport operator or ground handling agency selected by airport operator would only be allowed to do ground handling business at all the airports in India. As a result of ground handling policy, Air India floated a tender in 2007 to select a global partner who has international expertise and experience in this area of activity. SATS were selected pursuant to this process and a JV company was formed with SATS after obtaining the Cabinet approval.

Since ground handling constituted a non-core activity, an earlier Consultant report had suggested outsourcing of the ground handling business to a subsidiary company or strategic partner to be brought in for doing the business."

8.10. During the evidence, a witness tendered his views on financial aspect of AI-SATS before the Committee as under :

"Financially, we were earning around ₹ 350 crore per annum by handling all other airlines plus our own airlines that we were handling. It is an in-house cost. Since AI-SATS  is handling our flights, we have to pay them a charge. It is not only that. Again, if there is a profit in the revenue of AI-SAT, only then 50 per cent will come into our books and 50 per cent will be borne by them."

8.11. Taking this aspect into consideration, the Committee desired to know if AI-SATS was to be paid even for handling the flights of AI. The MoCA responded as under:

"It is true that AI- SATS has to be paid for handling the flights of Air India. With the depletion of the manpower strength at Hyderabad and Bangalore, it

118

was not possible to handle the Air India flights on its own and Air India had deployed additional manpower either on its own pay roll or through subsidiary company to handle its flights and foreign airline flights. Recruitment was frozen in Air India especially in non-operational areas since 1996. Air India therefore had to hire manpower resources through Air India Air Transport Services Ltd. (AIATSL) at various airports in order to handle the flights of the foreign airlines which was an additional cost to Air India. With the takeover of the ground handling activity by AI-SATS, this additional manpower in AIAT SL were taken over by AI-SATS on their pay roll."

8.12. The Committee further sought comparative statistics of what AI had spent for handling its flights prior to the joint venture with SATS and after AI-SATS was formed. To this, the Ministry made the following submission:

"It is not possible to compare the costs prior to the JV that is 2005- 06/ 2006-07/2007:08 and after the JV as prior to JV Air India (NB) was not charging anything for handling its own flights as same was done in-house and as was earning revenue from handling other carriers & wide body flights before merger.

After the JV that is 2008-09, 2009-10 & 2010-11 AI is paying for handling of AI flights to the JV Company and the revenue which was earned from handling foreign airlines goes to the JV Company. The handling rates given by AI to the JV company for handling Air India flights is at actual costs incurred by the JV company towards the handling of AI flights and is much less as compared to rates charged by them to international operators.

Al is also billing the JV company for the staff costs on AI pay roll working for the JV, lease cost for equipment given to JV at HYD & BLR & will receive 50% share of the dividend that the JV declares in future after taxes.

The economies of scale for the AI-SATS JV will be fully realized only when the Ground Handling Policy is implemented whereby AI/SATS JV can handle domestic flights of all private airlines operating at the airport."

## PART II

### OBSERVATIONS AND RECOMMENDATIONS

**Introductory**

The Committee note that the C&AG Report [No. 18 of 2011-12, Union Government (Civil)] on 'Performance Audit of Civil Aviation in India', highlights issues concerning acquisition of aircraft by the erstwhile Air India Limited (AIL) and Indian Airlines Limited (IAL), merger of AIL and IAL into National Aviation Company of India Limited (NACIL), impact of the liberalized policy of the Government from 2004-05 onwards on grant of air traffic rights to other countries through bilateral entitlements, beleaguered financial and operational performance of the pre-merger airlines and the merged entity and the oversight role of the Ministry of Civil Aviation (MoCA). The Committee also note that the Delhi High Court while disposing of a Writ Petition on the report of C&AG on the Performance Audit of Civil Aviation in India observed that since a responsible committee like the PAC was looking into the matter, no specific direction 'can be given to PAC to accomplish the task in a time bound manner'. The Committee examined the representatives of the MoCA, erstwhile Air India and Indian Airlines and representatives of Trade Unions and scores of documents and papers obtained from the Ministry. The result of their examination is contained in the succeeding paragraphs. The Committee observe that the Air India Limited (AIL) had last inducted two B747-400 aircraft in its fleet in 1996. Its proposal of December 1996 for acquisition of 3 A310-300 aircraft had not been cleared by Ministry of Civil Aviation (MoCA). To overcome its desperate need to acquire new aircraft and due to delay in acquisition, AIL had to induct 13 additional aircraft on dry lease by January 2004. When the proposal of December 1996 by AIL for aircraft acquisition was yet to be cleared, a fresh process for acquisition was initiated as late as January 2002. In January 2004, AIL submitted project report for acquisition of 28 aircraft (10 A340-300 + 18 B737-800) to MoCA. On 2nd August 2004, in a meeting chaired by the then Minister, Civil Aviation it was decided that Air India should revisit the proposal for purchase of aircraft and submit a fresh project proposal to the Government at the earliest. The Government directive was communicated *vide* Ministry's letter dated 5th August, 2004 and the Board of Directors of Air India in its 101st Meeting held on 13th September, 2004 decided that the fleet plan could be revisited in its entirety. The AIL Board, or 24th November, 2004, approved a revised plan for acquisition of 50 aircraft for AIL apart from 18 aircraft for its subsidiary Air India Charters Limited (AICL) (from August to November, 2004). Taking note of the fact that the acquisition process for 28 aircraft (10 A340-300 + 18 B737-800) was inordinately delayed, a purchase agreement was signed speedily for acquisition of 68 aircraft (8 B777-200 + 15 B777-300 + 27 B787-8 + 18 B737) in December, 2005. The representative of the Ministry of Civil Aviation testified that in 2001, the Cabinet decided there would be no disinvestment, the Government immediately started the fleet acquisition plan policy for over 12 years. The representative further submitted

119

120

that both the airlines were at a passe and it was imperative of the new Government to arrest further decline of the airlines and the new "Government had only two choices — either to close the airlines or to prop them with a slew of measures that needed to be implemented". The representative also submitted that the aviation sector is completely market driven and dynamic and needs rapid decision making to address the ever changing scenario. In view of the policy decisions of the Government first to keep AI on disinvestment mode and later removal from the disinvestment list, the Committee refrain comments on a matter of Governmental policy. Asked to explain the delay in one case and seemingly extraordinary haste in another case, the Ministry submitted that the proposal for acquisition of aircraft could not fructify in the first case due to approaching general elections to the Lok Sabha in 1996 and subsequently due to Government's plan on AI's disinvestment and the proposal was revived in 2002 when AI was taken off the disinvestment list.

**Letter of Congressional Caucus**

2. The chronology of events leading to change in aircraft requirement of Air India Limited (AIL) reveals that a letter dated 22 October, 2003 signed by 43 members of the US Congress pressing for purchase of aircraft by AIL from Boeing Corporation was received by Prime Minister's Office (PMO) which was forwarded to MoCA in November 2003. They further wrote that 'Air India is looking to expand its fleet of commercial aircraft and that based on price, value and schedule, the Boeing company has worked hard with Air India Management and technical experts to develop an excellent 777 and 737 package'. They referred to the American airline industry which was struggling as a result of the terrorist related events of 11th September, 2001. The letter further added that 'Air India's acquisition of Boeing aircraft will serve as a great demonstration of strengthened commercial relations between India and the United States. Therefore, we encourage you to give Boeing's proposal the utmost consideration'. The letter also made it amply clear that a successful contract with Air India would ease out their country's unemployment concerns which were at the highest levels in a decade. On 27th January 2004, PMO also forwarded two letters from Boeing (a letter of 17th November, 2003 to Secretary, MoCA and a letter of 2nd January, 2004 to PMO) to MoCA wherein Boeing had indicated that the economics of the acquisition project were strongly dependent on the number of aircraft chosen and that the technical evaluation could be easily influenced with the change in assumptions on number of aircraft to be purchased. In response to the contentions made by Boeing in these letters, AIL intimated MoCA that equal opportunity had been given to both suppliers and the number of long range aircraft had been reduced from 17 to 10 as it was not economically viable. AIL had made it clear that the question of giving Boeing a revenue benefit of 7 additional seats did not arise and also estimation of residual value after 17 years life of aircraft was fraught with risk. Further, AIL had stated that the percentage discount offered by Boeing for 10 aircraft was lower than that offered by Airbus. Furthermore, Director (S), MoCA in his letter dated 3rd March, 2004 intimated PMO that the in-house Techno-Economic Negotiating Committee (TENC) had evaluated different aircraft types on the basis of identical ground rules and had provided fair opportunity to all bidders. Highlighting the issues raised by AIL to MoCA, Director (S), MoCA stated that the AIL Board had recommended acquisition of only 10 aircraft of A340-300 variant as it was felt that acquisition of 17

121

long range aircraft would not be economically viable. The Committee note that despite the above reservations and concerns raised regarding the number of aircraft that were to be procured, the Government, as approved by the EGoM, went ahead with the deal without having a long term perspective. This is unfortunate to say the least.

**Assurance to Cabinet Committee on Economic Affairs (CCEA) not fulfilled**

3. As regards the number of aircraft to be acquired, the Committee find that Air India Limited (AIL) Board had considered and approved on 24th November, 2004, a revised long term fleet plan for 50 aircrafts. Out of this, two- thirds were on firm basis and one-third on option basis. In addition to this, 18 aircraft for Air India Charters Limited (AICL) were also approved. However, when the transaction was finalized on 30th December, 2005, Government of India approved acquisition of 68 aircraft on firm basis. this included 50 aircraft for AIL with General Electric (GE) engines and 18 aircraft with CFM engines for its subsidiary AICL, on the basis of the terms and conditions negotiated by the Empowered Group of Ministers (EGoM). All along it is seen that the proposal for acquisition was premised on 35 aircraft on firm basis and 15 aircraft on option basis. Further, at the pre-Public Investment Board (PIB) meeting held in August 2005, the representatives of the Planning Commission and Department of Expenditure (DoE) had expressed serious concerns regarding the Project Report. The Planning Commission was of the view that 'the assumptions made by AIL regarding traffic projections were risky and the upgradation appeared to be very ambitious, as statistics of the Directorate General of Civil Aviation (DGCA) did not suggest the kind of growth assumed in the Project Report'. Department of Expenditure had expressed the view that 'the assumption that enhancement of capacity would necessarily lead to higher market share may not be tenable beyond a point' and cautioned that 'Consequently, a purely supply side response would run into huge demand side risks'. It is surprising to note that the response of AIL to clearly articulated concerns of the Planning Commission and Department of Expenditure were not discussed at the pre-PIB meeting owing to the reported shortage of time and to the concerns of Department of Expenditure, AIL responded by stating that market share could be increased by increasing capacity. Despite these concerns, the PIB finally approved the purchase of 50 aircraft (35 on firm basis and 15 on option basis) for AIL at a price not exceeding ₹ 33,197 crore besides 18 aircraft for AICL at ₹ 4,952 crore. Further, the decision for exercising the option for 15 aircraft was to be taken by the board of AIL depending on the market situation. An EGoM was constituted for 'one final round of negotiations' with the manufacturers to finalise the transaction and this was based on a letter by the Minister, Civil Aviation to the Prime Minister on the lines of the EGoM set up earlier in respect of the IAL acquisition. The negotiations were held on 24th December, 2005 and the Chairman, EGoM submitted a note to the Prime Minister on the conclusions arrived at and concessions obtained by the EGoM based on its discussions with Boeing and GE. The Prime Minister's Office (PMO) on 30th December, 2005 enclosing the note of the Chairman, EGoM to Secretary, Ministry of Civil Aviation indicated that Prime Minister had seen the note and directed MoCA to inform the Cabinet Committee on Economic Affairs (CCEA) about the finalized transaction. The Committee note that the CCEA was apprised of the matter on 12th January, 2006, the MoCA conveyed approval of GoI to AIL for acquisition of 68 aircraft on firm basis on 30th December, 2005 when the PMO dispatched the said

122

note conveying the advice of the PM to inform the CCEA. Further, when DoE asked MoCA to clearly indicate in the final CCEA note the steps that were proposed to be taken for cost reduction and enhance productivity in AIL, the MoCA indicated in the CCEA note that a Committee would be set up by the Ministry to evaluate the cost structure and productivity. The MoCA need to explain whether such a Committee was setup and if so, what action was taken on its recommendations.

**Advice of stakeholders overlooked**

4. Taking note of the serious concerns of the stakeholders, the Committee find that in the Public Investment Board (PIB) meeting held on 13th October, 2005, the representative of the Planning Commission had categorically stated that, in order to mitigate the traffic risk, it would be useful to consider acquisition of 35 aircraft on firm basis and 15 aircraft on optional basis and also consider a mix of lease and outright purchase. The representative of Department of Expenditure had observed 'Plan Finance division would support purchase of 35 aircraft with an option for 15 aircraft. It also needs to be decided as to when and how the option, would be exercised'. When the Committee demanded the reasons for placing a firm order for all 50 aircraft ignoring the recommendations of the PIB, Planning Commission and Department of Expenditure, the Ministry submitted that 27 of 50 proposed aircraft were to only maintain the existing capacity, 8 were intended to cater to the growth factor and rest 15 were to be kept as an option for future growth. Thus, by the Ministry's own submission, the requirement was of 35 aircraft even after factoring in the needs arising out of growth. As originally envisaged, the 15 aircraft ought to have been kept on option basis. The second reason advanced is that 'the EGoM chose to place firm order of 50 aircraft on account of discounts made available by Boeing Company as also the other investments to be made by the Boeing Company in India'. The Committee refrain from making comment on the wisdom of EGoM but would like to be apprised of the discounts made on such bulk purchase orders and the investments made by the Boeing Company in India as assured.

**Delivery/deferment of aircraft**

5. Asked to explain why Air India (AI) deferred the acquisition of the last 3xB777—300 ER aircraft which were to be delivered in 2010-11 and 2011-12, the submission of the Ministry was that with the onset of economic recession in late 2008, traffic was on the decline and many airlines were adopting the strategy of reducing capacity and operations to reduce the impact of recession. It was claimed that Air India had undertaken restructuring of its existing operations including reduction of operations to curtail losses. In addition, the Board had directed AI management to explore the possibility of deferment/cancellation of new aircraft induction to reduce the burden of loan repayments. The proposal to defer B777s was made at AI's Board meeting held in June 2009 based on a Board's directive to evaluate the cost of deferment *vis-a-vis* the cost of taking delivery of the aircraft. Though the Board had directed that Air India should cancel or defer the deliveries of the last 6xB777 — 300 ER aircraft, AI was in a position to defer the delivery of only the last 3 aircraft as the other 3 aircraft were already in production and deferment of the same was not possible. The Committee deplore that when the purchase agreement was concluded in December 2005, a desperate need for 50 aircraft was made out and

123

in the next few years there had to be deferment in the delivery of aircraft to reduce the burden of loan repayments. While taking note of the submission of the representatives of the MoCA that the aviation sector is completely market driven and dynamic, the Committees however, feel that the payment capacity of Air India for such a large fleet was not anticipated.

**Debt Funding**

6. The Committee note that the entire acquisition (for both AIL & IAL) was to be funded through debt, to be repaid through revenue generation except for a relatively small equity infusion of ₹ 325 crore for IAL. Even when the decision on acquisition of 50 + 43 aircraft by AIL & IAL respectively was taken, the debt-equity ratio of AIL was very high at 4.6:1 and negative in case of IAL. The Planning Commission in the meeting of Public Investment Board (PIB) held on 13.10.2005 had prudently observed that 'since Air India is a commercial undertaking, it is best to leave major commercial decisions to them while the balance sheet of AI shows that there had been marginal profits for the last three years, for large investments over a long period, the balance sheet should be stronger, especially since AI is seeking Government guarantee for the loan'. Noting Debt Service Coverage Ratio being below one, AI was asked to explain how it would service the debt. The view of the Department of Economic Affairs (DEA) was that 'with regard to financing with GoI guarantee, a preferred option may be to encourage financing, arrangements not involving Government guarantee'. Department of Expenditure (Plan Finance Division) had clearly stated that 'Debt Service Coverage Ratio of the project for 50 aircraft is below one on a stand-alone basis. The capacity of AI to service the debt is a crucial issue, especially since Government guarantee is being sought'. When the Committee sought clarification about the role of GoI in financing the acquisition, the representative of the Ministry stated that the Company approached the Ministry only for Government guarantee because the Government guarantee provided certain level of comforts to the bankers and clarified that Government did not have any direct financing role. Further, the Ministry also added that the decision to fund through debt was taken in view of the economics involved as AI were able to secure US Exim financings for all its earlier aircraft at a very competitive rate of interest. Hence, AI had requested the GoI to provide a sovereign guarantee for arranging Exim financing for its acquisition of Boeing aircraft. The Committee observe that a Company (Boeing) was given business out of the money borrowed from an American Bank (Exim Bank) and to this the GoI had stood as a guarantor against the advice of Ministry of Finance that 'a preferred option may be to encourage financing arrangements not involving Government guarantee'. The Committee would like to be apprised of the ground for such an arrangement.

**Avoidable Interest Burden**

7. Further, the Committee are deeply distressed to note that due to the delay in providing GoI guarantee, the Air India Limited (AIL) and Air India Charters Limited (AICL) had to pay additional interest to the extent of ₹ 199.37 crore and ₹ 21.34 crore respectively, a huge burden wholly avoidable. Due to delays in providing GoI guarantee, AIL & AICL had to avail bridge loans as a stop-gap arrangement to make necessary pre-delivery payments. Since the bridge loans carried a higher rate of

124

interest, AIL & AICL had to pay additional interest. The Committee find that the request of AI to MoCA to approach Ministry of Finance (MoF) for Government guarantee was made in September 2006 and it fructified only in October 2007. According to the Ministry, the reasons for the delay was that headroom was not available to the Budget as the Financial Responsibility Budget Management (FRBM) Budget was equal to 0.5 percent of the GDP and the Government could not afford to give guarantee for more than that. Though the Ministry claimed that they had informed the Ministry of Finance about the time of delivery of the aircraft, they did not have the Budget to make payments. Surprisingly, the speed and synergy, with which the purchase agreement was concluded with Boeing, was lacking while executing the agreement, more so when the financial implications were evident causing a wholly avoidable loss of ₹ 220.71 crore to the public exchequer on account of additional interest burden alone.

Defective assumptions

8. The Committee note that in the Project Report dated le 14th May, 2005 for acquisition of 50 Long Range aircraft, it was assumed that the outbound travel was growing faster due to increased liberalisation and globalization of Indian economy and success of Indian IT industry. Many of the foreign airlines were given huge increase in capacity entitlements far in excess of the genuine 3rd./4th market freedom resulting in their use of this excess capacity to funnel traffic between India and USA/UK/Europe through their respective hubs. The Open Sky Policy had made the Indian air market fiercely competitive. It was assumed in this Project Report that the long term traffic growth rate would be 7-8% and this was not very high when compared to the Average Annual Growth (AAG) rate which was 6% in the previous decade. Further, the capacity share of an airline was a primary determinant of its market share and AI had to increase its capacity deployment at a rate faster than the traffic growth rate in order to increase its capacity share and therefore its market share. The other reason was that the private domestic carriers were aiming to fly overseas and they had a brand new fleet. The Project Report had envisaged that induction of 50 aircraft would enable AI to expand capacity on international routes at an AAG of 10.8%. This growth rate had factored the reduction in capacity as an outcome of transfer of some of its Gulf and South-East Asia routes to AICL. In addition, the assumption of the capacity (in terms of Available Seat Kilometers) to grow at an AAG of 14.5% was because of increased proportions of operations on long haul routes. The assumptions for yield increase was based on AI's route strategy which was to focus on its core markets of USA, UK & Gulf, including non-stop services between India & USA with Ultra Long Range aircraft. It was envisaged that the above route strategy would enable an increase in yields. The Committee however feel that many of the key assumptions underlying the revised Project Report for acquisition of 50 long range aircraft were unduly optimistic. The assumption that increase in capacity share would automatically lead to an increase in AIL's market share (projected increase from 19% to 30% by 2012-13) was not adequately validated. The concerns of the Planning Commission with regard to the assumptions made by AIL regarding traffic projections were that they were risky and the upgradation appeared to be very ambitious considering the past trends. 'Further, the statistics of the Directorate General of Civil Aviation (DGCA) did not suggest the kind of growth that was assumed

125

in the Project Report. Notably, the Planning Commission had opined that it would tantamount to skating on thin ice since traffic growth was not guaranteed and internal rate of return with fuel cost at the prices prevalent then was only 6.2%. The Department of Expenditure had also stated that a purely supply side response would run into demand side risks and the high traffic growth projections needed careful consideration since project viability was highly sensitive to reduction in traffic yield. The Committee would like to know whether reservations of all the stakeholders were placed before the EGoM.

**Lack of benchmarking and commercial intelligence**

9. The Committee find that there were multiplicity of negotiating procedures that were adopted. These included constituting a Price Negotiation Committee in June, 2005 to hold price negotiations with the concerned airframe/engine manufacturer, an Overseeing Committee constituted in August, 2005 to oversee the process of price negotiations and constitution of an Empowered Group of Ministers for 'one final round of negotiations' with the manufacturers to finalise the transaction. In order to negotiate the prices of aircraft, it was normal and necessary to make an assessment through commercial intelligence gathered globally to assess a reasonable or threshold price based on comparable prices paid by other buyers and other concomitant factors. Surprisingly, no benchmarks for the cost of the aircraft were set (either for the AIL acquisition or for the IAL acquisition) before negotiations were initiated with the manufacturers at various levels. When asked to furnish reasons for the same, the Ministry submitted mutually contradictory views to the Committee and to the Audit. Allaying the fears of Audit on the issue of arriving at the threshold price, the Ministry stated that 'every attempt is made by any buyer to collect commercial intelligence globally to determine the threshold price. Benchmarks are always established in a negotiation and this conclusion that there were not any is not correct'. In sharp contrast, the submission of the Ministry to the Committee was 'No separate benchmark price was set up for the negotiation process as no industry standards are available for benchmarking the price of civil aircraft'. Taking note of, the explanation submitted by the MoCA, the Committee wish to stress that any such future purchases should be made after due assessment of commercial intelligence and the global air traffic scenario to arrive at a correct price.

**Irregular post-bid seat re-configuration**

10. The Committee find that during negotiation process, the configuration of seats was revised in November 2005. The seating capacity of the B777- 200LR and B777-300ER were reduced by 28 seats and 38 seats respectively. This was the result of the discussion held on 12th November, 2005 on the proposed configuration of seats on the B777-200LR and B777-300ER in a high level ministerial meeting. Further, after finalizing the revised seat configurations and intimating the same to Boeing by AIL, the matter was sent for the AIL Board's information only. The GoI/EGoM was not informed of this change in seat configuration. On being asked that the seat re-configuration could have had an impact on the transparency of the negotiation process and terms and conditions of the contracts with the supplier, the Ministry stated that Boeing did not manufacture aircraft seats and the Airlines were given a choice to select its seat vendor from amongst the approved panel of Boeing. Such a

126

change in the seat configuration during the negotiation process was irregular as it was a post-bid change and clearly affected the transparency of the negotiation process. The assumption of further yield increase also could not be relied upon totally in view of the observation of the then Commercial Director, AIL who had stated that 'in the Executive Class, AIL should be able to achieve a further yield increase of 5 per cent on both aircraft, provided that there is no substantial increase in competitive pressures and all other aspects of the AI product offering to meet prevailing global standards'. The Committee are of the considered view that techno-economic decisions need to be taken only at the Airlines level and certainly not at the behest or level of the Ministry. The Committee also note that the Project Report had projected increase in revenue only by assuming additional 5% yield increase in the Executive Class. On the contrary, the preliminary analysis of the seat changes based on the methodology adopted in the Project Report indicated significant reduction in estimated passenger revenue and overall revenues contrary to the claim by the Ministry that re-configuration of seats would increase the revenue. The Committee are therefore of the considered view that post bid  seat re-configuration was irregular and the Government should evaluate the financial implications and report to the Committee within three months of presentation of this Report. Further, the Committee recommend that strong measures be taken so that such irregularities do not recur.

**Liquidated damages for delayed delivery**

11. The Committee note that against the 50 aircraft to be delivered by October 2011 as per contract, only 28 aircraft (8 B777-200LR, 12 B777-300ER and 8 B787-8) have been delivered as of September 2013. Delivery of 3 B777- 300 ER aircraft was deferred at the instance of AI in 2009. The delivery of all the 27 B787-800ER *i.e.* dreamliner aircraft, was scheduled between September 2008 and October 2011. The Committee have been apprised that the remaining 22 aircraft (3 B777-300ER and 19 B787-8) have now been scheduled for delivery by December, 2016. When specifically asked about the compensation for delayed delivery of the aircraft, the Ministry stated that as per the purchase agreement, the B787 were to be delivered from September 2008. The Committee are pained to note that the purchase contract was loaded against the buyer *i.e.* AI since despite the delay of more than three years in the delivery of these aircraft the purchase agreement provides for compensation only upto a maximum of 180 days. The amount of liquidated damages was to be calculated according to an approved formula on the basis of the data in the most recent AVMARK publication at the time customer received notice of a non-excusable delay from Boeing. This amount was not to exceed an aggregate sum of 180 days per aircraft. When asked about the liquidated damages, the Committee were apprised that for an average daily lease rate of USD 30,000 per day, the maximum compensation payable will be USD 30,000 multiplied by 180 days and will work out to USD 5.4 million per aircraft. The Committee therefore recommend that immediate steps be initiated for claiming liquidated damages as per the contract and action  should be taken to safeguard the interest of the Airline in terms of the contract and to avoid such a dereliction of duty in future.

127

**Compensation for grounding of dreamliner**

**12. The Committee note that, as of March, 2013 out of the 27 dreamliner aircraft that were to be received, only 6 were delivered to AI and all 6 of them had to be grounded following directives of US Federal Aviation Administration which were issued after the two, incidents that took place involving lithium ion batteries in the dreamliners. On being enquired, the Ministry conceded that Air India had grounded all of its 6 B787 aircraft since 17.01.2013 following a directive of DGCA that was based on Federal Aviation Administration (FAA), USA, Emergency Airworthiness Directive (EAD) dated 16.01.2013 which required all B787 operators to temporarily ground the aircraft, subsequent to fire incident reported on aircraft operated by JAL (Japan Airlines Ltd.) and ANA (AI Nippon Airways) caused by malfunctioning of Lithium-ion battery. It was further submitted that in order to restore B787 aircraft back to service, Boeing AOG team had arrived in Mumbai-Engineering facility and commenced work on the first aircraft on 30th April 2013, to accomplish the Boeing Alert SB. The task had been accomplished and all six aircraft were positioned at Delhi. As regards any compensation from Boeing for losses incurred by Air India due to grounding of the aircraft, the Committee were informed that a three-member committee comprising heads of Engineering, Finance and Commercial had been constituted by the Board, during its 52nd Board meeting held on 7th May 2013, to negotiate on the matter of compensation to be provided by Boeing on account of the prolonged grounding of these aircraft and consequent damages suffered by Air India. The Ministry, responding to the question if there were any in-built clauses to safeguard the interests of the Airlines in the event of technical problems arising after the delivery of the aircraft, as seen in the instant case, stated that, the contractual agreement with Boeing warrants that, at the time of delivery all Boeing products will be free from defects in materials, process of manufacture and workmanship, including the workmanship utilized to install suppliers products, engines, etc. The agreement also warrants that all Boeing products will be free from defects in design, including selection of materials and process of manufacture in view of the state-of-the-art at the time of design. In case of B787 aircraft such warranty is applicable for a period of 48 months after delivery. As per Clause 7.3 of the Warranty, Boeing will reimburse Customer's reasonable costs of Direct Materials and Direct Labour by credit memorandum (excluding labour hours expended for overhaul) at Customer's Warranty Labour Rate to correct defective Boeing products. As per clause 7.3.5, Boeing will reimburse Customer's freight charges associated with a correction of a defect on a Boeing product performed by its Authorized Agent or a third party Contractor. The Committee would like to be apprised of the action taken to safeguard the interest of the Airlines in terms of the contract after the defects were noticed.**

**Faulty assumptions about market share and fleet strength**

**13. The Committee, while examining the acquisition of aircraft by erstwhile Indian Airlines Ltd. (IAL) were apprised that in February 2006, erstwhile IAL had signed purchase agreements with Airbus/CFM for supply of 43 Airbus aircraft (with CFM engines) at an estimated cost of ₹ 3399.60 crore. In March 2002, IAL had projected an increase of 6% in domestic fares in the first year (2003-04) and further increase of 2% per annum for 4 years (2004-05 to 2007- 08) in order to make the negative Net Present Value (NPV) positive. This assumption of dramatic increase in**

128

yield at constant costs (i.e. while assuming costs-fuel, staff interest and other costs, etc. to be constant throughout the project life) appears to have been critical to projecting an optimistic picture of positive project cash flows on NPV basis which in turn was required for the approval of the acquisition project. In reality, IAL could not achieve constant revenues at constant costs, let alone increased yields at constant costs. When specifically asked if the achievements supported the projections that were then made to project positive cash flows, the Ministry responded by stating that the actual achievements may vary from the assumptions in the project study. It was also submitted that when the aircraft were evaluated, the share of the Low Cost Carrier market in India was below 10% and it had grown to nearly 70% resulting in dilution of yields of the Full Service Carriers like AI. The statistics regarding the increase in fleet strength and its bearing on IAL's market share did not support the Ministry's view that increase in fleet strength would increase IAL's market share. Evidently, the assumption that increase in fleet strength could bring commensurate increase in IAL's market share of traffic, was wholly unrealistic and based on specious claims which were challenged within the Government. The Committee would like to be apprised of the IAL's market share of traffic after the induction of new aircraft month-wise beginning from the induction of first aircraft.

**Setting up of MIRO**

14. While examining the manufacturer's commitments for aircraft acquisition, the Committee observe that the Airbus had proposed to establish a training centre at an approximate investment of US $75 million and a warehouse, and inspite of Airbus not being the leading company it would assist the creation of Maintenance, Repair and Overhaul (MRO) facilities with an investment of US $100 million. It is noteworthy that, the commitment regarding creation of MR0 and training facilities was open-ended as there was no timeframe laid for the creation of such facilities. Further, there was no mention that the training and MRO facilities would be exclusive for IAL's use or it was meant to be for all users of Airbus aircraft (public and private) in India and nearby. With regard to AIL aircraft acquisition, similar commitments were obtained from Boeing. The only difference was that these commitments were included in AIL's purchase agreements but did not figure in IAL's purchase agreements. On being asked to furnish reasons for the same, the Ministry replied that no firm commitment was made by Airbus for direct investment in the Cooperation Projects *i.e.* establishment of MRO, Pilots training facilities and dedicated spares centre for Airbus aircraft. The Ministry claimed that `The Letter Agreement no. 4 to the Purchase Agreement dated 20th February, 2006 described various Co-operation Projects' and `factually Airbus commitments are by way of Co-operation Projects as per Letter Agreement no. 4 to the Purchase Agreement'. Further, it was added that Letter Agreements to the Purchase Agreement constituted an integral part of the Purchase Agreement and governed by all the provisions of the Purchase Agreement. When the Committee enquired about the progress made in setting up of the Maintenance, Repair and Overhaul (MRO) and warehouse facilities, the Ministry submitted that Airbus in their letter dated 22nd January, 2008 sent to AI had mentioned their obligation and endeavoured to support the establishment of an MRO venture between AI and EADS (European Aeronautic Defence and Space Company, the parent Company of Airbus) and its Indian affiliates. It was submitted that there was no mention of any financial

129

commitment in the letter. To the AI's suggestion that Airbus could contribute in the development and expansion of Air India Engineering Service Ltd. (AIESL, which was wholly a subsidiary of AI formed as a result of hiving off its MRO activity as a separate company), the response from EADS/Airbus was awaited. On the prevalent situation with regard to running the MRO facilities, the Committee were apprised that there was no direct Airbus participation. About the commitment of Boeing with regard to MRO, it was stated that Nagpur had been shortlisted and the work had begun. The target date for completion was July 2013. To a specific query of the Committee whether any study had been conducted by AI for establishing MRO at Nagpur, the Ministry's reply was in the negative. When asked if Nagpur had any aviation infrastructure for setting up the MRO there or AI had to start from scratch to build this MRO, the Ministry's reply was that MRO was being set up at Special Economic Zone (SEZ) area near Nagpur Airport. The reply is far. from tenable and the Ministry need to explain the rationale for choosing  Nagpur as the location for MRO and the actual progress of the project and the  time by which the project would be commissioned.

**Expenditure on aircraft maintenance in foreign countries**

15. Enquired about the MRO infrastructure and facilities of Air India, the Committee were apprised that AI had developed, and was running its MRO facilities for the last several decades for maintenance of its aircraft. The Ministry also submitted that jobs from outside parties were also undertaken whenever slots were available. When specifically asked to furnish reasons for incurring expenditure on maintenance/ repair/servicing of the aircraft in foreign countries inspite of in-house facilities, the Ministry submitted that though MRO facilities of AI are equipped with infrastructure and manpower for carrying out maintenance checks of the aircraft in AI's fleet in-house, AI had been leasing aircraft for its operations which were sent abroad for redelivery/major maintenance checks since the lease agreements stipulated that these checks could be accomplished at Federal Aviation Administration (FAA)/ European Aviation Safety Agency (EASA) approved MRO facilities and AI MRO facilities were not FAA/EASA approved. The Committee are perplexed to note that during the last 5 years, AI incurred whopping expenditure to the tune of USD 22,568,214.98 on maintenance/repair/servicing of aircraft alone in foreign countries. This is clearly indicative of the fact that the lease agreements were one-sided and favoured the lessor at a huge cost to the nation. The Ministry therefore need to explain to the Committee as to what measures it undertook to ensure that the lease agreements were unbiased,  wholly unavoidable and that the nation's interests were well-safeguarded.

**Faulty assumptions about merger**

16. The Committee were apprised that taking note of the global trend towards consolidation in the airline industry, the MoCA considered it imperative that the two National Carriers are merged as the merged entity would not only be able to compete effectively in the market but also find greater acceptability amongst the global alliances. A consultant was appointed for preparing a business case for merger and paid a fee of ₹ 15.41 crore. The Cabinet approved the proposal for merger on 1st March, 2007. To a specific query of the Committee, the Ministry submitted that there were four reasons for the merger. Firstly, since the competitiveness in the aviation

130

field was increasing, AI on the global front was facing a lot of competition. Secondly, both the airlines were operating with older type of aircraft and processes were going on for expansion and acquisition of aircraft. This required integration of various requirements. Thirdly, there wiere certain overlapping routes from the scheduling point of view which were operated by erstwhile IA, AI as well as the subsidiaries. Lastly, since 70% of global traffic was being routed through various alliances in the world and in order to take leadership in the aviation, it was necessary to become a partner to some of the alliances. The merger was to provide competitiveness, economy of scale, resource consolidation and the optimal use of both the aircraft equipment, ground handling side as well as the manpower. When asked if the merger was effective, the Ministry submitted that there had been good progress regarding integration of network/schedules, cross-utilisation of aircraft fleet, leveraging scale for joint procurement (fuel, insurance, etc.) and harmonization of booking offices/facilities. However, disparities relating to HR issues were yet to be resolved. On the question of lack of adequate validation of financial case for merger, the Ministry submitted that the details of the financial gains from the merger due to synergies were anticipated and formed part of the consultant's report but admitted that some of them had not materialized due to several other prevalent factors. The Committee would like to be apprised of these 'several other 'prevalent factors' responsible for non-materialisation of the objective of merger, the revenue earned, the losses and debt incurred by AI year-wise post merger upto 2012-13.

**Action on Dharmadhikari Committee Report**

17. The Committee observe that although the merger of AIL and IAL was to be completed within 36 months from August 2007, there were huge delays regarding the same. When asked whether MoCA was able to complete the merger within the stipulated time-frame and manner, the Ministry responded that migration to a Passenger Service System, single code, IT integration, bogged down HR integration owing to legacy union agreements, integration of various cadres on Department of Public Enterprises guidelines and acceptable level mappings had, admittedly, delayed the merger process. Notably, AI had set up an inter-departmental Committee to monitor and facilitate the integration process. Several working groups were also set up at lower levels to implement the merger and integration. Ministry also constituted a Committee of experts under the Chairmanship of Justice (retired) D.M. Dharmadhikari to go into the HR issues including contentious issues with regard to Performance Linked Incentive (PLI), level mapping and cadre re-structuring. The Dharmadhikari Committee had submitted its report on 31st January, 2012 to the Government. When asked to supply a copy of the Report, the Ministry submitted that it was under the consideration of the Government. The Committee would like to be apprised on the recommendations and observations of the Dharmadhikari Committee and the implementational status thereof.

**Status of merger/integration**

18. When the Committee sought to know the areas in which the integration had been actualized, the Ministry stated that merger of Indian Airlines and Air India is an ongoing activity and concluded that the actual merger of both the companies for every

131

aspect was yet to be completed. Further, the Ministry also clarified that the major milestones were being achieved albeit slowly due to the precarious financial position of the company. Notably, at the time of merger, 226 critical activities had been identified and targeted for completion. Out of these, 161 were completed, 58 were in progress and 7 were not initiated at all. Amongst the ones that were not initiated at all, 5 pertained to operational integration and two were contingent on management decisions. Regarding the delays in implementing Single Code Passenger Reservation System, the Committee were informed that although Single Code Passenger Reservation System was scheduled to be achieved by 1st April, 2008, IA and AI managed to migrate to Single Code Passenger Reservation System with effect from 27th February, 2011. Delay was attributed to 're-tendering' as one of the parties who had not been selected had approached CVC and it had taken considerable time. The Ministry conceded that complete integration of the two entities had not been achieved with regard to  MR Management and that there were several constraints in implementing the merger process owing to the large dimensions of AI and the financial crisis faced by AI. In another candid submission before the Committee, a witness deposed that 'even on the field, practically, the erstwhile IA personnel are working separately; the erstwhile AI personnel are working separately'. HR integration below the level of DGM had not taken place and this had significantly affected the completion of merger. The Committee are dismayed that the crucial aspect of the merger has still not been achieved and therefore urge the Ministry to secure complete merger and consolidation in the interest of harmonious relations inter-se between the various stream of employees and the efficient functioning of AI.

Apprehensions of Employees' Associations/Unions

19. On the role of Employees' Associations/ Unions with regard to merger, the Committee were apprised that MoCA in 2007 had held a meeting with the Employee's Association/Unions of the two airlines and it was only to announce the decision of the merger and not to discuss the key issues. In a letter dated 8th February, 2007 of Joint Action Committee of Unions/Associations/Guilds of AIL addressed to the Convenor, Empowered Group of Ministers (EGoM), it was stated that the then Minister of Civil Aviation met all the Unions of AI on 17th January, 2007 in Delhi on the directions of the EGoM and it was apparently to apprise the representatives of the two oldest aviation companies on the proposed merger. According to the Union, the meeting was convened at a short notice of 24 hours, which made it virtually impractical and impossible to prepare and submit their concerns in detail. To a specific query of the Committee as to whether the Ministry  had held any consultations with the Unions/Associations about merger, the Ministry submitted that the Unions/Associations had been kept adequately briefed about the merger process and the scheme of amalgamation had addressed most of the issues raised by them. This apart, the Committee were apprised that captains and commanders of the pre-merger entities had different licenses and when the Ministry was asked about this, it was stated that it was a regulatory requirement of DGCA and pilots were licensed in this manner internationally. It was further submitted that 'in view of the merged entity now functioning as AIL, issues pertaining to integration, cross fleet training, etc. are under discussions. However, pilots will always remain specific to the aircraft/aircraft family'. The Committee therefore urge the Ministry to ensure that HR integration is achieved without further delay so that the organization  functions smoothly and efficiently.

132

**Joining the Star Alliance**

20. The Committee observed that AI was yet to join the Star Alliance network which was a global airline alliance established to offer customers convenient worldwide reach and a smoother travel experience. Asked to give reasons for joining the alliance, the Committee were informed that the benefits envisaged from joining the Alliance were (i) Enhanced Frequent Flyer Programme (FFP) participation, (ii) Enhanced Code share network, and (iii) Enhanced Brand image. They were further apprised that after paying an entry fee advance of • 5 million in June 2008, AIL's (then NACIL) entry into the Star Alliance was intended to take place in March 2009. The balance of • 5 million which was required to be paid at the time of entry into the alliance was also paid. One of the pre-requisites for joining the alliance was to comply with all the 87 Minimum Joining Requirements (MJRs) by 31st July, 2011 and AI was on track to comply with all the requirements and join Star Alliance by 31st July, 2011. However, in the interim, Star had requested the Indian Government to give a prior written confirmation that it would grant approval to 'Jet Airways' to join Star if and when it applies. Star had also advised AI that if it did not receive such a written decision from the GoI, AI's joining may not be approved by the Star carriers, which were required to vote unanimously in favour of AI, stating that AI had complied with all the joining requirements and the obligation to support entry of a 2nd carrier as agreed under the Agreement signed with Star Alliance in December 2007. Despite AI complying with all the joining requirements by 29th July, 2011 and receiving a written confirmation from the Star Alliance, AI was informed on 1st August, 2011, that it had not met the joining conditions in full and therefore AI's membership had been put on hold. No specific response was received from Star when AI sought details about the allegedly specific requirements that were not met by it. Apprising the Committee about the alternative actions undertaken by the Ministry to achieve the benefits that were expected from joining Star Alliance, the Ministry stated that since AI may still join Star Alliance, it has been decided that initially commercial co-operations would be entered into with Star carriers and non-aligned carriers. 'On the branding front, it may be noted that in the last couple of years, AI has taken major initiatives (particularly on the IT front) to offer competitive product/service level to its passengers'. In addition, it has been decided that without waiting to join Star Alliance, AI would implement the functionalities which a Star carrier is required to offer to its/other Star carriers' premium passengers. The Ministry was optimistic that these efforts should enable AI to achieve many of the benefits that would have accrued as a result of joining the Star. On the payments made to the Star Alliance as entry fee to the tune of Euro 10 million and on the prospects of its refund, the Ministry admitted that there was no provision of refund in the agreement signed with AI. The agreement was signed by Air India in good faith, and this situation of the Chief Executive Board refusing was not foreseen. Furthermore, when AI had raised the issue of refund of joining fees during a meeting with the Star on 18th July, 2011, the Star CEO had orally advised that the joining fees could be returned after deducting the expenses incurred by the Star carriers. Though 'Air India's membership had been put on hold and not refused', the Committee would like to be apprised as to how long the AI will remain 'on hold' and what measures have

the MoCA or AI taken to become member of the Star Alliance or to get the refund of the entry fee paid.

**Bilateral Agreements**

21. Examination of Air Service Agreements (ASAs), also known as bilateral agreements, revealed that these were concluded, usually on the basis of reciprocity and fair/ equal opportunity, and provided the legal framework for scheduled air services between two countries. Under these ASAs, traffic rights and capacity entitlements are exchanged between the countries on the basis of market requirements. The ASAs clearly specify the "entitlements" of the designated airline(s) of both countries in terms of frequency of operations, number of seats, points of call, etc. The concept of "open skies policy" permits unrestricted air services between countries with minimal government intervention. Upto 2000, bilateral entitlements to/ from India were in line with end-to-end traffic projections based on 3rd and 4th freedom traffic *i.e.* carrying passengers from the home country to another country and *vice-versa*; also, foreign carriers were restricted only to major airports in India. During 2003-04, bilateral entitlements were liberalised, and foreign airlines were permitted to operate to "interior points" in India *i.e.* beyond the major airports. The bilateral air traffic rights on international routes between India and other countries were decided on the basis of reciprocity. However, the Committee note that the actual utilisation of available rights on international sectors was highly imbalanced. While Indian entitlements had remained grossly underutilised, there was a problem of inadequate capacity on most international routes from India, with passengers finding it difficult to obtain seats for nearly six months of the year. The Ministries of External Affairs, Tourism and Commerce, as well as Trade, Industry and Tourism bodies felt the need to liberalise international air services so that seats were available to/ from India all through the year. Thus, the MoCA had adopted a 'limited open sky' policy to cater to peak season requirements (which had expanded substantially from 2003-04 onwards), permitting designated airlines to operate unlimited number of service to their imperative points of call for three to six months in a year. Surprisingly, even after the substantial increase in bilateral entitlements from 2004-05 onwards, the trend of imbalanced utilization of entitlements (with higher utilization by foreign carriers) continued notwithstanding the permission granted to private Indian carriers to fly on international routes. The Committee seek explanation for such a skewed arrangement and the corrective measures taken to restore balance and mutuality of interest between the foreign airlines and the National Carrier.

**India-Dubai Sector**

22. The Committee were apprised that the envisaged benefits of liberalized policy were that (a) passengers would have greater choice for international travel, (b) India's utilisation of traffic rights on international routes would improve, (c) tariffs on international routes were likely to become more reasonable and affordable, and (d) AI and IA would both gain by synergising their operations. However, the sequence of events demonstrated that it was one-sided nature of benefits to Emirates/Dubai through enhancement of entitlements and additional points of call in India. Inspite of Air India

134

protesting on the lack of reciprocity and the funneling of 6th freedom traffic by Emirates through Dubai from interior locations in India, even change of gauge facility at Dubai International Airport was not adequately pursued, nor linked to grant of additional benefits. This resulted in vague commitments for such a facility, not at Dubai Airport but at the upcoming Jebel Ali Airport (an impractical option for AIL and other Indian carriers) and that too with distant timeframes between 2012 and 2018. The Committee are distressed to note that while the Dubai Civil Aviation Authority had actively protected the commercial interests of its airlines, MoCA on the other hand had failed to obtain appropriate *quid pro quo*. When specifically asked to substantiate the MoCA's approval for massive increase in entitlements from 2004-05 onwards inspite of repeated reservations of AIL against the proposals/ requests from Gulf Countries for increase in seat entitlements as well as additional points of call at interior locations in India, the Ministry replied that 'although, Air India had expressed reservations, there was a considerable increase in the demand for opening up the Gulf routes, once the 3 years moratorium and protection of the Gulf routes for Air India was over. There were demands from other Indian Airlines also which needed to be catered to. Accordingly, entitlements were stepped up, at the request of Indian carriers for the Gulf routes in a graded manner'. To the query of the Committee regarding reciprocity in the facilities extended by India to Dubai, the Ministry's response was, 'India has fifth freedom rights beyond Dubai while India has not conceded fifth freedom rights for Dubai, UAE. Unfortunately, the fifth freedom given to India is without any restriction but the Indian carriers have not been able to take this to their advantage for want of fleet. Furthermore, the Gulf sector was completely reserved for the National Carrier until the 31st December, 2008 and thus Air India had the first mover advantage for this region. Further, the sector was opened up gradually in the interest of enhancing operations of Air India'. About the issue of change of gauge in Dubai, it was stated that the Government *suo motu* had tried to get this in the agreement without any such demand coming from any of the carriers. It was also stated that if any airline pursued this requirement then it could be certainly addressed with the Dubai Government. On being asked if the issue of change of gauge facility at Dubai International Airport was still being pursued by AI, the Ministry submitted that 'the last talks with Dubai in 2008, India had proposed that a change of gauge article should be incorporated in the air services agreement. This would provide benefit to the Indian carriers which would allow smaller aircraft feeding into Dubai to serve beyond points with much larger aircraft at Dubai'. The Committee deplore that despite having accepted in principle to change the gauge article in the service agreement, Dubai had not accepted as of April 2013 to implement the Article. The Committee would like to be apprised of the reasons for non-implementation of the agreement and the adverse impact thereof on the revenues of the AI.

**Want of level playing field to National Carrier**

23. To a pointed query whether the liberalized policy towards bilateral entitlements had provided a level playing field to AI, the Ministry submitted that due consideration was given to the operational plan of the National Carrier before allocating routes to other eligible schedule carriers. It was ensured that Air India had a first right of refusal for allocation of traffic rights. Further, it was also stated that 'Cabinet

135

had decided in December, 2004 wherein private Indian carriers with 5 years domestic experience and minimum 20 aircraft were allowed to fly international against Indian entitlements. While doing this, the Government reserved the Gulf sector exclusively for Air India for the next 3 years *i.e.,* until December, 2007 and further had commercialised agreements (approximately ₹ 400 crore annually) which Air India had entered into with international carriers *in lieu* of their inability to fly to some of the countries, and for which they are being compensated for capacity mismatch which continued till December, 2009'. The Committee note that the Gulf region was reserved for PSU airlines for three years but as per the assurance given by the Hon'ble Minister (CA), this was to be increased to 5 years. The file notings of MoCA indicated that "in the draft civil aviation policy. ..on Gulf routes, reservation of all traffic rights for AIL and IAL is proposed to be extended from 3 yrs. to 5 yrs. There is no proposal to review these provisions", and suggested informing the PM0 appropriately. However, the Committee are anguished to mark that the subsequent notings indicated that "OSD to MCA has conveyed that reply to PM0 need not go".  Furthermore, the reservation for AIL/ IAL continued only for 3 years *i.e.* till December 2007. This clearly indicated that the Gulf sector was AIL/ IAL's most profitable international segment before the liberalised policy on bilateral entitlements. AIL repeatedly expressed strong reservations to MoCA against the proposals/ requests from Gulf countries for increase in seat entitlements as well as additional points of call at interior locations in India. Despite AIL's reservations, MIoCA went ahead with massive increases in entitlements from 2004-05 onwards to the detriment of AI. When asked if there existed any possibility of rollback of excess entitlements granted beyond genuine traffic requirements, the Ministry's submission was that any roll back of excess bilaterals or freezing bilateral entitlements has to be decided mutually and cannot be a unilateral action since this principle is enshrined in the Air Services Agreements. The arrangement is specious and unacceptable. The Committee are shocked over the manner in which massive excess entitlements for most profitable gulf sector were granted to foreign airlines to the serious detriment of the Al. The Committee therefore recommend that immediate corrective measures be taken to protect the commercial interest of AI and the Committee apprised.

Uneconomic route thrust upon Air India

24. The Committee observe that the erstwhile Air India Limited (AIL), during the period between 2005-06 and 2009-10 on most routes (North America, UK, SE Asia, etc.) was incurring losses, and only the Gulf/ Middle East and Far East Asia routes were making profits till 2005-06. However, by 2009-10, all routes were turned into loss-making. Of these, the single largest loss-making route was the India/ USA route. Reasons attributed for this were lack of alliances, inadequate frequent flyer programme, few code shares only and connectivity, delayed deployment of Passenger Service System and the increased competition. Further, AI Management had stated (February, 2011) that during the period between 2005-06 and 2009-10, access to the Indian market for foreign carriers had increased manifold on the one hand while Indian carriers (private) were given unrestricted rights to increase domestic capacities besides entry into the international markets. However, the Ministry termed the above claim of AI management as incorrect and also said that stamping out the competition with other carriers in the economic environment was not possible. When

136

asked to elaborate on this issue, the Ministry defended by stating that the domestic carriers, including AI,operate under the Route Dispersal Guidelines and airlines are free to operate on any route. Operations on a particular route are decided by airlines keeping in view the commercial viability and availability of resources. However, the Committee note that while revising the number of aircraft one of the reasons advanced was the requirement of Ultra Long Range aircraft for India-USA operations. This was inspite of the fact that historically, India-USA sector was a loss-making sector and a commercially unviable route. The Committee therefore recommend that responsibility must be fixed for impinging on the autonomy of AI leading to loss of traffic to AI.

Joint Position Paper

25. The position paper of February 2011 of the three leading (as then) Indian international carriers — AI, Kingfisher and Jet Airways — brought out the serious problems with huge expansion of bilateral entitlements in respect of several countries (notably in the Gulf, SE Asia and Europe). This facilitated several foreign airlines (predominantly Emirates) in tapping the vast Indian market and funneling such traffic over their hubs (Dubai etc.) to various destinations in the USA, UK, Europe and elsewhere, through what is termed as "6th freedom traffic". Although the bilateral agreements do not explicitly provide for exercise of 6th freedom rights, the entitlements exchanged were vastly in excess of "genuine" or point-to-point flying requirements between the two countries (termed as 3rd/ 4th freedom traffic based on Origin- Destination data) and implicitly allow "mega-airlines" with giant hubs to exploit 6th freedom traffic. When the Committee sought MoCA's response on this joint position paper, the Ministry submitted that though AI was a party to this paper, this fact was not in the knowledge of the Ministry. This is not acceptable to the Committee. It was also added that the Joint Position Paper on bilateral rights was not shared with MoCA and therefore, it could not be verified in the Ministry. The Committee are surprised to note that the Ministry was not in the know of such a vital paper prepared by the official carrier which is accountable to the Ministry.

Free seats and upgradation of seats of former employees of AI

26. The Committee are startled to find that, in March 2010, at a time when NACIL was going through a major financial crisis, MoCA issued an order, whereby the facility for upgradation of ticket for self and immediate family for travel to the highest class available by Air India/ Indian Airlines, subject to availability of seats, was extended to all former Secretaries of the Ministry of Civil Aviation. When questioned the Ministry responded that it had constituted Justice Dharmadhikari Committee and one of the terms of reference of this Committee was to look into the facilities to the retired employees. The Committee had submitted its report on 31st January, 2012 and it was under consideration of the Ministry. However in a subsequent submission, the Ministry stated that since the facility of upgradation of seats was subject to availability of seats in the higher class, there was no loss of revenue. It was further stated that the seats in an aircraft/flight were a perishable commodity which were wasted once the aircraft took off and no revenue was generated. The Committee would like to be apprised of the recommendation of the Dharmadhikari Committee on this as also of the AI and similar practice elsewhere. Evaluation of performance indicators.

137

**Evaluation of Performance Indicaters**

27. **A scrutiny of the key performance indicators of AI during the period 2005-06 to 2010-11 revealed a significant deterioration in operational performance on most parameters such as passenger/cargo revenues, Available Seat Kilometers (ASKM), Available Tonne Kilometers (ATKM), Revenue Passenger Kilometers (RPKM), passenger revenue per RPKM and Passenger Load Factor (PLF) for the two airlines (pre/post merger) between 2005-06 and 2009-10. Asked to explain the reasons for decline in key operational and revenue markers of the National Carrier, the Ministry conceded that the competition between the two airlines (erstwhile AIL and IAL) resulted in lower yields, revenues and profitability to both the airlines. Further, AI was serving these routes with wide body aircraft which produced inferior economics on these relatively short-haul routes. The Committee find the argument rather specious and therefore recommend that all out efforts must be made to revamp the operational performance of the National Carrier and to restore to it the pride of place that it held for long.**

**Survey on customer perception and improvement of services**

28. **The Committee were apprised that Indian Market Research Bureau was commissioned by Air India to conduct a survey on customer perception of AI and other airlines such as Kingfisher, Jet Airways, Singapore Airlines, Lufthansa and British Airways. The survey revealed that in the international arena, the fliers were demanding more than the basic facilities with overall travelling experience and comforts and that the Air India brand was no longer preferred as it was not meeting the above standards. The Committee hardly need to emphasize that urgent and essential measures must be taken to further improve the services of AI so that it becomes an internationally preferred Airline and the Committee apprised.**

**Defective lease agreement**

29. **The Committee observe that as of March 2010, IAL and its subsidiary Airline Allied Services Ltd. (AASL), had 37 leased aircraft. Of these 37 aircraft, 11 aircraft were of very small capacity aircraft and 8 aircraft were sold and leased back. Of the remaining aircraft, 8 A320 aircraft had been obtained on an operating lease from a lessor (M/s. AerCap) in Netherlands between March 2003 and March 2005. Six of these aircraft were to be returned between March 2008 and October 2009, after completing the extended lease period. As per the lease agreements, the leased aircraft were to be sent to a mutually acceptable MRO facility for completion of stipulated aircraft checks before return to the lessor. Three of these aircraft were withdrawn from commercial operations by IAL and sent to a Jordan based MRO between February and July 2008. However, the lessor refused to accept the return of the aircraft, by raising disputes on their physical condition and documentation and raised claims of huge settlement amounts. Finally, one aircraft was returned to the lessor in May 2009 after a "buy-out package" (*viz.* payment of compensation to the lessor by IAL, in exchange for waiving all liabilities associated with the aircraft "redelivery conditions") of $ 2.7 million. Queried by the Committee, the Ministry submitted that the lessor sought huge compensation for the shortfall in the physical condition and documentation, meeting the redelivery/return conditions of the first aircraft. The compensation was negotiated considerably downwards in respect of the**

138

first aircraft by a Negotiating Committee constituted by CMD as per the decision of the Board. On the other two aircraft, the Ministry submitted that after completion and inspection of the next two aircraft, the lessor sought even higher compensations which were disputed by IAL. The excessive and highly unreasonable buy-out amounts, being extremely disproportionate to meet return conditions, clearly indicated the intention of AerCap (a leading aircraft lessor) to avoid or delay redelivery of aircraft to the extent possible. That the lessor's intention was *malafide* is borne out by the fact that it expected the return of about 17 year old aircraft in near brand new condition by listing even minor ignorable issues. The Ministry further clarified that, after protracted discussions and negotiations, the two aircraft were returned to the lessor after inspections by the Technical Expert and carrying out the maintenance tasks, which had become due by that time. When specifically asked if this situation could have been averted, the Ministry stated that the Lease Agreements were executed after proper vetting by and with the involvement of foreign legal adviser and were based on international practices, but conceded that 'the experience had indicated that these agreements were heavily loaded in favor of lessor and left room for manipulation by them if their intentions were *malafide'*. The Committee wish to caution the Ministry to  draw suitable lesson from the incident and be careful enough to avoid such a recurrence and also fix responsibility for drafting the defective lease agreement which was apparently flawed and detrimental to the National Carrier.

Turn Around Plan

30. The Committee were apprised that for the revival of the Airline, multiple versions of Turn Around Plan (TAP) were being considered from August 2009 onwards. These included, *inter-alia,* cost reduction and revenue enhancement targets. Further, Deloitte had furnished a report on 'Review of Turn Around Plan' in February 2011, after considering four financial scenarios proposed by AI. Asked to elaborate on this, the Ministry stated that M/s Deloitte Touche Tohmatsu India Pvt. Ltd. (Deloitte), independent Aviation Consultants, was appointed to review the Turn Around Plan of Air India. They submitted their report in February, 2011 which was then discussed with the lenders in April, 2011. The lenders appointed a Steering Committee from amongst its members to study the Turn Around Plan alongwith the comments of Deloitte. Based on the inputs of the lenders, the Turn Around Plan was revised and Deloitte gave their report on the revised Turnaround Plan in June, 2011. The Revised TAP was presented to the Group of Ministers in June, 2011, who appointed a Group of Officers mainly from the Ministry of Finance to study the TAP. The Group of Officers submitted the report to GOM in September, 2011 suggesting that the Moderated Growth Scenario VII is the most suited. The Group of Ministers who had accepted the above report in the meeting on October 28, 2011 had minuted that regulatory forbearance of the Reserve Bank of India be obtained. Reserve Bank of India had given its approval and dispensations that were sought by the lenders and had asked the lenders to complete the Financial Restructuring by 20th March, 2012. The Committee  were informed that the Plan was however awaiting approval by the various lenders and their respective Boards. The Committee would like to be  apprised of the Plan approved and the timelines for execution of the Turn Around Plan.

Financial structuring and Revival Strategy

31. Deposing before the Committee on the revival strategy of AI, the Strategic Business Unit Head MRO, Engine & Components (E&C) submitted that the Company

had put up a Turn Around Plan and a financial restructuring plan to the Government after lot of deliberations and discussions. This plan looked into the matter with respect to the market growth, the seat factor, with respect to the yields that at what rate AI had to grow, at what rate AI should acquire aircraft not only in the integrated entity but also in the subsidiary company like Alliance Air and Air India Express. This financial restructuring plan also looked into as to how to restructure the debt and also to obtain equity for acquisition of the large number of aircraft. As a part of the financial restructuring plan that was submitted to the group of officers set up by the Government, it was stated that AI had asked for an upfront equity infusion of ₹ 6750 crore and infusion of equity to fund cash deficit of ₹ 4552 crore. In addition, they had asked the Government to take over the burden of all principal repayments and all interest payments on account of fleet acquisition. So, the total equity support that was sought from the Government was to the tune of ₹ 30,231 crore. The Committee feel that in order to bail out the Company, the infusion of further equity of ₹ 30,231 crore is of paramount need and the equity infusion should be expedited.

**Ground handling agreement with Air India**

32. The Committee note that AI entered into a joint venture with Singapore Airport Terminal Services (SATS) for ground handling in Bangalore and Hyderabad. Furnishing details about this Joint venture, the Ministry submitted that AI-SATS joint venture was 50-50 equity partnership between AI and AISATS which initially operated as an Association of Persons (AOP) and was incorporated on 20th April, 2010 into a company by the name of Air India SATS Airport Services Private limited. The business was transferred from AOP to the new company incorporated *w.e.f* 1st August, 2010. Reason submitted for entering into this joint venture was that Air India on its own was not qualified to handle ground handling activities at Bangalore and Hyderabad and if they had not tied up with a JV partner, they would have lost the business to other foreign competitors who were authorized to do ground handling at these airports. Asked to specify about how the profits were being shared between AI and SATS, the Ministry stated that the profits were being shared in the capital ratio of 50:50 after tax on declaration of dividends. To another query of the Committee as to what were the profits that were earned by the Joint Venture and the amount AI got as its share, the MoCA replied that since AISATS had to invest in capital equipment and in running the business, till date i.e. as on 08.05.2012 no profits had been distributed by way of dividends amongst both the partners. About the details of investment made by SATS in the form of cash investment On ground handling equipment and human resources were sought, the Ministry apprised the Committee that, the initial investment made by AI and-SATS was ₹ 33.39 crore totalling ₹ 66.78 crore in the Association of Persons (AOP) which was ₹ 87.23 crore as on 31st March, 2011. The share capital of Air India SATS Airport Services Private limited was 80839950 shares of ₹10 each issued at a premium of ₹ 0.79 per share totalling ₹ 872263051 owned 50:50 by Air India Ltd. and SATS Ltd. Further, it was stated that since AI had a ban on recruitment, no manpower could be recruited on the pay roll of Air India in non-operational areas. AISATS joint venture was therefore formed to carry on ground handling business at the new green field airports like Hyderabad and Bangalore. SATS brought its own manpower of six officials from Singapore to India to man the important locations and reportedly assured MoCA that they would bring in additional share capital once Air India's equipment at Delhi is valued. When asked in March, 2013 if the valuation had been completed, the Ministry failed to apprise the

140

Committee on this aspect. The Committee would like to be apprised of all aspects of the matter as also the benefits likely to accrue to the Airlines from such an arrangement.

Rationale of a lopsided Joint Venture

33. The other notable aspect of the joint venture was that AI SATS has to be paid for handling the flights of Air India. The Committee were apprised that with the depletion of the manpower strength at Hyderabad and Bangalore, it was not possible to handle the Air India flights on its own and Air India had deployed additional manpower either on its own pay roll or through subsidiary company to handle its flights and foreign airline flights. Recruitment was frozen in Air India especially in non-operational areas since 1996. Air India therefore had to hire manpower resources through Air India Air Transport Services Ltd. (AIATSL) at various airports in order to handle the flights of the foreign airlines which was an additional cost to Air India. With the takeover of the ground handling activity by AI SATS, the additional manpower in AIATSL was taken over by AISATS on their pay roll whereas, it is noteworthy that prior to Joint Venture, Air India was not charging anything for handling its own flights as same was done in-house and AI was earning revenue from handling other carriers and Wide body flights before merger. After the JV (i.e. 2008-09, 2009-10 & 2010-11), AI is paying for handling of AI flights to the JV Company and the revenue which was earned from handling foreign airlines goes to the JV Company, which on the other hand would have accrued *in toto* to the AI. The Air Corporations Employees Union (ACEU) and the Civil Aviation Joint Action Front (CAJAF) in their submission to the Committee, described the arrangement as retrograde. The Committee would like the Ministry to share the rationale of such a lopsided joint venture entered into by the AI which is, apparently, a losing proposition.

34. To conclude, the Committee recognize that to make Air India to regain its past glory is a daunting task but nevertheless, it is in national interest that the National Carrier becomes self sustainable, vibrant and a pride of India in the globalized world. The Committee, therefore, exhort the Ministry of Civil Aviation and Air India to take note of their considered suggestions/recommendations, as highlighted in the preceding paragraphs and take suitable but urgent remedial and corrective action so that the National Carrier re-occupies its pre-eminent position.

| | |
|---|---|
| NEW DELHI; | DR. MURLI MANOHAR JOSHI |
| 31 *January*, 2014 | *Chairman*, |
| 11 *Magha*, 1935 (*Saka*) | *Public Accounts Committee.* |

BRIEF CHRONOLOGY OF EVENTS RELATED TO ACQUISITION OF AIRCRAFT
BY THE ERSTWHILE AIL

| Date/Month | Details in brief |
|---|---|
| 1 | 2 |
| December 1996 | AIL's proposal for acquisition of 3 A310-300 aircraft was not cleared by MoCA due to reasons like availability of excess A-320 type of aircraft with the erstwhile IAL. |
| January 2002 | Expert committee was constituted by AIL to identify aircraft requirement and prepare fleet plan for 5 year timeframe. |
| November 2002 | Techno-Economic and Negotiation Committee (TENC) was constituted by MD, AIL for finalisation of requirement of aircraft. |
| April/July 2003 | TENC submitted separate reports for acquisition of 17 (10 on firm basis + 7 on option basis) medium capacity long range aircraft (A340-300/B777-200 ER); and 18 short range aircraft (A320-200/B737-800). |
| November 2003 | After review, TENC submitted a revised report for 18 short range and 10 or 17 long range aircraft on the basis of revised pattern of operations, making NPV positive. |
| | AIL Board approved proposal for acquisition of 10 medium capacity long range aircraft (A340-300) and 18 small capacity short range aircraft (B737-800). |
| January 2004 | AIL submitted project report for acquisition of 28 aircraft to MoCA. |
| 02 August 2004 | In a meeting chaired by the then Minister, Civil Aviation it was decided that Air India should revisit the proposal for purchase of aircraft and submit a fresh project proposal to the Government at the earliest which could include the revised requirement. |
| 13 September 2004 | Based on the decision taken in the meeting of 2nd August, 2004, as communicated in the Ministry's letter dated 5th August, 2004, the Board of Directors of Air India in its 101st meeting decided that the fleet plan could be revisited in its entirety. |
| 24 November 2004 | AIL Board approved a revised plan for acquisition of 50 aircraft for AIL, apart from 18 aircraft for its subsidiary AICL. |
| 03 December 2004 | Bids were invited from Boeing and Airbus. |
| 24 December 2004 | Technical bids were opened. |
| 26 April 2005 | TENC evaluated bids and submitted its report. On the same day, AIL Board approved the acquisition of 50 aircraft (35 firm+15 on option) from Boeing with GE engines. |

141

142

| 1 | 2 |
|---|---|
| 14 May 2005 | Project Report for GoI approval for acquisition of aircraft was submitted to MoCA. |
| 16 June 2005 | Price Negotiation Committee was constituted by AIL, with 'in principle' approval of MoCA. |
| 30 June 2005 | Presentation was made by AIL to MoCA on aircraft acquisition. |
| 18 August 2005 | 'Overseeing Committee' was constituted by MoCA to oversee the process of price negotiations with Boeing and GE for acquisition of aircraft; negotiations were held by Overseeing Committee between August 2005 and November 2005. |
| 31 August 2005 | Pre-Public Investment Board (PIB) meeting was held. |
| 13 October 2005 | PIB cleared the aircraft acquisition at a cost not exceeding ₹ 33,197 crore, indicating: |
| | * that MoCA may evaluate AIL's cost structure and productivity and fix benchmarks for achieving reduction in cost and enhancing productivity; |
| | * purchase of 35 aircraft on firm basis, and 15 on optional basis, with the decision for exercising the option to be taken by AIL Board, depending on the market situation. |
| 15 December 2005 | CCEA (Cabinet Committee on Economic Affairs) approved constitution of EGoM (Empowered Group of Ministers) for final round of negotiations with lowest bidder. |
| 24 December 2005 | EGoM held discussions with the representatives of Boeing and GE. |
| 30 December 2005 | PMO (Prime Minister's Office) forwarded a copy of the note of the Chairman, EGoM to the PM on the action taken by the EGoM, where it approved acquisition of 50 aircraft by AIL on firm basis, in addition to acquisition of 18 aircraft by AICL; |
| | PMO returned the note indicating that the "Prime Minister has seen the note and directed that the Ministry of Civil Aviation may inform CCEA about the finalised transaction". |
| | MoCA conveyed GoI's approval to AIL. |
| | On the same day, AIL also signed purchase agreements. |
| 12 January 2006 | CCEA noted the contents of the MoCA note apprising them of the EGoM decision on acquisition. |
| July 2010 | 20 aircraft (8 B777-200LR+12 B777-300ER) received; receipt of 3 B777-300ER aircraft deferred at AIL's instance. |

*ANNEXURE II*

A meeting was taken by Shri Praful Patel, Minister of Civil Aviation on 2nd August, 2004 to discuss the proposal of Air India for acquisition of aircraft for its fleet. The following were present:

**MOCA**

    (i)  Shri Ajay Prasad, Secretary

    (ii) Shri V. Subramanian, AS&FA

    (iii) Shri Raghu Menon, Joint Secretary

**Air India**

    (i)  Shri V. Thulasidas, CMD

    (ii) Shri S. Punhani, Director (F)

2. MCA was informed that the project proposal of AI for acquisition of aircraft after approval of the BOD of AI had been submitted to Government. After examination in the Ministry, the proposal would have to be first discussed in a pre-PIB meeting and thereafter it would be submitted to PIB and Cabinet/CCEA for consideration.

3 It was noted that there had been some developments of late that needed consideration *vis-a-vis* the project proposal. First, the competition for AI on the India-US route had assumed a different dimension, particularly with the introduction of non-stop flights through ultra long-range aircraft by competing airlines in South-East Asia and the Gulf region. Unless, AI was able to match this product and connectivity by adding suitable aircraft to its fleet (which was not a part of the present proposal), AI's competitiveness, load factors and revenues were likely to be severely affected.

4. It was noted that Air India has initiated steps to lease in MCLR and ultra long range aircraft to meet the demand and competition in the near future, since induction based on the acquisition proposal would have a long lead time during which it was essential for Air India to maintain market share.

5. Further, AI had recently decided to launch a no-frills, airline called Air India Express through a separate company to destinations in SE Asia and the Gulf, which would offer lower fares to passengers. In view of this, Air India Express would operate the B-737-800 aircraft proposed for acquisition. It was also noted that the proposal of AI for purchase of B737-800 aircraft had been included in the proposal before the concept of introducing a low-cost airline was finalised. Therefore, the current project proposal may not have taken into account the economics of acquiring these types of aircraft if operated on low-cost basis and with fares that would be 25% lower than existing fares.

6. CMD, AI was of the view that although the present proposal did not fully cater to the requirement of the AI's fleet, the additional requirements of aircraft could be projected separately through a supplementary proposal after due evaluation etc. However, after due deliberations it was felt that it may not be advisable or prudent to

143

144

go through the pre-PIB and PIB exercise in two separate stages with two different sets of proposals for such capital intensive projects. It would be desirable to take a total and comprehensive view on the fleet of Air India keeping in mind its plans and growth for the next 15 years or so.

7. Keeping all these aspects in view, it was decided that:

(a)    Air India should revisit the proposal for purchase of aircraft and submit a fresh project proposal to the Government at the earliest, which could include the revised requirements.

(b)    AI could examine whether the proposal for purchase of short-range aircraft for the low cost airlines is justified on a stand-alone basis and could be de-linked from the purchase of other types of medium range and long-range aircraft for AI. While doing so, AI should examine whether the economics of the proposal for acquisition would be favourable, keeping in view the low-cost and low fare operations envisaged through a separate company. If the proposal is found to be justified and viable, Air India should revert to the Government at the earliest.

*ANNEXURE III*

MOST IMMEDIATE

## PRIME  MINISTER'S  OFFICE

Enclosed is a self-explanatory letter signed by 43 members of the US Congress concerning Air India's proposed expansion of its aircraft fleet. A draft reply from PM may kindly be sent urgently to the undersigned.

Sd/-

(Gautam Bambawale)

Director

Secretary, Ministry of Civil Aviation

PMO U.O. No. 870/41/P/1/03-Pol. Vol. VIII                    Dated: 3.11.2003.

145

146

*Embassy of the United States of America*
New Delhi
October 28, 2003

Excellency:

I am pleased to forward the enclosed letter from 43 Members of Congress concerning Air India's proposed expansion of its aircraft fleet. The signatories are all members of the U.S. Congressional Caucus on India and Indian Americans, which includes Caucus co-chairmen Representatives Jim McDermott and Joseph Crowley.

Thank you for your consideration of this matter.

Sincerely,

Sd/-

Walter North
Charged' Affaires a.i.

Enclosure: As stated

His Excellency
Atal Bihari Vajpayee,
Prime Minister,
Republic of India,
New Delhi.

**Congress of the United States**
**Washington, DC 20515**

October 22, 2003

His Excellency
Atal Bihari Vajpayee,
Prime Minister,
Republic of India,
New Delhi, India 110 001

Dear Mr. Prime Minister.

We are writing to you as members of the U.S. Congressional Caucus on India and Indian Americans; which is the largest country caucus in the U.S. Congress, composed of 168 Members of the U.S. House of Representatives. We have an abiding interest in U.S.—India relations. Our two countries continue to have many opportunities to explore the depth and breadth of out relations. Stronger commercial ties are a natural complement to political alignment, spawning a wider range of dialogue and enhancing the environment for stronger, more durable links.

We understand that Air India is looking to expand its fleet of commercial aircraft and that based on price, value, and schedule, The Boeing Company has worked hard with Air India management and technical experts to develop an excellent 777 and 737 package. Air India's acquisition of Boeing aircraft will serve as a great demonstration of strengthened commercial relations between India and the United States. Therefore, we encourage you to give Boeing's proposal the utmost consideration.

Boeing and its suppliers throughout the U.S provide jobs to many of our constituents. Unfortunately, the American airline industry is struggling as a result of the terrorist-related events of September 11, 2001. Our country is currently experiencing the highest levels of unemployment in a decade. A successful contract with Air India will not only provide India's flag carrier with the finest aviation products available, but will also help ease our unemployment concerns.

As representatives of the Congressional Caucus on India, we are confident in Boeing's ability to provide Air India and its passengers with the safest, most efficient, environmentally friendly, and technologically advanced aircraft in the world. We hope you will give Boeing's offer serious consideration.

Sincerely,

Sd/-                                              Sd/-

Jim McDermott                                     Joseph Crowley
Member of Congress                                Member of Congress

147

148

Donald Manzullo
Member of Congress

Joe Knollenberg
Member of Congress

Darlene Hooley
Member of Congress

Michael McNulty
Member of Congress

Gregory Meeks
Member of Congress

Tom Feeney
Member of Congress

Dave Weldon
Member of Congress

Peter Visclosky
Member of Congress

Earl Blumenauer
Member of Congress

Steny Hoyer
Member of Congress

Jim DeMint
Member of Congress

Gary Ackerman
Member of Congress

Steve Israel
Member of Congress

Eliot Engel
Member of Congress

149

Brad Sherman
Member of Congress

Judy Biggert
Member of Congress

Brian Baird
Member of Congress

Charles Rangel
Member of Congress

Rick Larsen
Member of Congress

Chris Bell
Member of Congress

Dennis Cardoza
Member of Congress

Jennifer Dunn
Member of Congress

Sheila Jackson-Lee
Member of Congress

Nick Lampson
Member of Congress

Phil English
Member of Congress

David Wu
Member of Congress

Sander Levin
Member of Congress

150

Sd/-
Joe Wilson
Member of Congress

Sd/-
Edward Royce
Member of Congress

Sd/-
Jayslee
Member of Congress

Sd/-
Norm Discks
Member of Congress

Sd/-
Adam Smith
Member of Congress

Sd/-
Howard Berman
Member of Congress

Sd/-
Tom Lantos
Member of Congress

Sd/-
Brad Miller
Member of Congress

Sd/-
Jim Matheson
Member of Congress

Sd/-
Thaddeus McCotter
Member of Congress

Sd/-
Frank Pallone Jr.
Member of Congress

Sd/-
Juanita Millender-McDonald
Member of Congress

Sd/-
Walter Jones
Member of Congress

Sd/-
Martin Frost
Member of Congress

*ANNEXURE IV*

## SCHEDULED INTERNATIONAL PASSENGER NUMBERS & MARKET SHARE TO/FROM INDIA

| Year | | AI | IX | IC | NACIL (AI+IX+IC) | Jet Airways (9W) | Air Sahara (S2) | Kingfisher (IT) | Other Indian Carriers (9W+S2 +IT) | Foreign Carriers | Industry Total |
|------|---|------|------|------|------|------|------|------|------|------|------|
| 2005 | pax Nos.(Mill.) | 3.268 | 0.354 | 1.850 | 5.472 | 0.320 | 0.141 | - | 0.461 | 13.421 | 19.364 |
|      | % share | 16.9 | 1.8 | 0.6 | 28.3 | 1.7 | 0.7 | - | 2.4 | 69.3 | 100.0 |
| 2006 | pax Nos.(Mill.) | 3.383 | 0.594 | 2.146 | 6.123 | 0.696 | 0.237 | - | 0.933 | 15.321 | 22.377 |
|      | % share | 15.1 | 2.7 | 9.6 | 27.4 | 3.1 | 1.1 | - | 4.2 | 68.5 | 100.0 |
| 2007 | pax Nos.(Mill.) | 3.321 | 1.377 | 2.432 | 7.130 | 1.250 | 0.206 | - | 1.456 | 17.586 | 26.172 |
|      | % share | 12.7 | 5.3 | 9.3 | 27.2 | 4.8 | 0.8 | - | 5.6 | 67.2 | 100.0 |
| 2008 | pax Nos.(Mill.) | 2.541 | 1.976 | 2.044 | 6.560 | 2.677 | 0.184 | 0.022 | 2.883 | 18.711 | 28.164 |
|      | % share | 9.0 | 7.0 | 7.3 | 23.3 | 9.5 | 0.7 | 0.1 | 10.2 | 66.5 | 100.0 |
| 2009 | pax Nos.(Mill.) | 2.630 | 2.142 | 1.961 | 6.889 | 3.226 | 0.189 | 0.425 | 3.838 | 18.854 | 29.583 |
|      | % share | 9.4 | 7.2 | 6.6 | 23.3 | 10.9 | 0.6 | 1.4 | 12.9 | 63.7 | 100.0 |
| 2010 | pax Nos.(Mill.) | 3.040 | 2.095 | 1.705 | 6.842 | 4.093 | 0.611 | 1.080 | 5.785 | 20.144 | 32.771 |
|      | % share | 9.3 | 6.4 | 5.2 | 20.9 | 12.5 | 1.9 | 3.3 | 17.6 | 61.5 | 100.0 |

SOURCE: DGCA

*ANNEXURE V*

The Boeing Company
P.O. Box 3707
Seattle, WA 96+24-2207

6-1166-DJG-776

Air India Limited
Nariman Point
218 Backbay Reclamation
MUMBAI - 400021
INDIA

**Subject**:   Liquidated Damages—Non-Excusable Delay

Reference:   Purchase Agreement No. 2998 (the Purchase Agreement) between The Boeing Company (Boeing) and Air India Limited (Customer) relating to Model 787-837 aircraft (the Aircraft).

This letter agreement (Letter Agreement) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement have the same meaning as in the Purchase Agreement.

**Definition of Terms**

**Non-Excusable Delay:** Delay in delivery of any Aircraft beyond the last day of the delivery month (Scheduled Delivery) established in the Purchase Agreement by any cause that is not an Excusable Delay pursuant to Article 7 of the AGTA and for which customer is otherwise entitled to a remedy from Boeing pursuant to applicable law.

**1. Liquidated Damages**

The parties want to establish liquidated damages for non-excusable delays but recognize that the amount varies over time depending on the circumstances existing at the time a delay occurs. Therefore Boeing agrees to pay Customer Liquidated damages for each day of Non-Excusable Delay (collectively the Non-Excusable Delay Payment Period) at a rate to be determined using the following liquidated damages formula.

The amount of liquidated damages will be based to data in the most recent AVMARK publication at the time Customer receives notice of a Non-Excusable Delay from Boeing. The AVMARK average for the newest and oldest lease rates for the model of aircraft being delayed will be divided by 30 days to determine the rate per day. In no even will be amount paid exceed an aggregate sum of 180 days of the rate per day per aircraft.

P.A. No. 2998
Liquidated Damages Non-Excusable Delay
BOEING PROPRIETARY

153

Air India Limited
6-1166-DJG-776 Page 2

**2. Interest**

In addition to the Liquidated Damages in Paragraph 1, for each day of Non-Excusable Delay, Boeing will pay Customer interest calculated as follows (Interest):

The product of the daily interest rate (computed by dividing the interest rate in effect for each day by 365 day, or 366 days, as the case may be) times the entire amount of advance payments received by Boeing for such Aircraft. The interest rate in effect for each day shall be the three month London Inter Bank Offered Rate (LIBOR) effective the first business of the calendar quarter and reset quarterly,  as published in the Wall Street Journal (U.S. edition).

Such interest will be calculated on a simple interest basis and paid in full at actual delivery.

**3. Escalation**

The calculation of the escalation adjustment, pursuant to Supplemental Exhibits AEI and EEI to this Purchase Agreement, will be based on the Scheduled Delivery month.

**4. Right of Termination**

Customer willl not have the right to refuse to accept delivery of any Aircraft because of a Non-Excusable Delay unless and until the aggregate duration of the Non-Excusable Delay for such exceeds 180 days (Non-Excusable Delay Period). After such Non-Excusable Delay Period, either party may terminate the Purchase Agreement as to such Aircraft by written or telegraphic notice given to the other.

**5. Termination**

If the Pruchase Agreement is terminated with respect to any Aircraft for a Non-Excusable Delay, Boeing will, in addition to paying Liquidated Damages and Interest as described above, promptly repay to Customer the entire principal amount of the advance payments received by Boeing for such Aircraft.

P.A. No. 2998
Liquidated Damages Non-Excusable Delay
BOEING PROPRIETARY

154

| Timeline | Brief Details |
|---|---|

BRIEF CHRONOLOGY OF EVENTS RELATED TO THE ACQUISITION OF 43 AIRCRAFTS BY THE ERSTWHILE IAL

| Timeline | Brief Details |
|---|---|
| October, 1996 | In-house task force (Aircraft Evaluation Committee) set up by IAL undertook evaluation of various types of aircraft for selection and purchase. |
| April, 1999 | GoI decided to make an equity contribution of Rs. 325 crore to IAL in phases, linked to acquisition of aircraft and subject to improved productivity and better working results. |
| April - June, 1999 | IA approached MoCA for acquisition of more technologically advanced and efficient aircraft for replacement of old/leased aircraft and for capacity enhancement to regain market share. Aircracft Evaluation Committee shortlisted 15 aircraft types (9 Boeing + 6 Airbus) of both narrow-bodied and wide-bodied types, and identified six types of aircraft for detailed technical, operational and financial analysis. Commercial offers were invited for these six aircraft types, but the offers were not opened due to General Elections. |
| December, 1999 | IAL Board finally shortlisted 9 types of narrow-bodied aircraft. |
| July-August, 2000 | Technical and financial bids were invited, and received, from Boeing and Airbus. |
| March, 2001 | Aircraft Evaluation Committee completed techno-economic analysis of offers and submitted its report to CMD, IAL. Evaluation report was not processed further, due to ongoing process of disinvestment of IAL. |
| December, 2001 | IAL invited revised financial bids, in view of the possibility of obtaining lower prices in the aftermath of the 9/11 incident in the United States. IAL evaluated various combinations/sets of Boeing and Airbus narrow-bodied aircrafts in the range of 95-200 seats. |
| March-April, 2002 | IAL Board approved acquisition of 43 aircraft (fitted with CFM engines) comprising 19 A 319 aircraft (122 seats), 4 A 320 aircraft (145 seats) and 20 A 321 aircraft (172 seats) for delivery between 2002-03 and 2007-08 at an estimated cost of Rs. 10,089 crore and submitted its project report to MoCA. |
| June, 2002 up to April, 2003 | Draft PIB memo was submitted to MoCA. Matter was not processed further, as IAL was on the list of PSUs to be |

155

| Timeline | Brief Details |
|---|---|
| | disinvested. In April, 2003, Cabinet Committee on Disinvestments decided to take IAL out of the PSUs to be disinvested. |
| April-June, 2003 | Two pre-PIB meetings held. |
| October, 2003 | MoCA forwarded draft PIB note for consideration of appraising agencies (DoE, Planning Commission, etc.) |
| December, 2003 | Note for PIB forwarded by Planning Commission to MoCA. |
| January, 2004 | PIB meeting scheduled for 29th January, 2004 did not take place, due to impending General Elections. |
| June-July, 2004 | MoCA sought CVC "clearance" for negotiation with L-1 bidder (Airbus). CVC informed MoCA that negotiations with L-1 bidder were permitted. |
| July-October, 2004 | IAL (at the request/direction of MoCA) reviewed the proposal due to lapse of time and requirement of wide-bodied aircraft for future international operations. However, it reiterated its existing proposal for 43 narrow-bodied Airbus aircraft. |
| November 10, 2004 | PIB approved the acquisition proposal. |
| December 6, 2004 | IAL constituted an inter-disciplinary Negotiation Committee to take "final" negotiations with the L-1 bidders (Airbus and CFM). |
| December 14, 2004 | 'Óverseeing Committee' was constituted by MoCA to oversee the process of price negotiations and to 'guide' the Negotiation Committee; negotiations were held by Overseeing Committee between December, 2004 to March, 2005. |
| August 26, 2005 | CCEA constituted EGoM for one final round of negotiations with L-1 bidders. |
| September 6, 2005 | EGoM held final negotiations with the representatives of Airbus and CFM. |
| September 29, 2005 | Government conveyed its approval to IAL for acquisition of 43 Airbus aircraft. |
| December 16, 2005 | Letter of Intent/Term Sheets were signed between IAL and Airbus. |
| February, 2006 | Purchase agreement were signed between IAL, Airbus and CFM. |
| Ocrober, 2006 to April, 2010 | All 43 Airbus aircraft were received in time (against the stipulated delivery schedule of November, 2006 to April, 2010). |

*ANNEXURE VII*

'C' AND 'D' CHECK

| Aircraft | Date | Total USD |
|---|---|---|
| VT-EVE 'C'<br>A3 10-300 | Jan. 07 | 1064879.00 |
| VT AIJ 'C'<br>B777-200 | Feb.07 | 513753.05 |
| VT-AIA 'C'<br>A310-300 | Feb. 07 | 929989.00 |
| VT-EVF 'C'<br>A310-300 | Mar. 07 | 617267.38 |
| VTAIL 'C'<br>B777-200 | Feb.07 | 424380.43 |
| VT-AIB 'C'<br>A310-300 | June 07 | 1668540.11 |
| VT-AIE Redelivery Check<br>8777-200 | July 07 | 600000.00 |
| VT-AIR 'C'<br>B777-200 | Aug. 07 | 817612.74 |
| VT-AIK Redelivery Check<br>B777-200 | Dec. 10 | 1173732.85 |
| VT-AIJ Redelivery Check<br>B777-200 | Dec. 10 | 1344124.22 |
| VT-AIL Redelivery Check<br>B777-200 | May 11 | 1672970.18 |

157

AIRCRAFT SENT EXTERNAL PARTY FOR MAINTENANCE

CHECKS FROM 2007-2011.

| S. No. | Aircraft | Date | Check | External-Party |
|--------|----------|------|-------|----------------|
| 1. | VT-EVE | 07-Jan.-07 | CHKC+REDELIVERY | Jor AMCo. Jordan |
| 2. | VT-AIJ | 29-Jan.-07 | CHKC | SIAEC (Singapore) |
| 3. | VT-AIA | 07-Feb.-07 | CHKC | Jor AMCo, Jordan |
| 4. | VT-EVF | 23-Feb.-07 | CHKC+REDELIVERY | JorAMCo. Jordan |
| 5. | VT-AIL | 11-Feb.-07 | CHKC | SIAEC (Singapore) |
| 6. | VT-AIB | 29-May-07 | CHKC | Jor AMCo    Jordan |
| 7. | VT-AIE | 20-June-07 | CHKC+REDELIVERY | JorAMCo. Jordan |
| 8. | VT-AIR | 07-Aug.-07 | CHKC | AMECO (Beijing) |
| 9. | VT-AIK | 15-Feb.-10 | CHKC+REDELIVERY | AMECO (Beijing) |
| 10. | VT-AIJ | 10-April-10 | CHKC+REDELIVERY | AMECO (Beijing) |
| 11. | VT-AIL | 04-July-10 | CHKC+REDELIVERY | AMECO (Beijing) |

158

EXPENDITURE INCURRED BY AIR INDIA (E/W INDIAN AIRLINES LTD.) ON MAINTENANCE/REPAIR/SERVICING OF AIRCRAFT IN FOREIGN COUNTRIES DURING LAST 5 YEARS

| Fin. Year | No. of A/C | A/c Type | A/C Regn. | Name of MRO | Expenditure incurred (US$) | Reasons for sending to the MRO |
|---|---|---|---|---|---|---|
| 2007-08 | 7 | A320 | VT-EVO* | SIAEC | 903,818.94 | As per Lease Agreement, to carry out 4C+6Y Check at an EASA/FAA approved MRO |
| | | | VT-EVO* | | 1,458,946.17 | |
| | | | VT-EVO* | | 894,964.84 | |
| | | | VT-EVO* | | 907,832.72 | |
| | | | VT-EYF | JORANICO | 1,165,128.46 | As per Lease Agreement, to carry out 4C+8Y and Lease Return Check at an EASA/FAA approved MRO |
| | | | VT-EYA | | 2,072,340.00 | |
| | | | VT-EYB | | | |
| 2008-09 | 3 | A320 | VT-EVS* | MAS | 886,230.29 | As per Lease Agreement, to carry out 4C+BY Check at an EASA/FAA approved MRO |
| | | | VT-EVT* | | 801,642.59 | As per Lease Agreement, to carry out 4C+BY and Lease Return Check at an EASA/FAA approved MRO |
| | | | VT-EYC | JORANCO | 2,07,614.00 | |
| 2009-10 | 0 | NIL | NIL | NIL | NIL | NIL |
| 2010-11 | 2 | A330 | VT-IWA* | REVIMA | 1,74809.00 | To carry out Leanding Ghar Replacement on both the aircrafts. |
| | | | VT-IWB* | | 1,773,856.00 | |
| | | A330 | VT-IWB* | SIAEC | 1,501,245.00$ | As per Lease Agreement to carry out BC Check at an EASA/FAA approved MRO |
| | | | VT-IWB* | | 2,846,485.97 | |
| 2011-12 | 5 | A319 | VT-SCA | ADAT | 298,000.00# | As per Lease Agreement, to carry out 6 year Check at an EASA FAA approved MRO |
| | | | VT-SCB | | 298,000.00# | |
| | | | VT-SCC | | 298,000.00# | |
| | | | VT-SCC | | | |

Note:   -Payment made by Air India (e/w Indian Airlines Ltd.) to the MRO.
*MRO Expenditure re-imbursed by the respective lessors has not been deducted.
$ Provisional Cost.
# This is the Basic Cost. The additional cost invoice yet to be received from the MRO.

*ANNEXURE VIII*

# Air India &
# Indian Airlines
# Opportunities Together
### 22 March 2006

**IA - AI Fact Sheet**

| Parameter | AI | IC | Combined Strength |
|---|---|---|---|
| Revenue (2004-05) | Rs. 7676 Cr. | Rs. 5363 Cr. | Rs. 13040 Cr. |
| Net Profit (2004-05) | Rs. 96 Cr. | Rs. 66 Cr. | Rs. 162 Cr. |
| Fleet | 41 | 70 | 111 |
| Market Share (Intl.) | 20% | 10% | 30% |
| Passengers carried | 4.5m | 8.6m | 13.1m |
| World Rank (Revenue) | 48 | 70 | 35 |
| Estimated with new fleet | | | 20 |
| Asia Pacific Rank | 16 | 21 | 12 |
| Estimated with new fleet | | | 8 |

**Changing Global Environment**

- Industry witnessing rapid developments—mergers creating mega-carriers with increased market power

- Increasing dominance of Global airline alliances

- Consolidation a Key-driving factor- SIZE a critical success factor

- High operating cost eliminating small/inefficient airlines

- Liberalisation/Deregulation stimulating competition, mainly from low-cost carriers

- Expensive cutting edge technologies key to survival -only major airlines can afford these

160

**Evolving Indian Aviation**

- Entry for new domestic carriers eased -10 domestic airlines likely - Indian Airlines is faced with greater competition
- After years of low key growth, unprecedented growth in Civil Aviation
- Structural changes -LCCs (international & domestic), airport privatisation, financial restructuring, mergers/acquisitions.....
- Major hubs in DEL & BOM, supporting hubs in BLR & HYD, MAA & CCU likely in near future
- With almost doubling of capacity and more routes opening up, yields dropping
- Value of large network critical to full service carriers like AI and IA
- Past five years—huge increases in entitlements/new routes for foreign airlines
    - Open Skies with USA, new open skies with UK/ASEAN/SAARC
    - Liberal bilateral agreements with Germany, France, Chine and most other countires
- Domestic carriers allowed to fly overseas, forge, partnerships with foreign carriers
- Foreign carriers interlining with domestic airlines to access secondary destinations
- Domestic airlines like Jet Airways with vast domestic networks in a position to fill international flights with ease
- Other domestic airlines will qualify for international operations in next 3-4 years - by then they will also have vast domestic networks
- Market Shares of AI and IA have dropped.

| Year | Domestic | International | | Total |
|---|---|---|---|---|
| | IA | IA | IA | |
| 1990 | 100.0 | 24.5 | 6.0 | 30.5 |
| 1995 | 59.1 | 22.9 | 8.6 | 31.5 |
| 2000 | 48.7 | 21.1 | 10.1 | 31.2 |
| 2005 | 31.0 | 19.5 | 10.1 | 29.6 |

**Global Alliance Phenomenon**

| Major Players | BA, AA | LH, UA, SQ | AF-KLM, DL, CO |
|---|---|---|---|
| Passengers Per Year [1] | 221 Million | 371 Million | 329Million |
| Market Share (RPK) | 15.1% | 22.2% | 20.2% |
| Countries | 133 | 140 | 146 |
| Destinations | 549 | 770 | 664 |

[1] As in July 2005
The alliances control over 80% of global airline capacity (ASKMs)



162

**Comparative Load Factors**

**Passenger Load Factors**

| Alliance Members | | | Non-alliance Airlines |
| --- | --- | --- | --- |
| United Airlines | 79.2 | 69.5 | Southwest Airlines |
| Air France-KLM Group | 78.8 | 69.3 | South African Airlines |
| American Airlines | 74.8 | 69.0 | Malaysian Airlines |
| British Airways | 74.8 | 69.1 | Air India |
| Delta Airlines | 74.7 | 67.4 | Japan Airlines Corporation |
| Singapore Airlines | 74.3 | 66.3 | China Eastern Airlines |
| Lufthansa | 74.0 | 62.2 | Saudi Arabian Airlines |

Alliance members achieve higher load factors

**Global Alliance phenomenon**

- Imperative  for AI & IA to jointly bid for Global Partnership on an urgent basis.

## Isolation Marginalisation

- AI and IA alone bring negligible value to any global alliance

- Together, with integrated domestic/international networks, they become very attractive

- Single airline for both domestic & international operations *e.g.* Qantas in Australia, Varig in Brazil, Air France, Lufthansa—use combination of narrow-body aircraft for domestic operations and wide-body aircraft for international operations.

**Options before the two airlines**

Synergy                        Holding Company                        Merger

**Past Attemps**

- IA &AI Managements have tried to enhance synergy/co-operation

- Flying Returns and hub & spoke operations are successful

- Other synergetic measures not as successful due differences in perception and  needs/goals

- Both airlines recognise need to integrate resources, networks, strategies and bottomline-possible only with complete merger

- Holding company model studied—found to be inadequate

    - No operational integration

163

- Two separate entities  acting independently and divergently

- Issues of network integration and expansion still remain

- Attempts to allocate international & domestic operations provoke resistance

- Past efforts have not fructified

  - Distinctive roles for AI/IA

  - No competitive pressures

  - Lack of Government/top management will to push merger

  - Each airline felt that merger benefits only the other airline

  - Fear of loss of identify and suppression

  - Daunted by task of merging manpower

- Merger was never considered seriously as both airlines worked in a protected environment—faced no serious threat of competition and had "complementary" roles

- Now environment vastly different. If AI & IA remain separate they will compete with each other

- Without merger—both AI & IA face marginalisation

**Best Option: Merger**

Both airlines believe

- Merger within a specified time frame

-  Full operational and manpower integration

-  With combined fleet strength of 160+aircraft, AI/IA capable of competing with AF-KLM (480), LH-Swiss (401), BA (284), EK-UL (102), SQ (126), Jet-Sahara (80)

-  Joint Working Group to prepare business plan with combined fleet, common schedule and single balance sheet, as one organisation

-  Merger will create a dominant competitive position

-  Manpower integration will pose challenges. These can be overcome.

**Merger Benefits**

- Large integrated domestic/international networks—seamless connectivity—benefits of "freed up" capacity

- Dominant domestic/international market position

164

- Scope for substantial unit cost reduction

- Synergies in sales and distribution

- Optimal utilisation of aircraft, manpower & other resources

- Economies of scale in purchasing, spares inventory, insourcing/ outsourcing

- Opportunity of create joint ventures—engineering MRO, ground handling, cargo

**Thank You!**

*ANNEXURE-IX*

| Area | Actual accrual-Annualized (Rs. Cr.) | Remarks |
|---|---|---|
| Commercial (Network) | 211.7 | Due network restructuring *i.e.* change in aircraft/outing/frequencies |
| Finance | 598.25 | Discount on ATF price/Aviation Insurance Premium/reduction in foreign posting. |
| Procurement | 58.51 | Synergy of vendors, contracts, rates, saving of freight, utilization of common warehousing facilities etc. |
| Ground Handling | 10.69 | Synergy of facilities & equipment, reduction in capex & ratinalization of contracts. Also review & renegotiation of ground handling agreements at foreign stations under progress benefits to be quantified after finalization of agreements(s) |
| Engineering/MRO | 7.41 | Cross utilization of resources |
| Security | 1.2 | Withdrawal of overlapping staff, common utilization of training faculties & saving in capital expenditure on X-ray machines |
| Public Relations | 0.2 | Mainly because now only one in-house magazine increased royalty for Namaskar, withdrawal of overlapping staff |
| Regions | 3.83 | Primarily surrender of overlapping space, cross utilization of communication lines, staff transport, canteen synergy of catering contracts/crew hotel accommodation |
| Operations | 644.00 | ATF savings emanating out of implementation of Fuel Efficiency Gap Analysis (FEGA) and Flight Planning (FWZ) |
| Total | 1535.79 | |

THE INTEGRATION OF BOTH THE COMPANIES HAVE BEEN COMPLETED IN THE FOLLOWING AREAS

| Area | Item |
| --- | --- |
| Admin/Corporate Affairs | Initiate exchange of Minutes of Board/General meetings (on CD) |
| Admin/Corporate Affairs | Appointment of RTI appellate authority |
| Admin/Corporate Affairs | Preparation of RTI material on company website |
| Admin/Corporate Affairs | Finalization of legal structure & legal practices for NACIL |
| Alliance Mgmt | Decision to join Star Alliance |
| Cabin crew | Standardize services provided by the company to cabin crew (transportation, hotel, etc.—excludes allowances) |
| Cabin crew | Integration of hotel accommodation contracts for cabin crew |
| Cargo | Operation of first freighter with common AI Cargo branding |
| Cargo | Common policies and procedures |
| Cargo | Interline message exchange to be functional between current AI and IA systems |
| Cargo | Implementation of common pricing and SPA's in the common markets |
| Cargo | Common training |
| Cargo | Integrated training facilities |
| Commercial | Preferential SPA's sale by GSA's—passenger side |
| Commercial | Common pricing on overlap markets—AI and IC |
| Commercial | Integrated pricing policies and control |
| Commercial | Filling of fares from more O&Ds—IA domestic network to/from AI international destinations |
| Commercial | E-ticketing between AI and IA |
| Commercial | 1-way Freesale: IA flights by AI |
| Commercial | Integrated & Standardized MIS |
| Commercial | Common agreements and rate structure with all CRS/GDS |

167

| Area | Item |
|---|---|
| Commercial | Common marketing, promotions advertising |
| Commercial | Common front-end interface for website |
| Commercial | Integrated airport facilities & City Ticketing Offices |
| Commercial | Common sales/distribution policies |
| Commercial | Finalization of Integrated sales force structure |
| Commercial | Single point accountability for sales force |
| Commercial | Design common commercial training procedures |
| Commercial | Implement common commercial training procedures |
| Commercial | Integrated Schedule for Summer 2008 |
| Commercial | Implement all schedule/network integration 'quick wins' |
| Commercial | Common/integrated internet booking engine |
| Commercial | File Summer-2008 slots at coordinated airports |
| Commercial | Consolidated Travel Agents network & common commission/incentives structure |
| Commercial | Integrated PSS/Single Code |
| Customer Service | Unified Face to Customer (UFC) at all touchpoints—signages |
| Customer Service | Unified face to Customer (UFC) at all touchpoints-—equipment |
| Customer Service | Unified Face to Customer (UFC) at all touchpoints—stationary (boarding passes, baggage tags, etc.) |
| Customer Service | Unified Face to Customer (UFC) at all touchpoints—in flight items |
| Customer Service | Integrated Complaint Handling |
| Customer Service | Integrated meal plans |
| Customer Service | Unified Face to Customer (UFC) at all touchpoints—uniforms |
| Customer Service | Through check-in & seamless transfers |
| Customer Service | Common/integrated call center |
| Finance | Synergies/quick wins in Insurance |
| Finance | Synergies/quick wins in Fuel procurement—ATF |
| Finance | Synergies/quick wins in number of banks & fund management |
| Finance | All aspects towards standardization of revenue & expenditure accounting & processing |

168

| Area | Item |
| --- | --- |
| Finance | Integration of Accounting policies, legal & tax issues |
| Finance | Integrated Financial Statement (P&L/Balance Sheet, etc.) |
| Finance | Integrated Route Profitability reporting |
| Finance | Design of Transfer Pricing principles between SBUs |
| Flight Safety | Extension of support of flight safety sections to all stations where there is presence of any airline |
| Flight Safety | Technical feasibility study for sharing of DFDR Frequency data and Flight Scope software systems |
| Flight Safety | Common safety policy along with a joint flight safety manual (with two co-existing parts) for the purposes of AOP (subject to in-principle approval by DGCA and other authorities) |
| Flight Safety | Formulation of a joint emergency response plan and a preparatory drill for the same |
| Flight Safety | Conducting of joint Safety audits |
| Flight Safety | FOQA harmonization |
| GHS | AI's Contracts Section to deal with the new customer airlines at BOM, MAA, COK, TRV, IA to deal with the new airlines at all other stations like DEL, CCU, AMD, CCJ etc. |
| GHS | Decision on method of handling (erstwhile AI/erstwhile IC/combines/outsourced) of flights at following overlap stations<br><br>—AMD, CCJ, IXE, ATQ, PNQ and TRZ |
| GHS | Centralized control for Ground Handling at both domestic and international handling at MAA, CCU, TRV<br><br>Equipment to be pooled and operated as a single unit |
| GHS | GS workshop facility and training centres at all stations to be pooled |
| GHS | Rationalization of handling contracts at common stations for getting a better deal |
| GHS | Common procedure for procurement of GH equipment, spare inventory control |
| GHS | Common procedure for handling contract agreements including SLAs compliance & monitoring |
| GHS | Common training procedures |
| GHS | Common optimized procedure to be adopted for Ramp services and On-ramp aircraft servicing |
| GHS | Centralized control for both domestic/international handling |

169

| Area | Item |
|---|---|
| | at DEL and BOM |
| GHS | Ramp-side activities to be taken over by GSD at select stations |
| GHS | Common optimized procedure to be adopted for Terminal side services |
| GHS | Automation of procedures particularly computerized system to be implemented |
| | —Shortage to be identified and procurement to be processed |
| Hindi | Compilation of all reports and procedures with consultation of directors Official Language Civil Aviation to finalize way forward |
| HR | Organization Structure till DGM level |
| HR | Seniority integration principles for general cadre—ED to DGM level |
| HR | Formulation of integrated Sports Board |
| HR | Delegation of Administrative and Financial Powers |
| IT | PSS |
| IT | Email system |
| IT | Hardware upgrade (servers) |
| IT | Network upgrade (MPLS IP VPN, Bandwidth, etc) |
| IT | Through check-in & seamless transfers |
| IT | E-ticketing between AI and IA |
| IT | Common front-end interface for website |
| Materials Mangt. | Aircraft Spares Procurement—Synergies in Initial provisioning |
| Materials Mangt. | Aircraft Spares Procurement—Synergies in common parts |
| Materials Mangt. | Aircraft Spares—Synergies in Logistics |
| Materials Mangt. | Synergies in Office Equipment & Hardware |
| Materials Mangt. | Synergies in Catering & Upliftment |
| Materials Mangt. | Synergies in Cabin Consumables |
| Materials Mangt. | Synergies in Ground catering |
| Materials Mangt. | Synergies in Passenger hotel |
| Materials Mangt. | Synergies in canteen supplies |

170

| Area | Item |
| --- | --- |
| Materials Mangt. | Synergies in Uniforms purchase |
| Materials Mangt. | Synergies in Crew & Cabin Hotels |
| Materials Mangt. | Synergies in Traveling/Transportation |
| Materials Mangt. | Integrated Policy |
| Materials Mangt. | Integrated Process |
| Medical | Pre-employment medical standards for ground staff, cabin crew and cockpit crew |
| MRO | Assessment of facilities at Mumbai, Delhi and Kolkata to identify future growth capabilities |
| MRO | Conduct feasibility study of existing component capability list of both IA and AI for possible integration |
| MRO | Standardising of processes in areas of: <br> - Quality Procedures <br> - MEL/CDL <br> -Aircraft performance <br> -Licensing/Approval System <br> -Delay and defect analysis |
| MRO | Exchange of information on inventory management procedures, facilities, IT systems and manpower |
| MRO | Policy decision on outsourcing Aircraft handling at Line Maintenance level in foreign stations, except for certification |
| MRO | Common engineering office in all Line Stations with all equipments and facilities |
| MRO | Feasibility study of avionics and accessories space, manpower and equipment at various locations |
| MRO | Uniform Quality Control policy for MEL Preamble |
| MRO | Combined Hanger planning |
| MRO | Integration of aircraft training courses |
| MRO | Common MOE manual as per CAR 145 |
| MRO | Aircraft performance and Component Reliability Reporting System Procedure Harmonization |
| MRO | Combined Overhaul shop load planning |
| MRO | Common contract for cabin cleaning |

171

| Area | Item |
|---|---|
| MRO | Common utilization of Fabrication Facilities, Non-Destructive Testing, Composite Repair Shop, Machine Shop, Structural shop, etc. |
| Network | File W-2007 slots at coordinated airports |
| Network | Rationalization of key overlap markets—AI and IC |
| Network | Standardized feeder flights to/from DEL for AI's International flights |
| Network | Deployment for Regional Jets to Full Service vs Low Cost Carrier |
| Network | Rationalization of key overlap markets—Full Service and Low Cost carriers |
| Network | Standardized feeder flights to/from BOM for AI's international flights |
| Network | Complete "clean sheet" network planning exercise |
| Operations | Common use of VHF company frequency |
| Operations | FMC database (Central Training Establishment)—Obtain value discounts from Honeywell |
| Operations | Operations manual integration including Training, Flight Dispatch & Operations |
| Operations | Requirements identification for crew scheduling & rostering software |
| Operations | Sharing of Jepson manuals to aircrafts instead of pilots |
| Operations | IOSA certification for AI and IC |
| Operations | Implementation of Fuel Efficiency Gap Analysis (FEGA) recommendations |
| Operations | Single Air Operators Permit (AOP) |
| Overall | Finalization of CMD |
| Overall | Finalization of Board of directors |
| Overall | Finalization of organization structure for NACIL |
| Overall | Selection of leadership team—Functional Directors, |
| Overall | Setup of Integration Cell |
| Overall | Setup of Grievance Redressal Mechanism |
| Overall | Setup of Communication Plan |
| Overall | Monitoring & tracking of overall synergy benefits |

172

| Area | Item |
| --- | --- |
| Overall | Creation of regional organization structures |
| Overall | Creation of integrated MIS for CMD office |
| Properties & Facilities | Rationalization of booking offices |
| Properties & Facilities | Rationalization of city offices |
| Properties & Facilities | Rationalization of airport facilities |
| Public Relations | Initiation of brand building exercise for the merged entity |
| Public Relations | Rationalization of in-flight and in-house magazines |
| Public Relations | Initiate joint handling of media relations |
| Public Relations | finalize common PR agency |
| Security | Exchange data on manpower and other available resources in both security departments |
| Security | Prepare note on organization structure for unified security departments in the merged entity |
| Security | Integration & harmonization of the 14 airline security functions |
| Security | Visit to airports to study processes and implementation of aviation security processes |
| Security | Initiate use of common aviation training facilities |
| Security | Initiate common use of X-BIS and BRS systems at major international airports |
| Security | Initiate use of common manpower available |
| Security | Present draft note to the ministry on extensions of single agency concept to all international airports in India |
| Security | Initiate manpower assessment to cater to security requirements as per R.P. Singh Committee |
| Training | Common e-mail ID for sharing of information |
| Training | Integration of training manual for AOP |
| Training | Integration of training manual for IOSA |
| Training | Sharing of printing press facilities/resources |
| Training | Harmonization of issuance of circulars/manuals |

173

| Area | Item |
|------|------|
| Training | Maintenance of common training records |
| Training | Finalization of training captains strength and ratio per fleet for merged entity |

*ANNEXURE XI*

AIRCRAFT UTILIZATION(DAILY HOURS) 2011-12

| Airline | A-319 Utilisation |
|---------|------------------|
| Aeroflot | 10:24 |
| Air Canada | 10:25 |
| Air China | 10:15 |
| Air France | 08:14 |
| AVIANCA | 16:19 |
| British Airways | 08:20 |
| China Southern | 09:54 |
| Delta Air | 08:06 |
| LAN Airlines | 10:07 |
| Lufthansa | 08:03 |
| Turkish Airlines | 11:52 |
| United Airlines | 12:59 |

| Airline | A-320 Utilisation |
|---------|------------------|
| Aeroflot | 10:00 |
| Air Canada | 10:35 |
| Air China | 09:09 |
| Air France | 08:25 |
| Air New Zealand | 08:56 |
| All Nippon Airways | 06.56 |
| Austrian | 09:46 |
| British Airways | 09:14 |
| Delta Air | 10:10 |
| Lufthansa | 09:04 |
| Qantas Airways | 10:06 |
| United Airlines | 12:49 |

174

| Airline | A-321 Utilisation |
|---|---|
| Aeroflot | 08:54 |
| Air Canada | 13:27 |
| Air China | 09:58 |
| Air France | 08:11 |
| AVIANCA | 09:07 |
| British Airways | 08:05 |
| China Southern | 09:24 |
| Lufthansa | 08:57 |
| Qantas Airways | 10:12 |
| Saudi Arabian Airlines | 07:02 |
| Turkish Airlines | 12:05 |
| US Airways | 07:31 |

AIRCRAFT UTILISATION (DAILY HOURS)
APRIL-MAY, 2012

| A319 | 9.9 |
|---|---|
| A320 | 8.6 |
| A321 | 10.3 |

*ANNEXURE XII*

THE MAJOR YEAR-WISE REASONS FOR INCREASE IN LOSSES FROM 2007-08
ONWARDS ARE GIVEN AS UNDER:

**Increase in loss during 2007-08**

In the first year of operations of the company *i.e.* 2007-08, the company posted a Net Loss (After Tax) of Rs. 2226.16 crores as against the combined Net Loss (After Tax) of erstwhile Indian Airlines Ltd. and erstwhile Air India Ltd. amounting to Rs. 688.22 crores in 2006-07.

The major reasons for increase in loss by Rs. 1537.94 crores are on account of the following:

* Decline in passenger revenue by Rs. 288 crores due to decline in carriage in RPKM by 1.8% (Rs. 191 crores) and decline in Yield by 1% *i.e.* from Rs. 3.25 to Rs. 3.22/RPK (Rs. 97 crores).

* Increase in fuel cost by Rs. 305 crores due to increase in ATF rates by 8%.

* Increase in interest cost by Rs. 425 crores.

* Increase in depreciation by Rs. 52 crores.

* Decrease in Other Revenue/Increase in Expenses by Rs. 468 crores.

**Increase in loss during 2008-09**

In the second year of operations *i.e.* 2008-09, the company suffered a Net Loss (After Tax) of Rs. 5548.26 crores as compared to Net Loss (After Tax) of Rs. 2226.16 crores in 2007-08.

The Major reasons for increase in loss by Rs. 3322.10 crores are on account of the following:

* Decline in passenger revenue by Rs. 687 crores due to decline in carriage in terms of RPKM by 16% (Rs. 1764 crores) due to recession. The reduction in carriage was partially offset by increase in yield by 10.9% *i.e.* from Rs. 3.22 to Rs. 3.57/RPKM (Rs. 1077 crores).

* Increase in fuel cost by Rs. 808 crores due to increase in ATF rates by 24%.

* Increase in depreciation by Rs. 464 crores mainly due to induction of new aircraft.

* Increase in interest cost on working capital borrowings by Rs. 736 crores.

* Increase in interest cost on aircraft project by Rs. 223 crores.

* Decrease in Other Revenue/Increase in Expenses by Rs. 404 crores.

**Increase in loss during 2009-10**

The company has posted a Net Loss (After Tax) of Rs. 5552.44 crores in 2009-10 as against a Net Loss (After Tax) of Rs. 5548.26 crores in 2008-09.

177

The major reasons for the minor increase in loss by Rs. 4.18 crores are on the account of the following:

* Decline in fuel cost by Rs. 2046 crores partly on account of decline in fuel prices by 25% and FEGA savings.

* Decrease in Passenger Revenue by Rs. 117 crores on account of decline in fall in yield per RPKM by 12% (from Rs. 3.57 to Rs. 3.16/RPKM) leading to a drop in pax revenue by Rs. 1188 crores. Although decline in yield was partially offset by increase in carriage in terms of RPKM by 11.6% (Rs. 1071 crores).

* Decline in Charter Revenue by Rs. 170 crores mainly due to decrease in Haj Charter Revenue and a decline in Block Seat Arrangement (BSA)/Interline Revenue by Rs. 125 crores.

* Decline in Handling Receipts by Rs. 79 crores.

* Increase in the expense of Traffic Handling by Other Operators by Rs. 75 crores.

* Increase in Interest on working capital borrowings by Rs. 522 crores due to increase in borrowing rates and working capital limits.

* Increase in interest on aircraft project loans by Rs. 246 crores due to induction of new aircraft.

* Increase in depreciation cost by Rs. 164 crores due to induction of new aircraft.

* Increase in other Expenses/Reduction in Revenue by Rs. 544 crores.

**Increase in loss during 2010-11**

The company has suffered a Net Loss (After Tax) of Rs. 6865.17 crores during 2010-11 as against the loss before tax of Rs. 5552.44 crores in 2009-10.

The major reasons for increase in loss by Rs. 1313 crores are on account of the following:

* Increase in fuel cost by Rs. 1097 crores in mainly on account of increase in fuel rates by 18.6% and increse in operations by 4.4%.

* Increase in Interest on working capital borrowings by Rs. 453 crores due to increase in borrowing rates and working capital limits.

* Increase in interest on aircraft project loans by Rs. 408 crores due to induction of new aircraft.

* Increase in depreciation cost by Rs. 301 crores due to induction of new aircraft.

178

* Increase in Staff Costs by Rs. 370 crores mainly due to increase in Provision for Gratuity by Rs. 292 crores due to increase in limits from Rs. 3.50 lakhs to Rs. 10.00 lakhs and increase in VDA rates by Rs. 84 crores.

* Increase in Yield per RPKM by 9.5% and increase in carriage in terms of RPKM by 4% contributed to an increase in Passenger Revenue by Rs. 1294 crores which partially offset the increase in expenses during the year.

* Increase in Revenue/Decrease in other expenses by Rs. 22 crores.

**APPENDIX I**

MINUTES OF THE THIRTEENTH SITTING OF THE PUBLIC ACCOUNTS
COMMITTEE (2011-12) HELD ON 11TH JANUARY, 2012

The Public Accounts Committee sat on Wednesday, the 11th January, 2012 from
1430 hrs. to 1700 hrs. in Room No. '63', Parliament House, New Delhi.

PRESENT

Dr. Murli Manohar Joshi—*Chairman*

MEMBERS

*Lok Sabha*

2.   Shri Anandrao Vithoba Adsul

3.   Shri Bhartruhari Mahtab

4.   Shri Sanjay Brij Kishorlal Nirupam

5.   Dr. K. Sambasiva Rao

6.   Dr. M. Thambidurai

7.   Dr. Girija Vyas

*Rajya Sabha*

8.   Shri Prakash Javadekar

9.   Prof. Saif-ud-Din Soz

*Secretariat*

1.   Shri Devender Singh       —     *Joint Secretary*

2.   Shri Abhijit Kumar        —     *Director*

3.   Smt. A. Jyothirmayi       —     *Deputy Secretary*

**Representatives of the Office of the Comptroller and Auditor General of India**

1.   Shri Vinor Rai            —     C&AG

2.   Ms. Malashri Prasad       —     Deputy C&AG

3.   Ms. Subha Kumar           —     Director General of Audit
                                     (Report Central)

4.   Ms. Saroj Punani          —     Director General of Audit (Commercial)

179

180

### Representatives of the Ministry of Civil Aviation

| 1. Dr. Nasim Zaidi | — | Secretary |
| 2. Shri S. Machendranathan | — | AS&FA |

2. At the outset, the Chairman welcomed the Members and the C&AG of India to the sitting of the Committee. The Chairman then apprised the Members that the sitting was convened to take Evidence of the representatives of the Ministry of Civil Aviation on 'Performance Audit of Civil Aviation in India' based on C&AG Report No. 18 of 2011-12, Union Government (Civil).

3. Thereafter, the representatives of the Ministry of Civil Aviation (MoCA) were called in and the Committee proceeded with the examination of the subject. The Secretary, Civil Aviation apprised the Committee about the kind of operations the airlines undertook with deregulation. He  enumerated the reasons for the decline of the company. The Members then sought clarifications regarding several aspects of the ailing national carrier's losses *viz.* fleet acquisition, merger, huge debt burden, poor financial and operational performance, route rationalization etc. The Secretary put forth the reasons for delay in acquisition, on the financing aspect and so on. However, the Committee were not satisfied with the Secretary's reply and desired that the representatives of the Ministry re-appear before the Committee with all the details and clarify their queries.

4. The Chairman thanked the representatives of the Ministry for deposing before the Committee and gave two weeks time to the Ministry of Civil Aviation to furnish the details on the various points raised by the Committee. The Chairman also thanked the representatives of the office of the C&AG of India for providing valuable assistance to the Committee in the examination of the subject.

The witnesses, then, withdrew.

A copy of the verbatim proceedings of the Sitting was kept on record.

*The Committee then adjourned.*

APPENDIX II

MINUTES OF THE FIFTEENTH SITTING OF THE PUBLIC ACCOUNTS
COMMITTEE (2011-12) HELD ON 19TH JANUARY, 2012

The Public Accounts Committee sat on Thursday, the 19th January, 2012 from
1130 hrs. to 1415 hrs. in Committee Room No. 'G-074', Parliament Library Building,
New Delhi.

PRESENT

Dr. Murli Manohar Joshi—*Chairman*

MEMBER

*Lok Sabha*

2.  Shri Anandrao Vithoba Adsul

3.  Shri Sandeep Dikshit

4.  Shri Shripad Yesso Naik

5.  Dr. K. Sambasiva Rao

6.  Shri K. Sudhakaran

7.  Dr. Girija Vyas

*Rajya Sabha*

8.  Shri Prasanta Chatterjee

9.  Shri Naresh Gujral

10.  Shri J.D. Seelam

11.  Prof. Saif-ud-Din Soz

SECRETARIAT

| | | | |
|---|---|---|---|
| 1. | Shri Devender Singh | — | *Joint Secretary* |
| 2. | Shri Abhijit Kumar | — | *Director* |
| 3. | Smt. A. Jyothirmayi | — | *Deputy Secretary* |

**Representatives of the Office of the Comptroller and Auditor General of India**

| | | | |
|---|---|---|---|
| 1. | Shri Vinod Rai | — | C&AG |
| 2. | Ms. Malashri Prasad | — | Deputy C&AG |
| 3. | Ms. Subha Kumar | — | Direcot General of Audit (Report Central) |
| 4. | Ms. Saroj Punani | — | Director General of Audit (Commercial) |
| 5. | Shri A.M. Bajaj | — | Principal Director of Audit (Economic and Service Industries) |

181

182

WITNESSES

### Representatives of Erstwhile Air India

| | | | |
|---|---|---|---|
| 1. | Shri K.M. Unni | — | SBU Head MRO (Airframe) |
| 2. | Shri S. Venkat | — | Director (Finance) |
| 3. | Shri F.J. Vaz | — | Executive Director (Commercial) |

### Representatives of Erstwhile Indian Airlines

| | | | |
|---|---|---|---|
| 1. | Shri Vipin K. Sharma | — | SBU Head MRO (E&C) |
| 2. | Shri Deepak Brara | — | Executive Director (Hqrs.) |
| 3. | Smt. V. Bhandari | — | Executive Director (IR) |

2. At the outset, the Chairman welcomed the Members and the Audit Officers to the sitting of the Committee. The Chairman then apprised the Members that the Sitting was convened to take oral evidence of the representatives of NACIL (now renamed as Air India) on 'Performance Audit of Civil Aviation in India' based on C&AG Report No. 18 of 2011-12, Union Government (Civil). Thereafter the representatives of the erstwhile Air India were called in. Before commencing the examination, they were told that the deliberations of the Committee were confidential and not to be divulged to any outsider untill the report on the subject was laid in the Parliament. The Commitee then proceeded with the examination of the subject.

3. The Members sought to know the background of merger, reasons for acquisition of aircraft, the impact of open sky policy, earnings of the organization before and after the merger and so on. The Representatives answered the queries of the Members and assured that the information which was not readily available with them would be furnished to the Committee.

4. The Chairman thanked the representatives of the erstwhile Air India for deposing before the Committee and directed that written information on the various points raised during the oral evidence be furnished to the Committee at the earliest.

5. The Chairman, thereafter, welcomed the representatives of erstwhile Indian Airlines and apprised them that the Sitting had been convened to hear their views regarding the points raised in CAG Report on "Performance of Civil Aviation in India'. They were told that the deliberations of the Committee were confidential and not to be divulged to any outsider until the presentation of the Report of the Committee to the House. The Chairman asked the SBU-Head MRO (E&C) to give his views on the issues of merger, acquisition of aircraft by erstwhile Indian Airlines and so on. The Members also sought the reasons with respect to the decline of the airline and its poor financial position. The representatives of the erstwhile IAL attended to these queries of the Members.

183

6. At the end, the Chairman thanked the representatives of the erstwhile IAL for appearing before the Committee and asked them to furnish requisite information at the earliest. He also stated that the representatives, may be asked to re-appear before the Committee, if need be. The Chairman also thanked the representatives of the office of the C&AG of India for providing valuable assistance to the Committee in the examination of the subject.

The witnesses, then, withdrew.

A copy of the verbatim proceedings of the Sitting was kept on record.

*The Committee then adjourned.*

**APPENDIX III**

MINUTES OF THE SEVENTEENTH SITTING OF THE PUBLIC ACCOUNTS
COMMITTEE (2011-12) HELD ON 22ND FEBRUARY, 2012

The Public Accounts Committee sat on Wednesday, the 22nd February, 2012
from 1100 hrs. to 1330 hrs. in Room No. '53' , Parliament House, New Delhi.

PRESENT

Dr. Murli Manohar Joshi    —        *Chairman*

MEMBERS

*Lok Sabha*

2.   Shri Anandrao Vithoba Adsul

3.   Shri Anant Kumar Hegde

4.   Shri Bhartruhari Mahtab

5.   Shri Sanjay Brij Kishorlal Nirupam

6.   Shri Jagdambika Pal

7.   Shri Adhi Sankar

8.   Kunwar Rewati Raman Singh

9.   Shri K. Sudhakaran

10.  Dr. Girija Vyas

*Rajya Sabha*

11.  Shri Tariq Anwar

12.  Shri Prasanta Chatterjee

13.  Shri Naresh Gujral

14.  Shri Prakash Javadekar

15.  Shri J. D. Seelam

16.  Prof. Saif-ud-Din Soz

SECRETARIAT

1.   Shri Devender Singh          —        *Joint Secretary*

2.   Smt. A. Jyothirmayi          —        *Deputy Secretary*

184

185

**Representatives of the Office of the Comptroller and Auditor General of India**

| | | | |
|---|---|---|---|
| 1. | Ms. Subha Kumar | — | Director General of Audit (Report Central) |
| 2. | Shri Anand Mohan Bajaj | — | Principal Director (Economic and Services Ministries) |
| 3. | Ms. Sudha Rajan | — | Director (PAC) |

**Representatives of the Associations**

| | | | |
|---|---|---|---|
| 1. | Shri K.R. Chidambaram | — | President, Indian Airlines Officers'Association |
| 2. | Shri Arjun Singh Bisht | — | President, Indian Aircraft Technicians' Association |
| 3. | Shri Ganesh Sabnis | — | President, Air India Aircraft Engineers'Association |
| 4. | Shri A.K. Mohan | — | President, Airlines Ground Instructors' Association |

2. At the outset, the Chairman welcomed the Members and the Officers of C&AG of India to the sitting of the Committee. Soon thereafter, one Member pointed out that there was paucity of time to go through the bulky papers which had been circulated to the Members for the sitting. The Member was explained that the full set of papers was received on 17th February, 2012 from the Ministry of Civil Aviation and they were circulated on the same day. To this, the Member suggested that one set of papers be sent to the permanent address of Members. He was informed that as per the Directions of the Speaker, papers for the sitting are circulated only at the local address of the Members. Not satisfied with the position explained, the Member observed that there was an intention that Members 'do not go through the papers', which was objected to by the Chairman. Thereupon, the Member walked out of the sitting despite persuasion of many Members not to do so.

3. The Chairman, then, placed before the Committee, the proposal for on-the-spot Study Visit Programme to Hyderabad and Gadimoga from 29th February to 2nd March, 2012. The Members deliberated on the pros and cons of undertaking such a Study Visit including the dates on which this tour should be undertaken. When some Members sought clarifications about who would meet the expenditure, the Chairman clarified that all the expenditure would be borne by the Lok Sabha Secretariat. After further discussions, the Committee decided to defer the tour, in view of the pre-occupation of several Members on these dates.

4. Thereafter, the representatives of the Indian Airlines Officers' Association (IAOA), Indian Aircraft Technicians Association (IATA), Air India Aircraft Engineers' Association (AIAEA) and Airlines Ground Instructors'Association (AGIA) were called in and the Committee proceeded with the examination of the subject 'Performance of Civil Aviation in Indiabased on C&AG Report No. 18 of 2011-12, Union Government

186

(Civil). The representatives of the Associations presented their views on the critical aspects ailing the national carrier *viz.* fleet acquisition, merger, HR issues, huge debt burden, poor financial and operational performance, route rationalization, bilaterals etc. and also put forth their suggestions regarding how the national carrier could regain its past glory.

5. The Chairman then thanked the representatives of the Associations for deposing before the Committee. The Chairman also thanked the representatives of the officers of the C&AG of India for providing valuable assistance to the Committee in the examination of the subject.

The witnesses, then, withdrew.

6. Thereafter, the Members were informed that the afternoon sitting for taking oral evidence of the representatives of the Ministry of Civil Aviation stood cancelled in view of the suggestions of some Members.

A copy of the verbatim proceedings of the sitting was kept on record.

*The Committee, then, adjourned.*

**APPENDIX IV**

MINUTES OF THE SIXTEENTH SITTING OF THE PUBLIC ACCOUNTS
COMMITTEE (2013-14) HELD ON 30TH JANUARY, 2014

The Public Accounts Committee sat on Thursday, the 30th January, 2014 from
1130 hrs. to 1400 hrs. in Committee Room 'B', Parliament House Annexe, New Delhi.

PRESENT

Dr. Murli Manohar Joshi            —       *Chairman*

MEMBERS

*Lok Sabha*

2.  Shri Anandrao Vithoba Adsul

3.  Dr. Baliram

4.  Shri`Sandeep Dikshit

5.  Dr. M. Thambidurai

6.  Shri Bhartruhari Mahtab

*Rajya Sabha*

7.  Shri Prasanta Chatterjee

8.  Shri Prakash Javadekar

9.  Dr. V. Maitreyan

10. Shri N.K. Singh

11. Smt. Ambika Soni

SECRETARIAT

1. Shri Devender Singh      —      *Joint Secretary*

2. Shri Jaya Kumar T.       —      *Additional Director*

3. Shri D.R. Mohanty        —      *Deputy Secretary*

4. Smt. A. Jyothirmayi      —      *Deputy Secretary*

5. Ms. Miranda Ingudam      —      *Under Secretary*

6. Shri A.K. Yadav          —      *Under Secretary*

7. Smt. Anju Kukreja        —      *Under Secretary*

188

**Representatives of the Office of the Comptroller and Auditor General of India**

| | | | |
|---|---|---|---|
| 1. | Shri A.K. Singh | — | Dy. C&AG |
| 2. | Smt. Usha Sankar | — | Dy. C&AG |
| 3. | Shri Gautam Guha | — | Director General of Audit |
| 4. | Smt. Ila Singh | — | Director General of Audit |
| 5. | Shri C. Gopinathan | — | Director General of Audit |
| 6. | Shri Jayant Sinha | — | Pr. Director of Audit |
| 7. | Shri Purushottam Tiwari | — | Pr. Director of Audit |
| 8. | Shri A.M. Bajaj | — | Pr. Director of Audit |

2. At the outset, the Chairman welcomed the Members and the Representatives of the Officer of C&AG to the sitting of the Committee. The Chairman, then, apprised that the meeting was convened to consider and adopt nine Draft Reports (five Original and four Action Taken Reports) of the Committee. Thereafter, the Committee took up the following draft Reports one by one for consideration.

(i)      ***    ***    ***    ***

(ii)     Draft Report on 'Performance of Civil Aviation in India';

(iii)    ***    ***    ***    ***

(iv)     ***    ***    ***    ***

(v)      ***    ***    ***    ***

(vi)     ***    ***    ***    ***

(vii)    ***    ***    ***    ***

(viii)   ***    ***    ***    ***

(ix)     ***    ***    ***    ***

3. After detailed deliberations, the draft Reports at Sl. Nos. (i), (ii) and (iii) were adopted with some modifications/amendments that are given at Annexure and the rest were adopted without any changes. The Committee also authorized the Chairman to finalise these Reports, in light of their suggestions and the factual verifications received from the Audit and present the same to the House on a date convenient to him.

4. The Chairman thanked the Members for their valuable suggestions on the consideration of the Draft Reports.

*The Committee, then, adjourned.*

---

***Matter does not pertain to this report.

*ANNEXURE*

MODIFICATIONS/AMENDMENTS MADE BY THE PAC IN THE DRAFT
REPORTS

| Sl. No. | Page No. | Recommendation Para/Line No. | For | Read |
|---|---|---|---|---|
| 1. | *** | | | |
| | *** | *** | *** | |
| 2. | Draft Report on 'Performance of Civil Aviation in India' | | | |
| | 165 | 34/first line | In fine | To conclude |
| 3. | *** | | | |
| (i) | *** | *** | *** | *** |
| (ii) | *** | *** | *** | *** |
| (iii) | *** | *** | *** | *** |
| (iv) | *** | *** | *** | *** |
| (v) | *** | *** | *** | *** |
| (vi) | *** | *** | *** | *** |

***Matter does not pertain to this Report.

189

GMGIPMRND—4337LS—22.08.2014.