# EXHIBIT 9

# PREFACE

This Performance Audit Report has been prepared for submission to the President of India under Article 151 of the Constitution.

The Report is a Performance Audit of civil aviation sector in India which includes NACIL (Air India Limited as it is known today), the Ministry of Civil Aviation (MoCA) and the Bilateral Agreements concluded by Government of India with other governments on entitlements for international operations between India and their countries, as well as permissions given to private Indian carriers to operate on international routes. The Performance Audit was commenced in September 2009 and would have concluded in 2010, but for the fact that reasons for non-performance/losses incurred by Air India Limited were inconclusive without examining the role and extent of support/control by MoCA. Air India repeatedly stated that the government's decision to award profitable routes to private Indian carriers and international carriers vide bilateral agreements also adversely impacted their commercial viability. Hence, to ensure a holistic study, we had to examine the open sky policy of the government which also included bilateral agreements with other countries.  This examination was carried out in late 2010 and early 2011.

At each stage of the audit process, our findings have been shared with AIL and MoCA. The first draft of the performance audit was issued to the Ministry in November 2010 and a second draft report in March 2011. The final draft incorporating the results of the audit of bilateral agreements was issued to the MoCA in July 2011. The replies received from the AIL and Ministry have been incorporated in the Report. Deliberations held in the exit conference on 3rd August 2011 have also been addressed adequately.

Audit wishes to acknowledge the cooperation received from IAL, AIL and the MoCA at each stage of the audit process.



# Executive Summary

## 1.  Introduction

Air India Limited (AIL) and Indian Airlines Ltd. (IAL) dominated the Indian aviation industry till the mid-1990's, when as part of the open sky policy, the Government of India (GoI) ended their monopoly in air transport services, and allowed private operators to provide air transport services. The declining market share of IAL in domestic air transport services was further compounded by the GoI's liberalised policy on bilateral entitlements with foreign countries from 2004-05 onwards, and permitting private Indian carriers to fly on international routes, which put pressure on the international operations of AIL and IAL.

After IAL and AIL (as well as Air India Charters Ltd. (AICL), the Low Cost Carrier subsidiary of Air India) undertook massive fleet acquisitions of Airbus and Boeing aircraft respectively in 2005, a proposal for merger of the two airlines was initiated and completed in August 2007 with their amalgamation into the National Aviation Company of India Ltd. (NACIL); this Company was subsequently renamed as "Air India" in November 2010.

Almost immediately after the merger, NACIL faced significant financial problems, which continued to multiply manifold, resulting in acute cash flow and working capital problems. This forced Air India (AI) to approach the GoI repeatedly for financial support. Further, the actual merger of the operational activities of IAL and AIL took unduly long, and is still not complete in many respects.

## 2.   What does our performance audit cover?

We took up the performance audit to ascertain:

- ■   Whether the acquisition of aircraft by the erstwhile Air India Ltd. (AIL) and Indian Airlines Ltd. (IAL) was appropriately planned and effectively implemented, with due regard to economy,  efficiency and accepted norms of financial propriety;

- ■   Whether the merger of AIL and IAL into NACIL was properly planned and effectively implemented, and the effectiveness of merged operations of the two entities;

- ■   the impact of the liberalised policy of the Government of India (GoI) from 2004-05 onwards on grant of air traffic rights to other countries through Air Services Agreements (ASAs)/ "bilateral" agreements, and permitting Indian private carriers to fly on international routes;

Executive Summary - Performance Audit Report on Civil Aviation in India

- The main reasons for the poor financial and operational performance of the pre-merger airlines and the merged entity; and

- Whether the Ministry of Civil Aviation (MoCA) exercised its oversight role adequately and effectively.

# What are our major findings?

## 3.  Acquisition of aircraft

### 3.1  Acquisition by erstwhile Air India Ltd. (AIL)

On 30 December 2005, AIL signed purchase agreements for supply of 50 Boeing aircraft (with GE engines) at an estimated project cost of Rs. 33,197 crore. We found that:

- The AIL's aircraft acquisition process had taken an unduly long time. The initial proposal was made in December 1996 and examination continued in fits and starts till January 2004. Once AIL revisited their earlier proposal and sent a plan for acquiring 68 aircraft (53 firm and 15 optional) the process gained momentum culminating in the contract being signed in December 2005.

(Para 3.1.3)

- AIL's project report of January 2004 proposed acquisition of 18 small capacity short range aircraft (B737-800) and 10 medium capacity long range aircraft (A340-300) with a positive Net Present Value (NPV) on stand-alone basis. However, by November 2004, the AIL Board changed their fleet acquisition plan and submitted a revised proposal for acquisition of 50 medium capacity long range/ ultra long range aircraft (in addition to 18 small capacity short range aircraft for its subsidiary, Air India Charters Ltd. (AICL)). The sequence of events upto November 2004 clearly demonstrates that the erstwhile AIL hastily reworked its earlier acquisition plan and expanded its requirement. The revised plan saw a dramatic increase in the number of aircraft to be purchased in the period between January 2004 and November 2004. This increase in numbers does not withstand audit scrutiny, considering the market requirements obtaining then or forecast for the future as also the commercial viability projected to justify the acquisition. The acquisition   appears to be supply-driven.

(Paras 3.1.4.1 & 3.1.4.2)

- Audit is constrained to comment on the speed at which the acquisition process proceeded. A programme which was under consideration from 1996 and took eight years to progress upto the Government level for purchase of 28 aircrafts suddenly picked up speed. Between August 2004 and December 2005 the proposals were

formulated by AIL, approved by its Board, examined and approved by MoCA, the Planning Commission, the Department of Expenditure, PIB, EGoM and also the CCEA.  Government conveyed its approval on 30 December and the Contract was signed by AIL with Boeing on the same day. From receipt of the proposal by the government to the signing of contract with government approval, by AIL with Boeing took seven months.

(Para 3.1.7)

- Many of the key assumptions underlying the revised project report (for 50 long range aircraft) were flawed. The assumption that increase in capacity share would automatically lead to a substantial increase in AIL's market share, was not adequately validated. Similarly, the assumptions of yield increases (at constant cost), especially the yield increase of 10 per cent (at constant cost) of non-stop USA flights, were unduly optimistic. This sector on which American/Canadian airlines were already operating non –stop flights and based on which fact AIL was made to reconsider  its fleet requirement, turned out to be  a loss making sector right from the date of commencement of such services.

(Para 3.1.4.2)

- To enable effective price negotiations, it is normal (and was also necessary) to make an assessment through commercial intelligence gathered globally, to assess a reasonable or threshold price (based on comparable prices paid by other buyers and other factors). However, no benchmarks for the cost of the aircraft were set (either for the AIL acquisition or for the IAL acquisition) before negotiations were initiated with the manufacturers at various levels. Consequently, in the absence of such benchmarks, the effectiveness and efficiency of negotiations and the reasonableness of the price arrived at is difficult to ascertain.

(Para 3.1.7)

- The post-bid change in the seat configurations during the negotiation process was irregular, and adversely affected the transparency of the negotiation process. The assumption of further yield increase was also of doubtful reliability, considering the caveats attached by the then Commercial Director of AIL.

(Para 3.1.8)

- The entire acquisition (for both AIL and IAL) was to be funded through debt (to be repaid through revenue generation), except for a relatively small equity infusion of Rs. 325 crore for IAL. This was a recipe for disaster ab initio and should have raised alarm signals in MoCA, PIB and the Planning Commission.

(Para 3.4)

Executive Summary - Performance Audit Report on Civil Aviation in India

## 3.2 Acquisition of aircraft by erstwhile Indian Airlines Ltd. (IAL)

■ In February 2006, IAL signed purchase agreements with Airbus/ CFM for supply of 43 Airbus aircraft (with CFM engine) at an estimated cost of Rs. 8399.60 crore. We found that:

■ The Net Present Values (NPVs) of all the considered sets of aircraft (including the L-1 combination of Airbus aircraft) were all negative, even assuming constant cost and revenue yield at 2001-02 levels. Consequently, IAL projected an increase of 6 per cent in domestic fares in the first year, with further annual increases of 2 per cent for four years, evidently to make the negative NPV positive. This unrealistic assumption of dramatic increases in yield at constant costs (i.e. while assuming costs – fuel, staff, interest and other costs etc. to be constant throughout the project life) was critical to projecting an optimistic picture of positive project cash flows on NPV basis, and to the approval of the acquisition project.

(Para 3.2.4)

■ In fact, even assuming constant yield at constant costs would have been a major challenge for IAL, given the cost profiles and trends of the organisation and future uncertainties. This could not, in fact, be achieved.

(Para 3.2.4)

■ If indeed, GoI/ MoCA was keen on, or agreeable to, a full-scale aircraft acquisition by IAL in the public/ national interest, it should have acknowledged that such an acquisition would involve substantial negative cash flows (based on realistic and reasonable assumptions) and considered and approved appropriate arrangement(s) for funding the resulting cash deficit.

(Para 3.2.4)

■ Concerns regarding potential difficulties of IAL in successfully funding the acquisition process with a positive NPV had been raised within MoCA, but were ignored. The file notings indicate an undue haste to push through the pre-PIB meeting. Such haste evidently rendered it difficult for MoCA officials to express their concerns or reservations.

(Para 3.2.5)

■ The Planning Commission and the Department of Expenditure, MoF raised concerns on several key and critical issues at different stages, but finally concurred with the acquisition proposal. The subsequent AS&FA, MoCA repeatedly expressed serious reservations about the acquisition proposal. However, his views did not cause a re-think on the aircraft acquisition process.

(Para 3.2.6)

■ The commitments made by the manufacturers to the EGoM regarding creation of Maintenance, Repair and Overhaul (MRO), training facilities, warehouse facilities for aircraft spares etc. were quite open-ended. These commitments were not included in the purchase agreements in respect of the IAL fleet acquisition. There has been no tangible progress towards setting up the MRO and warehouse facilities.

(Para 3.2.9)

## 4.  Merger of AIL and IAL into NACIL

■ Based on available records, we are unable to ascertain the detailed justification for, or the background to the 'in principle' approval of GoI for 'working towards the merger' of AIL and IAL.

(Para 4.1)

■ Inexplicably, synergised / integrated operation between AIL and IAL (even though this was recommended / recognised in 2004) was not factored in as part of the acquisition project analysis either for AIL or IAL.  The initiation of action towards the merger in March 2006, less than a few months after completion of independent large scale acquisition of aircrafts by IAL (Airbus) and AIL (Boeing) in late 2005 (after long drawn out procedures/ negotiations) appears somewhat ill-timed, with loss of significant synergistic opportunities. Had the possibility of merger (with attendant route rationalization, network integration, common maintenance/ overhauling facilities and other synergies) been considered – even at a late stage – in the process of fleet acquisition, the underlying economics could have been significantly altered; perhaps, even a common acquisition process for AIL/ IAL could well have been considered. **In our view, the potential benefits for the merger would have been far higher, had this been undertaken before finalization of the massive and separate fleet acquisition exercises undertaken by AIL and IAL.**

(Para 4.1)

■ The financial case for the merger was not adequately validated, prior to the merger. Detailed item-wise financial analysis was not available, so as to assess the reasonableness and robustness of the projected benefits (on account of revenue synergies and cost and capital productivity synergies). The proposed revaluation of fixed assets had no operational or cash flow benefits.

(Para 4.3)

■ There were huge delays in actualisation of the merger/ operational integration. The single code passenger reservation system (which was a critical element in network integration) was activated only in February 2011.

(Para 4.4)

Executive Summary - Performance Audit Report on Civil Aviation in India

- ■ HR factors in any merger process are the most complicated. Even in March 2006, apprehensions with regard to HR problems due to a potential merger were expressed. **HR integration below the level of DGM, representing 98 per cent of the staff, has still not taken place.**

(Para 4.4.3)

- ■ Even four years after the merger, AI is yet to join the Star Alliance, mainly due to the delay in setting up a single code passenger reservation system. In fact, as per the press release of 31 July 2011 available on the Star Alliance website, AI's application for membership of the Star Alliance has been "put on hold", and the integration of Air India into the global airline alliance "will be suspended". This raises the likelihood of indefinite delays as also serious uncertainties on AI's prospects for joining the alliance.

(Para 4.4.2)

## 5.   Role of MoCA

### Liberalised policy towards bilateral agreements on international entitlements

From 2004-05 onwards, there was a substantial liberalisation by the Government of the policy on bilateral agreements on entitlements for international operations between India and other countries, as well as in allowing private Indian airlines to operate on international routes. In our view, while the liberalised policy towards bilateral entitlements benefited the Indian traveller considerably in terms of choices (and lower tariffs), the timing of the liberalisation (given the timing of AIL/IAL aircraft acquisition, upgraded Indian airport with infrastructure with hub-spoke capabilities etc.) did not provide a level playing field to AI (and to a lesser extent other Indian private airlines). At this stage, Indian carriers (including AI) will have to tackle renewed and serious challenges to compete effectively with established international "mega carriers" specialising in 6th freedom traffic.

The massive expansion of bilateral entitlements in respect of several countries (notably in the Gulf, South East Asia and Europe) has facilitated several foreign airlines (predominantly Emirates) in tapping the vast Indian market and funnelling such traffic over their hubs (e.g. Dubai) to various destinations in the USA, UK, Europe and elsewhere, through what is termed as "6th freedom traffic". Although the bilateral agreements do not explicitly provide for exercise of 6th freedom rights, the entitlements exchanged are vastly in excess of "genuine" flying requirements between the two countries (termed as 3rd/ 4th freedom traffic based on Origin-Destination data) and implicitly allow "mega-airlines" with giant hubs to exploit 6th freedom traffic.

- ■ As an illustrative case of the liberalisation of bilateral entitlements, the sequence of events  relating to the Dubai sector, covering the period from May 2007 to March

2010, (when the seat capacity was increased from 18,400 seats/ week to 54,200 seats/ week and points of call in India were increased from 10 to 14), clearly demonstrates the one-sided nature of benefits to Emirates/ Dubai (through enhancement of entitlements and additional points of call in India). This evoked repeated protests from Air India on the lack of reciprocity and the funnelling of 6th freedom traffic by Emirates through Dubai from interior locations in India. Even change of gauge facility at Dubai International Airport, which would at least have provided an opportunity for Indian carriers to funnel traffic in smaller capacity aircraft from interior Indian locations and take them onward to UK/ USA/ Europe and other destinations in larger capacity aircraft was not adequately pursued, nor linked to grant of additional benefit. Repeated requests from AIL resulted in vague commitments from UAE Authorities for such facility, not at Dubai Airport but at the upcoming Jebel Ali Airport (an impractical option for AIL and other Indian carriers) and that too with distant timeframes between 2012 and 2018! Clearly, while Dubai actively protected the commercial interests of its airlines, MoCA failed to obtain appropriate quid pro quo while granting concessions.

(Para 5.1.4.2.1)

■   The notings on MoCA files while processing proposed entitlement liberalisation refer to the demand from the "labour class/ working class" Indians for more seats to/ from India (as projected by several agencies – Ministry of External Affairs (MEA), Ministry of Tourism (MoT), Ministry of Commerce and Industry (MoCI)). These, however, are in a sense, misleading, since the "labour class/ working class" Indians would be interested only in point-to-point connectivity, largely to the Gulf/ Middle East.

(Para 5.1.8)

■   It is certainly not our case that AI should benefit from a protected environment, cloistered from competition from foreign airlines (and other Indian carriers), especially in the current era of economic liberalisation. However, the timing of the liberalisation of bilateral entitlements (notably the Gulf/ SE Asia/ Europe) from 2004-05 onwards left much to be desired:

❑   The delivery of AIL/ IAL's new fleet acquisitions, approved by GoI in December 2005, was scheduled only between 2006 and 2011. Giving a reasonable timeframe of 2 to 3 years post-aircraft delivery for stabilisation of the expanded "footprint" could have provided AIL/ IAL a "level playing field" for competition. Substantially enhanced fleet acquisition, in fact, justified AIL to operate larger number of routes.

❑   It is only now (November 2010 onwards) that India finally has an international class airport terminal at Delhi  capable of large scale hub and spoke operations (domestic/ international and international/ international); large scale development of other international airports in India facilitating hub and spoke

Executive Summary - Performance Audit Report on Civil Aviation in India

operations (at the minimum where domestic and international terminals are co-located) will follow later. Again, giving a reasonable timeframe of 2 to 3 years after full-scale operationalisation of Delhi would have provided a level playing field to all Indian airlines (not just AIL/ IAL) to compete with the mega carriers specialising in 6th freedom traffic.

❑ Many of the countries in the Middle East have only one, or maybe two major airports or "points of call" to offer, while the vast Indian market has numerous attractive interior locations with good commercial potential. The element of "reciprocity" or "give-and-take", if any, in exchange of bilateral entitlements, except to an extent in the case of Qatar, which was apparently guided by politico-economic considerations), could not be ascertained

(Para 5.1.8)

### Monitoring role of MoCA

■ The Memorandum of Understanding (MoUs) signed between the erstwhile IAL and AIL and MoCA were flawed. The non-financial parameters included in the MoU included minor or insignificant parameters or gave undue weightage to such parameters, at the cost of critical traffic and operating parameters in the airline industry (such as those being monitored by Directorate General of Civil Aviation). This skewed the MoU ratings of IAL and AIL unduly to present a "rosy" picture of performance. The overall combination of financial and non-financial parameters devised for the MoUs were such as to ensure that the MoUs became a meaningless exercise, rarely (if ever) reflecting poor performance, and ensuring lack of effective accountability for all parties concerned.

(Para 5.2)

■ The issue of the MoCA order of 2010 granting additional facilities for upgradation of tickets, subject to availability, for former Secretaries, MoCA and their immediate family members at this time of AI's financial crisis indicates that MoCA is not acting as a responsible stakeholder. These decisions granting freebies to retired airline staff and officials needs to be reviewed.

## 6.    Financial and operational performance of the erstwhile IAL/ AIL and AI

■ There was a significant deterioration in operational performance on most parameters such as; passenger/cargo revenues, Available Seat Kilometres (ASKM), Available Tonne Kilometres (ATKM), Revenue Passenger Kilometres

(RPKM), passenger revenue per RPKM and Passenger Load Factor (PLF) for the two airlines (pre/ post merger) between 2005-06 and 2009-10.

(Para 6.1.1)

■  As regards the erstwhile IAL: route economics revealed that most of the services were not meeting cash costs or total costs, both in domestic and international sectors.

(Para 6.1.2.1)

■  The performance of IAL vis-a-vis its competitors on various parameters (PLF, domestic market share, Passenger Revenue per RPKM) was consistently poor. IAL's On-time Performance – a critical parameter of service – was dismally low, compared to both full service carriers and low cost carriers. Further, the market share of IAL in cargo operations dropped dramatically, despite conversion of five B737 aircraft into freighter aircraft.

(Paras 6.1.2.2 & 6.1.2.4)

■  With regard to the erstwhile AIL:  even earlier, most routes (North America, UK, SE Asia etc.) were incurring losses, **and only the Gulf/ Middle East and Far East Asia routes made profits till 2005-06. By 2009-10, all routes were loss-making**. The single largest loss-making routes being the India/ USA route, which contributed between 41 to 90 per cent of AIL's total operating losses during the period 2005-06 to 2009-10. This clearly revealed the grossly exaggerated nature of assumptions relating to increased yield on account of non-stop operations (projected in the revised fleet acquisition report). Besides this, the main reasons for low route profitability were the liberal increase in bilateral entitlements, which benefited foreign carriers with large volumes of 6th freedom traffic  and the failures of AIL to contain losses, especially on the India/ USA route, through appropriate route rationalisation and other measures etc.

(Paras 6.1.3.1 & 6.1.3.1.1)

■  AIL's PLF suffered drastically vis-a-vis its competitors. In particular, the PLF of AIL flights in first class and business class declined from already low figures of 14 per cent and 31 per cent (2004-05) to abysmal levels of 12 per cent and 28 per cent respectively. Considering the widely recognised view that occupancy of a single seat in business/ first class can financially offset several vacant seats in economy class, these abysmally low PLFs in business/ first class are unsustainable. Similarly, AIL's On-time Performance for arrival and departure was significantly low at 62 and 52 per cent respectively during 2009-10.

(Paras 6.1.3.2, 6.1.3.3 & 6.1.3.4)

Executive Summary - Performance Audit Report on Civil Aviation in India

- ■ Market surveys of customer perception revealed that Air India was no longer a preferred brand, and that it was not adequately oriented towards customer satisfaction. Expenditure on publicity and sales promotion was negligible.

  (Paras 6.1.3.5 & 6.1.3.6)

- ■ Dedicated cargo freighter operations started in June 2007/ August – December 2008 by converting four passenger aircraft ( two owned and two leased) into freighters at a cost of Rs.168.30 crore. This ended up incurring losses of Rs.270.62 crore and were suspended from September 2009.

  (Para 6.1.3.10)

The overall financial position of IAL/ AIL and the merged entity has been abysmally poor during the period from 2004-05 to 2009-10:

- ■ Revenues showed a static trend. Expenditure increased dramatically. Interest burden, which was nominal in 2004-05, increased 36 times to Rs. 2434 crore in 2009-10. Working capital loan went up nearly 21 times from 2004-05 to Rs. 18524 crore in 2009-10;

  (Para 6.2.1)

- ■ In our opinion, the Directors on the AI Board (especially the Government Directors) should have been aware much earlier that such enormous increases in working capital loan limits (without a corresponding increase in operational revenues) were indicative of a major liquidity problem.

  (Para 6.2.4)

- ■ Cash profits and marginal net profits in 2004-05 and 2005-06 turned into substantial cash losses and net losses. The net worth of the entities, which was negative in 2004-05, was made positive in 2008-09 through a revaluation of fixed assets by Rs. 8,028 crore. Even such revaluation could not reverse the trend and it became hugely negative in 2009-10;

  (Para 6.2.1)

- ■ As of 2009-10, the total borrowing was 2.87 times the total revenue. Even the working capital loan was 1.38 times the total revenue.  GoI's equity infusion of Rs. 325 crore in 2005-06 into the erstwhile IAL and Rs. 800 crore in 2009-10 to AI represented a mere drop in the ocean.

  (Para 6.2.1)

We had pointed out in earlier audit reports that Productivity Linked Incentive (PLI) paid to officials amounted to rewarding employees for less than average achievement, since the base levels for incentive payment were set lower than the average performance achieved prior to introduction of the PLI scheme. During 2004-10, huge amounts continued to be

paid as PLI to different categories of staff without appropriate linkage to operational and financial performance, at a time when the entity can ill afford such payments.

(Para 6.4)

In sum, while the liberalised approach to bilateral agreements on international entitlements, as well as external factors (Aviation Turbine Fuel (ATF) prices, and economic recession from late 2008 onwards) were important contributory factors leading to the dismal financial and operational performance of the erstwhile IAL/ AIL and the merged entity, chronic operational deficiencies in their functioning cannot be ignored.

# 7.   What do we recommend?

The current critical state of affairs of the merged entity "Air India" is a combination of a multiplicity of factors:

- risky acquisition of a large number of aircraft with the intention of vastly expanded operations and "footprint". In the case of the erstwhile AIL, the large acquisition was clearly driven under the influence of the MoCA;

- a liberalised policy on bilateral entitlements for international air travel introduced by GoI. These agreements, besides not affording adequate time to AIL/ IAL to set their houses in order and gear up for a highly competitive environment, very evidently worked to the detriment of the National and Indian private carriers.

- an ill-timed merger undertaken strangely after separate aircraft acquisitions by AIL and IAL were completed, driven from the top (rather than by the perceived needs of both these airlines), with inadequate validation of the financial benefits from such a merger and without adequate consideration of the difficulties involved in integration (notably in terms of HR and IT, among other areas); and

- chronic operational deficiencies;

- a weak financial position, grossly inadequate equity capital and undue dependence on debt funding providing little or no cushion for the financial shock when it came;

- external factors beyond the control of AI,  such as high ATF prices, the 2008 economic recession etc.

However, the merged entity "Air India" has since undertaken several positive measures, notably the following:

- A considerable amount of **route rationalisation** has taken place, especially in terms of loss making routes during 2008-09 and onwards;

Executive  Summary - Performance Audit Report on Civil Aviation in India

■ **A common code** for AIL and IAL passenger reservations has finally been implemented with effect from February 2011, although the full set of modules of the new Passenger Service System (PSS) is yet to be implemented and operationalised. The next critical milestone to be fulfilled is **admission to the Star Alliance**, which is yet to happen. The importance of joining the Star Alliance cannot be overemphasised, as failure to do so by this deadline could allow other competing private carriers (e.g. Jet Airways) a window of opportunity and, thus, result in AI losing first entry advantage to other competing private Indian carriers.

Timely development of hubs in India (e.g. at Delhi and Mumbai Airports) will help Air India in getting significant volumes of 6th freedom traffic from India.

■ The 43 narrow-bodied ordered by the erstwhile IAL have been received by April 2010, while of the 50 aircraft ordered by the erstwhile AIL, 20 (8 777-200LR – long range, and 12 777-300ER – mid-range[†]) aircraft have been received.  However, the delivery of the 27 B787-8 aircraft (which is termed as the "dreamliner" aircraft in popular parlance, and is projected to have substantially lower fuel consumption) is delayed to the 2nd half of 2011-12.

In order to maximise the chances of a positive outlook for the merged Air India, further measures need to be taken:

■ **HR integration** (viz. harmonisation of HR) below DGM level (pilots, engineers and other staff) of the erstwhile AIL and IAL has not yet taken place. This is a critical issue, whose importance and associated difficulties were not fully appreciated pre-merger, more so in view of recent strikes and HR disputes. This needs to be handled swiftly, if the merger is to become a success.

■ **Incentive structure** – In our view, the current structure of the Performance Linked Incentive (PLI) needs to be restructured, as it does not adequately incentivise, or disincentivise actual performance on the ground:

❑ **PLI should focus on On-time Performance (OTP),** as this is the most critical parameter in the airline industry, from a service perspective. The base level for OTP for performance incentive should not be set at an unduly low level, based on AIL/ IAL's past performance. It should be linked to the performance of its competitors (Jet Airways and Kingfisher, the leading full service carriers, – in respect of domestic operations, and Jet Airways/ Emirates/ Singapore Airlines etc. in respect of international operations).  **At the very least, the OTP baseline for performance incentive should be set close to the performance of its competitors (say no more than 3-5 per cent below its competitors – Jet Airways/ Kingfisher).**

---

[†] Out of 15 777-300ER aircraft ordered, delivery of 3 aircraft was subsequently deferred at AI's request.

Executive  Summary - Performance Audit Report on Civil Aviation in India

❑ **Impact of first flights on OTP** – The impact of the first flights on On-Time Performance throughout the day, especially for short haul flights is critical. Consequently, the incentive/ disincentive for OTP of the first flights should be set at a substantially higher level than for subsequent flights.

❑ **The PLI paid to various categories of employees should have distinct components** – one component linked to the overall performance of AI as a whole and the other component linked to the specific performance of the division/ department/ sector to the most granular level possible. This will ensure that incentives are as closely linked as possible to performance at the grassroots level. The structuring should be such that different categories of employees do not get incentives merely for completing activities within their limited sphere of work, without consideration of how such work contributes to the overall efficiency of the organisation.

■ **Relocate operations from city offices** – Ultimately, the success or failure of an airline will depend on the extent of close supervision/ oversight by top and middle management on operational activities on site, rather than in city offices. As has been reflected in the CMD, AI's testimony to COPU[2], attempts to shift officers and staff from city offices to airports have been met with stiff resistance. Unless senior level officers at the level of DGM/ GM and above, and not merely at the level of Duty Manager[3] are available onsite, and on a round-the-clock basis, to obtain real-time feedback on the status of operations, significant improvements in operational performance are unlikely to take place.

■ **Increased proportion of web-based/ technology-based ticket sales** – In order to ensure cost rationalisation, AI must ensure a substantial increase in ticket sales through web/ technology based channels, rather than agents/ front offices (which result in enhanced costs). The current proportion of ticket sales through AI's website is abysmally low. Further, anecdotal evidence of the poor speed/ response of AI's Internet website ticketing vis-a-vis that of competing airlines/ travel sites also abounds.

AI should also leverage IT more effectively to ensure maximum use of technology for operations – e.g. web/ mobile check in, check-in kiosks/ scanned security checks etc. In particular, it is not enough to set up technological solutions; it is necessary to ensure that these are fully utilised.

■ **Real-time revenue management** – AI's record of implementing revenue management solutions has been, at best, mixed. In addition to full scale implementation of latest generation, revenue management systems to enable real-

---

[2] Para 3.21 (pg. 45) of the 4th Report of COPU (2009-10) – Fifteenth Lok Sabha
[3] Typically of the rank of Manager/ Sr. Manager

time dynamic pricing, AI also needs to ensure adequate availability of skilled analysts who could make use of such granular data, with appropriate delegation of powers and empowerment of officials.

■ The airline is in a crisis situation. Salary payments and ATF obligations are becoming difficult. If the airline has to survive, the management and employees will have to set personal interests aside and undertake some harsh decisions, unless the health of the airline improves. PLI, incentives, salary hikes and allowances merit major restructuring in the long term interest of the employees and the airlines.

■ **Maximisation of PLF in Business/ First Class** – Even more than overall PLF and PLF in economy class, **AI's PLF, in terms of revenue-generating seats, for business/ first class – which is far more critical to a full service carrier's financial health than economy class PLF - is abysmal.** Rigorous controls need to be put in place to ensure that there are no vacant seats in Business/ First class, allowing for **"upgrades on availability basis"** from economy class, which is subject to exploitation.

❑ All free travel by AI officers, on duty or leaves in business/ first class should be prohibited. All existing facilities offered in this regard should be withdrawn till AI's financial conditions improve dramatically. Given the life-threatening crisis that AI is currently facing, top and middle management in AI should set an example in this regard.

■ **Freeze on bilateral entitlements to countries/airlines predominantly utilising 6th freedom traffic** – Most of the liberalised entitlements for bilateral rights granted to foreign airlines, especially in Dubai, Bahrain, Qatar and other Gulf/ SE Asian countries, has been utilised for 6th freedom traffic, typically to destinations like USA/ UK/ Europe and not for genuine traffic to the other country. AI and Indian carriers are handicapped by the lack of adequate hub facilities and other factors from competing effectively with other predominantly 6th freedom carriers (e.g. Emirates). Till India has its own effective and efficient hubs and AI/ other Indian carriers are able to exploit them effectively, entitlements for airlines/ countries predominantly dependent on 6th freedom traffic, notably Dubai, Bahrain and other Gulf countries, should be strictly frozen by MoCA. If possible, subject to diplomatic and other considerations, options for rollback of excess entitlement granted beyond genuine traffic requirements should also be considered by MoCA. MoCA has in the past five years very obligingly bowed to ostensible pressures from Ministry of External Affairs, Ministry of Tourism and Ministry of Commerce. Whilst these Ministries no doubt recommended the need to liberalise international air services based on their mandate, MoCA yielded to them ignoring the interest of the Indian carriers including that of AI, the national carrier.

- **Prompt payment of Government dues** – AI's services are frequently used for VVIP and other Government duties. Reimbursement of costs incurred by AI is never done in a timely manner. Given the financial and liquidity crisis in which it finds itself, AI cannot afford such delays.  MoCA should ensure that such dues are paid to AI in a timely manner.

- **Infusion of Government Equity** – Both the erstwhile AIL and IAL and the merged entity have been unduly dependent on debt/ loan funding with a very narrow equity basis, which has dramatically increased the financial risk/ burden on AI. GoI should consider prompt infusion of additional Government equity in a timely fashion to ensure that the Debt-Equity (D/E) ratio reaches levels prevalent in the Industry. However, such infusion has to be linked to a package which the company must accept in advance viz. restricting of incentives at all levels, reassessment of additional aircraft acquisitions, on time performance, rationalisation of routes with MoCA maintaining a hands off approach, critical relook at Bilateral Agreements, especially those linked with 6th freedom traffic and cutting down on staff/officers posted abroad in countries where the Airline does not operate.

*We believe that AIL had inherent strengths. A multitude of factors which were internal and external have rendered it in a very critical situation. There is also no evidence of MoCA having provided it with positive support in the last few years. If the Airline has to be nursed to commercial viability, Government has to consciously attend to the following:*

*(i)   The Airline has a debt liability of Rs. 38,423 Crore as on 31 March 2010. Aircraft acquisition has contributed predominantly to it. Government must lay down a road map for liquidating the liability within a short span after making a realistic assessment of revenue generation capacity. Piecemeal infusion of small amounts is merely going to at best delay the certain closure of the Airline.*

*(ii)   Accountability in the Airline, its Board, Government nominated Directors and the MoCA has to be clearly established and transparently dealt with. Grant of routes to private carriers, Bilateral Agreements (of which there appears to be no further scope as there is  saturation already) must factor in interests of the national and other private carriers. Concluded agreements need to be reassessed.*

*(iii)   A critical assessment of the Airlines profitable sectors, if any, is required. On other sectors attempt to remove infirmities including bilaterals to support the Airlines  may be made.*

Executive  Summary - Performance Audit Report on Civil Aviation in India

*(iv)   MoCA and Government must recognise that AI is the National Carrier. In very many ways, it is a symbol of the State. Even if Ministers and  officials in MoCA profess not to be Ministers/Officials for AI alone, the fact remains that it has to be given a more than level playing field now which it has not been given. All decisions to allot routes, alter timings, provide first refusal rights on domestic and international routes must be made taking into account the interests of AI. This should be done in a transparent and demonstrable manner placing it in public domain. Accountability at the decision making level has to be established.*

*(v)   A total hands-off approach with regard to the management of the airline is required.*

*Audit is of the firm view that unless the Government takes cognisance of above mentioned factors and decisions thereupon, the Airline does not have a future as a vibrant Public Sector entity.*

# Chapter 1    Introduction

Scheduled air services in India began in October 1932 under the Aviation Department of Tata Sons Ltd, which was succeeded by Tata Airlines. This was subsequently renamed in July 1946 as Air India Ltd., and incorporated as Air India International Ltd. in March 1948.

In 1953, the Air Corporations Act was passed. Air India International Ltd. was nationalised, and two corporations came into existence – Indian Airlines Corporation (as the national domestic carrier) and Air India (as the international carrier). In 1994, the Air Corporations Act was repealed, and Air India Ltd. (AIL) and Indian Airlines Ltd. (IAL) were incorporated under the Companies Act, 1956.

Government-owned airlines dominated the Indian aviation industry till the mid-1990's, when, as part of the open sky policy, the Government of India (GoI) ended the monopoly of AIL and IAL in air transport services, and allowed private operators to provide air transport services.

In March 2007, National Aviation Company of India Ltd. (NACIL) was incorporated. The scheme of amalgamation of Air India Ltd. and Indian Airlines Ltd. into NACIL was approved in August 2007, with the "appointed" date of the merger being set as 1 April 2007. Subsequently, in November 2010, NACIL was renamed as Air India Ltd. (AI). The administrative Ministry for these Government airline(s) is the Ministry of Civil Aviation (MoCA).

*Notes:*

- *Throughout this report, the abbreviations 'AIL' and 'IAL' are used to refer to the erstwhile Air India Ltd. and Indian Airlines Ltd. (pre-merger entities).*

- *The abbreviation 'AI' is used to refer to the merged entity.*



# Chapter 2   Audit Approach

## 2.1   Audit Objectives and Scope

The objectives of the performance audit were to ascertain:

- Whether the acquisition of aircraft by the erstwhile Air India Ltd. (AIL) and Indian Airlines Ltd. (IAL) was appropriately planned and effectively implemented, with due regard to economy and efficiency and accepted norms of financial propriety;

- Whether the merger of AIL and IAL into NACIL was properly planned and effectively implemented, and the effectiveness of merged operations of the two entities;

- The impact of the liberalised policy of the GoI from 2004-05 onwards on grant of air traffic rights to other countries through Air Services Agreements (ASAs)/ "bilateral" agreements, and permitting Indian private carriers to fly on international routes;

- The main reasons for the poor financial and operational performance of the pre-merger airlines and the merged entity; and

- Whether the MoCA exercised its oversight role adequately and effectively.


## 2.2   Audit Criteria

The audit criteria adopted for the performance audit included:

- The reliability of the data used, reasonableness of assumptions adopted, and robustness and competitiveness of the tendering, evaluation, negotiating and contracting processes/ procedures for the acquisition of aircraft;

- The reliability of data and robustness of assumptions underlying the decision for merger of the airlines as well as the planning of the merger;

- Adequacy of the facts and information put forth to evaluating/ approving agencies for the acquisition of aircraft, approval of liberalised policy on "bilaterals", and approval of merger of AIL and IAL; and

- Performance parameters achieved by competing national and international airlines.


## 2.3   Audit Methodology

Our performance audit (conducted between September 2009 and June 2011) involved scrutiny of records of MoCA and AI. The first draft of the performance audit report was issued to the MoCA on 15 November 2010; the replies of MoCA and AI received in February 2011 have been considered and duly incorporated in this report. A revised draft of the performance audit report was issued to MoCA on 11 March 2011, to which no response was received.

A further revised draft of the performance audit report (including findings arising out of additional scrutiny of records of MoCA and AI) was issued to MoCA on 6 July 2011, reply to which has been received on 3rd August 2011. Further, an exit conference to discuss the main audit findings was also held with MoCA on 3rd August 2011.

## 2.4   Audit Acknowledgement

We take this opportunity to acknowledge the co-operation extended by MoCA and AI in facilitating the conduct of our audit.

# Chapter 3    Acquisition of Aircraft

## 3.1   Acquisition of aircraft by erstwhile Air India (AIL)

### 3.1.1   Overview

On 30 December 2005, the erstwhile Air India Ltd. (AIL) signed purchase agreements with Boeing and General Electric (GE) for supply of 50 Boeing aircraft (with GE engines) at an estimated project cost of Rs. 33,197 crore:

- 8 B777-200LR ultra long range aircraft (ULR) with a seating capacity of 266;
- 15 B777-300 ER medium capacity long range aircraft (MCLR-A) with a seating capacity of 380; and
- 27 B787-8 (popularly known as "dreamliner") medium capacity long range (MCLR-B) aircraft with a seating capacity of 258.

In addition, Air India Charters Ltd. (AICL)[1] also signed purchase agreements with Boeing and CFM for supply of 18 short range B737 aircraft with CFM engines at an estimated project cost of Rs. 4,952 crore[2].

### 3.1.2   Chronology of Events

The last fleet acquisition by the erstwhile AIL involved induction of two B747-400 aircraft in 1996. A brief chronology of events related to the current acquisition of aircraft by the erstwhile AIL is indicated below:

*Table 3.1 - Chronology of events relating to aircraft acquisition by erstwhile AIL*

| Date/ Month | Brief Details |
|---|---|
| December 1996 | AIL's proposal for acquisition of 3 A310-300 aircraft was not cleared by MoCA due to reasons like availability of excess A-320 type of aircraft with the erstwhile IAL. |
| January 2002 | Expert committee was constituted by AIL to identify aircraft requirement and prepare fleet plan for 5 year timeframe. |
| November 2002 | Techno Economic and Negotiation Committee (TENC) was constituted by MD, AIL for finalisation of requirement of aircraft. |
| April/ July 2003 | TENC submitted separate reports for acquisition of:<br>- 17 (10 on firm basis + 7 on option basis) medium capacity long range aircraft (A340-300 / B777-200 ER); and<br>- 18 short range aircraft (A320-200 / B737-800). |

---

[1] AICL operates flights under the 'Air India Express' brand.

[2] This has not been covered in this performance audit.

| Date/ Month | Brief Details |
|---|---|
| November 2003 | After review[3], TENC submitted a revised report for 18 short range and 10 or 17 long range aircraft on the basis of revised pattern of operations, making NPV positive.<br><br>AIL Board approved proposal for acquisition of 10 medium capacity long range aircraft (A340-300) and 18 small capacity short range aircraft (B737-800). |
| January 2004 | AIL submitted project report for acquisition of 28 aircraft to MoCA. |
| 02 August 2004 | In a meeting chaired by the then Minister, Civil Aviation it was decided that Air India should revisit the proposal for purchase of aircraft and submit a fresh project proposal to the Government at the earliest which could include the revised requirement. |
| 13 September 2004 | Based on the decision taken in the meeting of 2nd August, 2004, as communicated in the Ministry's letter dated 5th August, 2004, the Board of Directors of Air India in its 101st meeting decided that the fleet plan could be revisited in its entirety. |
| 24 November 2004 | AIL Board approved a revised plan for acquisition of 50 aircraft for AIL, apart from 18 aircraft for its subsidiary AICL. |
| 03 December 2004 | Bids were invited from Boeing and Airbus. |
| 24 December 2004 | Technical bids were opened. |
| 26 April 2005 | TENC evaluated bids and submitted its report.<br><br>On the same day, AIL Board approved the acquisition of 50 aircraft (35 firm + 15 on option) from Boeing with GE engines. |
| 14 May 2005 | Project Report for GoI approval for acquisition of aircraft was submitted to MoCA. |
| 16 June 2005 | Price Negotiation Committee was constituted by AIL, with 'in principle' approval of MoCA. |
| 30 June 2005 | Presentation was made by AIL to MoCA on aircraft acquisition. |
| 18 August 2005 | 'Overseeing Committee' was constituted by MoCA to oversee the process of price negotiations with Boeing and GE for acquisition of |

---

[3] Since NPV of 17 long range aircraft was negative on stand-alone basis

| Date/ Month | Brief Details |
|---|---|
| | aircraft; negotiations were held by Overseeing Committee between August 2005 and November 2005 |
| 31 August 2005 | Pre- PIB (Public Investment Board) meeting was held. |
| 13 October 2005 | PIB cleared the aircraft acquisition at a cost not exceeding Rs. 33,197[4] crore, indicating:<br><br>• that MoCA may evaluate AIL's cost structure and productivity and fix benchmarks for achieving reduction in cost and enhancing productivity;<br><br>• purchase of 35 on firm basis, and 15 on optional basis, with the decision for exercising the option to be taken by AIL Board, depending on the market situation. |
| 15 December 2005 | CCEA (Cabinet Committee on Economic Affairs) approved constitution of EGoM (Empowered Group of Ministers) for final round of negotiation with lowest bidder. |
| 20 December 2005 | Cabinet Secretariat communicated constitution of EGoM. |
| 24 December 2005 | EGoM held discussions with the representatives of Boeing[5] and GE. |
| 30 December 2005 | PMO (Prime Minister's Office) forwarded a copy of the note of the Chairman, EGoM to the PM on the action taken by the EGoM, where it approved acquisition of 50 aircraft by AIL on firm basis, in addition to acquisition of 18 aircraft by AICL; |
| 30 December 2005 | PMO returned the note indicating that the "Prime Minister has seen the note and directed that the Ministry of Civil Aviation may inform CCEA about the finalised transaction". |
| 30 December 2005 | MoCA conveyed GoI's approval to AIL. |
| 30 December 2005 | On the same day, AIL also signed purchase agreements. |
| 12 January 2006 | CCEA noted the contents of the MoCA note apprising them of the EGoM decision on acquisition. |
| July 2010 | 20 aircraft (8 B777-200LR + 12 B777-300ER) received; receipt of 3 B777-300ER aircraft deferred at AIL's instance. |

---

[4] US$ 7402.72 million @ Rs.44/US$ + Rs. 625 crore

[5] Who also represented CFM in respect of engines for B737-800W aircraft (for AICL's acquisition)

Our main audit findings in respect of this aircraft acquisition are summarised below.

### 3.1.3    Undue time taken for acquisition

There is no doubt that the erstwhile AIL desperately needed to acquire new aircraft. Due to lack of timely acquisition, AIL had to induct 13 additional aircraft on dry lease by January 2004. AIL's proposal of December 1996 for aircraft acquisition was not cleared, and a fresh process for acquisition was initiated only in January 2002. Thus, it took nearly eight years (December 1996 to January 2004) when  AIL finally came before  Government with a firm acquisition proposal. *Such an unduly delayed acquisition process is deleterious for the financial health of a commercial airline.*

Interestingly, although the original proposal for acquisition of 18 + 10 aircraft took its own time for processing, the revised proposal for acquisition of 18 + 50 aircraft was processed considerably faster, with many activities (e.g. price negotiations) taking place concurrently with (or in anticipation/ advance of) approvals.

The Ministry explained (August 2011) that the delay referred to above, was  due to the then prevailing circumstances, viz. shrunk market because of global events (9/11, SARS) and proposed disinvestment of the airline and later on the acquisition was done on priority to arrest the rapid decline of the airlines and the fact that other carriers were increasing capacity. The Ministry further stated that at no point was any activity required in the procurement process constituted in haste or in anticipation of any approval.

We do not agree with the Ministry's reply. While the acquisition took nearly eight years from the first proposal, the revised proposal for acquisition of 18 + 50 aircraft was processed faster.

Further, the Ministry's contention regarding lack of haste in the procurement proposal for 50 + 18 aircraft is not borne out by facts since, as brought out in the chronology of events above. From the approval for the constitution of EGoM by the CCEA, for final round of negotiation with lowest bidder, to the signing of purchase agreement, it took just 16 days.

### 3.1.4    Increase in requirements from 10 + 18 aircraft to 50 + 18 aircraft in 2004

#### 3.1.4.1    *Change in number of aircraft to purchase*

The erstwhile AIL's project report of January 2004 proposed acquisition of 10 medium capacity long range aircraft (A340-300) and 18 small capacity short range aircraft (B737-800). This, itself, had taken two years to mature.

However, by November 2004, the AIL Board changed their fleet acquisition plan and submitted a revised proposal for acquisition of 50 medium capacity long range/ ultra long range aircraft, in addition to 18 small capacity short range aircraft for its subsidiary, Air India Charters Ltd. (AICL). This analysis to enhance AIL's requirements took just four months (from August to November 2004), after MoCA advised them to "revisit" their proposal.

A chronology of events leading to the substantial change in requirements is summarised below:

Performance Audit Report on Civil Aviation in India

*Table 3.2 – Chronology of events leading to change in aircraft requirements of AIL*

| Date | Brief Details of Event |
|---|---|
| 30 October/ 3 November 2003 | Letter from 43 member delegation of US Congress regarding AIL's proposed aircraft acquisition forwarded by PMO to MoCA |
| 27 January 2004 | PMO forwarded two letters from Boeing (a letter of 17 November 2003 to Secretary, MoCA and a letter of 2 January 2004 to PMO) to MoCA, wherein Boeing indicated that the economics of the acquisition project were strongly dependent on the number of aircraft chosen, and that the technical evaluation could be easily influenced with the change in assumptions on number of aircraft. |
| 19 February 2004 | In response to contentions made by Boeing in these letters, AIL intimated MoCA that:<br><br>• Equal opportunity had been given to both suppliers, and the number of long range aircraft had been reduced from 17 to 10 as it was not economically viable;<br><br>• The evaluation was undertaken in conformity with AIL's requirements. The question of giving Boeing a revenue benefit of 7 additional seats (reduced by them to provide the mid cabin galley) did not arise; also, estimation of residual value after 17 years life of aircraft was fraught with risk and the percentage discount offered by Boeing for 10 aircraft was lower than that offered by Airbus; |
| 3 March 2004 | Director (S), MoCA intimated PMO that the in-house TENC had evaluated different aircraft types on the basis of identical ground rules, providing fair opportunity to all bidders.<br><br>In addition to highlighting the issues raised by AIL to MoCA, he also stated that AIL had invited offers for 10 firm and 7 optional long range aircraft. Boeing had the opportunity for bringing in scale economics into their offer. After due consideration of economics, the AIL Board had recommended acquisition of only 10 A340-300 aircraft as it felt that acquisition of 17 long range aircraft would not be economically viable. |
| 29 June 2004 | Director (S), MoCA recorded on file that there had been some "important developments" as submitted by Secretary, MoCA to the Principal Secretary to PMO that many international carriers were planning direct operations to USA/Canada and the A340-300 aircraft was going out of production in near future.  Therefore, AIL needed to |

| Date | Brief Details of Event |
|---|---|
| | review its proposal and consider suitable long range aircraft for its fleet. Further, it was understood that *"Minister, Civil Aviation (CA) also impressed upon AIL in a meeting at Mumbai to examine the feasibility of direct India-US/ Canada flights"*. |
| **5 July 2004** | AS&FA (Additional Secretary and Financial Advisor), MoCA expressed ignorance about the purported note of Secretary, MoCA and stated that: <br><br> • *"I am not aware of the A-340-300 going out of production in the near future, thus calling for a re-look at the choice. The fact that Air India chose to invite offers for this type of aircraft and the Company decided to quote for the same less than a year ago, leads one to think whether Air India chose the right type of aircraft while inviting offers.  If the assumption that the aircraft is going out of production is true, Air India is guilty of not having done their homework and the Airbus Company is guilty of unethical business practice in offering an aircraft that is being phased out. …But it would be worthwhile to get clarifications on these aspects from both Air India and Airbus Company".* <br><br> •  *"Minister (CA) in a meeting at Mumbai impressed upon the need for Air India to examine the possibility of non-stop India-US operations. But he never suggested that the present fleet acquisition plan should be dropped and only that option should be examined. Hence, it would not be correct to presume that the new option that would be examined would be 'in lieu of' the existing plan. It could be 'in addition' as well. Of course, if Air India decides to go in for the option of non-stop India-America operations, this would call for a re-look at the present fleet acquisition proposal."* <br><br> Consequently, AS&FA suggested that a meeting (like the one Minister, CA took in respect of IAL) would be in order, wherein the points of view of both AIL and MoCA could be considered, and a consensus arrived at on the future course of action. |
| **August 2004** | In a meeting on 2 August 2004 taken by the then Minister, Civil Aviation with Secretary, MoCA and CMD, AIL, it was decided that: <br><br> • Air India should revisit the proposal for purchase of aircraft and submit a fresh project proposal to the Government at the earliest, which could include the revised requirements. <br> • AI could examine whether the proposal for purchase of short range aircraft for the low cost airline is justified on a stand-alone basis and could be de-linked from the purchase of other types of |

Performance Audit Report on Civil Aviation in India

| Date | Brief Details of Event |
|---|---|
| | medium range and long range aircraft for AI. While doing so, AI should examine whether economics of the proposal for acquisition would be favourable, keeping in view the low-cost and low fare operations envisaged through a separate company. If the proposal is found to be justified and viable, Air India should revert to the Government at the earliest. |
| | • At this meeting of 2 August 2004, the Chairman and Managing Director (CMD), AIL was of the view that although the present proposal did not fully cater to the requirement of AIL's fleet, the additional requirement of aircraft could be projected separately through a supplementary proposal after due evaluation. However, it was felt that it may not be advisable or prudent to go through the pre-PIB and PIB exercise in two separate stages with two different sets of proposals for such capital intensive projects. It would be desirable to take a total and comprehensive view on the fleet of AIL, keeping in mind its plan and growth for the next fifteen years or so. |
| | MoCA communicated the above mentioned decisions on 5 August 2004 to AIL and directed them to revisit the acquisition proposal and submit a fresh proposal, which would include revised requirements in view of: |
| | • New dimension in the competition on the India/USA route with the introduction of non-stop flights through ultra long range aircraft by competing airlines in South East Asia and the Gulf Region. Unless AIL was able to match this product and connectivity by adding suitable aircraft to its fleet (which was not a part of the present proposal), AIL's competitiveness, load factors and revenues were likely to be severely affected. |
| | • AIL had decided (May 2004) to launch a 'no frill' airline called 'Air India Express'  through a separate company (Air India Charters Limited) to destinations in South East Asia and the Gulf, which would offer lower fare to passengers. Therefore, the current project proposal may not have taken into account the economics of these types of aircraft if operated on low cost basis and with fares that would be 25 *per cent* lower than existing fares. |
| October 2004 | CMD, AIL indicated to MoCA that during the AIL Board meeting of 13 September 2004, some Board members indicated that in view of MoCA's advice, the fleet acquisition programme needed to be revisited in its entirety (including examination of other aircraft types, apart from B737-800, for small capacity short range aircraft). CMD, however, felt that the B737-800 project should be delinked and |

| Date | Brief Details of Event |
|---|---|
| | studied separately and was to be submitted under the banner of AICL. CMD sought MoCA's clarification in this regard.<br><br>MoCA sought clarification from CMD, AIL as to whether the B737-800 aircraft was selected after carrying out the required comparative evaluation on stand-alone basis. AIL confirmed the selection of B737-800 aircraft after comparative evaluation on stand-alone basis. |
| 18 November 2004 | Director (S) noted that *"strictly speaking, it is for the AI Board to take a view in the matter. As far as Ministry's advice... is concerned, there is a suggestion... that AI needs to take a total comprehensive view on its fleet, keeping in mind its plans and growth for the next 15 years or so"*.<br><br>Consequently, a clarification was issued along these lines, with the approval of Minister, Civil Aviation, to AIL. |
| 24 November 2004 | AIL Board considered and approved a revised long term fleet plan for 50 aircraft (two thirds on firm basis and one-third on option basis), apart from 18 aircraft for its subsidiary, AICL. This process of revision took only four months! |

*The above sequence of events clearly demonstrates that the erstwhile Air India was advised to revisit its proposal by MoCA into expanding its requirement of aircraft. Whilst their earlier proposal for 28 aircraft had taken two years (from January 2002 to January 2004) to prepare and submit, the revised long-term fleet for 50 aircraft[6] plan was completed in four months (from August to November 2004)*

The Ministry did not agree (August 2011).  It stated that it never suggested to AIL to drop the present acquisition plan and to pursue a particular option.  It was the Air India Board which resolved to acquire 35 aircraft, with 15 on optional basis.  This position was reiterated by the Ministry during the exit conference (August 2011).

The Ministry's position is not tenable.  The sequence of events brought out in Table 3.2 – "Chronology of events leading to change in aircraft requirements of AIL" clearly brings out the role played by the Ministry in the erstwhile AIL's proposal being revised from 10 long range aircraft to 50 long range aircraft.

A comparison of the underlying assumptions for the original and revised proposals reveals the following position:

---

[6] In addition to 18 short range aircraft intended for its subsidiary, AICL

### Table 3.3 - Comparison for 18 small capacity short range aircraft of AIL/AICL

| Assumption/ Parameter | Original proposal for 18 short range aircraft (AIL) | Revised proposal for 18 short range aircraft (AICL) |
|---|---|---|
| Seating | 146 seats (138 economy + 8 executive class) | 181 seats (all economy) |
| Frequencies (per week) | 124 | 229 |
| Aircraft utilisation (hours/ day) | 8.2 | 12.7 |
| Available Seat Kms (ASKMs) p.a. | 5,379 | 10,158 |
| Passenger Load Factor (%) | 68.1 | 70.3 |
| Deployment | India-Singapore, near Gulf | India-Gulf, India-SE Asia, domestic routes for AIL's hub and spoke |
| Net aircraft cost (US$ million) | 858.76 | 843.14 |

By contrast, there was a massive change in assumptions in respect of medium capacity long range aircraft, as summarised below:

### Table 3.4 - Comparison of original and revised proposals for long range aircraft (10 versus 50)

| Assumption/ Parameter | Original proposal for 10 medium capacity long range aircraft | Revised proposal for 50 long range aircraft |
|---|---|---|
| Aircraft | 10 A340-300 | ULR (B777-200LR) – 8 MCLR-A (B777-300ER) – 15 MCLR – B (B787-8) - 27 |
| Seating | 272 | 266/ 380/ 258 |
| Frequencies (per week) | 45 | 303 |
| Aircraft utilisation (hours/ day) | 14.0 | 14.6 |
| Available Seat Kms (ASKMs) p.a. | 10,780 | 62,667 |

| Assumption/ Parameter | Original proposal for 10 medium capacity long range aircraft | Revised proposal for 50 long range aircraft |
|---|---|---|
| Passenger Load Factor (%) | 79.6 | 62.7 – 76.3 |
| Deployment | Chicago (via-London), Newark (via Paris), New York (via Frankfurt), India/ Saudi Arabia | ULR – Non-stop to USA MCLR- A – USA/Canada via intermediate points and terminator services to London MCLR-B – UK/ Europe, Saudi Arabia, Africa, East Asia, SE Asia, Australia, premium markets in Gulf/ SE Asia |
| Net aircraft cost (US$ million) | 1104 | 6149 |
| Net cost/ aircraft (US$ million) | 110 | ULR (B777-200LR) – 133 MCLR-A (B777-300ER) – 150 MCLR-B – (B787-8) 105 |

*Clearly, there was a massive inflation of aircraft requirement (frequency, destinations, and types of aircraft) between January 2004 and August 2004, which is inexplicable (considering that such a dramatic shift in market requirements/ conditions could not reasonably have occurred in such a short period of time).*

### 3.1.4.2  Flawed Assumptions underlying revised project report (50 long range aircraft)

In our opinion, many of the key assumptions underlying the revised project report for acquisition of 50 long range aircraft (as against 10 long range aircraft envisaged earlier) were flawed or unduly optimistic:

- As depicted in the preceding table, a massive increase in frequencies, ASKM and destinations were projected, without adequate justification for the increase in such a short period of time (between January and November 2004). Out of the 50 aircraft being acquired, 27 were intended as replacement and 23 as incremental. The logic being that expanding capacity faster than the market / competitors would enable AIL to grow and increase market share, since the market to/ from India was booming. *The assumption that increase in capacity share would automatically lead to an increase in AIL's market share (projected increase from 19% to 30% by 2012-13) was not adequately validated.*

This leads Audit to agree with the observation thus made by the Department of Expenditure that 'a purely supply side response would run into huge demand side risks' (Table 3.5). Department of Expenditure obviously had reservations and felt the PIB proposal was 'supply driven'.

- Revenue estimates were made on the basis of one-time yield increase, at constant costs, of 5 per cent on all classes[7]. Further, the core feature of the revised project report was acquisition of 8 Ultra Long Range (ULR) aircraft for providing non-stop services to Chicago/ New York; a further one-time yield increase of 10 per cent (at constant cost) for non-stop services to New York and Chicago was assumed, which, in our opinion, was unduly optimistic. In reality, even prior to this acquisition, the India-USA sector was historically a loss-making sector, and this trend of commercial unviability continued even with the introduction of non-stop India-USA flights.

- As per the original proposal (for 28 aircraft), the AIL Board reduced the requirement of long range aircraft from 17 to 10, as the NPV for 17 long range aircraft on stand-alone basis was negative. By contrast, the revised TENC Report (April 2005) for 50 aircraft had a negative NPV for the 15 B777-300ER aircraft. By the stage of the revised project report (May 2005), this became a positive NPV of Rs. 98 crore (mainly due to inclusion of "commonality benefit" – through fleet acquisition of different variants of Boeing aircraft).

- Long term traffic growth rate of 7 to 8 per cent was assumed (although the average growth rate during 1998-2004 was only 6.5 per cent); this was also unduly optimistic.

> **Whatever chances AI had of increasing market share through increased capacity share were severely hampered by the MoCA's decision to liberalise bilateral entitlements from 2005 onwards, benefiting airlines/ countries with huge proportion of 6th freedom traffic and giving inadequate lead time for AI (after delivery of the aircraft) for gearing itself up for competition. This is brought out subsequently in the Report.**

The Ministry in their reply (August 2011) stated that market share was not a complete index of an airline's performance. In 2004-05, Air India was in no position, with its existing complement of aircraft, to even hold on to its market size, leave alone market share.

The Ministry's reply, however, did not offer adequate explanations as to the flawed assumptions underlying the acquisition proposal, as pointed out by us.

### 3.1.5   Comments/ concerns of other stakeholders

At the pre-PIB Meeting (August 2005), the representatives of the Planning Commission and Department of Expenditure (DoE) expressed several concerns:

---

[7] In the original project report (January 2004), a yield increase of 5 per cent in economy class and 20 per cent in first/ executive classes had been assumed.

*Table 3.5 – Comments of appraising agencies*

| Concerns of Planning Commission | • Considering the past trends, the assumptions made by AIL regarding traffic projections were risky and the up-gradation appeared to be very ambitious, as statistics of the Directorate General of Civil Aviation (DGCA) did not suggest the kind of growth assumed in the Project Report. The Project Report assumed substantial increase in long haul traffic and the proposed increase in market share from 19 *per cent* to 30 *per cent* would only be possible, if 10 to 12 *per cent* rate of growth was achieved. It was not clear how the policies of the Government relating to this sector would fuel such growth.<br><br>• Internal rate of return with fuel cost at current prices was only 6.2 *per cent.* This was tantamount to skating on thin ice, especially when traffic growth was not guaranteed. |
|---|---|
| Concerns of Department of Expenditure | • The assumption that enhancement of capacity would necessarily lead to higher market share may not be tenable beyond a point. **Consequently, a purely supply side response would run into huge demand side risks.** The high traffic growth projections, therefore, needed careful consideration since project viability was highly sensitive to reduction in traffic yield. |

However, citing shortage of time, the pre-PIB meeting (August 2005) could not discuss the response of AIL on the above concerns. MoCA decided to directly include the response of AIL on these observations in the draft note for the PIB meeting (October 2005). 'Shortage of time' is inexplicable.

AIL responded to the concerns of DoE by stating that market share could be increased by increasing capacity. In our view, this was surprising as the market share of AIL  had, in fact, remained static from 19.5 *per cent* in 1999-00 to 19.4 *per cent* in 2003-04, despite increase in the fleet size from 23 aircraft to 35 aircraft during the same period.

### 3.1.6   PIB approval

Despite the concerns expressed by the Planning Commission and the DoE at the pre-PIB stage (August 2005), the PIB finally approved the purchase of 50 aircraft (35 on firm basis and 15 on option basis) for AIL at a price not exceeding Rs. 33,197 crore[8] (besides 18 aircraft for AICL at Rs. 4,952 crore). The decision for exercising the option for 15 aircraft was to be taken by the board of AIL depending on market situation.

---

[8]  Based on an exchange rate of Rs. 44 per US$.

> *Further, MoCA was directed by PIB to evaluate AIL's cost structure and productivity and fix benchmarks for achieving reduction in cost and enhancing productivity. In fact, DoE also observed, in December 2005, that the steps proposed to be taken for cost reduction and enhancing productivity in AIL may be clearly indicated by MoCA in the final CCEA note. However, MoCA simply indicated in the CCEA note that a Committee would be set up by the Ministry to evaluate the cost structure and productivity. In response to audit, in February 2011, MoCA expressed apprehension to implement any reduction in employee cost on the ground of avoiding industrial unrest.*

The Ministry's reply (August 2011) stated that the concerns of the Planning Commission were taken on board. With respect to the DoE which had similarly raised concerns about the market share, this was evaluated in the Project Report and only then did DoE officials recommend the proposal for acquisition of 35 aircraft on firm basis and 15 on option basis to the PIB.

### 3.1.7    Negotiation Process

A multiplicity of negotiating procedures was adopted with regard to the acquisition process:

- With the 'in principle' approval of MoCA, CMD, AIL constituted a Price Negotiation Committee (PNC)[9] in June 2005 to hold price negotiations with the concerned airframe/engine manufacturer to negotiate the terms and conditions to be incorporated in the purchase agreement, without any commitment to the manufacturer till the receipt of GoI approval for the acquisition project.

> **The appointment of a price negotiating committee even before the pre-PIB meeting (let alone PIB approval) was surprising. The only possible explanation could be "expediting" the acquisition process. However, no such haste was shown till the aircraft requirements were revised upwards from 10 long range aircraft to 50 long range aircraft.**

- In August 2005, MoCA constituted an Overseeing Committee[10] to oversee the process of price negotiations. The negotiations held between August 2005 and November 2005 resulted in reduction of Rs. 539 crore in the net project cost of 50 aircraft.

- After consideration of the proposal, CCEA approved constitution of an Empowered Group of Ministers (EGoM)[11] for "one final round of negotiations" with the manufacturers to finalise the transaction; this was based on a letter by the Minister, Civil Aviation to the Prime Minister on the lines of the EGoM set up earlier in respect of the IAL acquisition. These negotiations were held on 24 December 2005.

---

[9] The members of the PNC were Director-Engineering, Director-Operations, Director-Finance, Director-Material Management and Director-Planning and International Relations of AIL.

[10] Chaired by Late Shri CG Somiah and including Secretary, Civil Aviation and Secretary (Expenditure), MoF

[11] Chaired by the then Finance Minister, and including the then Minister, Law & Justice, the then Minister, Statistics & Programme Implementation and the then Minister, Civil Aviation

### Table 3.6 – Concessions obtained by EGoM in respect of AIL fleet acquisition

(Rs. in crore)

| Particulars | AIL | AICL |
|---|---|---|
| Boeing additional cash concessions | 198.11 | 17.50 |
| GE additional cash concessions | 19.69 | NA |
| Boeing additional special financing credit | 134.32 | -- |
| Escalation capping | 629.02 | 20.03 |
| GE additional credit for purchase of tools/equipments | 15.40 | NA |
| Training Simulators | 330.00 | -- |
| Investment in MRO | 440.00 | -- |
| Investment in Training & other civil aviation matters | 44.00 | -- |
| Total value of concessions | 1810.54 | 37.53 |

*NA—Not Applicable*

In addition, the following conditions were also stipulated:

- Improved aircraft specifications of the B787-8 aircraft up to the date of certification and of B777-200 LR and B777-300 ER aircraft up to a period of 18 months after the signing of the purchase agreement to be provided by Boeing to AIL free of cost.

- Inclusion of "integrity" and "most favoured" clauses in the agreement for AIL by Boeing.

- Counter trade/off-set at 30 per cent of the net cost offered by both Boeing and CFM/GE

The Chairman of the EGoM submitted a note to the Prime Minister on the conclusions arrived at and concessions obtained by the EGoM based on its discussions with Boeing and GE on 24 December 2005. **On 30 December 2005**, the PMO enclosed the note of the chairman, EGoM to Secretary, MoCA indicating that the PM had seen the note and directed that MoCA may inform CCEA about the finalised transaction. Subsequently CCEA took note of these actions on 12 January 2006. **On the same day (30 December 2005)**, MoCA conveyed approval of GoI to AIL for acquisition of 68 aircraft on firm basis (50 aircraft for AIL with GE engines and 18 aircraft with CFM engines for its subsidiary, AICL, on the basis of the terms and conditions negotiated by the EGoM), involving cash concessions and special financing concessions estimated at Rs. 1848.07 crore as summarised in table 3.6. above. This showed remarkable promptness in all Departments.

**AIL and AICL signed the purchase agreements with Boeing and GE/ CFM on the same day (30 December 2005).**

> *To enable effective price negotiations, it is normal (and was also necessary) to make an assessment through commercial intelligence gathered globally to assess a reasonable or threshold price (based on comparable prices paid by other buyers and other factors). However, no benchmarks for the cost of the aircraft were set by AIL/ MoCA before negotiations were initiated with the manufacturers at various levels. Consequently, in the absence of such benchmarks, the effectiveness and efficiency of negotiations and the price arrived at is difficult to ascertain.*

The Ministry replied (August 2011) that the Overseeing Committee was constituted so as to comply with the requirement for commercial intelligence and having benchmarks. It also stated that the Purchase Agreements were signed on 30 December 2005, as the price offers were valid only upto 31 December 2005.

The reply is not tenable as we could not see evidence or documentation of the Overseeing Committee obtaining commercial intelligence regarding comparable acquisitions undertaken by other airlines during the same period. Nor did we find records of any benchmarks set for negotiations. As regards the Ministry's claim regarding expiry of offers on 31 December 2005, it is a globally accepted phenomenon that when approval processes are at an advanced stage, extension of 1-2 weeks is invariably sought for, and obtained.

### 3.1.8   Reconfiguration of seats in November 2005

During the negotiation process, the configuration of seats was revised in November 2005. This is certainly irregular.

- The proposed configuration of seats on the B777-200LR and B777-300ER was discussed at a meeting with the then Minister, Civil Aviation on 12 November 2005. It was decided that *"in the context of the fiercely competitive aviation scenario, AIL should provide the best possible product in terms of seat comfort, in-flight entertainment systems and other passenger amenities on the new aircraft"*. Accordingly, the seating capacities of the B777-200LR and B777-300ER aircraft were reduced by 28 seats and 38 seats respectively.

- It was also noted that the then Commercial Director, AIL[12] had confirmed that in the Executive Class, AIL should be able to achieve a further yield increase of 5 per cent on both aircraft, provided that *"there is no substantial increase in competitive pressures and all other aspects of the AI product offering meet prevailing global standards"*.

- The revised seat configurations were finalised and intimated by AIL to Boeing, and were only subsequently submitted for the AIL Board's information (not approval)[13]. Even the GoI/ EGoM was not informed (as per documents made available to us) of this change in seat configuration.

---

[12] Shri VK Verma

[13] It is not clear whether this revision of seat configuration was concurrent with the negotiations undertaken by the "Overseeing Committee" between August and November 2005.

In response to an audit enquiry, AI stated (August 2010) that two Joint Secretaries of MOCA were on the AIL Board and, therefore, only issues requiring approval of GOI were referred to the latter and further added (September 2010) that:

- Revision in seat configuration showed marginal improvement in profitability and, hence, the Project Report submitted to the GoI was not amended.

- The selection process involved pre-defined like-with-like comparison of competing aircraft and improvements were only made with respect to the selected product, *i.e.*, Boeing aircraft in this case. The revised seat configuration provided a possibility for an increase in the cargo carrying capability of the aircraft.

- Aircraft evaluation and selection followed the guidelines of MoCA and the Central Vigilance Commission (CVC) guidelines.

The Ministry endorsed (February 2011) the reply of AI.

> *In our view, this post-bid change in the seat configuration during the negotiation process was irregular, and adversely affected the transparency of the negotiation process. The assumption of further yield increase was also of doubtful reliability, considering the caveats attached by the then Commercial Director of AIL. These, in any case, are techno-economic decisions which should be taken at the airline level and not at the Ministry's instance.*

The Ministry in its reply (August 2011) stated that MoCA only suggested that AIL should have best product in terms of seat comfort, etc. in a competitive scenario and the decision was mainly taken by AIL, based on the increase in the revenue projected. It also added that the Government Director on AIL Board had suggested for a fresh look by the Chief Vigilance Officer (CVO).

The reply is not tenable as the post bid seat re-configuration (November 2005) lacked transparency. As regards projected increase in revenue, the preliminary analysis for the seat changes based on the methodology adopted in the Project Report indicated significant reduction in estimated passenger revenue and overall revenues, and the higher revenues were projected only by assuming additional 5 per cent yield increase in the Executive class. Further, no reference was made by AIL to CVO despite the Government Director's suggestion.

### 3.1.9   Option for 15 aircraft dispensed with

Till EGoM's recommendation, the fleet acquisition for AIL was premised on only 35 aircraft on firm basis, with 15 aircraft on option basis[14]:

---

[14] In addition to acquisition of 18 small capacity short range aircraft by AICL.

- The PIB specifically recommended acquisition of 35 aircraft on firm basis, and 15 aircraft on optional basis, with the decision for exercising the option for 15 aircraft to be taken by the AIL Board depending on the market situation.

- This approach was also specifically recommended by both the Planning Commission and the Department of Expenditure at the pre-PIB stage.

- This was also highlighted specifically by the AS&FA, MoCA during the PIB meeting.

- The sensitivity analysis carried out on the recommendation of PIB (to estimate the impact of negative variation of 5 per cent in some important assumptions e.g. revenues, fuel prices, salaries and project cost) showed positive NPV with the option clause.

In response, MoCA stated (February 2011) that it had placed a note for consideration of the Cabinet of Ministers for acquisition of 35 aircraft on firm basis and 15 on option basis for AIL. However, the Cabinet decided to have price negotiations with the manufacturer, and accordingly, the EGoM was set up. The EGoM, after negotiations with the manufacturer, obtained cash concessions and other benefits for all the 68 aircraft, and decided to place a firm order, and this was communicated to the airline *in toto*.

### 3.1.10  Financing of acquisition

Due to delays of 117 to 331 days in provision of GoI guarantee, AIL and AICL had to avail of bridge loans as a stop-gap arrangement to make necessary pre-delivery payments. Since these bridge loans carried a higher rate of interest than that envisaged, AIL and AICL paid additional interest of Rs. 199.37 crore and Rs. 21.34 crore respectively.

In response, MoCA stated (February 2011) that the proposal for GoI guarantee was examined by the various Ministries, and the whole process involves examination/ checks at various levels. However, it endeavoured to finalise and extend the sovereign guarantee as quickly as possible. There should be accountability for such delay which cost the Company Rs 220 crore.

The Ministry accepted (August 2011) the delay and stated that it was on account of procedural formalities.

### 3.1.11  Delayed delivery of aircraft

Against the 50 aircraft to be delivered only 20 aircraft (8 B777-200LR and 12 B777-300ER aircraft have so far (June 2011) been delivered; delivery of the remaining 3 B777-300ER aircraft has been deferred at the instance of AI. However, the delivery of all the 27 B787-8 (dreamliner) aircraft, scheduled between September 2008 and October 2011, is still to take place, and has been rescheduled from October 2011 onwards. As regards compensation for delayed deliveries, MoCA stated (February 2011) that after negotiations, Boeing had agreed for compensation, which works out to nearly $ 500 million, and that the matter was further being discussed with Boeing.

## 3.2   Acquisition of aircraft by erstwhile IAL

### 3.2.1   Overview

In February 2006[15], the erstwhile Indian Airlines Limited (IAL) signed purchase agreements with Airbus/ CFM for supply of 43 Airbus aircraft (with CFM engines) at an estimated cost of Rs. 8399.60 crore[16]:

- 19 A319 aircraft (seating capacity of 122);

- 4 A320 aircraft (seating capacity of 140); and

- 20 A321 aircraft (seating capacity of 172).

### 3.2.2   Chronology of events

The last fleet expansion of IAL was completed in 1994, with the induction of 30 A320 aircraft over the period 1989-94. A brief chronology of events related to the current acquisition of aircraft by the erstwhile IAL is indicated below:

*Table 3.7 - Chronology of events for Acquisition of 43 aircraft by IAL*

| Timeline | Brief Details |
|---|---|
| October 1996 | In-house task force (Aircraft Evaluation Committee) set up by IAL undertook evaluation of various types of aircraft for selection and purchase. |
| April 1999 | GoI decided to make an equity contribution of Rs. 325 crore to IAL in phases, linked to acquisition of aircraft and subject to improved productivity and better working results. |
| April – June 1999 | IA approached MoCA for acquisition of more technologically advanced and efficient aircraft for replacement of old/ leased aircraft and for capacity enhancement to regain market share.<br><br>Aircraft Evaluation Committee shortlisted 15 aircraft types (9 Boeing + 6 Airbus) of both narrow-bodied and wide-bodied types, and identified six types of aircraft for detailed technical, operational and financial analysis. Commercial offers were invited for these six aircraft types, but the offers were not opened due to General Elections. |
| December 1999 | IAL Board finally shortlisted 9 types of narrow-bodied aircraft[17]. |
| July/ August 2000 | Technical and financial bids were invited, and received, from Boeing and Airbus. |

---

[15] Pursuant to GoI approval in September 2005, and issue of Letter of Intent in December 2005.

[16] US$ 1826 million at an exchange rate of 1 USD= Rs. 46

[17] The IAL Board approved inclusion of 3 aircraft types, but decided to invite offers for all 9 narrow body types, to maintain an element of competitiveness.

Performance Audit Report on Civil Aviation in India

| Timeline | Brief Details |
|---|---|
| **March 2001** | Aircraft Evaluation Committee completed techno-economic analysis of offers, and submitted its report to CMD, IAL. <br><br> Evaluation report was not processed further, due to ongoing process of disinvestment of IAL. |
| **December 2001** | IAL invited revised financial bids, in view of the possibility of obtaining lower prices in the aftermath of the 9/11 incident in the United States. <br><br> IAL evaluated various combinations/ sets of Boeing and Airbus narrow-bodied aircrafts in the range of 95-200 seats. |
| **March- April 2002** | IAL Board approved acquisition of 43 aircraft (fitted with CFM engines) comprising 19 A319 aircraft (122 seats), 4 A320 aircraft (145 seats) and 20 A321 aircraft (172 seats) for delivery between 2002-03 and 2007-08 at an estimated cost of Rs. 10,089 crore[18], and submitted its project report to MoCA. |
| **June 2002** | Draft PIB memo was submitted to MoCA. |
| **Up to April 2003** | Matter was not processed further, as IAL was on the list of PSUs to be disinvested. In April 2003, Cabinet Committee on Disinvestments decided to take IAL out of the PSUs to be disinvested. |
| **April – June 2003** | 2 (two) pre-PIB meetings held. |
| **October 2003** | MoCA forwarded draft PIB note for consideration of appraising agencies (DoE, Planning Commission, etc.) |
| **December 2003** | Note for PIB forwarded by Planning Commission to MoCA. |
| **January 2004** | PIB meeting scheduled did not take place, due to impending General Elections. |
| **June/ July 2004** | MoCA sought CVC "clearance" for negotiation with L-1 bidder (Airbus). CVC informed MoCA that negotiations with L-1 bidder were permitted. |
| **July-October 2004** | IAL (at the request/ direction of MoCA) reviewed the proposal due to lapse of time and requirement of wide-bodied aircraft for future international operations. However, it reiterated its existing proposal for 43 narrow-bodied Airbus aircraft. |
| **November 2004** | PIB approved the acquisition proposal. |
| **December 6, 2004** | IAL constituted an inter-disciplinary Negotiation Committee to take up "final" negotiations with the L-1 bidders (Airbus and CFM). |

---

[18] US$ 2014 million plus Rs. 224 crore

| Timeline | Brief Details |
|---|---|
| December 14, 2004 | 'Overseeing Committee' was constituted by MoCA to oversee the process of price negotiations and to 'guide' the Negotiation Committee; negotiations were held by Overseeing Committee between December 2004 to March 2005. |
| August 2005 | CCEA constituted EGoM for one final round of negotiations with L-1 bidders. |
| September 6, 2005 | EGoM held final negotiations with the representatives of Airbus and CFM. |
| September 29, 2005 | Government conveyed its approval to IAL for acquisition of 43 Airbus aircraft. |
| December 16, 2005 | Letter of Intent/ Term Sheets were signed between IAL and Airbus. |
| February 2006 | Purchase agreements were signed between IAL, Airbus and CFM. |
| October 2006 to April 2010 | All 43 Airbus aircraft were received in time (against the stipulated delivery schedule of November 2006 to April 2010). |

### 3.2.3   Undue time taken for acquisition

IAL's aircraft acquisition process took almost ten years from October 1996 (when an in-house aircraft evaluation committee was constituted) to February 2006 (when the purchase agreements were finally signed). This enormous timeline spanned two General Elections (1999 and 2004) as well as an extended delay, when IAL was considered for disinvestment.

The Ministry noted the position (August 2011), but referred to a "two-faced" argument by audit regarding delayed acquisition process on the one hand, and nudging the airline to expedite the process on the other hand. The Ministry's claims regarding audit's arguments are not relevant, as our comments pertained to the AIL acquisition and not the IAL acquisition.

### 3.2.4   Flawed underlying assumptions

IAL had initially (1999) shortlisted 9 narrow-bodied aircraft, divided into small (95-125 seats), medium (125-150 seats) and large (150-200 seats) categories, which were taken up for detailed evaluation. A total of 54 possible combinations/ sets were evaluated on the basis of traffic forecast on each route (113 routes as per winter 2001 schedule) over a period of five years (2003-08). The project cost, cash flows, NPV (Net Present Value) and weightage were computed for each combination. Ranking of various sets of aircraft was done on a 100 point scale, with 95 points for NPV of funds flow and 5 points for non-quantifiable parameters.

*NPV of fund flows of all 54 sets of aircraft at a discount rate of 8 per cent over the economic life of the project of 15 years was negative, assuming constant cost and revenue yield at 2001-02 levels. NPV of the selected set (L-1) was also (-) Rs. 2,632 crore.*

*Consequently, in March 2002, IAL projected an increase of 6 per cent in domestic fares in the first year (2003-04) and further increases of 2 per cent per annum for 4 years (2004-05 to 2007-08), evidently to make the negative NPV positive. The NPV of the selected set (at a discount rate of 8 per cent) became (+) Rs. 1,539 crore. This unrealistic assumption of dramatic increases in yield at constant costs (i.e. while assuming costs – fuel, staff, interest and other costs etc. to be constant throughout the project life) was critical to projecting an optimistic picture of positive project cash flows on NPV basis, and to the approval of the acquisition project. In fact, even obtaining constant yield at constant costs would have been a major challenge for IAL, given the cost profiles/ trends of the organisation and future uncertainties[19].*

*While clearly IAL desperately needed to acquire new aircraft to replace its ageing fleet and reduce its dependence on leased aircraft if it was to continue its operations as a "going concern", a limited acquisition of aircraft, while acknowledging its negative cash flows, would have been more appropriate. Such a limited acquisition, with options for additional aircraft, was also suggested by the Planning Commission and Department of Expenditure in the initial stages of appraisal, but not pursued further.*

In practice, IAL was obviously unable to achieve such dramatic increases in yield at constant costs:

- Besides dramatic increases in fuel and staff costs, the actual increase during 2007-08[20] on 10 domestic routes test checked by us was only due to fuel surcharge, and not due to any increase in the basic fare.

- The percentage of cost to revenue increased from 99 per cent in 2004-05 to 152 per cent in 2009-10.

- During the period from 2006-07 (when aircraft delivery commenced) to 2009-10, the total revenue declined by 25 per cent from Rs. 7,196 crore to Rs. 5,372 crore. In fact, when IAL increased the basic fare in 2008-09 by 21 per cent, PLF dropped by 8.65 per cent and revenue declined from Rs. 7,196 crore to Rs. 5,564 crore.

*Thus, IAL could not even achieve constant revenues at constant costs, let alone increased yields at constant costs; this was to be expected, considering the wholly unrealistic nature of the assumption. This factor, though overstated by the airline, should have been questioned by the Government.*

---

[19] ATF fuel prices had increased from Rs. 13,540/ KL in November 2001 to Rs. 30,608/ KL by April 2005.

[20] The first full year after commencement of delivery of new aircraft (October 2006).

Even the discount rate of 8 per cent adopted for calculating NPV was optimistic (coupled with the assumed increases in yield). IAL was forced to borrow funds from IDBI at effective rates ranging from 11.25 to 11.75 per cent.

In response (February 2011), AI stated that:

- Its expansion plan was completely reasonable, as otherwise the airline would have, by this time, become an irrelevant player in the market, as globally an airline's capacity share dictates its market share.

- 'Air India' had reversed the trend of continuous decline in domestic market share, and recorded domestic passenger market share of 17.7 *per cent* in 2009-10 against 16.9 *per cent* achieved in 2008-09; further, the market share of erstwhile IAL had been gradually increasing since 2004-05 in line with increase in the domestic market.

MoCA stated (February 2011) that:

- There was requirement for more aircraft (over and above 43 aircraft) to meet the traffic demand.

- The older aircraft were not preferred by the passengers, and they had higher maintenance cost. Also, it was difficult to compete with other airlines without newer aircraft.

- Most of the 43 aircraft purchased were in the nature of replacements, and were purchased in one lot to avail of concessions.

We do not subscribe to this viewpoint, for the following reasons:

- Despite an increase in fleet strength from 67 aircraft (March 2005) to 97 aircraft (March 2009), IAL's market share declined precipitously from 37 *per cent* in 2004-05 to 16.9 *per cent* in 2008-09, and only increased marginally to 17.7 per cent in 2009-10.

- During 2004-10, the increase in Available Seat Kilometres (ASKM) was only a marginal 10 per cent, despite increase in available seats by 59 per cent. Consequently, the increase in Passenger Load Factor (PLF) from 64.4 per cent in 2004-05 to 68.5 per cent in 2009-10 was based on a much lower level of ASKMs, and, therefore, did not indicate a dramatic improvement in commercial performance.

In the exit conference (August 2011), the Secretary MOCA admitted that it was the conscious policy decision of the Government, even while they knew fully well that the Net Present Values (NPV) was negative.

*If indeed, GoI/ MoCA was keen on, or agreeable to, a full-scale aircraft acquisition by IAL in the public/ national interest, it should have acknowledged that such an acquisition would involve substantially negative cash flows, based on realistic and reasonable assumptions and considered and approved appropriate arrangement for funding the resulting cash deficit. The "footprint" of IAL, and the corresponding fleet acquisition plans,*

> *should have been appropriately tailored in line with the deficits/ funding that GoI, as the ultimate owner of IAL, was willing to bear.*

### 3.2.5   Concerns within MoCA

In fact, concerns regarding potential difficulties of IAL in successfully funding the acquisition with a positive NPV had been raised within MoCA. In 2003, Director (R), MoCA had highlighted several key issues before the pre-PIB meeting, including:

- IAL would not be in a position to fully meet the requirements of internal resources, and would require GoI assistance to meet advance payment obligations as well as to increase its equity base;

- Attention was drawn to the need for fare increases (keeping input costs current) so as to ensure positive NPV, also casting doubts on the feasibility of such fare increase;

- Use of a discount rate of only 8 per cent rather than the stipulated 12 per cent; and

- The high risks in proposing purchase of all 43 aircraft on firm basis (instead of firm + option basis) etc.

Director(R)'s note concluded that ...*"buying new aircraft is not the solution which shall do wonders for IAL but a restructuring exercise to reduce costs, specially staff costs, improve service standards and operational efficiency matching global norms...".*

However, the then AS&FA[21], MoCA, took a contrary view. In his reference to Director (R)'s note, he indicated that *"almost all these issues were addressed in the pre-PIB meeting, except those relating to fleet selection strategy and declining prices of aircraft. The items that were not brought up for discussion relate to commercial decisions of IAL. Pre-PIB and PIB, that have been set up to consider investment decisions, do not have the charter and competence to go into such commercial issues on selection of fleet, price issues etc.*

*If IAL had chosen to draw up their project report based on a different make and capacity of aircraft, the proposal would have been discussed only from the point of view of investment decision, and not on the choice and price of aircraft.*

***I am of the view that Director(R) is under a mistaken notion about the investment decision-making process in the Government."*** AS&FA further commented that *"the Ministry representatives were at liberty to express their own reservations, though they would be embarrassed if they had been asked as to why they chose to bring the proposal up for discussions...".*

On the notings of AS&FA, JS(M) further noted that *"... the note of Dir (R)... is neither clear nor procedurally correct. As pointed out by AS&FA, it is also not factually correct.... I agree with his (AS&FA's) observations, since pre-PIB process cannot be initiated unless the Ministry supports the proposal. Orders by Secretary ... are very clear."*

---

[21] Shri V Subramanian

> *The arguments of MoCA officials regarding the nature of the "investment decision making process in Government" and the "commercial issues" falling within the jurisdiction of IA are incorrect. The notings indicate a haste to push through the pre-PIB meeting. Such haste evidently rendered it difficult for MoCA officials to express their concerns or reservations.*

By contrast, the subsequent AS&FA[22], MoCA, clearly noted his serious reservations at the PIB Meeting (November 2004) on the acquisition proposal:

- The basic study for induction of aircraft was done in the late 1990's, and subsequent increase in the capacity by the private operators had increased the competition significantly, thereby undermining the basis of the study.

- In the airline industry, it was a standard practice to keep a few options, which may or may not be exercised.

- While there could be an increase in the international and domestic traffic, the share of IAL in such traffic may not be of the same order, leaving the aircraft sub optimally utilised.

- Both direct and indirect operating costs of IAL were phenomenally high. Unless efforts were taken to reduce cost, all revenue and cost calculations would go awry, thus, undermining the entire exercise of acquisition.

Subsequently, in March 2005, he reiterated that "*As regards the financial viability of the acquisition, it appears... that in all probability, this project is not going to be financially viable. The project has assumed Aviation Turbine Fuel (ATF) rate of 2001, whereas the present rate is much higher. If we take into account the present ATF rate, there will be much less returns as compared to those reflected in the Cabinet note*".

> *These concerns of the AS&FA were serious. However, no attempt was made to address them and re-assess the proposal.*

AS&FA's note also made two other important points

- There were only two major players – Airbus and Boeing, but negotiations with only L-1 were permissible under CVC guidelines (hence not much concession could be obtained from Airbus); hence, there was a need to evolve new procedures with limited players in the field, so that maximum benefit could be obtained for Government;

- It was difficult to obtain information regarding sale of aircraft to other airlines in India due to confidential contractual arrangements, and hence, it was desirable to strengthen economic intelligence by GoI.

> *No concrete action was taken on these suggestions of AS&FA.*

---

[22] Shri PK Mishra

The Ministry replied (August 2011) that it was incorrect to say that the Ministry approached PIB without the concurrence of AS&FA.  In fact, we had not commented on the concurrence (or otherwise) of the AS&FA, but had stated that the concerns of the AS&FA were not adequately addressed in the PIB meeting.

### 3.2.6   Concerns of appraising agencies gradually "faded" over time

The Planning Commission and the DoE raised concerns on several key and critical issues at different stages (initial stage, pre-PIB meetings, and PIB meetings) but finally concurred with the acquisition proposal at the time of the submission of the CCEA note.

The main concerns of the Planning Commission at different points of time are summarised below:

- In the pre-PIB meetings, IAL clarified that the increase in capacity would be around 30 per cent, and 70 per cent of the capacity was towards replacement. *The Planning Commission representative indicated that new accretion to capacity had to be viewed with great circumspection, and suggested that IAL should consider purchasing only 28 aircraft at this stage, and the rest in Phase-II, after reviewing the situation, depending on the growth of traffic.*

- The aircraft requirement, at least for international routes, could be reduced, as it would be appropriate for IAL and AIL to chalk out a common strategy for their international operations, as they were competing with each other along with other international airlines on some international routes. Further, although IAL was envisaging expansion of international operations to increase its market share (currently 10 per cent), private airlines were also being permitted to operate to neighbouring countries.

- The company was incurring losses in the last three years[23], and it was necessary to evolve a suitable strategy for funding the proposal to avoid time and cost overrun. Further, operating more aircraft to compete with the private sector might lead to further deterioration of IAL's financial position.

The main concerns of the Department of Expenditure (DoE) at different stages are summarised below:

- It would be prudent to go in for some options, rather than placing orders for all 43 aircraft on a firm basis, as the projected fare hikes and load factors on international sectors might not materialize in the competitive market scenario.

- The acquisition project had negative NPV at constant price for all combinations. Further, the project envisaged 6 per cent increase in fares during the first year of induction, and 2 per cent p.a. thereafter for four years. Since these projections were made in March 2002 and fares upwardly revised since then, further hikes might not be possible in the present market scenario.

---

[23] Rs.159 crore in 2000-01, Rs.250 crore in 2001-02 and Rs.197 crore in 2002-03.

- The pressure of competition was much more intense on international sectors than in the domestic sector, with more bilateral rights being granted in these sectors and the possibility of other domestic scheduled operators being granted international rights. Consequently, the projections of load factors on international sectors may not materialize in the long run.

In the PIB meeting of November 2004, MoCA and IAL justified the projections in the Project Report on the following grounds:

- Adoption of 8 per cent IRR was appropriate, as the earlier rate of 12 per cent was a very old historical figure when the interest rates were very high.

- Fare increase may not be really difficult in the present scenario.

- The capacity addition was justifiable, as the market was growing at a rate of 7.8 *per cent* p.a. over the 2000-01 level, and the annual growth projection of 5 per cent in the X Plan was on a conservative side.

- ***Market share of IAL would be directly related to its capacity share.***

- The proposal to permit domestic carriers to fly on domestic and international routes had been duly considered.

> ***The representatives of the Planning Commission and Department of Expenditure chose not to press their concerns expressed earlier (after taking note of MOCA/ IAL's response), and finally agreed to the MoCA proposal for acquisition of 43 aircraft by IAL.***
>
> ***IAL's claim that capacity share dictates market share and that an increase in capacity would automatically result in a proportionate market share was not adequately validated, and was also not borne out.***

The Ministry replied (August2011) that the audit observations that the Ministry had not evaluated the proposal were incorrect. However, our comment was on the concerns expressed by the appraising agencies and their final approval to the proposal.

### 3.2.7   PIB approval

On November 10, 2004, PIB recommended the proposal for acquisition of 43 aircraft at a total revised cost of Rs. 9474.95 crore, assuming a lower exchange rate of @1US$=Rs.46, and estimating  a shift in the period of induction to 2006-11. Based on the revised price cost, the revised exchange rate, and all other assumptions remaining the same, and factoring the fare increase of 6 *per cent* in the first year of induction and 2 *per cent* per annum thereafter for the next four years, the NPV worked out to Rs. 1539.08 crore at a discount factor of 8 per cent, which corresponded to an IRR of 12 *per cent* for the project.

Further, the PIB decided that MoCA would approach the Cabinet Committee on Economic Affairs (CCEA) for approval with the following additional information:

- The likely impact of changes in the civil aviation policy on permitting domestic airlines to fly on the international route;

- Economic viability of the project at a discount rate of 12 *per cent* as well as without the increase in fares i.e. at constant prices with constant revenue, with sensitivity analysis under various scenarios;

- Proposed financing pattern, including the mix of domestic and foreign borrowings; and

- Rationale for not inviting fresh price bids at this stage.

As regards changes in the civil aviation policy, MoCA indicated that the Union Cabinet had, in December 2004, reserved the Gulf sector for IAL/ AIL for the next three years.

> *Subsequently in March 2005, a revised project cost of Rs. 10,237 crore (with all other factors remaining the same) resulted in a negative NPV of (-) Rs. 308 crore. Further, sensitivity analysis assuming a discount rate of 12 per cent and no fare increase indicated a substantially negative NPV of (-) Rs. 2976 crore. This, however, did not affect the decision of GoI to proceed ahead with the aircraft acquisition.*

It was also decided that MoCA would decide the benchmark for further negotiations with the L-1 bidders (Airbus and CFM) and take a decision regarding the stage at which such negotiations should be held. This was not done.

### 3.2.8   Negotiation Process

As in the case of AIL, a multiplicity of negotiating procedures was adopted with regard to the acquisition process:

- On December 6, 2004, an inter-disciplinary Negotiation Committee was constituted by IAL to take up "final negotiations" with the L-1 bidders.

- On December 14, 2004 (just 8 days later), MoCA constituted an Overseeing Committee[24] to oversee the process of price negotiations, and to "guide" the Negotiation Committee.

- In August 2005, CCEA approved constitution of an Empowered Group of Ministers (EGoM)[25] for "one final round of negotiations" with the manufacturers (lowest bidder) to finalise the transaction.

- In September 2005, MoCA conveyed approval of GoI to IAL for acquisition of 43 aircraft on the basis of the terms and conditions negotiated by the EGoM (involving cash concessions and special financing concessions) as summarised below:

  ❖ Cash concession of US$ 25.9 million on January 2004 economic conditions by Airbus, and cash concession of US$ 5.2 million at January 2004 economic conditions by CFM.

---

[24] Same composition as in respect of AIL acquisition.

[25] Same composition as in respect of AIL acquisition.

❖ Escalation from January 2004 onwards to be calculated at a fixed rate of 3 per cent per annum on yearly basis by Airbus and CFM.

❖ Improved aircraft specifications by Airbus, free of cost, and counter-trade/ offset to be increased from 30 per cent to 40 per cent by both Airbus and CFM; the completion of such counter-trade/ offset offered within 12 years after the last delivery of the aircraft.

❖ Insertion of "integrity" and "most favoured" clauses in the purchase agreement.

❖ Even though Airbus was not the leading company, it would assist the creation of MRO facilities in India in association with promoters. The estimated investment was of the order of US$ 100 million for MRO[26] facilities, and US$ 75 million for setting up of training centres in India.

> ***Despite the PIB's decision that MoCA would decide the benchmark for further negotiations with the L-1 bidders, no such benchmarks were set by MoCA before negotiations. Consequently, in the absence of such benchmarks, the effectiveness and efficiency of negotiations is open to question.***

The Ministry replied (August 2011) that :

- The difficulty in obtaining comparison with other deals of the same manufacturer and consequent difficulty in fixing clear benchmark for negotiation was stated by MoCA in Para 9.3.2 of the note for CCEA dated 17 August 2005. CCEA was informed that the issue of comparison between prices offered by Airbus to IAL vis-à-vis other airlines was taken up by the Oversight Committee.

- EGoM had directed that the most favoured clause and integrity clauses would be inserted in the purchase agreement. Further, during negotiations, EGOM extracted further concessions from supplier.

We do not agree. Inclusion of most favoured and integrity clauses does not detract from the need for fixing benchmarks for negotiations. In the absence of such benchmarks, the potential scope for financial benefits/ reductions and the actual achievement thereagainst could not be ascertained.

### 3.2.9   Manufacturer commitments for MRO/ Training Centre not fulfilled

#### 3.2.9.1   *Manufacturer commitments for aircraft acquisition*

The EGoM minutes for the IAL aircraft acquisition from Airbus reflected the following commitments:

- A training centre would be established by Airbus in India at an approximate investment of US$ 75 million.

---

[26] MRO: Maintenance, Repair and Overhaul

- A warehouse for spares would be established in India (cost not quantified in monetary terms as it depended on the types of spares stock-out).

- Even though Airbus was not the leading company, it would assist the creation of MRO facilities in India in association with promoters. The estimated investment was of the order of US$ 100 million.

In our view, the commitments made by Airbus regarding creation of MRO and training facilities were quite open-ended:

- Unlike the other clauses, there was no mention of a timeframe by which such facilities will be created.

- The wording committed by Airbus Industries was "… agreed to make or facilitate the following investments". It was not clear who or what combination of promoters (Airbus and/ or other entities) would together make up the required investment.

- In respect of the MRO, the wording "facilitate creation of MRO facilities in India in association with the promoters" did not give any indication of a binding commitment.

- There was no mention anywhere that the training and MRO facilities would be exclusive for IAL's use or would be meant for all users of Airbus aircraft (public and private) in India and nearby.

The commitments obtained from Boeing in respect of the AIL aircraft acquisition, as reflected in Chairman, EGoM's note to the PM, were similar (without exact costs, timeframes etc.):

- Boeing would provide training simulators costing upto US$ 75 million.

- Boeing would invest upto US$ 100 million for creation of MRO facilities for Boeing aircraft in India.

- Boeing would invest US$ 10 million in training and other civil aviation requirements.

The directions of the EGoMs were communicated to both IAL and AIL.

> ***While these commitments were included in AIL's purchase agreements, these commitments were, however, not included in IAL's purchase agreements.***

### 3.2.9.2   *Non-fulfilment of manufacturer commitments in respect of MRO and warehouse facilities by Airbus (IAL fleet acquisition)*

After a delay of two years, IAL entered into a JV agreement in October 2008 with EADS (the parent company of Airbus Industrie) for setting up the MRO facility. There had, however, been no tangible progress towards setting up the facility. The warehouse facility for aircraft spares had also not been established. However, the flight training at Bengaluru and full flight simulator for A320 and ATR had commenced from November 2007.

In response (February 2011), MoCA and AI stated that the issue of establishment of MRO was discussed between IAL and EADS, as well as between MoCA and EADS; an independent consultant had been engaged in July 2010 for deciding valuation of land, other assets and contribution by AI to the proposed JV company, and the matter would be processed further on acceptance of the valuation report by both EADS and AI. Subsequently, EADS and Airbus Industrie had informed MoCA that two initiatives regarding MRO were underway. Instead of a fresh investment, an MoU signed by EADS with Skil Infrastructure Ltd was, in our opinion, injudiciously included towards discharging of the investment commitment by Airbus.

The Ministry stated (August 2011) that the matter of non fulfilment had been referred to law ministry. In the mean time, a letter dated 18 April 2011 had been received from Airbus, confirming their commitment to facilitate investments required for training facilities and MRO.

However, the Ministry's reply does not address why these clauses were not included in the purchase agreement. In the absence of a firm commitment flowing through an agreement, the enforceability of the agreed concessions (obtained by EGOM) remains questionable.

## 3.3 Synergy between AIL and IAL network not considered during acquisition process

As brought out subsequently in the chapter on "Merger", a key driving factor behind the merger of AIL and IAL was route rationalisation and network integration through proper synergy. However, even prior to the merger, MoCA had commissioned, in 2004, a study by AT Kearney to suggest measures for achieving better operational integration between AIL and IAL. The study had recommended freeing up of capacity by leveraging the AIL and IAL networks for international short haul markets and consolidation of frequencies on overlap routes and redeployment of freed up capacity on under serviced routes.

*Inexplicably, synergised / integrated operation between AIL and IAL (even though this was recommended / recognised before the finalisation of the fleet acquisition process and specifically referred to in the December 2004 MoCA note for liberalisation of bilateral agreements) was not factored in as part of the acquisition project analysis either for AIL or IAL. In fact, the projected fleet deployment of a part of the B787-8 aircraft capacity of AIL for domestic routes (to increase capacity utilisation) evidently ignores such synergistic operations. Further, the suggestions (during the evaluation/ approval process for IAL aircraft) for consideration of wide-bodied aircraft for international operations by IAL indicated that let alone an AIL-IAL merger, even synergy between their operations was not considered, and IAL was expected to compete with AIL on some international routes.*

*As pointed out elsewhere, inexplicably, the need for such synergy/ integration/ merger was accepted only after expensive fleet acquisition processes were carried out independently by both airlines.*

The Ministry stated (August 2011) that the fleet acquisition was on stand alone basis by the respective airlines and had no link with the merger, and that the synergy between AIL and IAL were kept in mind at the time of acquisition.

We do not agree with the Ministry's response. The fact that there was no link between the fleet acquisitions by the two airlines and the merger, despite the 2004 study on synergy between AIL and IAL, is precisely our point. The claim regarding synergy at the time of acquisition is clearly an after-thought, as the projected operations underlying the acquisition proposals indicated no such synergy. Further, the projections regarding deployment of AIL aircraft on domestic sectors for their own hub and spoke operations clearly indicated that integration between IAL's domestic flights and AIL's international flights was not envisaged.

## 3.4   Risks of Debt Funded Acquisition – Very high Debt Equity Ratio

Even as of 2005-06 (when the decision on acquisition of 50 + 43 aircraft by AIL and IAL was taken), the debt-equity ratios of AIL was very high at 4.6:1 and negative in case of IAL.

The fleet acquisition cost for both AIL and IAL was to be funded entirely through debt (except for a marginal equity infusion of Rs. 325 crore in respect of IAL). With additional borrowings of Rs. 32,274 crore and Rs. 8,335 crore towards acquisition of aircraft by AIL and IAL, the debt equity ratio of both AIL and IAL would be further adversely affected (as against prudent project financing ratios of upto 4:1). As stated elsewhere, the projected cash flows for repayment of loans were based on unduly optimistic assumptions, and could not have been relied on to reduce the serious risks associated with debt-funded acquisitions.

> **The adverse impact of debt-funded acquisition (with extraordinarily high Debt-Equity ratios) and interest/ principal repayment was felt   by AI, essentially from 2009-10 onwards., and will continue for the foreseeable future, unless there is substantial infusion of GoI equity (coupled with strong internal cash flows).**



# Chapter 4    Merger of AIL and IAL into NACIL

## 4.1   Initiation of Merger – March 2006

The initial reference to the merger of AIL and IAL in the records of MoCA is a noting of 16 March 2006 that the Minister, Civil Aviation had desired a concept paper on the integration/ merger of AIL and IAL; AIL had sent a concept paper prepared by the consultants, AT Kearney. As mentioned elsewhere, this concept paper of 2004 (which highlighted the potential for value creation through collaboration on fleet and network between IAL and AIL) was referred to in the December 2004 note on liberalisation of bilateral agreements, but was re-considered only after completion of independent fleet acquisitions by both airlines.

Subsequently, a presentation was made on 22 March 2006 before the Prime Minister on the issue of the proposed merger of AIL and IAL[27]; a copy of this presentation could not be retrieved from MoCA's records. As per the file notings:

- In the presentation, it was highlighted that in the light of the global trend towards consolidation in the airlines industry, it had become incumbent for the two national carriers to work towards merger, as the merged entity would not only be able to compete effectively in the market but would also find greater acceptability amongst the global alliances. It was emphasised that given the overall developments in the civil aviation sector internationally as well as in the domestic sector, nothing short of merger would be an effective way to compete effectively in the market.

- During the discussions held after the presentation, apprehensions were expressed with regard to the HR problems arising due to merger. However, it was felt that it would be in the overall interest of both AIL and IAL to sort out these issues and work towards merger under the guidance of MoCA.

- During the discussions, it was, inter alia, suggested that the MoCA may examine the possibility of certain interim measures like formation of a holding company of both AIL and IAL preceding their full merger.

- ***After detailed deliberations, 'in principle' approval was given for working towards the merger of AIL and IAL and to bring up a Cabinet note with full details at a later date in this regard.***

In view of the 'in principle' approval for working towards merger of AIL and IAL, the following course of action was approved:

- Since AIL had taken the lead in making the presentation, they would be asked to engage a consultant, in consultation with IAL, to advise on the merger process, for which a draft Terms of Reference (ToR) was also prepared;

---

[27] Others present were the Minister, Civil Aviation, Dy. Chairman, Planning Commission, Pr. Secy to PM, Secretary, MoCA, CMDs of AIL and IAL, JS to PM, and JS, MoCA

- Working Groups for Commercial, Finance/ Accounts, Engineering/ Operations and HR involving officials of both AIL and IAL would be constituted.

These decisions were conveyed by MoCA to the erstwhile AIL on 20 April 2006.

> *Based on available records, we are unable to ascertain the detailed justification for, or the background to the 'in principle' approval of GoI for 'working towards the merger' of AIL and IAL. However, in our opinion, the initiation of action towards the merger in March 2006, less than a few months after completion of independent large scale acquisition of aircrafts by IAL (Airbus) and AIL (Boeing) in late 2005 (after long drawn out procedures/ negotiations) appears somewhat ill-timed, with loss of significant synergistic opportunities.*
>
> *Had the possibility of merger (with attendant route rationalization, network integration, common maintenance/ overhauling facilities and other synergies) been considered – even at a late stage – in the process of fleet acquisition, the underlying economics (including frequencies, routes, seating, and other operational aspects) could have been significantly altered; perhaps, even a common acquisition process for AIL/ IAL could well have been considered. In our view, the potential benefits for the merger would have been far higher, had this been undertaken before finalization of the massive and separate fleet acquisition exercises undertaken by AIL and IAL.*

The subsequent chronology of events relating to the merger is summarised below:

### Table 4.1 - Chronology of events relating to the merger of AIL and IAL

| Timeline | Event(s) |
|---|---|
| July 2006 | Joint Committee of Boards of AIL and IAL on Merger (constituted by GoI) selected Accenture India Pvt. Ltd. as consultant to advise on the merger. |
| October 2006 | Cabinet Secretariat communicated the constitution of a GoM[28] to consider the suggested roadmap for the merger proposed by MoCA, financial and legal issues etc. |
| November 2006 | GoM raised concerns on the merger proposal and desired that a CoS (chaired by Cabinet Secretary) examine the following issues:<br><br>• While merger of the two airlines was a deliberate goal, the process should be so tailored that the benefits of synergy were not dissipated by addition of inefficiencies, especially on the manpower side. |

---

[28] chaired by the then Defence Minister, Shri Pranab Mukherjee

Performance Audit Report on Civil Aviation in India

| Timeline | Event(s) |
|---|---|
| | • There was a declining trend in the financial and operational performance of the two airlines. The merger process would be successful only if these concerns were suitably addressed.<br><br>• The two airlines were presently overstaffed. There were some differences in their work culture as well. |
| December 2006 | CoS agreed with the merger proposal, and decided that:<br><br>• GoI would provide the necessary relaxation from the existing norms/ rules on need basis for effecting the merger quickly.<br><br>• A team in MOCA may be constituted under the Secretary, to guide, co-ordinate and facilitate the merger process. |
| January 2007 | Pursuant to directions of GoM, MoCA held meetings with employee associations of AIL and IAL. |
| February 2007 | GoM decided to recommend to the Cabinet that the proposal for merger of AIL and IAL be approved. |
| 1 March 2007 | Cabinet approved the proposal for merger. |
| 30 March 2007 | National Aviation Company of India Ltd. (NACIL) was incorporated. |
| 22 August 2007 | AIL and IAL stood dissolved and merged into NACIL; the approved scheme of amalgamation set the "appointed date of merger" as 1 April 2007. |

The Ministry in its reply (August 2011) elaborated the background and rationale for the merger and acquisition of aircraft, and stated that the merger would not have altered the aircraft acquisition programme significantly, and that no losses could be attributable to the merger.

We do not agree. In our opinion, merger before aircraft acquisition could have the potential for altering the acquisition strategy. Further, we did not comment about the merger causing losses, but had merely highlighted the failure to implement the merger as envisaged, as it was ill timed with loss of significant synergistic opportunities.

## 4.2   Objectives and Envisaged Benefits of Merger

According to the consultant (Accenture), the merger was intended to:

• Provide an integrated international/ domestic footprint, which would significantly enhance customer proposition and allow easy entry into one of the three global airline alliances;

- Enable optimal utilization of existing resources through improvement in load factors and yields on commonly serviced routes, as well as deploy 'freed up' aircraft capacity on alternate routes;

- Provide an opportunity to fully leverage strong assets, capabilities and infrastructure:

  - ❖ Parking bays and landing slots in an 'infrastructure constrained' environment;

  - ❖ Potential to launch high growth & profitability businesses {Ground Handling Services (GHS); Maintenance, Repair & Overhaul (MRO) etc.};

  - ❖ Potentially enable the merged entity to command better valuation;

- Operate a combined fleet strength (~112), which would be the largest in India and comparable to other airlines in Asia/Region {Emirates (93), Singapore (118), Malaysian (110);

- Provide maximum flexibility to achieve financial and capital restructuring through revaluation of assets and cleaning up of financial books;

Besides the above, a merged airline would be in a better position to serve and promote the airport hubs now being developed at the metro cities, pursuant to the airport restructuring and modernization programme approved by the GoI, by providing seamless connectivity over domestic and international networks.

According to the consultant, the following benefits were envisaged:

- Net synergy benefits of Rs. 820 crore (against the integration cost of Rs. 200 crore) was envisaged; potential recurring synergies were expected to enhance profitability by Rs. 600 crore at the end of the 3rd year of merger.

- The merger would make the combined airline the largest in the country, improve combined market share, result in a combined balance sheet (which would be important for an IPO), and revaluation of assets of both airlines (which would be possible only after a merger) and improve net worth.

### 4.3   Lack of adequate validation of financial case for merger

> *In our view, the main focus of the process leading upto the implementation of the  merger was on consideration of alternative options for merger, stamp duty and tax implications, creation of top level posts for accommodating existing incumbents etc. However, the financial case for merger was not adequately validated, prior to the merger.*

- In the consultant's report, the synergies likely to be yielded by progressive integration of networks and operations had been illustrated as follows:

Performance Audit Report on Civil Aviation in India

### *Chart 4.1 – Progressive integration of networks and operations is expected to yield significant synergies*



However, the details of how these were likely to, or should, work out in practice had not been explored in depth.

- The Accenture report expected synergies on two counts – revenue synergies (primarily on account of network integration) and cost and capital productivity synergies (leveraging economies of scale for rates for catering, crew boarding and lodging etc.; opportunities for rationalizing overlapping facilities and infrastructure e.g. international locations serviced by both airlines). A figure of Rs. 820 crore on account of synergies at the end of the third year after merger was projected by the consultant.

### Chart 4.2 - Expected build-up of synergy benefits and integration costs



These estimates would be refined, during the detailed integration design work, based on Business plans for the Merged Entity, in Phase 2

- However, except for a statement that profitability would be enhanced by over Rs. 600 crore (4 per cent of current combined revenue), detailed item-wise financial analysis was not available, so as to assess the reasonableness and robustness of these projected savings.

- The only major accounting implication highlighted was that the post-merger net worth would go up considerably (from Rs. 185 crore as of 2005-06 to Rs. 2557 crore), mainly due to revaluation of fixed assets by 50 per cent of the current book value. Obviously, this had no operational or cash flow benefits.

- One of the key assumptions for improved employee productivity was that the merged entity would have fewer employees/ aircraft on account of increase of fleet through procurement, and reduction of employee base by around 4,000 due to expected retirements. However, such expected improvement in employee productivity had not been achieved, and was, in any, case not directly dependent on the merger.

The Ministry in its reply (August 2011) narrated the action taken during the last four years, like route rationalization, combined insurance policy, etc. and the benefits accrued in the first year of merger and also stated that the consultant had looked into the financial aspects of the merger.

The reply is not tenable as our finding relates to the inadequate validation of the financial case for merger, prior to the merger.

## 4.4 Huge Delays in Actualisation of Merger/ Integration

Although the merger of AIL and IAL was officially notified in 2007, the integration process had still not been fully completed, as described below:

### 4.4.1 Delays in implementing Single Code Passenger Reservation System

A critical element in the integration of the networks of the erstwhile AIL and IAL was the integration of the reservation systems to help the merged entity (AIL) to operate all its flights on a single code, and reap the benefits of network integration through seamless travel for passengers on all domestic and international routes.

Prior to the merger, the two airlines were using separate reservation systems (UNYSIS system by AIL and IBM system by IAL) with separate airline codes (IC for Indian Airlines flights and AI for Air India flights). The then Minister, Civil Aviation had stated in Parliament on 2 March 2007 that the merged airline with one code was expected to be in place within 16 weeks. Further, the action plan for the merger indicated a timeline of August 2008 for integration of the reservation systems.

*However, there were enormous delays in implementing the single code passenger reservation system[29]. The contract for the upgradation of the existing Passenger Service Systems (PSSs) of the two airlines into a single code reservation system was awarded only in April 2010, and the single code reservation system was activated only in February 2011.*

Further, the integration of domestic flights into the PROS revenue management software, which was critical for efficient yield management, had still not taken place; this is described further in this report.

The Ministry in its reply (August 2011) stated that due to the complexities involved, the integration process was taken up in a phased manner and that the compliance of PSS related components is a time consuming process and the PSS had been put in place effective February 2011. Further, during the exit conference, the Ministry indicated that though the merger was to have been completed within 36 months, normally it takes 4-5 years period, which is the normal period by which such mergers are completed.

The reply is not tenable as the merger process was delayed and is yet to be completed even after 4 years. Further, the Ministry and AI should have framed realistic timeframes for merger, duly considering the experiences of mergers in the airline industry.

### 4.4.2 Membership of "Star Alliance"

In a dynamic and growing passenger air transportation industry, the pooling of the resources of multiple carriers in the form of airline alliances is considered to be of critical importance for several reasons:

---

[29] One reason for the delay was a vigilance complaint filed by an unsuccessful bidder, which resulted in detailed examination of the case by the Central Vigilance Commission (CVC).

- It helps to bring together networks, lounge access, check-in-services, ticketing, 'move under one roof' projects and a host of other services to improve the travel experience for the customer and efficiencies for the airlines.

- It also reduces the costs of individual airlines from economies of scale.

Consequently, one of the targeted objectives of the merger included easy entry into one of the three global airline alliances.

After paying an entry fee advance of € 5 million in June 2008, NACIL's entry into the Star Alliance was intended to take place in March 2009. The balance of € 5 million was required to be paid at the time of entry into the alliance. Out of the pre-requisites for joining the alliance (Minimum Joining Requirements – MJR), the most important requirement was a passenger reservation system with a single code for both the erstwhile airlines, which did not take place until February 2011. Since Star GmbH was not ready to extend the timeline for payment of balance 50 *per cent* joining fees beyond 30 June 2010, AIL paid the balance entry fee of € 5 million in 12 equal instalments from January 2010 to December 2010.

The Ministry stated (August 2011) the delay in joining Star Alliance was on account of large number of Minimum Joining Requirements (MJR) and the time consuming process involved, and this was likely to be fulfilled by 31 July 2011. In response to our requests for clarification during the Exit conference (August 2011)  as to the latest status of Air India joining Star Alliance, the Ministry informed that Air India had met 90 per cent of the requirements of the MJRs. Thus, as far as the Government was concerned, Air India was all set to join the Star Alliance.  The Ministry also clarified that they had received no formal communication about Air India having been denied entry into the Star Alliance and had, in fact, also learnt about this from the news reports in the press. The Ministry also stated that the decision of Star alliance to exclude AI would not have any major impact on AI's operations.

We do not agree. Setting aside the Ministry's obfuscation regarding the status of joining the Star Alliance, we believe that AI's not joining the Alliance in the near future could significantly affect its financial and operating performance on international sectors.

> *Even four years after the merger, AI is yet to join the Star Alliance, mainly due to the delay in setting up a single code passenger reservation system. In fact, as per the press release of 31 July 2011 available on the Star Alliance website, AI's application for membership of the Star Alliance has been "put on hold", and the integration of Air India into the global airline alliance "will be suspended". This raises the likelihood of indefinite delays as also serious uncertainties on AI's prospects for joining the alliance.*

### 4.4.3   Harmonization of Human Resources (HR)

> *Even at the time of the 'in principle' approval (March 2006) on working towards the merger, apprehensions with regard to HR problems due to the merger were expressed. These issues remain a critical impediment to the merger, and have still not been fully resolved.*

In January 2007, as directed by the GoM, MoCA held meetings (before the decision to merge) with the employee associations/ unions of the two airlines, where three key issues were highlighted:

- Pendency of wage revision of employees with effect from January 1997 in terms of DPE guidelines;

- Employees who joined the two airlines around the same time being in different positions/ grades, due to differences in promotion policy; and

- Spelling out the viability of Memorandum of Settlements, Agreements and Awards[30] pursuant to the merger.

While making assumptions on the merger process, the consultant (Accenture) clearly indicated that it would not provide advice, options or any other deliverables around areas concerning manpower rationalization, compensation, or restructuring of workforce. Consequently, HR integration was taken up internally, and an integration cell was set up only in September 2007.

> *HR integration below the level of DGM, representing 98 per cent of the staff, has still not taken place. Pay and allowances, seniority, promotions and transfers etc. had still not been harmonised. Consequently, Industrial Relations (IR) disputes have arisen. The key issue with regard to HR is not one of job security or protection of compensation/ perquisites, but one of perceived disparities between employees of the erstwhile separate airlines.*

 As an in-house exercise, incorporation of HR issues like service regulation, annual performance appraisal, recruitment and promotion is still ongoing, as also issues of seniority, compensation, union recognition etc are continuing. This is stated to be due to the financial condition of AI, since HR integration involves pay parity and thus substantial financial outgo.

In February 2011, during a meeting held by MoCA with the unions, there was a consensus on the appointment of an independent committee of experts from outside the organization who would impartially examine all the issues relating to service conditions, wage and allowances paid in the erstwhile entities, together with the requirement to harmonize/rationalize the same. It was envisaged that it would be linked to the best market practices, competition culture and performance parameters. This Committee has been constituted in May 2011 under the chairmanship of Justice Dharmadhikari.

The Ministry accepted (August 2011) the delay in HR integration and, during the exit conference indicated the steps being taken to integrate manpower. The fact remains that the delay in HR integration has significantly affected the completion of the merger.

---

[30] Both airlines had an age old system

### 4.4.4    Route Rationalisation and Network Integration

Consequent to the merger of erstwhile AIL and IAL, AI undertook re-structuring of operations between the networks of the erstwhile entities as under:

- Route rationalization by identifying overlapping operations between the erstwhile airlines in Middle East and East Asia was done in phases by end 2008;

- 'Through flight numbers' , which would improve AI displays on Global Distribution System (GDS) and thereby enhance sales, were given on a few routes[31];

- Network integration by matching the route potential and market requirements was done;

- Overlapping operations between erstwhile IA coded flights and subsidiary, AICL (IX coded) flights were removed/ minimized;

- A Strategic Group was formed (August 2008) by AI Board to consider various measures including analysing all routes, withdrawal / curtailment of services on routes not meeting cash costs, implementing cost reduction and revenue enhancement strategies in the short/ medium/ long term and evolving suitable turnaround strategy. During 2008-09 and 2009-10, loss making international and domestic services[32] were withdrawn, routes were restructured[33] to reduce costs/ losses, new routes/ capacity increase on international/domestic services[34] were implemented, hub at Frankfurt operationalised (due to absence of infrastructure for hub operations in India) for services between India and USA, and unproductive positioning legs on international services eliminated.

- Further, the launch of T-3 (Terminal -3) at New Delhi enabled AI to designate Delhi as the hub for integration of international and domestic operations and for providing convenient connections between international and domestic destinations with reduced connecting times.

> *We acknowledge the substantial efforts made by AIL towards route rationalization/ network integration. However, given its present critical financial position, AI needs to further endeavour to reap the synergy benefits in network integration.*

The Ministry's reply (August 2011) cited the efforts taken for route rationalization, which have already been acknowledged in the report.

### 4.4.5    Finance

Even after four years of merger, the erstwhile AIL and IAL (now termed internally as NACIL – wide body and NACIL – narrow body) have separate accounting package. A common

---

[31] Hyderabad-Mumbai-New York, Kolkata-Delhi-New York, etc.

[32] Delhi-Frankfurt-Los Angeles, Ahmedabad/ Kolkata-London, Mumbai-Nairobi, Mumbai-Bangalore-Dubai, Mumbai- Bangalore, Chennai-Mumbai, Mumbai-Baroda, Kolkata-Ahmedabad/Jaipur, etc.

[33] Chennai-Trichy-Calicut-Kuwait, Chennai-Kochi-Goa-Kuwait, Mumbai-Delhi-Lucknow, Mumbai-Kochi-Trivandrum etc.

[34] Bangalore-Male, Delhi-Kathmandu, Mumbai-Rajkot, Kolkata-Delhi, etc.

integrated ERP has still not been implemented, as AI kicked off the project work only in January 2011.

The Ministry replied (August 2011) that it took extra time due to the vast extent of accounts activities, and the new timeline for completion of ERP had been fixed as 31 March 2013. In our opinion, the timeline for implementation of ERP would be challenging, as the project work commenced only in January 2011

### 4.4.6   Synergy benefits not quantifiable

The original estimates of synergy benefit (Rs. 820 crore) were refined during the detailed design work by the consultant (Accenture), and the annualised estimates of revised synergy benefits projected were Rs. 996 crore. As against this, the actual accruals were to the tune of Rs. 503 crore till December 2008 (as claimed by Accenture in a presentation made in April 2009). Subsequently, the Management stated (March 2010) that the quantification of subsequent synergy benefits was practically difficult on stand alone basis because the benefits of network integration were the cumulative effect of many factors.

The Ministry reiterated (August 2011) the AIL Management's earlier reply (March 2010) in this regard.

## 4.5   MoCA's response

In February 2011, the Ministry stated that the merger process was examined in all aspects at various levels - by the Consultant (Accenture), the Ministry, the Minister, a Committee of Secretaries, a Group of Ministers (GOM) and the Cabinet of Ministers. This was, thus, a collective decision arrived at after multiple levels of due diligence.  MoCA claimed that integration had been completed in many areas like organisational structure and was under progress in many other areas like sales and marketing, IT, passenger service system, enterprise resource planning, property *etc.* However, the Ministry admitted that integration of HR policies had a financial outgo; the delay in harmonising was also due to critical financial condition being faced by AI and pay, allowances and career progression were governed by the agreements/settlements with various unions/associations of the two erstwhile companies.

The Ministry reiterated (August 2011) its earlier reply of February 2011 relating to merger and cited the progress made in HR integration, constraints in execution, etc. In our opinion, these difficulties, including the critical aspect on HR integration, should have been foreseen and planned in detail before the merger.

> *While we take note of the efforts being made by MoCA and AI for completion of the merger process, the process is still incomplete, despite lapse of four years from the merger (2007). In our opinion, this is largely due to lack of adequate validation of the financial implications of the merger, as well as inadequate appreciation of the difficulties in harmonizing human resources of the two airlines. Further, one of the biggest potential benefit of merger – viz. fleet integration – was not available, since the two airlines had just concluded huge and long drawn out fleet acquisition exercises independently.*

# Chapter 5    Role of MoCA

## 5.1   Air Service Agreements (ASAs)/ "Bilaterals"

### 5.1.1   Overview

The Convention on International Civil Aviation of December 1944, also known as the Chicago Convention, established the International Civil Aviation Organisation (ICAO)[35]. The Convention also established rules of airspace, aircraft registration and safety, and detailed the aviation rights of the signatory countries in relation to air travel.

International commercial aviation traffic rights are usually expressed as **"freedoms of the air"**, which constitute a set of commercial aviation rights granting a country's airline(s) the privilege to enter and land in another country's airspace. The convention officially recognises five freedoms. The first two freedoms viz.:

- 1st freedom – the right to fly over a foreign country, without landing there; and

- 2nd freedom – the right to refuel or carry out maintenance in a foreign country[36] on the way to another country

are covered by the International Air Services Transit Agreement (IASTA), which has been accepted by 129 countries (as of summer 2007).

The 3rd, 4th and 5th freedoms, described below, are negotiated between countries through Air Services Agreements (ASAs) (also referred to as "bilateral agreements").

*Table 5.1 – 3rd, 4th & 5th Freedoms of the Air*

| Freedom | Description | Example |
|---|---|---|
| 3rd | The right to fly from one's own country to another country | New Delhi – London for Air India |
| 4th | The right to fly from another country to one's own country | London – New Delhi for Air India |
| 5th | The right to fly between two foreign countries (and take and put down traffic) during flights, when the flight originates or ends in one's own country | New Delhi – London – New York and vice versa for Air India (5th freedom rights granted by UK) |

In addition to the first five freedoms, several other "freedoms" have been added, although most are not officially recognised under international bilateral treaties.

---

[35] A specialized agency of the United Nations charged with co-ordinating and regulating international air travel.
[36] i.e. for non-traffic purposes

In particular, 6th freedom – the right to fly from a foreign country to another foreign country while stopping in one's own country – has gained considerable importance. For example, the 6th freedom traffic of Emirates[37] involves flying passengers from India through Dubai (its home state) to UK/ USA. Many international airlines especially those operating from city states/ small states (e.g. Emirates/ Dubai; Qatar Airways/ Qatar; Cathay Pacific/ Hong Kong; Singapore Airlines/ Singapore) derive a large portion of their passenger traffic revenues from 6th freedom traffic.

Other unofficial freedoms include:

- seventh freedom (the right to fly between two foreign countries, while not offering flights to one's own country) e.g. Singapore Airlines flying directly from UK to USA;

- eighth freedom (the right to carry passengers between two or more points in a foreign country) e.g. British Airways flights from London carrying passengers between New York and Los Angeles in the USA;

- ninth freedom (the right to carry passengers within a foreign country without continuing service to or from one's own country) e.g. a foreign airline running "stand-alone" flights within France.

However, as of now, these 7th, 8th and 9th freedoms are generally only of marginal commercial importance.

### 5.1.2   ASAs/ Bilateral Agreements

Traffic rights for operation of international air services are specified through bilateral Air Service Agreements (ASAs, also referred to as "bilateral agreements" or simply "bilateral"). These ASAs or bilateral agreements are concluded bilaterally, usually on the basis of reciprocity and fair/ equal opportunity, and provide the legal framework for scheduled air services between two countries. Under these ASAs, traffic rights and capacity entitlements are exchanged between the countries on the basis of market requirements. The ASAs clearly specify the "entitlements" of the designated airline(s) of both countries in terms of frequency of operations, number of seats, points of call etc.

In recent times, the concept of "open skies policy", which permits unrestricted air services between countries with minimal government intervention, has gained some ground. The European Union – US Open Skies Agreement of March 2007 is a landmark in this direction. However, most other countries have bilateral agreements with regulated air services/ entitlements. Even the ASEAN Multilateral Air Services/ Air Freight Services Agreements of May 2009 call for a calibrated and gradual implementation to allow countries with less developed airline industries to cope with more developed ones.

Upto 2000, bilateral entitlements to/ from India were in line with end-to-end traffic projections based on 3rd and 4th freedom traffic – i.e. carrying passengers from the home country to another country and vice-versa; also, foreign carriers were restricted only to

---

[37] Also known by its airline code "EK"

major airports in India. During 2003-04, bilateral entitlements were liberalised, and foreign airlines were permitted to operate to "interior points" in India i.e. beyond the major airports.

### 5.1.3   Revised policy on "Utilisation of traffic rights on international routes" - December 2004

While approving the MoCA note on the ASA with Tunisia in September 2004, the Cabinet also directed that *"issues related to building up of the capacity both in the public and private sector for providing air services between India and other countries and optimal utilisation of such capacity"* should be examined and brought up before the Cabinet at an early date. In this context, MoCA moved a Cabinet note in December 2004 for "Utilisation of Traffic Rights on International Routes".

According to the MoCA:

- While bilateral air traffic rights on international routes between India and other countries were decided on the basis of reciprocity, at present, the actual utilisation of available rights on international sectors was highly imbalanced. While utilisation by foreign airlines was around 65 per cent, that of our airlines was only around 30 per cent; as a result, foreign airlines derived disproportionate economic advantage out of the traffic rights. Further, out of 100 countries with which India had ASAs, airlines of 51 countries operated to India, while Indian carriers operated only to 25 countries.

> **After the substantial increase in bilateral entitlements from 2004-05 onwards, the trend of imbalanced utilization of entitlements (with higher utilization by foreign carriers) continued. This was notwithstanding the permission granted to private Indian carriers to fly on international routes.**

- While Indian entitlements had remained grossly underutilised, there was a problem of inadequate capacity on most international routes from India, with passengers finding it difficult to obtain seats for nearly six months of the year. The Ministries of External Affairs, Tourism and Commerce, as well as trade, industry and tourism bodies had been reiterating the need to liberalise international air services so that seats were available to/ from India all through the year.

- Acknowledging the problem of serious capacity constraints on international routes during several months of the year, the MoCA had adopted a 'limited open sky' policy to cater to peak season requirements (which had expanded substantially from 2003-04 onwards), permitting designated airlines to operate unlimited number of services to their respective points of call for three to six months in a year.

- The bulk of the traffic rights were available with AIL (with IAL designated to operate to SAARC, Gulf and SE Asian countries and Jet Airways and Air Sahara designated to operate to some SAARC countries). However, traffic entitlements of foreign airlines had

to be progressively enhanced to meet the requirements of trade and tourism, on account of AIL's inability to utilise the entitlements.

The following aspects were considered for utilisation of traffic rights and build capacity on international services:

- **Strengthen AIL to enable it to utilise traffic rights on international routes**

  ❖ AIL would be approaching GoI in due course with its fleet acquisition project report (which would include additional infusion of equity and provision of GoI guarantee to the borrowings related to fleet acquisition); the proposal would be considered by GoI on merit.

  ❖ Also, it was proposed that traffic rights for AIL would be reserved in accordance with its operational plans for the next two years.

  ❖ The existing compensation being received by AIL (through Government-mandate commercial agreements with foreign airlines), may be allowed to continue, subject to review over the next five years.

- **Synergy between Air India and Indian Airlines on fleet and network utilisation**

  ❖ In view of IAL's request to operate more international routes, GoI needed to consider whether it would allow two of its PSUs to compete against each other on international routes (which would be to the detriment of both). On the other hand, from the shareholders' perspective, GoI might prefer better synergy and integration in the operations of AIL and IAL.

  ❖ MoCA referred to the study through the consulting firm (AT Kearney) commissioned jointly by AIL and IAL at MoCA's behest so as to achieve better operational integration between the two airlines. The study suggested that there was immense potential for value creation through collaboration on fleet and network between the two airlines, and suggested that improved collaboration between AIL and IAL would generate potential benefits of Rs. 340 crore for the GoI as the common shareholder (of which Rs. 238 crore could be generated through efficient network integration).

  ❖ Better synergy and operational integration between AIL and IAL would be a better strategy towards strengthening both the airlines and creating an appropriate hub and spoke arrangement within the country to make the best possible utilisation of traffic rights in the international sector; a win-win situation could be created for both airlines;

  ❖ In view of the above aspects, appropriate measures may be formulated and implemented by MoCA for establishing improved operational synergy between the two airlines for their mutual benefit.

*The fleet acquisition proposals for both AIL and IAL (not referred to in the MoCA note) were still in process as of December 2004. If indeed "operational synergy" between the two airlines was considered, we are unable to ascertain why the underlying assumptions behind the fleet acquisition proposals of AIL and IAL did not reflect proposals for such operational synergy, and also why a common fleet acquisition strategy (if not joint fleet acquisition) was not considered.*

*We are also unable to ascertain why the AT Kearney Study report of 2004, which found that there was "immense potential for value creation through collaboration on fleet and network between the two airlines" was not taken up again till March 2006 (just a few months after completion of independent aircraft acquisitions by both AIL and IAL), just before the "in principle view" of GoI in favour of the merger of AIL and IAL was taken.*

- **Allowing Indian scheduled carriers to operate on international routes.**

  ❖ Even if the proposals for strengthening AI and achieving better synergy between AIL and IAL were implemented, there would be a significant gap between our entitlements and actual utilisation of traffic routes (especially on major routes like USA, SE Asia and India-UK). As against this, the utilisation of rights on some major routes by foreign countries had been far higher, one factor being their policy to designate more than one airline to operate on international routes.

  ❖ Since most of the economic advantages during the open sky period go to airlines of other countries, there was enough justification and scope for designating more airlines of India to operate on international routes. This was also in line with the recommendations of the trade and industry bodies, Ministry of Tourism (MoT) and Ministry of Commerce & Industry (MoCI), the Naresh Chandra Committee, and an NCAER study commissioned by MoCA.

  ❖ More and more countries were moving in the direction of allowing more than one airline to operate on international routes. Consequently, it was felt that we would be in a position to more optimally utilise our traffic rights on international routes and rectify the imbalance by designating more airlines.

  ❖ However, a calibrated approach was recommended, to enable the national carriers to get time to adjust to the competitive environment, and Gulf routes were to be reserved for AIL and IAL for the next 3 years, while other Indian scheduled airlines were to be allowed to operate on all other international routes. Also, to eliminate "non-serious" operators, only Indian scheduled carriers with a minimum of five years continuous operation and having a minimum of 20 aircraft were to be allowed to operate on international routes.

  ❖ Due consideration was to be given to the operational plans of AIL/ IAL while allotting allotments to Indian scheduled carriers.

- **Commercial Agreements**

  ❖ Most of the commercial agreements were based on the premise that our airlines needed to be compensated for the unilateral operations by the foreign airlines, and that the foreign airlines were unduly benefiting by carrying **6th freedom traffic**; this may be difficult to enforce, once other Indian scheduled carriers were allowed to operate on international routes against our unutilised entitlements.

> *Interestingly, this is the only reference in the note to the fact that foreign airlines were unduly benefiting by carrying 6th freedom traffic.*

  ❖ Globally, it was not a normal practice to mandate commercial agreements during Government level talks, and it was left to the respective airlines to explore suitable co-operative arrangements that were mutually beneficial. Further, there were major inconsistencies in the terms of commercial agreements from country to country. Also, the fares charged by foreign airlines would be lower, if they were not required to provide compensation to the Indian national carriers, and many airlines and countries had represented against unreasonably high amounts of compensation, which were making it difficult to continue with their operations.

  ❖ Consequently, MoCA proposed that the practice of demanding compensation from foreign airlines by way of Government-mandated commercial agreements be discontinued henceforth; all new operations by foreign carriers would be free from such agreements, and all existing Government-mandated commercial agreements would be reviewed and phased out over the next five years.

> **Envisaged Benefits of Liberalised Policy**
>
> Four major benefits out of the proposed liberalised policy for utilisation of traffic rights were highlighted:
>
> - Passengers would have greater choice for international travel.
>
> - India's utilisation of traffic rights on international routes would improve.
>
> - Tariffs on international routes were likely to become more reasonable and affordable.
>
> - AI and IA would both gain by synergising their operations.

The proposal of MoCA on utilisation of traffic rights on international routes was approved by the Cabinet in December 2004, and guidelines for operation of Indian scheduled carriers on international routes notified by DGCA in January 2005.

> *In our view:*
>
> - *The proposal for allowing private Indian carriers to operate on international routes was justified on the grounds of "unutilised entitlements" on international routes. As detailed later, the justification of under-utilization of entitlements by AIL/ IAL was partially flawed. In the North American sector, utilisation by AI was substantially*

> *higher than that of foreign airlines, while utilisation by private Indian carriers was lower. It is only in the Africa, Asia, Soviet Region, and to an extent the Gulf sector, that there was significant under-utilisation by AI; in these regions, the utilisation by the private Indian carriers was also poor.*
>
> - *The benefit of the liberalised policy to Indian passengers in terms of choice for international travel, as well as lower tariffs, is noted. GoI could well have justified the grant of rights to private Indian carriers on account of the need for AIL/ IAL to move out of their protected environment and function in a competitive environment, which might have forced improvements in operational efficiency. However, this justification was not explicitly used.*
>
> - *The critical issue, that the MoCA note did not adequately address, is the "undue benefit" to foreign airlines by 6th freedom traffic; this is described in a later section.*

### 5.1.4   Impact of enhancement in capacity entitlements under "bilaterals"

#### *5.1.4.1   Background*

The key entitlements exchanged through bilateral agreements usually cover the following aspects:

### *Table 5.2 – Key terms of bilateral agreements*

| Capacity | Capacity is generally indicated in terms of seats/ week or frequencies/ week or a combination thereof, with some variations: |
|---|---|
| | - In the case of Singapore, the determined capacity also includes "units" (based on the type of aircraft deployed). |
| | - In an "open sky" bilateral agreement (e.g. India-USA), entitlements are unlimited (with no restrictions on seats/ frequencies etc.). In the "near open sky" agreement with UK, there is a restriction of frequencies only in respect of flights to/ from Mumbai/ Delhi airports, and unlimited entitlements in respect of all other airports. For ASEAN/ SAARC countries, India has an "open sky" policy for 18 tourist destinations. |
| | Generally, the capacity entitlements are reciprocal, with some minor variations. |
| Flexibility/ margin | Since sticking to the exact seat entitlements may not always be operationally feasible, the agreement may provide for flexibility or margin (typically 1 or 2 per cent) beyond the specified seat entitlements |
| Points of call | This indicates the points of call for the foreign carriers (i.e. Indian airports to which the foreign airlines can operate flights from/to) and points of call for the Indian carriers (i.e. foreign airports to which the Indian airlines can operate flights from/to). |

| | |
|---|---|
| **Traffic rights** | The bilateral agreement may or may not allow for 5th freedom ("beyond") rights for one or both parties with/ without restrictions. For example, the India-Singapore agreement includes Jakarta, Perth and Sydney as "beyond" points for Indian carriers i.e. Indian carriers can take passengers from Singapore to Jakarta/ Perth/ Sydney and vice versa. |
| **Seasons** | Different capacities could be specified for the summer and winter seasons or for specific seasons (e.g. summer 2009 or winter 2009/10). |

We conducted a review of bilateral liberalisation in respect of the following 18 countries from pre-liberalisation (2004) and post liberalisation (2008-09/ 2009-10):

*Table 5.3 – Region and Name of countries whose bilateral agreements reviewed*

| | |
|---|---|
| **Gulf/ Middle East** | Dubai (UAE), Oman, Kuwait, Bahrain, Qatar, Saudi Arabia |
| **Europe** | UK, Germany, France, Switzerland |
| **North America** | USA, Canada |
| **SE Asia and Oceania** | Singapore, Thailand, Malaysia, and Australia |
| **Africa** | South Africa and Mauritius |

Initially, the mechanism for determining exchange of traffic rights involved correspondence to ascertain the views of the relevant stakeholders (including AIL), before bilateral talks. Subsequently, a mechanism was evolved whereby, prior to bilateral talks, an inter-Ministerial Meeting (chaired by Secretary, Civil Aviation) was held with Ministries, such as External Affairs, Tourism and other relevant Ministries; eligible Indian carriers were also invited for their views. The bilateral talks themselves were generally documented in the form of minutes.


*5.1.4.2  Bilaterals in the Gulf Region*

The Gulf route is a major sector in India's outbound traffic, mainly consisting of migrant labour. A summary of capacity enhancement and points of call at the beginning of liberalization and as on 2008-09/ 2009-10 in respect of six nations in the sector, as well as a brief profile of utilisation of capacity entitlements by the Indian/ foreign carriers, is depicted below:

Performance Audit Report on Civil Aviation in India

**Table 5.4 – Summary of capacity entitlements (pre and post liberalisation) under bilaterals for Gulf countries**

| Country | Pre-liberalisation | | | Post-liberalisation | | | Remarks |
|---|---|---|---|---|---|---|---|
| | Year | Capacity Entitlements | Points of call (for foreign/ Indian carriers) | Year | Capacity Entitlements | Points of call (for foreign/ Indian carriers) | |
| Dubai (UAE) | 2003-04 | 10,400 seats/ week | 6 Foreign/ 1 Indian | 2008-09 | 54,200 seats/ week | 14 foreign/ 1 Indian | Dubai carrier's utilisation (98.5%); Indian carriers utilisation (45.9 %) |
| Oman | 2003-04 | 3774 seats/ week | 4 foreign / 2 Indian | 2010-11 | 11,550 seats/ week | 12 foreign/ 2 Indian | Oman carrier's utilisation (11,242 seats); Indian carriers (8447 – 9697 seats) in 2009-10 |
| Kuwait | 2003-04 | 5200 seats/ week | 5 foreign/ 1 Indian | 2007-08 | 12,000 seats/ week + 2% flexibility | 9 foreign/ 1 Indian | Kuwait carrier's utilisation (7880-10254 seats); Indian carriers (3863-4154 seats) in 2007-08 |
| Bahrain | 2003-04 | 11,186 seats/ week | 7 foreign/ 1 Indian | 2009-10 | 13,768 seats/ week | 9 foreign/ 1 Indian | This increase in allocation was despite the entire Gulf Air entitlement going to Bahrain, and the remaining shareholder countries getting their entitlements separately. |

Performance Audit Report on Civil Aviation in India

| Country | Pre-liberalisation | | | Post-liberalisation | | | Remarks |
|---|---|---|---|---|---|---|---|
| | Year | Capacity Entitlements | Points of call (for foreign/ Indian carriers) | Year | Capacity Entitlements | Points of call (for foreign/ Indian carriers) | |
| | | | | | | | Bahrain carrier's utilisation (11109-13071 seats); Indian carriers (2718-2396 seats) in 2009-10 |
| Qatar | 2003-04 | 2872 seats/ week | 5 foreign / 1 Indian | 2010-11 | 24,778 seats/ week | 13 foreign/ 1 Indian | This was apparently on political considerations. Qatar carriers' utilisation (18,140 -21,100 seats); Indian carriers (5294 – 4680 seats) in 2010-11 |
| Saudi Arabia | 2003-04 | 8500 seats/ week; 13 frequencies | 4 foreign/ 3 Indian | 2008-09 | 20,000 seat/ week; 75 frequencies | 8 foreign/ 3 Indian | Saudi carriers' utilisation (8333 – 12294 seats); Indian carriers (5955-9896 seats) in 2008-10 |

> *The above table clearly reflects huge increases in capacity entitlements on different sectors in the Gulf region. The utilisation of enhanced entitlements by the foreign carriers was almost invariably higher than that of the Indian carriers; a significant reason for this was 6th freedom traffic from India routed through these foreign countries to other destinations, and not merely "point-to-point" traffic.*

### 5.1.4.2.1  India- Dubai sector

As an illustrative case of the liberalisation of bilateral entitlements, a chronology of events relating to the Dubai sector, covering the period from May 2007 to March 2010, (when the seat capacity was increased from 18,400 seats/ week to 54,200 seats/ week and points of call in India were increased from 10 to 14), is summarised below:

*Table 5.5 - Chronology of enhancement of entitlements for capacity/ points of call for Dubai sector*

| Timeline | Event(s) |
|---|---|
| May 2007 | Bilateral entitlements were increased from 18,400 seats/ week to 21,950 seats immediately with further increases to 26,700 seats (winter 2007/08), 28,200 seats (summer 2008) and 29,100 seats (July 2008). |
|  | It was also agreed that due to the congestion at Mumbai resulting in non-availability of slots, the UAE airline (Emirates) would *"make best efforts to utilise the enhanced capacity at Mumbai, by upgrading the equipment on the existing frequencies to the extent possible."* |
| September/ October 2007 | Emirates filed a winter 2007 schedule for 28 services/ week to/ from Mumbai, against their existing operation of 19 services/ week, and indicated that despite best efforts to upgrade the aircraft, they were unable to do so due to non-availability of aircraft. Director of Regulations & Information (DRI), DGCA advised consideration of Emirates' request by MoCA, since the MoU did not put any definite cap on the number of frequencies. SO(A) recommended concurrence to the increase in frequency, which was approved by MoCA for the winter 2007 schedule. |
| December 2007 | Emirates requested upgradation of aircraft from 237 seater A-330 to 380 seater B-777 on 42 services during December 2007. DRI, DGCA indicated that while there was no justification for permitting Emirates' request, in view of the open sky policy during the peak season and "non-availability of seats to the travelling public", MoCA might like to consider the case. |
|  | JS(R), MoCA indicated that the Minister, Civil Aviation had discussed this case with him, and *"in view of the winter rush and problem of getting seats on the flights, it was felt that we may agree to the upgradation request"*. This was approved by the Minister. |

| Timeline | Event(s) |
|---|---|
| **January 2008** | SO(A) proposed that MoCA may agree to Kozhikode as an additional point of call for both Emirates (Dubai) and Air Arabia (Sharjah) on the ground of *"long pending demands"* from the Sharjah and Dubai CAAs and other requests, and that **this could be formalised through exchange of letters without holding bilateral talks.** Secretary, MoCA approved this proposal. |
| | **Kozhikode was approved as an additional point of call whereas Dubai remained the only point of call for Indian carriers.** |
| **March 2008** | Dubai CAA suggested bilateral talks for reviewing and increasing the existing entitlements and market access. DGCA indicated that the request of Dubai CAA for increase in capacity entitlements appeared to be justified, since the entitlements were being fully utilised by the designated airlines and the load factors were in the *"vicinity of 80% or so."* |
| | However, **AIL strongly recommended against the holding of bilateral talks and grant of additional opportunities to Emirates for at least one more year (till mid-2009)** on the following grounds: |
| | • Capacity entitlements under India/ Dubai bilateral had increased by nearly 60 per cent only 9 months ago, in addition to increases of 7,190 seats in respect of other bilaterals for UAE (excluding Dubai). |
| | • Emirates had a seat factor of 86.9 per cent (during April/ November 2007) but the Indian carriers seat factor averaged only 74.9 per cent (during January – December 2007)[38] which was essentially because the Indian carriers mainly carried 3rd/ 4th freedom traffic, while Emirates was able to carry large volumes of 6th freedom traffic between India and points beyond Dubai. 53 per cent of Emirates' carriage was mainly to/ from UK, Germany, USA, Qatar, Saudi Arabia etc. The adverse impact of Emirates' 6th freedom carriage on AIL's UK services was substantial. |
| | • The expected increase in capacity deployment by the Indian/ Dubai carriers would more than adequately meet market requirements till mid-2009, with likely situation of excess capacity. |
| | • With each tranche of additional capacity entitlements, Emirates would be able to further increase its 6th freedom carriage to/ from UK/ Europe/USA to the detriment of the Indian carriers, also adversely affecting AIL's plans to operationalise its Europen hub and increase capacity deployment to USA, Canada, UK and Europe. |
| | Despite AIL's reservations, SO(A) indicated that there was "merit in the case of considering bilateral talks" with Dubai, on account of the load factor of 80 per cent, and interest shown by private carriers. The proposal for holding bilateral talks was approved by the Minister. |

---

[38] Contrary to DGCA's claims of seat factors "in the vicinity of 80 per cent or so".

| Timeline | Event(s) |
|---|---|
| **April 2008** | To finalise the negotiating strategy, an "inter-ministerial meeting" chaired by Secretary, MoCA was held.  JS(R), MoCA highlighted the requests of Jet Airways, JetLite and Air Deccan for operations on this route. It was decided that India should "secure the traffic entitlements sought by our own carriers" over the schedules upto winter 2009-10 which would be in the interest of our own carriers and the travelling public.

*Thus, while the Cabinet approval of December 2004 was premised on allowing private Indian carriers to use unutilised bilateral entitlements, the above "negotiating strategy" was based on increasing bilateral entitlements so as to meet the requirements of the private Indian carriers.*

At the bilateral talks, the Indian side indicated that although the Indian carriers had 5th freedom rights beyond Dubai, they were not being utilised and "change of gauge"[39] could facilitate that. After negotiations, the two sides agreed to increase entitlements gradually to 39,200 seats (immediately, 48,200 seats (winter 2008/09), 51,200 seats (summer 2009) and 54,200 seats (winter 2009/10). The Indian request for a provision for "change of gauge" and Dubai's request for additional points of call (Amritsar, Mangalore, Pune, Trichy, Coimbatore and Goa ) were to be considered through correspondence. |
| **August/ September 2008** | Dubai CAA stated that they agreed to the proposal for change in gauge "in principle". However, due to acute infrastructural constraints at Dubai airport, they would "need to revisit the India proposal at a later date, once the facilities and infrastructure at the upcoming Jebel Ali Airport were more suitably geared and ready to accommodate such arrangements".

AIL indicated that:

- While Emirates was able to derive substantially greater traffic under the India/ Dubai bilateral (due to 6th freedom traffic and access to 10 points of call in India), Indian carriers were essentially carrying only 3rd/ 4th freedom India/ Dubai traffic. The "change in gauge" provision would enable Indian carriers to operate to Dubai from various points in India with smaller aircraft to feed larger aircraft beyond Dubai to points in Europe / North America.
- The infrastructure constraints at Dubai airport cited by Dubai CAA for change of gauge was only an excuse for completely denying Indian carriers an opportunity that Emirates had been enjoying for decades.
- Although during discussions in April 2008, the Dubai delegation had |

---

[39] "Change of gauge" enables airlines to manipulate capacity commensurate with traffic on different segments of a route. This could be implemented through change of aircraft (from smaller to bigger or vice versa) or change in number of frequencies. Through change in gauge, Indian carriers would be able to accumulate traffic from different parts of India and transfer it to separate, bigger aircraft (using Dubai as a hub) to USA/ UK/ Europe and vice versa.

| Timeline | Event(s) |
|---|---|
| | stated that the proposal was acceptable to them and would be confirmed after speaking to their higher authorities, subsequently – *perhaps because agreement had already been reached on the quantum of increase in capacity entitlements, and they were aware that non-acceptance of the Indian proposal re "change in gauge" would not be a breaking point for the talks* – they advised that they had not been able to contact their higher authorities, and the matter would be finalised through correspondence.<br><br>AIL therefore recommended that the Dubai CAA be advised to immediately accept the proposal for "change in gauge", while the request for additional points of call could be considered during the next round of bilateral talks (so as to bring pressure on the Dubai CAA). |
| **March 2009** | Dubai CAA reiterated that they would be in a position to provide Indian carriers with change of gauge facility at Jebel Ali Airport from later 2012 onwards (asking India for their "formulation" on change of gauge), and requested that initially 3 additional points – Amritsar, Mangalore, Trichy - be authorised for summer 2009 operations.<br><br>CMD, AIL wrote (March 3, 2009) to Secretary, on the basis of media reports of Fly Dubai announcing commencement of operators to Pune, Chandigarh, Amritsar, Jaipur and Goa (effective June 2009) indicating the following:<br><br>• India had access to only one point (Dubai), while the UAE carriers already had access to 10 points of call.<br><br>• During the April 2008 talks, the Dubai delegation had stated that while the Indian proposal for "change in gauge" was acceptable, they could not obtain the required approval from the higher authorities over telephone, and would do so on their return to Dubai. However, subsequently, the Dubai CAA had indicated that they would revisit the change in gauge proposal for Jebel Ali Airport (and not Dubai airport) between 2012 and 2018 (i.e. 4 to 10 years later).<br><br>• No additional points of call should be granted. If it became absolutely essential to consider grant of additional points, Dubai should not be granted access to Pune, Amritsar, Mangalore and Trichy, as Air India Express operated direct services to these points.<br><br>CMD, AIL again wrote (25 March 2009) to Secretary, MoCA, reiterating the above and indicating that access to 10 points of call in India had enabled Emirates to funnel traffic from different parts of India to various points in the world to the detriment of the Indian carriers. Grant of additional points of call would only strengthen Emirates' "hubbing" of Indian traffic over Dubai and should not be permitted. Further enhancement in the sector would result in similar requests from others and Dubai's request for holding bilateral talks in June/ July 2009 should not be accepted. |

Performance Audit Report on Civil Aviation in India

| Timeline | Event(s) |
|---|---|
| | On this letter, JS(P) indicated that "*because of Dubai's present precarious financial situation, the entire project at Jebel Ali is reportedly held up*" and suggested a wording to determine that the change of gauge facility "*is made available, say by 2010 at the present airport, but can be considered for Jebel Ali operations from 2012 or whenever ready*". After discussion with CMD, AIL and CMD, Air India Express, JS(S) proposed allocating Chandigarh and Lucknow – where there was little possibility of 6th freedom traffic. This was approved by the Secretary, MoCA. |
| | **Thus Dubai got two more additional points of call whereas Indian carriers got none.** |
| April/ May/ June 2009 | Dubai CAA reiterated their request for 6 additional points of call, and indicated their agreement in principle for change of gauge at Jebel Ali Airport from 2012. SO(A) proposed grant of Coimbatore and Goa as additional points of call and also sending the change of gauge formulation to Dubai for their consideration. This was approved by Secretary, MoCA. |
| | In response, Dubai CAA indicated that they would "revert in due course" on the Indian formulation for change of gauge, but asked for the other four additional points of call as well as 1300 additional seats to Kolkata. |
| | SO(A) proposed for accepting request for enhancement of entitlements to Kolkata (since it merely amounted to "*shifting of agreed enhancements from winter 2009/10 to summer 2010*") as well as a reminder to Dubai on acceptance of the change in gauge formulation. While Secretary, MoCA did not agree to advancing the winter schedule, Minister, CA indicated that "*JS(P) may discuss the entitlement issue with Secretary, CA and then put up*". JS(P) indicated that he had informed Secretary of Minister, CA's directions. |
| | **Coimbatore and Goa were approved as additional points of call in addition to 1300 additional seats to Kolkata whereas Dubai remained the only point of call for Indian carriers.** |
| August/ September 2009 | AIL again wrote to Secretary, Civil Aviation indicating that: |
| | • The grant of additional 4 points of call (Chandigarh, Lucknow, Coimbatore and Goa) would effectively result in substantial enhancement of bilateral opportunities for Dubai with no reciprocal benefits for the Indian carriers. |
| | • Since Jebel Ali Airport did not provide any connectivity and was not an airport to/ from which AIL would be operating, this effectively meant denial of the change of gauge facility. |
| | AIL recommended that Dubai CAA be advised that commencement of operations to the 4 additional points of call would be permitted only after change of gauge facility at Dubai Airport (and not Jebel Ali Airport) became available. |

| Timeline | Event(s) |
|----------|----------|
| **February/ March 2010** | On the request of UAE for re-allocation of capacity entitlements to allow for operation of Fly Dubai from/ to Chandigarh, Lucknow and Coimbatore, Secretary, MoCA wrote to the Principal Secretary to PM indicating that:<br><br>• In view of the over-capacity in the Indian market and Fly Dubai being a low cost carrier, this were likely to further depress fares and adversely affect Indian carriers and<br>• The request of Fly Dubai (commencing from Summer 2010) would be considered, but in a calibrated manner so as to minimise the impact on Indian carriers. |
| | **The proposal for allowing Fly Dubai to operate to/from Lucknow – for the time being was approved by the Minister, CA.** |

*The sequence of events clearly demonstrates the one-sided nature of benefits to Emirates/ Dubai (through enhancement of entitlements and additional points of call in India). Despite the repeated protestations of Air India on the lack of reciprocity and the funnelling of 6th freedom traffic by Emirates through Dubai from interior locations in India, even change of gauge facility at Dubai International Airport was not adequately pursued, nor linked to grant of additional benefits. This resulted in vague commitments for such facility, not at Dubai Airport but at the upcoming Jebel Ali Airport (an impractical option for AIL and other Indian carriers) and that too with distant timeframes between 2012 and 2018. Clearly, while the Dubai CAA actively protected the commercial interests of its airlines, MoCA failed to obtain appropriate quid pro quo.*

The progressive enhancement of capacity entitlements and additional points of call adversely affected AIL's operations to Dubai. During 2009-10, while the capacity deployed by Dubai carriers ranged from 48663 to 53664 seats/ week (98.5 per cent of entitlements), the corresponding capacity deployed by the Indian carriers ranged from 24916 to 25390 seats/ week (45.9 per cent of entitlement). AIL's deployment[40] accounted for just 9.7 per cent of the Indian deployment; during 2009-10, it achieved a PLF of 67.4 per cent and incurred an operating loss of Rs. 42 crore[41]. However, the adverse impact of the enhanced entitlements (through Emirates' 6th freedom traffic operations) on AIL's flights to USA/ UK/ Europe could not be quantified.

**In September 2006, PMO had forwarded two letters to MoCA from Shri Abani Roy and Shri Ajay Chakraborty, MPs. Shri Roy's letter referred to the policy under which the Gulf**

---

[40] Excluding operations of its subsidiary, AICL

[41] AIL's flights to Dubai started incurring operating losses from 2007-08 onwards (roughly coinciding with the substantial jump in seat entitlements/ points of call).

region had been reserved for PSU airlines for three years, and, as per the assurance given by the Hon'ble Minister (CA), this needed to be increased to 5 years. The file notings indicated that *"in the draft civil aviation policy….on Gulf routes, reservation of all traffic rights for AIL and IAL is proposed to be extended from 3 yrs to 5 yrs. There is no proposal to review these provisions"*, and suggested informing the PMO appropriately. However, the subsequent notings indicated that "OSD to MCA has conveyed that reply to PMO need not go." In fact, the reservation for AIL/ IAL continued only for 3 years i.e. till December 2007.

*Clearly, the Gulf sector was AIL/ IAL's most profitable international segment before the liberalised policy on bilateral entitlements. AIL repeatedly expressed strong reservations to MoCA against the proposals/ requests from Gulf countries for increase in seat entitlements as well as additional points of  call at interior locations in India. This was on the grounds that the existing capacity was well in excess of "genuine" / point-to-point traffic (i.e. 3rd/ 4th freedom traffic) and that these proposed increases largely reflected 6th freedom traffic, which would adversely affect AIL's performance not only on the Gulf sector, but also other sectors like UK/ USA/ Europe. Despite AIL's reservations, MoCA went ahead with massive increases in entitlements from 2004-05 onwards.*

### 5.1.4.3  European Region

Entitlements in the European sector were also enhanced substantially. A summary of the enhancements for UK, Germany, France and Switzerland is given below:

**Table 5.6 - Summary of capacity entitlements (pre and post liberalisation) under bilaterals for European Region**

| Country | Pre-liberalisation | | | Post-liberalisation | | |
|---------|------|---------------------|------------------------------------------|------|---------------------|------------------------------------------|
| | Year | Entitlements/ week | Points of call (for foreign/ Indian carriers) | Year | Entitlements/ week | Points of call (for foreign/ Indian carriers) |
| **UK** | 2003-04 | 16 frequencies + 3 extra (7600 seats) | 4 foreign/ 3 Indian | 2005-06 | 56 frequencies (Mumbai/ Delhi — London) + unlimited on other sectors | 7 foreign/ 6 Indian |
| **Germany** | 2003-04 | 12 frequencies. | 5 foreign/ 5 Indian | 2009-10 | 61/63 frequencies | 9 foreign/ 8 Indian |
| **France** | 2003-04 | 5200 seats/ week | 3 each | 2009-10 | 18375 seats/ week | 6 foreign/ 4 Indian |

| Country | Pre-liberalisation | | | Post-liberalisation | | |
|---|---|---|---|---|---|---|
| | Year | Entitlements/ week | Points of call (for foreign/ Indian carriers) | Year | Entitlements/ week | Points of call (for foreign/ Indian carriers) |
| Switzerland | 2003-04 | 5700 seats/ week | 3 each | 2009-10 | 5700 seats/ week | 4 foreign/ 3 Indian |

*Many of the European countries were the destinations for 6th freedom traffic from India through Gulf and other carriers. In addition, competition from other Indian carriers and national carriers of these European countries contributed to AIL's declining performance.*

### 5.1.4.4   North American Region

Upto 2003-04, the agreement with the USA allowed unlimited frequencies, with limits only on the points of call. In 2005-06, this was liberalised to unlimited points of call, which AIL was in favour of. In 2010-11, AIL's utilisation was 8120 – 6454 seats, and Jet Airways – 3556 seats; US carriers' utilisation was 7805 - 7679 seats.

In respect of Canada, upto 2003-04, the entitlement was for 2100 seats/ week + 2 services with two points of call each. This was increased in 2007-08 to 35 frequencies with 4 additional points of call each. In 2010-11, AIL's utilisation was 2394 seats, and Jet Airways – 1778 seats; the Canadian carriers' utilisation was nil.

*USA and Canada were also important destinations for 6th freedom traffic from India through other carriers; in our opinion, this contributed partly to the adverse performance of AIL on North American routes.*

### 5.1.4.5   South East Asia and Oceania Region

The liberalisation of entitlements in respect of the SE Asia and Oceania region is summarised below:

**Table 5.7 – Summary of capacity entitlements (pre and post liberalisation) under bilaterals for SE Asia and Oceania**

| Country | Pre-liberalisation | | | Post-liberalisation | | | Remarks |
|---|---|---|---|---|---|---|---|
| | Year | Entitlements | Points of call (for foreign/ Indian carriers) | Year | Entitlements | Points of call (for foreign/ Indian carriers) | |
| Singapore | 2003-04 | 23.05 units + 1650 seats + 5 unlimited frequencies to 18 points[42] | 6 + 18 Foreign/ 1 Indian | 2008-09 | 31.15/ 32.75 units + 1650 seats + 5 unlimited frequencies to 18 points) + 20.65 units | 7 + 18 Foreign/ 1 Indian | Singapore carriers' utilisation (22364-22121 seats); Indian carriers utilisation (13719-11456 seats) from 2008-09 |
| Thailand | 2003-04 | 9895 seats/ week | 8 foreign/ 2 Indian | 2007-08 | 23,609 seats/ week (+2745) | 8 + 18 foreign/ 3 Indian | Thai carriers' utilisation (13325-12955 seats); Indian carriers utilisation (7818-9065 seats) during 2007-09 |
| Malaysia | 2003-04 | 7000 (+ 1500) seats/ week | 6 foreign/ 3 Indian | 2007-08 | 22531 seats/ week | 6 + 18 foreign/ 6 Indian | Malaysian carriers' utilisation (10161-10003 seats); Indian carriers' utilisation (5557-4129 seats) from 2008-09 onwards |

---

[42] These 18 tourist destinations were separately identified for unlimited flights from ASEAN and SAARC countries

Performance Audit Report on Civil Aviation in India

| Country | Pre-liberalisation | | | Post-liberalisation | | | Remarks |
|---|---|---|---|---|---|---|---|
| | Year | Entitlements | Points of call (for foreign/ Indian carriers) | Year | Entitlements | Points of call (for foreign/ Indian carriers) | |
| Australia | 2003-04 | 2100 seats/ week | 3 points each | 2009-10 | 8531 seats | 5 points each | Australian carriers utilisation (711-891 seats); Indian carriers (under CSA[43]) 355 seats in 2009-10 |

[43] CSA- Code Share Agreement

> *SE Asian carriers (notably from Thailand, Malaysia etc.) were again important 6th freedom traffic carriers, who were benefited considerably by the substantial increase in capacity entitlements.*

### 5.1.4.6   Africa Region

We reviewed liberalisation of bilateral entitlements for two countries – South Africa and Mauritius:

- In the case of South Africa, entitlements were increased from 14 frequencies and 3 points of call each to 28 frequencies and 6 points of call each in 2008-09. AIL did not operate any flights to South Africa

- In the case of Mauritius, entitlements were increased from 4 frequencies and 3 points of call (for foreign airlines) to 14 frequencies and 4 points of call (for foreign airlines). AIL did not operate flights to Mauritius.

### 5.1.5   First Right of Refusal

As part of the liberalised policy for bilateral entitlements, it was noted that *"due consideration would be given to operational plans of Air India/Indian Airlines before allotting entitlements to other Indian carriers"*; it is not clear whether this wording actually amounts to a "First Right of Refusal" in the strict sense of the term.

Accordingly, the requests by the other Indian carriers for operations on international sectors are forwarded by MoCA to AIL for its comments. We reviewed thirteen requests pertaining to proposed international operations of Jet Airways, etc. forwarded by the MoCA for AIL's comments.

- In many cases, AIL was in agreement with the requests, when unutilised entitlements were available for use by other Indian carriers.

-  However, in some cases of proposed operations by the private carriers on their own/ through code sharing arrangements, AIL expressed its reservations, stating that the capacity deployed in the market was more than the existing genuine market requirement, and that further addition of capacity would result in slump in individual market share, reduction in seat factor, dilution of yields, affect the profitability of the routes and were thus not in the best interests of the national carrier.

Further, AI Management stated (May 2011) that in many cases in the past, MoCA had not sought the views of AIL, when the Indian private carriers had "filed" for their additional operations.

> *While AIL would, no doubt, be expected to try to protect its commercial interests, in our view, the liberalised policy merely allows AI to have the first right to utilise the*

*entitlements. This does not necessarily extend to restricting deployment of private carriers, as there was already adequate capacity.*

*The general problem of severe competition on account of 6th freedom carriers is, of course noted. The other problem that AIL had with code sharing arrangements of private Indian carriers (apart from domestic code share rights not being specifically exchanged under bilateral agreements) was that it was unable to offer its own domestic network for code share, due to non-availability of a single code reservation system. As pointed out in an earlier section, had AI joined the Star Alliance in a timely manner, it could have reaped the full benefits of such code sharing.*

### 5.1.6   Commercial Arrangements

The exchange of bilateral opportunities is generally based on the principle of fair and equal opportunity and balance of benefits to the airlines of the two countries. In case of inequality of benefits due to unilateral operations and or imbalanced operations by foreign carriers, the inter-governmental ASA/ Memorandum of Understanding (MoU) generally require such unilateral/ imbalanced operations/ imbalance in points of call/ benefits derived by the airline of one side perceived to be substantially larger than those of other side, to be covered by Commercial Arrangements between the designated airlines of the two sides. Such Commercial Arrangements are in several forms:

*Table 5.8 – Types of Commercial Agreements*

| | |
|---|---|
| **Pool Agreements** | Under this arrangement, airlines of both sides are operating and the revenues earned by the airlines are pooled and shared in a pre-determined ratio, subject to ceiling. |
| **Joint Venture Agreements** | Under this arrangement, the flights are operated by one airline (operating airline) while the capacity is sold by the airlines of both sides under joint flight number. The net revenues (after reckoning costs) are shared equally between the airlines, subject to minimum guaranteed return payable by the operating airline to the other airline. |
| **Compensation Agreements** | An arrangement under which the operating airline pays a pre-determined compensation to the airline of the other side. |
| **Code Share/ Block Space Agreements** | An arrangement under which flights are operated by one airline (operating airline) and the other airlines (participating/marketing airline) obtains seats (fixed block or free sale) from the operating airline and sells this capacity as its own flight under its own reservation system. The revenue generated by sale of these seats on such flights in excess of the agreed seat price is retained by the marketing airline. |

AIL had concluded Commercial Arrangements/ Agreements with 20-26 foreign airlines operating into India which enabled AIL to earn revenues without operating the routes.

These ranged from Rs. 200-500 crore during 2001-10; such Government-mandated commercial agreements were phased out after December 2009, while in respect of smaller airlines (with 7 flights or less), these were phased out from January 2008 itself.

### 5.1.7   Joint Position Paper on Bilateral Rights

In February 2011, the representatives of three major airlines – Jet Airways, Kingfisher Airlines and Air India – put forth a joint position paper on the bilateral rights exchanged in the recent past[44] for the Confederation of Indian Industry (CII)'s National Committee on Civil Aviation. The main findings of the three airlines were as follows:

- The traffic rights exchanged under bilateral agreements are already far in excess of the true 3rd/ 4th freedom market requirements in respect of several countries. As a result, in most of the cases, the capacity deployed under the bilateral is also in excess of the market requirements.

- The capacity entitlements under various bilateral during the period from January 2004 (pre-liberalisation) till March 2010 had increased by 282 per cent[45]. Further, many foreign carriers had also been granted access to a large number of interior points in India, resulting in negating the home country advantage for Indian carriers.

- Since the available entitlements are far in excess of the true 3rd/ 4th freedom traffic potential, this has encouraged the mega carriers to carry significant volume of 6th freedom traffic to/ from India. The grant of access to interior points has further increased the 6th freedom component of the carriage by these mega carriers, as the 3rd/ 4th freedom potential from these interior points is generally quite low. These interior points with low potential should ideally be served by the home country carriers over their hubs.

- **The grant of access to a large number of interior points in India, coupled with the grant of capacity entitlements far in excess of true 3rd/ 4th freedom market situation has resulted in a situation where the foreign carriers are funneling Indian traffic over their hubs i.e. outside India.** This has adversely affected the growth of strong hubs in India to the detriment of the Indian carriers (both for domestic and international operations), Indian airports and other agencies involved in the civil aviation industry.

- **In terms of volume, the 6th freedom carriage to/ from India by Emirates (EK) is the highest – 2.4 million passengers (59% of its traffic).** Even Air Arabia, a low cost carrier which is supposed to work on the model of point-to-point sale, had 43% 6th freedom traffic.

- Since the increased entitlements were granted even before the Indian carriers had a proper hub airport, foreign carriers' operations from most of their countries are already much more than the Indian carriers' operations, pre-empting the Indian carriers from expanding their operations in these markets. It is because of such pre-emption and excess entitlements exchanged that the utilization of entitlements by the Indian carriers

---

[44] The views expressed in this position paper of February 2011 had largely been highlighted earlier by AIL in a detailed letter to MoCA in April 2010, but to no avail.

[45] The actual increase in capacity entitlements is even higher due to lack of quantification/ partial quantification in respect of USA, UK and ASEAN/ SAARC.

appears to be low.

Consequently, they recommended the following measures:

- Entitlements should be rolled back, commensurate with true 3rd/ 4th freedom market requirement for Gulf (Bahrain, Qatar, Abu Dhabi, Sharjah, Dubai), Asia (Hongkong, Malaysia, Singapore, Thailand), Russia, and Europe (France, Germany and Netherlands).

- Entry to a foreign carrier to interior Indian points should be restricted, and access to numerous points under bilateral be withdrawn. In other cases, no increase in capacity entitlements/ traffic rights should be exchanged for the next five years, except where entitlements are less than the 3rd/ 4th freedom market requirement (based on Origin/ Destination data).

- Even if there is significant traffic potential from a point of call in India to another country, before granting access, it must be considered if the Indian carriers are already providing enough capacity.

### 5.1.8   Overall Impact of Enhanced Capacity Entitlements and Position of 6th freedom carriage

The capacity entitlements given to both the foreign and Indian carriers under Bilateral Agreements between India and other countries during the period from July 2004 to July 2010 had increased from 51.1 million to 180.48 million seats (two way) per annum representing an increase of 253.18 per cent. The increase in seat capacity entitlements ranged between 100 to 700 *per cent* for Gulf nations, 100 to 200 *per cent* for South East Asia nations, and 200 to 400 *per cent* for European nations. On account of the liberalised bilateral entitlements, leading international carriers increased coverage and frequency to major cities as well as interior points in India. There was also increased capacity deployment by competitor airlines to/ from interior points in India.

The details of the passenger carriage of the traffic from/ to India during the period 2009-10 by some of the airlines of the Gulf, South East Asia, Europe and North American nations as well as the 6th freedom traffic carried by these airlines are depicted below:

*Table 5.9 – Break-up of passenger traffic to/ from India during 2009-10 carried by leading international airlines into 6th freedom traffic/ "point-to-point" traffic*

| Name of foreign airline | Total passengers (in lakh) carried from/to India | "Point-to-point" passengers (in lakh) carried from/to India | 6th freedom passengers (in lakh) carried from/to India | Percentage of 6th freedom carriage |
|---|---|---|---|---|
| *A. Gulf Region* | | | | |
| Emirates  (UAE) | 39.91 | 16.35 | 23.56 | 59 |
| Jazeera       Airlines | 12.14 | 6.87 | 5.27 | 43 |

Performance Audit Report on Civil Aviation in India

| Name of foreign airline | Total passengers (in lakh) carried from/to India | "Point-to-point" passengers (in lakh) carried from/to India | 6th freedom passengers (in lakh) carried from/to India | Percentage of 6th freedom carriage |
|---|---|---|---|---|
| (Kuwait) | | | | |
| Qatar Airways | 9.54 | 2.12 | 7.42 | 78 |
| Oman Air | 9.36 | 5.37 | 3.99 | 43 |
| Gulf Air (Bahrain) | 6.58 | 1.38 | 5.20 | 79 |
| Etihad Airways (Dubai/ UAE) | 4.77 | 1.25 | 3.52 | 74 |
| Kuwait Airways | 4.76 | 2.85 | 1.91 | 40 |
| Total | **87.06** | **36.19** | **50.87** | **58** |
| B. South East Asia Region | | | | |
| Thai Airways | 10.14 | 6.24 | 3.90 | 39 |
| Singapore Airlines | 9.99 | 5.11 | 4.88 | 49 |
| Cathay Pacific | 9.58 | 2.31 | 7.27 | 76 |
| Sri Lankan | 7.02 | 3.82 | 3.20 | 46 |
| Malaysian Airlines | 5.42 | 3.17 | 2.25 | 42 |
| Total | **42.15** | **20.65** | **21.50** | **51** |
| C. Europe Region | | | | |
| Lufthansa | 11.37 | 1.49 | 9.88 | 87 |
| British Airways | 9.83 | 3.81 | 6.02 | 61 |
| Air France | 4.21 | 1.14 | 3.07 | 73 |
| KLM (Netherlands) | 3.17 | 0.76 | 2.41 | 76 |
| Swiss | 2.03 | 0.75 | 1.28 | 63 |
| Austrian | 0.97 | 0.14 | 0.83 | 86 |
| Total | **31.58** | **8.09** | **23.49** | **74** |
| D. North American Region | | | | |
| Continental | 3.36 | 3.14 | 0.22 | 7 |
| American Airlines | 1.60 | 1.49 | 0.11 | 7 |
| Delta | 1.13 | 1.10 | 0.03 | 2 |
| Northwest | 0.52 | 0.34 | 0.18 | 34 |
| Total | **6.61** | **6.07** | **0.54** | **8** |

*(Source: Joint Position paper on Bilaterals by AIL, Jet Airways and Kingfisher submitted to the CII National Committee on Civil Aviation in February 2011)*

> *As can be seen above, the 6th freedom traffic from/ to India was largely captured by Emirates, Jazeera Airlines, Qatar Airways, Thai Airways, Singapore Airlines, Lufthansa, British Airways, Cathay Pacific, Continental, Northwest etc.  The 6th freedom carriage by the foreign carriers to their total carriage from/ to India ranged from 40 to 79 per cent (Gulf carriers), 39 to 76 per cent (South East Asia carriers), 61 to 87 per cent (European carriers) and 2 to 34 per cent (North American carriers). The enhancement of capacity entitlements enabled foreign carriers to carry 6th freedom traffic, which could otherwise have been carried by AIL and other Indian carriers.*

Further, as a consequence of the liberalised bilateral rights extended by MOCA, the private Indian carriers significantly ramped up their operations, and were granted permission to operate on international routes. The share of private Indian carriers increased substantially vis-à-vis the national carriers as summarized below:

### Table 5.10 - International passenger traffic (in lakh) carried to / from India on scheduled services of selected Indian carriers

| Year | IAL | AIL | Jet Airways | Jet lite |
|------|-----|-----|-------------|----------|
| 2004-05 | 16.77 | 31.05 | 1.21 | 1.04 |
| 2005-06 | 19.57 | 30.96 | 4.41 | 1.83 |
| 2006-07 | 22.55 | 31.42 | 8.25 | 2.58 |
| 2007-08 | 24.40 | 29.59 | 16.40 | 1.74 |
| 2008-09 | 21.33 | 22.49 | 31.07 | 1.95 |

In the response provided by AI (December 2009) to audit enquiries to MOCA, AI indicated that the liberal policy adopted by the GoI had resulted in overcapacity on both domestic and international markets, leading to lower occupancy factors and lower yields and heavy cash losses to Indian domestic and international carriers. Further, the Indian private carriers only introduced services to markets that had already been served by AI; this defeated the purpose of policy aimed at increasing air connectivity to/ from India, and adversely affected AI's occupancy factors and yields.

> **The issue regarding 6th freedom traffic has been repeatedly raised by AI, and to an extent also by other private Indian carriers. Considering the fact that the data depicted in the preceding tables in para 5.1.8 could have been easily collected by MoCA/ DGCA, it is not understood as to how such an obvious issue was largely ignored or not addressed in the file notings of MoCA, which has resulted in very adverse impact on Indian carriers.**

*The position paper of February 2011 of the three leading Indian international carriers – AI, Kingfisher and Jet Airways – only serves to confirm the serious problems with huge expansion of bilateral entitlements in respect of several countries (notably in the Gulf, SE Asia and Europe). This has facilitated several foreign airlines (predominantly Emirates) in tapping the vast Indian market and funnelling such traffic over their hubs (Dubai etc.) to various destinations in the USA, UK, Europe and elsewhere, through what is termed as "6th freedom traffic". Although the bilateral agreements do not explicitly provide for exercise of 6th freedom rights, the entitlements exchanged are vastly in excess of "genuine" or point-to-point flying requirements between the two countries (termed as 3rd/ 4th freedom traffic based on Origin- Destination data) and implicitly allow "mega-airlines" with giant hubs to exploit 6th freedom traffic. In fact, the advertising campaigns run by many of these airlines make this intent clear. The notings on MoCA files while processing proposed entitlement liberalisation referring to the demand from the "labour class/ working class" Indians for more seats to/ from India (as projected by several agencies – MEA, Ministry of Tourism, MoCI), are, in a sense, misleading, since the "labour class/ working class" Indians would be interested only in point-to-point connectivity (largely to the Gulf/ Middle East), and not 6th freedom traffic (i.e. flights to UK/ USA/ Europe etc.)*

*While it is expected that the Indian scheduled carriers would try to protect their commercial interests to the extent possible (and lesser competition from foreign airlines would help them), the clear issue is one of a lack of a level playing field for AI (and other Indian airlines) before facing fierce competition. It is certainly not our case that AI should benefit from a protected environment, cloistered from competition from foreign airlines (and other Indian carriers), especially in the current era of economic liberalisation. However, the timing of the liberalisation of bilateral entitlements (notably the Gulf/ SE Asia/ Europe) from 2004-05 onwards left much to be desired:*

- *The delivery of AIL/ IAL's new fleet acquisitions (approved by GoI in later 2005) was scheduled only between 2006 and 2010[46]. Giving a reasonable timeframe of 2 or 3 years post- aircraft delivery for stabilisation of the expanded "footprint" could have provided AIL/ IAL a "level playing field" for competition.*

- *It is only now (November 2010 onwards) that India finally has an international class airport at Delhi (T-3) capable of large scale hub and spoke operations (domestic/ international and international/ international); large scale development of other international airports in India facilitating hub and spoke operations (at the minimum where domestic and international terminals are co-located) will follow later. Again, giving a reasonable timeframe of 2 to 3 years after full-scale operationalisation of Delhi T-3 would have provided a level playing field to all Indian airlines (not just AIL/ IAL) to take on the mega carriers specialising in 6th freedom traffic.*

---

[46] Further delays in delivery of B787-8 dreamliner aircraft obviously could not have been foreseen, and considered.

- *Even the request of AIL in 2008 for deferral of further enhancement in entitlements to Dubai by just one year (to mid-2009) was not considered by MoCA, while agreeing to exchange of enhanced entitlements.*

- *Many of the small states in the Middle East have only one (or in a few cases two major airports or "points of call") to offer, while the vast Indian market has numerous attractive interior locations with good commercial potential. The element of "reciprocity" or "give-and-take" in exchange of bilateral entitlements, except to an extent in the cases of Qatar (which was apparently guided by politico-economic considerations) could not be verified by us.*

- *While Dubai Airport is a major hub for 6th freedom traffic by Emirates Airlines, India could not obtain firm and immediate commitments from Dubai for "change of gauge" facility at Dubai Airport, which would at least have provided an opportunity for Indian carriers to funnel traffic in smaller capacity aircraft from interior Indian locations and take them onward to UK/ USA/ Europe and other destinations in larger capacity aircraft. Instead, the Dubai Government refused to make commitments in respect of their main airport (Dubai Airport) and only made vague commitments in respect of the upcoming Jebel Ali International Airport (which is, currently, mainly a cargo airport and is quite distant from Dubai Airport) and that too with distant timeframes between 2012 and 2018. Clearly, while the Dubai Government clearly protected the commercial interests of its airlines, MoCA failed to obtain adequate "quid pro quo".*

*Thus, while the liberalised policy towards bilateral entitlements benefited the Indian traveller considerably in terms of choices (and lower tariffs), the timing of the liberalisation (given the timing of AIL/ IAL aircraft acquisition, upgraded Indian airport with infrastructure with hub-spoke capabilities etc.) did not provide a level playing field to AI (and to a lesser extent other Indian private airlines). At this stage, Indian carriers will have to tackle renewed and serious challenges to compete effectively with established international "mega carriers" specialising in 6th freedom traffic.*

*However, this should not be considered as the only major reason for AI's difficulties in competing with other international airlines; AI's serious and chronic operational deficiencies (which are described elsewhere in this report) have also affected its ability to compete effectively.*

### 5.1.9    MoCA's response

The Ministry's response (August 2011) as well as its stand at the Exit Conference (August 2011) is summarised below:

- They explained the larger role they played in addressing public interest, connectivity, safety etc. rather than just being the owner of the national carrier. Negotiations on bilaterals were held between the respective governments.

- The interest of the national carriers (AIL and IAL) was protected in the Gulf Region for three years, and also by way of extension of commercial arrangements for five years. Further, reciprocity and Air India's interest were always kept in view while deciding on bilateral rights.

- Regarding 6th freedom, the Ministry stated that this freedom was not given, but it flows as an unintended benefit from the 3rd and 4th freedoms. Further, they were in possession of documents wherein other Indian carriers had, on record, stated that they were not concerned with 6th Freedom. Also, Indian carriers were using 6th freedom to carry passengers to and from Nepal and Bangladesh.

- On the Dubai Sector, the Ministry explained that the 14 points of call in India had been given so as to provide better connectivity, on the request of the public, trade, people's representatives and workers and executives going abroad for work. Audit's recommendation of a possible roll-back could not be implemented. Further, Dubai was the largest market on the basis of 3rd / 4th freedom traffic, and AIL/ Indian carriers flew maximum flights from our cities to Dubai. The added advantage of using 5th freedom rights from Dubai and beyond for Indian carriers had not been covered by audit. The Government, suo-moto, tried to get change of gauge in the agreement, without any such demand coming from any Indian carriers.

- AIL had been granted the first right of refusal routinely. MoCA, however, based on the genuine intention of AIL, had been taking decisions in the interest of public.

- Regarding the CII Joint Position Paper authored by Kingfisher, Jet Airways and Air India and referred to in the draft Audit Report, the Ministry stated that this Joint Position Paper was not an official document, and was not available on Government record. Further, the chairman was the owner of a major airline. Therefore, it should not have been used in the Audit Report. According to them, the recommendations, conclusions drawn and figures pinpointing numbers to various airlines by the joint paper were thus of dubious veracity. However, they failed to provide alternate data, or indicated details of why the data was 'dubious'.

- While accepting the observation that the Indian carriers could not get the benefit of 6th freedom traffic due to the constraint of not having hubs in India facilitating transfers between domestic and international flights, the Ministry stated that they had to give priority to the interest of the general public over that of the airlines and that the Indian

carriers were not able to cater to many destinations, which were catered to by the foreign airlines. Thus, 6th freedom was inevitable, though this was not given expressly.

- The Ministry, however, agreed to streamline the bilateral policy and stated that they were working on a manual for bilaterals.

We do not agree with the Ministry's response for the following reasons:

- The 'unintended benefit' of 6th freedom traffic arose primarily on account of huge and generous expansion of entitlements by MoCA, without due consideration of 3rd and 4th freedom traffic from and to India. As pointed out in this report, the timing of such expansion, considering the constraint of hubs and delayed fleet acquisition by IAL/ AIL, did not provide for a level playing field for AI, and to an extent, other Indian carriers.

- The interests of the national carriers were not adequately protected. Such massive expansion of bilateral entitlements, well beyond 3rd/ 4th freedom traffic, did not amount to reciprocity, when AI made no requests for such increased entitlements for flying to other sectors. The requests of AI for reciprocal treatment, especially with reference to Dubai, were not appropriately addressed.

- The CCEA note of December 2004 for allowing private carriers to fly on international routes included just one incidental reference to 6th freedom traffic. In fact, while the note suggested allowing private carriers to avail of "unutilised entitlements", the negotiations with Dubai for enhanced entitlements was specifically premised on meeting the requirements of the private Indian carriers.

- The Ministry's claim that they had taken up the request for change of gauge at Dubai suo-moto is factually incorrect, as this had been specifically highlighted by AIL in numerous letters in 2008 and 2009 (highlighted in Table 5.5). In fact, the Ministry did not make adequate efforts to link the change of gauge with grant of additional points of call and enhanced capacity entitlements.  As regards exploitation of 5th freedom rights by Indian carriers, during the Dubai bilateral talks of April 2008, the Indian side had specifically highlighted the fact that although the Indian carriers had 5th freedom rights beyond Dubai, they were not being utilized and change of gauge could facilitate that.

- As regards the data of "dubious veracity" indicated in the Joint Position Paper on Bilateral Rights prepared jointly by Air India, Jet Airways and Kingfisher for the CII National Committee on Civil Aviation, as well as the lack of available valid data on 6th freedom traffic as well as 3rd/ 4th freedom traffic, we noted that AIL had repeatedly quoted detailed statistics (in particular, in November 2008 and in April 2010) of 6th freedom carriage by other foreign airlines with regard to enhanced entitlements. In fact, the notings on the Ministry's files relating to examination of Dubai bilaterals have at no point of time stated that such data quoted by AIL was not valid, or was of dubious quality. Clearly, the Ministry's response is an after-thought.

A summary comparison of data indicated in the Joint Position Paper and AI's letters of November 2008 and April 2010 to MoCA reveals the following position:

### Table 5.11 - Data relating to 6th freedom carriage by the major airlines (in percentage)

| | Data as per | | |
|---|---|---|---|
| Airline | AIL | | Joint position paper |
| | November 2008 | April 2010 | February 2011 |
| Emirates | 51 | 56 | 59 |
| Gulf Air | 85 | 79 | 79 |
| Etihad Airways | 67 | 66 | 74 |
| Oman Air | 36 | Not Available | 43 |
| Kuwait Airways | 41 | Not Available | 40 |
| | | | |
| Thai Airways | 46 | 39 | 39 |
| Singapore Airlines | 53 | 47 | 49 |
| Malaysian Airlines | 44 | Not Available | 42 |
| Cathay Pacific Airlines | 53 | 72 | 76 |
| | | | |
| Lufthansa Airlines | 75 | 81 | 87 |
| British Airways | 49 | 48 | 61 |
| KLM Airlines | 76 | 69 | 76 |
| Air France | 59 | 67 | 73 |

*Source: AIL's letters to MoCA dated 19 November 2008, 13 April 2010 and joint position paper submitted to CII dated 7 February 2011.*

Clearly, the trends indicated in AI's letters to MoCA and the Joint Position Paper were broadly consistent, in fact, showing a distinct increasing trend from 2008 to 2011 in many cases and can, by no means, be dismissed peremptorily as "dubious data".

## 5.2 MoCA's monitoring of performance of AIL, IAL and AI through MoUs

The annual MoU between the administrative Ministry of the GoI and the management of the Central Public Sector Enterprise (CPSE) is intended to be a performance monitoring tool for evaluating the performance of the CPSE at the end of the year with reference to the targets fixed at the beginning of the year. As per the guidelines of the Department of Public Enterprises (DPE), the performance evaluation has both 'financial' and 'non-financial parameters' having weightage of 50 per cent each. The non-financial parameters are further divided into dynamic parameters (30% weightage), enterprise specific parameters (10% weightage) and sector specific parameters (10% weightage).

The Ministry in its reply (August 2011) accepted the audit comment and stated that the MoU has been overhauled and an entirely new MOU with fresh parameters has been drawn up.

### 5.2.1  Lack of Correlation between MOU Ratings and Financial Performance

A review of MoU ratings by DPE with composite scores of AIL, IAL and NACIL based on 1989-2008 audited data revealed the following position:

*Table 5.12 – MoU ratings of AIL, IAL and NACIL/AI*

| Year | Air India Ltd. (AIL) | Indian Airlines Ltd. (IAL) | AI |
|------|----------------------|----------------------------|-----|
| 1989-90 | Good | NS/ NE[47] | - |
| 1990-91 | NS/ NE | NS/ NE | |
| 1991-92 | NS/ NE | NS/ NE | - |
| 1992-93 | Very Good | Poor | - |
| 1993-94 | Excellent | NS/ NE | - |
| 1994-95 | Fair | Excellent | - |
| 1995-96 | Fair | Excellent | - |
| 1996-97 | Very Good | Excellent | - |
| 1997-98 | NS/ NE | Excellent | - |
| 1998-99 | Very Good | Very Good | - |
| 1999-2000 | Very Good | Very Good | - |
| 2000-2001 | NS/ NE | Very Good | - |
| 2001-2002 | Good | Very Good | - |
| 2002-2003 | Very Good | Very Good | - |
| 2003-2004 | Very Good | Excellent | - |
| 2004-2005 | Good | Very Good | - |
| 2005-2006 | NS/ NE | Very Good | - |

---

[47] Presumably, NS/ NE stands for "Not Submitted/ Not Evaluated"

Performance Audit Report on Civil Aviation in India

| Year | Air India Ltd. (AIL) | Indian Airlines Ltd. (IAL) | AI |
|------|----------------------|----------------------------|-----|
| 2006-07 | NS/NE | NS/ NE | - |
| 2007-08 | - | - | NS/NE |
| 2008-09 | - | - | NS/NE |

*Note: Effective 1 April 2007 due to merger of AIL and IAL, the new merged entity is known as AI*

The above table reveals that over the 20 year period from 1989-90 to 2008-09, there was only one instance where AIL/ IAL/ NACIL received a poor rating viz. – Poor – IAL (1992-93). A substantial number of ratings were NS/ NE (Not Submitted/ Not Evaluated), which is the position continuing in uninterrupted fashion from 2006-07 onwards.

By contrast, a profile of the net profit/ loss of AIL, IAL, and AI over the same 20 year period from 1989-90 to 2008-09 reveals the following position:

### Table 5.13 – Profile of Net Profit / (Loss) of AIL/ IAL and NACIL (AI) from 1989-90 to 2008-09

(Rs. in crore)

|  | AIL | IAL | NACIL |
|--|-----|-----|-------|
| 1989-90 | 70.89 | NA | -- |
| 1990-91 | 81.23 | NA | -- |
| 1991-92 | 145.89 | NA | -- |
| 1992-93 | 333.14 | NA | -- |
| 1993-94 | 201.90 | -258.46 | -- |
| 1994-95 | 40.80 | -188.73 | -- |
| 1995-96 | -271.84 | -109.98 | -- |
| 1996-97 | -296.94 | -14.59 | -- |
| 1997-98 | -181.01 | 47.27 | -- |
| 1998-99 | -174.48 | 13.12 | -- |
| 1999-00 | -37.63 | 45.27 | -- |
| 2000-01 | -44.40 | -159.17 | -- |
| 2001-02 | 15.44 | -246.75 | |
| 2002-03 | 133.86 | -196.56 | -- |
| 2003-04 | 92.33 | 44.17 | -- |
| 2004-05 | 96.36 | 65.61 | -- |
| 2005-06 | 14.94 | 49.50 | -- |
| 2006-07 | -447.93 | -240.29 | -- |
| 2007-08 | -- | -- | -2226.16 |
| 2008-09 | -- | -- | -5548.26 |

> *In our view, the MoU ratings of AIL/ IAL/ NACIL bore little or no correlation with their actual financial performance, notwithstanding the 50 per cent weightage for financial parameters in the MoU.*

A summary of the financial parameters adopted for IAL and AIL from 2004-05 to 2006-07 is given below:

### *Table 5.14 - Financial Parameters in MoUs with IAL*

| Year wise criteria value target/achievement-IAL | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Criteria type | Criteria | Unit | 2004-05 | | | 2005-06 | | | 2006-07 |
| | | | Weight in % | Target | Achievement | Weight in % | Target | Achievement | |
| Financial | Gross margin/gross block | Rs. | 2 | .063 | .068 | 2 | .070 | .078 | Not signed /not evaluated |
| | Net profit (loss) | Rs. in Cr | 15 | (24.75) | 17.50 | 10 | 30.00 | 68.50 | |
| | Gross profit (loss) | -do- | 8 | 23.10 | 56.35 | 10 | 68.85 | 100.50 | |
| | Gross margin (profit before int., depreciation &tax | -do- | 18 | 345.50 | 370.50 | 17 | 383.00 | 428.85 | |
| | Gross sales | -do- | 2 | 5041.00 | 5246.50 | 4 | 6417.75 | 6038.00 | |
| | PBDIT/total employment | Rs. in lakh | 5 | 1.85 | 1.99 | 7 | 2.06 | 2.33 | |

*Table 5.15 - Financial Parameters in MoUs with AIL*

| Year wise criteria value target/achievement-AIL | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Criteria type | Criteria | Unit | 2004-05 (BE) | | | 2005-06 | | | 2006-07 |
| | | | Weight in % | Target | Achievement | Weight in % | Target | Achievement | |
| Financial | Gross margin/gross block | % | 2 | 8.70 | Data not available | Not submitted/not evaluated | | | Not sub-mitted/ not evaluat-ed |
| | Net profit/net worth | % | 10 | 22.86 | | | | | |
| | Gross profit/ capital employed | -% | 10 | 9.12 | | | | | |
| | Gross margin | Rs.in cr | 8 | 634.98 | | | | | |
| | Gross sales (revenue) | -do- | 4 | 6444.00 | | | | | |
| | PBDIT/total employees | % | 7 | 4.04 | | | | | |
| | Added value/gross sales | % | 9 | 5.04 | | | | | |

In our view, the inclusion of multiple criteria of the same or similar nature (e.g. gross margin, gross profit, net profit etc.) resulted in unnecessary duplication of parameters, without adding value in terms of monitoring.

In its reply (August 2011), the Ministry accepted the audit comments and noted them for future compliance.

### 5.2.2 Non-Financial Parameters adopted for MoUs

Audit scrutiny of the non-financial parameters revealed that weightages were assigned in respect of IA to different parameters as follows:

### *Table 5.16 – Non-financial Parameters in MoUs of IAL*

| Parameter | Weightage Assigned |
|---|---|
| Aircraft Utilisation (total) | 10% |
| Technical Regularity | 5% each |
| Foreign Exchange Earnings, Employee Productivity (ATKMs/ No of Employees); Customer Satisfaction (IMRB Rating); HRD (No. Of employees trained); Safety indicators | 4% each |
| Preparation of corporate/ strategic plan; benchmarking; preparation of marketing plan | 3% each |
| Cargo carried; Overall Load Factor; On-time Performance | 2% each |

Similar analysis in respect of AIL revealed the following position:

### *Table 5.17 – Non-financial Parameters in MoUs of AIL*

| Parameter | Weightage Assigned |
|---|---|
| Benchmarking; Aircraft Utilisation (total) | 5% each |
| Induction of two aircraft; new station introduced on network | 4% each |
| Customer satisfaction survey; growth in scheduled ATKMs; no. of commercial staff trained | 3% each |
| On-time performance; reportable incidents indicator; operating revenue; operating costs; RTKMs/ Employee; No. Of Departments with ISO Certification; Preparation of Strategic Plan; Sundry Debtors; Hiring of Ground Service Department | 2% each |
| Passenger Load Factor; Passenger Market Share; Expenditure on Product Upgradation and IT; Joint Ventures with one airline; disposal of one aircraft | 1% each |

By contrast, the traffic and operating parameters monitored by the DGCA include the following:

- Flight Cancellation Data and On-time Performance (Arrivals and Departures);

- Passengers Carried, Seat Kilometres Performed, and Growth in Passengers Carried;

- Passenger Load Factor;

- Cargo Carried and Ton Kilometres Performed;

- Weight Load Factor;

- Market Shares of Different Scheduled Airlines; and

- Passenger Complaints (No. Per 10,000 passengers carried);

> *In audit's view, the non-financial parameters included in the MoU included minor or insignificant parameters (preparation of plans of different types, number of employees trained, benchmarking, "technical regularity" etc.)or gave undue weightage to such parameters, at the cost of critical traffic and operating parameters in the airline industry (such as those being monitored by DGCA). This skewed the MoU ratings of IA and AI unduly to present a "rosy" picture of performance*
>
> *The overall combination of financial and non-financial parameters devised for the MoUs were such as to ensure that the MoUs became a meaningless exercise, rarely (if ever) reflecting poor performance, and ensuring lack of effective accountability for all parties concerned.*

The Ministry, in its reply (August 2011), accepted the audit comment and stated that the MoU was being revised, so that the parameters reflected the position correctly.

### 5.2.3   Other Serious Deficiencies in MoU Monitoring

- Part V of the MoU makes the Ministry responsible for monitoring the performance in terms of targets set out and parameters laid down in the MoU on a quarterly basis. Audit scrutiny of the correspondence files/documents related to MoU revealed no monitoring by MoCA, and no progress reports obtained and no feedback on achievement of targets communicated to the airlines. The only monitoring and evaluation of the MoUs was by DPE.

- During the period 1989-90 to 2006-07, MoUs of IAL were not signed/not evaluated five times and that of AIL six times.  Further, MoUs were submitted at the fag end of the financial year and thus not used as an effective monitoring tool  e.g. IAL's MoU for 2004-05 were signed in November 2004 and that of 2005-06 in October 2005, while AIL's MoU for 2004-05 was signed in September 2004.

- As regards 2007-08, the MoU for NACIL merely reflected the criteria "Completion of Merger", which was not completed (but was not evaluated). The MoU for NACIL for 2008-09 was forwarded to DPE in April 2009 after the completion of 2008-09.

The Ministry, in its reply (August 2011), accepted the audit comment and stated that fresh MIS for reporting performance of the airline to MoCA had been drawn up, and was subjected to periodic monitoring.

## 5.3   Grant of Undue Facilities

In March 2010, at a time when NACIL was going through a major financial crisis, MoCA issued an order, whereby the facility for upgradation of ticket for self and immediate family

for travel to the highest class available by Air India/ Indian Airlines, subject to availability of seats, was extended to all former Secretaries of the Ministry of Civil Aviation. The documents/ files relating to the processing and issue of this record were sought by audit, but were not provided.

> *In audit's view, the issue of this circular granting additional facilities, at this time of crisis of NACIL, indicates that MoCA was not acting as a responsible stakeholder. If at all, MoCA was of the view that such facilities need to be extended, such costs should be borne by the MoCA, and not by NACIL.*
>
> *The implication of such upgradation may also be read with our audit findings relating to poor performance on first and business class, and the system of free upgrades, without adequate commercial value to NACIL.*

The Ministry, in its reply (August 2011), noted  the audit comment.

.

# Chapter 6      Financial and Operational Performance

## 6.1   Operational performance

### 6.1.1   Key Operational/ Revenue Parameters

A summary of key operational/ revenue parameters for the two airlines (pre/ post-merger) is presented below:

*Table 6.1 – Key Operational/ Revenue parameters during 2005-10*

| | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 |
|---|---|---|---|---|---|
| **Passenger Revenues (Rs. crore)** | 10397 | 10242 | 9954 | 9267 | 9150 |
| **Cargo Revenues (Rs. crore)** | 818 | 748 | 673 | 662 | 691 |
| **ASKM[48] (million)** | 47274 | 47969 | 48393 | 43591 | 44723 |
| **ATKM[49] (million)** | 5786 | 5840 | 6168 | 5602 | 6053 |
| **RPKM[50] (million)** | 31403 | 31483 | 30890 | 25950 | 28965 |
| **RTKM[51] (million)** | 3505 | 3456 | 3689 | 3191 | 3533 |
| **Passenger revenue/ RPKM (Rs.)** | 3.31 | 3.25 | 3.22 | 3.57 | 3.16 |

*Note: For 2005-06 to 2006-07, figures in respect of IAL and AIL have been summed up, while figures for 2007-08 to 2009-10 are in respect of the merged entity (AI).*

A break-up in respect of IAL / NACIL (narrow-body) and AIL / NACIL (wide-body) reveals the following position:

*Table 6.2 – Key Operational/ Revenue parameters in respect of IAL/ NACIL (narrow-body) and AIL/ NACIL (wide-body)*

| | IAL/ NACIL (narrow-body) | | AIL/ NACIL (wide-body) | |
|---|---|---|---|---|
| | 2005-06 | 2009-10 | 2005-06 | 2009-10 |
| **Passenger Revenue (Rs. crore)** | 4709 | 4496 | 5688 | 4654 |
| **ASKM (million)** | 16308 | 15846 | 30966 | 28877 |
| **RPKM (million)** | 10891 | 10855 | 20511 | 18110 |

---

[48] Available Seat Kilometers
[49] Available Tonne Kilometers
[50] Revenue Passenger Kilometers
[51] Revenue Tonne Kilometers

|  | IAL/ NACIL (narrow-body) | | AIL/ NACIL (wide-body) | |
|---|---|---|---|---|
|  | 2005-06 | 2009-10 | 2005-06 | 2009-10 |
| Passenger Revenue/ RPKM (Rs.) | 4.32 | 4.14 | 2.77 | 2.57 |
| Passenger Load Factor (%) | 66.8 | 68.5 | 66.20 | 62.77 |
| Cargo Revenue (Rs. crore) | 242 | 198 | 576 | 493 |
| ATKM (million) | 1593 | 1637 | 4193 | 4417 |
| RTKM | 1141 | 1089 | 2364 | 2444 |
| Overall Load Factor (%) | 71.6 | 66.5 | 56.40 | 55.30 |

*There was a significant deterioration in operational performance on most parameters (passenger/ cargo revenues, Available Seat Kilometres (ASKM), Available Tonne Kilometres (ATKM), Revenue Passenger Kilometres (RPKM), passenger revenue per RPKM, Passenger Load Factor (PLF)) for the two airlines (pre/ post merger) between 2005-06 and 2009-10.*

**6.1.2    Comparative performance of IAL/ NACIL (narrow-body)**

### 6.1.2.1  Routes rendering cash losses

Route economics for the period 2005-06 to 2009-10 relating to IAL revealed that out of total 742 Services (500 Domestic and 242 International),

- 467 services (63 *per cent)* were not meeting cash costs;

- 185 services (25 *per cent*) were meeting cash costs but not meeting total costs; and

- only 90 services (12 *per cent*) were meeting total cost of operations.

The year wise trend of the profitability of domestic and international services is depicted below:

#### *Table 6.3 – Matrix of services of IAL/ NACIL (narrow-body)*

| Year | Total Services | | Services not meeting cash costs | | Services meeting cash costs, but not total costs | | Services meeting total costs | |
|---|---|---|---|---|---|---|---|---|
|  | Dom. | Intl. | Dom. | Intl. | Dom. | Intl. | Dom. | Intl. |
| 2005-06 | 90 | 49 | 23 | 17 | 28 | 12 | 39 | 20 |
| 2009-10 | 107 | 39 | 63 | 27 | 41 | 10 | 3 | 2 |
| 2005-10 (Overall) | 500 | 242 | 326 | 141 | 123 | 62 | 51 | 39 |

Dom. – Domestic,                Intl. - International

Between 2005-06 and 2009-10,

- the services not meeting cash cost increased from 26 *per cent* to 59 *per cent* in the domestic sector and 35 *per cent* to 69 *per cent* in the international sector; and

- the services meeting total cost declined from 43 *per cent* to 3 *per cent* in the domestic sector and from 41 *per cent* to 5 *per cent* in the international sector.

In response (February 2011),

- AI Management stated (February 2011) that during the period under review, access to the Indian market for foreign carriers increased manifold on the one hand while Indian carriers (Jet Airways, Air Sahara and Kingfisher Airlines) were given unrestricted rights to increase domestic capacities besides entry into the international markets. Consequently, Jet Airways, Kingfisher, Jet-Lite and Air Sahara up to a point commenced operations on the very same international routes which were / are served by the Company.

- MoCA replied (February 2011) that during this period, there had been recession in aviation sector in general, and almost every airline had suffered losses. The trend was further accentuated by the high fuel prices in 2008. Several initiatives had been taken in rationalisation of routes.

The Ministry stated (August 2011) that the claim of AI management about the unrestricted rights being provided to Indian carriers to increase domestic capacities was incorrect and stamping out the competition with other carriers in the economic environment was not possible.

### *6.1.2.2   Unsatisfactory performance vis-a-vis other competitors*

A comparison of the performance of IAL with its competitors on various parameters reflects its poor performance on all parameters:

**Chart 6.1 – PLF of IAL/ NACIL (narrow-body) and its competitors**



Even though 2008-09 was a bad year for all airlines, IAL's position was significantly worse than that of its competitors.

### Chart 6.2 – Domestic Market share of IAL/ NACIL (narrow-body) and its competitors



### Chart 6.3 – Revenue per RPKM of IAL/ NACIL (narrow-body) and Jet Airways



Between 2006-07 and 2009-10, IAL's domestic market share dropped dramatically as compared to its competitors (primarily Kingfisher and Spice Jet). Passenger revenue per RPKM remained static (although Jet's passenger per RPKM dropped dramatically from 2004-05 to 2009-10).

**Chart 6.4 – On-Time Performance of major domestic airlines (July 2010)**



IAL's On Time Performance (OTP) was significantly low, compared to both Full Service Carriers (Kingfisher and Jet Airways) as well as Low Cost Carriers (Jet Lite, Indigo, Go Air – except Spice Jet).

The Ministry replied (August 2011) that the observation has been noted.

### 6.1.2.3   Leased aircraft could not be returned

Although the acquisition project involved return of all leased aircraft, as of March 2010, IAL and its subsidiary, Airline Alllied Services Ltd. (AASL), had 37 leased aircraft. Of these 37 aircraft:

- 11 aircraft were very small capacity aircraft (7 ATR and 4 CRJ aircraft), which could not reasonably have been replaced by the newly acquired aircraft[52].

- 8 aircraft were sold and leased back, evidently as a means of funds generation (in view of the AI's critical financial position)

Of the remaining aircraft, 8 A320 aircraft had been obtained on an operating lease from a lessor (M/s. Aercap) in Netherlands between March 2003 and March 2005. Six of these aircraft were to be returned between March 2008 and October 2009, after completing the extended lease period.

As per the lease agreements, the leased aircraft were to be sent to a mutually acceptable MRO facility for completion of stipulated aircraft checks before return to the lessor. Three of these aircraft were withdrawn from commercial operations by IAL and sent to a Jordan-based MRO between February and July 2008. However, the lessor refused to accept the

---

[52] To that extent, the assumption in the project report that all leased aircraft would be returned was faulty.

return of the aircraft, by raising disputes on their physical condition and documentation and raised claims of huge settlement amounts.

Finally, one aircraft was returned to the lessor in May 2009 after a **"buy-out package[53]"** (viz. payment of compensation to the lessor by IAL, in exchange for waiving all liabilities associated with the aircraft "redelivery conditions") of $ 2.7 million. In respect of the remaining two aircraft and three aircraft, the lessor demanded buyout packages ranging from $ 5 to $ 10 million and $ 19.63 million respectively.

> *In all fairness, this situation could not have been easily foreseen by IAL; it is not clear whether cannibalisation of aircraft spares also contributed, at least partly, to these difficulties.*
>
> *However, this highlights the danger of undue dependence on leasing. When the leasing market turns adverse (with difficulties in obtaining new customers for leased aircraft), the lessor would naturally try to protect its commercial interests, by utilising all possible contractual loopholes to discourage/ prevent IAL from returning the leased aircraft.*

The Ministry stated (August 2011) that the matter regarding leasing of the aircraft had also been discussed by the board of Air India, and noted the audit observations.

### 6.1.2.4  Cargo operations

The market share of IAL in cargo operations dropped dramatically from 36.8 per cent in 2006-07 to 29.6 per cent in 2009-10, as depicted below:

#### Chart 6.5 – Market share of IAL/ NACIL (narrow-body) in Cargo operations



The conversion of five B737 aircraft into freighter aircraft between August 2007 and July 2008 did not benefit IAL.

---

[53] The term "buy-out package"/ compensation does not, appear in the lease contract itself, but arises only at the time of re-delivery of leased aircraft. This could be construed as a form of pressure tactics applied by the lessor.

> *In sum,*
>
> - *Route economics revealed that most of IAL's services were not meeting cash costs or total costs, both in domestic and international sectors.*
>
> - *The performance of IAL vis-a-vis its competitors on various parameters (PLF, domestic market share, Passenger Revenue per RPKM) was consistently poor. IAL's On-time Performance – a critical parameter of service – was low, compared to both full service carriers and low cost carriers. Further, the market share of IAL in cargo operations dropped dramatically, despite conversion of five B737 aircraft into freighter aircraft.*

The Ministry noted (August 2011) the audit observation, and also stated that the volume of cargo operation had been scaled down for the reasons mentioned by audit.

### 6.1.3   Comparative performance of AIL

#### 6.1.3.1   Route Profitability Analysis

During 2005-10, the erstwhile AIL operated ten international routes having 26 sub-routes (destinations) which were reduced to 19 sub-routes in 2009-10.  Of the ten routes operated during 2005-10,

- six routes (India/USA, India/Canada, India/UK[54], India/East Africa, India/ South East Asia and India/China) were incurring losses since 2001-02;

-  only two routes (India/Far East Asia and India-Gulf/Middle East) made profits till 2005-06.;

- The two new sub-routes introduced in 2009-10 that of India-Frankfurt and India–Washington also incurred losses.

- All the routes were loss making in 2009-10 as indicated below:

#### *Table 6.4 – Profitability of Routes operated by AIL / NACIL (wide-body) during 2005-10*

(Rs. in crore)

| | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 |
|---|---|---|---|---|---|
| India/USA | -552.44 | -1003.02 | -1452.18 | -2842.86 | -1522.15 |
| India/Canada | -61.92 | -144.34 | -228.96 | -191.95 | -355.21 |
| India/UK | -115.09 | -234.63 | -348.18 | -272.66 | -514.87 |
| India/East Africa | -6.57 | -23.56 | -30.79 | -79.28 | -34.39 |
| India/South East Asia | -94.66 | -152.43 | -97.67 | -5.99 | -51.49 |

---

[54] Except in 2004-05

|  | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 |
|---|---|---|---|---|---|
| India/China | -18.31 | -64.31 | -85.67 | -90.38 | -66.98 |
| India/Gulf Middle East | 229.91 | 90.81 | -262.17 | -566.53 | -688.13 |
| India/Far East Asia | 7.8 | -152.1 | -158.72 | -482.59 | -207.02 |
| India/Paris | -- | -- | -- | -54.95 | -331.08 |
| India/Bangladesh | -- | -- | -- | -0.57 | -- |

The Ministry replied (August 2011) that the observation has been noted.

#### 6.1.3.1.1  India /USA Route

Scrutiny of routes revealed that AIL was consistently making losses on the USA route. The operational loss in USA route, where it was flying to four sub-routes (destinations) is given below:

*Table 6.5 – Profile of operations by AIL/ NACIL (wide-body) on India-USA Route*

(Rs. in crore)

| Particulars | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 |
|---|---|---|---|---|---|
| Operating loss on India/USA route | -552 | -1003 | -1452 | -2843 | -1522 |
| Total operating loss[55] of AIL on routes operated | -611 | -1684 | -2664 | -4588 | -3743 |
| Percentage of Operating loss of India/USA route to the Total operating loss of AIL on routes operated (%) | 90 | 60 | 55 | 62 | 41 |

*Table 6.6 – Performance of sub routes of India-USA operations*

(Rs. in crore)

| Sub routes of India-USA route | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 |
|---|---|---|---|---|---|
| New York | -73.84 | -265.57 | -686.23 | -1499.71 | -482.01 |
| Newark | -125.24 | -217.73 | -317.46 | -642.85 | -563.95 |
| Chicago | -113.17 | -240.52 | -293.77 | -496.65 | -328.34 |
| Los Angeles | -240.19 | -279.19 | -154.68 | -203.65 | - |
| Washington | - | - | - | - | -147.85 |

---

[55] The operating loss for each of the years is the sum total of the profit/loss incurred on all the routes operated by AIL.

> **The India/USA route was the single biggest factor adversely affecting AIL's operations. The grossly exaggerated nature of the assumption relating to increased yield on account of non-stop USA operations (projected in the revised project report for 50 long range aircraft) is clearly revealed.**

The Ministry replied (August 2011) that there was recession and high oil prices during the said period and most of the airlines in the world had incurred losses on operating flights to US. However, the reply is silent about the exaggerated assumptions relating to yield on non-stop USA operations.

### 6.1.3.1.2   New York sub-route

Even though AIL was incurring losses on the New York sub-route, it increased the frequency of operations from 725 flights (2005-06) to 2183 flights (2008-09), but the PLF declined from 68.5 *per cent* (2005-06) to 58.8 *per cent* (2008-09) (although AIL had deployed newly acquired B777-200LR aircraft on this sub-route from mid 2007-08 onwards by operating daily non-stop flights). The total operating loss on this sub-route, which was Rs. 73.84 crore in 2005-06, increased to Rs. 482.01 crore in the year 2009-10.

Further, AIL continued to operate the New York sub-route under loss without any major curtailment of frequencies. Incidentally, Jet Airways, which was operating to San Francisco withdrew (January 2009) its operations in an effort to right size capacity on the North American routes, and leased its seven long haul B777 aircraft to other airlines. It is only in 2009-10, that the frequency of AIL operations on the New York sub-route was reduced to 1219 flights, the PLF stood at 67.9 *per cent* and the total operating loss on this sub-route was Rs.482.01 crore.

In response, the Management replied (February 2011) that AIL's operations on the India-USA route were continuously reviewed and various measures were taken to improve the operating margins, which had produced gratifying results; and the route was now generating cash surpluses, *i.e.* in 2010-11.  The Ministry stated that AIL enjoyed market share of about 23 *per cent* on this route during 2009-10 and that it was necessary to continue the operations to USA to retain market share/ airports slots.

The Ministry concurred (August 2011) with the response given by AIL.

### 6.1.3.1.3   Gulf and Middle East Route

Till 2005-06, AIL was making profits on all the ten sub-routes in Gulf/ Middle-East except in Al-Ain. The operations on some of the routes were withdrawn and handed over (April 2005 to February 2007) to its low cost subsidiary, Air India Charters Limited (AICL). In 2007-08, AIL operated seven sub-routes, out of which only two sub-routes made profits (Abu Dhabi and Muscat). In 2009-10, all the five sub-routes operated were under losses.

### Kuwait sub-route

AIL was making profit intermittently on this sub route till 2005-06, which turned loss-making in subsequent years. Till January 2007, AIL was operating flights with dry leased aircraft. However, from February 2007, it deployed an additional wet leased aircraft to increase frequency of its operations. The frequency of operations was reduced in December 2007/ January 2008 due to withdrawal (November 2007) of the wet leased aircraft by the lessor. Subsequently, AIL withdrew (October 2008) all flights from the Kuwait sub route. Out of the total operating loss of Rs. 59.60 crore during 2007-08 on Kuwait sub-route, the wet lease hire charges accounted for 88.05 *per cent*, i.e. Rs. 52.48 crore. Although there was an increase in traffic in 2008-09 from Mumbai/ New Delhi to Kuwait, AIL did not reintroduce flights to Kuwait from these cities when its competitor (Jet Airways) commenced (January 2008) operations to Kuwait from New Delhi and Kochi.

### Riyadh sub-route

Riyadh sub-route was in profit in 2005-06, but incurred operating loss during 2006-10. Frequent delays/ rescheduling/ misconnections by 372 times during the period 2006-09 adversely affected the PLF which declined from 81.40 *per cent* (2006-07) to 63.6 *per cent* (2008-09). Despite the operating loss, AIL increased the frequency of flights during 2008-09 which further increased the losses. During the year 2009-10, AIL operated 1621 flights on the Riyadh sub-route but there were delays/ rescheduling/ misconnections on 232 occasions and the PLF was 66.2 *per cent*.

Management attributed (April 2010) the increased losses to the liberal bilateral entitlements, entry of private Indian carriers on the routes operated by AIL and  access to interior points in India to other foreign carriers and increase in ATF cost.

*In our opinion, besides the chronic operational deficiencies of AIL, the key reasons for low route profitability were the liberal increase in bilateral entitlements which benefited foreign carriers with large volumes of 6th freedom traffic (described elsewhere) and the failures of AIL to contain/ reduced losses (especially on the India/ USA route) through appropriate route rationalisation/ curtailment/ withdrawal of services on chronically loss making routes, revenue management strategies etc.*

The Ministry replied (August 2011) that route rationalization was undertaken, and admitted that liberal bilateral agreements which benefitted foreign carriers in terms of large volumes of 6th freedom traffic was inevitable. It also stated that AI's non stop US flights were preferred over any 6th freedom arrangement for sheer convenience of passengers.

The Ministry's reply is not tenable, as it is not borne out either by AI's profitability figures on this sector or by the frequency of operation, which has come down.

### 6.1.3.2   Poor PLF vis-a-vis competitors

The PLF of AIL on international operations declined from 73.3 *per cent* in 2003-04 to 61.1 *per cent* in 2009-10.  By contrast, the PLF of Jet Airways increased from 19.4 *per cent* in 2003-04 to 80.4 *per cent* in 2009-10.  The PLF of Singapore Airlines and Emirates were also much better than that of AIL.

*Chart 6.6 – Passenger Load Factor of AIL/ NACIL (wide-body) and its competitors*



The Management stated (February 2011) that the comparison of AIL's PLF with Singapore Airlines and Emirates was not fair, as they had hubs in their own countries.  However, with the development of hub at New Delhi, higher PLF would be achieved in 'Air India'.

The Ministry noted (August 2011) the audit observation.

### 6.1.3.3   PLF in First Class and Business Class

The aircraft operated by AIL on the international routes normally had a configuration of Economy, Business/ Executive and First class, of which Business/Executive and First Class represent high yielding business.  There was a substantial decrease in the PLF of AIL flights in First class from 14.4 *per cent* (2004-05) to 12 *per cent* (2009-10) and in Business/ Executive class from 31.0 *per cent* (2004-05) to 27.73 *per cent* (2009-10).

*Chart 6.7 – Passenger Load Factor of First class Business class and Economy class of AIL/ NACIL (wide-body) during 2004-05 to 2009-10*



The Management stated (March 2010) that they were aware of the need to improve the seat factors in First and Business/ Executive class and several initiatives had been taken to achieve this objective. The Management further replied (February 2011) that during 2010-11 (April – December), the PLFs in business and first class were 25 and 22 *per cent* respectively and added that various marketing schemes were offered to improve the PLF on this segment.

The Ministry noted (August 2011) the audit observation.

### 6.1.3.4   On Time Performance

On-time performance of AIL flights continued to be unsatisfactory for the period 2006-07 to 2009-10.

#### Chart 6.8 – On-Time Performance of AIL/ NACIL (wide-body)



*Source: Information obtained from the AI Management.*

The Ministry stated that the Company was operating with an age old fleet, which was the cause of unsatisfactory 'on-time' performance; and with the aircraft acquisition, PLF and OTP had improved.

While noting the recent improvement in PLF and OTP, we believe that, in addition to the hub factor, chronic operational deficiencies are also major factors in the non-achievement of high PLF and OTP.

The Ministry noted (August 2011) the audit observation.

### 6.1.3.5   Quality of Service

'Air India' carried out a study to ascertain the strength and weakness of the Air India brand, through a leading market research agency, *viz.*, Indian Market Research Bureau (IMRB) in February/March 2009. The study revealed that in the international arena, the fliers were demanding more than the basic facilities with overall travelling experience and comforts and that the Air India brand was no longer preferred as it was not meeting the above

standard. The study further stated that the services of 'Air India' were not oriented towards customer satisfaction, the personnel had an indifferent "sarkari" attitude and brand Air India was kept as a substitute airline to travel.

The customer perception of the other branded airlines *vis-à-vis* Air India brand is tabulated below:

**Table 6.7 – IMRB survey of Customer perception of AI and other airlines**

|  | Air India | Kingfisher | Jet Airways | Singapore Airlines | Lufthansa | British Airways |
|---|---|---|---|---|---|---|
| **Ambience** | Ordinary, Outdated | Luxurious, Glamorous | Corporate | Lively, Informal | Professional, impeccable | **Impeccable, Comfortable** |
| **Service** | Apathetic attitude, Grudging | King size service, | Professional Attentive, Smart, Pleasant | Cutting edge | Quick, Superlative efficiency | **Punctual** |
| **Personnel** | **Elderly, Unpleasant, Unresponsive, Unattractive** | **Young Glamorous, Friendly, Obliging, Well dressed** | **Professional, Efficient, Classy, Friendly, Responsive** | **Young, Cheerful, Warm** | **Professional Responsive Accommodating, Courteous** | Polished, Hospitable |

Further, SkyTrax[56] ratings for 'Air India' during 2009 in respect of various parameters (services for first class, business class and economy class at airport, lounges, on board product for long haul, short haul, regional routes, *etc.)* were between 1 – 3 stars (out of 5 stars). In comparison, the ratings for the other Indian private competitors, *viz.* Kingfisher Airlines and Jet Airways as well as some foreign competitors, *viz.* Emirates, British Airways, Singapore Airlines, ranged between 2 – 5 stars (out of 5 stars) on all counts.

The Ministry noted (August 2011) the observation.

### 6.1.3.6   *Inadequate publicity and sales promotion*

AI did not adequately advertise the induction of new aircraft with new routes/ sectors and promotional schemes, especially in a scenario of aggressive advertising by its competitors. The amount spent towards publicity and sales promotion by the AI *vis-à-vis* other airlines for the period 2007-10 was as under:

---

[56] Skytrax, an international airline and air travel industry rating agency, provides quality certification of airline product and service standard, competitive performance analysis and other services on a year to year basis.

**Chart 6.9 – Expenditure on Publicity and Sales Promotion**



**Chart 6.10 – Percentage of expenditure on Publicity and Sales Promotion to Operating Revenue**



As against the industry norm of 1.5 *per cent* to 2 *per cent*, the percentage of publicity and sales promotion expenditure to the revenue earned for 'Air India' ranged between 0.22 *per cent* and 0.46 *per cent* whereas in respect of private airlines, the percentage ranged between 0.75 *per cent* and 3.99 *per cent.* Further, expenditure on publicity and sales promotion by 'Air India' decreased from Rs.70.15 crore in 2007-08 to Rs. 29.12 crore in 2009-10, while private airlines increased their expenditure on publicity and sales promotion during the same period.

The Ministry admitted (February 2011) that AIL had very low spending on advertising which was mainly on account of cost saving measures adopted by 'Air India'.

The Ministry noted (August 2011) the audit observation.

### 6.1.3.7   Negligible sales from website

In AIL, the web sales were through an IT system called the Internet Booking Engine (IBE) established in 2002. During 2007-08,'Air India' revamped and changed the website to make it user friendly, but the percentage of web sales to total sales was poor and it never exceeded 2.63 *per cent* during 2005-10. On the other hand, the web sales of Jet Airways accounted for 11 *per cent* of total sales (2008-09). Further, AI failed to have an integrated website till 2010.

The Management replied (February 2011) that the integrated web-site was achieved in February 2010, and that the web sales for domestic and international had grown considerably.  With the PSS implementation from end January 2011, there would be a single back end like other international airlines. Further, several additional incentives were being introduced to improve web-sales which are under implementation.

*We note the recent efforts made to improve the web sales, but the fact remains that web sales had increased marginally to 2.63 per cent of total sales in 2009-10 and AI's efforts had not translated into any major increase in web sales.*

The Ministry noted (August 2011) the audit observation.

### 6.1.3.8   Code Share utilisation

The selling of the seats on a flight by a different (operating) airline by a "marketing" airline, through a different code is called code share arrangement. As the utilisation of code share seats by AIL was low (40-45 *per cent)*, the Strategic Group in its meetings held in August 2008/ October 2008 discussed the need to market these seats more aggressively by the Sales and Marketing unit. By increasing the code share utilisation to 70 *per cent*, AIL could earn an additional Rs. 60 crore per *annum*. However, it was observed in audit that during 2009-10, the code share seat utilisation was only 43.48 *per cent*.

The Management replied (February 2010) that the marketing airline was always at a disadvantage, as it could not match the practices / benefits extended to passengers by the operating airline.

The Ministry noted (August 2011) the audit observation.

### 6.1.3.9   Hire of Aircraft

During the period 2006-10, AIL returned 24 lease aircraft but entered into a fresh lease for 17 aircraft mainly to "retain market share" and to "bridge the capacity gap". However, AIL made operational losses on the leased aircraft for the period 2006-07 to 2009-10; while the total revenue earned on leased aircraft operations was Rs. 9,882 crore, the expenditure incurred was Rs. 14,786.26 crore, resulting in an operational loss of Rs. 4,886.13 crore. The percentage of losses on leasing operations to total operational losses of AIL during 2006-10 ranged between 24.59 *per cent* and 64.99 *per cent*, as depicted below:

### Chart 6.11 – Operational loss of AIL/ NACIL (wide-body )in respect of leased and own aircraft during 2006-10



We reviewed eleven lease aircraft proposals, out of which five were executed prior to 2006-07 and six during 2006-10 and observed that in respect of seven proposals[57], leasing had been justified with negative returns for 'maintaining market presence' or slot utilisation at foreign airports. The proposals were approved by the Board (including GoI Directors), but actual performance was not reviewed subsequently by the Board.

In response, Management (April 2010) stated that liberal bilateral rights and grant of access to Indian private carriers on international sectors resulting in increased capacities coupled with fuel increase and global economic recession in 2008-09 had impacted the leased operations of AIL/'Air India'. We do not agree; the lease proposals were approved to retain the market share and "bridge the capacity gap" which, however, did not fructify.

The Ministry agreed (August 2011) to the observations and stated that the airline was making attempts to reduce lease capacity.

#### 6.1.3.10 Cargo carriage

Cargo carriage by AIL was on a declining trend over the years vis-a-vis its competitors.

---

[57] Three B777-200ER (dry), two B767-300ER(wet), and one each of A310-300(wet) and B747-400(dry)

### *Chart 6.12 – Cargo Revenue of AIL /NACIL (wide-body) and Jet Airways*



*Jet Airways started international operations from 2003-04.*
*Source: Figures for AIL as supplied by the AI Management and for Jet Airways and Emirates as per their Annual Reports.*

### *Chart 6.13 – Percentage of Cargo revenue to Operating Revenue of AIL/ NACIL (wide-body) and Jet Airways and Emirates*



AIL converted four passenger aircraft (including two leased aircraft) into freighter aircraft at a cost of Rs. 168.30 crore for its own dedicated freighter operations on the Paris, Frankfurt, Far East and South Asian routes. The freighters were inducted between June 2007 and December 2008, but cargo freighter operations were suspended in September 2009, since AIL incurred a loss of Rs. 270.62 crore on these operations. In fact, as of April 2010, AIL continued to incur lease charges of approximately Rs. 2.27 crore p.m. on the leased freighter aircraft, despite no cargo operations from October 2009 onwards.

AIL Management stated (February 2011) that the freighter operations were affected by technical delays from the beginning, affecting scheduled integrity, and other factors (hike in fuel prices, global economic slowdown and intense competition) added to the losses, forcing withdrawal of freighter operations. The Ministry stated additional steps were being taken to improve cargo profitability, and improvement of belly space utilisation in passenger aircraft would be the area of current focus.

The Ministry noted (August 2011) the observation and stated that the volume of cargo operation had been scaled down.

*In sum*

- *Even earlier, most routes (North America, UK, SE Asia etc.) of the erstwhile AIL were incurring losses, and only the Gulf/ Middle East and Far East Asia routes made profits till 2005-06. By 2009-10, all routes were loss-making, the single largest loss-making routes being the India/ USA route, which contributed between 41 to 90 per cent of AIL's total operating losses during the period 2005-06 to 2009-10. This clearly revealed the grossly exaggerated nature of assumptions relating to increased yield on account of non-stop operations (projected in the revised fleet acquisition report). Besides this, the main reasons for low route profitability were the liberal increase in bilateral entitlements, which benefited foreign carriers with large volumes of 6th freedom traffic and the failures of AIL to contain/ reduced losses (especially on the India/ USA route) through appropriate route rationalisation and other measures etc.*

- *AIL's PLF suffered drastically vis-a-vis its competitors. In particular, the PLF of AIL flights in first class and business class declined from already low figures of 14 per cent and 31 per cent (2004-05) to abysmal levels of 12 per cent and 28 per cent respectively. Considering the widely recognised view that occupancy of a single seat in business/ first class can financially offset several vacant seats in economy class, these low PLFs in business/ first class are unsustainable. Similarly, AIL's On-time Performance for arrival and departure was dismally low at 62 and 52 per cent respectively during 2009-10.*

- *Market surveys of customer perception revealed that Air India was no longer a preferred brand, and that it was not adequately oriented towards customer satisfaction. Expenditure on publicity and sales promotion was negligible.*

## 6.2   Financial performance

### 6.2.1   Overall position

The overall financial position of IAL/ AIL and the merged entity has been abysmally poor during the period from 2004-05 to 2009-10. Even in 2004-05/ 2005-06 (when the aircraft acquisition was still under way), the financial position of the airlines was not very promising. This deteriorated drastically post-merger (2007-08 onwards).

*Table 6.8 – Key financial indicators of AIL/ IAL/ AI*

Rs. in crore

| | 2004-05 | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Operating Revenue | 12921 | 14600 | 14425 | 13638 | 13224 | 13109 |
| Other Income | 72 | 431 | 1990 | 1619 | 255 | 294 |
| Total Revenue | 12993 | 15031 | 16415 | 15257 | 13479 | 13402 |
| **Expenses** | | | | | | |
| Operating Expenditure | 12810 | 14924 | 17240 | 17854 | 18896 | 16581 |
| Interest and financial charges | 67 | 105 | 276 | 702 | 1666 | 2434 |
| Other Expenditure and adjustments | -21 | -71 | -328 | - | 106 | 21 |
| Total Expenditure | 12856 | 14958 | 17188 | 18556 | 20668 | 19036 |
| **Profit** | | | | | | |
| Cash Profit | 888 | 768 | 21 | -1465 | -4322 | -4163 |
| Net Profit after tax | 162 | 64 | -688 | -2226 | -5548 | -5552 |
| **Liabilities** | | | | | | |
| Working Capital Loan | 889 | 2181 | 5595 | 9924 | 16328 | 18524 |
| Loans for Acquisition | 776 | 1542 | 2995 | 8458 | 14575 | 19899 |
| Total Borrowings (inc. other loans) | 1694 | 3961 | 9009 | 18413 | 30908 | 38423 |
| Net Worth | -578 | -188 | -875 | -2081 | 56 | -4554 |

*Note: For 2004-05 to 2006-07, figures in respect of IAL and AIL have been summed up, while figures for 2007-08 to 2009-10 are in respect of the merged entity (AI).*

In brief:

- Revenues showed a static trend, and expenditure increased dramatically;

- Interest burden, which was nominal in 2004-05, increased 36 times to Rs. 2434 crore[58] in 2009-10 and working capital loan went up nearly 21 times from 2004-05 to Rs. 18524 crore in 2009-10;

- Cash profits and marginal net profits in 2004-05 and 2005-06 turned into substantial cash losses and net losses;

---

[58] Representing 18 per cent of total revenues in 2009-10

- The net worth of the entities, which was negative till 2007-08, was made positive in 2008-09 through a revaluation of fixed assets by Rs. 8,028 crore, but again became hugely negative in 2009-10;

- As of 2009-10, the total borrowing was 2.87 times the total revenue; even the working capital loan was 1.38 times the total revenue.

- GoI's equity infusion of Rs. 325 crore in 2005-06 into the erstwhile IAL and Rs. 800 crore in 2009-10 to AI represented a mere drop in the ocean.

MoCA and AI stated (February 2011) that the revaluation of immovable properties was done so as to leverage value from assets, as per the recommendations of the consultant (Accenture). Further, the revaluation improved the company's net worth, and helped it to mitigate deferred tax liability. The fact, however, remains that this was merely a book adjustment, and represented a totally unrealised gain.

In addition, the CAG's comments (under Section 619(4) of the Companies Act, 1956) on the accounts of NACIL for 2009-10 pointed out an understatement of loss by Rs. 3,039 crore, and that the "true and fair view" expressed by the statutory auditors on NACIL's financial statements was not sustainable:

- Rs. 196 crore on account of overstatement of prepaid expenses (payments to lessors towards maintenance charges of aircraft); and

- Rs. 2843 crore by not writing down the net deferred tax assets of earlier years.

> ***Clearly, the financial position of AI is unsustainable, and the merged airline is heading towards, if not already in, a debt trap.***

### 6.2.2   Cost Profile

A summary profile of key cost components of the merged airline, as well as its individual components (erstwhile IAL/ AIL) is depicted below:

*Table 6.9 – Profile of key cost components of AIL/ IAL/AI*

(Rs. in crore)

| | Total | | IAL/ NACIL (narrow-body) | | AIL/ NACIL (wide-body) | |
|---|---|---|---|---|---|---|
| | **2005-06** | **2009-10** | **2005-06** | **2009-10** | **2005-06** | **2009-10** |
| **Fuel and oil** | 5107 | 5015 | 1966 | 2031 | 3141 | 2984 |
| **Employee costs** | 2352 | 3357 | 1108 | 1672 | 1244 | 1685 |
| **Maintenance and repair costs** | 1353 | 1229 | 696 | 935 | 657 | 294 |
| **Passenger** | 566 | 483 | 188 | 173 | 378 | 310 |

| | Total | | IAL/ NACIL (narrow-body) | | AIL/ NACIL (wide-body) | |
|---|---|---|---|---|---|---|
| | 2005-06 | 2009-10 | 2005-06 | 2009-10 | 2005-06 | 2009-10 |
| Amenities | | | | | | |
| Leasing/ hire charges | 1124 | 1177 | 180 | 411 | 944 | 766 |
| Interest and financing | 106 | 2434 | 22 | 919 | 84 | 1515 |
| Depreciation | 703 | 1390 | 297 | 506 | 406 | 884 |
| Employees (in numbers) | 33575 | 29630 | 18219 | 16380 | 15356 | 13250 |

Our analysis indicates the following:

*Table 6.10 – Key issues on Cost Components*

| Cost Item | Audit Analysis |
|---|---|
| Employee Costs | • Both for the erstwhile AIL/ NACIL (wide-bodied) and IAL/ NACIL (narrow-bodied) entities, employee costs were a critical factor during the period 2005-10. Despite a substantial reduction in number of employees by 13.71 *per cent* and 10.09 *per cent* in AIL and IAL, the total employee costs of AIL and IAL went up from Rs. 1244 crore to Rs. 1685 crore and from Rs. 1108 crore to Rs. 1672 crore respectively during this period. The per-employee costs of AIL and IAL went up from Rs. 8.10 lakh p.a. to Rs. 12.72 lakh p.a. and from Rs. 6.08 lakh p.a. to Rs. 10.21 lakh p.a. respectively. <br><br> ***This is completely contrary to the worsening financial position of the two entities during this period, and clearly indicates the need for a complete overhauling of the remuneration structure to better synchronise it with financial and operational performance.*** |
| Fuel Costs | • Fuel/ oil costs were more or less determined by the fluctuations in ATF prices. However, in 2009-10, there was a substantial drop in AIL's fuel costs of more than Rs. 1,000 crore (Rs. 4034 crore in 2008-09 and Rs. 2984 crore in 2009-10), apparently driven by route rationalisation and due to Fuel Efficiency Gap Audit (FEGA) as well as reduction in ATF prices. |
| Maintenance and Repair Costs | • The maintenance and repair costs of AIL came down substantially during 2005-10. However, in the case of IAL, it increased substantially from Rs. 696 crore to Rs. 935 crore. |
| Passenger | • Expenditure on passenger amenities (including food costs, passenger accommodation costs on account of delays/ |

| Cost Item | Audit Analysis |
|---|---|
| Amenities | cancellations etc.) in respect of both AIL and IAL showed a downward trend.<br><br>*This is a disturbing trend, as passenger service is critical to the image of a commercial full-service airline. Instead of excessive cost-control in this area (which is apparently easy to "cut"/ address, but could adversely affect customer satisfaction), IA should focus cost cutting efforts more on other areas.* |
| Interest | • The interest burden for both AIL and IAL was marginal in 2005-06, but has spiralled to Rs. 2434 crore in 2009-10. The major jump in respect of AIL was in 2008-09 (when it more than doubled from Rs. 553 crore in 2007-08 to Rs. 1145 crore in 2008-09).<br><br>*Such enormous increase in interest burden is both on account of enormous increase in working capital, as well as the debt-funded fleet acquisition. A debt trap is not far off, unless substantial infusion of equity (coupled with dramatic improvements in financial and operational performance) takes place.* |
| Depreciation | • Depreciation for AIL and IAL has more than doubled during 2009-10 from Rs. 406 crore to Rs. 884 crore and from Rs. 297 crore to Rs. 506 crore respectively.<br><br>This increase in depreciation is largely on account of replacement of old aircraft, and induction of new aircraft. Since this is a non-cash expense, this does not have immediate adverse impact. However, in the medium term, it would adversely affect the profit/ loss and thus the borrowing capacity of AI. |

### 6.2.3   Revenue profile

A summary profile of key revenue parameters is depicted below:

*Table 6.11 – Key Revenue parameters*

(Rs. in crore)

|  | Total | | IAL/ NACIL (narrow-body) | | AIL/ NACIL (wide-body) | |
|---|---|---|---|---|---|---|
|  | 2005-06 | 2009-10 | 2005-06 | 2009-10 | 2005-06 | 2009-10 |
| Passenger Revenue | 10397 | 9150 | 4709 | 4496 | 5688 | 4654 |
| Cargo Revenue | 818 | 691 | 242 | 198 | 576 | 493 |

|  | Total | | IAL/ NACIL (narrow-body) | | AIL/ NACIL (wide-body) | |
|---|---|---|---|---|---|---|
|  | **2005-06** | **2009-10** | **2005-06** | **2009-10** | **2005-06** | **2009-10** |
| **Total revenue (including Others)** | 15031 | 13402 | 5786 | 5371 | 9245 | 8031 |

#### 6.2.4   Increase in Working Capital

The stated working capital of AIL (i.e. current assets less current liabilities) remained positive throughout the period 2009-10 − ranging from Rs. 1057 crore in 2005-06, going up to Rs. 2847 crore in 2006-07 and coming down to Rs. 529 crore in 2009-10. However, this should be read with the fact that sundry debtors increased from Rs. 1448 crore in 2005-06 to Rs. 2144 crore in 2009-10, indicating difficulties in collection.

> *Further, the stated working capital of AIL did not reflect the huge increase in the working capital loan[59] from Rs. 2056 crore in 2005-06 to an enormous figure of Rs. 12,679 crore in 2009-10 (as against operating revenues of just Rs. 7824 crore).  Clearly, even in 2005-06, erstwhile AIL's funds/ liquidity position was precariously poor, while in 2009-10, in case of merged entity, it was teetering on the brink of disaster.*

As of July 2010, AI had availed of an overall amount of Rs. 19207 crore as Working Capital loan, of which Rs. 18,162 crore was utilised as working capital, and Rs. 1,045 crore was utilised for aircraft acquisition payments. The main items on which the working capital loans was utilised as of June 2010 were fuel (Rs. 5,639 crore), aircraft repairs and refurbishment (Rs. 4,058 crore) interest/ repayment of old aircraft loans (Rs. 3,732 crore), leasing (Rs. 1,416 crore) and wages (Rs. 1,348 crore).

> *Clearly, the Directors on the AI Board (especially the Government Directors) should have been aware much earlier that such enormous increases in working capital loan limits (without a corresponding increase in operational revenues) were indicative of a major liquidity problem.*

The Ministry replied (August 2011) that the increase in working capital limits to extreme proportion was noted by the Government Directors and Independent Directors of the NACIL/AIL Board, but they had little option, keeping in view the cash flow position of the airline.

The reply is not acceptable, as the Directors on the AIL Board should have been aware of the alarming situation that AIL would be facing in future.

---

[59] Which was depicted under unsecured loans.

### 6.3   Real-time Revenue Management Systems

In the era of deregulated air fares, yield management is a critical aspect of revenue generation for the airline industry. Yield management involves strategic control of inventory (seats in the case of airlines) to sell it to the right customer at the right time for the right price; this process can result in price discrimination and market segmentation. This is a complex activity, involving use of sophisticated IT systems and complex revenue models, as well as experienced revenue management strategists. There are different categories of revenue management software:

- **Leg/ segment revenue management tools** – which allocate seats among different fare buckets;

- **PNR O&D data based systems** – which represents a substantial improvement over leg/ segment revenue management systems and examine how the route network should be designed, based on analysis of PNR data;

- **Real-time dynamic pricing systems** – which go further in terms of the granularity of market/ customer satisfaction.

Although IAL never used an Automated Revenue Management System (ARMS), AIL acquired and implemented an ARMS – PROS 5.2, supplied by PROS (a leading vendor of revenue management systems) – in June 2001. PROS 5.2 was used upto 2007, but fell into disuse when server failure resulted in loss of two years data, and was only marginally utilised after revival until May 2010. PROS was upgraded to PROS 5.12 in February/ April 2010. AIL has been able to use PROS in auto pilot mode only in a limited number of sectors and in lean season, and had to result to manual intervention in respect of the majority of sectors. Besides software limitations, one of the reasons was that the sole surviving IT server (out of the original seven servers) was running in excess of 85 per cent of capacity with very poor response time to end-users.

The use of PROS was again discontinued from February 2011, after the introduction of the new single code reservation system, which required integration of PROS with the new reservation system. The use of PROS was restored for international flights only from June 2011; for domestic flights, the use of ARMS has not yet been implemented, due to lack of adequate training of the revenue management team at Delhi.

> **Management is actively considering a proposal for a 4th generation ARMS – PROS O&D, which can forecast demand at O&D level (instead of at sector level), thereby looking at maximising overall network revenue. This was approved by the NACIL Board in August 2010, but has not yet been implemented. However, even this tool does not represent a state-of-the art ARMS, which will take into account automated real-time pricing models and analytical tools. This cannot be over-emphasised in the current dynamic and competitive environment.**

The Ministry noted (August 2011) the audit observation.

## 6.4   Productivity Linked Incentive (PLI)

IAL's PLI scheme for pilots, introduced in 1993, was extended to other categories of employees between May 1994 and March 1998.

In the CAG's Audit Report – Union Government (Commercial) of 2004, we had pointed out that the pre-determined performance levels (for disbursement of PLI) were less than the average performance achieved by the workmen prior to introduction of the PLI scheme. Pegging the base level for incentive payment below the average performance level amounted to rewarding the employees for less-than-average achievement. Deficiencies in the PLI scheme (revised in February 2005) were again highlighted in the CAG's Audit Report – Union Government (Commercial) of 2008.

A comparison of the profit/ loss of IAL, the overall load factor and PLI during 2004-10 revealed that an increasing trend in losses and static/ decreasing Overall Load Factor was contrasted by enormous increases in PLI.

*Table 6.12 – Profit/ (Loss) and PLI of IAL/ NACIL (narrow body)*

| Year | Profit/Loss (Rs. in crore) | Overall load factor (%) | Total PLI (Rs. in crore) |
|------|---------------------------|-------------------------|--------------------------|
| 2004-05 | 66 | 69.1 | 438 |
| 2005-06 | 50 | 71.6 | 473 |
| 2006-07 | -240 | 73.1 | 534 |
| 2007-08 | -1124 | 70.9 | 679 |
| 2008-09 | -2962 | 63.0 | 685 |
| 2009-10 | -2774 | 66.4 | 750 |

AIL had a separate PLI structure – introduced in May 1996 for technical cadre employees and subsequently extended for other employees. As in the case of IAL, the base performance levels for PLI payment were set well below the average performance prior to introduction of PLI, as summarised below:

*Table 6.13 – Average Performance Prior to PLI and Base Performance Level for Payment of PLI in respect of AIL/ NACIL (wide body)*

| Parameter | Base Performance Level for Payment under PLI | Performance Level for 100% PLI Payment | Average Performance Prior to PLI |
|-----------|-----------------------------------------------|------------------------------------------|-----------------------------------|
| On time performance | 56% | 80% | 66% |
| Revenue per Available Tonne Kilometre (in Rs.) | 10.93 | 11.69 | 11.17 |

| Parameter | Base Performance Level for Payment under PLI | Performance Level for 100% PLI Payment | Average Performance Prior to PLI |
|---|---|---|---|
| Passenger carried per Employee (in numbers) | 22.90 | 26.40 | 24.13 |
| Equipment Serviceability | 84.25% | 89.50% | 87.28% |
| Dispatch Reliability | 96.01% | 97.5% | 96.63% |
| Aircraft Availability | 65.47% | 78.84% | 73.36% |

Although an internal committee of AIL (constituted in August 2008 to work out modalities for implementation of reduction of PLI/ Allowance) had recommended (September 2009) reduction ranging from 25 to 50 per cent (yielding Rs. 600 crore annually), this was yet to be implemented. PLI continued to be paid, irrespective of the poor financial performance of the AI.

In response (February 2011):

- The Management stated that when revision of pay scales effective January 1997 was being considered, it was assessed that any modification to existing PLI schemes may result in industrial unrest. Further, AI had already taken steps by carrying out an extensive examination to link PLI and perks with productivity and align them with work performance, as also to evolve Key Performance indicators (KPI) and Balanced Score Card approach for assessing the performance and accountability of individuals to decide upon incentives and bonus.

- The Ministry referred to the legacy union agreements as an important factor standing in the way of any meaningful rationalisation of cost and service related matters. The lack of rationalisation and resultant non-harmonisation of wage related issues had a negative bearing on the efficiency and productivity of the airline as a whole.  These facts were submitted before the CCEA, which directed that AI may be advised to carry out an exercise for wage rationalisation.  Accordingly, Air India was instructed to initiate action for wage rationalisation in consultation with various unions/associations.

*The fact remains that huge amounts are being paid as PLI to different categories of staff without appropriate linkage to operational and financial performance, at a time when the entity can ill afford such payments.*

> **While the liberalised approach to bilaterals, as well as external factors (ATF prices, and economic recession from late 2008 onwards) were important contributory factors leading to the dismal financial and operational performance of IAL/ AIL and the merged entity, chronic operational deficiencies in their functioning cannot be ignored.**

The Ministry accepted the audit comment and stated (August 2011) that action would be taken by AI, based on the recommendations given by the Justice Dharmadhikari Committee.

## 6.5   Turn Around Plan(s)

From August 2009 onwards, multiple versions of a Turn Around Plan have been presented:

*Table 6.14 – Details of Turn Around Plan(s)*

| Turn Around Plan (August 2009) | Presented to CoS, and included cost reduction and revenue enhancement targets: <br><br> • Fuel savings of Rs. 124 crore during 2009-10; <br><br> • Staff cost reduction from Rs. 839 crore/ quarter to Rs. 650 crore/ quarter in 2009-10 (3rd quarter); <br><br> • Reduction in material and maintenance cost by Rs. 234 crore, Rs. 508 crore and Rs. 683 crore in 2009-10, 2010-11 and 2011-12 respectively; and <br><br> • Revenue enhancement from Rs. 2,077 crore in 2009-10 2nd quarter to Rs. 2465 crore by 4th quarter. <br><br> GoM laid down milestones in November 2009/ February 2010. MoCA released Rs. 800 crore as equity infusion in March 2010 on the grounds that the company had attained certain milestones, and also provided an outlay of Rs. 1,200 crore in the 2010-11 as equity contribution, concomitant on achievement of targets. |
|---|---|
| Revised Turn Around Plan (July 2010) | Approved by AIL Board with the following salient features: <br><br> • Targeted net profit (before depreciation, interest and tax) of Rs. 21,200 crore during 2010-15; <br><br> • GoI equity infusion of Rs. 8,000 crore + GoI guarantee for working capital borrowings + all-inclusive interest rate not exceeding 9 per cent; <br><br> • Estimated fleet size of 235 to 270 aircraft for different types of operations; and <br><br> • Separating ground handling and MRO operations from the main airline business. <br><br> Government Director's concern regarding lack of plans for rationalisation of wages/ PLI cost was not accepted, as the AIL Board felt |

| | |
|---|---|
| | that wage/ PLI cuts as a "front-end strategy" would be a negative factor in seeking the assistance of the unions. |
| **Review of Turn Around Plan (February 2011)** | Deloitte had furnished a report on "Review of Turn Around Plan" in February 2011, after considering four financial scenarios proposed by AI. Some of the salient projections/ assumptions underlying the review report are as follows: |
| | • Increase in AI's domestic market share from 17% to 21% (with PLF of 75% and 80% in full service and LCC operations respectively), assuming a growth in domestic market of 22% p.a. (against the overall market growth rate of 12-13%). |
| | • Growth of AI's market share by 15% p.a. (against market growth of 8-9%), with targeted PLFs of 71 to 80%. |
| | • Yields from wide-body aircraft growing at 5% p.a. to stabilise at Rs. 3.55/RPKM and from narrow-body aircraft at 3% p.a. to stabilise at Rs. 4-5.55/RPKM |
| | • Staff cost to decrease from Rs. 0.92/ASKM in 2010-11 and Rs. 0.32/ ASKM in 2014-15. |

*The Deloitte Review Report is predicated on extremely challenging assumptions. Essentially, AI's efficiency (commercial, operations etc.) would need to make quantum jumps in 4/5 years (much faster than their competitors). Further, the impact of staff costs is sought to be reduced by "spreading" them over a substantially expanded fleet of 235 to 270 aircraft.*

*In our view, further expansion of aircraft fleet (whether through leasing or acquisition) is an extremely risky proposition, considering that the financial burden of even the 2005 aircraft acquisitions will continue to be borne for several years to come and the current financial position of AI is extremely precarious.*

The Ministry noted the audit comment and stated (August 2011) that the same would be taken note of by the Committee for Turnaround Plan appointed by the GoM.

During the Exit conference (August 2011), the Ministry stated that the Turn Around Plan was under process and would be submitted to CCEA. The Plan inter-alia included various options, viz.

- 10 year plan to meet the gap between revenue and expenditure,
- Financial restructuring of loans,
- Infusing government equity,
- Payment for VVIP flights,
- Induct Independent Directors on the Board of AI,
- Shelve out MRO and Cargo Handling, etc.

## Chapter 7    Conclusions and Recommendations

Air India has enjoyed the unique position of being considered the National Carrier of the country.  This is in spite of the fact that there are many other Indian Carriers today who are operating both domestic and international flights.

In spite of this advantage, it is also a fact that Air India is no more the favoured airline of passengers, both Indian as also International.  The services and criteria that benchmark a favoured and popular airline are perceived to be absent in Air India. The discerning passenger who may be a corporate, businessman, tourist or civil servant who has to spend long hours in flight looks for a comfortable, luxurious and salubrious environment. Attentive, efficient, pleasant and courteous service from the crew on board is an added attraction.

The current dismal state of affairs of the merged entity "Air India" is a combination of a multiplicity of factors such as:

- risky acquisition of a large number of aircraft with the intention of vastly expanded operations and "footprint" and also, in the case of the erstwhile AIL, perceivably following a 'supply response' philosophy enunciated by MoCA.

- a liberalised policy on bilateral entitlements for international air travel introduced by GoI without affording adequate time to AIL/ IAL to set their houses in order and gear up for a highly competitive environment, & subsequent rights being liberally approved to foreign carriers without any quid pro quo to Indian Carriers.

- an ill-timed merger undertaken after separate aircraft acquisitions by AIL and IAL were completed, driven from the top, rather than by the perceived needs of both these airlines, with inadequate validation of the financial benefits from such a merger and without adequate consideration of the difficulties involved in integration (notably in terms of HR and IT, among other areas);

- chronic operational deficiencies;

- a weak financial position reflected in a grossly inadequate equity capital and undue dependence on debt funding, providing little or no cushion for the financial shock when it came; and

- external factors beyond the control of AI (high ATF prices, the 2008 economic recession etc.).

However, the merged entity "Air India" has since undertaken several positive measures, notably the following:

- A considerable amount of **route rationalisation** has taken place, especially in terms of loss making routes during 2008-09 and onwards;

- **Resource integration and network planning/ scheduling** activities of the erstwhile AIL and IAL has now largely stabilised;

- **A common code** for AIL and IAL passenger reservations has finally been implemented with effect from February 2011, although the full set of modules of the new Passenger Service System (PSS) is yet to be implemented and operationalised.

- Timely development of hubs in India (e.g. at Delhi and Mumbai Airports) will help Air India in getting significant volumes of 6th freedom traffic from India.

- The 43 narrow-bodied aircrafts ordered by the erstwhile IAL have been received by April 2010, while of the 50 aircraft ordered by the erstwhile AIL, 20 (8 B777-200LR – long range, and 12 B777-300ER – mid-range[60]) aircraft have been received;  the delivery of the 27 B787-8 aircraft (which is termed as the "dreamliner" aircraft in popular parlance, and is projected to have substantially lower fuel consumption) is delayed to the 2nd half of 2011-12.

If the merged Air India is to regain its predominant position several positive remedial measures need to be urgently undertaken by all the major stakeholders. They would be the Government, in the Ministry of Civil Aviation and its attached office the Director General of Civil Aviation, the Board of Directors and senior management, and all personnel of Air India.

Accordingly our recommendations have been demarcated for each stakeholder as follows:

### The Board of Directors, Senior Management and Employees of AI

- The Board of Directors should provide the necessary expertise to lead the turn-around of Air India from a downward spiralling airline to a profitable well run airline.

- **HR integration** (viz. harmonisation of HR) below DGM level (pilots, engineers and other staff) of the erstwhile AIL and IAL has not yet taken place. This is a critical issue, whose importance and associated difficulties were not fully appreciated pre-merger, more so in view of recent strikes and HR disputes. This needs to be handled swiftly, if the merger is to become a success.

- **Incentive structure** – In our view, the current structure of the Performance Linked Incentive (PLI) needs to be restructured, as it does not adequately incentivise or disincentivise actual performance on the ground:

---

[60]  Out of 15 777-300ER aircraft ordered, delivery of 3 aircraft was subsequently deferred at AI's request.

❖ **PLI should focus on On-time Performance (OTP)**, as this is the most critical parameter in the airline industry, from a service perspective. However, the base level for OTP for performance incentive should not be set at an unduly low level, based on AIL's past performance, but should be linked to the performance of its competitors (Jet Airways and Kingfisher, the leading full service carriers, – in respect of domestic operations, and Jet Airways/ Emirates/ Singapore Airlines etc. in respect of international operations). **At the very least, the OTP baseline for performance incentive should be set close to the performance of its competitors (say no more than 3-5 per cent below its competitors – Jet Airways/ Kingfisher)**.

❖ **Impact of first flight(s) on OTP** – The impact of the first flight on On-Time Performance throughout the day is critical. Consequently, the incentive for OTP of the first flight should be set at a substantially higher level than for subsequent flights.

❖ **The PLI paid to various categories of employees should have distinct components** – one component linked to the overall performance of NACIL as a whole (again relative to its competitors) and the other component linked to the specific performance of the division/ department/ sector to the most granular level possible (so as to ensure incentives are as closely linked as possible to performance at the grassroots level). The structuring should be such that different categories of employees do not get incentives merely for completing activities within their limited sphere of work, without consideration of how such work contributes to the overall efficiency of the organisation. For example, the departure of any flight on time depends on the contribution of several sets of employees from different departments (Engineering, Operations, Commercial etc.) at different levels.

● **Relocate operations from city offices** – Ultimately, the success or failure of an airline will depend on the extent of close supervision/ oversight by top and middle management on operational activities on site, rather than in city offices. As has been reflected in the CMD, NACIL's testimony to COPU[61], attempts to shift officers and staff from city offices to airports have been met with stiff resistance. Unless senior level officers at the level of DGM/ GM and above (and not merely at the level of Duty Manager[62]) are available onsite to obtain real-time feedback on the status of operations, significant improvements in operational performance are unlikely to take place.

● **Increased proportion of web-based/ technology-based ticket sales –** In order to ensure cost rationalisation, AI must ensure a substantial increase in ticket sales through web based channels, rather than agents/ front offices. The current proportion of ticket sales

---

[61] Para 3.21 (pg. 45) of the 4th Report of Committee on Public Undertakings (COPU) (2009-10) – Fifteenth Lok Sabha

[62] Typically of the rank of Manager/ Sr. Manager

through AI's website is abysmally low. Further, anecdotal evidence of the poor response of AI's Internet website ticketing vis-a-vis that of competing airlines sites also abounds. AI should also leverage IT more effectively to ensure maximum use of technology for operations – e.g. web/ mobile check in, check-in kiosks/ scanned security checks etc. In particular, it is not enough to set up technological solutions; it is necessary to ensure that these are fully utilised.

- **Real-time revenue management** –AI's record of implementing revenue management solutions has been, at best, mixed. In addition to full scale implementation of the latest generation revenue management systems to enable real-time dynamic pricing, AI also needs to ensure adequate availability of skilled analysts who could make use of such granular data, with appropriate delegation of powers and empowerment of officials.

> **The airline is in a crisis situation. Salary payments and ATF obligations are becoming difficult. If the airline has to survive, the management and employees will have to set personal interests aside and undertake some harsh decisions, till the health of the airline improves.**

- **Maximisation of PLF in Business/ First Class** – Even more than overall PLF and PLF in economy class, **AI's PLF (in terms of revenue-generating seats) for business/ first class - which is far more critical to a full service carrier's financial health than economy class PLF - is abysmal**. Rigorous controls need to be put in place to ensure that there are no vacant seats in Business/ First class, allowing for **"upgrades on availability basis"** from economy class:

  ❖ All free travel by AI officers (on duty/ leave) in business/ first class should be prohibited; all existing facilities offered in this regard should be withdrawn till AI's financial conditions improve dramatically. Given the life-threatening crisis that AI is currently facing, top and middle management in AI should set an example in this regard.

- Even four years after the merger, AI is yet to join the Star Alliance, mainly due to the delay in setting up a single code passenger reservation system. In fact, as per the press release of 31 July 2011 available on the Star Alliance website, AI's application for membership of the Star Alliance has been "put on hold", and the integration of Air India into the global airline alliance "will be suspended". This raises the likelihood of indefinite delays as also serious uncertainties on AI's prospects for joining the alliance. Therefore, the AI board should take immediate steps to ensure that AI is accepted in the Star Alliance at the earliest.

## Government / Ministry of Civil Aviation

- **Freeze on bilateral entitlements to countries/airlines predominantly utilising 6th freedom traffic** – Most of the liberalised entitlements for bilateral rights granted to foreign airlines (especially in Dubai, Bahrain, Qatar and other Gulf/ SE Asian countries) has been utilised for 6th freedom traffic and not for genuine traffic to the other country. AI and other private Indian airlines are handicapped by the lack of adequate hub facilities and other factors (e.g. lack of agreement for change in gauge at Dubai Airport) from competing effectively with other predominantly 6th freedom carriers (e.g. Emirates). Till India has its own effective and efficient hubs and AI/ other Indian carriers are able to exploit them effectively (say within 3 to 5 years), entitlements for airlines/ countries predominantly dependent on 6th freedom traffic **(notably Dubai, Bahrain and other Gulf countries in the first instance)** should be strictly frozen by MoCA; if possible, subject to diplomatic and other considerations. Options for rollback of excess entitlement granted beyond genuine traffic requirements may also be explored by MoCA.

- **Prompt payment of Government dues** –Air India's services are frequently used for VVIP and other Government duties; yet, reimbursement of costs incurred by AI is often not done in a timely basis. Given the financial crisis in which it finds itself, AI cannot afford such delays, even if interest were to be hypothetically leviable by it for delayed payment. MoCA should ensure that such dues are paid to Air India in a timely manner (say within 30 days of provision of services).

- **Infusion of Government Equity** – Both the erstwhile AI and IA and the merged entity have been unduly dependent on debt funding with a very narrow equity basis, which has dramatically increased the financial burden on AI. GoI should consider prompt infusion of additional Government equity in a timely fashion to ensure that the D/E ratio reaches tolerable levels. **However, such infusion has to be clearly and categorically linked to demonstrable, realistic operational improvements (in line with the performance of competitors) according to specified timelines, and also undertaking necessary reforms (e.g. PLI), such as those delineated in this report. Else, there is a possibility of "untied" GoI funding going into a "black hole" without any long-lasting benefit, but merely postponing the inevitable.**

- AIL has to function in a level playing field. While it may be a Public Sector Undertaking with Government infusing equity into the entity yet, they should be allowed the same autonomy with regard to commercial and operational decision as those enjoyed by any private airline.  The Government must in this regard have a total "hands off" approach from the day to day professional management decisions of the airline.   It is also imperative that Air India therefore should be headed by a professional who has a stake in the success of the airline.   The best person should be selected in a transparent

manner by professionals having the requisite experience to know what is required in a person who is to head a large national airline who should also perhaps have the experience to turn around an airline which is not doing well.

- The Government has to acknowledge that at this point of time Air India requires some time to recover their financial health.  The decisions taken by the Ministry of Civil Aviation which have adversely impacted AIL and to some extent, other Indian Carriers have been discussed in detail in this Report.  The Government today has to review the policy regarding bilateral agreements to safeguard the interest of the Indian carriers. The Government has to also acknowledge that the debt burden imposed on Air India is a consequence of the purchase of aircrafts and has contributed predominantly to its financial downturn.  The Government has to make a realistic assessment of the present level of debt, the likely burden which will accrue if the acquisition programme were to continue and the present capacity of the airline to service the debt with its own resources.  The Government has to make an immediate intervention in the form of a bail-out package which would consist of equity infusion, outright grant and soft loans as per the requirements of the airline.

In response, the Ministry indicated that the conclusions and recommendations had been noted for appropriate action as necessary.

*We believe that AIL had inherent strengths. A multitude of factors which were internal and external have rendered it in a very critical situation. There is also no evidence of MoCA having provided it with positive support in the last few years. If the Airline has to be nursed to commercial viability, Government has to consciously attend to the following:*

 *(i)      The Airline has a debt liability of Rs. 38,423 crore as on 31 March 2010. Aircraft acquisition has contributed predominantly to it. Government must lay down a road map for liquidating the liability within a short span after making a realistic assessment of revenue generation capacity. Piecemeal infusion of small amounts is merely going to at best delay the certain closure of the Airline.*

*(ii)   Accountability in the Airline, its Board, Government nominated Directors and the MoCA has to be clearly established and transparently dealt with. Grant of routes to private carriers, Bilateral Agreements (of which there appears to be no further scope as there is  saturation already)  must factor in interests of the national and other private carriers. Concluded agreements need to be reassessed.*

*(iii)  A critical assessment of the Airlines profitable sectors, if any, is required. On other sectors attempt to remove infirmities including bilaterals to support the Airlines may be made.*

*(iv) MoCA and Government must recognise that Air India is the National Carrier. In very many ways, it is a symbol of the State. Even if Ministers and officials in MoCA, profess not to be Ministers/Officials for AI alone, the fact remains that it has to be given a more than level playing field now, which it has not been given. All decisions to allot routes, alter timings, provide first refusal rights on domestic and international routes must be made taking into account the interests of AI. This should be done in a transparent and demonstrable manner placing it in public domain. Accountability at the decision making level has to be established.*

*(v) A total hands-off approach with regard to the management of the airline is required.*

*Audit is of the firm view that unless the Government takes cognisance of the above mentioned factors and decisions thereupon, the Airline does not have a future as a vibrant Public Sector entity.*

**Dated:  16 August, 2011**                                   **(ANAND MOHAN BAJAJ)**
**Place: New Delhi**            **Principal Director of Audit (Economic and Services Ministries)**

**Countersigned**

**Dated:  17 August, 2011**                                            **(VINOD RAI)**
**Place: New Delhi**                              **Comptroller and Auditor General of India**

