# EXHIBIT 16



# PARLIAMENT OF INDIA
# RAJYA SABHA

151

## DEPARTMENT-RELATED PARLIAMENTARY STANDING COMMITTEE ON TRANSPORT, TOURISM AND CULTURE

### ONE HUNDRED FIFTY FIRST REPORT

### ON

### MERGER OF INDIAN AIRLINES AND AIR INDIA: ITS IMPACT ON THE CIVIL AVIATION SECTOR

(PRESENTED TO THE HON'BLE CHAIRMAN, RAJYA SABHA ON 21ST JANUARY, 2010)

(PRESENTED TO THE HON'BLE SPEAKER, LOK SABHA ON 21ST JANUARY, 2010)

(PRESENTED TO THE RAJYA SABHA ON 3RD MARCH, 2010)

(LAID ON THE TABLE OF THE LOK SABHA ON 3RD MARCH, 2010)

**RAJYA SABHA SECRETARIAT**
**NEW DELHI**

JANUARY, 2010/MAGHA, 1931 (SAKA)



# PARLIAMENT OF INDIA
# RAJYA SABHA

## DEPARTMENT-RELATED PARLIAMENTARY STANDING COMMITTEE ON TRANSPORT, TOURISM AND CULTURE

ONE HUNDRED FIFTY FIRST REPORT

ON

MERGER OF INDIAN AIRLINES AND AIR INDIA:
ITS IMPACT ON THE CIVIL AVIATION SECTOR

(PRESENTED TO THE HON'BLE CHAIRMAN, RAJYA SABHA ON 21ST JANUARY, 2010)
(PRESENTED TO THE HON'BLE SPEAKER, LOK SABHA ON 21ST JANUARY, 2010)

(PRESENTED TO THE RAJYA SABHA ON 3RD MARCH, 2010)
(LAID ON THE TABLE OF THE LOK SABHA ON 3RD MARCH, 2010)



सत्यमेव जयते

RAJYA SABHA SECRETARIAT
NEW DELHI

JANUARY, 2010/MAGHA, 1931 (SAKA)

CONTENTS

PAGES

1.   COMPOSITION OF THE COMMITTEE ........................................................................ (i)-(ii)

2.   INTRODUCTION ........................................................................................................ (iii)

3.   REPORT OF THE COMMITTEE .................................................................................. 1—36

4.   OBSERVATIONS/CONCLUSIONS/RECOMMENDATIONS — AT A GLANCE .................. 37—50

5.   MINUTES .................................................................................................................. 51—71

COMPOSITION OF THE DEPARTMENT-RELATED PARLIAMENTARY
STANDING COMMITTEE ON TRANSPORT, TOURISM AND CULTURE
(2009-10)

1.  Shri Sitaram Yechury — *Chairman*

**RAJYA SABHA**

2.  Shri Ramdas Agarwal
3.  Shri Birendra Prasad Baishya
4.  Shri Shadi Lal Batra
5.  Shri Naresh Gujral
6.  Shri Syed Azeez Pasha
7.  Shri Thomas Sangma
8.  Shri Satish Kumar Sharma
*9.  Prof. Saif-ud-Din Soz
10.  Shri Vikram Verma

**LOK SABHA**

11.  Yogi Aditya Nath
12.  Shri Avtar Singh Bhadana
13.  Shri V. Kishore Chandra S. Deo
14.  Shrimati Bhavana Gawali Patil
15.  Shri Mahesh Joshi
16.  Shri P. Karunakaran
17.  Shri Jose K. Mani
18.  Shrimati Ranee Narah
19.  Shri Rajaram Pal
20.  Shri Bal Kumar Patel
21.  Shri Nama Nageswara Rao
22.  Shri S.D. Shariq
23.  Shri Madan Lal Sharma
24.  Shri Dushyant Singh
25.  Shri Jitendra Singh
26.  Shri Rakesh Singh
27.  Shri Shatrughan Sinha
28.  Shri K. Sugumar
29.  Shri Kabir Suman
30.  Shri Anurag Singh Thakur
31.  Shri K.C. Venugopal

*Nominated on 12th September, 2009.

(ii)

**SECRETARIAT**

Shri N.K. Singh, Joint Secretary

Shri Jagdish Kumar, Director

Shri Swarabji B., Joint Director

Shrimati Nidhi Chaturvedi, Assistant Director

## INTRODUCTION

I, the Chairman, Department-related Parliamentary Standing Committee on Transport, Tourism and Culture, having been authorised by the Committee, do hereby present on its behalf this 151st Report on the 'Merger of Indian Airlines and Air India: its impact on the Civil Aviation Sector'.

2.      The Department-related Parliamentary Standing Committee on Transport, Tourism and Culture in its meeting held on the 24th April, 2008 decided to have an in-depth study on the functioning and performance of the NACIL which came into existence after the merger of the erstwhile Air India and Indian Airlines. The subject selected was notified in Parliamentary Bulletin part II dated the 30th April, 2008.

3.      Apart from a detailed background note obtained from the Ministry of Civil Aviation, the Committee heard the views of the Secretary, Ministry of Civil Aviation and the CMD, National Aviation Company of India Limited in its meeting held on the 22nd August, 2008. The Committee also heard the views of the representatives of the employees' unions of erstwhile Indian Airlines on 2nd September, 2008 and those of the employees' unions of erstwhile Air India on the 19th September, 2008.

4.      The Committee could not take up the subject for further considerations thereafter due to intervening sessions and other urgent engagements. In the meantime, the Parliament was adjourned on the 26th February, 2009. In the face of imminent dissolution of Lok Sabha, the Committee in its meeting held on the 24th March, 2009 decided that the new Committee, which will be constituted after the General Elections, may examine the matter further after taking into account all the material facts and evidence available so far.

5.      After its reconstitution, the Committee in its first meeting held on the 15th September, 2009 decided to take up the subject for the further consideration and report.

6.      As around one year had already passed since the Committee had heard the stakeholders, it was decided to have current facts about the issues involved. Therefore, the Committee heard views of the representatives of various organizations/unions of NACIL on the 20th October, 2009. On the same day, the Committee also heard the Secretary, Ministry of Civil Aviation and the CMD, National Aviation Company of India Limited. The Committee again heard the Secretary, Ministry of Civil Aviation and the CMD, National Aviation Company of India Limited on the 30th October, 2009.

7.      The Committee considered and adopted the Report at its meeting held on the 8th January, 2010.

8.      The Committee expresses its gratitude to the representatives of the Ministry of Civil Aviation, National Aviation Company of India Limited, Employees' Unions of erstwhile Indian Airlines and Air India for their cooperation in furnishing the required facts and existing position in respect of issues under consideration and also for making valuable suggestions for improving the functioning of NACIL.

SITARAM YECHURY

NEW DELHI;                                      *Chairman,*
*January* 8, 2010                   *Department-related Parliamentary Standing*
*Pausa* 18, 1931 *(Saka)*          *Committee on Transport, Tourism and Culture.*

REPORT

The erstwhile Air-India (now termed as NACIL-A) and Indian Airlines (now termed as NACIL-I) were established in 1953 under the Air corporations Act, 1953, to provide safe, efficient, adequate, economical and properly co-ordinated international and domestic air transport services.

2.    The undertakings of erstwhile Air-India and Indian Airlines were transferred to and vested in Air-India Limited and Indian Airlines Limited, Public Limited companies registered under the Companies Act, 1956 with effect from 1st March, 1994 subsequent to the enactment of the Air Corporations (Transfer of Undertakings and Repeal) Act, 1994.

3.    Aviation sector in India has undergone remarkable transformation in the recent past in terms of its growth, accessibility and affordability. One of the major changes was the opening of Indian skies to private players in the early 1990s, in the wake of 'Open Sky Policy' of the Government. This deregulation, in fact, led to new operators entering the aviation market that challenged the monopoly enjoyed by the Government owned carriers in the aviation market. The competition so generated had resulted into reduced fares, increased seat availability and sometimes better service than what was available so far. Introduction of no-frill Low Cost Carriers (LCCs) and a cut-throat reduction in fares significantly dented the operations and profitability of the national carriers.

4.    The opening of aviation sector to private players also had its share of disadvantages as many of the new airlines, after making a windfall in the market, started to disappear, as they could not withstand the intense competition in the sector. Besides, our State owned carriers also had to bear the brunt as they were ill-prepared for such a situation. Both the airlines – Air India and Indian Airlines, already in bad health, were in dire need of a major restructuring to put them on their feet. The dwindling market due to fierce competition and declining financial performance posed a serious threat to future survival of the two airlines on a stand alone basis. It was felt that in an increasingly consolidating global aviation environment, where 'critical mass/size' is a key success factor, combining the two state owned airlines into a single merged entity would better equip them to survive and prosper amidst fierce global and domestic competition as it would provide an opportunity to leverage combined assets and capital better and build a stronger sustainable business.

5.    The theory of merger of airlines, till then an international phenomenon, therefore, started to be considered seriously in the Indian aviation market. The concept of merge or perish, in fact, became the new mantra not only of the State-owned but amongst private airlines also.

6.    It was against such a backdrop, the Government of India announced a major policy decision to merge the two Government carriers' Air India' and 'Indian Airlines' into a single entity named as **'National Aviation Company of India Limited' (NACIL)**.

**Merger of Air India and Indian Airlines**

7.    The Air India Board constituted a Committee to oversee the entire process of merger. The Board Committee decided on 24 July, 2006 to appoint the M/s. *Accenture* led consortium as the Consultant to draw up a road-map for the merger of erstwhile Air India and India Airlines. The

consortium - which included *Ambit Corporate Finance* – had been given a mandate to prepare a detailed blueprint for the merger within 26 weeks.

8.     The Consultants had to prepare a road map for the merger specifically related to integration of flight schedules, networks, infrastructure, marketing and distribution channels, integration/ rationalization of the fleet, subsidiary companies, and business strategy and plans for the merged entity. They were also asked to support change management and communication during pre and post merger stages and look into issues involved in integration of manpower resources and support implementation of various integration measures/initiatives for a period of one year after the merger.

9.     The Government had appointed a Core Group to monitor the progress and to co-ordinate with Consultants at the top level. In addition, four Working Groups had also been constituted to coordinate on each of the major issues likely to arise during the process of merger *viz.* (i) commercial (ii) human resources (iii) finance and (iv) operations, engineering and infrastructure.

10.    The empowered Group of Ministers (GOM) which met on the 27th November, 2006, to discuss the interim presentation of the consultant, decided to refer the matter to a Committee of Secretaries (COI) headed by Cabinet Secretary and comprising the Secretaries from Ministries/ Departments of Civil Aviation, Finance, Revenue, Law and Public Enterprises for a detailed study of the issues and submission of its recommendation. The proposal received the approval of the GOM on 21st February, 2007 and the Cabinet on 1st March, 2007.

11.    Consequent to the Government's decision to merge the erstwhile Air India and Indian Airlines into a new company, as a first step, a new Company *viz.* National Aviation Company of India Limited (NACIL) was incorporated on 30 March, 2007 with an authorized capital and paid-up capital of Rs.1500.05 crore and Rs.145.00 crore respectively, under the Companies Act. The Certificate to Commence Business was obtained on 14 May, 2007. The entire paid-up share capital of newly formed NACIL is held by the Government of India. The Registered Office of the Company is at Airlines House, 113, Gurudwara Rakabgunj Road, New Delhi-110001.

12.    The Air India Board, in its 121st meeting held on 4 May, 2007 approved the Scheme of amalgamation of Air India Limited and Indian Airlines Limited with National Aviation Company of India Limited. The scheme was approved by the Boards of all the three companies.

13.    It was also decided that post Air India-Indian Airlines merger, the new entity will be known as "Air India", while "Maharaja" will be retained as its mascot.

14.    The final Order on Merger was passed by the Ministry of Corporate Affairs on 22 August, 2007. The order was filed with the Registrar of Companies and the merger became effective on 27 August, 2007. Consequently, both Air India Limited and Indian Airlines Limited were dissolved without being wound up. As a result of this, all assets, liabilities, obligations of both these Companies were taken over by the NACIL effective from 27 August, 2007. The appointed date of merger was 1 April, 2007.

**Objectives of Merger**

15.    This merger was projected as one of the best decisions in the Indian aviation history. The newly created entity NACIL was said to have become one of the largest operators in the world.

3

It was hoped that with this merger, NACIL would give the private operators run for their money. This Government-owned company was expected to reclaim their supremacy in the Indian skies. The merger process which was initiated in the year 2006, became effective from the 27th August, 2007.

16.     It was submitted before the Committee that the merged entity with a fleet of 140+ aircraft was expected to take on the growing competition from private airlines and international carriers as well as to enter the list of top 30 airlines globally in terms of fleet size and the top 10 in Asia. It was envisaged that operational synergies, redeployment of aircraft, route rationalization and optimal utilization of infrastructural resources would result in considerable profits for the Company. The merger was to provide an opportunity to leverage the combined assets and capital in a better manner to build a sustainable business. It was expected that the merger would enable optimal utilization of existing resources through improvement in load factors and yields on commonly serviced routes as well as deploy 'freed up' aircraft capacity on alternate routes, provide an opportunity to leverage skilled and experienced manpower available with both companies to the optimum potential, enhance customer proposition and allow easy entry into one of the three global airline alliances, provide an opportunity to fully leverage strong assets, capabilities and infrastructure, to develop profitable businesses like Ground Handling Services, Maintenance Repair and Overhaul (MRO) etc.

**Objectives of merger achieved so far**

17.     Regarding the level of achievement of these objectives, the Ministry submitted before the Committee that with the merger, Air India had became the largest airline in India and comparable to other airlines in Asia. The integration of routes had been initiated effective winter 2007 thereby the routes operated by both erstwhile Air India and Indian Airlines concurrently had been discontinued. The domestic sectors are now operated by A320 aircraft, whereby the released A310 capacity has been redeployed on more lucrative routes. Further, route rationalization measures are being planned with focus on profitability. A new organizational structure has been finalized and Functional Directors and Executive Directors have been appointed; seniority integration principles finalized; and combined seniority list finalized for General Managers. Administrative and Financial Powers harmonized. Integrated procurement policies and procedures manual created; and integrated field level (regional) structures and slotting were being reviewed. The committee was also informed about many other steps being taken progressively to merge various activities of both the airlines to improve efficiency and effect savings in operations.

**Slow pace of merger**

18.     The euphoria, if any, generated by the Government's decision to merge its national carriers started faltering even before it had actually become effective, in almost all the areas - administrative, financial, operational, etc. Employees of both the carriers felt apprehensive about several aspects in the new set up. They claimed that they were not consulted when some major decisions regarding merger were taken. The 'bold business decision of the decade' as described by the Government, started to loose its sheen and turned out to become the worst ever decisions taken by the Government. The mother of all mergers could not bring the desired results, as expected by the Government. NACIL started accumulating losses, contrary to the objectives of

4

merger. It was, in fact, in this background, that the Committee had decided to go into all the major issues involved in and circumstances arising out of this merger.

19.     The merger process was started in the year 2007 and both the existing national carriers were merged into one entity called NACIL but even after a period of two years, the merger process was yet to take shape. Even after two years there are three entities functioning till date namely, the Air India, Indian Airlines and the newly created NACIL. When asked by the Committee about such a slow pace of the merger process and the status of road map for the merger, the Ministry replied that any merger process was a time consuming exercise in itself and there were quite a number of issues/policies which needed to be addressed and that merger was in progress. The Committee was apprised that in view of the complexity of the process and the time required for the same, the question of derailment of merger process did not arise. Presently, only the NACIL was in existence and not three separate entities, although the process had been delayed because of global recessionary conditions. The Ministry quoted some examples of international mergers of JAL-JAS and AF-KLM to support their arguments.

20.     **The Committee is not convinced with the arguments of the Government to justify the avoidable delays in taking the process of merger with required speed and manner. Merger of other international airlines does not *ipso facto* apply to the merger of Air India and Indian Airlines also. The Committee notes that the present aviation sector is already under pressure due to cut throat competitions and any further delay in merger is not going to do any favour for the ailing public carrier. Although more than two years have lapsed, the merger is neither visible in the air nor on the ground.**

21.     **After considering existing post-merger realities and claims and counter claims in this regard, the Committee has enough reasons to say that the merger process has certainly been delayed, if not derailed. It appears that all the planning and road map for this have gone hay wires. Any successful business model, in fact, depends on the proper integration of the men and material from the beginning and not in the mid-way. In this case, the essential integration has not taken place in real terms. As per the merger document, the integration of human resources will take at least two more years. In such a scenario, NACIL is having virtually three managements namely, NACIL itself, erstwhile Air India (NACIL-A) and Indian Airlines (NACIL-l). The Committee notes that at the time of merger, it was promised that an airline with a combined fleet size of 112 aircrafts, servicing both domestic and international routes with one code, would, no doubt, be comparable to any other airline, at least in the Asian region. But an analysis of the available data shows that such expectations from the merger process have been largely belied.**

22.     **The Committee fails to understand how the two major avowed objectives of merger - 'economies of scale' and 'increased leverage' - could be accrued without achieving proper synergies. The fleet configurations of both the erstwhile airlines are different. The Air India fleet consists of Boeing aircraft of medium and long range which are being normally used for long distance international destinations and the Indian Airlines fleet consists of Airbus aircrafts which are suitable for short-range distances predominantly for the domestic destinations. Both these operators also drew fleet acquisition plan on the basis of their operational requirements. Operating crews, engineers, technicians and other technical**

5

personnel who are trained and certified on the Indian Airlines fleet, cannot be utilized on aircrafts of Air India which operates different type of aircraft. This also applies to the aircrafts operated by Air India also. The Committee also notes that the technical infrastructure for aircraft maintenance including various workshops created by each company over the year is specialized and unique to each fleet type owned by both these airlines. As such, cross-utilization of the maintenance services is also not feasible. The Committee feels that in such a situation, these inherent contradictions existing within NACIL have become major stumbling block in achieving the required economies of scale and increased leverage.

23.     The Committee feels that the manpower integration, cross utilization of resources at Airports, existence of different sets of Passenger Service System (PSS) in Air India and Indian Airlines, sharing the codes, the transition to Strategic Business Units (SBUs) etc. are some of the critical areas which NACIL has to look into actively to achieve the desired results of merger of the Air India and Indian Airlines.

**Fleet of NACIL**

24.     The Committee noted that the fleet (owned and leased) for erstwhile Air India and erstwhile Indian Airlines as on August 2007 was as follows:—

**Air India** B747-400 (7), B747-400 combi (1), B747-300 Combi (2), B777-200 ER (4), B777-200 LR (3), A310 (14), A310 freighter (2), B767-300 (2), B737-200 (1), B737-800 (17). Total 53.

**Indian Airlines** A300 (3), A321 (3), A320 (48), B737 (11), D0228 (2), A319 (6), ATR 42 (4). Total 77.

25.     Thus both AI and IA had a combined fleet strength of 130 aircrafts as on August, 2007. With the purchase of more aircrafts the fleet strength of NACIL has gone up to 158 aircrafts that has posed a new problem of putting the management into agony of deploying the increased fleet in the existing slackness in the aviation industry with low yield.

**Purchase of new aircrafts**

26.     Another important issue that came up before the Committee was aircraft acquisition programme. Erstwhile Air India and Indian Airlines ordered the purchase of 111 (68 Boeing and 43 Airbus) aircrafts at a mammoth cost of more than Rs.44000 crores. The servicing of the interest and loan liability of the acquisition cost was to the tune of approximately Rs.6500 crores per annum. The Ministry informed that out of an order for 111 aircraft, 64 aircrafts had already joined the fleet and remaining 47 aircrafts were expected to join the NACIL fleet in a phased manner during 2014-15.

27.     The Committee was informed that the fleet size was normally guided by the Network Plan, which is developed on the basis of a study of market size and future potential based on GDP growth rate and other demand and economic growth indicators. Presently, NACIL's fleet size was sufficient to cover its domestic and international operations. However, the Network Plan was continuously reviewed with respect to the markets served and any new aircraft types/variants on offer. Additional requirements, if any, were then processed through the option of leasing or purchase of aircraft.

6

28.     AI's current operations are based on actual requirement of operating 22 wide body aircrafts and 57 narrow body aircrafts. The aircraft requirement for any airline would depend primarily on markets served, frequency/schedule operated as well as on other factors such as line maintenance, crew duty limitations, airport slots, etc.

29.     The Ministry was also asked about the rationale behind the purchase of 68 aircrafts for Air India as they had originally planned to purchase 24 aircrafts only even though the market factors and the financial conditions of the company were not in favour of such a decision. The Ministry in its reply stated that Aircraft Acquisition Plan of both the erstwhile Air India and Indian Airlines were their respective Board decisions which were referred to the Ministry of Civil Aviation because of its being the administrative Ministry for the two public carriers.

30.     The Ministry further added that the aviation sector started on a high growth project rate in 2004 and keeping in mind the changed scenario, the Government had suggested to the two airlines if they would like to have a relook at their acquisition programme. While the Indian Airlines Board had decided to go ahead with their original decision of acquiring of 43 aircraft, Air India had decided to augment their acquisition programme, including the acquisition of 18 aircraft for Air India Express.

31.     The Committee noted that NACIL had made a financial commitment of Rs.44,000 crores, for purchase of 111 aircrafts, when it had a poor equity base of Rs.145 crores and carry forward losses of Rs.776 crores as on March, 2006.

32.     The Committee was informed by the Air Corporations Employees Union that initially Air India had planned to purchase only 24 aircrafts and Indian Airlines had planned to purchase 43 aircrafts. Under the active guidance of the Ministry of Civil Aviation, Air India changed its fleet plan and within 24 weeks firmed up an aircraft plan for 68 aircraft. The Ministry of Civil Aviation and the Board of the Airline while clearing these proposals ignored the fact that Air India had a turnover of Rs.7000 crores per annum, was placing orders for Rs.35000 crores with yearly capital repayment and interest on this coming to Rs. 6000 crores.

33.     The Ministry further replied that the NACIL Board at its 21st Meeting held on 20th August, 2009, directed the Management to actively pursue with M/s. Boeing for the cancellation of the orders for the six B777-300 ER aircraft which were scheduled for delivery in 2010/11 in view of the depletion in traffic flows to/from India on account of the impact of worldwide recession and the worsening financial health of NACIL. M/s Boeing's response is awaited.

34.     **In view of the facts made available to it, the Committee feels that the Aircraft Acquisition Programmes of the erstwhile Air India and Indian Airlines were finalized in haste. The Committee fails to understand the logic behind purchasing a large number of aircrafts when the aviation industry was hurt by huge losses due to the global economic recession. There is no budgetary provision for this purchase and the money to the tune of Rs.50000 crores has to be raised through loans only. The return on such large scale investment will take its time and there is no guarantee of immediate return on such investments. The Committee is of the opinion that NACIL should review its aircraft acquisition programme in view of its financial conditions, changing commercial dynamics and the demand and supply in the market. The Company is already struggling to get equity**

**infusion to consolidate its capital. The Committee feels that a deferment of the aircraft acquisition programme will reduce the debt burden of the NACIL substantially.**

35.    **The Committee was given to understand that the entire aircraft acquisition programme lacked required transparency. Reasons for going ahead with huge purchases by the Ministry of Civil Aviation despite Air India and Indian Airlines not having the capacity to support it, remains unknown to the Committee. It, therefore, recommends that this aspect needs to be further probed to fix the responsibility for taking such an ambitious decision that has become big financial liability.**

**Lease of Aircrafts**

36.    In a written reply to the Committee, NACIL had submitted that till 1999, both the Airlines did not have any leased aircraft. However, in the year 2000, to meet the requirement of Air India and Indian Airlines on account of increased competition and growth in the aviation industry, it was decided to increase the capacity by way of leasing aircraft as the fleet acquisition process was taking its own time.

37.    Subsequent to the decision to purchase the aircraft by Air India and Indian Airlines in 2005 to be inducted effective 2006, further induction of aircraft on lease was minimized.

**Number of aircraft taken on lease**

38.    In all, 16, A310s, 8, B747-400s and 4, B777-200ERs were taken on dry lease during the period December, 2000 to December, 2005 by the AI. One 747 was taken on a short term lease of one year in September, 2007, to overcome urgent requirement. The rest of A310 and 747 fleets were taken on 3-year lease term. The 777s were inducted on 5-year term.

39.    Considering the demand for capacity and the delay in delivery of B787s, the lease term of six A310s was extended by another term on newly negotiated terms and conditions. 33 aircraft consisting of 26, A-320, 5, A-319 and 2, A-330s were also taken on initial lease period of 3 to 5 years by erstwhile IA.

**Current lease fleet**

40.    Out of the 61 aircraft taken on dry lease, 26 were returned to the lessors at the end of their respective lease terms.

41.    Currently the following aircraft are on lease with NACIL:

- Two A310s – Lease term ends in March and May, 2010.

- Four 777-200ERs – Lease term ends in March/May/August, 2010 and January, 2011.

- 22, A-320 returnable during 2009-2011.

- 5, A-319 returnable in 2010-2011 and 2 A-330 returnable in 2014.

42.    The Air Corporations Employees Union submitted before the Committee that Air India made lease of 15 expensive aircraft for which they did not even had pilots ready. Five Boeing 777 leased

8

aircraft and three Airbus 310 aircraft sat on ground without pilots to fly them. This was known to the Management as well as to the Ministry of Civil Aviation. It was also submitted before the Committee that when both Indian Airlines and Air India started to make major losses, a novel scheme of sale and lease back of aircraft was started in 2007 at the behest of the Ministry of Civil Aviation. This is like asset sell-off on one hand, and retaining surplus capacity on the other hand.

**Early lease termination**

43.    To a specific query on the termination of lease agreements and return of leased aircrafts, the Ministry furnished the following information:-

(i)    Lessor M/s Yamasa Full Moon Co. Ltd. – Aircraft 2 A330 a/c: Meeting was held with the Lease manager in July, 2009. The lease manager intimated that he would take up the matter with the owner. Owner subsequently communicated that they could not make a proposal since it is difficult to find new lessee and NACIL will have to pay all costs and lease rental differentials etc.

(ii)   Lessor M/s GMT Global – Aircraft 4 A320 a/c: Meeting was held with the Lessor and Lease manager in September, 2009. They provided the proposal for USD 37 million. This was contested by NACIL during the meeting. The proposal is under review by NACIL Engineering and Finance.

(iii)  Lessor M/s ORIX – Aircraft 1 A320 a/c: The lessor will provide the proposal after finalizing the proposal of the above four aircraft, for which M/s ORIX is the Lease Manager.

(iv)   Lessor M/s CIT – Aircraft 3 A319 a/c : Lessor intimated that since only one year is left for its return, the most beneficial financial position for both sides will be to proceed in an orderly return of the aircraft and not to redeliver the aircraft ear1ier, because early return will involve remarketing cost and lease rental differential etc.

(v)    Lessor M/s AerCap – Aircraft 2 A320 a/c, 2 A319 a/c: Lessor intimated that they are not prepared for an early termination of the Leases.

(vi)   Lessor M/s Volito – Aircraft Lessor intimated that they are not in a position to accept an early termination of the Lease Agreements.

(vii)  Lessor M/s Investec – Aircraft 7 A320 a/c, (Sale and Lease back): Lessor offered to accept the aircraft on "as is where is" without carrying out any maintenance work for redelivery of aircraft. They provided the proposal for USD 29.5 Million. The proposal is under review by Finance.

44.    NACIL adopted standard lease agreement drafts with negotiated changes, as required. The international lease agreements do not have an early termination clause. In other words, leases can only be terminated prior to the expiry date, only by mutual understanding with the lessor. The lessors generally base their financials on lease rentals per month value based, *inter-alia,* on the given fixed period of lease. All the lease arrangement of NACIL had been duly approved by the Board.

9

45.    In view of the sudden downturn in aviation sector during 2008 and 2009, efforts were made with all the lessors for an early termination of leases. While several lessors declined the early termination, some have indicated that they could not accept the proposal since it was difficult to find new lessees and that in case of termination, NACIL would have to pay all costs and lease rental differentials.

46.    The Committee was informed that currently, there are 4, B777-200ER aircrafts on lease with NACIL. Action was initiated to discuss with the lessors for the return of these aircraft. However, the lessors had sought compensation in terms of entire balance portion of lease amount. Pending a final decision, 3 of these aircrafts were proposed to be operated in the Gulf Sector in the Winter Schedule. The leased aircrafts were being progressively phased out as feasible. The capacity available will be redeployed on the most profitable (least loss making) routes.

47.    Negotiations are on with the lessors for return of the two A330 aircrafts on lease. Pending finalization, these aircraft were being deployed for Haj operations.

48.    Currently, NACIL has 22 leased A320 aircraft out of which 8 were on sale and lease-back. The remaining 14 aircraft were proposed to be returned within the next one year.

49.    A separate Group has been constituted to ensure that aircrafts were returned within a fixed time-frame.

50.    **After analyzing the facts available to the Committee, it appears that from 2006, a decision to go for dry and wet lease of aircrafts was taken to increase market share, without due considerations regarding proper route study and marketing or pricing strategy. It was also noted that Air India dry leased four Boeing 777s for a period of five years in 2006, whereas it was to get the delivery of its own aircrafts from July, 2007 onwards. As a result, five Boeing 777s and five Boeing 737s were kept idle on ground at an estimated loss of Rs.840 crore during the period 2007 to 2009.**

51.    **The Committee observes that aircrafts were dry/wet leased even while the aircrafts acquisition programme was going on. The Committee feels that aggressiveness shown in leasing of aircrafts has now turned out to be a unviable proposition. It raises genuine doubts about the Government's approach towards the entire issue. The Committee notes that absence of early exit-clause in lease agreements will lead to litigations and payment of lease rents even without using the aircrafts. The Committee is of the opinion that it has led NACIL into a morass from which it is very difficult to come out.**

52.    **The Committee notes that from the year 2007 onwards, the NACIL was scheduled to get delivery of the new aircrafts which had been planned in the year 2005. The Committee could not comprehend why the NACIL Management and the Ministry of Civil Aviation went ahead after 2005 with the expensive proposition of leasing of aircrafts that too without any exit clause. The Committee also notes that even after the new aircrafts delivery to NACIL, the company continued to lease aircrafts or renewed the leases on some pretext or the other, which caused huge loss to the company at the time of recession, low seat factor and capacity underutilization. All such decisions taken by the Management and the Ministry of Civil Aviation had ultimately resulted in big financial loss to the company. The Committee**

10

recommends that all the lease agreements may be reviewed and appropriate action may be taken in cases where agreements were not based on sound business prudence.

**Profit and loss of Air India and Indian Airlines before merger**

53.    The Profits/Losses of the two erstwhile airlines five years prior to the merger are given below:

**Net Profit/(Loss) after tax:**

*(Rs. in crore)*

| Year | Air India | Indian Airlines |
|------|-----------|-----------------|
| 2002-03 | 133.86 | (196.56) |
| 2003-04 | 92.33 | 44.17 |
| 2004-05 | 96.36 | 65.61 |
| 2005-06 | 14.94 | 49.50 |
| 2006-07 | (447.93) | (240.29) |

54.    The main reasons for the losses of erstwhile Air India in the year 2006-07 can be attributed to:

- Wage arrears of Rs.425 crore settled during the year.

- Increase in fuel costs due to increase in fuel prices from USD 2.02/USG to USD 2.25/USG resulting in additional expenditure of Rs.341 crores.

- Additional Interest burden of Rs.160 crores incurred on working capital.

- Decrease in Passenger Load factors from 66.2% in 2005-06 to 63.8%.

- Increase in passenger amenities, leasing costs and communication charges to the extent of Rs.l10 crores.

55.    The main reasons for the losses of erstwhile Indian Airlines in the year 2006-07 can be attributed to:

- Increase in ATF prices.

- Declining yields on account of intense competition.

- Write off of amount due from Airlines Allied Service Ltd. (AASL)--Rs.295.49 crore.

- Diminution in the value of investment made by the company in AASL.

**Financial performance of NACIL**

56.    The Committee then considered the financial performance of NACIL. The merger was considered as a boon to the sagging national carriers and it was expected that the merged entity

will present a rosy picture in the following years but the financial performance of the new entity presented a dismal picture. NACIL incurred a loss of Rs.2226.16 crores during the year 2007-08 and it has expected to incur a loss of Rs.5000 crores approximately (Prov.) during the year 2008-09. When the issue was taken up with the Ministry of Civil Aviation, they argued that the losses suffered by NACIL were mainly due to the following factors:

- Global economic slowdown and recession

- Decline in passenger load factor due to increased competition

- Decline in yields due to large scale expansion of capacity by low cost carriers

- Increase in financing costs due to aircraft acquisition and increasing working capital.

- Increase in Aviation Turbine Fuel (ATF) cost

- Increase in depreciation expenditure and aircraft maintenance expenditure

57.    It may be pertinent to note that the entire aviation industry had been affected globally due to the recessionary trends and the International Air Transport Association (IATA) had been forecasting huge losses for the entire industry and had in September 2009 announced a revised global financial forecast predicting airline losses totalling US$11 billion in 2009, as against the previous prediction of US$ 9 billion. The same was primarily due to rising fuel prices and exceptionally weak yields. IATA also revised its loss estimates for 2008 from a loss of US$10.4 billion to a loss of US$16.8 billion.

58.    As per IATA, three main factors are driving the expected losses:

**Demand:** Passenger traffic is expected to decline by 4.0% and cargo by 14% for 2009.

**Yield:** Yields are expected to fall 12% for passenger and 15% for cargo. The fall in passenger yield is led by the 20% drop in demand for premium travel. There is little hope for an early recovery in yields in either the passenger or cargo markets.

**Fuel:** Spot oil prices have been driven up sharply in anticipation of improved economic conditions.

59.    IATA expected losses to continue into 2010 with the industry expected to report a US$3.8 billion net loss. This was based on a limited revival of growth in traffic volumes of 3.2% for passenger and 5% for cargo; very little increase in yields of 1.1% for passenger and 0.9% for cargo and oil at US$72 per barrel.

60.    The position of airlines in India also, it was argued, was similar with pressure both on yields as well as load factors as there was excess capacity in the market and demand had shrunk.

61.    The Committee was informed that a number of steps had been taken by NACIL to reduce the losses, some of these are listed below:

- Fleet right-sizing

    i.   Plans to reduce the fleet size gradually over the next three years from current level of around 140 aircraft to 107 aircraft

 ii. Sale of owned three B 747-400, four A 320, two Dorniers, five B737-200 aircraft

 iii. Sale of two A3l0 freighter aircraft

 iv. Lease out of B 777-200LR and other freighter aircraft

 v. Phase out of leased aircraft wherever possible after negotiations with lessors

- Route Profitability enhancement:

 i. Replacement of B747 aircraft with other aircraft on fleet

 ii. Capacity adjustments to cut cash costs – discontinue of loss making routes

 iii. Restructure Frankfurt Hub operations

 iv. Rationalization of overlap operations of Air India and Air India Express on common routes to middle East and South East Asia

 v. Elimination of domestic positioning (dead legs) on International flights

- Fuel Management:

 i. IATA conducted a Fuel Efficiency Gap Analysis (FEGA) and the recommendations made by the team are being implemented

 ii. Tracking of FEGA initiatives

 iii. Fuel council appointed

 iv. Fuel consumption tracking flight-wise and pilot-wise

 v. Implementation of flight planning system

 vi. Plans to recommence fuel hedging

 vii. Track fuel burn guarantees

- Manpower Cost Rationalisation

 i. Alternate PLI scheme to be introduced soon

 ii. Reduction in overtime

 iii. Rationalisation of manpower through repositioning of operating personnel and redeployment of surplus staff

 iv. Leave without pay scheme introduced

 v. Rationalisation of contract and casual employees

 vi. Plans to increase pilot utilization to 70 hours/month

 vii. Rationalize India based officers (IBOs) based abroad on need basis

- Material/Maintenance costs

 i. Just in time approach for shelf life items of inventory

 ii. Optimisation of inventory

 iii. Deferral of expenses on initial provisioning of B777 and A320 aircraft

 iv. Reduction in aircraft spares commitment

13

- Entry into Star Alliance

- Improvement of On-time performance through introduction of three tier mechanism for monitoring of flights

- Create Cargo business plan and improve revenue by emphasis on utilization of Cargo belly space

- Income from Properties through appointment of real estate advisor and by making alternate use of properties

- Increased On board revenue through In-flight advertising co-branding of products, on board sale etc.

- Increased use of IT through investment in Quick Win IT enablers which would automate the processes.

62.    M/s *Accenture,* the consultant appointed for the merger process, in their report projected some synergy benefits. When the Committee pointed out the delay in accrual of benefits due to synergy and also the status of merger as on date, the Ministry replied that M/s *Accenture* had projected a saving of 3-4% in Costs and an increase of 3-4% in Revenue (Synergy Benefits) to accrue over a period to time. This was based on the consideration that the merger would enable optimal utilization of the existing resources through improvement in load factors and yields on common-serviced routes, as well as through deployment of the freed up capacity on alternate routes. The merger was also to provide an integrated, international/domestic footprint, enhance the customer proposition and ensure its entry into one of the three Global Airlines Alliances.

63.    However, it was argued, that subsequent to the merger, the entire aviation landscape had significantly changed due to the Global Recession, increase in fuel prices and the collapse of major financial institutions in USA. The synergy benefits which were therefore forecast were deeply affected by the developments of the aviation industry.

**Benefits of merger**

64.    The Committee was also informed that as per the estimates worked out by M/s *Accenture* at the time of initiating the merger, an amount of Rs.996 crore have been projected as the synergy benefit spread over a period of two years, against which an amount of Rs.503 crore have been realized as synergy benefit in the first year of the integration. The details of the estimated and actual figures of the synergy benefit are as follows:

*(Rs. in crore)*

| Area | Estimates Annualised | Actual Accrual (Year 1) |
|---|---|---|
| 1 | 2 | 3 |
| Network | 299 | 197 |
| Sale and Marketing | 160 | 69 |

14

| 1 | 2 | 3 |
|---|---|---|
| Finance | 224 | 223 |
| Material Management | 91 | 38 |
| Cargo | 99 | 17 |
| Ground Handling | 69 | 11 |
| Engineering/MRO | 10 | 10 |
| Security | 26 | 4 |
| Administration | 1 | 0.2 |
| Regions | 17 | 3.7 |
| TOTAL: | 996 | 503 |

**Steps taken by the management to ensure profit**

65.    The Ministry further stated that over the last two years, routes had been rationalized and several overlapping international routes in the Middle East and East Asia were also eliminated. Areas have also been identified where the airlines would be able to realize economies of scale in the procurement of goods and services. A combined insurance policy was taken for covering aircrafts and non-aviation insurance to cover all equipments and buildings and other facilities. Similarly, annual saving of nearly Rs.200 crores had been envisaged by procuring bulk fuel for the entire fleet operations including that of subsidiary companies due to "Volume Discount on Fuel". Tenders of certain in-flight service item were released on a consolidated requirement basis to achieve "Volume Discount".

66.    Engineering facilities available at various locations have been used to leverage the shortfall in capacity in Mumbai resulting in saving on transportation costs. Apart from this, management of working capital is also done optimally by taking the resources position on a combined basis.

67.    To a query on the total borrowing of NACIL as on date, the Ministry replied that the NACIL had Rs.16,000 crores towards working capital and USD 4.5 million (Approx. Rs.22,500 crores @ Rs.50 per USD) total borrowing as on 30 September, 2009.

**Bailout Package**

68.    As far as the financial bailout package for the ailing national carrier, the Government replied that Air India had submitted a turnaround plan to the Government and has requested for assistance from the Government in this regard. The Committee of Secretaries had two meetings on 25 July and 29 August, 2009 and has recommended the following:

    (i)    Equity induction of Rs.5,000 crores over 3 years towards Fleet Acquisition schedule Principal Liability;

    (ii)   Government Guarantee for working capital of Rs.10000 crores.

**Drop in yield**

69.     The Committee notes that the passenger load factor had slightly increased from 59.6% in 2008-09 to 62.7% during the period of April-September, 2009. However, the yield factor had shown significant drop *i.e.* from Rs.3.50 per km. in 2008-09 to Rs.2.97 per km. during the April to September, 2009. The main reason attributed to this decrease was the increased competition from low cost carriers and excess capacity in the market. **The Committee feels that the trend is worrisome because NACIL is not able to regain its yield even after induction of brand new aircrafts and adopting various cost cutting measures.**

70.     The Committee was informed by the CMD, NACIL that national carriers the world over were getting financial support from their Governments. For example, Japan Airlines - (US $ 2.03 billion), Alitalia - (US $ 1.38 billion), Chine Eastern - (US $ 1.02 billion), Chine Southern - (US $ 439 million), Shanghai Airlines - (US $ 146 million), etc. are the airlines which received the funds in the recent past.

71.     **The Committee notes the steps taken/or proposed to be taken by the Management of NACIL to achieve a turn around in the company mainly by reducing costs and enhancing revenues. The Committee further notes that NACIL had a huge liability due to the acquisition of large number of aircrafts. With the global economic recession, generation of excess capacity in the market and low yield, the Committee finds that the basic assumptions advanced for the purchase of new aircrafts were no longer valid. Therefore, even if the NACIL manages to cut costs and generate some amount of revenues, it may not be able to service the huge liability created due to debt repayment and interest payment of the aircraft purchase. The Committee, in such a situation, is of the considered opinion that the entire aircraft purchase of the NACIL may be funded by the Government of India as soft loan as a one time measure. A cue in this regard may be taken from the examples of similar bail out packages provided in other countries to their airlines.**

**IT integration**

72.     One of the major problems being faced by the NACIL and its passengers is the separate Passenger Service Systems (PSS) of Air India and Indian Airlines. The integration of the PSS of the two Airlines has become a daunting task and a stumbling block in the process of merger. Earlier, the companies were using the PSSs supported by different technologies which do not allow any integration. It was submitted to the Committee that NACIL was still in the process of IT integration. NACIL was making efforts to appoint a consultant to align the process and systems of the erstwhile two Airlines to bring them at par with Star Alliance standards. NACIL has floated a Request for Proposal (RFP) seeking bids from interested parties across the globe to advise the company on 'Commercial Transformations Project' *i.e.,* in defining, upgrading and revamping of processes and systems in various areas of commercial functioning in the airline.

73.     **The Committee notes with dismay that NACIL took almost two years to start the process by inviting Request for Proposal for revamping the commercial processes and systems and infrastructure yet the integration of Passenger Service Systems (PSS) still remains a far cry. The Committee also observes that until NACIL gets a common IT platform, a meaningful business transformation would be difficult to achieve.**

74.     **The Committee, therefore, recommends that NACIL should strive to achieve a common IT platform without any delay before finalizing any Commercial Transformation Project as the success of the latter is closely linked with the former.**

**Human Resource Management**

75.     The committee noted that NACIL is having a total staff strength of 30275, as on 31.10.2009, out of which 13593 were in Air India and 16682 in Indian Airlines. The total cost of salaries of staff came around 18% of operating cost *i.e.*, Rs.3124.24 crores for the year 2008-09.

76.     Merger of two organizations means a lot to the employees of both organizations as it has a significant impact on the payments and other benefits enjoyed by them in their parental organizations. In this case also, employees of both the airlines started to feel the pinch even before the merger was over, as both the organizations had different set of rules and service conditions. The employees, particularly from Indian Airlines, alleged discrimination and felt insecure about their job and future promotional avenues. Problem of differential payments and entitlements to the employees of the erstwhile Air India and Indian Airlines also stares at the fate of NACIL management. Even after two years since the merger process has begun, these grievances of employees were yet to be redressed.

77.     The Committee was informed that the issue of pay revision of Air India and Indian Airlines was taken by the Government in January, 2005. At that point of time, Indian Airlines had an accumulated losses (as on 31.03.2004) of Rs.1072.37 crores and that the average annual financial impact of PLI scheme covering all categories of employees had increased from Rs.50 crores in 1994 to Rs.350 crores in 2003-04. It was also informed that PLI settlements/understandings were in a way surrogate wage revisions. The Government allowed Indian Airlines to commence the negotiations on wage revision with Unions/Associations with conditions that the same would be prospective with only notional fixation *w.e.f.* 1.1.1997, and also the fitment benefit to be made out of existing allowances, including increased payments allowed through review of PLI, to reduce the overall impact. Payment over and above ceiling of 50% of the basic pay, should be entirely in the nature of performance related which should not exceed 5% of the distributable profits of the enterprise. Based on these criteria, six major Unions entered into Understanding/Settlements during the years 2006 and 2007.

78.     However, the payment of wage arrears *w.e.f.* 1.1.1997 was persisted by Air Corporations Employees Union. A settlement was reached with ACEU only on fixation of pay on notional basis *w.e.f.* 1.1.1997 and payment of arrears *w.e.f.* 1.1.2000, excluding HRA and CCA, as it was recognized that employees covered under ACEU were not major beneficiaries of the PLI revision in Indian Airlines. The Settlement with ACEU was signed in conciliation on 15th June, 2007. Settlements/Understandings on wage revision has been signed with Unions/Associations (except ACEU) with notional fitment *w.e.f.* 1.1.1997 with arrears payable from 1.8.2006. However, all these Unions/Associations other than ACEU signed settlements agreements without giving up their claim to payment of arrears *w.e.f.* 1.1.1997.

79.     A PLI settlement with the Indian commercial Pilots' Association (ICPA) was signed on 18.7.2006. In the said PLI settlement covering Pilots of erstwhile Indian Airlines, a provision of

additional productivity allowance was agreed to *w.e.f.* 1.4.2006 *i.e.* Rs.5,000/- per month in respect of First Officers/Captains and Rs.15,000/- per months in respect of commanders, which would be adjusted against wage component depending upon effective date of wage revision.

80.     After the creation of NACIL, a Joint Action Committee was formed for wage arrears *w.e.f.* 1.1.1997. The matter was taken up with the Ministry and it was finally decided that the financial health of the Company warranted that no arrear demands can be considered by the company. The Committee was also informed that wage arrears of all categories of Air India employees have been settled and paid in full; except pilots, Aircraft Maintenance Engineers, Technical Officers, Cabin Crew and Flight Engineers who have been paid part payment of arrears.

81.     **The Committee feels that had the wages been revised in 1997 itself, the IA workers would have now been getting what was due to them. However, it is surprising that the revision was delayed for 10 years, though the company was making profits during this period. The company made losses not due to employees' inefficiency but due to wrong Government policies and decisions of the management. Making the employees to suffer (by not getting the arrear payments) due to no fault of theirs, can hardly be justified. The Committee, therefore, recommends that the arrears to all the employees be sanctioned *w.e.f.* 1.1.1997 and paid appropriately.**

82.     The Committee was informed that the cabin crew and pilots of Air India are paid a higher remuneration compared to that of their counter parts in Indian Airlines. Reason given was that the Air Indian crew and pilots were flying on long haul routes, while the Indian Airlines crew and pilots mostly flew on domestic routes or short haul routes to neighbouring countries.

83.     In this context, the Committee sought the information on the guidelines for promotion in NACIL(I) and NACIL(A) for which the Ministry replied that in NACIL(A) unionized category of employees get promotion as per policy on career progression pattern agreed with related Union/ Associations, which is mostly on time bound basis but subject to suitability. In case of officers promotions were vacancy - based and were carried out through a process of selection.

84.     In NACIL(I) promotions are effected amongst the unionized category of employees as per understanding arrived with related Union/Associations on career progression pattern which is basically on time bound basis subject to suitability. However, the higher posts in any unionized category are based on vacancy/a percentage of the total strength and the same is filled up through a process of selection.

85.     To a specific query on the discrepancies in promotion of certain categories of employees of Indian Airlines after the announcement of merger, the Ministry informed the Committee that the promotion policy of NACIL was reviewed subsequent to announcement of merger and a view had been taken that several important issues such as integration of seniority and filling up of vacancies were to be finalized after amalgamation. A view was taken that promotions to the level of Executive Director, General Manager and Dy. General Manager would be kept in abeyance till the finalization of these issues. It was also decided that posts below Dy. General Manager would continue to be filled up as per the respective systems prevalent in erstwhile companies.

86.     However, the posts of General Manager (Operations) and Addl. General Manager (Ground Support) were exceptions due to exigencies of requirement. The Ministry submitted that it would,

18

therefore, not be correct to state that certain categories of officials of Indian Airlines were completely left out.

87.    In any case, as per direction of Government of India, Ministry of Civil Aviation *vide* their letter No.AV.18013/02/2007-AI dated 05.04.2007 an Interim Governance Mechanism was operative essentially to ensure that management decisions in Air India and Indian Airlines were taken in consultation with each other in view of the legal process for merging Air India and Indian Airlines into new Company already being commenced.

88.    It may be relevant to mention here that promotions to higher posts were primarily effected for smooth discharge of Company's functions while it also met the reasonable aspirations of an employee for Smooth career advancement. Accordingly, decision to fill up any vacancy in managerial cadre was taken, from time to time, depending upon requirements of the Company.

89.    It has been accepted and notified that no common principle can be laid down for all levels of category of employees and category/level specific solutions will have to be found. NACIL is in process of finalizing mapping of comparable levels keeping in view comparable scale of pay.

90.    **The Committee has found that the merger process was entirely guided by the report of M/s *Accenture* who was engaged as consultant by the Government of India. However, the absence of a proper study and discussion with employees of both the airlines regarding amalgamations of systems and HR management, lead to imparity and thus, heart-burning between the employees of erstwhile AI and IA in the NACIL. The merger process in this manner, instead of creating conducive working conditions in the new entity, has left a potential cause of unrest waiting to happen any time between the employees and management of NACIL. The pay-scales being different in the erstwhile IA and AI before the merger, the integration process has faced with a complex and peculiar problem that needs to be solved without further delay. The promotions at the ED level and discrimination in the pay scale of cabin crew of AI and IA has further compounded this problem. The Committee notes that merger has taken place at the level of Executive Directors, General Managers and Deputy General Managers but other categories are left out and they are still governed by the rules and regulations of their parent organizations.**

91.    **The Committee also notes that NACIL is facing the seniority merger issues for the last two years, as IA and AI followed a different promotion policy during the pre-merger periods. The eligibility criteria for the higher posts by combining the employees of both the airlines have resulted in resentment among the employees of erstwhile IA. The committee finds that there are various differences in the pay/allowances/emoluments of employees of erstwhile IA *vis-a-vis* AI, due to bilateral agreements done from time to time leading to anomalous situations after the merger for work/task carried out by employee at same level. The classic example is that pilots of erstwhile AI who fly less than 40 hours are paid emoluments based on 80 hours of flying per month, whereas the payment of emoluments for erstwhile IA pilots are based on actual flying hours. In such a situation, integration of human resources remains a serious challenge. Settlement of wage arrears, revision of pay for certain employees of erstwhile Indian Airlines are other such challenges that are yet to be resolved.**

19

92.    **The newly merged NACIL has not introduced any Service Regulations or Standing Orders to govern its employees till date for the reasons best known to management only. The Committee is of the opinion that in such a scenario, integration of human resources and settlement of their related problems amicably in the new entity may take years and not within the stipulated time as projected by the Government.**

93.    **The Committee notes that NACIL need to look into the genuine grievances of its employees and ensure that wide disparities in respect of wages, salaries, etc. are reduced to the extent possible.**

**Productivity linked incentive**

94.    The productivity linked incentive is one of the issues which is agitating the employees. The representatives of the Indian Commercial Pilots Association (ICPA) submitted before the Committee that

> "...till 1996, the pilots of Indian Airlines were paid a variety of allowances under different headings *e.g.* Special Travel Allowance (STA), Meal Allowance, Two crew allowance etc. In 1996, all these allowances were merged into one head called "Performance Linked Incentive (PLI)", with two components — while one was a fixed component, the other was a variable one, linked to the number of hours flown by individual pilots every month, which formed the major part of the payment made to the IA pilots. ICPA on its side increased the flight and duty time and reduced the rest periods in return for the increase in flying allowance/productivity allowance. This increase in perks was needed to bring the Indian Airlines pilots at par with the industry standards in terms of emoluments and to stem the exodus of trained and experienced pilots, to the other airlines…"

95    The ICPA informed that they never wanted these allowances to be paid under the PLI but it was the management which insisted on it as it was the industry norm and wages could not be increased beyond the pay scales governed by pay commissions and Department of Public Enterprises (DPE) guidelines for Public Sector Units (PSU). So the contention that PLI payments are surrogate payments or a runaway is fundamentally wrong. In fact, the same was given birth by the very management who is raising objections to its existence".

96.    The Committee was informed that the parameters for variable payments under PLI schemes are

(i)    Average annual flying hours of A-300 and A-320 aircraft per month per aircraft;

(ii)    Number of passengers carried on an average per day in the month;

(iii)    Average 'On time Performance' during the month etc.

97.    PLI is paid in proportion to the parameters achieved. For instance, if there are fewer passengers the employees will get only less PLI.

98.    A similar situation arose in 2004, when a lot of new private airlines started operations and there was once again exodus of trained pilots as there was disparity in emoluments with Indian Airline pilots who were grossly underpaid. The management realized the gravity of the situation

20

and entered into an agreement with ICPA in 2006, (after about 25 senior commanders left the airline).

99.    In this agreement also, ICPA traded its flight and duty time limitations and reduced rest periods (bringing them very close to the DGCA prescribed upper limit) in return for an increase in flying allowance/productivity allowance.

100.    It was brought before the Committee that salary and allowances for the months of June and July 2009 were not paid in time by the NACIL management on the plea that PLI norms were to be reviewed for the company as a whole.

101.    The Air Corporation Employees Union submitted to the Committee that their Union surrendered the payment of overtime allowance, subsidy on canteen as well as uniforms, footwear, transport etc. through a settlement in 2004. An amount of approximately Rs.100 crores was saved out of this settlement against which the employees were paid approximately Rs.35 crores as PLI and the rest was retained by the company.

102.    The Committee was informed that NACIL constituted a 5-Member Committee on August 27, 2009, to curtail performance/productivity linked incentives and flying related allowances (PLI Schemes) to the extent of 50%. The Committee had to work out the modalities of the implementation of the above decision taken by the Board. Discussions have been held with the representatives of Unions/Associations/Guilds, over a period of three days, in the first week of September 2009.

103.    The Committee was further informed that after discussions with employees' unions, NACIL had issued an office order informing about the reduction of PLI and flying related allowances (including Subsistence Allowance) effective August, 2009 as per details furnished below:

| Slabs (Rs.) | Percentage reduction | Reduction in amount at the top of the Grades |
|---|---|---|
| Upto 10000 | 25% | Rs.2500 |
| 10001-25000 | 35% | Rs.2500+35% of 15000 |
| 25001-50000 | 40% | Rs.7750+40% of 25000 |
| 50001-200000 | 45% | Rs.17750+45% of 150000 |
| Above 200000 | 50% | Rs.85250+50% excess over 200000 |

104.    In addition, the following allowances were also abolished/modified as under:

1.    Executive Pilots of erstwhile Air India/India Airlines:

Entertainment Allowance while on flying duty at outstation away from base.

2.    Executive Pilots of erstwhile Indian Airlines:

a.    Executive flying allowance.

b.    25% above the applicable flying allowance for undertaking training on simulator.

21

    c.    50% additional over the applicable flying allowance for undertaking hub and spoke flights.

    d.    Payment for carrying out observation flights.

3.    Executive Aircraft Engineers of both erstwhile Indian Airlines and Air India.

    Approval/licence allowance and LUFA to be paid on the basis of current fleet.

105.    In response to the above, initially the Executive Pilots of erstwhile Indian Airlines and later the Executive Pilots of erstwhile Air India reported sick and absented themselves in a concerted manner leading to severe disruption of flights. The line pilots, though not covered by the present instructions for reduction in flying related allowances, were not directly participating in the agitation. They were, however, providing tacit support by not accepting changes in the roster pattern as replacement to the Executive Pilots. Consequent on the strike by the Executive pilots, the decision to cut PLI was kept in abeyance pending further discussions and negotiations.

106.    **The Committee notes that the parameters adopted for the payment of PLI are different for different categories of employees depending on the nature of work undertaken by the staff and the level of officers. There are wide disparities between the NACILA and NACIL-I employees, as far as PLI payment is concerned. The Committee also notes that the PLI schemes between NACIL-A and NACIL-I have not yet been harmonized. However, committees have been constituted for examining the harmonization issues of PLI.**

107.    **The Committee recommends that the standards adopted for payment of PLI should be reasonable, just and equitable. The employees should not feel that one category of employees is paid at the expenses of another category of employees. A total harmonization of PLI may be worked out in consultation with various unions and associations.**

108.    **Since all the parameters are laid down for PLI payment, the Committee does not see any scope for reduction in PLI of employees. Even after achieving all the parameters, if the company is making losses, the reason for losses obviously lay somewhere else. The Committee feels the misplaced Government policies and priorities are the main reason for the losses.**

109.    **The Committee notes that NACIL has recently announced a number of cost cutting measures to the tune of Rs.4000 crores during 2009-2010. The recent instances of delay in payment of salary, cut in PLI and issuing a number of cost cutting advisories, it appears have not gone well with the employees. Employees, as a result, resorted to strike due to cut in their PLI. The Committee feels that employees are being made scapegoat and cut in their salaries and PLI have become tools in the hands of management in the name of cost cutting/financial restructuring.**

110.    **The Committee would like to quote the CMD, NACIL, who deposed before the Committee on 20th October, 2009 stated *inter alia***

    **"...in my own organization, we do not now take 15 minutes delay as on-time. I said that we have to close our door at D-10 and then we have to fly. Sir, I have got the same set of employees. I have these 32,000 employees who did not get their PLIs in**

**time. It is the same set of people who have not got their salary on time. But, at the airports, they have given me 76 per cent on-time performance with 65 per cent of my routes are going on dot..."**

111.   **The Committee feels that this definitely showed that the employees are sincere, efficient and punctual and they should not be punished for that by withdrawing their salaries and allowances.**

112.   **The Committee understands the compulsions of the NACIL management to reduce costs. At the same time, it is their duty to ensure that further losses are not incurred due to strike by the employees leading to flight disruptions. The Committee recommends that the management should find out a via media to overcome the situation by calibrating the withdrawal of PLI in consultation with the Employees' Unions.**

113.   **The Committee feels that while formulating the policies, Government should always ensure level-playing field for the PSUs and ensure that they should not go out of business due to the policies.**

### Duplication of flight services

114.   Merger of Air India and Indian Airlines brought another important issue to the light. Both the AI and IA operated their services in same sector and virtually these Government owned companies were competing with one another and cutting profits and also market share. Air India Express, the LCC promoted by Air India also joined the bandwagon. Gulf and South East Asian sectors saw intense battle between these governmental agencies. The Committee was informed by the Ministry that the basis for rationalization of routes were (i) overlapping of operations on common routes, consequent to the merger of erstwhile Air India and Indian Airlines (ii) losses incurred on a particular route and (iii) retirement of aged aircrafts. The Committee was further informed that Air India undertakes continuous review of the services on its network in terms of profitability and market dynamics.

### Route Dispersal Guidelines

115.   The Route Dispersal Guidelines of the Government of India stipulates that 10% of overall operations of the individual airlines should be category II and IIA routes to/from North East, J & K, Port Blair and Lakshadweep Islands. The Committee was informed that NACIL is having 19% of its operations in category II/IIA routes. Maintaining connectivity to remote and under served markets is part of NACIL's network planning systems whereas private airlines develop their network based solely on profitability and network synergies. The Committee notes that NACIL is operating almost double the capacity of its statutory obligations to category II and II A destinations. **The Committee, therefore, recommends that the NACIL should be adequately compensated for carrying out its operations in non-viable routes and fulfilling its social responsibility.**

### Surrender of routes by NACIL

116.   The Committee was informed that NACIL has reduced its number of services on various

23

routes as a cost cutting measure. In certain city pairs NACIL completely withdrew its services. The private airlines have started their services in many of such city pairs.

117.    The details of international routes where NACIL has withdrawn air services and private scheduled airlines are presently operating are as follows:

| Routes | Operation by private Scheduled Airlines |
|---|---|
| Kolkata-Bangkok | Jet Airways and Kingfisher Airlines |
| Kolkata-Dhaka | Jet Airwavs and Kingfisher Airlines |
| Doha-Cochin | Jet Airways |
| Cochin-Kuwait | Jet Airways |
| Cochin-Muscat | Jet Airways |

118.    The details of domestic routes where NACIL has withdrawn air services and private scheduled airlines are presently operating are as follows:

| Routes | Operation by private Scheduled Airlines |
|---|---|
| Ahmadabad-Bangalore | Kingfisher Airlines, Go Air, IndiGo |
| Ahmadabad-Kolkata | IndiGo |
| Ahmadabad-Jaipur | Spiceiet |
| Ahmadabad-Delhi | Jet Airways, Spicejet, IndiGo |
| Bangalore-Bhubaneshwar | Kingfisher Airlines |
| Bhubaneshwar-Kolkata | JetLite, Kingfisher Airlines |
| Mumbai-Vadodara | Jet Airways, Kingfisher Airlines, IndiGo |
| Vadodara-Delhi | Jet Airways, IndiGo |
| Hyderabad-Nagpur | Kingfisher Airlines |
| Mumbai-Patna | Kingfisher Airlines |
| Mumbai-Pune | Jet Airways |
| Chennai-Coimbatore | Jet Airways, Kingfisher Airlines, Spicejet, Paramount Airways |
| Pune-Goa | Kingfisher Airlines |

119.    **Rationalization of routes has become another major issue before the newly created NACIL. They started to withdraw their services from the lucrative and profit earning routes in the name of route rationalization and simultaneously opened door for the private operators. In the Mumbai-Dubai sector, services were reduced from 3 flights daily to 2 daily,**

24

but their competitor was able to operate 4 services daily. If the services were reduced mainly due to the overlapping, the services could have still remained unaffected with one of the Government operators. And if the decision was based purely on commercial prudence, then how come the competitor could operate 4 services daily? Similarly, even in the domestic sector, while services between Mumbai and Ahmadabad were reduced from 3 flights daily to 2 daily, another airlines was able to run 4 services daily. When the Committee analyzed the available data it was found that services from the lucrative Mumbai-Doha sector which got 90 per cent occupancy were withdrawn abruptly and the vacuum was filled up by a private operator.

120.    The Open Sky Policy and the reckless licensing that followed opened up a Pandora's box in Indian civil aviation industry. Under the Open Sky Policy, five year old private airlines were allowed to fly in international sector. Jet and Kingfisher, therefore, were allowed to utilise the bilaterals in the lucrative gulf sectors. Private players were favoured in the route dispersal guidelines and more and more bilaterals were handed over to the private airlines on platter. Thus, the Open sky policy, in the initial years, denied Indian Airlines a level-playing field. Private operators were permitted to operate on routes of their choice and they naturally concentrated on the lucrative trunk routes. Indian Airlines was forced to keep a network operational, which involved operating more than 70% routes that were loss making and most of which were being operated for socio economic reasons. Private players were promoted at the cost of national carriers which resulted in over licensing, over capacity, price wars and financial failures. The Government remained a mute spectator to the price war waged by the private operators to grab the market from the national carriers. The Government did not take any initiative to control the low cost fares to ensure sustainability of the private operators on a long term basis. As a result, many of the companies accumulated hundreds of crores of losses and many of them like Damania, Continental, East West, Modiluft, NEPC, Raj etc. went out of business and disappeared from the aviation horizon. A few players who had the financial backing of their holding companies and clouts, continued their business even though they were making heavy losses. The Government forced the national carriers also to compete with the private players and make losses. The Committee firmly believes that private operators can come and go at their own will but the national carrier has to stay back and serve the nation whether they make loss or profit. The Committee, therefore, recommends that the Government should ensure that the low cost carriers and the private players are not imposing any restrictive trade practices which are not sustainable in the long run. The Government should come out with the policy which prices the air tickets in such a way that the operating companies can run their business without accumulating losses.

**Bilaterals**

121.    The Government policies on bilaterals are governed by the Air Services Agreements that provide for the basic legal framework for operation of air services between countries. These are traditionally concluded bilaterally between countries. They additionally specify the frequencies and capacity that can be operated on specified routes by the designated airlines of the two sides.

25

122.    Traffic rights for operation of international airlines are determined through bilateral air services agreements concluded with foreign countries on reciprocal basis in which the balance of opportunities and benefits are the key determinants. The Ministry of Civil Aviation in consultation with the Ministry of External Affairs etc. decides the quantum of seats to be allocated to various foreign as well as domestic players.

123.    It has been brought to the notice of the Committee by the Air Corporations Employees' Union that the Ministry of Civil Aviation within the period of five years from 2004 to 2009, gave away bilateral rights amounting to 90,000 seats per week to foreign carriers, knowing fully well that Indian Airlines or Air India did not have the capacity at that point of time to start new flights. So, foreign airlines like Emirates, Qatar Airways, Singapore Airlines, Thai and Lufthansa benefited a lot as they got lot more seats and many internal Indian airports to land in. Ministry of Civil Aviation kept on telling everybody that the National Carriers were not using the full bilateral rights and so other Indian private airlines should be allowed to fly on the foreign routes. Actually Jet Airlines was the only Indian private carrier who benefited and got 12000 seats per week. To give them this advantage, foreign carriers had to be given 90000 seats.

124.    The Joint Action Committee of the employees of NACIL submitted before the Committee that the reckless Bilateral Policy adopted by the Government of India has caused immense damages to the profitability of the Air India and Indian Airlines. They submitted that Lufthansa (LH) has 56 services into India with seven entry points whereas Air India has just four services to Frankfurt with single entry point.

125.    Lufthansa picks up passengers directly from Trivandrum whereas Air India has to bring the passengers from Trivandrum to Bombay and then to Frankfurt. This is resulting in better flexibility and better product for Lufthansa and a drop in passenger loads for Air India. Before the bilaterals were given away Air India had seven flights a week to London and British Airways had also 7 flights a week to India. Now Air India has just 7 flights a week whereas British Airways has 21 flights a week. Sixth freedom Rights were given to Lufthansa, Malaysia Airlines, Cathy Pacific, Singapore Airlines and Air France. Emirates were given 11 gateways. During the period of 2003 to 2007 around 90000 seats (per week) were increased, that was increase of 300%.

126.    Regarding Lufthansa (LH) serving seven points in India *versus* AI having only a single entry point and LH operating 56 services per week *versus* AI operating seven services per week the Ministry of Civil Aviation clarified that, LH is a major 6th freedom carrier with a strong hub at Frankfurt and funnels traffic between India and USA/Canada/Europe over this hub. It may also be noted that India is a country having multiple points of commercial value, whereas in Germany, the only point of significant commercial value is Frankfurt.

127.    To another query the Ministry mentioned that though it may be in the passenger interest to have reasonable tariff and greater choices available, any specific airline operating on a route may, in their commercial interest, prefer not to have added competition on that route. In this background, the Government effort has been to achieve a balance between interests of the airline, the passengers and the interests of trade/tourism/economy of the country.

128.    **The Committee notes that in granting traffic rights, home carriers' interests, whether Government owned or private, are always considered. The incremental capacity**

generated by the bilateral could not be utilized by the home carriers due to the limitation of Indian Airlines/Air India's fleet size. The Government which was aware of the limitations of the National Carrier, knowingly and willingly, allowed incremental capacity to foreign airlines. The Committee feels that the bilateral should have opened only after the acquisition of new aircrafts by Air India/Indian Airlines.

129.     The Committee, therefore, recommends that the decision to open the highly lucrative international air markets to/from India may be probed by a suitable agency and all those bilateral must be reconsidered and reviewed and responsibility may be fixed for giving away the national rights. The Committee also notes that the bilateral rights once granted, are generally never withdrawn. The Committee was informed by the Ministry that, however, in the Air Services Agreements (ASA) concluded between India and other countries, there is a safeguard termination clause which can be invoked for Termination of Agreement.

130.     NACIL in their written reply stated that NACIL had been highlighting this issue in the inter-governmental talks and has also made a request to Ministry of Civil Aviation in November, 2008. This issue also was included in the presentation made by NACIL before the Committee of Secretaries in July, 2009 wherein it was requested for freezing and roll back of bilaterals. NACIL also demanded that the sixth freedom to the airlines to be checked. NACIL strongly demanded review of access points and limitations on the frequency of services given away through bilateral agreements. Another demand of NACIL was freeze on entry of new players.

131.     The Committee notes with dismay that even after the National Carrier was making an earnest plea for controlling the unrestricted entry of the foreign airlines in India, the Government looked the other way and decided to grant further bilateral to various foreign airlines thus making the NACIL more vulnerable to operational difficulties and losses. The Committee strongly recommends that an inquiry may be conducted to find out why such a large number of bilateral were granted to foreign players knowing well that domestic players could not match and avail bilateral granted to them due to the constraints of availability of aircrafts. Wherever required, the termination clause of the ASA may be invoked to ensure that NACIL is getting its due share of bilateral. The Committee further recommends that no more bilateral may be allowed till the home carriers are capable of utilizing their quota.

132.     The Committee also notes that services are being withdrawn from lucrative sectors by NACIL paving the way for introduction of services by the private operators in the same sector. The Committee fails to understand the logic behind this move and feels that this move will definitely fill the coffers of private operators and make the NACIL incur huge losses. The Committee recommends that all the existing domestic services may be reviewed and NACIL may be permitted to opt for routes and timings of their choice. The other airlines may be adjusted thereafter, in such a way that they do not encroach on the services of NACIL.

133.     The Committee apprehends that there appears to be a nexus operating for surrendering lucrative routes to favour the private operators. The Committee recommends that an inquiry be constituted to analyze the withdrawal of lucrative routes both domestic and international to favour the private players in the field. The inquiries are necessitated

**by the fact that immediately on withdrawal of services by NACIL the private operators introduced their flights in the same sector promptly and are presumably making profits.**

**Declared goods status for ATF**

134.    The Committee was informed by NACIL that ATF prices constitute almost 38% of the operating expenditure of the company. They further submitted that Declared Goods' status can reduce the ATF price to a great extent since many states are charging an exorbitant sales tax on ATF. They also submitted that the matter was taken up with Ministry of Finance and Ministry of Petroleum and Natural Gas and the decision was pending.

135.    The Committee, therefore, sought the views of Ministry of Petroleum and Natural Gas and the Ministry of Finance on the issue of granting of declared goods status to Air Turbine Fuel (ATF). The Committee was informed by the Ministry of Finance that the Market share of NACIL in the domestic market is just 17%. Thus "declared goods" status will mainly benefit the private airlines which account for almost 83% of the domestic market share. It was further informed that even now (October 2009), the end retail price of diesel and petrol is Rs.33 per liter and Rs.45 per liter respectively, whereas ATF for domestic flight is only Rs.37 per liter. The present level of state taxes for petrol and diesel are also similar to what is being charged on ATF. There already are demands for inclusion of even petrol and diesel in the list of 'declared goods' and for reduction of Sales tax on petrol and diesel. If ATF sales are taxed at 4%, there will be no justification to tax petrol and diesel sales at a higher rate, as these are the fuels for the common man.

Details of sales tax charged on ATF by major States

| Sl. No. | State/UT | Sales Tax-ATF | 2007-08 Collection | 2008-09 Collection | SalesTax Petrol | Sales Tax-Diesel |
|---------|----------|---------------|--------------------|--------------------|-----------------|------------------|
| 1 | Maharashtra | 25% | 494.08 | 650.00 | 28% | 28% |
| 2 | Delhi | 20% | 440.00 | 601.87 | 20% | 12.5% |
| 3 | Karnataka | 28% | 269.50 | 277.93 | 28% | 20% |
| 4 | West Bengal | 25% | 191.85 | 193.10 | 25% | 21% |
| 5 | Tamil Nadu | 29% | 170.62 | 146.05 | 30% | 25% |
| 6 | Gujarat | 30% | 97.86 | 100.00 | 26% | 24% |
| 7 | Andhra Pradesh | 33%/4% | 93.25 | 39.04 | 33% | 22.25% |
| | Sub-Total Major States | | 1757.16 | 2007.99 | | |

136.    **The Committee also noted that benefit of any reduction of Sales Tax on ATF is not being passed on to the passengers by the airlines. The Government of Kerala, which, in the budget of March, 2008, announced a reduction from 25% to 4%, promptly pushed it back to 25% when it was realized that benefits were not being passed on to the passengers.**

28

137.   **The Committee was also informed that ATF prices without sales tax were 17% costlier in India, compared to international prices due to the pricing mechanism that are being followed by the Oil Marketing Companies.**

138.   **In view of the factual position given above the Committee sees no reasons why ATF should be given 'declared goods status' at this point of time. However, the Committee recommends that the pricing mechanism followed by Oil Marketing Companies need reconsideration. The Committee, therefore, recommends that NACIL may take up the issue of pricing of OMCs with Ministry of Petroleum and Natural Gas.**

**Proposed withdrawal of flights**

139.   **The Committee noted that non-stop flights operated by NACIL to USA from Mumbai and New Delhi were incurring losses to the tune of Rs.750 crore per year, which was more than the amount (Rs.700 crores) the airline plans to save by cutting employees PLI. The losses on these routes, the Committee learnt accounted 15% of the total loss of the NACIL. On being asked, the CMD, NACIL informed that these flights were not being withdrawn because NACIL may not get the slot at these airports again in future. The Committee, in view of current financial crisis and several cost cutting measures taken by NACIL, is of the opinion that the idea to continue operating non-stop flights at these routes needs to be reconsidered.**

140.   **The Committee recommends that such huge loss making routes need to be rationalized or linked with some other stop over routes.**

141.   **The Committee further notes that low cost carriers are the need of the hour. The NACIL, therefore, should not hesitate to tap the potential of low cost market by mixing the low cost and full cost services, wherever possible.**

**Ground Handling Services**

142.   Ground handling is considered as one of the revenue generating ventures in the aviation field. To a query on the role of Air India in ground handling operations at the domestic airports, the Ministry replied that Air India was undertaking Ground Handling Services for its own flights except in Bangalore and Hyderabad, where it is done by a consortium with SATS. When the Committee asked about the rationale behind the Joint Venture mode for ground handling services in Hyderabad and Bangalore, the Ministry stated that NACIL has entered into an MOU with Singapore Airport Terminal Services for Ground Handling at Bangalore International Airport and Rajiv Gandhi International Airport at Hyderabad. The consortium of AI-SATS has entered into a Service Provider Rights Holder Agreement with respective airport operators to undertake this activity.

143.   The revenue earned by NACIL at Bangalore and Hyderabad respectively through Third Party Handling for the last five years is as below—

*Revenue in crores*

| Year | Bangalore | Hyderabad |
|------|-----------|-----------|
| 2004-05 | Rs. 25.57 | Rs.39.20 |
| 2005-06 | Rs. 34.90 | Rs.50.91 |
| 2006-07 | Rs. 51.99 | Rs.61.19 |
| 2007-08 | Rs. 53.69 | Rs.39.13 |
| 2008-09 | Rs. 25.96 | Rs.12.45(After incorporation of AI-SATSJV) |

144.   In the year 2006, at Bangalore Airport the selection criteria were as per the tender from BIAL. From the various selection criteria stipulated by BIAL for awarding Ground Handling at the new Bangalore International Airport, one of the criteria for which the weightage was 25% was "international experience and network of Ground Handling Services at best international standards and competitive prices at airports similar to the size and set up of the new Bangalore International Airport".

145.   With regard to the above selection criteria, NACIL decided to join the consortium with an internationally experienced Ground Handling Agent. Out of the Foreign Handling Agents shortlisted by BIAL, only Swissport and SATS had submitted the tender as independent unit, whereas other global player had joined hands with Indian partners. M/s Swissport had declined the offer for a Joint Venture Partnership with NACIL for Cargo and hence there was no other independent international operator other than SATS shortlisted by BIAL. As such it was felt appropriate to join hands with SATS for submission of tender for Ground Handling at BIAL. This was particularly in view of the fact that Air India had agreed to go jointly with SATS for submission of tender for Cargo.

146.   A pre-requisite to qualify in the tender procedure at Hyderabad Airport was to form a consortium with third ground handling service provider or the ground-handling subsidiary of a foreign airline or parent company of an airline offering ground handling service. The Committee was informed that NACIL had entered into a consortium at Bangalore and Hyderabad airports with SATS. This consortium was necessitated due to pre-condition of tender requirements which stipulated international experience as one of the conditions.

147.   GHIAL had shortlisted 10 International Ground Handling Agencies apart from Air India and Indian Airlines operating through Hyderabad Airport, to whom the RFP (Request for Proposal) were issued. Out of these 10 parties, only M/s SATS from SIngapore and M/s DNATA from Dubai had shown interest to join NACIL as JV partner. Security Clearance for SATS and DNATA was asked for, from the Ministry of Civil Aviation, Government of India, on the direction of AI Board. MOCA communicated to CMD, Air India that Security Clearance has been accorded by Government for AI/IC to have M/s SATS as the JV Partner.

148.   **The Committee feels that criteria followed by the private airport operators of Hyderabad (HIAL) and Bangalore airports (DIAL) has not showed the desired results of**

Government policy in this regard as it had affected the earnings of Air India considerably. The new ground handling policy, as announced by the Government, will add to the existing woes of the NACIL. The Committee feels that these joint ventures have become instruments of back-door privatization thereby giving up control of the Government in investment as well as management, besides resulting in job losses.

149.   The Committee observes that NACIL (Air India and Indian Airlines) were doing the ground handling activities of both private and international airlines for so many decades at all the Indian airports. They have had good expertise and adequate manpower with superior abilities than any joint venture foreign company. The criteria of having international expertise cannot be mechanically interpreted as handling in international airports outside India. The Committee recommends that the handling of international aircrafts in Indian airports should be an adequate criteria for deciding the international experience. The Committee feels that the criteria of "international level standards for ground handlers" at Bangalore and Hyderabad, in fact, facilitated the entry of foreigners through backdoor in the profit making ground handling activity at the Indian airports. Such a move has rendered a large number of NACIL employees jobless and reduced the profit of the company drastically in the Bangalore and Hyderabad airports. The profit of NACIL at Hyderabad airport was Rs.53.69 crores in 2007-08 which dropped to Rs.25.96 crores in 2008-09. Likewise, at Bangalore airport, the profit dropped from Rs.39.13 crores in 2007-08 to Rs.12.45 crores in 2008-09. This situation also resulted in employment to foreigners in Indian Airports and made their joint venture a profitable venture for foreigners in India.

150.   The Committee recommends that the such biased clauses against ground handling by NACIL may be removed from the Agreements of private airports at Bangalore and Hyderabad. In future NACIL should be given exclusive rights to ground handling activities in all the Indian airports. The Committee also recommends that the idea of foreigners' entry into ground handling may be re-considered in view of prevailing security scenario. The Committee notes that NACIL already has a subsidiary named Air India Air Transport Services Limited (AIATSL) mainly to carry out the ground handling activities. The Committee recommends that NACIL and its subsidiary/SBU should be permitted to provide Ground Handling services to all the airlines at all the airports including the metro airports in India.

**Salary and perks of the top officials of NACIL**

151.   The Annual Report and Audited accounts of NACIL for the period of 2007-2008 provides details of staff whose salary exceeds Rs.2 lakhs a month or Rs.24 lakhs annually. Around 1800 staff of NACIL is getting more than Rs. 2 lakhs per month and a large number of them are getting more than Rs. 6 lakhs per month. The Committee observed that this group which constitute 6% of the employees are paid around 40% of the salary component of NACIL whereas the remaining 30,000 employees which constitutes 94% are paid just 60% of the salary component.

152.   The Air Corporations Employees' Union informed the Committee that around 80% of the amount of PLI goes to 20% upper categories and the balance left over amount of 20% is distributed to the 80% of the low paid categories of staff.

31

153.    **The Committee notes that various allowances including flying allowances were paid to the employees of NACIL irrespective of the nature of job they undertake. The Committee in view of such a gross discrepancy recommends that this needs to be rationalized in such a way as to ensure that these disparities did not affect the very existence of NACIL.**

**Separate offices for Indian Airlines and Air India**

154.    **The Committee notes that Offices of IA and AI in major cities are still functioning independently and the higher officials are not in a mood to surrender their office space resulting in hefty payment of market rents. NACIL management is operating from two places namely from Delhi and Mumbai. The Committee is of the opinion that a decision in this regard may be taken at the earliest to end the confusion and uncertainty. Once it is done, the surplus space either in the Nariman Point Headquarters, Mumbai or the Airline House, Delhi, both located at prime locations, can be used suitably for generating non-aeronautical revenue.**

**Senior officers are keeping offices at Delhi and Mumbai**

155.    Due to the incomplete process of merger of Indian Airlines and Air India, a large number of senior officers are maintaining multiple offices and personal staff in Mumbai and Delhi and they are shuttling between Mumbai and Delhi quite frequently at the company's cost. In addition to this since both the companies were having different codes of operation around 30 to 40 senior managers who used to be with the Indian Airlines are shuttling between Delhi and Mumbai to sign the mandatory papers because there are decisions only they can sign off. They are also maintaining multiple offices along with personal staff in Mumbai and Delhi. The Committee notes that the usage of dual code is a stumbling block in the entire process of merger and is causing a lot. of expenses which could have been avoided. **The Committee, therefore, recommends that except the CMD, no other officer should operate from more than one office and those officers who are operating from different locations may be suitably relocated to reduce the losses to the company.**

**Branding and rebranding which resulted in wasteful expenditure**

156.    **Another example of avoidable expenditure by NACIL is the refurbishment and repainting of all its aircrafts. In the pre-merger scenario, to boost the image of the erstwhile IA, the Government rechristened its brand as 'Indian' and started to repaint its aircrafts with the brand name of 'Indian'. After merger into NACIL, the brand name 'Indian' again has been replaced with the brand name 'Air India'. Huge cost has already been incurred on changes of brand, logo, etc. which need to be incorporated in fleets, equipments, stationary, etc. Needless to say, these costs must have added to the operating cost of NACIL. The Committee feels that this branding and re-branding exercises were wasteful expenditures, particularly the one done in the case of Indian Airlines; it could have been avoided.**

**Board of Directors**

157.    The Central Government appoints the Director on the Board of the company. The

Committee notes that the Directors were appointed for shorter period and some even for a few days knowing well that they may retire in a short span of time. The Committee also notes that many officers of the Ministry of Civil Aviation with no substantive expertise in the Civil Aviation. industry, were appointed to the Board. There are no professionals and independent Directors on the Board.

158.    **The Committee recommends that the practice of filling the Board of Directors mainly with the officers from the Ministry of Civil Aviation should be discouraged. Independent Directors with professional experience and expertise may be inducted into the Board. The Board may be allowed to function in a professional way. Professional Board & Directors and a committed CMD is the need of the hour to run the NACIL in an efficient way.**

**Chairman and Managing Director**

159.    The merger of Air India and Indian Airlines became effective *w.e.f.* 27th August, 2007 and the new company NACIL came into existence from that date. Post merger, the Ministry of Civil Aviation reconstituted the Board of Directors on 18th September, 2007 with Shri V. Thulasidas as Chairman and Managing Director. On retirement of Shri V. Thulasidas, Shri Raghu Menon took over as CMD of NACIL *w.e.f.* 1st April, 2008. He continued as CMD upto April, 2009. Shri Arvind Jadhav was appointed as CMD on May, 2009 and he is still continuing.

160.    **The Committee notes that over a period of two years the NACIL has got four CMDs which is against the healthy norms of corporate governance. A company which is grappling with the problems relating to merger should have an element of permanency at the top level at this hour. This has happened even after the consultants who advised the Ministry on the merger issues recommended a five year fixed period for the CMD during the merger period. The Committee has no hesitation to conclude that the frequent changes of CMD left the NACIL directionless and resulted in the present imbroglio.**

161.    The representatives of some of the unions who appeared before the Committee submitted that over a period of time, the Government of India and the Ministry of Civil Aviation had followed a pattern of appointing the CMD of the Airlines from within the bureaucracy of the Central Government. Perhaps NACIL is one of the few public sector units in the country which is having officers of the Indian Administrative Service as Chairman and Managing Directors.

162.    **The Committee observes that an aviation giant such as NACIL should be run with the help of technocrats and knowledge experts at the helm of affairs. It is, however, noted that the CMDs, even after the merger, have been from the Indian Administrative Service. The Committee, therefore, strongly recommends that experience in Civil Aviation Industry or Open Market Competitions must be main considerations for appointing CMD of NACIL. The company needs knowledge experts to deliver the results especially at this juncture when it is to meet challenges of merger, recession, less traffic and losses due to increased costs. The NACIL should be run by professionals and not by generalists.**

**Frequent changes at the too level**

163.    While analyzing the available data, the Committee has noted that after the merger of Air

33

India and Indian Airlines there are four changes in Chairman and Managing Director, five changes to head of Commercial Department, three changes to head of Cargo Handling and multiple changes in IT, industrial relations, planning, procurement, Engineering and most other functional areas. **The Committee has no hesitation to conclude that each change has resulted in change of direction, focus and plans each time. This has resulted in the impairment of the entire decision making process. Important subjects such as manpower integration, IT integration, PSS integration, common code, decision on overlap of flights etc. were deferred since no one in NACIL set up wanted to take uncomfortable decisions.**

164.    The Committee noted that many officers were posted as Directors even for a few days. Many officers are biding time, waiting to retire or waiting for promotion to some other posts/ Ministries. People at the senior levels avoided taking important decisions. The Committee also noted that no one has been held responsible for not taking decisions and delaying the merger process and plunging NACIL into huge loss.

165.    **The Committee recommends that the people at the top management including the CMD and Directors of NACIL should be appointed for a specific period say at least three years and they should be given targets to achieve in time bound manner. The Committee also recommends that accountability should be fixed on each one, serving or retired, responsible for creating the present mess in NACIL.**

**Responsibilities of NACIL as PSU**

166.    In reply to Unstarred Question No.2916 dated 15.12.2009 Rajya Sabha was informed that the amount charged per Haj Pilgrim as travel cost had remained unchanged at Rs.12000 since 1994. The fare has been increased to Rs.16000 *w.e.f.* Haj 2009 while the cost to the airlines per pilgrim for Haj 2006, Haj 2007 and Haj 2008 was Rs.47495, Rs.48064 and Rs.67332 respectively, the difference in fares being the subsidy borne by the Government.

167.    **The Committee notes that NACIL is providing the aircrafts for the Haj Pilgrimage after withdrawing aircrafts from its normal scheduled operations. The Committee, therefore, recommends that the Government should in addition to the reimbursement of the Haj subsidy to NACIL, adequately compensate the NACIL for providing the aircraft to the Haj Pilgrimage.**

168.    **The Committee noted that 6-B747 aircrafts are frequently used for VVIP flights, whose market value running into hundreds of crores. The present system is that payment is made for these flights only for operational cost and not for downtime of the aircrafts. The Committee recommends that the Government should compensate the NACIL for the loss of business and opportunities by providing these services to Government. NACIL should claim full cost upfront, incorporating these components.**

169.    **The committee also notes that compared to the private operators the NACIL has to keep a large number of additional staff to manage the dealings with Ministry of civil Aviation, Parliamentary matters such as the Parliamentary Questions and answering the Parliamentary Standing committees, Rajbhasha Department, internal Audit etc. All these are mandatory departments required for a public sector undertakings, whereas the private**

34

operators have no responsibility to maintain any of these departments. **The Committee, therefore recommends that the Government should take into account all these factors while deciding the level-playing field with private operators. NACIL should be adequately compensated for maintaining all those Departments.**

170. **The Committee recommends that if NACIL has to operate as a commercial enterprise, all non-profit operations that it is required by the Government of India to undertake, should be compensated at commercial rates. It may include flying to non-viable destinations, services rendered during natural calamities, use of VIP aircrafts, Haj Subsidy, etc.**

**Priority for landing and take off**

171. **It was brought to the notice of the Committee that over a period of time, the Indian Airlines/Air India flights had to wait in the air for longer duration for landing permission from the ATC, while other private airlines and foreign airlines need not wait in the air for landing. This is resulting in huge burden to the NACIL as fuel cost. The Committee notes that more than Rs.300 crore was the additional expenditure incurred by NACIL last year, due to the airport congestion and taxing time.**

172. **The Committee recommends that the Government should undertake a study into the waiting time for landing and take off of NACIL aircrafts, *vis-a-vis* the private and foreign airlines during the last one year. The Committee further recommends that NACIL should be given preference for landing and take off at all the airports since it is the national carrier and any money wasted is the tax payers' money.**

**Customer Services**

173. Service to customers and quality of in-flight services by NACIL are always a matter of concern. Every now and then there are reports of poor quality services. One such incident reported in the media was that the passengers travelling in Air India flight 311 dated 3.12.09 from Hong Kong to Mumbai, *via* Delhi were forced to travel in unhygienic conditions and made the flight a harrowing experience for the 151 passengers travelling by economy class.

174. **The Committee feels that when the NACIL is struggling to attract passengers, such inefficient services to the passengers will not augur good for the company. This is just one** of the **incidents quoted from a large number of deficient services being provided to the passengers by NACIL. The Committee recommends that every effort should be made to ensure that customer services are provided in a decent way at par with other airlines.**

**Cancellation of flights from Karipur (Kozhikode), Kerala**

175. Yet another incident of inefficient management of flight services have reported from Karipur (Kozhikode) International Airport in Kerala. Between 20th and 27th of December, 2009 more than 28 international flights to Sharjah, Kuwait, Doha Bahrain, Abudhabi, Muscat etc. were cancelled due to non-availability of pilots. The pilots took leave to celebrate Christmas and New Year. The passengers went on a rampage and the police had to be called in to control the violence. Due to

35

the cancellations, a large number of passengers who had to report to duties at their work places in Gulf countries could not do so and many of them may loose their jobs.

176.     It was reported that many of the pilots, some of them expats, applied for leave four months in advance. However, NACIL could not make alternate arrangements to operate the flights. **The Committee wonders when the NACIL was aware in advance that flights may be disrupted, why did they book the passengers in those flights and why they waited till the last minute to cancel the flights. The Committee observes that this is a reflection on the state of affairs prevailing in the NACIL and it is an example of corporate inefficiency. The Committee recommends that an inquiry may be ordered on the cancellation of those flights and the responsibility may be fixed. The Committee may be furnished the details of the revenue losses suffered by NACIL due to the above said cancellations of flights.**

177.     **Kerala has a large population working in the Gulf countries who are fully depending on the NACIL. Any disruption of flights of NACIL may put the passengers to untold miseries and they may be compelled to go to the foreign airlines. The Committee, therefore, recommends that the Gulf Services of NACIL may be operated without any disruption and adequate steps may be taken to ensure that the last minute cancellation of flights does not take place.**

178.     One more instance of the bad planning in the NACIL was brought to the notice of the Committee. On 28th November, 2009, NACIL flew a 430 seater Boeing 747 without any passengers from Riyadh to Mumbai. The problem began when a Kochi--Riyadh-Mumbai flight originally scheduled to leave from Kochi airport on 27th November, 2009 was cancelled because the crew had exhausted the flying duty timings permitted by the DGCA. A day later, the airline operated the flight carrying only 90 passengers, one fourth of its capacity to Riyadh and had no takers on the return flight to Mumbai.

179.     **The Committee notes that the management of NACIL should have foreseen the situation and taken adequate steps to ensure that alternate crew was in position to operate the flight. Such incidents would only add losses to the company and scare away the existing passengers.**

**Air India Engineering Service Limited (AIESL)**

180.     The Committee was informed that authorized share capital of the company is Rs.10 crores while paid-up share capital of the Company is Rs.5 1akhs, which has been subscribed and paid up by NACIL. The certificate to Commence Business was obtained on 17 January, 2006. It is planned to develop this subsidiary company into a Maintenance, Repair and Overhaul (MRO) facility with Air India providing the necessary initial support in terms of infrastructure and domain knowledge. The Company is yet to commence business. However, the total expenditure during 2007-08 is Rs.l.79 1akhs as against Rs.l.97 lakhs during 2006-07. The loss for the year 2007-08 is Rs.l.24 1akhs as against Rs.l.31 1akhs during 2006-07.

181.     **The Committee fails to understand the rationale behind delay in commencement of business by AIESL. The Committee notes that a Joint Venture Agreement for creation of a Maintenance, Repair and Overhaul Centre for Airbus aircraft has already been signed by**

36

the NACIL with European Aeronautic Defence and Space Company (EADS) in October, 2008. The Committee feels that Air India can be a pioneer in offering engineering repairs, maintenance, overhaul and offer engineering services to all operators-domestic or international, through the MRO SBU as it is having a staggering 9000 engineers in its kitty. In such a scenario, the Committee is not convinced with the JV module even in this sector also. The Committee is of the opinion that a successful operator needs diversification of his business as ticket sale alone cannot fill its coffers. The Committee desires that NACIL should fasten its belt to enter the MRO business very soon to reap the early bird benefits.

**General Recommendations**

182.    The Committee is of the firm view that the turn around of NACIL is not possible by shifting the burden of the crisis on to the shoulders of the employees and/or blaming them for the ills of the company. The Committee firmly believes that the one and only way of overcoming the problem is to change the often irrational and misplaced policy decisions of the Government.

183.    The Committee, therefore, recommends that as a first step the Government should write off the entire loss suffered by the NACIL as the loss is due to the policy directions of the Ministry of Civil Aviation.

184.    Secondly the Ministry should bring about regulations to control the flight schedules in such a way that the Public Sector NACIL should get priority in all the routes and prime times routes. Too many flights to same destination are leading to total chaos and loss to the Civil Aviation industry as a whole and this should be controlled and regulated.

185.    The Committee notes that presently there is no independent regulatory authority to regulate the allotment of routes, bilaterals, social commitment of private players, operation of non-viable routes etc. The Committee, therefore, recommends that the Government may consider formation of an independent regulatory authority to regulate the above subjects since the civil aviation sector in India has grown manifold in recent years.

186.    The Committee feels that the merger process has so far seen rough patches and still need more time to settle. Employees' role in merger process is not adequate and the mechanism to actively involve employees in this lengthy process is the need of the hour. The Government should make sincere efforts to make the merger successful by ensuring the proper integration of the employees and resolving the outstanding employees issues between the former Indian Airlines and Air India. Unless this is done, the required synergy to make NACIL a mega corporate taking on stiff international competition cannot be realized. In this context, the Committee considers that the NACIL functioning as a holding company with NACIL-A and NACIL-I as separate functional units merits a serious consideration by the Government. The Committee is of the opinion that the Government should be pro-active in promoting the interest of the national carriers in future by taking them into confidence while making any major policy decisions.

## OBSERVATIONS/CONCLUSIONS/RECOMMENDATIONS — AT A GLANCE

**Merger of Air India and Indian Airlines**

The Committee is not convinced with the arguments of the Government to justify the avoidable delays in taking the process of merger with required speed and manner. Merger of other international airlines does not *ipso facto* apply to the merger of Air India and Indian Airlines also. The Committee notes that the present aviation sector is already under pressure due to cut throat competitions and any further delay in merger is not going to do any favour for the ailing public carrier. Although more than two years have lapsed, the merger is neither visible in the air nor on the ground.                (Para : 20)

After considering existing post-merger realities and claims and counter claims in this regard, the Committee has enough reasons to say that the merger process has certainly been delayed, if not derailed. It appears that all the planning and road map for this have gone haywires. Any successful business model, in fact, depends on the proper integration of the men and material from the beginning and not in the mid-way. In this case, the essential integration has not taken place in real terms. As per the merger document, the integration of human resources will take at least two more years. In such a scenario, NACIL is having virtually three managements namely, NACIL itself, erstwhile Air India (NACIL–A) and Indian Airlines (NACIL–I). The Committee notes that at the time of merger, it was promised that an airline with a combined fleet size of 112 aircrafts, servicing both domestic and international routes with one code, would, no doubt, be comparable to any other airline, at least in the Asian region. But an analysis of the available data shows that such expectations from the merger process have been largely belied.                (Para : 21)

The Committee fails to understand how the two major avowed objectives of merger - 'economies of scale' and 'increased leverage' - could be accrued without achieving proper synergies. The fleet configurations of both the erstwhile airlines are different. The Air India fleet consists of Boeing aircraft of medium and long range which are being normally used for long distance international destinations and the Indian Airlines fleet consists of Airbus aircrafts which are suitable for short-range distances predominantly for the domestic destinations. Both these operators also drew fleet acquisition plan on the basis of their operational requirements. Operating crews, engineers, technicians and other technical personnel who are trained and certified on the Indian Airlines fleet, cannot be utilized on aircrafts of Air India which operates different type of aircraft. This also applies to the aircrafts operated by Air India also. The Committee also notes that the technical infrastructure for aircraft maintenance including various workshops created by each company over the year is specialized and unique to each fleet type owned by both these airlines. As such, cross-utilization of the maintenance services is also not feasible. The Committee feels that in such a situation, these inherent contradictions existing within NACIL have become major stumbling block in achieving the required economies of scale and increased leverage.                (Para : 22)

38

The Committee feels that the manpower integration, cross utilization of resources at Airports, existence of different sets of Passenger Service System (PSS) in Air India and Indian Airlines, sharing the codes, the transition to Strategic Business Units (SBUs) etc. are some of the critical areas which NACIL has to look into actively to achieve the desired results of merger of the Air India and Indian Airlines.                    (Para : 23)

**Purchase of new aircrafts**

In view of the facts made available to it, the Committee feels that the Aircraft Acquisition Programmes of the erstwhile Air India and Indian Airlines were finalized in haste. The Committee fails to understand the logic behind purchasing a large number of aircrafts when the aviation industry was hurt by huge losses due to the global economic recession. There is no budgetary provision for this purchase and the money to the tune of Rs.50000 crores has to be raised through loans only. The return on such large scale investment will take its time and there is no guarantee of immediate return on such investments. The Committee is of the opinion that NACIL should review its aircraft acquisition programme in view of its financial conditions, changing commercial dynamics and the demand and supply in the market. The Company is already struggling to get equity infusion to consolidate its capital. The Committee feels that a deferment of the aircraft acquisition programme will reduce the debt burden of the NACIL substantially.
                    (Para : 34)

The Committee was given to understand that the entire aircraft acquisition programme lacked required transparency. Reasons for going ahead with huge purchases by the Ministry of Civil Aviation despite Air India and Indian Airlines not having the capacity to support it, remains unknown to the Committee. It, therefore, recommends that this aspect needs to be further probed to fix the responsibility for taking such an ambitious decision that has become big financial liability.                    (Para : 35)

**Lease of Aircrafts**

After analyzing the facts available to the Committee, it appears that from 2006, a decision to go for dry and wet lease of aircrafts was taken to increase market share, without due considerations regarding proper route study and marketing or pricing strategy. It was also noted that Air India dry leased four Boeing 777s for a period of five years in 2006, whereas it was to get the delivery of its own aircrafts from July 2007 onwards. As a result, five Boeing 777s and five Boeing 737s were kept idle on ground at an estimated loss of Rs.840 crore during the period 2007 to 2009.                    (Para : 50)

The Committee observes that aircrafts were dry/wet leased even while the aircrafts acquisition programme was going on. The Committee feels that aggressiveness shown in leasing of airerafts has now turned out to be a unviable proposition. It raises genuine doubts about the Government's approach towards the entire issue. The Committee notes that absence of early exit-clause in lease agreements will lead to litigations and payment of lease rents even without using the aircrafts. The Committee is of the opinion that it has led NACIL into a morass from which it is very difficult to come out.                    (Para : 51)

The Committee notes that from the year 2007 onwards, the NACIL was scheduled to get delivery of the new aircrafts which had been planned in the year 2005. The Committee could not comprehend why the NACIL Management and the Ministry of Civil Aviation went ahead after 2005 with the expensive proposition of leasing of aircrafts that too without any exit clause. The Committee also notes that even after the new aircrafts delivery to NACIL, the company continued to lease aircrafts or renewed the leases on some pretext or the other, which caused huge loss to the company at the time of recession, low seat factor and capacity underutilization. All such decisions taken by the Management and the Ministry of Civil Aviation had ultimately resulted in big financial loss to the company. The Committee recommends that all the lease agreements may be reviewed and appropriate action may be taken in cases where agreements were not based on sound business prudence. (Para : 52)

**Financial performance of NACIL**

The Committee notes that the passenger load factor had slightly increased from 59.6% in 2008-09 to 62.7% during the period of April-September 2009. However, the yield factor had shown significant drop i.e. from Rs.3.50 per km. in 2008-09 to Rs.2.97 per km. during the April to September, 2009. The main reason attributed to this decrease was the increased competition from low cost carriers and excess capacity in the market. The Committee feels that the trend is worrisome because NACIL is not able to regain its yield even after induction of brand new aircrafts and adopting various cost cutting measures.

(Para : 69)

The Committee notes the steps taken/or proposed to be taken by the Management of NACIL to achieve a turn around in the company mainly by reducing costs and enhancing revenues. The Committee further notes that NACIL had a huge liability due to the acquisition of large number of aircrafts. With the global economic recession, generation of excess capacity in the market and low yield, the Committee finds that the basic assumptions advanced for the purchase of new aircrafts were no longer valid. Therefore, even if the NACIL manages to cut costs and generate some amount of revenues, it may not be able to service the huge liability created due to debt repayment and interest payment of the aircraft purchase. The Committee, in such a situation, is of the considered opinion that the entire aircraft purchase of the NACIL may be funded by the Government of India as soft loan as a one time measure. A cue in this regard may be taken from the examples of similar bail out packages provided in other countries to their airlines.         (Para : 71)

**IT integration**

The Committee notes with dismay that NACIL took almost two years to start the process by inviting Request for Proposal for revamping the commercial processes and systems and infrastructure yet the integration of Passenger Service Systems (PSS) still remains a far cry. The Committee also observes that until NACIL gets a common IT platform, a meaningful business transformation would be difficult to achieve.  (Para : 73)

The Committee, therefore, recommends that NACIL should strive to achieve a common IT platform without any delay before finalizing any Commercial Transformation Project as the success of the latter is closely linked with the former.         (Para : 74)

**Human Resource Management**

The Committee feels that had the wages been revised in 1997 itself, the IA workers would have now been getting what was due to them. However, it is surprising that the revision was delayed for 10 years, though the company was making profits during this period. The company made losses not due to employees' inefficiency but due to wrong Government policies and decisions of the management. Making the employees to suffer (by not getting the arrear payments) due to no fault of theirs can hardly be justified. The Committee, therefore, recommends that the arrears to all the employees be sanctioned *w.e.f.* 1.1.1997 and paid appropriately.                                    (Para : 81)

The Committee has found that the merger process was entirely guided by the report of M/s Accenture who was engaged as consultant by the Government of India. However, the absence of a proper study and discussion with employees of both the airlines regarding amalgamations of systems and DR management, lead to imparity & thus, heart-burning between the employees of erstwhile AI and IA in the NACIL. The merger process in this manner, instead of creating conducive working conditions in the new entity, has left a potential cause of unrest waiting to happen any time between the employees and management of NACIL. The pay-scales being different in the erstwhile IA and AI before the merger, the integration process has faced with a complex and peculiar problem that needs to be solved without further delay. The promotions at the ED level and discrimination in the pay scale of cabin crew of AI and IA has further compounded this problem. The Committee notes that merger has taken place at the level of Executive Directors, General Managers and Deputy General Managers but other categories are left out and they are still governed by the rules and regulations of their parent organizations.                    (Para : 90)

The Committee also notes that NACIL is facing the seniority merger issues for the last two years, as IA and AI followed a different promotion policy during the pre-merger periods. The eligibility criteria for the higher posts by combining the employees of both the airlines have resulted in resentment among the employees of erstwhile IA. The committee finds that there are various differences in the pay/ allowances/ emoluments of employees of erstwhile IA *vis-a-vis* AI, due to bilateral agreements done from time to time leading to anomalous situations after the merger for work/task carried out by employee at same level. The classic example is that pilots of erstwhile AI who fly less than 40 hours are paid emoluments based on 80 hours of flying per month, whereas the payment of emoluments for erstwhile IA pilots are based on actual flying hours. In such a situation, integration of human resources remains a serious challenge. Settlement of wage arrears, revision of pay for certain employees of erstwhile Indian Airlines are other such challenges that are yet to be resolved.                                                        (Para : 91)

The newly merged NACIL has not introduced any Service Regulations or Standing Orders to govern its employees till date for the reasons best known to management only. The Committee is of the opinion that in such a scenario, integration of human resources and settlement of their related problems amicably in the new entity may take years and not within the stipulated time as projected by the Government.                    (Para : 92)

41

The Committee notes that NACIL need to look into the genuine grievances of its employees and ensure that wide disparities in respect of wages, salaries, etc. are reduced to the extent possible. (Para : 93 )

**Productivity Linked Incentive**

The Committee notes that the parameters adopted for the payment of PLI are different for different categories of employees depending on the nature of work undertaken by the staff and the level of officers. There are wide disparities between the NACIL–A and NACIL–I employees, as far as PLI payment is concerned. The Committee also notes that the PLI schemes between NACIL–A and NACIL–I have not yet been harmonized. However, committees have been constituted for examining the harmonization issues of PLI. (Para : 106)

The Committee recommends that the standards adopted for payment of PLI should be reasonable, just and equitable. The employees should not feel that one category of employees is paid at the expenses of another category of employees. A total harmonization of PLI may be worked out in consultation with various Unions and Associations. (Para : 107)

Since all the parameters are laid down for PLI payment, the Committee does not see any scope for reduction in PLI of employees. Even after achieving all the parameters, if the company is making losses, the reason for losses obviously lay somewhere else. The Committee feels the misplaced Government policies and priorities are the main reason for the losses. (Para : 108)

The Committee notes that NACIL has recently announced a number of cost cutting measures to the tune of Rs.4000 crores during 2009-2010. The recent instances of delay in payment of salary, cut in PLI and issuing a number of cost cutting advisories, it appears have not gone well with the employees. Employees, as a result, resorted to strike due to cut in their PLI. The Committee feels that employees are being made scapegoat and cut in their salaries and PLI have become tools in the hands of management in the name of cost cutting/financial restructuring. (Para : 109)

The Committee would like to quote the CMD, NACIL, who deposed before the Committee on 20th October, 2009 stated *inter alia*

"…in my own organization, we do not now take 15 minutes delay as on-time. I said that we have to close our door at D-10 and then we have to fly. Sir, I have got the same set of employees. I have these 32,000 employees who did not get their PLIs in time. It is the same set of people who have not got their salary on time. But, at the airports, they have given me 76 per cent on-time performance with 65 per cent of my routes are going on dot…"

(Para : 110)

The Committee feels that this definitely showed that the employees are sincere, efficient and punctual and they should not be punished for that by withdrawing their salaries and allowances. (Para : 111)

42

The Committee understands the compulsions of the NACIL management to reduce costs. At the same time, it is their duty to ensure that further losses are not incurred due to strike by the employees leading to flight disruptions. The Committee recommends that the management should find out a via media to overcome the situation by calibrating the withdrawal of PLI in consultation with the Employees' Unions.                    (Para : 112)

The Committee feels that while formulating the policies, Government should always ensure level-playing field for the PSUs and ensure that they should not go out of business due to the policies.                    (Para : 113)

**Route Dispersal Guidelines**

The Route Dispersal Guidelines of the Government of India stipulates that 10% of overall operations of the individual airlines should be category II and IIA routes to/from North East, J & K, Port Blair and Lakshadweep Islands. The Committee was informed that NACIL is having 19% of its operations in category II/IIA routes. Maintaining connectivity to remote and underserved markets is part of NACIL's network planning systems whereas private airlines develop their network based solely on profitability and network synergies. The Committee notes that NACIL is operating almost double the capacity of its statutory obligations to category II and II A destinations. The Committee, therefore, recommends that the NACIL should be adequately compensated for carrying out its operations in non-viable routes and fulfilling its social responsibility.                    (Para : 115)

**Surrender of routes by NACIL**

Rationalization of routes has become another major issue before the newly created NACIL. They started to withdraw their services from the lucrative and profit earning routes in the name of route rationalization and simultaneously opened door for the private operators. In the Mumbai-Dubai sector, services were reduced from 3 flights daily to 2 daily, but their competitor was able to operate 4 services daily. If the services were reduced mainly due to the overlapping, the services could have still remained unaffected with one of the Government operators. And if the decision was based purely on commercial prudence, then how come the competitor could operate 4 services daily? Similarly, even in the domestic sector, while services between Mumbai and Ahmedabad were reduced from 3 flights daily to 2 daily, another airlines was able to run 4 services daily. When the Committee analyzed the available data it was found that services from the lucrative Mumbai-Doha sector which got 90 per cent occupancy were withdrawn abruptly and the vacuum was filled up by a private operator.                    (Para : 119)

The Open Sky Policy and the reckless licensing that followed opened up a Pandora's box in Indian civil aviation industry. Under the Open Sky Policy, five year old private airlines were allowed to fly in international sector. Jet and Kingfisher, therefore, were allowed to utilise the bilaterals in the lucrative gulf sectors. Private players were favoured in the route dispersal guidelines and more and more bilaterals were handed over to the private airlines on platter. Thus, the Open sky policy, in the initial years, denied Indian Airlines a level-playing field. Private operators were permitted to operate on routes of their

43

choice and they naturally concentrated on the lucrative trunk routes. Indian Airlines was forced to keep a network operational, which involved operating more than 70% routes that were loss making and most of which were being operated for socio economic reasons. Private players were promoted at the cost of national carriers which resulted in over licensing, over capacity, price wars and financial failures. The Government remained a mute spectator to the price war waged by the private operators to grab the market from the national carriers. The Government did not take any initiative to control the low cost fares to ensure sustainability of the private operators on a long term basis. As a result, many of the companies accumulated hundreds of crores of losses and many of them like Damania, Continental, East West, Moduluft, NEPC, Raj etc. went out of business and disappeared from the aviation horizon. A few players who had the financial backing of their holding companies and clouts, continued their business even though they were making heavy losses. The Government forced the national carriers also to compete with the private players and make losses. The Committee firmly believes that private operators can come and go at their own will but the national carrier has to stay back and serve the nation whether they make loss or profit. The Committee, therefore, recommends that the Government should ensure that the low cost carriers and the private players are not imposing any restrictive trade practices which are not sustainable in the long run. The Government should come out with the policy which prices the air tickets in such a way that the operating companies can run their business without accumulating losses. (Para : 120)

**Bilaterals**

The Committee notes that in granting traffic rights, home carriers' interests, whether Government owned or private, are always considered. The incremental capacity generated by the bilateral could not be utilized by the home carriers due to the limitation of Indian Airlines/Air India's fleet size. The Government which was aware of the limitations of the National Carrier, knowingly and willingly, allowed incremental capacity to foreign airlines. The Committee feels that the bilateral should have opened only after the acquisition of new aircrafts by Air India/Indian Airlines. (Para : 128)

The Committee, therefore, recommends that the decision to open the highly lucrative international air markets to /from India may be probed by a suitable agency and all those bilateral must be reconsidered and reviewed and responsibility may be fixed for giving away the national rights. The Committee also notes that the bilateral rights once granted, are generally never withdrawn. The Committee was informed by the Ministry that, however, in the Air Services Agreements (ASA) concluded between India and other countries, there is a safeguard termination clause which can be invoked for Termination of Agreement. (Para : 129)

The Committee notes with dismay that even after the National Carrier was making an earnest plea for controlling the unrestricted entry of the foreign airlines in India, the Government looked the other way and decided to grant further bilateral to various foreign airlines thus making the NACIL more vulnerable to operational difficulties and losses. The Committee strongly recommends that an inquiry may be conducted to find out why such a large number of bilateral were granted to foreign players knowing well that domestic

players could not match and avail bilateral granted to them due to the constraints of availability of aircrafts. Wherever required, the termination clause of the ASA may be invoked to ensure that NACIL is getting its due share of bilateral. The Committee further recommends that no more bilateral may be allowed till the home carriers are capable of utilizing their quota.                                                              (Para : 131)

The Committee also notes that services are being withdrawn from lucrative sectors by NACIL paving the way for introduction of services by the private operators in the same sector. The Committee fails to understand the logic behind this move and feels that this move will definitely fill the coffers of private operators and make the NACIL incur huge losses. The Committee recommends that all the existing domestic services may be reviewed and NACIL may be permitted to opt for routes and timings of their choice. The other airlines may be adjusted thereafter, in such a way that they do not encroach on the services of NACIL.                                                              (Para : 132)

The Committee apprehends that there appears to be a nexus operating for surrendering lucrative routes to favour the private operators. The Committee recommends that an inquiry be constituted to analyze the withdrawal of lucrative routes both domestic and international to favour the private players in the field. The inquiries are necessitated by the fact that immediately on withdrawal of services by NACIL the private operators introduced their flights in the same sector promptly and are presumably making profits.
                                                              (Para : 133)

**Declared goods status for ATF**

The Committee also noted that benefit of any reduction of Sales Tax on ATF is not being passed on to the passengers by the airlines. The Government of Kerala, which, in the budget of March, 2008, announced a reduction from 25% to 4%, promptly pushed it back to 25% when it was realized that benefits were not being passed on to the passengers.
                                                              (Para : 136)

The Committee was also informed that ATF prices without sales tax were 17% costlier in India, compared to international prices due to the pricing mechanism that are being followed by the Oil Marketing Companies.                                  (Para : 137)

In view of the factual position given above the Committee sees no reasons why ATF should be given 'declared goods status' at this point of time. However, the Committee recommends that the pricing mechanism followed by Oil Marketing Companies need reconsideration. The Committee therefore, recommends that NACIL may take up the issue of pricing of OMCs with Ministry of Petroleum and Natural Gas.                     (Para : 138)

**Proposed withdrawal of flights**

The Committee noted that non-stop flights operated by NACIL to USA from Mumbai and New Delhi were incurring losses to the tune of Rs.750 crore per year, which was more than the amount (Rs.700 crores) the airline plans to save by cutting employees PLI. The losses on these routes, the Committee learnt accounted 15% of the total loss of the NACIL.

45

On being asked, the CMD, NACIL informed that these flights were not being withdrawn because NACIL may not get the slot at these airports again in future. The Committee, in view of current financial crisis and several cost cutting measures taken by NACIL, is of the opinion that the idea to continue operating non-stop flights at these routes needs to be reconsidered.                                                                                    (Para : 139)

The Committee recommends that such huge loss making routes need to be rationalized or linked with some other stop over routes.                                  (Para : 140)

The Committee further notes that low cost carriers are the need of the hour. The NACIL, therefore, should not hesitate to tap the potential of low cost market by mixing the low cost and full cost services, wherever possible.                                           (Para : 141)

Ground Handling Services

The Committee feels that criteria followed by the private airport operators of Hyderabad (HIAL) and Bangalore airports (BIAL) has not showed the desired results of Government policy in this regard as it had affected the earnings of Air India considerably. The new ground handling policy, as announced by the Government, will add to the existing woes of the NACIL. The Committee feels that these joint ventures have become instruments of back-door privatization thereby giving up control of the Government in investment as well as management, besides resulting in job losses.                (Para : 148)

The Committee observes that NACIL (Air India and Indian Airlines) were doing the ground handling activities of both private and international airlines for so many decades at all the Indian airports. They have had good expertise and adequate manpower with superior abilities than any joint venture foreign company. The criteria of having international expertise cannot be mechanically interpreted as handling in international airports outside India. The Committee recommends that the handling of international aircrafts in Indian airports should be an adequate criteria for deciding the international experience. The Committee feels that the criteria of "international level standards for ground handlers" at Bangalore and Hyderabad, in fact, facilitated the entry of foreigners through backdoor in the profit making ground handling activity at the Indian airports. Such a move has rendered a large number of NACIL employees jobless and reduced the profit of the company drastically in the Bangalore and Hyderabad airports. The profit of NACIL at Hyderabad airport was Rs.53.69 crores in 2007-08 which dropped to Rs. 25.96 crores in 2008-09. Likewise, at Bangalore airport, the profit dropped from Rs. 39.13 crores in 2007-08 to Rs. 12.45 crores in 2008-09. This situation also resulted in employment to foreigners in Indian Airports and made their joint venture a profitable venture for foreigners in India.                                                                                            (Para : 149)

The Committee recommends that the such biased clauses against ground handling by NACIL may be removed from the Agreements of private airports at Bangalore and Hyderabad. In future NACIL should be given exclusive rights to ground handling activities in all the Indian airports. The Committee also recommends that the idea of foreigners' entry into ground handling may be re-considered in view of prevailing security scenario. The Committee notes that NACIL already has a subsidiary named Air India Air Transport

Services Limited (AIATSL) mainly to carry out the ground handling activities. The Committee recommends that NACIL and its subsidiary/SBU should be permitted to provide Ground Handling services to all the airlines at all the airports including the metro airports in India.

(Para : 150)

**Salary and perks of the top officials of NACIL**

The Committee notes that various allowances including flying allowances were paid to the employees of NACIL irrespective of the nature of job they undertake. The Committee in view of such a gross discrepancy recommends that this needs to be rationalized in such a way as to ensure that these disparities did not affect the very existence of NACIL.

(Para : 153)

**Separate offices for Indian Airlines and Air India**

The Committee notes that Offices of IA and AI in major cities are still functioning independently and the higher officials are not in a mood to surrender their office space resulting in hefty payment of market rents. NACIL management is operating from two places namely from Delhi and Mumbai. The Committee is of the opinion that a decision in this regard may be taken at the earliest to end the confusion and uncertainty. Once it is done, the surplus space either in the Nariman Point Headquarters, Mumbai or the Airline House, Delhi, both located at prime locations, can be used suitably for generating non-aeronautical revenue.

(Para : 154)

**Senior Officers are keeping offices at Delhi and Mumbai**

Due to the incomplete process of merger of Indian Airlines and Air India, a large number of senior officers are maintaining multiple offices and personal staff in Mumbai and Delhi and they are shuttling between Mumbai and Delhi quite frequently at the company's cost. In addition to this since both the companies were having different codes of operation around 30 to 40 senior managers who used to be with the Indian Airlines are shuttling between Delhi and Mumbai to sign the mandatory papers because there are decisions only they can sign off. They are also maintaining multiple offices along with personal staff in Mumbai and Delhi. The Committee notes that the usage of dual code is a stumbling block in the entire process of merger and is causing a lot of expenses which could have been avoided. The Committee, therefore, recommends that except the CMD, no other officer should operate from more than one office and those officers who are operating from different locations may be suitably relocated to reduce the losses to the company.

(Para : 155)

**Brandig and rebrandine which resulted in wasteful expenditure**

Another example of avoidable expenditure by NACIL is the refurbishment and repainting of all its aircrafts. In the pre-merger scenario, to boost the image of the erstwhile IA, the Government rechristened its brand as 'Indian' and started to repaint its aircrafts with the brand name of 'Indian'. After merger into NACIL, the brand name

47

'Indian' again has been replaced with the brand name 'Air India'. Huge cost has already been incurred on changes of brand, logo, etc. which need to be incorporated in fleets, equipments, stationary, etc. Needless to say, these costs must have added to the operating cost of NACIL. The Committee feels that this branding and re-branding exercises were wasteful expenditures, particularly the one done in the case of Indian Airlines; it could have been avoided.                                                                    (Para : 156)

### Board of Directors

The Committee recommends that the practice of filling the Board of Directors mainly with the officers from the Ministry of Civil Aviation should be discouraged. Independent Directors with professional experience and expertise may be inducted into the Board. The Board may be allowed to function in a professional way. Professional Board and Directors and a committed CMD is the need of the hour to run the NACIL in an efficient way.
                                                                    (Para : 158)

### Chairman and Managing Director

The Committee notes that over a period of two years the NACIL has got four CMDs which is against the healthy norms of corporate governance. A company which is grappling with the problems relating to merger should have an element of permanency at the top level at this hour. This has happened even after the consultants who advised the Ministry on the merger issues recommended a five year fixed period for the CMD during the merger period. The Committee has no hesitation to conclude that the frequent changes of CMD left the NACIL directionless and resulted in the present imbroglio.           (Para : 160)

The Committee observes that an aviation giant such as NACIL should be run with the help of technocrats and knowledge experts at the helm of affairs. It is, however, noted that the CMDs, even after the merger, have been from the Indian Administrative Service. The Committee, therefore, strongly recommends that experience in Civil Aviation Industry or Open Market Competitions must be main considerations for appointing CMD of NACIL. The company needs knowledge experts to deliver the results especially at this juncture when it is to meet challenges of merger, recession, less traffic and losses due to increased costs. The NACIL should be run by professionals and not by generalists.           (Para : 162)

### Frequent changes at the top level

While analyzing the available data, the Committee has noted that after the merger of Air India and Indian Airlines there are four changes in Chairman and Managing Director, five changes to head of Commercial Department, three changes to head of Cargo Handling and multiple changes in IT, industrial relations, planning, procurement, Engineering and most other functional areas. The Committee has no hesitation to conclude that each change has resulted in change of direction, focus and plans each time. This has resulted in the impairment of the entire decision making process. Important subjects such as manpower integration, IT integration, PSS integration, common code, decision on overlap of flights etc. were deferred since no one in NACIL set up wanted to take uncomfortable decisions.
                                                                    (Para : 163)

48

The Committee recommends that the people at the top management including the CMD and Directors of NACIL should be appointed for a specific period say at least three years and they should be given targets to achieve in time bound manner. The Committee also recommends that accountability should be fixed on each one, serving or retired, responsible for creating the present mess in NACIL. (Para : 165)

## Responsibilities of NACIL as PSU

The Committee notes that NACIL is providing the aircrafts for the Haj Pilgrimage after withdrawing aircrafts from its normal scheduled operations. The Committee, therefore, recommends that the Government should in addition to the reimbursement of the Haj subsidy to NACIL, adequately compensate the NACIL for providing the aircraft to the Haj Pilgrimage. (Para : 167)

The Committee noted that 6-B747 aircrafts are frequently used for VVIP flights, whose market value running into hundreds of crores. The present system is that payment is made for these flights only for operational cost and not for downtime of the aircrafts. The Committee recommends that the Government should compensate the NACIL for the loss of business and opportunities by providing these services to Government. NACIL should claim full cost upfront, incorporating these components. (Para : 168)

The committee also notes that compared to the private operators the NACIL has to keep a large number of additional staff to manage the dealings with Ministry of civil Aviation, Parliamentary matters such as the Parliamentary Questions and answering the Parliamentary Standing committees, Rajbhasha Department, internal Audit etc. All these are mandatory departments required for a public sector undertakings, whereas the private operators have no responsibility to maintain any of these departments. The Committee, therefore recommends that the Government should take into account all these factors while deciding the level-playing field with private operators. NACIL should be adequately compensated for maintaining all those Departments. (Para : 169)

The Committee recommends that if NACIL has to operate as a commercial enterprise, all non-profit operations that it is required by the Government of India to undertake, should be compensated at commercial rates. It may include flying to non-viable destinations, services rendered during natural calamities, use of VIP aircrafts, Haj Subsidy, etc. (Para : 170)

## Priority for landing and take off

It was brought to the notice of the Committee that over a period of time, the Indian Airlines/Air India flights had to wait in the air for longer duration for landing permission from the ATC, while other private airlines and foreign airlines need not wait in the air for landing. This is resulting in huge burden to the NACIL as fuel cost. The Committee notes that more than Rs.300 crore was the additional expenditure incurred by NACIL last year, due to the airport congestion and taxing time. (Para : 171)

49

The Committee recommends that the Government should undertake a study into the waiting time for landing and take off of NACIL aircrafts, *vis-a-vis* the private and foreign airlines during the last one year. The Committee further recommends that NACIL should be given preference for landing and take off at all the airports since it is the national carrier and any money wasted is the tax payers money. (Para : 172)

**Customer Services**

The Committee feels that when the NACIL is struggling to attract passengers, such inefficient services to the passengers will not augur good for the company. This is just one of the incidents quoted from a large number of deficient services being provided to the passengers by NACIL. The Committee recommends that every effort should be made to ensure that customer services are provided in a decent way at par with other airlines. (Para : 174)

**Cancellation of flights from Karipur (Kozhikode), Kerala**

It was reported that many of the pilots, some of them expats, applied for leave four months in advance. However, NACIL could not make alternate arrangements to operate the flights. The Committee wonders when the NACIL was aware in advance that flights may be disrupted, why did they book the passengers in those flights and why they waited till the last minute to cancel the flights. The Committee observes that this is a reflection on the state of affairs prevailing in the NACIL and it is an example of corporate inefficiency. The Committee recommends that an inquiry may be ordered on the cancellation of those flights and the responsibility may be fixed. The Committee may be furnished the details of the revenue losses suffered by NACIL due to the above said cancellations of flights. (Para : 176)

Kerala has a large population working in the Gulf countries who are fully depending on the NACIL. Any disruption of flights of NACIL may put the passengers to untold miseries and they may be compelled to go to the foreign airlines. The Committee, therefore, recommends that the Gulf Services of NACIL may be operated without any disruption and adequate steps may be taken to ensure that the last minute cancellation of flights does not take place. (Para : 177)

The Committee notes that the management of NACIL should have foreseen the situation and taken adequate steps to ensure that alternate crew was in position to operate the flight. Such incidents would only add losses to the company and scare away the existing passengers. (Para : 179)

**Air India Engineering Service Limited (AIESL)**

The Committee fails to understand the rationale behind delay in commencement of business by AIESL. The Committee notes that a Joint Venture Agreement for creation of a Maintenance, Repair and Overhaul Centre for Airbus aircraft has already been signed by the NACIL with European Aeronautic Defence and Space Company (EADS) in October, 2008. The Committee feels that Air India can be a pioneer in offering engineering repairs,

maintenance, overhaul and offer engineering services to all operators- domestic or international, through the MRO SBU as it is having a staggering 9000 engineers in its kitty. In such a scenario, the Committee is not convinced with the JV module even in this sector also. The Committee is of the opinion that a successful operator needs diversification of his business as ticket sale alone cannot fill its coffers. The Committee desires that NACIL should fasten its belt to enter the MRO business very soon to reap the early bird benefits.

(Para : 181)

**General Recommendations**

The Committee is of the firm view that the turn around of NACIL is not possible by shifting the burden of the crisis on to the shoulders of the employees and/or blaming them for the ills of the company. The Committee firmly believes that the one and only way of overcoming the problem is to change the often irrational and misplaced policy decisions of the Government.

{Para : 182)

The Committee therefore, recommends that as a first step the Government should write off the entire loss suffered by the NACIL as the loss is due to the policy directions of the Ministry of Civil Aviation.

(Para : 183)

Secondly the Ministry should bring about regulations to control the flight schedules in such a way that the Public Sector NACIL should get priority in all the routes and prime times routes. Too many flights to same destination are leading to total chaos and loss to the Civil Aviation industry as a whole and this should be controlled and regulated.

(Para : 184)

The Committee notes that presently there is no independent regulatory authority to regulate the allotment of routes, bilaterals, social commitment of private players, operation of non-viable routes etc. The Committee, therefore, recommends that the Government may consider formation of an independent regulatory authority to regulate the above subjects since the civil aviation sector in India has grown manifold in recent years.   (Para : 185)

The Committee feels that the merger process has so far seen rough patches and still need more time to settle. Employees' role in merger process is not adequate and the mechanism to actively involve employees in this lengthy process is the need of the hour. The Government should make sincere efforts to make the merger successful by ensuring the proper integration of the employees and resolving the outstanding employees issues between the former Indian Airlines and Air India. Unless this is done, the required synergy to make NACIL a mega corporate taking on stiff international competition cannot be realized. In this context, the Committee considers that the NACIL functioning as a holding company with NACIL-A and NACIL-I as separate functional units merits a serious consideration by the Government. The Committee is of the opinion that the Government should be pro-active in promoting the interest of the national carriers in future by taking them into confidence while making any major policy decisions.     (Para : 186)

# MINUTES

**XX**
**TWENTIETH  MEETING**

The Committee met at 3.00 P.M. on Thursday, the 24th April, 2008 in Committee Room 'B', Ground Floor, Parliament House Annexe, New Delhi.

**MEMBERS PRESENT**

1. Shri Sitaram Yechury — *Chairman*

**RAJYA SABHA**

2. Shri Naresh Gujral

3. Shri M.V. Mysura Reddy

4. Shri Shahid Siddiqui

**LOK SABHA**

5. Shri Anandrao Vithobha Adsul

6. Shri Sukhbir Singh Badal

7. Shrimati Priya Dutt

8. Shri P. Karunakaran

9. Dr. P.P. Koya

10. Shri Ramkrishna Kusmaria

11. Shri Akshay Pratap Singh

**SECRETARIAT**

Shrimati Agnes Momin George, Joint Secretary

Shri Jagdish Kumar, Joint Director

Shri Swarabji B., Deputy Director

Shrimati Nidhi Chaturvedi, Committee Officer

| | | |
|---|---|---|
| 2. | * | * | * |
| 3. | * | * | * |
| 4. | * | * | * |

---

*** Relates to other matter.

54

5.      The  Committee  also  discussed  in  future  course  of  action  and  decided  to  take  up  the "Functioning and Performance of National Aviation Company of India Limited (NACIL) for detailed examination.

6.      *                                    *                                    *

7.      *                                    *                                    *

8.      The  meeting  of  the  Committee  then  adjourned  at  4.00  P.M.

---

*** Relates  to  other  matter.

# II
## SECOND  MEETING

The Committee met at 11.30 A.M. on Friday the 22nd August, 2008 in Committee Room 'A', Ground Floor, Parliament House Annexe, New Delhi.

**MEMBERS PRESENT**

1.  Shri Sitaram Yechury — *Chairman*

**RAJYA SABHA**

2.  Shri Naresh Gujral
3.  Shrimati Jayanthi Natarajan
4.  Shri Shanta Kumar
5.  Shri Birendra Prasad Baishya
6.  Shri Biswajit Daimary

**LOK SABHA**

7.  Shri Joachim Baxla
8.  Shri Sartaj Singh Chhatwal
9.  Shri Adhir Chowdhury
10.  Dr. K. Dhanaraju
11.  Dr. P. P. Koya
12.  Shri Samik Lahiri
13.  Shri Alok Kumar Mehta
14.  Shri Hemlal Murmu
15.  Shri Madanlal Sharma
16.  Shri Dushyant Singh

**SECRETARIAT**

Shri N.K. Singh, Joint Secretary

Shri Jagdish Kumar, Joint Director

Shri Swarabji B., Deputy Director

Shrimati Nidhi Chaturvedi, Committee Officer

**REPRESENTATIVES OF THE MINISTRY OF CIVIL AVIATION**

Shri Ashok Chawla, Secretary

Shri R.K. Singh, Joint Secretary

Shri Raghu Menon, CMD, NACIL

56

Shrimati Abha Shukla, Director

Shri M.P. Vijayakumar, ED (F&NP), NACIL

Shri S. Venkat, ED (Finance), NACIL

2.      At the outset, the Chairman welcomed the Members of the Committee, specially Shri Shanta Kumar, MP, a new member of the Committee. Thereafter, the Committee heard the views of the representatives of Ministry of Civil Aviation and National Aviation Company of India Limited (NACIL) on the 'Functioning and Performance of NACIL'. Members raised queries to which the Secretary and other senior officers replied. The Ministry was requested to furnish written replies to certain queries raised by the Members.

3.      Since, the merger of erstwhile Air India and Indian Airlines has bearing on issues relating to the human resource management, the Committee, decided to hear all the stakeholders in the new company. To begin with, it decided to hear the representatives of various categories of employees to have a clear idea about the issues concerning them in the pre and post-merger scenario, on 2nd September,  2008.

4.      *                                     *                                     *

5.      *                                     *                                     *

6.      *                                     *                                     *

7.      A verbatim record of proceedings of the meeting was kept.

8.      The Committee then adjourned at 1.30 P.M.

---

*** Relates to matter not included in this Report.

# III
# THIRD  MEETING

The  Committee  met  at  3.30  P.M.  on  Tuesday  the  2nd  September,  2008  in  Committee Room  'A',  Ground  Floor,  Parliament  House  Annexe,  New  Delhi.

**MEMBERS PRESENT**

1.  Shri  Sitaram  Yechury — *Chairman*

   **RAJYA  SABHA**

2.  Shri  Naresh  Gujral
3.  Prof.  Alka  Balram  Kshatriya
4.  Shri  Shanta  Kumar
5.  Shri  Birendra  Prasad  Baishya
6.  Shri  Biswajit  Daimary

   **LOK  SABHA**

7.  Shri  Anandrao  Vithoba  Adsul
8.  Shri  Sartaj  Singh  Chhatwal
9.  Shri  Adhir  Chowdhury
10.  Dr.  K.  Dhanaraju
11.  Shri  P.  Karunakaran
12.  Dr.  P.P.  Koya
13.  Shri  Samik  Lahiri
14.  Shri  Alok  Kumar  Mehta
15.  Shri  Madanlal  Sharma
16.  Shri  Prahlad  Joshi

   **SECRETARIAT**

   Shri  N.K.  Singh,  Joint  Secretary

   Shri  Jagdish  Kumar,  Joint  Director

   Shri  Swarabji  B.,  Deputy  Director

   Shrimati  Nidhi  Chaturvedi,  Committee  Officer

   I.  **Representatives  of  Air  Corporations  Employees  Union**

   Shri  J.B.  Kadlan,  General  Secretary

   Shri  Anand  Prakash,  Joint  Secretary

58

II.  **Representatives of Indian Commercial Pilots Association**

Capt. R. Khangte, President

Capt. Vikram Yadav, General Secretary

III.  **Representatives of Indian Airlines Officers Association**

Shri K.R. Chidambaram, President

Shri R.K. Chopra, General Secretary

IV.  **Representatives of Airlines Radio Officers and Flight Operations Officers Association**

Shri A.K. Bhatia, President

Shri S. Debasish, General Secretary

V.  **Representatives of All India Aircraft Engineers Association**

Shri Manish Khare, President

Shri Y.V. Raju, General Secretary

VI.  **Representatives of Indian Aircraft Technician Association**

Shri R.D. Bhagwat, President

Shri M.S. Kulkarni, General Secretary

VII.  **Representatives of Indian Airlines Employees Congress**

Shri A.K. Chaturvedi, President

Shri Amit J. Sharma, General Secretary

Shrimati Anupma Khera

2.      At the outset, the Chairman welcomed the members of the Committee.

3.      Thereafter, witnesses were called in and the Chairman informed that the Committee was currently examining the "Functioning and Performance of National Aviation Company of India Limited" and that it heard the Ministry and the management of the NACIL on this subject. The merger of Air India and Indian Airlines has caused serious concern amongst the officers and employees of both the companies. Even one year after the merger, there remains serious confusion about various issues relating to the service conditions, wage revision, promotion prospects, payment of pension and other allowances, etc. in the post-merger situation. Due to the absence of a clear line of command, the personnel of both the airlines are still working as employees of two separate airlines. Further, despite NACIL suffering a huge loss and a lot of talk of cost-cutting taking place, wasteful expenditure still occurred. The Committee, therefore, in order to understand these problems, decided to hear the representatives of the Unions/Associations of erstwhile Indian Airlines and Air India.

4.      Thereafter, the representatives of the Unions/Association expressed their views on different aspect of merger of the two Airlines and the resulting consequences. They were requested to supply facts/information to support their arguments/views expressed before the Committee in

59

writing, if they had not brought with them. They agreed to do so. The witnesses expressed their gratitude to the Committee for having given the opportunity to put their view before the Committee on the issues which they felt very concerned about.

5.     A verbatim record of the proceedings of the Meeting was kept.

6.     The Committee then adjourned at 5.30 P.M.

## XII
## TWELFTH  MEETING

The Committee met at 3.30 P.M. on Tuesday the 24th March, 2009 in Committee Room 'A', Ground Floor, Parliament House Annexe, New Delhi.

**MEMBERS PRESENT**

1. Shri Sitaram Yechury — *Chairman*

**RAJYA  SABHA**

2. Shri Naresh Gujral
3. Prof. Alka Balram Kshatriya
4. Shrimati Hema Malini
5. Shri Birendra Prasad Baishya
6. Shri Bhagat Singh Koshyari

**LOK SABHA**

7. Shri Joachim Baxla
8. Shri Alok Kumar Mehta

**SECRETARIAT**

Shri V.K. Agnihotri, Secretary-General

Shri N.K. Singh, Joint Secretary

Shri Jagdish Kumar, Joint Director

Shri Swarabji B., Deputy Director

Shrimati Nidhi Chaturvedi, Committee Officer

2. At the outset the Chairman of the Committee welcomed the Members. Thereafter, the Chairman informed the Members about the merger of Indian Airlines and Air India that was under consideration.

3. The Chairman briefed the members on the background of selection of this subject, meetings held and witnesses heard so far. Based on these discussions a detailed questionnaire was sent to the Ministry on the 25th September, 2008 for furnishing the replies. Despite repeated reminders, replies were given only on the 3rd February, 2009.

4. The Committee expressed its displeasure on the inordinate delay in submitting the replies due to which it could not consider the matter further. The Committee then decided that the next Committee, which will be constituted after the general elections, may examine the matter further after taking into account all the material facts and evidences available before the present Committee.

5.     *                              *                                                               \**

6. The Committee then adjourned at 4.20 P.M.

---

\*\*\* Relates to other matter not included in this Report.

# I
## FIRST  MEETING

The Committee met at 12.00 Noon on Tuesday the 15th September, 2009 in Committee Room 'A', Ground Floor, Parliament House Annexe, New Delhi.

**MEMBERS PRESENT**

1.  Shri Sitaram Yechury — *Chairman*

**RAJYA SABHA**

2.  Shri Ramdas Agarwal
3.  Shri Birendra Prasad Baishya
4.  Shri Shadi Lal Batra
5.  Shri Naresh Gujral
6.  Shri Syed Azeez Pasha
7.  Shri Satish Kumar Sharma
8.  Shri Vikram Verma

**LOK SABHA**

9.  Shrimati Bhavana Gawali Patil
10.  Shri Mahesh Joshi
11.  Shri P. Karunakaran
12.  Shri Jose K. Mani
13.  Shrimati Ranee Narah
14.  Shri Rajaram Pal
15.  Shri Nama Nageswara Rao
16.  Shri S.D. Shariq
17.  Shri Madan Lal Sharma
18.  Shri Dushyant Singh
19.  Shri Shatrughan Sinha
20.  Shri K. Sugumar
21.  Shri Kabir Suman
22.  Shri K.C. Venugopal

**SECRETARIAT**

Shri N.K. Singh, Joint Secretary

Shri Jagdish Kumar, Director

62

Shri Swarabji B., Joint Director

Shrimati Nidhi Chaturvedi, Assistant Director

\*                              \*                              \*

2.     The Chairman welcomed the Members of the newly constituted Committee. Thereafter, the Chairman requested the Members to introduce themselves.

3.     \*                              \*                              \*

4.     The Chairman also made a mention about the subject 'Functioning and Performance of NACIL', which the previous Committee could not take up for further consideration mainly because the Committee had ceased to exist due to dissolution of Lok Sabha. It was decided to take it up further.

5.     \*                              \*                              \*

6.     \*                              \*                              \*

7.     \*                              \*                              \*

8.     \*                              \*                              \*

9.     \*                              \*                              \*

10.    \*                              \*                              \*

11.    \*                              \*                              \*

12.    A verbatim record of proceedings of the meeting was kept.

13.    The Committee adjourned at 2.30 P.M. to meet again on the 24th September, 2009.

---

\*\*\* Relates to other matter not included in this Report.

# III
# THIRD  MEETING

The  Committee  met  at  12.00  Noon  on  Tuesday  the  20th  October,  2009  in  Committee  Room  No.  074,  Ground  Floor,  Parliament  Library  Building,  New  Delhi.

**MEMBERS PRESENT**

1.  Shri  Sitaram  Yechury  —  *Chairman*

**RAJYA  SABHA**

2.  Shri  Birendra  Prasad  Baishya
3.  Shri  Shadi  Lal  Batra
4.  Shri  Naresh  Gujral
5.  Shri  Syed  Azeez  Pasha
6.  Shri  Thomas  Sangma
7.  Shri  Satish  Kumar  Sharma
8.  Prof.  Saif-ud-Din  Soz
9.  Shri  Vikram  Verma

**LOK  SABHA**

10.  Shri  Mahesh  Joshi
11.  Shri  P.  Karunakaran
12.  Shri  Jose  K.  Mani
13.  Shrimati  Ranee  Narah
14.  Shri  Rajaram  Pal
15.  Shri  Nama  Nageswara  Rao
16.  Shri  S.D.  Shariq
17.  Shri  Madan  Lal  Sharma
18.  Shri  Dushyant  Singh
19.  Shri  Rakesh  Singh
20.  Shri  Shatrughan  Sinha
21.  Shri  K.  Sugumar
22.  Shri  Kabir  Suman

**SECRETARIAT**

Shri  N.K.  Singh,  Joint  Secretary
Shri  Jagdish  Kumar,  Director
Shri  Swarabji  B.,  Joint  Director
Shrimati  Nidhi  Chaturvedi,  Assistant  Director

64

**REPRESENTATIVES OF AIR CORPORATION EMPLOYEES UNION**

Shri D.K. Shetty, President

Shri J.B. Kadian, General-Secretary

Shri Anand Prakash

Shri Surender Kumar

**REPRESENTATIVES OF INDIAN AIRLINES OFFICERS ASSOCIATION**

Shri R.K. Chopra, General Secretary

Shri A.C. Mehta

Shri A.F. Toppo

**REPRESENTATIVES OF ALL INDIAN AIRCRAFT ENGINEERS ASSOCIATION**

Shri S.L. Usagaonkar, President

Shri Y.V. Raju, General Secretary

Shri Phool Kumar

**REPRESENTATIVES OF MINISTRY OF CIVIL AVIATION**

Shri M. Madhavan Nambiar, Secretary

Shri E.K. Bharat Bhushan, Additional Secretary and F.A.

Shri Prashant Sukul, Joint Secretary

Shrimati Abha Sukla, Director

**REPRESENTATIVES OF NACIL**

Shri Arvind Jadhav, CMD

Shri Anup K. Srivastava, Director (Personnel)

Shri Vipin K. Sharma, SBU Head MRO (E&C)

Shri K.M. Unni, SBU Head MRO (AF)

Shri S. Venkat, Co. Secretary and E.D.

Shri F.J. Vaz, E.D. (Commercial)

Shri T.K. Palit, E.D. (FP&IR)

Shri T.R. Ramachandran, E.D. (IR)

Shri P.P. Singh, COO(AICL)

Shri V. Srikrishnan, E.D. (Hqrs)

2.      The Chairman welcomed the members and the representatives of employees unions of NACIL and briefed them about the purpose of the meeting — to discuss the 'Functioning and Performance of NACIL'. He informed than the Committee had discussed this subject last year with the then Secretary, Ministry of Civil Aviation and CMD, NACIL on the 22nd August, 2008. Then also the Committee had heard various organizations/unions of erstwhile Indian Airlines and Air India at Delhi and Mumbai in September, 2008. Subsequently, a detailed questionnaire was sent on the 25th September, 2008. Due to late submission of replies by the Ministry and dissolution/election of

65

the new Lok Sabha in the intervening period, the Committee was not able to finalize its Report on the subject. Since number of developments had taken place thereafter, representatives of the various unions were called to elicit their views on the merger of the erstwhile Air India and Indian Airlines and its implications. They were also asked as to how they a turnaround can be brought in the ailing company.

3.      The representatives of the Air Corporation Employees Union, Indian Airlines Officers' Association and All India Aircraft Engineers Association attended the meeting, but those of Indian Commercial Pilot Association did not attend the meeting. Indian Commercial Pilot Association, however, submitted some papers for the Committee's consideration. The Union representatives were of the view that the merger of the two airlines *per se* was highly ill-conceived and done without consultations, as a result the things have gone from bad to worse. Two airlines, even after two years of the so called merger were functioning separately, without any integration of their operations, administration, etc. There are still wage disparities and losses are increasing. Wrong policies framed for leasing of aircrafts, rescheduling/withdrawal of flights from profitable routes, signing of bilaterals with foreign countries which are not in favour of NACIL, wrong deployment of aircrafts etc. were main causes of losses in NACIL. Further, the employee's seniority issue, non-payment of PLI, contract labour, surrender of allowances by employees were elaborated by them. The representatives assured that all the unions were committed to do their best to save the NACIL. The Chairman and Members raised queries on various issues and representatives of the Unions replied. The Chairman thanked the representatives for their inputs and requested them to provide written replies on the issues which remained unanswered during the meeting.

4.      The Committee then adjourned at 1.30 P.M. for lunch.

5.      The Committee again met at 3.00 P.M. to hear the views of the Secretary, Ministry of Civil Aviation and CMD, NACIL on the subject. The Chairman welcomed the officials of the Ministry and NACIL and asked them to apprise the Committee about the status of merger, and the proposals to resolve the issues arising after the merger of Indian Airlines and Air India. The Chairman asked the Secretary of the Ministry to explain various issues like derailment of merger process, creating three entities — Air India, Indian Aiilines and AI Express—instead of one, increase in losses, discontentment among staff, wage disparities, reasons for withdrawal from lucrative routes, acquisition of aircrafts, transfer of ground handling to private parties and leasing of aircrafts. The Secretary, Ministry of Civil Aviation briefed the Committee about the present status of merger of Air India and Indian Airlines. He informed that due to purchase of new aircrafts, huge payment is due and losses are more because of the overall recession and low passenger load and high ATF prices. Thereafter, CMD stated that various efforts were being made to save NACIL like maintaining high density route, diversification of business activities, outsourcing ground handling, problem of integration of IT systems of AI and IA. Further, the efforts relating to cost cuttings like cutting the salaries of the employees were explained to the Committee. The Chairman and Members raised several queries to which the officials replied. To some of the queries raised by Members, the Chairman directed the Ministry to furnish the written replies before the next meeting.

6.      The officials of the Ministry submitted that there were lot of issues whose replies could not be given due to paucity of time and requested that they might be given one more opportunity to clarify the position. The Committee, therefore, decided to meet again on 30th October, 2009 to

66

further hear the officials of Ministry of Civil Aviation on the issues relating to the merger of Air India and Indian Airlines.

7.     A verbatim record of proceedings of the meeting was kept.

8.     The Committee adjourned at 5.20 P.M. to meet again on 30th October, 2009.

## IV
## FOURTH  MEETING

The  Committee  met  at  11.00  A.M.  on  Friday  the  30th  October,  2009  in  Main  Committee  Room,  Ground  Floor,  Parliament  House,  New  Delhi.

**MEMBERS PRESENT**

1.  Shri  Sitaram  Yechury  —  *Chairman*

**RAJYA  SABHA**

2.  Shri  Ramdas  Agarwal
3.  Shri  Shadi  Lal  Batra
4.  Shri  Naresh  Gujral
5.  Prof.  Saif-ud-Din  Soz
6.  Shri  Vikram  Verma

**LOK  SABHA**

7.  Shrimati  Bhavana  Gawali  Patil
8.  Shri  Rajaram  Pal
9.  Shri  S.D.  Shariq
10.  Shri  Dushyant  Singh
11.  Shri  Jitendra  Singh
12.  Shri  Shatrughan  Sinha
13.  Shri  K.  Sugumar
14.  Shri  Kabir  Suman

**SECRETARIAT**

Shri  N.K.  Singh,  Joint  Secretary

Shri  Jagdish  Kumar,  Director

Shri  Swarabji  B.,  Joint  Director

Shrimati  Nidhi  Chaturvedi,  Assistant  Director

**REPRESENTATIVES OF MINISTRY OF CIVIL AVIATION**

(i)      Shri  M.  Madhavan  Nambiar,  Secretary

(ii)     Shri  Prashant  Sukul,  Joint  Secretary

(iii)    Shri  L.  Raja  Shekhar  Reddy,  Director

(iv)    Shrimati  Abha  Sukla,  Director

(v)     Ms.  Mausami  Chakravarty,  Director  (PIB)

68

**REPRESENTATIVES OF NACIL**

(i)      Shri  Arvind  Jadhav,  CMD

(ii)     Shri  Anup  K.  Srivastava,  Director  (Personnel)

(iii)    Shri  S.  Chandrasekhar,  Director  (Finance)

(iv)    Shri  Vipin  K.  Sharma,  SBU,  Head  MRO  (E&C)

(v)     Shri  K.M.  Unni,  SBU,  Head  MRO  (AF)

(vi)    Shri  S.K.  Kundra,  E.D.  (Finance)

(vii)   Shri  F.J.  Vaz,  E.D.  (Commercial)

(viii)  Shri  T.K.  Palit,  E.D.  (FP&IR)

(ix)    Shri  V.  Srikrishnan,  E.D.  (Hqrs)

(x)     Shri  R.D.  Singh,  E.A.  to  CMD

2.    The Chairman welcomed the members and informed that in the last meeting of the Committee a number of serious problems/issues came up for discussion with Secretary, Ministry of Civil Aviation, CMD, NACIL and the representatives of various unions of erstwhile Indian Airlines and Air India. This meeting has been called to further discuss those issues and also for providing more time to put further facts, proposals, explanations, etc. by the Ministry of Civil Aviation.

3.    The Chairman then welcomed the representatives of the Ministry of Civil Aviation and asked them to continue their presentation on the status of merger, details on the level of discussion with the employees union, etc. The Chairman also informed them that the issue of declared goods status to Air Turbine Fuel (ATF) was taken up with the Ministry of Finance and they have informed the Committee that it is not possible to accord 'declared goods' status to ATF as the Sales Tax on ATF is less than that of the Petrol and Diesel sold in the States. Further, the Committee took up the issue of extending credit facility to NACIL by Oil Marketing Companies with the Ministry of Petroleum and Natural Gas which informed that they are not ready for extension of credit facility for six months period as it may lead to an accumulation of outstanding to the tune of Rs.2400 crore and other private airlines will place a similar request as well.

4.    The Secretary, Civil Aviation gave overall picture of the global aviation industry and the measures some foreign airlines had taken in this regard and how the respective Governments had acted over the issue. Further he gave details on the issue of merger of the two national carriers and various meetings held with the Prime Minister and other Government Committees. Thereafter CMD, NACIL stated that efforts are being made to some revenue gaining measures such as ground handling services through a strategic Business United Model in the major airports of the country so that skilled staff of the airlines could be utilized more efficiently. He admitted that complaints are there regarding the services, support and ticketing issues and route planning, IT, integration etc. are on the way to overcome the issue. Renegotiation with the unions and representatives bodies will be held for common policy for promotion for harmonious settlement. Details on route dispersal guidelines and rationalisation of route was also explained. He also stated then now permission has been sought from DGCA to operate the flights with a single code so that major problem of ticketing of both the airlines could be sorted out. He also stated that same discussion are going on with foreign airlines to provide them ground support in India by the Air India Airlines Terminal Services (AIATS).

69

5.     The Chairman expressed his concern over the recent strike call by the pilots and the future of the airline revenue when the passengers will be diverted to other service providers in such cases.

6.     One of the Member pointed out an incident of recent flight cancellation where a fully loaded flight was cancelled as the airhostess were not available. Another Member had pointed out the delay in travel due to technical snag of the aircraft where the substitute aircraft also had gone out of order. The CMD assured that such incidents would not repeat in future and adequate measures had already been taken in that regard. The issue of posting of foreign pilots while many young pilots are jobless in the country and the training facilities to the domestic pilots was also raised by the Members. Some other issues like lease of Aircrafts, cancellation of routes, availability of similarities etc. also were discussed. The CMD, Air India also explained the difficulty in keeping different makes of aircraft and its operational hurdles. The Chairman and members raised several queries to which the officials replied. To some of the queries raised by the Members, the Chairman directed the Ministry to furnish the written replies. While summing up, the Chairman again expressed the concern and apprehension of the Committee on the issue.

7.     A verbatim record of the proceeding was kept.

8.     The meeting adjourned at 12.30 P.M. to meet again on 13th November.

# VII
# SEVENTH  MEETING

The Committee met at 11.30 A.M. on Friday the 8th January, 2010 in Committee Room, 'D', Ground Floor, Parliament House Annexe, New Delhi.

**MEMBERS PRESENT**

1.  Shri Sitaram Yechury — *Chairman*

**RAJYA  SABHA**

2.  Shri Ramdas Agarwal
3.  Shri Birendra Prasad Baishya
4.  Shri Shadi Lal Batra
5.  Shri Naresh Gujral
6.  Shri Syed Azeez Pasha
7.  Shri Thomas Sangma
8.  Prof. Saif-ud-Din Soz
9.  Shri Vikram Verma

**LOK  SABHA**

10.  Shri Mahesh Joshi
11.  Shri Jose K. Mani
12.  Shrimati Ranee Narah
13.  Shri Rajaram Pal
14.  Shri Bal Kumar Patel
15.  Shri S.D. Shariq
16.  Shri Madan Lal Sharma
17.  Shri K. Sugumar
18.  Shri Anurag Singh Thakur
19.  Shri Shatrughan Sinha
20.  Shri K.C. Venugopal

**SECRETARIAT**

Shri Jagdish Kumar, Director

Shri Swarabji B., Joint Director

Shrimati Nidhi Chaturvedi, Assistant Director

70

71

2.     The Chairman welcomed the Members of the Committee and extended New Year wishes to them. Thereafter, the Committee took up for consideration of the draft 151st Report on the 'Merger of Indian Airlines and Air India : Its impact on Civil Aviation Sector'. The Committee discussed the draft report in detail and Members suggested certain additions/modifications, which were incorporated. The Committee adopted the report with those modifications/suggestions.

3.     The Committee decided to present the Report to Hon'ble Chairman, Rajya Sabha during the inter session period and authorized its Chairman to present the Report to Hon'ble Chairman, Rajya Sabha. The Committee also desired that the Action Taken Notes from the Ministry of Civil Aviation on the report should be obtained before the Demands for Grants for the year 2010-2011 are taken up for consideration, to facilitate better scrutiny.

4.     While considering the draft report, the Committee noted the delay in providing the requisite information at various stages of consideration of the subject, which resulted in delay in preparation of report on the subject. The Committee desired the Ministry of Civil Aviation to be prompt in supplying information, etc., to it and responding to the communications sent by the Secretariat. The Committee directed the Secretariat to bring the observation to the notice of the Ministry of Civil Aviation.

5.     *                              *                              *

6.     *                              *                              *

7.     *                              *                              *

8.     A verbatim record of the proceedings was kept.

9.     The meeting adjourned at 1.40 P.M.

---

*** Relates to other matter not included in the Report.

**Printed at : Bengal Offset Works, 335 Khajoor Road, Karol Bagh, New Delhi-110005.**