# EXHIBIT 39



# R. v. Karigar, 2013 ONSC 5199 (CanLII)

| | |
|---|---|
| Date: | 2013-08-15 |
| File number: | 10-G30208 |
| Citation: | R. v. Karigar, 2013 ONSC 5199 (CanLII), <https://canlii.ca/t/g03dw>, retrieved on 2021-04-21 |

**CITATION:** R. v. Karigar 2013 ONSC 5199
**COURT FILE NO.:** 10-G30208
**DATE:** 20130815

**ONTARIO
SUPERIOR COURT OF JUSTICE**

**B E T W E E N:**

| | | |
|---|---|---|
| HER MAJESTY THE QUEEN | ))) | Moray Welch and Mark Seebaran for Her Majesty the Queen |
| - and - | )) | |
| NAZIR KARIGAR | ))) | Israel Gencher and Martin Reesink for Nazir Karigar |
| | ))) | **HEARD:** September 24, 25, October 1, 9, 10, 11, 16, November 13, 14, 15, 19, 2012 and March 27, 2013 (Ottawa) |

**HACKLAND R.S.J.  (Orally)**

**REASONS FOR JUDGMENT**
-

### Introduction

[1]     The accused Nazir Karigar (Mr. Karigar or the accused) is charged under the *Corruption of Foreign Public Officials Act* (S.C. 1998 c. 34), ("*CFPOA*"), with offering or agreeing to give or offer bribes to Air India officials and India's then Minister of Civil Aviation, in order to secure a major contract from Air India for the provision of facial recognition software and related equipment.  At the material times Mr. Karigar was acting as a paid agent for Cryptometrics Canada of Ottawa, Ontario and certain related companies.

[2]     The one count Indictment, as amended, reads as follows:

That he the said Nazir Karigar between June 1, 2005 and January 1, 2008, inclusively at the city of Ottawa in the said region and elsewhere in Canada and in the United States and in India, in order to obtain or retain an advantage in the course of business directly or indirectly give, offer or agree to give or offer, a loan, reward advantage or benefit to a foreign public official, to induce the official to use

his position to influence an act or decision of the foreign state for which the official performs duties or functions, contrary to section 3(1)(b) of the Corruption of Foreign Public Officials Act (S.C. 1998 c.34) and did thereby commit an indictable offence pursuant to section 3(2) of that Act.

[3]     The Crown's theory is that Mr. Karigar assumed a leading role in a conspiracy with several persons associated with Cryptometrics Canada and persons in India to bribe officials administering the bidding process on a tender issued by Air India, for the purpose of influencing them to award the contract to Cryptometrics Canada.  As events transpired, the contract was never awarded to Cryptometrics Canada or any entity represented by the accused.  However, there is a significant body of evidence that Mr. Karigar and certain others agreed to offer bribes to a targeted group of Air India officials and the Indian Minister of Civil Aviation.  The evidence establishes that Air India is a corporation owned and controlled by the Government of India and that the targeted officials fall within the definition of Foreign Public Officials under the CFPOA.

[4]      This case was defended primarily on the basis that the Crown failed to prove the existence of an agreement or conspiracy involving Mr. Karigar, particularly a conspiracy or agreement by which a particular foreign public official agreed to accept or receive a bribe in order to influence the award of this proposed contract.  The accused also argues that Canada lacks territorial jurisdiction over the offence charged herein.

**The Evidence**

[5]     The Crown's case was substantially based on the testimony of Robert Bell, who is an engineer and who at the material times was Vice-President, Business Development, for Cryptometrics Canada as well as on voluminous documentation, particularly e-mail communications, seized from computer hard drives situate at Cryptometrics Canada's offices in Kanata, a suburb of Ottawa.  Many of the e-mails were authored by the accused himself.  Certain other communications are dependant for their admissibility on the co-conspirator exception to the hearsay rule which, as discussed below, I find to be applicable in this case.  Mr. Karigar also made statements to a Canadian Trade Commissioner in Mumbai acknowledging the payment of bribes and made similar admissions in a statement he gave to the RCMP, which is acknowledged by him to have been provided voluntarily, as well as in correspondence he sent to the United States Justice Department.  The accused did not call evidence in this case.

[6]      I accept and rely on the evidence of Mr. Bell who was an unindicted co-conspirator and intimately involved in virtually the entire course of events.  He acknowledged that he was testifying under promise of immunity from prosecution.  He gave his evidence in a careful and under-stated manner and he was apparently on good terms with Mr. Karigar throughout these events and certainly displayed no animus toward him in his recital of events.  He was able to explain the documentation and the course of events in relation to the accused's participation in Cryptometrics Canada's efforts to win this contract.  The documentation largely served to corroborate what Mr. Bell had to say.  In essence, Mr. Bell handled the technical and some financial aspects of Cryptometrics Canada's bid on the Air India project, while the accused handled or advised on strategy to win the contract, including communications with Air India officials and in particular the offering of bribes as a means of winning the contract.  The two executives who were apparently making the ultimate strategic decisions throughout were Mario Berini, the Chief Operating Officer for Cryptometrics Canada and its parent company Cryptometrics Corporation and Robert Barra, who was Chief Executive Officer of these two related corporate entities.

[7]      Mr. Bell testified that in June of 2005 he was contacted by Mr. Karigar who indicated that he was President of IPCON, a firm that had done business in India.  Mr. Karigar said that he had good contacts with certain Air India officials and advised that the airline was looking to acquire technology to deal with airline security issues, particularly passenger identification fraud and possibly other related matters such as no-fly lists.  Discussion ensued as to whether Cryptometrics' facial recognition technology, based on a science known as biometrics, could provide a solution to the airline.  Subsequently, in September of 2005 Mr. Karigar and his colleague Mehul Shah met with Mr. Bell in Ottawa to discuss a passenger identification solution for Air India using Cryptometrics' technology.  The concept discussed was that Mr. Karigar and Mr. Shah would help Cryptometrics obtain this work from Air India in return for 30% of the expected revenue stream.

[8]     In September 2005 Mr. Bell travelled to Mumbai to explore this potential project.  While there he met the accused and his associates Mr. Shah, a Mr. Mehta and a Mr. Harish.  Mr. Karigar reiterated to Mr. Bell that he and his contacts had the necessary connections with Air India management and politicians to win the contract.  Mr. Karigar and Mr. Bell also met with Annie Dube, Canadian Assistant Trade Commissioner in Mumbai, to discuss doing business in India.  Mr. Karigar introduced Mr. Bell to senior Air India officials, in particular Mr. Gafoor, Air India's Director of Security and his Deputy, Captain Mascarenhas.  He gave a presentation on Cryptometrics Canada's facial recognition technology to 40-50 people in the Air India offices.

[9]     Over the course of the fall of 2005 Mr. Karigar forwarded to Mr. Bell considerable information pertaining to the expected requirements of Air India, including what might be characterized as inside information about proposed tender terms and competitors. By December 28, 2005 Mr. Bell and Cryptometrics Canada had been provided with a copy of the draft tender, which had not yet been issued by Air India.

[10]     On January 19, 2006 Mr. Gafoor and Captain Mascarenhas travelled with Mr. Karigar to visit Cryptometrics Canada in Kanata. Subsequently, a company named Cryptometrics India was established under the direction of the accused, with Mr. Shah as his assistant. Mr. Bell drew a contract officially hiring the accused as Executive Director of Cryptometrics India. Then, on February 24, 2006 Air India released its official Request for Proposal (RFP) to supply a biometric facial passenger ID security system. Shortly afterwards a revised RFP was issued by Air India extending the implementation period for the contract from 3 to 5 years and indicating that the lowest price bidder would receive the contract. Mr. Bell and Cryptometrics Canada then began to prepare a proposal in answer to the RFP. The evidence establishes that this was done under the executive direction of Mario Berini and with the guidance and strategic advice of the accused Mr. Karigar.

[11]     Mr. Bell testified that on April 16, 2006 he, Mr. Barini, Mr. Karigar and Messrs. Shah and Mehta met in a hotel room in India to discuss submission of the Cryptometrics' bid. At that time Mr. Shah raised the point that Indian officials would have to be paid in order to obtain the contract. This appears to be the first time that the payment of bribes was openly discussed in front of Mr. Bell. Shortly afterwards Mr. Bell was provided with financial spreadsheets which listed Air India officials who would be paid bribes and the amount of money and Cryptometrics' shares to be offered these officials. The accused subsequently admitted in a statement to the RCMP that he furnished this information reflected in the spreadsheets.

[12]     In the ensuing weeks Mr. Bell, in close contact with Mr. Barini, developed Cryptometrics Canada's proposal in response to the RFP. During this period Mr. Karigar provided Mr. Bell with inside information pertaining to potential competitors for the contract. In June of 2006 Mr. Bell, the accused and other representatives of Cryptometrics Canada visited India, met with the Canadian Deputy Trade Commissioner, performed certain presentations to Air India technical committee members and generally attempted to advance Cryptometrics' proposal.

[13]     Subsequently, under Mr. Karigar's direction and on his advice, the Cryptometrics team developed a second bid to be presented under the name IPCON (which was Mr. Karigar's firm) to create the appearance of a separate competitive bidder using Cryptometrics Canada technology, but at a much higher price. This was designed to give the false impression that there existed a competitive bidding situation. In the minds of the Cryptometrics team a competitive bidding situation provided Cryptometrics with certain procedural advantages in the bidding process over a sole sourcing scenario which would involve a more complicated and closely scrutinized process.

[14]     On June 19, 2006 Mr. Karigar e-mailed Mr. Bell and Mr. Barini in order to get $200,000 for Captain Mascarenhas, before he went to Italy to pick up certain shares which he was being issued. The evidence reveals that $200,000 was transferred from Cryptometrics U.S.A. to the accused's bank account in Mumbai and there is strong circumstantial evidence which satisfies me that this money was intended for the purpose of bribing Captain Mascarenhas.

[15]     I accept the Crown's submission that a number of aspects of the evidence in this trial show that Mr. Karigar was an active and knowledgeable part of a conspiracy to offer bribes to Air India officials to obtain the Air India contract. I quote and adopt these evidentiary references and find that they establish beyond a reasonable doubt the accused Mr. Karigar's involvement in a conspiracy to offer bribes to Air India officials in order to win this contract for Cryptometrics Canada.

- As noted previously in April, 2006, Bell, together with the accused Mr. Karigar and Berini, Shah & Mehta met in a hotel room in India to discuss the company's proposal. Shah advised that SPI (firm controlled or operated by Shah and the accused) required more money because officials would have to be paid in order to obtain the contract.

- Also as noted, soon after this meeting, a spreadsheet budgeting intended bribes to identified officials was circulated between Berini, Bell, Barra and Shah. The accused Mr. Karigar admitted in his statement to RCMP Sergeant Bedard that he was the initial author of the list of persons to be offered bribes and the amounts.

- On June 16, 2006, via e-mail, Mr. Karigar asked that arrangements be made to pay funds in regards to the selection of two companies (Cryptometrics Canada and IPCON) as the only compliant bidders so that the deal would "not get blown".

- On June 19, 2006, Mr. Karigar e-mailed Berini & Bell to get $200,000 for "the Captain", before he went to Italy to pick up his shares. The Captain figures on the spread-sheet as an individual who is to receive shares and "up front cash". The Captain was the co-chair of the selection committee for the Air India project.

- On June 21, 2006, Mr. Karigar e-mailed Berini, stating that the Captain and MMD "need to see the money", and that he needed it the following day. The same day $200,000 was transferred from Cryptometrics, U.S.A. to the bank account of Mr. Karigar in Mumbai.

- On July 18, 2006, Mr. Karigar told Berini and Bell that he was ready to push the short list but that MMD had problems with the valuation of the shares. The MMD is listed on the bribe spreadsheet as an individual who is to receive shares, as bribes.

- On or around August 3, 2006, IPCON and Cryptometrics were short-listed as the only two qualified bidders, as planned. Mr. Karigar informed Berini that the CMD was to be in New York and wanted $5000 spending money. He further stated that the Captain and the CMD were giving pressure about the "shares".

- On August 7, 2006, Mr. Karigar wrote to Barra and Berini on SPI letterhead to say that the selection had been completed, that Cryptometrics and IPCON were the two companies qualified and that Cryptometrics would win the commercial round because its price was substantially lower than that of IPCON.

- On September 3, 2006, Berini e-mailed Mr. Bell a copy of the draft Air India/ Cryptometrics Canada agreement and the latest version of the spread sheet. Berini and Bell discussed via e-mail how the bribes were to be amortized in order to maintain the profitability of the project.

- On March 6, 2007, Robert Barra, CEO of Cryptometrics Inc. (USA), and Mr. Karigar entered into a Letter of Agreement. The agreement provided that $250,000 USD in Indian Rupees was to be transferred to Mr. Karigar's bank account in Mumbai in order to secure the Air India contract (Tender # 42018). The agreement was entered into via e-mail correspondence. If the contract was not secured, the money was to be returned. The money was transferred from Cryptometrics to Mr. Karigar's bank account on that date.

- On April 17, 2007, Robert Barra asked Berini the following question by e-mail: "Are we finally going to receive the letter today from A.I.? It has been over 6 weeks. I can not understand these delays on a continuous basis. {...}". The six weeks referred to by Barra refers to the amount of time since the $250,000 transfer was made.

- On April 19, 2007, Berini (via e-mail) criticized Mr. Karigar for transferring the money to one Dhoble. He asserts this was a breach of contract. He demands the funds were to be returned to Cryptometrics Inc. asap. Mr. Karigar responds that he put the money in a secure place, "in escrow with Dhoble" to prevent "Tabby" from dipping into the funds to pay for school fees. The money could be wired back to Cryptometrics Inc. (USA) anytime. In a following e-mail, Mr. Karigar writes that he would recover the funds from Dhoble, but "I don't think Dhoble will react favourably to that. Please be advised that I have alerted you to this fact and the consequences are not my responsibility."

- On April 20, 2007, Mr. Karigar sent an e-mail saying that he had met with "PP". (PP stands for Praful Patel, the Minister of Civil Aviation). Mr. Karigar stated that he and Patel discussed the "increments" and that the project would be cleared right away.

- On May 15, 2007, Mr. Karigar and Dario Berini met with Annie Dubé at the Consulate General for Canada in Mumbai. During the meeting, Mr. Karigar stated that Cryptometrics had paid a bribe to Praful Patel (Minister of Civil Aviation – India) through an agent in order to clear the process and obtain the Air India contract. Mr. Karigar also stated that their agent confirmed the bribe money had been received by Patel. Mr. Karigar didn't disclose the identity of the agent, nor the amount of money that was paid. Mr. Karigar also talked about corruption in general in India and specifically how government figures would get up to 8% of the value of a contract as a bribe payment. Mr. Karigar stated "But we know he received the money" and "You didn't hear that from us". He continued that "we went to an agent and he received something. And we got information from the agent that the Minister received it." Dubé testified that she was shocked and expressed that they could be prosecuted (or sued).

- On July 12, 2007, Mr. Karigar sent an e-mail to Berini containing the following comments: "After PP took the money, I thought all was done and went ahead {...}". Karigar added: "I guess by now you

- know why Patel has the Cryptometrics Project on hold! {...}". Karigar made suggestions on how to get "Patel" back on board with Cryptometrics and stated the following: "someone needs to get all the separate thinking on one track and make it work... will need the backing of Thulasidas and Mehra, if you are in touch with Bankoti, ask him to dig out more about it." Mr. Karigar asked Dario Berini: "What have you done about the funds with PP? Have you asked and got them back?

- On July 28, 2007, Mr. Karigar sent an e-mail to Mr. Bell asking him to review a draft of an e-mail he was going to send to Dario Berini who seemed to have cut off all contact with him for the past two (2) weeks. He stated the following: I have no idea what your intentions are. I have been in touch with Wagchaure and Dhoble and they say they are ready and able to recover dues. I don't know if you want to take this route." Mr. Karigar explained that there was a lot he couldn't discuss via e-mail and wanted to meet with Dario Berini.

- On August 13, 2007, one "Buddy" sent an e-mail to the Fraud Section (FCPA) of the US Department of Justice stating he had information about US citizens paying bribes to foreign officers and inquired about reporting the matter. Mr. Karigar admitted that he is "Buddy" (Karigar's statement of 27 May, 2010 to RCMP).

- The accused Mr. Karigar ultimately described the scheme in an e-mail dated January 19, 2008, as follows:

*There was a tender put out by Air India (Government of India enterprise) for a biometric security system, Cryptometrics bid on the system.*

   1. *Cryptometrics Paid USD 200,000 to make sure that only 2 companies were technically qualifieds.*

   2. *They paid $250,000 for the minister to 'bless' the system. There are documents executed to return the funds if the contract is not awarded. There are recordings asking for the money back.*

   3. *The People involved are mr. Robert Barra, US citizen, CEO of Cryptometrics and Dario Berini, COO of Cryptometrics, also US Citizen.*

   4. *I am a Canadian Citizen on contract with the Canadian subsidiary of Cryptometrics.*

   5. *What about my immunity?*

- On September 4, 2007, Dario Berini sent an e-mail to Mr. Karigar, with a cc to Robert Barra. The e-mail was in regards to the delay in the approval of the Air India Tender and stated: "As you know, sizable investments were made to win the contract on top of winning this tender through the formal process. Cryptometrics will not extend itself further without assurances that the contract with AI will be formally awarded to Cryptometrics {...}".

- On November 2, 2007, Dario Berini and Robert Barra met with Shailesh Govindia, CEO of Emerging Markets Group (EMG) at the Cryptometrics Inc. office in New York, USA. Govindia was hired in another attempt to close the Air India deal. To make this happen, it was agreed that Cryptometrics Inc. (USA) would initially transfer $650,000 USD to Govindia: $500,000 USD would be given to Praful Patel and $150,000 USD was for Govindia's expenses. After the contract was approved / signed, Praful Patel would receive $1.5 million USD and Govindia would get $250,000 USD. They also discussed a "deferred success fee" of $2 million USD for Praful Patel and $1 million USD for Govindia / EMG. Robert Barra wanted Govindia to hold the funds until the contract was signed. He didn't want to see happen what happened last time.

- On November 9, 2007, $650,000 USD was transferred from Cryptometrics Inc. (USA) bank account to the account of EMG.

[16]    In my view, the foregoing events occurred as proven in the documentary evidence and lead to the inescapable conclusion, or proof beyond a reasonable doubt, that the accused conspired with Messrs. Berini and Barra representing Cryptometrics Inc. and Cryptometrics Canada Inc. and certain of his Mumbai based colleagues, to offer bribes to certain targeted Air India officials and the Minister of Civil Aviation for the purpose of obtaining the Air India contract.

[17]    The evidence discloses that the accused ultimately had a falling out with the principals behind the Cryptometrics' bid, Berini and Barra, with whom he was a co-conspirator in this bribery scheme. As discussed below, Mr. Karigar's disposition of the bribery funds is unclear. Berini and Barra lost trust in him and, as noted,

proceeded to attempt to have the contract awarded through further monetary bribes by way of funds sent from Cryptometrics to Shailesh Govindia.

[18]   During this period Cryptometrics also began a civil claim against Mr. Karigar in the U.S. courts to recover the last bribery advance of $250,000 and for his part Mr. Karigar was disclosing the bribery scheme to U.S. authorities by way of e-mails in which he uses the name "Buddy". On January 16, 2008 Mr. Karigar (under the name "Buddy") e-mailed the U.S. Justice Department alleging that Cryptometrics paid a half million dollars (U.S.) to procure a contract and to subvert the selection process. He advised that the money was sent through his account. In a further e-mail dated January 19, 2008 he advised that Cryptometrics paid $200,000 to make sure only two companies were technically qualified and then paid $250,000 for the Minister to "bless" the system. He said that the people involved were Barra and Berini and that he was on contract with the Canadian subsidiary of Cryptometrics. He again inquired about immunity.

**Co-Conspirators (or Common Purpose) Exception**

[19]   The test for admissibility of hearsay evidence of co-conspirators is set out by the Supreme Court of Canada in *R. v. Carter*, 1982 CanLII 35 (SCC), [1982] 1 S.C.R. 938. The court must first be satisfied on all the evidence that the Crown has established beyond a reasonable doubt that the conspiracy existed. If so, the court is to ask has the Crown established, using only the evidence directly admissible against the accused, on a balance of probabilities, that the accused is a member of the conspiracy. Only if the Crown has satisfied the court of these two elements will the hearsay evidence of the co-conspirators in furtherance of the conspiracy be admissible against the accused.

[20]   As noted, I am satisfied beyond a reasonable doubt that a conspiracy or agreement existed in this case to bribe Air India officials to obtain the contract in question and on the basis of Mr. Bell's evidence as well as the accused's own communications and statements, that the accused Mr. Karigar was a part of the conspiracy as a principal or at the very least as a party having promoted and organized the unlawful agreement to offer bribes, see *R. v. J.F.*, 2013 SCC 12 (CanLII), 2013 S.C.C. 12. As such the result is that the hearsay evidence of the actions of co-conspirators such as Berini, Barra and Shah in furtherance of the agreement are admissible against the accused. I would also view the evidence of Berini and Barra's attempts to pursue the contract by further bribes through Mr. Govindia as admissible against the accused on the basis that it constitutes further evidence of the existence of an agreement to offer bribes, notwithstanding the falling out with Mr. Karigar.

**"Agrees" to Give or Offer**

[21]   The accused argues that a contravention of s. 3(1)(b) of the *CFPOA* has not been proven by the Crown, having regard to the requirements of the *Act*. Specifically, s. 3(1) of the *Act* requires proof that a person "directly or indirectly gives, offers or agrees to give or offer..." a benefit to a foreign public official...

   ...

   (b)  to induce the official to use his or her position to influence any acts or decisions of the foreign state or public international organization for which the official performs duties or functions.


[22]   The accused submits that the word "agrees" as it appears in s. 3(1) of the *Act* should be given its ordinary meaning so as to apply to "the agreement of two people – one to pay a bribe and one to receive said bribe". The accused says that the Crown has based its case on two separate alleged bribes, one in the sum of $200,000 (US) in June 2006 and the other in the sum of $250,000 (US) in April 2007, but has failed to present any evidence regarding the payment of these sums to any improper recipient. It follows from this, in the submission of counsel for the accused, that the court cannot know whether any foreign public official was actually offered or received a bribe or other inducement, whether any such official was induced to use his or her position to influence any act or decision and whether any such official had any duties or functions which could be influenced by any such inducement. In short, in the absence of any evidence that a bribe was actually offered or paid to any official, how can the Crown have proven the requisites of the offence charged beyond a reasonable doubt?

[23]   I agree that there was no evidence as to what became of the two payments referred to above after the amounts were transferred from the bank account of Cryptometrics Inc. in New York to the accused's account in India. It is correct to say that there was no evidence as to what subsequently became of those two sums of money and in particular whether these funds were offered or paid to anyone who qualified as a foreign public official under the *Act*.

[24]     The position of the Crown is that no evidence of what actually became of the money is necessary to establish a violation of the *CFPOA*.  The Crown argues that incoate offences, in particular a conspiracy to pay bribes, as exists here, constitutes a violation of the *Act*.  It is pointed out that s. 3 of the *CFPOA* prohibits the giving, offering or the agreement to give or offer a bribe.  It does not prohibit the receipt of a bribe.

[25]     The Crown also submits that assistance in determining Parliament's intention in this regard can be gleaned from the requirements of the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("the *Convention*"), referred to in the preamble to the *CFPOA,* and to which Canada is a party.  The *Convention* requires Canada and other signatories to criminalize attempts and conspiracy to bribe a foreign public official to the same extent as such prohibitions apply to domestic public officials.

[26]     The wording of s. 3 of the *CFPOA* is consistent with the terms of Article 1 of the *Convention* which reads in part as follows:

> 1.     Each party shall take such measures as may be necessary to establish that it is a criminal offence under its law for any person intentionally to offer, promise or give any undue pecuniary or other advantage, whether directly or through intermediaries to a foreign public official...
>
> 2.     Each party shall take the measures necessary to establish that complicity in, including incitement, aiding and abetting, or authorization of an act of bribery of a foreign public official shall be a criminal offence.  Attempt and <u>conspiracy to bribe a foreign public official shall be criminal offences</u> to the same extents as attempt and conspiracy to bribe a public official of that Party.
>
>                                                                                                   (underlining added)

[27]     There would appear to be no jurisprudence interpreting the *CFPOA*.  This is the first prosecution under this *Act* which has proceeded to trial.

[28]     In any event, I am satisfied that a conspiracy or agreement to bribe foreign public officials is a violation of the *Act*.  The *actus reus* of this offence is the agreement to pursue an unlawful object.  The *CFPOA* specifies that an agreement is an element of the offence itself.  Section 3 (1) of the *Act* criminalizes the act of one who "... directly or indirectly gives, offers or <u>agrees</u> to give or offer... an advantage or benefit of any kind".  In my view, the use of the term "agrees" imports the concept of conspiracy into the *Act*.  In doing so, it meets Canada's obligations under the *Convention* to criminalize conspiracies to give or offer bribes to foreign public officials.

[29]     I also reject the accused's submission on a policy basis.  In my opinion if the word "agrees" in the *Act* is restricted to the act of essentially two parties, "one to pay the bribe and one to receive the bribe", the scope of the *Act* would be unduly restricted and its objectives defeated.  Moreover, to require proof of the offer of or receipt of a bribe and the identity of a particular recipient would require evidence from a foreign jurisdiction, possibly putting foreign nationals at risk and would make the legislation difficult if not impossible to enforce and possibly offend international comity.

[30]     The evidence in this case satisfies me beyond a reasonable doubt that all of the contemplated recipients of bribes, as identified in the spreadsheets and in the electronic communications between the accused and his co-conspirators, were employees of Air India or the Minister of Civil Aviation himself and as such were foreign public officials within the meaning of the *CFPOA*.

[31]     The accused also relies on s. 6 of Bill S-14, the *Fighting Foreign Corruption Act*, which is recent legislation introducing several amendments to the *CFPOA*.  This amending legislation was passed by Parliament on June 18, 2013 and received Royal Assent on June 19, 2013**.**   It is argued that the new *Act* only now makes conspiracy to offer bribes an offence.  The section provides:

> **6.** An information may be laid under section 504 of the *Criminal Code* in respect of an offence under this Act – or a conspiracy to commit, an attempt to commit, being an accessory after the fact in relation to, or any counselling in relation to, an offence under this Act – only by an officer of the Royal Canadian Mounted Police or any person designated as a peace officer under the *Royal Canadian Mounted Police Act.*

[32]     In my opinion, this provision is not intended to broaden the scope of the *CFPOA* to include conspiracy, not previously caught by the *Act*.  On the contrary, the new provision implies or assumes that conspiracies were and are caught by the *Act* and simply now provides exclusive authority to the RCMP to lay charges under the Act.  I agree

with and adopt the Library of Parliament's Legislative Summary of Bill S-14 (Publication No. 41-1-S14-E) 2013, as to the context and meaning of this clause.

> 2.6     EXCLUSIVE ABILITY TO LAY CHARGES (CLAUSES 2 AND 4)
>
> Clause 2 of the bill removes the definition of "peace officer" in the current CFPOA, which incorporates the definition from section 2 of the *Criminal Code*.  That definition is quite broad, including such persons as mayors, sheriffs, and bailiffs, in addition to police officers.  Clause 4 of the bill restricts the term "peace officer" to those so designated by the Commissioner of the Royal Canadian Mounted Police under section 7(1)(*d*) of the *Royal Canadian Mounted Police Act.*
>
> Clause 4, through the addition of a new section 6 to the CFPOA, provides exclusive authority to the RCMP to lay charges under the Act.

[33]     In summary, it is not necessary to establish a violation of s. 3 of the *CFPOA,* that a bribe be actually paid to a foreign official with the power to offer a business advantage.  Rather, it is sufficient if the party alleged to have paid a bribe to such an official believes that a bribe is being paid to such an official and that, otherwise, the *actus reus* of conspiracy is met.  In this case the evidence proves that Mr. Mr. Karigar believed that bribes needed to be paid as a cost of doing business in India and he agreed with Berini and others to pay such bribes.  He believed bribes were in fact paid and he said as much to the Deputy Trade Commissioner in Mumbai and to U.S. authorities and to the RCMP.

**Territorial Jurisdiction**

[34]     The accused argues that Canada lacks territorial jurisdiction to try this offence.

[35]     Bill S-14 has as one of its primary purposes to amend the *CFPOA* to establish "nationality jurisdiction" as a basis for Canadian Courts to exercise jurisdiction over persons accused of violating the *CFPOA*.  In other words, jurisdiction over the bribery of a foreign public official based on the nationality of the offender i.e. his or her Canadian citizenship, is a new jurisdictional basis similar to the court's jurisdiction currently exercised on this basis over certain sexual offences against children and terrorism offences.  However, these recent changes to the *Act* are not retroactive and do not apply to the present case.

[36]     Under the *CFPOA* applicable at the time of the trial of the present case, in order for this court to exercise jurisdiction over the offence, the Crown must prove that there was a "real and substantial link" between the offence and Canada, based on the principles set out by the Supreme Court of Canada *in Libman v. The Queen*, 1985 CanLII 51 (SCC), [1985] 2 S.C.R. 178.  I reviewed this issue in an earlier application for prohibition in the present case, see 2012 ONSC 2730.  I granted leave to the accused to raise the jurisdictional argument at trial at the close of the Crown's case.  It was agreed that the court would deal with the argument as a substantive defence.

[37]     The accused argues that in order for the *Libman* substantial connection test to be satisfied "the bulk of the elements of the offence must be grounded in Canada.  Reliance is placed on paragraph 74, page 39 of the *Libman* case, in which La Forest J. stated:

> As I see it, all that is necessary to make an offence subject to the jurisdiction of our courts is that a significant portion of the activities constituting that offence took place in Canada.

[38]     Based on this view of the substantial connection test, the accused emphasizes that the directing minds of this proposed business transaction i.e. the "pullers of financial strings" from an operational point of view (including approving and funding any bribes), were Messrs. Barra and Berini, who were based in New York.  The dealings with Air India officials, apart from two brief visits to Kanata, all occurred in India.  Any harm or unlawful consequences of the offence arising from the alleged bribes would arguably occur in India.

[39]     I do not accept this argument.  I am of the opinion that territorial jurisdiction is clearly established in this case.  The substantial connection test is not limited to the essential elements of the offence as submitted by the accused.  Moreover, one cannot segregate or otherwise deal with the bribery as a separate and discrete issue thereby excluding the legitimate aspects of the transaction from consideration in applying the substantial connection test.  As I observed in my earlier ruling in the prohibition application in this case, at paragraph 8:

> In *Libman*, after examining the British and Canadian jurisprudence on this subject, Justice La Forest held that the territorial basis for assuming jurisdiction was never applied rigidly in Canada.  He stated at pp. 212-213 that "all that is necessary to make an offence subject to the jurisdiction of our

courts is that a significant portion of the activities constituting that offence took place in Canada. …[I]t is sufficient that there be a "real and substantial link" between an offence and this country." The outer limits of the test, according to Justice La Forest, were "coterminous with the requirements of international comity": p. 213.

[40]     I accept the Crown's submission that the facts show a real and substantial connection to Canada.  When the accused first approached Cryptometrics Canada, a Canadian company based in Ottawa, Mr. Karigar was a Canadian businessman resident for many years in Toronto.  At all material times in reference to efforts to secure the Air India contract, he was employed by or/and acted as an agent of Cryptometrics Canada.  A Canadian company (Cryptometrics Canada) based in Ottawa was the contracting party.  Mr. Karigar and his co-conspirators contemplated obtaining work, and an unfair advantage, for a Canadian company or for a significant Canadian component of an International Company, as the fruit of a contract with Air India obtained through bribery.  Had the contract been awarded the evidence shows that a great deal of the work would be done by Cryptometrics Canada employees in Ottawa.  This scenario provides a sufficient substantial connection to confer jurisdiction on this Court over the bribery offence charged.

[41]      Further, in reference to the *Libman* test I see nothing about this prosecution which would offend international comity.  Canada is a signatory to the *Convention* and is obligated to enforce the *CFPOA*.  The *Convention* seeks to promote a level playing field for the pursuit of international business among member states.  If a Canadian company could obtain a contract through the use of bribes and not be prosecuted for it, the purpose of the *Convention* would be thwarted and Canada would be in violation of its obligations under the *Convention*.  Additionally, as the Crown points out, nearly all of the real evidence, principally documents and e-mails, was situate in Canada and was seized in Canada.  All of the witnesses who testified at trial were from Canada.

## Disposition

[42]     I am satisfied on the evidence beyond a reasonable doubt that the accused, Nazir Karigar, agreed with others to offer bribes to foreign public officials contrary to s. 3(1)(b) of the *CFPOA* and is therefore guilty of the offence charged.

_____

Mr. Justice Charles T. Hackland

**Released:**  August 15, 2013 (Orally)

CITATION: R. v. Karigar 2013 ONSC 5199
COURT FILE NO.: 10-G30208
DATE: 20130815

ONTARIO
SUPERIOR COURT OF JUSTICE

B E T W E E N:

HER MAJESTY THE QUEEN

– and –

NAZIR KARIGAR

_____

**REASONS FOR JUDGMENT**

_____

## HACKLAND R.S.J.

**Released:** August 15, 2013 (Orally)