# EXHIBIT 51

\*   **IN THE HIGH COURT OF DELHI AT NEW DELHI**

\+   **WP(C) No. 2302 of 2010**

Reserved on: 30th May, 2012
%   Pronounced on: 1st June, 2012

Centre For Public Interest Litigation                    … Petitioner
                    Through:   Mr. Prashant Bhushan, Mr.Pranav
                                    Sachdeva, Advocates

VERSUS

UNION OF INDIA & ORS.                          …Respondents
                    Through:   Mr. A.S. Chandhiok, ASG with
                                    Mr.Sumeet   Pushkarna,   Ms.
                                    Anjana Gosain, Advs. for UOI
                                    Mr. Parag P. Tripathi, ASG with
                                    Mr.Anuj  Bhandari,  Ms.  Tanu
                                    Priya,  Mr.  Mukesh  Kumar,
                                    Advocates for AAI
                                    Ms. Arpana Bhat, Adv. for R-4
                                    Mr. Gaurang Kanth, Adv. for R-5
                                    Mr.  P.K.  Sharma,  Mr.  Uday
                                    Prakash  Yadav,  Advs.  for
                                    Respondent No.7

**CORAM :-**
**HON'BLE THE ACTING CHIEF JUSTICE**
**HON'BLE MR. JUSTICE RAJIV SAHAI ENDLAW**

**<u>A.K. SIKRI, Acting Chief Justice</u>**

1.    The present petition is being filed by the petitioner by way of a
public   interest   litigation   alleging   deliberate   and   misdirected
decisions of the Ministry of Civil Aviation ( hereinafter referred to

as „MOCA‟) driving Air India (hereinafter referred to as „AI‟) and Indian Airlines ( hereinafter referred to as „IA‟) into heavy losses to the tune of thousand of crores.  As per the petitioner, these decisions have led to bail out plans by the Government at the cost of the exchequer and benefited various other entities such as private Indian and foreign airlines.  By way of this petition, the petitioner is seeking an investigation into this issue.

2.   Before dealing with the present case at hand we would like to trace out the history of the Airlines Industry in India:

3.   The erstwhile Air India (now termed as NACIL-A) and Indian Airlines (now termed as NACIL-I) were the initial two national carriers operating in India. They were established under the Air Corporations Act, 1953 to provide safe, efficient, economical and properly coordinated international and domestic air transport services.

4.   The undertakings of erstwhile Air India and Indian Airlines were transferred to and vested in Air India Limited and Indian Airlines Limited, Public limited Companies registered under the Companies Act, 1956 with effect from 1st March, 1994 subsequent to the enactment of the Air Corporations (Transfer of undertakings and repeal) Act,1994.

5.   Since then the aviation sector in India has undergone a substantial transformation in terms of growth accessibility and affordability. One of the major changes was the opening of Indian Skies to private players I the early 1990s, in the wake of „Open sky policy‟

of the government. This deregulation, in fact, led to new operators entering the aviation market that challenged the monopoly enjoyed by the government owned carriers in the aviation market. The competition so generated has resulted into reduced fares, increased seat availability and better service than available so far. Introduction of no frill Low Cost Carriers (LCCs) and a cut throat reduction in fares significantly dented the operations and profitability of the national carriers.

6.    It was then felt that in an increasingly consolidating global aviation environment, where ‚critical mass/size‟ is a key success factor, combining the two state owned airlines into a single merged entity would better equip them to survive and prosper amidst fierce global and domestic competition as it would provide an opportunity to leverage combined assets and capital better and build a stronger sustainable business.

7.    The theory of merger of airlines, till then an international phenomenon, therefore, started to be considered seriously in the aviation market. The concept of merge or perish, in fact, became the new mantra not only of the state owned but amongst private airlines also.

8.    It was against such a backdrop, the government of India announced a major policy decision to merge the two government carriers ‚Air India‟ and ‚Indian Airlines‟ into a single entity named as ‚National Aviation Company of India Limited‟ (NACIL). The merger process which was initiated in the year

2006, became effective from the 27th August, 2007. It was envisaged that operational synergies, redeployment of aircraft, route rationalization and optimal utilization of infrastructural resources would result in considerable profits for the company.

9.    So as to refurbish the image of erstwhile Air India Ltd. and Indian Airlines Ltd. went in for acquisition plan in the year 2005 primarily to replace its aging fleet. The last acquisition was done by erstwhile Indian Airlines ltd in 1989 and by erstwhile Air India ltd in 1993-94. The fleet acquisition program envisaged the purchase of 43 Airbus aircraft of erstwhile Indian Airlines Ltd. and 68 Boeing aircraft of the erstwhile Air India Ltd.  Out of these, 18 aircraft were allocated to Air India Charters Ltd. (Air India Express), the new low cost carrier to be operated as the wholly owned subsidiary of erstwhile Air India Ltd.

10.   The acquisition of 50 aircraft for the erstwhile Air India Ltd. and 18 aircraft for its subsidiary AICL was approved by the Empowered Group of Ministers (EGOM) chaired by the Finance Minister in December 2005. The EGOM had also approved a Government of India guarantee to support the financing for all the aircraft.

11.   The 50 long haul aircraft ordered were as follows:

-B777-200 LR – 8 in number

-B777-300 ER – 15 in number

-B787-8 aircraft – 27 in number

Out of the aforesaid, eight B777-200 LR (Long Range) and eleven B777-300 ER (Economic Range) have already joined NACIL˝s fleet. A decision was taken to defer the delivery of 3 B777-300 ER for next few years. Due to production delays the B787 aircraft which were to join the fleet in September 2008 were not delivered and NACIL has also filed a claim with Boeing for delay in induction of the B787 aircrafts.

12.     Even the erstwhile Indian Airlines ordered 43 Airbus Aircraft. The purchase agreements for these Aircrafts were signed with Airbus in February 2006. These ordered aircrafts have already joined the fleet of NACIL.

A.      **AIRCRAFT ACQUISITION PROGRAM**

13.     It is categorically alleged by the petitioner that the government went in for a huge fleet expansion program in which purchase orders for 111 aircraft were given without any proper study and without any transparency. These purchase orders were given costing a whopping thousand of crores. Loan was taken from US and Indian Banks to finance the same and today the airlines are deep in debt and suffering huge losses and it is basic the reason for the present annual losses. The approach of leasing the aircrafts is also questioned by the petitioner.

14.     Apart from this the petitioner has also pressed upon the decisions of the government granting major profit making routes and timings to one or two private airlines causing loss to market share

of the national carriers. Even foreign airlines were given unrestricted entry into India and major routes were given to them without taking any reciprocal benefits for Air India.

15.     It is not in dispute that these issues were raised by the two Parliamentary Committees namely Parliamentary Standing Committee on Transport, Tourism and Culture and the Committee on Public Undertakings in their Report. The petitioner has heavily relied on these reports but the Respondents have questioned the weightage to be given to these reports. It is submitted by the Respondents that these Committees act as Parliament‟s „watch dogs‟ over the executive. It is submitted that the reports of the committee, which are entitled to highest consideration, are not binding and mandatory and having regard to the fundamental principle of separation of powers, a PIL cannot be filed for the enforcement of such reports.

16.     The Parliamentary Standing Committee on Transport, Tourism and Culture has condemned the government on its acquisition program. The said Committee in a detailed and unanimous report dated 21.01.2010 has made the following observations:

    a.  *Aircraft Acquisition programme of the erstwhile Air India and Indian airlines were finalized in haste.*

    b.  *The entire Aircraft acquisition programme lacked transparency.*

    c.  *Reasons for going ahead with the purchases by the Ministry of Civil Aviation despite Air India and*

Indian Airlines not having the capacity to support it, remains unknown to the Committee.

d. It, therefore, recommends that this aspect needs to be further probed to fix responsibility for taking such an ambitious decision that has become a big financial liability.

17.  The Parliamentary Committee on Public Undertakings has also made the following observations:

The Committee is skeptical of NACIL"s request for Rs. 10,000 Crore capital in- fusion from the government towards fleet acquisition.  The Company, as well as the Government, have not presented any details of project financial closure for the acquisition projects of the erstwhile Indian and Air India, which were finalized before merger of the two airlines was even mooted.  The Committee feel that the lack of continuity of policies as is manifest in the failure of concerned entities to adhere to plans (made by predecessors in positions of authority) regarding the revenue sources for financing the acquisition projects reveal an underlying lack of sense of ownership and public responsibility.  The Committee is also concerned about the delay in the delivery of the more fuel efficient Boeing 787 and Airbus A-320/321/319 aircraft.

18.     The committee also observed that a lot of idle capacity is being allowed to exist in the company despite ambitious acquisition orders.

19.     In order to counter this contention the argument of the respondents is that the average age of fleets at that point of time was 15 years and any delay in the acquisition of the new fleets would have resulted to severe adverse effects on the operation of the airlines and would have made maintenance cost of such ageing fleets highly uneconomical besides causing serious passenger and aircraft safety issues and the approval for acquisition was granted by the Government after accepting the recommendations of different committees constituted for the same.

20.     It is thus submitted by the Respondents that the Aircraft acquisition was envisaged to improve the market share of the Airlines and avoid huge costs of maintenance.


**B.     LEASE OF AIRCRAFTS**

21.     It is also submitted by the Learned Counsel for the Petitioner that apart from the purchase of aircrafts, a large number of Aircrafts were taken on lease by Air India. NACIL adopted standard lease agreement drafts for taking Aircrafts on lease which did not have an early termination clause. In view of very low load because of large scale Aircraft acquisition, several flights, especially overseas flights, were running almost empty and at huge loss. NACIL could

not even terminate the lease agreements since in that case NACIL would have to pay all costs and all cost differentials.

22.   In this regard the Parliamentary Committee on Transport in its analysis concluded:

    a. *A decision to go for lease of Aircrafts was taken to increase market share without due considerations regarding proper route study and marketing or pricing strategy.*

    b. *The committee observes that the Aircrafts were dry/wet leased while Aircraft acquisition programme was going on. The committee feels that the aggressiveness shown in leasing of Aircrafts has now turned out to be an unviable proposition. It raises genuine doubts about the Government''s approach towards the whole issue.*

    c. *The committee could not comprehend why the NACIL Management and the Ministry of Civil Aviation went ahead after 2005 with the expensive proposition of leasing of aircrafts that to without any exit clause. The committee also notes that even after the new Aircraft delivery to NACIL, the company continued to lease Aircrafts or renewed the leases on some pretext or the other, which caused huge loss to the company at the time of recession, low seat factor and underutilization. All such decisions taken by the*

> *Management and the Ministry of Civil Aviation had ultimately resulted in big financial loss to the company.*
>
> d. *The committee recommends that all the lease agreement may be reviewed and appropriate action may be taken in cases where agreements were not based on sound business prudence.*

23.   It is submitted by the Respondents that leasing of Aircrafts was carried out after following due procedures in order to meet the urgent demand and to arrest the loss of market share of the two Airlines. So far as the early exit clause is concerned, it was contended by the Respondents that international lease agreements do not have an early exit clause and the need for an early exit has not arisen because of induction of new aircrafts but to minimize losses on account of sudden downfall in the aviation industry in 2008.

### C.   LOSS OF ROUTE AND MARKET SHARE

24.   Another submission of the learned counsel for the petitioner is that on the directions of the Civil Aviation Ministry Air India withdrew its services from major profit making routes and the biggest beneficiaries of this decision were the private operators as they took all those routes and a bigger market share. It was also brought to the notice of this court that Air India gave away its

routes to private and foreign operators without taking any reciprocal benefits.

25. The Parliamentary Committee on Transport has noted and recommended that:

    a. *Air India started to withdraw their services from lucrative and profit earning routes in the name of route rationalization and simultaneously opened door for private operators.*

    b. *Private operators were favored in the route dispersal guidelines and more and more bilateral were handed over to the private airlines on the platter.*

    c. *The committee recommends that the decision to open the highly lucrative international air markets to/from India may be probed by a suitable agency and all those bilateral must be reconsidered and reviewed and responsibility may be fixed for giving away the national rights.*

    d. *The committee strongly recommends that an enquiry may be conducted to find out why such a large number of bilateral were granted to foreign players.*

    e. *Committee apprehends that there appears to be a nexus operating to favor the private players.*

26. The Parliamentary Committee on Public Undertakings has recommended that:

> *The Committee feels that it is in the public interest for the Ministry of Civil Aviation to dispel any misgivings over transparency of route and time-slot allocations raised by allegations of favors being shown to private operators for some consideration or the other. The Committee, therefore, recommends that the Ministry of Civil Aviation should conduct a transparent review of the entire route and slot allocations, both in the domestic and international sectors, and effect necessary changes to ensure that NACIL is neither put at any disadvantage nor appear to be placed in any disadvantageous position.*

27.   In this regard the submission of the Respondents is that certain routes were withdrawn by NACIL in view of the losses incurred on these routes. The main reasons for losses are the high Air turbine fuel (ATF) cost, reduced demand and yields in the light of economic slowdown and excess capacity deployed in the market on these routes. It is also brought to the notice of this court that it was not only NACIL but other carrier withdrew from various routes due to heavy losses.

28.   As far as bi-lateral agreements with other countries are concerned, it is submitted that the Government has been adopting a calibrated approach towards granting further bi-lateral traffic rights keeping in view of the difficult financial situation being faced by Indian

Carriers particularly Air India in the recent past. The termination of the capacity entitlements is not possible, as it is specified in the MOU signed between the two countries and there is no provision of termination of the MOUs in isolation. Therefore, freezing or roll back of bi-lateral agreements is not possible.

**D.   CHANGE   OF   NAME   OF   'INDIAN   AIRLINES'   TO 'INDIAN'**

29.   Another contention raised by the petitioner is that the brand name of our domestic carrier „Indian Airlines‟ was in December 2005, for a brief period, changed  to „Indian‟. It was submitted that not only the name betrays a complete non application of mind, it was done at a huge cost as well.

30.   The Parliamentary Committee on public Undertakings has noted that:

> *The Committee note with concern that the merger of the erstwhile Indian Airlines and Air India was an ill-conceived and erroneous decision neither arrived at by the two Airlines on their own accord nor mutually considered by them to be in their best interests.  On the contrary, in the years preceding the merger, the two Airlines had finalized grandiloquent plans for acquisition of new fleet and had even placed orders in their efforts to revive their respective businesses which were at that point of time grappling with the*

*changed market scenario brought about by the
increasing private competition ushered in by the
Open Sky Policy.  At this juncture, Indian Airlines,
which had established unparalleled Brand recall
value across the country, was rebranded and
"Indian" suddenly appeared in the skies without any
convincing rationale drawing humongous costs from
the public exchequer. As all would well appreciate,
the importance of brand equity which is phenomenal
both in terms of goodwill and performance was
frittered away with this whimsical decision.*

31.     The Parliamentary Committee on Transport has noted as under:

*The government rechristened its brand as „Indian"
and started to repaint its Aircrafts. After merger into
NACIL, the brand name „Indian" has been replaced
with the brand name „Air India". Needless to say,
these costs have added to the operating cost of
NACIL. The committee feels that this branding and
rebranding exercises were wasteful expenditures.*

32.     The argument of the Respondents in this regard is that the new
look of the Airline was meant to communicate a bold striking
progressive and distinctive image for the airline. It is also
submitted that the decision of changing the brand name of

erstwhile Indian Airlines ltd. was much before the amalgamation of two entities i.e. "Indian Airlines" and "Air India". The issue of merger was not even at discussion stage during that time.

33.     Both the Committees have even condemned the Ministry of Civil Aviation for time and again blaming the rising fuel prices, world recession and salary to the employees for the present condition of the Airline.

**E.     INDEPENDENT REGULATOR**

34.      It is in the light of all these arguments raised by the Petitioner that the need for an independent regulator for the Civil Aviation Sector is highlighted by the Petitioner. An independent Regulator is also recommended by the Parliamentary Committee.

35.      Parliamentary Committee on Transport has noted and recommended:

> *The committee notes that presently there is no independent regulatory authority to regulate the allotment of routes, bi-laterals, social commitment of private players, operation of non viable routes etc. The committee, therefore, recommends that the government may consider formation of an independent regulatory authority to regulate the above subjects since the civil aviation sector in India has grown manifold in recent years.*

36.    On this aspect the submission of the Respondents is that the government has already established Directorate General of Civil Aviation (DGCA) as a principle regulatory body in the field of civil aviation in India. DGCA is responsible for regulation of air transport services to/from/within India, formulation and enforcement of civil aviation regulations, air safety, air worthiness standards and also standards and also coordinates all regulatory functions with International Civil Aviation Organisation (ICAO).

37.    It is also submitted that the provisions of Airport Economic Regulatory Authority Act, Government has also established an independent regulatory authority, namely Airport Economic Regulatory Authority (AERA).

## F.    INCOMPLETE MERGER

38.    The petitioner has conceded to the fact that in principal the merger of the two Airlines might not be a bad idea as the two Airlines can leverage each others" assets and need not duplicate many administrative costs and overheads. The merger was to be completed by 2009. But it is known and is also been noted by the two Parliamentary Committees that the said merger is only on paper.

39.    Parliamentary Committee on Transport has noted:

> *"Any further delay in merger is not going to do any favor for the ailing public carrier. Although more*

*than two years have laPACd, the merger is neither visible in the air nor on the ground"*

40.     Parliamentary Committee on Public Undertakings has observed:

"*The Committee is disconcerted to note that having imposed the merger of the two carriers, the Ministry has shown little initiative in monitoring the progress of the charted merger plan. Taking note of the fact that the CMDs of NACIL were frequently changed during the crucial two years period from the date of approval of merger by the Cabinet in March 2007, the Committee strongly deprecate the failure of the government for not ensuring the continuity of leadership in the nascent stages of the merger. The utter lack of sincerity on the part of the Ministry of Civil Aviation, the Committee feel, is manifest in their failure to ensure some continuity of leadership to the Company during its nascent stages of merger.*"

41.     The respondents have conceded that NACIL has completed the integration process in many of the areas but in some critical areas like man power integration below DGM level, Passenger Service System etc. the full integration is yet to be realized. It is also submitted that the recommendations of the Parliamentary Committees are very important for the Government and these would be implemented in due course.

## G.    REPORT OF CAG

42.     This Court vide order dated 12.05.2010 asked the Central Vigilance Commission (CVC) and the Comptroller and Auditor General of India (CAG) whether any action has been taken by them on issues raised in this petition.

43.     The CVC has not filed any response to the above petition but the CAG has examined the entire aspect of purchase of aircrafts and the role of the civil aviation ministry. The CAG has given a detailed „Performance Audit Report‟ on 17.08.2011 which in effect corroborates the observations of the Parliamentary Committees.

44.     It is submitted by the Petitioner that the said CAG report proves the role of the Government in revising the requirement projection of 28 Aircrafts for international travel to make it 68 Aircrafts and the fact that this was done without any study, in haste, and despite the concerns raised by the planning commission and from within the ministry. It is also submitted that as per the CAG the fleet expansion programme "does not withstand audit scrutiny" and was a recipe of disaster *ab initio* and should have raised alarm signals in the government.

45.     Some of the observations made by the CAG are as follows:

> a.  *Air India"s Project Report of January 2004 proposed acquisition of 28 aircrafts. However, by November 2004, Air India changed their fleet acquisition plan*

*and submitted a revised proposal for acquisition of 68 Aircrafts. The sequence of events upto November 2004 clearly demonstrates that the Air India hastily reworked its earlier acquisition plan and expanded its requirement. The increase in numbers does not withstand audit considering the market requirements obtaining then or forecast for the future as also the commercial viability projected to justify the acquisition. The acquisition appears to be supply-driven.*

b. *A programme which was under consideration from 1996 and took 8 years to progress upto Government level for purchase of 28 aircrafts suddenly picked up speed after August 2004 and by December 2005 Government signed contract with Boeing for 68 Aircrafts.*

c. *Many of the key assumptions underlying the revised project were flawed*

d. *No benchmarks for the cost of the Aircrafts were set before negotiations were initiated with the manufacturers.*

e. *The entire acquisition was funded through debt. This was a recipe for disaster ab initio.*

**H.   OUR ANALYSIS, SCOPE OF COURT'S INTERFERENCE AND CONCLUDING REMARKS**

46.   From the scope of the writ petition noted above, it becomes apparent that the petitioner in this petition is questioning the wisdom, propriety and legality of the various facets of the so called expansion program of the NACIL and the faulty manner in which it was executed.  The submission of the petitioner is that the entire program defies even the normal prudence which is expected of the Executive and gross violations at various stages without even proper study and lack of transparency proves that everything smacks of malafide, ulterior motives and ill intentions to seek personal gains at the cost of national resources and exchequer.  On this basis, submission is that it requires court's intervention and some directions are needed to remedy the fraud.

47.   We may state at the outset that how such business enterprise as the NACIL, even when it is Government controlled, is to function is the exclusive domain of the Executive and it is for the policy makers or those at the helm of affairs to take decisions in this behalf.  Courts are normally not required to go into the wisdom of such decisions that too business decisions.   Such commercial decision taken at a particular time, may at a later stage turn out to be imprudent or not commercially viable.  The decision makers can commit errors and simply because the decision turns out to be erroneous or commercially unviable would not be a reason enough to castigate the decision makers.

48.    However, the aforesaid well settled proposition of law is pregnated with a caveat, namely, the decisions taken should be bonafide and not actuated with ulterior motives, malafide or arbitrariness.  Courts have the power to look into this aspect of the decision making.  To bring home this point, it would be suffice to take note of the following observations of the Supreme Court contained in *Centre for Public Interest Litigation v. Union of India*, **(2012) 3 SCC 1**:

> "99.   In majority of judgments relied upon by learned Attorney General and Learned Counsel for the Respondents, it has been held that the power of judicial review should be exercised with great care and circumspection and the Court should not ordinarily interfere with the policy decisions of the Government in financial matters. There cannot be any quarrel with the proposition that the Court cannot substitute its opinion for the one formed by the experts in the particular field and due respect should be given to the wisdom of those who are entrusted with the task of framing the policies. We are also conscious of the fact that the Court should not interfere with the fiscal policies of the State. However, when it is clearly demonstrated that the policy framed by the State or its agency/instrumentality and/or its implementation is contrary to public interest or is violative of the

*constitutional principles, it is the duty of the Court to exercise its jurisdiction in larger public interest and reject the stock plea of the State that the scope of judicial review should not be exceeded beyond the recognised parameters.*

*100.   When matters like these are brought before the judicial constituent of the State by public spirited citizens, it becomes the duty of the Court to exercise its power in larger public interest and ensure that the institutional integrity is not compromised by those in whom the people have reposed trust and who have taken oath to discharge duties in accordance with the Constitution and the law without fear or favour, affection or ill will and who, as any other citizen, enjoy fundamental rights and, at the same time, are bound to perform the duties enumerated in Article 51A. Reference in this connection can usefully be made to the judgment of the three Judge Bench headed by Chief Justice Kapadia in Centre for P.I.L. v. Union of India, (2011) 4 SCC 1."*

49.   If it is found that there was misuse or colorable exercise of power and the decision depicts utter callousness, negligence and even the elementary aspects were overlooked, which every prudent decision maker is supposed to follow, adverse inference can be

drawn.  In such circumstances, Courts assume power to look into the propriety of such decisions, though the scope of interference by the Courts is limited.

50.   Keeping in mind the aforesaid parameters of judicial review of administrative action, we have examined the issues at hand. Learned counsel for the petitioner has argued that the actions of the Government in ordering the purchase of a large number of expensive aircrafts, without any study and with full knowledge that Air India is not in a position to pay for them, shows a complete application of mind and enters the arena of arbitrariness and malafides and is, therefore, repugnant to Article 14 of the Constitution.  It is pointed out that these acts of omission and commission have put Air India in deep debt and have made it incur huge losses, resulting in burdening the common man/tax payer and causing huge dent on the economy of this country.  It is also argued that the manner in which the Government deliberately gave up profit making routes and entered into various lease agreements, bye-laws, route rationalization, without taking reciprocal benefits for Air India have only benefited a few private parties at the cost of national careers causing them huge losses. All this was done, according to the petitioner, without having experts and professionals with experience in running the airlines which is against the basic norms and tenets of corporate governance.

51.     The legal enquiry in the form of judicial review into this aspect
        becomes available particularly when we find that the other wings
        of the Executive have themselves made comments on the issues
        raised by the petitioner and condemned the actions.  We have
        already pointed out the criticism not only of Parliamentary
        Committee on Transport, Parliamentary Committee on Public
        Undertakings but also the "Performance Audit Report dated 17th
        August, 2011" submitted by the Comptroller and Auditor General
        of India.  The comments and critique of these expert bodies put a
        big question mark on the bonafides of the Aircraft Requisition
        Programme , the lease of aircrafts, giving away the profitable air
        routes to the private airlines and retaining only loss making routes
        and even the unprofessional decision of merger of Indian Airlines
        and Air India.  Prima facie it appears that "**all is not well**".

52.     All this clearly amplifies and demonstrates that matter needs
        thorough examination and probe is required to see as to whether
        this was done by some particular persons for their personal gains.
        The matter is under examination of PAC.  It is the function of
        PAC to look into the financial irregularities which have landed
        NACIL in such a tight spot making it a huge loss making
        enterprise necessitating pumping of thousands of crores of rupees
        by the Government to resuscitate but also threatening the
        continuance and existence of NACIL.  Learned ASG informed us
        about the progress of the enquiry before the PAC.  The
        chronology of events of C&AG Report No.18 of 2011-12 of the

C&AG-Union Government (Civil Aviation) – Performance Audit of Civil Aviation in India given by the learned ASG reads as under:

| 1. | 19.11.2010 | DG (Commercial, C&AG vide her letter dated 15.11.2010 had forwarded a copy of Performance Audit of Civil Aviation in India for acceptance and comments of this Ministry. |
| --- | --- | --- |
| 2. | 19.11.2010 | Forwarded to Air India for furnishing their comments latest by 26.10.2010. |
| 3. | 07.12.2010 | Reminder sent to CMD, Air India. |
| 4. | 07.02.2011 | Based on inputs provided by Air India, para-wise comments both from Air India Management and Ministry's side were sent to C&AG. |
| 5. | 08.09.2011 | C&AG had laid the Report No.8 of 2011-12 on the Table of both the Houses of Parliament. |
| 6. | 05.10.2011 | C&AG Report No.18 of 2011-12 of the C&AG-Union Government (Civil) Performance Audit of Civil Aviation in India received in the Section though F.I. |

| | | Section. |
|---|---|---|
| 7. | 14.10.2011 | Lok Sabha Sectt., PAC Branch had forwarded a list of question for the examination. |
| 8. | 02.11.2011 | Point-wise replies to the questionnaire were forwarded to Lok Sabha Sectt., PAC Branch as well as copies of the same were also sent to C&AG and the Directorate of Audit for vetting as desired by Lok Sabha Sectt. |
| 9. | 25.11.2011 | O/o the Principal Director of Audit vide its letter dated 23.11.2011 has forwarded vetting comments with a request that the same may kindly be sent to Lok Sabha Sectt. As well as to C&AG. |
| 10. | 30.11.2011 | Vetting comments were sent to Air India for providing further comments. Reminder was also sent to AI on 20.12.2011. |
| 11. | 06.01.2012 | Lok Sabha Sectt. PAC Branch intimate that PAC (2011-12) will take oral evidence of the Ministry of Civil Aviation on 11.1.2012 at 14.30 hrs. |
| 12. | 17.01.2012 | Lok Sabha Sectt. Sent list of points arising |

| | | of oral evidence of the representatives of the Ministry dt. 11.01.2012. |
|---|---|---|
| 13. | 14.02.2012 | ATR sent to Lok Sabha Sectt. PAC Branch & C&AG. |
| 14. | 20.03.2012 | Vetting comments of C&AG received. |
| 15. | 27.04.2012 | Replies vetted by Audit and this Ministry's further comments to the list of points sent to Lok Sabha Sectt. |

The scope and functions of the PAC as well as the nature and scope of examination to be undertaken by the PAC makes the following reading:

> "The functions of the Committee, as enshrined in Rule 308(1) of the Rules of Procedure and Conduct of Business in Lok Sabha, include examination of accounts showing the appropriation of sums granted by Parliament for the expenditure of the Government of India, the annual finance accounts of the Government and such other accounts laid before the House as the Committee may think fit. In scrutinising the Appropriation Accounts of the Government of India and the Report of the Comptroller & Auditor

*General of India thereon, the Committee has to satisfy:*

*(a) that the moneys shown in the accounts as having been disbursed were legally available for, and applicable to, the service or purpose to which they have been applied or charged;*

*(b) that the expenditure conforms to the authority which governs it;*

*(c) that every re-appropriation has been made in accordance with the provisions made in this behalf under rules framed by competent authority.*

*It shall also be the duty of the Committee –*

*(a) to examine the statement of accounts showing the `income and expenditure of state corporations, trading and manufacturing schemes, concerns and projects together with the balance sheets and statements of profit and loss accounts which the President may have required to be prepared or are prepared under the provisions of the statutory rules regulating the financing of a particular corporation, trading or manufacturing scheme or concern or project and the report of the Comptroller and Auditor General thereon.*

*(b) to examine the statement of accounts showing the income and expenditure of autonomous and semi*

*autonomous bodies, the audit of which may be conducted by the Comptroller and Auditor General of India either under the directions of the President or by a statute of Parliament; and*

*(c) to consider the report of the Comptroller and Auditor General in cases where the President may have required him to conduct an audit of any receipts or to examine the accounts of stores and stocks.*

*If any money has been spent on any service during a financial year in excess of the amount granted by the House for that purpose the Committee shall examine with reference to the facts of each case the circumstances leading to such an excess and make such recommendation as it may deem fit.*

***Nature and Scope of Examination***.

*An important function of the Committee is to ascertain that money granted by Parliament has been spent by Government "within the scope of the demand." The implications of this phrase are that (i) money recorded as spent against the grant must not be more than the amount granted, (ii) the expenditure brought to account against a particular grant must be of such a nature as to warrant its record against the grant and against no other, and (iii) the grants should be*

spent on purposes which are set out in the detailed demand and they cannot be spent on "any new service not contemplated in the demand."  The functions of the Committee extent "beyond the formality of expenditure to its wisdom, faithfulness and economy". The Committee thus examines cases involving losses, nugatory expenditure and financial irregularities. When any case of proved negligence resulting in loss or extravagance is brought to the notice of the Committee, it calls upon the Ministry/Department concerned to explain what action, disciplinary or otherwise, it had taken to prevent a recurrence.  In such a case it can also record its opinion in the form of disapproval or pass strictures against the extravagance or lack of proper control by the Ministry or Department concerned.   Another important function of the Committee is the discussion on points of financial discipline and principle.  The detailed examination of questions involving principle and system is a leading and recognized function of the Committee.  The Committee is not concerned with questions of policy in the broad sense.  As a rule, it expresses no opinion on points of general policy, but it is within its jurisdiction to point out whether there

> *has been extravagance or waste in carrying out that policy."*

53.    Having regard to the aforesaid and the fact that a responsible committee like PAC is looking into the matter, we are not giving any directions at this stage ourselves but expect the PAC to look into the matter from all angles which will include examination on the following aspects as well:

(a)    Whether it was at all feasible and commercially viable decision to order purchase of so many aircrafts and then lease a large number of aircrafts.

(b)    Whether loss of market share by giving up profit making routes to the private airlines was deliberate and the role of senior officers of Civil Aviation Ministry and top management of NACIL.

(c)    If prima facie case of imprudence, gross negligence, hinting towards clear malafides, violation of settled procedure in taking the decision etc. is made out, it needs deep probing and investigation by the SIT/CBI.

(d)    Whether it would be feasible for the Government and NACIL to cancel purchase order of aircrafts for which payments have not been made and the aircrafts have not yet been delivered.

54.    Though no specific direction can be given to PAC to accomplish the task in a time bound manner, we hope and expect that having

regard to the importance and sensitivity of the matter, PAC shall try to complete its task with alacrity and submit their report at the earliest.

55.    In the meantime, the Government shall take decision on the following within six months from today:

    (i)    On the feasibility of cancelling the routes by lateral lease agreements, as per the recommendation of PAC.

    (ii)    On the feasibility of setting up a regulator for civil aviation sector as recommended by the Parliamentary Committee.

    (iii)    On the feasibility of appointment of only professionals and experts as CMD and Directors on the Board of NACIL as recommended by the PAC.

    (iv)    On effectuating and implementing the complete merger of Air India and Indian Airlines in a time bound manner, as recommended by the two Parliamentary Committees.

56.    With the aforesaid observations, the writ petition is disposed of.


**ACTING CHIEF JUSTICE**


**(RAJIV SAHAI ENDLAW)**
**JUDGE**

**JUNE 01, 2012**
pk